No. 2024-2351

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

REGENERON PHARMACEUTICALS, INC.,

*Plaintiff-Appellant*,

v.

MYLAN PHARMACEUTICALS INC., AMGEN USA, INC.,
BIOCON BIOLOGICS INC., CELLTRION, INC., FORMYCON AG,
AMGEN INC., SAMSUNG BIOEPIS CO., LTD., SANDOZ INC.,

*Defendants-Appellees.*

Appeal from the U.S. District Court for the Northern District of West Virginia
No. 1:24-md-3103-TSK, Chief Judge Thomas S. Kleeh

## DEFENDANT-APPELLEE AMGEN INC.'S NONCONFIDENTIAL OPPOSITION TO REGENERON'S MOTION FOR AN INJUNCTION PENDING APPEAL

Wendy Whiteford
Eric Agovino
Chanson Chang
Pauline Pelletier
AMGEN INC.
One Amgen Center Drive
Thousand Oaks, CA 91320
(805) 447-1000

Jeffrey A. Lamken
Robert K. Kry
Lucas M. Walker
Kayvon Ghayoumi
MOLOLAMKEN LLP
600 New Hampshire Ave., NW, Suite 500
Washington, D.C. 20037
(202) 556-2010

*Attorneys for Defendant-Appellee Amgen Inc.*
*(counsel listing continued on following page)*

E. Anthony Figg
Joseph A. Hynds
Jennifer Nock
Brett A. Postal
ROTHWELL, FIGG, ERNST,
  & MANBECK, P.C.
901 New York Avenue, NW
Suite 900 East
Washington, D.C. 20001
(202) 783-6040

John R. Labbe
Kevin M. Flowers
Thomas Burns
MARSHALL, GERSTEIN & BORUN LLP
233 South Wacker Drive
6300 Willis Tower
Chicago, IL 60606
(312) 474-6300

*Attorneys for Defendant-Appellee Amgen Inc.*

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

Case No. 24-2351
Regeneron Pharmaceuticals, Inc. v. Mylan Pharmaceuticals Inc.
Filing Party: Defendant-Appellee Amgen Inc.

1.   **Represented Entities.** The full names of all entities represented by undersigned counsel in this case. Fed. Cir. R. 47.4(a)(1).

   **Amgen Inc.**

2.   **Real Party in Interest.** The name of the real parties in interest (if the entities named above are not the real parties in interest). Fed. Cir. R. 47.4(a)(2).

   n/a

3.   **Parent Corporations and Stockholders.** All parent corporations and any publicly held companies that own 10 percent or more of the stock of the entities. Fed. Cir. R. 47.4(a)(3).

4.   **Legal Representatives.** The names of all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4)

   **PROSKAUER ROSE LLP**: Siegmund Y. Gutman; Shawn S. Ledingham, Jr.; Scott P. Cooper

   **BOWLES RICE LLP**: Stuart A. McMillan; Ashley Hardesty Odell; Kaitlyn N. McKitrick; Ryan Moore; Karly King

   **HENDRICKSON & LONG, PLLC**: John H. Tinney, Jr.

5.   **Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria of Fed. Cir. R. 47.5(a)?

   Yes. Please see separate Notice of Related Case Information.

6.    **Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

n/a

I certify that the information provided above is accurate and complete to the best of my knowledge.

Date: October 1, 2024                    /s/ Jeffrey A. Lamken
                                          Jeffrey A. Lamken

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ........................................................................1

BACKGROUND .........................................................................4

I.      The '865 Patent and the Parties' Products........................................4

II.     The District Court's Decision.........................................................5

ARGUMENT ..............................................................................7

I.      The District Court Properly Applied the *Becton* Presumption........................7

II.     Regeneron's Counterarguments Are Meritless ...............................11

      A.     The District Court's *Formycon* Ruling Is Irrelevant...........................11

      B.     The District Court's Injunctions Against Other Biosimilars Are Irrelevant ............................................................14

      C.     Regeneron Misstates the Applicable Legal Standards........................14

      D.     Regeneron's Position Has No Support in the Intrinsic Record...........16

      E.     Regeneron's Extrinsic Evidence Arguments Are Irrelevant and Wrong................................................................18

III.    The Equities Weigh Sharply Against an Injunction ......................20

IV.    Any Bond Must Be Sufficient To Compensate Amgen for the Enormous Losses It Faces ............................................................22

CONCLUSION ........................................................................24

# <u>CONFIDENTIAL MATERIAL OMITTED</u>

The material omitted on pages 3, 21, and 22 describes Regeneron's confidential business forecasts and strategies.  The material omitted on page 23 describes Amgen's confidential damages forecasts.

# TABLE OF AUTHORITIES

Page(s)

## CASES

Becton, Dickinson & Co. v. Tyco Healthcare Grp. L.P.,
    616 F.3d 1249 (Fed. Cir. 2010) ..................................................*passim*

Brown v. Shannon,
    61 U.S. 55 (1857)...............................................................................22

DexCom, Inc. v. Abbott Diabetes Care, Inc.,
    89 F.4th 1370 (Fed. Cir. 2024) ...........................................................7

Douglas Dynamics, LLC v. Buyers Prod. Co.,
    717 F.3d 1336 (Fed. Cir. 2013) .........................................................22

In re Glass,
    492 F.2d 1228 (C.C.P.A. 1974) .........................................................20

Google LLC v. EcoFactor, Inc.,
    92 F.4th 1049 (Fed. Cir. 2024) .........................................8, 15, 17, 18

HTC Corp. v. Cellular Commc'ns Equip., LLC,
    701 F. App'x 978 (Fed. Cir. 2017) .....................................................8

Inline Plastics Corp. v. Lacerta Grp., LLC,
    97 F.4th 889 (Fed. Cir. 2024) ...........................................................18

Kyocera Senco Indus. Tools Inc. v. ITC,
    22 F.4th 1369 (Fed. Cir. 2022) ...........................................1, 8, 9, 15

Mead Johnson & Co. v. Abbott Labs.,
    201 F.3d 883 (7th Cir. 2000) ............................................................22

NSK Corp. v. ITC,
    495 F. App'x 51 (Fed. Cir. 2012) .......................................................7

Phillips v. AWH Corp.,
    415 F.3d 1303 (Fed. Cir. 2005) (en banc) ...................................11, 18

Salt Lake Trib. Publ'g Co., LLC v. AT&T Corp.,
    320 F.3d 1081 (10th Cir. 2003) ........................................................21

*Sanofi-Synthelabo v. Apotex, Inc.*,
   470 F.3d 1368 (Fed. Cir. 2006) ...........................................................23

*Seabed Geosolutions (US) Inc. v. Magseis FF LLC*,
   8 F.4th 1285 (Fed. Cir. 2021) .............................................................11

*Sec. Sav. & Loan Ass'n v. United States*,
   983 F.2d 1085, 1992 WL 349334 (Fed. Cir. Oct. 14, 1992) .............7

*Second City Music, Inc. v. City of Chicago*,
   333 F.3d 846 (7th Cir. 2003) ..............................................................21

*SkinMedica, Inc. v. Histogen Inc.*,
   727 F.3d 1187 (Fed. Cir. 2013) ..........................................................17

*Standard Havens Prods., Inc. v. Gencor Indus., Inc.*,
   897 F.2d 511 (Fed. Cir. 1990) ............................................................13

*Sun Pharm. Indus. Ltd. v. Saptalis Pharms., LLC*,
   No. 18-cv-648, 2019 WL 2549267 (D. Del. June 19, 2019)..............9

*ViaTech Techs. Inc. v. Microsoft Corp.*,
   733 F. App'x 542 (Fed. Cir. 2018) ....................................................18

### STATUTES AND RULES

35 U.S.C. § 102(e) ...............................................................................19

35 U.S.C. § 112 ....................................................................................11

Fed. R. App. P. 8(a)(2)(E).....................................................................22

### OTHER AUTHORITIES

Wright & Miller, *Federal Practice and Procedure* (3d ed. rev. 2024) ...................21

## INTRODUCTION

The Court should deny an injunction pending appeal for a straightforward reason:  Amgen's product does not infringe the '865 patent.  The patent claims pharmaceutical formulations with **_four_** specific, separately listed structures: (1) a VEGF antagonist (aflibercept); (2) an organic co-solvent; (3) a buffer; and (4) a stabilizing agent.  Op.17-20 (citing Patent.19:29-34).[1]  Amgen's product does not have those four separate ingredients—only three.  As the district court recognized, "there is **_no dispute_** that ABP 938 does not contain a separate buffer."  Op.79 (emphasis added).  Instead, Amgen developed an innovative way to prepare and formulate the aflibercept that renders a separate buffer unnecessary.

The district court correctly applied this Court's decision in _Becton, Dickinson & Co. v. Tyco Healthcare Group L.P._, 616 F.3d 1249 (Fed. Cir. 2010), to hold that those facts preclude a finding of infringement.  _Becton_ establishes a clear rule: "Where a claim lists elements separately, 'the **_clear implication_** of the claim language' is that those elements are '**_distinct component[s]_**' of the patented invention."  616 F.3d at 1254 (emphasis added).  _Becton_ establishes a "**_presumption_** that . . . components are distinct."  _Kyocera Senco Indus. Tools Inc. v. ITC_, 22 F.4th 1369, 1382 (Fed. Cir. 2022) (emphasis added).  The district court faithfully applied

---

[1] "Op." refers to the district court's opinion (Add621-710).  "Patent" refers to the '865 patent (Add903-915).

those principles. It understood that the asserted claims list four distinct structural elements. It analyzed the intrinsic record and found nothing to overcome the *Becton* presumption that those separately listed elements require separate structures. And while the extrinsic evidence was irrelevant in light of that clear intrinsic record, that evidence supported Amgen's position too. The court properly concluded that Amgen's ***three***-structure formulation does not infringe claims that require ***four***.

Regeneron barely engages with the district court's thorough application of *Becton*. It primarily argues that this Court should enjoin Amgen pending appeal—costing Amgen millions of dollars per day—because the district court's claim construction supposedly conflicts with a preliminary claim construction the district court adopted in a different suit against Formycon, where the court construed "buffer" to include "proteins like aflibercept." Mot.7-8. But the district court correctly recognized that *Formycon* did not decide the issue here. The court held in this case that the '865 patent requires ***four separate structures***. That requirement was not at issue in *Formycon*: Formycon's product ***had*** four separate structures, including a separate buffer. Even if "proteins like aflibercept" could satisfy the buffer limitation, that would not change the fact that Amgen's product lacks a ***separate*** buffer ***in addition to*** the VEGF antagonist. Amgen's product has three distinct structures where the claims require four.

**Confidential Material Omitted**

Regeneron's effort to invoke *Formycon*'s preliminary claim construction is rather rich. In June 2023, before Regeneron learned about Amgen's formulation, Regeneron emphasized the need for four distinct structures when defending the patent's validity in its bench trial against Mylan. Only after Regeneron learned the details of Amgen's product in September 2023 did the words "proteins like aflibercept" find their way into Regeneron's sealed briefing in *Formycon*. Amgen was not a party to that case and had no access to that briefing at the time. And Formycon did not use "proteins like aflibercept" as a buffer—it thus lacked Amgen's clear incentive to dispute that specific language. Regeneron cannot prevail simply by procuring a favorable claim construction in another case against a different party.

The equities also favor Amgen. Regeneron has been aggressively steering Eylea customers toward its new Eylea HD product to avoid biosimilar competition. Regeneron cannot claim irreparable harm when its own strategies are causing Eylea's dwindling sales.

More fundamentally, those facts show that it is ***Amgen***, not Regeneron, that faces severe irreversible harm. According to Regeneron's own projections, if Amgen is kept off the market for even a few months, Regeneron will have converted about ▆▆▆ of its Eylea sales to Eylea HD. Once customers are converted to Eylea HD, they will be unlikely to purchase ABP 938: Amgen's product is a biosimilar for Eylea, not Eylea HD. Each day this Court leaves its injunction in place is another

day that Regeneron will use to thwart competition by steering customers away from the market its competitors seek to enter. Amgen's interests and the public interest weigh strongly against an injunction.

## **BACKGROUND**

### I. THE '865 PATENT AND THE PARTIES' PRODUCTS

This case concerns pharmaceutical formulations of the protein aflibercept, which the FDA has approved to treat serious eye disorders. Regeneron formerly held a patent for aflibercept, but that patent expired in June 2023. Supp.Add426 (Sheridan.Ex.3 at 24). Regeneron thus seeks to enforce a different patent that covers specific *formulations* of aflibercept.

The '865 patent claims products that contain *four* specific, separately listed structures: a VEGF antagonist (aflibercept), an organic co-solvent, a buffer, and a stabilizing agent. Op.17-20. The '865 patent recites each component as a separate limitation on a separate line:

> A vial comprising an ophthalmic formulation suitable for intravitreal administration that comprises:
>
>> [a] a vascular endothelial growth factor (VEGF) antagonist [*i.e.*, aflibercept,]
>>
>> [b] an organic co-solvent,
>>
>> [c] a buffer, and
>>
>> [d] a stabilizing agent . . . .

Patent.19:29-34.  Regeneron markets a product named Eylea that contains those *four* distinct components.  Op.4-5.

Amgen seeks to market a biosimilar product, ABP 938, that does *not* contain those four separate elements.  Unlike Eylea and all the other biosimilar products against which the '865 patent has been asserted, ABP 938 does not contain a buffer separate from the VEGF antagonist:

| Claim Elements | Regeneron EYLEA | Mylan YESAFILI | Formycon FYB203 | SB OPUVIZ | Celltrion CT-P42 | Amgen ABP 938 |
|---|---|---|---|---|---|---|
| **Active Ingredient** | | | | | | |
| VEGF Antagonist | 40 mg/ml aflibercept | 40 mg/ml aflibercept | 40 mg/ml aflibercept | 40 mg/ml aflibercept | 40 mg/ml aflibercept | 40 mg/ml aflibercept |
| **Excipients (*i.e.*, Ingredients Other than the Active Ingredient)** | | | | | | |
| Organic Co-Solvent | Polysorbate 20 | Polysorbate 20 | Polysorbate 20 | Polysorbate 20 | Polysorbate 20 | Polysorbate 80 |
| Buffer | Phosphate buffer | Histidine buffer | Histidine buffer | Phosphate Buffer | Histidine buffer | NONE |
| Stabilizing Agent | Sucrose | Trehalose | Sucrose | Sucrose | Trehalose | Sucrose / Trehalose |

Amgen Prelim. Inj. Opp. 1 (Dkt.180); Op.9-10.

Amgen discovered a way to prepare and formulate aflibercept so that a separate buffer is unnecessary.  Op.8.  Amgen's buffer-free formulation improves stability.  Supp.Add160-162 (Chamow Decl. ¶¶277-281).  The FDA approved ABP 938 on August 23, 2024, Supp.Add417 (Dkt.253-1), making it "the first FDA-approved *buffer-free* fusion protein formulation," Op.66 (emphasis added).

## II.    THE DISTRICT COURT'S DECISION

The district court denied Regeneron's motion for a preliminary injunction against commercial marketing of ABP 938.  In a thorough 90-page opinion, the court

5

held that Regeneron had not shown a likelihood of success of proving infringement because ABP 938 lacks the separate "buffer" required by the asserted claims. Op.79-81. Citing *Becton, Dickinson & Co. v. Tyco Healthcare Group LP*, 616 F.3d 1249 (Fed. Cir. 2010), the court explained that, where a claim lists separate structures, those structures are ***presumed*** to be distinct. Op.36-37. Here, the asserted claims list four separate structures: a VEGF antagonist, an organic co-solvent, a buffer, and a stabilizing agent. Those claims are thus ***presumed*** to require a separate structure for each element. *Id.* The court observed that "[t]here is ***no dispute*** that ABP 938 does not contain 'a buffer' that is separate from the other components listed in the claims, namely, the VEGF antagonist." Op.81 (emphasis added). Thus, unless Regeneron could overcome the *Becton* presumption, it was ***undisputed*** that ABP 938 would not infringe.

The district court correctly found that Regeneron did not overcome the *Becton* presumption. Nothing in the intrinsic record suggested that the claims reached formulations where the same substance acted as both the "VEGF antagonist" and the "buffer." To the contrary, ***every single example*** and ***every single embodiment*** requires a buffer separate from the VEGF antagonist. Op.37-57. Given that "clear and unambiguous" intrinsic evidence, there was no reason to consider extrinsic evidence. Op.61. But that evidence supported Amgen too. Op.62-77.

Having resolved the *Becton* issue in Amgen's favor, the district court did not resolve the separate dispute over whether the term "buffer" covered **any** substance that resisted changes to pH, even "proteins like aflibercept." Op.78-79. "Having determined that the claims require a 'buffer' that is separate from the 'VEGF antagonist,'" the court stated, "the Court **need not address** the proposed constructions of the term 'buffer.'" Op.78 (emphasis added).

## ARGUMENT

A party seeking an injunction pending appeal must satisfy "the traditional factors" governing injunctive relief—"the likelihood of success on the merits, the irreparable harm to the movant, the [balance of] injury to the other parties, and the public interest." *Sec. Sav. & Loan Ass'n v. United States*, 983 F.2d 1085, 1992 WL 349334, at *3 (Fed. Cir. Oct. 14, 1992) (table). A court "need not address the remaining preliminary injunction factors" where a party fails to show likelihood of success. *DexCom, Inc. v. Abbott Diabetes Care, Inc.*, 89 F.4th 1370, 1377 (Fed. Cir. 2024); *see NSK Corp. v. ITC*, 495 F. App'x 51, 53 (Fed. Cir. 2012) (denying injunction based solely on failure to show likelihood of success). Regeneron does not meet those requirements.

## I.   THE DISTRICT COURT PROPERLY APPLIED THE *BECTON* PRESUMPTION

Regeneron's motion fails at the first step:  The district court correctly found that Regeneron had not shown a likelihood of infringement.

The '865 patent lists four distinct structural limitations: a VEGF antagonist (aflibercept), an organic co-solvent, a buffer, and a stabilizing agent. Patent.19:29-34. As the district court recognized, "there is **no dispute** that ABP 938 does not contain a separate buffer." Op.79 (emphasis added). That absence of a separate buffer precludes infringement: Amgen's **three**-structure formulation does not infringe Regeneron's **four**-structure claim.

Regeneron argued below that the aflibercept itself could serve double duty, acting as both the "VEGF antagonist" and the "buffer." Op.35. But this Court's precedents foreclose that one-structure-meets-two-limitations theory. The Court's holding in *Becton, Dickinson & Co. v. Tyco Healthcare Group L.P.*, 616 F.3d 1249 (Fed. Cir. 2010), is clear: "Where a claim lists elements separately, 'the **clear implication** of the claim language' is that those elements are '**distinct component[s]**' of the patented invention." *Id.* at 1254 (emphasis added). *Becton* establishes a "**presumption** that . . . components are distinct" when "[t]he asserted claims list . . . elements separately." *Kyocera Senco Indus. Tools Inc. v. ITC*, 22 F.4th 1369, 1382 (Fed. Cir. 2022) (emphasis added); *see also Google LLC v. EcoFactor, Inc.*, 92 F.4th 1049, 1058 (Fed. Cir. 2024) (reaffirming "'presumption' that separately listed claim limitations may indicate separate and distinct physical structure"); *HTC Corp. v. Cellular Commc'ns Equip., LLC*, 701 F. App'x 978, 982 (Fed. Cir. 2017) ("The

8

separate naming of two structures in the claim strongly implies that the named entities are not one and the same structure.").

In *Becton*, the Court held that a claim that separately recited a "hinged arm" and a "spring means" required distinct structures. 616 F.3d at 1254. Nothing in the claims or specification suggested that "the hinged arm and the spring means [could] be the same structure." *Id.* Case after case applies the same rule. *See, e.g.*, *Kyocera*, 22 F.4th at 1382 ("safety contact element" and "exit end of the mechanism" required separate structures); *Sun Pharm. Indus. Ltd. v. Saptalis Pharms., LLC*, No. 18-cv-648, 2019 WL 2549267, at *6 (D. Del. June 19, 2019) (Bryson, J.) ("sweetener" and "polyhydroxy alcohol" required separate structures).

The '865 patent claims a formulation with four distinct components, each set forth on a separate line:

> A vial comprising an ophthalmic formulation suitable for intravitreal administration that comprises:
>
> > [a] a vascular endothelial growth factor (VEGF) antagonist [*i.e.*, aflibercept,]
> >
> > [b] an organic co-solvent,
> >
> > [c] a buffer, and
> >
> > [d] a stabilizing agent . . . .

Patent.19:29-34. That is precisely the sort of "claim [that] lists elements separately" to which the *Becton* presumption applies. 616 F.3d at 1254. Regeneron did not argue otherwise below: "The parties' dispute is not whether the claims list these

9

four elements separately, or whether the presumption applies, but whether this presumption is rebutted by the evidence of record." Op.37.

Regeneron previously read its claims the same way. In its opening arguments in the *Mylan* bench trial before the same judge, Regeneron urged:

> Our claim . . . is full of structural limitation. It has to have aflibercept. That's a structure. Organic cosolvent. Buffer. Stabilizing agent. ***Those are all structures that limit what formulations are in the claim. If you don't have an organic cosolvent or a buffer, you're out of our claim.***

Supp.Add258 (Chamow Ex.C-3 at 33) (emphasis added). Only after learning of Amgen's formulation did Regeneron switch positions.

The district court properly rejected Regeneron's attempt to overcome the *Becton* presumption. The intrinsic record, it held, is "clear and unambiguous." Op.61. The claims contain no hint that the VEGF antagonist itself could play the role of the buffer. Op.37-57. Certain dependent claims specify concentrations that ***preclude*** the VEGF antagonist from acting as the buffer too. Op.40-42.

The specification points the same way. ***Every one*** of the eight examples and ***every one*** of the twenty-two other embodiments has a VEGF antagonist ***plus*** a separate buffer. Op.45-46. In all but two embodiments, the buffer is "phosphate"— not a protein like aflibercept. Op.46. In the remaining two embodiments, the patent specifies concentrations for the VEGF antagonist and the buffer that are ***mutually inconsistent***, precluding a single substance from acting as both. Op.46-47. Nothing

anywhere in the specification remotely hints that the VEGF antagonist can also be the buffer. Reading the claims so broadly would invalidate the patent for lack of written description under §112.

Because the "clear and unambiguous" intrinsic evidence fails to overcome the *Becton* presumption, Regeneron's extrinsic evidence is irrelevant. Op.61. The *intrinsic* record is "the single best guide to the meaning of a disputed term" and is usually "dispositive." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (en banc). Extrinsic evidence cannot alter "the meaning of a claim term [that] is clear from the intrinsic evidence." *Seabed Geosolutions (US) Inc. v. Magseis FF LLC*, 8 F.4th 1285, 1287 (Fed. Cir. 2021). But "for completeness," the district court examined the extrinsic evidence and found that it supported Amgen too. Op.62-77. That evidence showed that aflibercept was not "known as (or understood to be) a buffer in a pharmaceutical composition during the relevant timeframe." Op.66.

Regeneron shows no clear error in those findings. Nor does it show any other error that would justify the extraordinary step of enjoining Amgen pending appeal.

## II.    REGENERON'S COUNTERARGUMENTS ARE MERITLESS

None of Regeneron's arguments casts doubt on the district court's decision.

### A.    The District Court's *Formycon* Ruling Is Irrelevant

Bizarrely, the centerpiece of Regeneron's argument for an injunction pending appeal is ***not*** that the district court departed from ***this Court's*** precedents.

Regeneron instead demands an injunction because the district court's decision supposedly conflicts with the ***district court's own*** preliminary claim construction in a case against another defendant, Formycon. *See, e.g.*, Mot.2, 3-4, 7-8. That argument is unfounded and irrelevant.

In *Formycon*, the district court adopted a preliminary claim construction of "buffer" to mean "a substance that resists changes to pH . . . including, for example, histidine, phosphate, and ***proteins like aflibercept***." Op.26 (emphasis added). Contrary to Regeneron's argument, that construction is ***not*** inconsistent with the court's decision here. The court denied an injunction here because, under *Becton*, the '865 patent requires four separate structures—one structure cannot meet two different limitations. Op.33-77. That "separate structure" presumption was not at issue in *Formycon*, where the accused formulation included four different structures. Op.9-10, 26-27. *Becton*'s separate structure requirement is logically distinct from whether "proteins like aflibercept" can be buffers. Even if "proteins like aflibercept" could be buffers (despite nothing in the specification remotely disclosing that use), that would not mean that a single structure (whether proteins like aflibercept or anything else) can be ***both*** the "VEGF antagonist" ***and*** the "buffer" under the claims.

The district court thus recognized that *Formycon* "did not address the claim construction issue" that was dispositive here. Op.27. Consequently, after spending 44 pages addressing the *Becton* issue, the court held that it "***need not address***

12

[Regeneron's] proposed construction[ ] of the term 'buffer' " to include "proteins like aflibercept."   Op.78 (emphasis added).   Regeneron's argument that the court "conclud[ed] . . . that [the buffer] could not be a VEGF antagonist like aflibercept" (Mot.9) ignores what the court plainly said.

Even if the district court's ruling here were inconsistent with its preliminary construction in *Formycon*, that would not be grounds for an injunction pending appeal.   Regeneron must show it is "likely to succeed on the merits" of the appeal. *Standard Havens Prods., Inc. v. Gencor Indus., Inc.*, 897 F.2d 511, 512 (Fed. Cir. 1990).   The district court's prior ruling is no more binding on this Court than its current one.   Any inconsistency would merely mean that ***one*** of the two rulings is wrong.   As shown above, the ruling here is the correct one.

The preliminary claim construction in *Formycon*, moreover, was not the product of any traditional adversary proceeding.   The district court adopted its "proteins like aflibercept" construction because Regeneron, after learning the details of Amgen's formulation, slipped that language into a sealed brief.   Op.26; No. 23-97, Dkt.101 (N.D.W. Va. Feb. 22, 2024).   Amgen had no opportunity to object:   It was not a party to *Formycon* and had no access to the sealed filings at the time.   And Formycon had no comparable incentive to vigorously contest that specific language: Formycon used histidine, not "proteins like aflibercept," as a buffer.   Op.26.

13

The district court's preliminary construction in *Formycon* thus deserves precisely zero weight.  It certainly does not justify an injunction pending appeal.

## B.     The District Court's Injunctions Against Other Biosimilars Are Irrelevant

Regeneron invokes the district court's injunctions against other Eylea biosimilars.  *See, e.g.*, Mot.1, 5, 7.  As the court recognized, however, Amgen's product differs in a critical respect.  Every other biosimilar has a separate buffer, either phosphate or histidine.  Op.9-10.  Amgen's product is the ***only one*** that has no separate buffer—it is the ***only product*** for which Regeneron must rely on its theory that the aflibercept itself can serve double duty as the separately recited "VEGF antagonist" and "buffer."

Regeneron's victories against other products are thus beside the point. Infringement is a product-specific inquiry.  The fact that a district court finds some products infringing and others non-infringing casts no doubt on its rulings.  The different outcomes merely confirm that the court was attentive to the unique attributes of each product.

## C.     Regeneron Misstates the Applicable Legal Standards

To the extent Regeneron even addresses *Becton*, it erroneously tries to water the decision down.  In Regeneron's view, *Becton* applies only when allowing a single structure to meet multiple claim elements would be "nonsensical" or a "physical impossibility."  Mot.17.  That is not what *Becton* held.  Under *Becton*, the

mere fact that a "claim lists elements separately" is sufficient to create a "'clear implication' . . . that those elements are 'distinct component[s].'" 616 F.3d at 1254. The Court's observation later in the opinion that the plaintiff's construction would produce "nonsensical" results and a "physical impossibility" was an ***additional*** ground for rejecting the construction, in the nature of an alternative holding. *Id.* at 1255. The Court did not suggest that "nonsensical" results or "physical impossibility" were necessary to invoke the presumption in the first place.

This Court's later cases read *Becton* the same way. The presumption of separate structures arises from the listing of separate claim elements and does not require any additional showing of nonsensicality or impossibility. *See, e.g.*, *Kyocera*, 22 F.4th at 1382 (presumption applies where "[t]he asserted claims list . . . elements separately"); *Google*, 92 F.4th at 1058 (similar).

Regeneron points to *Google*'s observation that *Becton* did not establish a "*per se* rule." Mot.17 (quoting 92 F.4th at 1058). But the district court did not treat *Becton* as a *per se* rule. It treated *Becton* as a ***presumption*** and then spent 40 pages methodically analyzing whether Regeneron had overcome that presumption. Op.37-77. *Google* illustrates the sort of facts that might overcome the presumption: There, the claim language itself suggested that a single structure could satisfy multiple limitations, and the specification disclosed an embodiment where the elements were not distinct. 92 F.4th at 1057-59. There is nothing similar here.

15

### D.     Regeneron's Position Has No Support in the Intrinsic Record

Regeneron fails to show that the intrinsic record overcomes the *Becton* presumption.  Mot.18-19.  Regeneron does not contend that the '865 patent discloses any embodiment in which a formulation relies on the VEGF antagonist to satisfy multiple elements of the four-structure claim.  Instead, its argument goes as follows.  The '865 patent specification identifies glycerol as a potential "stabilizing agent."  Patent.2:44-5.  Elsewhere, in the separate "Background of Invention" section, the specification states: "Ophthalmic formulations are known, see for example, U.S. Pat. Nos. 7,033,604 and 6,777,429."  Patent.2:1-2.  The cited '429 patent, in turn, mentions glycerol as a "non-ionic tonicity agent."  U.S. Patent No. 6,777,429 at 1:25.  Of course, "tonicity agent" is not one of the four structures at issue, although it is mentioned in certain ***unasserted*** dependent claims of the '865 patent.  *See, e.g.*, Patent.19:66-67, 20:49-50.  Regeneron's convoluted theory seems to be that someone reading the '865 patent together with the allegedly incorporated '429 patent would have realized that glycerol could act as either a stabilizing agent or a tonicity agent, and somehow would have inferred from this revelation that the '865 patent's list of four separate structures was intended to claim formulations in which the VEGF antagonist also acts as the buffer.

The district court correctly rejected that strained argument.  Op.47-49.  As an initial matter, one fleeting citation to another patent does not incorporate everything

16

mentioned in that other patent for every conceivable purpose. *See SkinMedica, Inc. v. Histogen Inc.*, 727 F.3d 1187, 1207 (Fed. Cir. 2013) (rejecting incorporation argument where inventors "did not indicate their reference to Doyle was for [the asserted] purpose" and did not "refer with any detailed particularity to the [relevant] passages"). No one would reasonably interpret the '865 patent's nebulous phrase "Ophthalmic formulations are known" as an invitation to hunt through the '429 patent for various compounds, compare them to compounds in the '865 patent, and extrapolate conclusions about whether the VEGF antagonist could perform double duty in the '865 patent.

Regardless, the '429 patent does not bear on the issue here. The relevant question is not whether someone skilled in the art would appreciate, in the abstract, that one substance can have multiple uses. The question is whether the '865 patent's list of four separate structures, each as a separate limitation, covers formulations with just *three* of those four structures, on the theory that one structure can satisfy two limitations at once. Unlike, say, an embodiment in the specification that shows that the inventors affirmatively meant to *claim* double-duty structures (*cf. Google*, 92 F.4th at 1057-59), the mere fact that a cross-referenced patent *mentions* that a substance can be used for a different purpose casts no light on whether claims that

recite multiple elements require separate structures.  It certainly does not show that the ***active protein*** can serve double duty as the separately recited "buffer."[2]

### E.  Regeneron's Extrinsic Evidence Arguments Are Irrelevant and Wrong

Regeneron's resort to extrinsic evidence similarly fails.  For one thing, the district court considered the intrinsic record sufficiently "clear and unambiguous" to resolve this case.  Op.61.  The court evaluated the extrinsic evidence only "for completeness."  Op.62.  And rightly so:  The intrinsic record is "the single best guide to the meaning of a disputed term" and is usually "dispositive."  *Phillips*, 415 F.3d at 1315; *cf. Google*, 92 F.4th at 1057-59 (relying solely on intrinsic evidence).  Any disagreement with the court's assessment of the extrinsic evidence thus cannot justify an injunction pending appeal, because it did not affect the outcome.

Regeneron also ignores the demanding standard of review it faces.  This Court reviews "subsidiary factual determinations based on extrinsic evidence" only for "clear error."  *Inline Plastics Corp. v. Lacerta Grp., LLC*, 97 F.4th 889, 901 (Fed. Cir. 2024).  Regeneron cannot obtain an injunction merely by showing that another court could evaluate the extrinsic evidence differently.

---

[2] Regeneron makes a similar argument based on U.S. Patent No. 6,676,941.  Mot.19.  But Regeneron forfeited that argument by raising it only in an expert declaration below.  Add37 (Trout Decl. ¶81); *see ViaTech Techs. Inc. v. Microsoft Corp.*, 733 F. App'x 542, 552 (Fed. Cir. 2018).  In any event, the argument fails for the same reasons as the '429 patent argument.

In any event, Regeneron fails to show error, much less clear error, in the district court's findings. Regeneron points to instances where Amgen's expert acknowledged that some excipients could perform multiple functions. Mot.20-21. But no one disputes that substances *can* have multiple functions. The issue is whether the '865 patent *claims* those formulations. *See* Op.70-74 (rejecting Regeneron's reliance on this expert testimony).

The cited testimony is particularly uninformative on whether *aflibercept* can serve as both the "VEGF antagonist" and the "buffer." Regeneron argues that the buffering properties of proteins were well-known. Mot.10-11. But the district court found that "the evidence does not show that aflibercept was known as (or understood to be) a buffer in a pharmaceutical composition during the relevant timeframe." Op.66. None of Regeneron's scientific references disclosed the use of proteins as buffers *in a pharmaceutical formulation*, much less aflibercept. Op.65. Amgen itself innovated to develop those uses over the years that followed. Supp.Add58-59, Supp.Add90-92 (Chamow Decl. ¶¶110-111, 133-136). The first reference that disclosed the use of proteins as buffers in pharmaceutical formulations was Amgen's own Gokarn patent application—which, as the district court noted, post-dates the relevant timeframe. Op.66-70.[3]

---

[3] The Gokarn application was filed eight days before the '865 patent's filing date but published months later. Op.67. Thus, even if Gokarn qualifies as § 102(e) prior art,

## III.    THE EQUITIES WEIGH SHARPLY AGAINST AN INJUNCTION

As the district court recognized, Regeneron's failure to show likelihood of success is sufficient grounds alone for denying an injunction. Op.31. But the equities also strongly favor Amgen.

Regeneron's regulatory exclusivity for Eylea expired in May 2024. Supp.Add312-313 (Blackburn Decl. ¶71). To avoid competition from biosimilars, "Regeneron has been aggressively seeking to transition as many patients as possible from EYLEA to EYLEA HD." Supp.Add318 (Blackburn Decl. ¶82). Regeneron told investors: "The strategy has always been, let's move this market to . . . EYLEA HD." Supp.Add391 (Blackburn Ex.B-45 at 6). "[M]ost EYLEA HD patients are being switched from existing medicines[,] most notably, EYLEA." Supp.Add406 (Blackburn Ex.B-71 at 6).

---

it does not show what a person skilled in the art would have known at the time. Op.67-68. Regeneron argues that the district court should have considered Gokarn based on "[c]ontrolling law" in one footnote in a 50-year-old CCPA decision. Mot.15 (citing *In re Glass*, 492 F.2d 1228, 1232 n.6 (C.C.P.A. 1974)). In fact, the CCPA later walked back that footnote, explaining that "later-issued patents and publications [are relevant] only if a showing is made that such claim language is the 'language of the ***present*** art' as of the filing date of the application in question." *Application of Voss*, 557 F.2d 812, 818-19 n.15 (C.C.P.A. 1977) (emphasis added). That "present art" language is missing here: A secret, unpublished patent application cannot inform persons of ordinary skill in the art about the meaning of the claims. Op.66. In any event, the court stated that it would reach the same result regardless of Gokarn's timing. Op.69-70.

**Confidential Material Omitted**

Regeneron's April 2024 corporate strategy presentation shows that the company expects "[p]eak conversion" from Eylea to Eylea HD of ▮▮▮ Add726. Regeneron forecasts a "[r]amp to peak conversion" of "▮▮▮ in 2023, ▮▮▮ *in 2024*, ▮▮▮ in 2025." *Id.* (emphasis added). In other words, ***by the end of 2024***, Regeneron expects to have converted ▮▮▮ × ▮▮▮ = ▮▮▮ of its existing Eylea customer base to Eylea HD. The same presentation explains why Regeneron is aggressively pursuing that conversion: The company expects "~▮▮▮ sales erosion over 3 years" from biosimilar competition for Eylea, but "***[n]o impact*** from Eylea biosimilars" on Eylea HD. *Id.* (emphasis added).

Those circumstances preclude Regeneron from showing irreparable harm. "[S]elf-inflicted wounds are not irreparable injury. Only the injury inflicted by one's adversary counts for this purpose." *Second City Music, Inc. v. City of Chicago*, 333 F.3d 846, 850 (7th Cir. 2003); *see also Salt Lake Trib. Publ'g Co., LLC v. AT&T Corp.*, 320 F.3d 1081, 1106 (10th Cir. 2003); 11A Wright & Miller, *Federal Practice and Procedure* § 2948.1 (3d ed. rev. 2024). Regeneron itself is responsible for Eylea's dwindling market share.

Critically, those same facts also tip the balance of hardships sharply in Amgen's favor. Amgen will suffer severe harm from being excluded from the market, even if only for a few months. Supp.Add431-439 (Heath Decl. ¶¶ 9-25); Supp.Add445-451 (Blackburn Decl. ¶¶ 9-21). Amgen seeks to launch a biosimilar

**Confidential Material Omitted**

that would compete with Eylea.  Regeneron, however, is aggressively winding down that market by converting customers to Eylea HD so that Amgen cannot win their business.  Eylea HD contains a significantly higher dose of aflibercept, requiring less frequent injections.  Op.4-5.  Doctors are therefore less likely to view Amgen's product as a substitute.  As noted above, Regeneron plans to have converted approximately ▉ of its Eylea users to Eylea HD by the end of this year (up from just ▉ in 2023).  Each day of delay allows Regeneron to carry out its plan to avoid competition by phasing out the very market in which Amgen seeks to compete.

Finally, the public interest is not served by keeping a biosimilar competitor off the market based on a patent it does not actually infringe.  *See Douglas Dynamics, LLC v. Buyers Prod. Co.*, 717 F.3d 1336, 1346 (Fed. Cir. 2013).  And the public interest in protecting intellectual property is much diminished where the patent owner is rapidly abandoning the market that the asserted claims allegedly protect.

## IV.   ANY BOND MUST BE SUFFICIENT TO COMPENSATE AMGEN FOR THE ENORMOUS LOSSES IT FACES

This Court may "condition [an injunction] on a party's filing a bond."  Fed. R. App. P. 8(a)(2)(E).  The bond should be set at an amount high enough "to cover ***all possible damages*** which the respondent may sustain" from the injunction.  *Brown v. Shannon*, 61 U.S. 55, 58 (1857) (emphasis added).  Courts should "err on the high side."  *Mead Johnson & Co. v. Abbott Labs.*, 201 F.3d 883, 888 (7th Cir. 2000),

**Confidential Material Omitted**

*amended*, 209 F.3d 1032 (7th Cir. 2000); *see Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1385 (Fed. Cir. 2006) (affirming $400 million injunction bond).

The damage that Amgen faces from being kept off the market is very substantial.  Supp.Add431-439 (Heath Decl. ¶¶9-25); Supp.Add445-451 (Blackburn Decl. ¶¶9-21).  Regeneron is aggressively steering customers toward Eylea HD to insulate its products from competition.  Add726.  The losses that Amgen faces are thus enormous, irreparable, and difficult to fully estimate.  *No* bond would adequately protect Amgen, so the Court should deny the injunction.

At a minimum, any bond should cover the conservative estimates that Amgen's expert puts forth.  Amgen faces losses of at least ▉dollar amount▉ *per day* from being kept off the market.  Supp.Add454-455 (Blackburn Decl. ¶29).  If the Court keeps ABP 938 off the market until July 1, 2025—a reasonable estimate for Regeneron to prosecute this appeal and seek rehearing—total losses would exceed ▉dollar amount▉.  *Id.*  Even the Court's current interim injunction is expected to cost Amgen over ▉dollar amount▉.  Supp.Add455 (Blackburn Decl. ¶31).  The Court should impose bond requirements commensurate with those amounts: an immediate bond of ▉dollar amount▉ for the interim injunction and a ▉dollar amount▉ bond for an injunction pending appeal.

## CONCLUSION

The Court should deny Regeneron's motion for an injunction pending appeal.


October 1, 2024

Respectfully submitted,


  /s/ Jeffrey A. Lamken

| | |
|---|---|
| Wendy Whiteford | Jeffrey A. Lamken |
| Eric Agovino | Robert K. Kry |
| Chanson Chang | Lucas M. Walker |
| Pauline Pelletier | Kayvon Ghayoumi |
| AMGEN INC. | MOLOLAMKEN LLP |
| One Amgen Center Drive | 600 New Hampshire Ave., NW, Suite 500 |
| Thousand Oaks, CA 91320 | Washington, D.C. 20037 |
| (805) 447-1000 | (202) 556-2010 |
| | |
| E. Anthony Figg | John R. Labbe |
| Joseph A. Hynds | Kevin M. Flowers |
| Jennifer Nock | Thomas Burns |
| Brett A. Postal | MARSHALL, GERSTEIN & BORUN LLP |
| ROTHWELL, FIGG, ERNST, | 233 South Wacker Drive |
|   & MANBECK, P.C. | 6300 Willis Tower |
| 901 New York Avenue, NW | Chicago, IL 60606 |
| Suite 900 East | (312) 474-6300 |
| Washington, D.C. 20001 | |
| (202) 783-6040 | |

*Attorneys for Defendant-Appellee Amgen Inc.*

# SUPPLEMENTAL ADDENDUM

## SUPPLEMENTAL ADDENDUM – TABLE OF CONTENTS

Page

Expert Declaration of Steven M. Chamow, Ph.D.
(Dkt. 206-2) **[Sealed]**............................................................. Supp.Add1

Exhibit C-3 (Dkt. 206-6) (excerpt) ........................................ Supp.Add234

Declaration of David Blackburn, Ph.D.
(Dkt. 206-26) **[Sealed]**............................................... Supp.Add277

Exhibit B-45 (Dkt. 206-31).................................................... Supp.Add385

Exhibit B-71 (Dkt. 206-34).................................................... Supp.Add400

FDA Approval Letter (Dkt. 253-1)........................................ Supp.Add417

Sheridan Ex. 3 (Dkt. 180-18) (excerpt) ................................. Supp.Add424

Declaration of Brian Heath **[Sealed]** .................................... Supp.Add428

Declaration of David Blackburn, Ph.D. **[Sealed]** ................................. Supp.Add440

**Confidential Material Omitted**

# Supp.Add1-233
# Redacted in Entirety

# EXHIBIT C-3

```
 1            UNITED STATES DISTRICT COURT

 2          NORTHERN DISTRICT OF WEST VIRGINIA

 3   Regeneron Pharmaceuticals, Inc.

 4        Plaintiff,

 5            VS.                 CIVIL ACTION NO.

 6                                1:22-cv-61

 7   Mylan Pharmaceuticals, Inc., and
     Biocon Biologics,
 8        Defendants.

 9                        - - -

10      Proceedings had in the bench trial of the above-styled
     action on June 12, 2023, before Honorable Thomas S. Kleeh
11   District Judge, at Clarksburg, West Virginia.

12                        - - -

13      APPEARANCES:

14      On behalf of the Plaintiff:

15      David I. Berl
        Ellen E. Oberwetter
16      Kathryn S. Kayali
        Williams & Connolly, LLP
17      680 Maine Avenue, SW
        Washington, D.C.  20024
18      202.434.5000

19      APPEARANCES CONTINUED ON NEXT PAGE

20

21

22

23

24

25
```

2

1          On behalf of the Plaintiff, continued:

2          Steven Robert Ruby
           Carey, Douglas, Kessler & Ruby, PLLC
3          797 Virginia Street, East, Suite 901
           Charleston, WV  25301
4          304.345.1234

5          Petra Scamborova
           Regeneron Pharmaceuticals, Inc.
6          777 Old Saw Mill River Road
           Tarrytown, NY  10591-6717
7          914.847.7611

8

9          On behalf of the Defendant:

10         Deanne M. Mazzochi
           William A. Rakoczy
11         Neil B. McLaughlin
           Rakoczy, Molino, Mazzochi & Siwik, LLP
12         6 W. Hubbard Street, Suite 500
           Chicago, IL  60654
13         312.527.2157

14

15         Gordon H. Copland
           William J. O'Brien
16         Steptoe & Johnson
           400 White Oaks Blvd.
17         Bridgeport, WV  26330
           304.933.8162

18

19         Proceedings recorded utilizing realtime translation.
           Transcript produced by computer-aided transcription.
20

21

22

23

24

25

```
 1                                 Monday Morning Session,

 2                                 June 12, 2023, 9:30 a.m.

 3                          -  -  -

 4              THE COURT:  Thank you.  Please be seated.

 5              Madam Clerk, would you be kind enough to call our

 6    next case, please.

 7              THE CLERK:  Regeneron Pharmaceuticals, Inc., v. Mylan

 8    Pharmaceuticals, Inc., Civil Action Number 1:22-cv-161.

 9              Will counsel please note your appearance for the

10    record.

11              MR. RUBY:  Good morning, Your Honor.  Steve Ruby of

12    Carey, Douglas, Kessler & Ruby for plaintiff Regeneron

13    Pharmaceuticals, Inc.  With me I have David Berl, Ellen

14    Oberwetter, and Kathryn Kayali from Williams & Connolly in

15    Washington, D.C.  And also from Regeneron I have with me Joe

16    LaRosa, who is executive vice president and general counsel;

17    Larry Coury, who is vice president and associate general

18    counsel.  I'll note that Mr. Coury is a native of Mercer

19    County.

20              THE COURT:  Welcome home, sir.

21              MR. RUBY:  His father is a WVU alum and his mother

22    Marshall alum.  So we're glad to have him back in West Virginia

23    for a little while.

24              Also Petra Scamborova, James Evans, Andrew Deciare,

25    and Arun Bhoumik, all from Regeneron.
```

1          THE COURT:  Good morning, everyone.

2          Good morning, Counsel.

3          MR. COPLAND:  Good morning, Your Honor.  This is

4   Gordon Copland, Steptoe & Johnson, appearing on behalf of the

5   defendants Mylan Pharmaceuticals, Inc., and Biocon Biologics,

6   Inc.  Also appearing this morning is William O'Brien of

7   Steptoe & Johnson; William Rakoczy and Deanne Mazzochi, both

8   with the Rakoczy Molino Mazzochi & Siwik firm.

9          THE COURT:  Good morning, everyone.

10          All right.  Here for day one for trial slated to

11   start opening statements, but word was there was a request to

12   seal the courtroom during a portion of plaintiff's opening.  Is

13   that correct?

14          MR. COPLAND:  That's correct, Your Honor.  The

15   motion's not opposed by the plaintiff.  We did prepare a brief

16   just in case, which I'll hand up if I may, Your Honor.

17          THE COURT:  Sure.  Which slides are we talking about?

18          MR. COPLAND:  It's 14 through, I believe, 45, but may

19   I double-check that, Your Honor, when I get back to my seat?

20   And there are about 142 slides, maybe a little more.  So only

21   the portion between the first slide, which is 14, and the last

22   one that has an issue, 41, would we request sealing.  And, of

23   course, that would not apply to anyone already under the

24   protective order, only to third parties present in the

25   courtroom.

1      We do have an agreement that certain counsel for

2  Regeneron may attend even though outside-counsel-eyes-only

3  material will be some of the material, and we just ask that

4  their counsel confirm that they're agreed to be under the

5  protective order pursuant to the parties' prior agreement.

6      THE COURT:  Understood.

7      Counsel?

8      MR. RUBY:  We agree to that, Your Honor, yes.

9      THE COURT:  Understood.  And note that we have a

10  spectator or two today.  I'll leave it to counsel to police who

11  is permitted to attend -- remain in the courtroom under the

12  Court's protective order and who is not.

13      MR. COPLAND:  If Mr. Berl will just give us notice

14  before he hits Slide 14, and we can pause.

15      THE COURT:  Understood.

16      A couple housekeeping matters for everyone.  There

17  are additional restrooms.  Since we've got a bigger crowd than

18  we had for naturalization on Friday, the line will back up

19  quickly here.  There are additional restrooms up on the third

20  floor and either the elevator or stairs at the end of the hall

21  will get you there.

22      As folks may have noticed, in addition to our looming

23  asbestos abatement project, some preliminary work is ongoing on

24  the roof of the building.  So please continue to refrain from

25  trying to park immediately adjacent to the courthouse, those

1    spots abutting the building.  One, it'll save your cars or

2    rental cars some damage -- potential damage, I should say --

3    and we need whatever slots they randomly let us have on any

4    given day for the court personnel.

5              With that, Mr. Berl, sir, the floor is yours.

6              MR. BERL:  Good morning, Your Honor.  David Berl for

7    Regeneron.  This case is about Eylea, a product that made

8    Regeneron what it is today.  More specifically, this case is

9    about the discoveries that made Eylea what it is.

10             Before the discoveries at issue in this trial,

11   Regeneron was a small fledgling company with virtually no

12   products or revenues.  The discoveries of the patents-in-suit

13   led to Eylea's groundbreaking treatments for diseases that are

14   the leading causes of blindness.

15             Eylea is responsible for a majority of Regeneron's

16   revenues.  It funds Regeneron's research and development into

17   the hardest diseases to treat, from cancer to Alzheimer's.

18   Regeneron had and has a culture of innovation.

19             To take just one example, when COVID struck and most

20   of the world shut down, its scientists, led by George

21   Yancopoulos, its cofounder, sprung into action immediately and

22   quickly developed a treatment that saved many lives, including

23   possibly the then-president of the United States.

24             That's who the plaintiff is.

25             The defendants in this case are Mylan and Biocon.

1  Mylan filed an abbreviated biologic application to FDA to sell

2  a biosimilar version of Eylea.  Mylan then transferred that

3  application to its successor in interest, Biocon, in Bangalore,

4  India.  Biocon will be selling this product if the defendants

5  succeed in this case.

6          In order to understand the issues a little better,

7  some background on the anatomy of the eye will be helpful.

8  This is a diagram of a healthy eye.  It's not drawn to scale.

9  It's intended to show in two dimensions what's obviously three

10 dimensions in real life.

11         The important components here are the retina, shown

12 in pale yellow, which is supplied by blood vessels, that are

13 shown in red; and the vitreous, which is a gelatinous area of

14 the area that abuts the retina.  In between the vitreous and

15 the retina is a barrier called the ILM, the inner or internal

16 limiting membrane.

17         There's also a protein in the retina, shown in green

18 here in the little dots, called VEGF.  And when VEGF is present

19 in the right amounts, it supplies the healthy blood vessels of

20 the retina and everything is fine.

21         But when there's too much VEGF in the eye, things go

22 wrong.  The blood vessels increase, and the blood vessels get

23 too thick, and blood and fluid starts to leak.  That creates

24 significant problems and diseases, including macular edema,

25 shown here, and other diseases that cause blindness.

1          Regeneron developed Eylea to try to solve that

2     problem.  The active ingredient in Eylea, aflibercept, shown in

3     purple here, blocks VEGF -- two hands on the football -- and

4     thereby inactivates it.

5          Now, Eylea is administered into the eye through a

6     needle, so-called intravitreal injection.  When it's

7     administered into the vitreous, however, it must get into the

8     retina to do its job.  It must pass through that barrier, get

9     into the retina, and inactivate the VEGF there, where there's a

10    disease state.  And when it does that and inactivates much of

11    the VEGF in the retina, the VEGF essentially goes away and the

12    disease recedes.  You can see the blood vessels come back to

13    their healthy state and vision is restored.

14         Now, Eylea has a VEGF inhibitor called aflibercept,

15    but there were lots of VEGF inhibitors out there, not just one,

16    for many different companies.  This is the story of why a

17    product with one of those inhibitors, from a sea of potential

18    inhibitors, won out.  This is the story of the two inventions

19    that made that happen.

20         There are two inventions here.  One on the left is

21    directed to the product that is administered.  Because of

22    witness schedules, we'll start with that one this week.  And it

23    came first in time.  The second invention is treating using

24    aflibercept, the VEGF inhibitors in a particular way that has

25    been proven to be very successful.

1          Now, starting with the product patent, the '865

2    patent, you will hear from two of the inventors of the product

3    patent, Dr. Furfine and Graham, about their invention and the

4    research that led to it.

5          The products they invented, one example of which was

6    Eylea, were transformative.  They bucked the conventional

7    wisdom to invent a stable formulation with a high concentration

8    of aflibercept, 40 milligrams per milliliter, required by all

9    the asserted claims through incorporation of the independent

10   claims.  And that high dose and formulation of Eylea

11   facilitated the product's eventual success.

12         Now, in order to market a biosimilar version of Eylea

13   that copies from the patent the 40 milligrams per milliliter of

14   aflibercept as well as the organic cosolvent it uses of

15   polysorbate, Mylan and Biocon advanced various defenses of

16   noninfringement and invalidity.  I don't think you'll hear in

17   detail about many of these defenses given how many there are,

18   but Mylan has not narrowed what it proposes to present at

19   trial; so I'll try to cover them all this morning.

20         The first dispute is whether Mylan infringes the

21   organic cosolvent limitations of the claims.  And they do.

22         And this is the point where I'm going to hit material

23   that I think they want the courtroom sealed for.

24         THE COURT:  Understood.

25         The Court would then seal our proceedings.  Those not

1  specifically permitted to be here in the Court's protective

2  order, if I could ask you to depart, please.

3            (The following proceedings (10/3 to 20/7) were sealed

4  and are filed under separate cover.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7              THE COURT:  Thank you.

8              If I could ask court security to unseal our courtroom

9   and extend an invitation to those out there to rejoin us if

10  they'd like.  Thank you.

11             Welcome back, everyone.

12             Mr. Berl, go right ahead, sir.

13             MR. BERL:  Next are Mylan's invalidity defenses, and

14  we'll start with anticipation.

15             The patents at issue in this case were issued after

16  substantial examination by the US Patent and Trademark Office,

17  and they were duly issued and entitled to the presumption of

18  validity.

19             Mylan bears a heavy burden -- clear and convincing

20  evidence -- to prove the facts necessary to show invalidity.

21  It can't do so.  Anticipation requires that a single record,

22  just one, disclose each and every limitation of the claims

23  expressly or inherently arranged as in the claim.

24             The first of Mylan's two anticipation references

25  called Fraser doesn't even come close to meeting that

1    requirement.  It's mincing lots of limitations from the claim.

2    This argument of theirs reminds me of the old Coffee Talk Joan

3    Rivers skit on Saturday Night Live.  The Holy Roman Empire is

4    neither Holy nor Roman nor an empire.  You may remember that.

5    That's what this is.

6         Fraser discloses neither an ophthalmic formulation

7    nor intravitreal administration nor glycosylated nor

8    aflibercept nor 98 percent native conformation nor 40

9    milligrams per milliliter.  It's got none of it.  And it has to

10   have everything.

11        Mylan tries to plug at least some of the holes in the

12   dam by suggesting that anything written in an article that

13   Fraser cites or, in fact, anything written in an article cited

14   by an article that Fraser cites somehow magically becomes part

15   of Fraser because anticipation, they have to have only one

16   reference.

17        First of all, that's implausible; but second, it's

18   contrary to consistent federal circuit precedent, that the host

19   document -- here Fraser -- must identify with detailed

20   particularity what specific material it incorporates.  Simply

21   adding the footnote and citing a reference isn't close to

22   enough.  You've gone from Joan Rivers to Six Degrees of Kevin

23   Bacon in one article.

24        Now, the second anticipation argument that they

25   advance is this, and the assertion of Dix requires the Court to

1    address a subsidiary question, which is whether Regeneron is

2    entitled to a priority date of March 21, 2006, or earlier

3    because that's before the time that Dix was filed.

4            Now, the answer to that question is yes.  In fact,

5    the invention here was made far earlier in the fall of 2005,

6    but for present purposes, because Mylan has only asserted Dix,

7    we only need to show priority back to March 21, 2006, or

8    earlier.

9            If Regeneron is entitled to that date -- and we think

10   it's clear that it is -- then Dix simply is not prior art.

11   Everything you hear about Dix the next two weeks -- and I

12   suspect you'll hear quite a bit -- is totally and blessedly

13   irrelevant to this case because it's not prior art.

14           But even if Dix were prior art, then it would still

15   not anticipate the claims because it too, like Fraser, is

16   missing at least one limitation, in fact, several, including

17   intravitreal administration and an ophthalmic formulation.  It

18   has none of that.

19           Now, for the 40 milligrams per milliliter

20   formulation, which is a very important limitation in the claim,

21   what they rely on is a disclosure of 10 to 50 milligrams per

22   milliliter in Dix.

23           First of all, that disclosure is not about

24   aflibercept in particular; so it's not arranged as in the

25   claim.  But more importantly, the federal circuit repeatedly

1   has been clear, including earlier this year, that the

2   disclosure of a range, like 10 to 50, is not a disclosure of

3   discrete points within that range like 50, like 40.  10 to 50

4   does not anticipate 40.  It can't do that under controlling

5   law.

6           Now, with that, I'll move to obviousness, which is

7   their backup prior art argument.  And the first problem with

8   Mylan's obviousness argument is their selection of references.

9   They pluck out of prior art various references, most of which

10  have nothing whatsoever to do with the issue here, which is

11  intravitreal injection that can treat diseases in the retina.

12  But that's not allowed under the law.

13          The question is not whether the so-called person of

14  ordinary skill, or the POSA, with the two prior art references

15  in front of him could combine them and arrive at the

16  patent-in-suit, which, by the way, it couldn't even if they had

17  them in front of them.

18          Mylan and Biocon don't even get to that question

19  because the question, as the federal circuit said in the WBIP

20  case, is whether the skilled artisan would have plucked one or

21  more of those references out of the sea of prior art in the

22  first place.  And Mylan's experts skip over that analysis and

23  choose their references without any contemporaneous

24  justification or basis.

25          There were many VEGF inhibitors in the prior art.  It

1   was a sea of VEGF inhibitors.  And Mylan just assumes without

2   basis that the POSA would have chosen one of them, aflibercept.

3   Not so.

4          As I mentioned earlier, there's a barrier between the

5   vitreous, where the drug is injected, and the retina and other

6   associated tissues where it needs to go.  And whether the

7   molecule would get from the vitreous to the retina was

8   understood to depend on its size.  And aflibercept at the time

9   was considered too big.

10          Now, the prior art taught -- and this is the

11  Gaudreault reference from Genentech in 2005.  And we'll hear a

12  lot about this reference.  It taught that penetration of

13  ranibizumab -- that was Genentech's product at the time.  They

14  were developing a different product called ranibizumab that

15  later became Lucentis, which is a product on the market.  They

16  were ahead of Regeneron; so they were publishing already.

17          And what they said was penetration of their molecule,

18  ranibizumab, into the retina is critical for its credible use.

19  You've got to get to the retina.  Or as people in the field

20  often say, the tissue is the issue.  So you've got to get to

21  the right tissue.  And why do they say their product gets to

22  the retina?  Because of its small molecule size,

23  48 kilodaltons.  Kilodaltons is just a measure of weight like

24  pounds or kilograms.

25          And they contrasted it with what they called a

1    full-length antibody, something that was 148 kilodaltons that

2    they said was not able to penetrate the retinal layers of the

3    monkeys.  So 148 was too big; 48 was good enough.  And what the

4    art said -- not just Genentech but others -- is that things

5    that are over about 70 kilodaltons or about 76 kilodaltons were

6    too big.

7          Now, we all know that aflibercept, in fact, did end

8    up penetrating the eye into the retina.  If it didn't, none of

9    us would be here today.  Okay?  We'd all be somewhere else.

10   But that's not what matters for obviousness.  What matters is

11   what everyone thought and knew at the time of the invention

12   about 16, 17 years ago.  And at that time aflibercept was

13   simply considered too big.

14         This is ranibizumab, what we just saw, 48

15   kilodaltons.  Aflibercept was 115.  And it actually behaved

16   like it's even bigger because of its unusual size.  The idea of

17   using aflibercept via intravitreal injection straight into the

18   eye was actually tried in mice in the prior art, and it didn't

19   work very well.

20         The figure on the left is subcutaneous injection.

21   That's systemic injection that Your Honor is used to, less

22   scary than intravitreal injection.  And what you want to look

23   for here is does the problem go down.  You want the numbers to

24   go down.  This is golf, not bowling.

25         And when you did this systemic administration, what

1  we see is the bar goes way down.  That works well.  But when

2  you do intravitreal administration straight into the eye, the

3  bar doesn't go down very much.  And what people at the time

4  said -- and not just people.  This on the right is an article

5  by Genentech and in particular someone called Napoleone

6  Ferrara.  He's the godfather of VEGF.  He actually discovered

7  VEGF.  And he, while at Genentech, developed the first two

8  anti-VEGF therapies:  Avastin and then Lucentis.  And what he

9  said is he looked at these data and he said there's limited

10 efficacy, despite the high binding of the molecule.  And it may

11 be due at least in part to the existence of a barrier to

12 penetration of large molecules such as the VEGF Trap.

13        That's what people were thinking and saying at the

14 time.  It's too big.  And without showing that you want to do

15 intravitreal administration of aflibercept, that claim can't be

16 obvious because all of the claims require it.

17        But the claims actually require more.  Mylan has to

18 show much more than that.  They have to show that the person of

19 skill would have wanted to use 40 milligrams per milliliter of

20 aflibercept, this high concentration of aflibercept.  They have

21 to show that by clear and convincing evidence.

22        And the presentation from them that you'll see in a

23 moment has all sorts of prior art showing all sorts of buffers

24 and organic cosolvents and stabilizing agents, almost nothing

25 about 40 milligrams per milliliter.  That was never done in the

1    prior art for aflibercept.  And they can't meet that burden,

2    including because people thought that increasing concentration

3    increases aggregation.  That's the problem I discussed earlier.

4         In fact, Genentech in this same Gaudreault article

5    tried 40 milligrams per milliliter, and it went poorly.  What

6    happened when they did 40 milligrams per milliliter was that

7    they got ocular inflammation that was moderate to severe.  Bad

8    news.  You don't want inflammation.  It resolved after

9    eight days, but keep in mind this is a product that's

10   administered every month.  No one wants their eye to be

11   inflamed for one week out of every month, let alone inflamed

12   potentially with particles that can hurt your vision and cause

13   real problems.

14        So Genentech, the leader in the field, ditched the

15   40 milligrams per milliliter idea and instead pursued lower

16   doses, 6 milligrams per milliliter or 10 milligrams per

17   milliliter, which is what they ultimately used in Lucentis.

18        The argument based on Fraser of obviousness fails for

19   this reason alone.  Not only does it fail to disclose

20   aflibercept or intravitreal injection, it has only

21   24.3 milligrams per milliliter, and the claim requires 40.  The

22   skilled artisan would have used less than 24, not more, and

23   certainly wouldn't have gone all the way up to 40 when

24   Genentech, the prior art, was teaching away from it.

25        Now, the second prior art reference for obviousness

1    that Mylan advances is Dix.  And the assertion of Dix would

2    require the Court to answer a second question in the event that

3    the Court does not believe that Regeneron is entitled to an

4    earlier priority date.

5            If we are entitled to an earlier priority date, as I

6    said, Dix goes out the window completely.  But if you answer

7    that question no, Your Honor, then you have to answer a second

8    question.  Is Dix subject to the safe harbor of 103(c) in the

9    statute so that it cannot be used for obviousness?

10           And the answer to that question is that Dix is

11   subject to the safe harbor.  The statute is very clear.  You

12   can't use as an obviousness reference a reference owned by the

13   same person as the patent or subject to an assignment of -- to

14   an obligation of assignment to the same person.  Your own prior

15   art can't be used against you for obviousness under 103(c).

16           There is no question but that Dix shown here on the

17   right and other such references and the product patent at issue

18   were owned by the same person, Regeneron Pharmaceuticals.  And

19   all of the scientists working at Regeneron at the time, of

20   course, had an obligation to assign their inventions.  That's

21   how pharmaceutical companies work.  If you work for them and

22   use their labs, you don't get to keep your invention.  It

23   belongs to the company, of course.

24           Now, even if Dix could be used for obviousness, it

25   doesn't really help Mylan and Biocon.  It does not disclose

1   40 milligrams per milliliter.  And based on the prior art that

2   we've seen, the skilled artisan never would have used that high

3   a concentration.  It would have used a much lower concentration

4   for the intravitreal injection, just as the prior art

5   repeatedly taught.

6         In any event, even if Mylan could show motivation to

7   make the claimed invention, it cannot show expectation of

8   success, an independent requirement of the obviousness inquiry.

9   And moreover, the objective indicia of nonobviousness,

10  including commercial success, demonstrate clearly that the

11  invention was not obvious, as you'll hear from Dr. Richard

12  Manning, our expert economist.

13        Now, Regeneron did not succeed because it had a

14  molecule that inhibited VEGF.  Lots of companies had that.  But

15  consider what happened with Genentech.  They were the big

16  800-pound gorilla in the field, the leaders in the field of

17  biotechnology in general and VEGF in particular.  They had a

18  big first mover advantage with their product, ranibizumab.

19        And there were lots of companies out there trying to

20  compete with Genentech, who had the leader in the field,

21  Dr. Ferrara, leading their program.  None of the other

22  competitors succeeded, none of them.  Only Regeneron succeeded.

23  And Regeneron succeeded wildly with a product Eylea that ended

24  up being the market leader and, in fact, overtaking Genentech's

25  ranibizumab.

1          Now, because the prior art does not invalidate the

2    patent, Mylan next turns to Section 112 defenses.  Now, these

3    defenses, as I pointed out at the pretrial conference, are so

4    blatantly inconsistent with their prior art references that

5    Mylan actually has to bring two separate experts in order to

6    advance these arguments -- prior art on the one hand and

7    Section 112 on the other -- because one person couldn't

8    possibly keep them straight, let alone testify lucidly as to

9    both.

10          They start with enablement, but their theory on

11    enablement suffers from a repeated fatal flaw.  Mylan runs

12    enablement in the alternative in saying if the patent is not

13    obvious, then it must not be enabling because it's either hard

14    to do, in which case it's not enabled, or it's easy to do

15    because it's obvious.

16          The problem with that argument, as the federal

17    circuit repeatedly recognized, including in the Allergan case,

18    is that enablement and obviousness are different because, for

19    obviousness, you don't have a patent.  You don't have the

20    benefit of what the inventors did and taught the world.  For

21    enablement, you do.  And the question is, whether reading the

22    specification, then you can practice the invention without

23    undue experimentation.

24          The Supreme Court addressed enablement last month in

25    the Amgen v. Sanofi case.  And what they said, among many other

1    things, is that enablement is a problem where you have to do as

2    much work without the patent as you do with the patent, where

3    the patent doesn't really help you in any way.  That manifestly

4    is not the case here.

5           The claims here require 40 milligrams per milliliter

6    of aflibercept, not taught for intravitreal injection in the

7    prior art.  Taught in the patents.  They require organic

8    cosolvents disclosed in the patent.  They require stabilizing

9    agents disclosed in the patent.  The patent tells you what pH

10   to use so that you can choose an appropriate buffer.

11          The notion that the skilled artisan is in the same

12   position with or without the patent, respectfully, is not

13   plausible.  And the prior art does not disclose all of this,

14   including and especially 40 milligrams per milliliter of

15   aflibercept.  But the patent does.

16          Mylan's argument is premised on the very notions that

17   the Amgen supreme court decision rejects, that it's about the

18   cumulative time and effort it takes to make all the embodiments

19   or that enablement is about exhausting the genus, making every

20   single embodiment in the claim.  That's not what we have here.

21          In the cases where nonenablement is found, each and

22   every embodiment of the claim must be made and tested.  So

23   you've got a big research project of making absolutely

24   everything.  But in this case, as their own Section 112 expert

25   explained repeatedly, the skilled artisan wouldn't need to make

1  every formulation in order to practice this claim.  You'd be

2  able to eliminate a lot of candidates and narrow yourself down

3  to acceptable candidates and then do some experimentation.  So

4  the premise of cases like Idenix and others from the federal

5  circuit -- you have to make each and every one; therefore, it's

6  not enabled -- is simply not present here.

7         Now, Dr. MacMichael says for enablement that it would

8  be really hard to make these formulations of the claim.  He's

9  wrong.  The POSA could have made the formulations with the

10 patent in hand quite easily.  But you don't have to take it

11 from me.  You can take it from Mylan's other expert,

12 Dr. Rabinow.

13         When we asked him, in your view, the POSA could have

14 made and used the formulations within the claims even without

15 the specification with one hand tied behind his back.  And he

16 answered quite simply yes.  It is impossible on this record to

17 find that the claims are somehow not enabled when their own

18 expert agrees you can make the formulations even without the

19 help of the specification.

20         Now, finally, Amgen is a mismatch for this case.

21 Justice Gorsuch said the problem is where a patentee seeks

22 sovereignty over an entire kingdom.  You claim everything that

23 works, which is what they did in Amgen, without limitation as

24 to what particular structures should be used to practice the

25 claim.

 1              Our claim, unlike Amgen's and all the others that go

 2    down, is full of structural limitation.  It has to have

 3    aflibercept.  That's a structure.  Organic cosolvent.  Buffer.

 4    Stabilizing agent.  Those are all structures that limit what

 5    formulations are in the claim.  If you don't have an organic

 6    cosolvent or a buffer, you're out of our claim.  Whether it

 7    works or not, it's structurally limited.  And, therefore,

 8    enablement cannot -- nonenablement cannot be found.

 9              Mylan's written description argument is advanced on

10    the same basis as its enablement argument, and it's wrong for

11    similar reasons.  The federal circuit in Alcon made clear that

12    all that matters for written description is whether the skilled

13    artisan can recognize what was claimed.  It's not about whether

14    the patentee has proven that it will work.

15              So Dr. MacMichael's enablement -- the written

16    description argument that there aren't enough examples, you

17    haven't proven enough, simply isn't required.  He's looking for

18    something that the law does not require.

19              And written description is present where claims are

20    limited to known sets of structures.  And he admitted over and

21    over in his deposition, and will admit it again at trial, that

22    the claims are limited to particular structures that were

23    known.  Nonwritten description is present where a skilled

24    artisan doesn't know what structures to use and so can't

25    visualize what was claimed.  When it's clear what structures

1    can be used, the written description requirement is met.

2            The last invalidity argument on the treatment patent

3    is indefiniteness.  And Mylan asserts that the terms "suitable

4    for intravitreal administration" and "measured by SEC" are

5    somehow indefinite.  They appear now only to be running one of

6    those arguments, but both of them are wrong.  And they're wrong

7    including because their own experts were able to understand and

8    use that term repeatedly.

9            And so if their experts understand what it means and

10   skilled artisans understand what it means, then the claims

11   simply are not indefinite, as the federal circuit has held.

12            And, with that, I'll move to the treatment patents.

13            You'll hear momentarily from Dr. Yancopoulos, the

14   sole inventor of the treatment patents.  There are two sets of

15   claims at issue in the treatment patents.  The first is Claim 6

16   of the '572 patent.  It claims treating an angiogenic eye

17   disorder with an extended eight-week dosing regimen, that you

18   dose every eight weeks, with an isotonic solution of

19   aflibercept.  And isotonic refers to the amount of substance

20   dissolved in the formulation.

21            The other claims at issue relate to treatment of

22   specific diseases:  diabetic macular edema, DME, and diabetic

23   retinopathy, DR, using a specific dosing regimen that requires

24   five monthly loading doses.  In the claims called an initial

25   loading dose and then four secondary doses, one plus four being

1  five.  That five loading dose regimen was never disclosed,

2  never suggested in the prior art.

3          These claims do not involve any of the terms that the

4  Court construed in its claim construction order, and none of

5  them were asserted or admitted to be invalid by stipulation, as

6  Mylan misleadingly asserts in its slides.

7          Now, a little background about how this works.  The

8  claim in the patent discusses initial doses and secondary

9  doses.  And those together are called loading doses.  Loading

10 doses is loading the patient up with initial doses to try to

11 get the disease under control.  And then the patent talks about

12 maintenance doses, which are also called tertiary doses.  And

13 what we see here is an every-eight-week dosing regimen.  Every

14 eight weeks, a dose is administered.  An extended dosing

15 regimen of eight weeks rather than four weeks, which was

16 typically used in fixed-dosing regimens of the prior art.

17         Now, the number of loading doses in the patent can

18 change.  It can move back and forth.  And, in fact, in the DME

19 and DR claims, as I just mentioned, five loading doses are

20 required.  The claimed dosing regimens were nothing short of

21 transformative.  Everyone agreed that you wanted fewer

22 injections.  Obviously, everyone wants injections into the eye

23 less often.

24         But Regeneron was the only one who figured out how to

25 made that happen.  And they did so with a particular

1  fixed-dosing regimen that was disclosed in claims in this

2  patent and that are at issue in this case.  They did that by

3  going against the conventional wisdom which taught going in a

4  different direction, and they did something different.

5       Now, Mylan has again a host of defenses, throws up

6  everything against the wall, but none of the defenses are

7  meritorious.  Somehow, Mylan and Biocon still continue to

8  assert noninfringement.  But the expert testimony as to the two

9  inquiries that underlie the infringement analysis will be

10  uncontested.

11       That is because, even though Mylan insisted that its

12  noninfringement expert, Dr. Russell, would testify when it

13  submitted the pretrial order on May 18, it reversed course a

14  week later and agreed that no expert would testify about

15  noninfringement.  Dr. Russell vanished.

16       Our expert, by contrast, Dr. Karl Csaky, a renowned

17  retinal specialist who practices in Dallas, Texas, will address

18  both validity and infringement.  And as to infringement, it's

19  no mistake that Dr. Russell capitulated.  Mylan and Biocon do

20  not seriously dispute that their label teaches each and every

21  limitation of the claimed dosage regimens.  And as a result,

22  under the federal circuit's law, that is dispositive of the

23  induced infringement inquiry.

24       Now, they then move to invalidity, to excuses for why

25  they should be able to sell their product anyway, starting for

1   anticipation, which again requires a single prior art reference

2   to each and every limitation in the claim.  And the problem

3   with their anticipation theory here, based on the prior art

4   Dixon reference, is that it never discloses the isotonic

5   solution required by Claim 6 of the '572 patent.

6           Instead, it discloses something different, the

7   suitable -- suitable for the comfortable, nonirritating direct

8   injection into the eye.  That doesn't say isotonic, and Mylan

9   knows it.  So what Mylan does instead is rely on the doctrine

10  of inherency to prove anticipation, but inherency is a tall

11  standard.  That's a tall hurdle to meet.  It requires that the

12  missing material -- here, isotonic solution -- is necessarily

13  present in the prior art, necessarily present in Dixon, not

14  there by probabilities or possibilities.

15          In his report, Mylan and Biocon's expert said that it

16  is inherent because you have Dixon, and comfortable,

17  nonirritating injection into the eye must be something that is

18  not -- must be something that is isotonic.  But that flimsy

19  opinion did not survive even moderate cross-examination.

20          We asked him quite clearly, "Do you think that even a

21  hypertonic solution, one that's not isotonic, nonetheless could

22  be comfortable and nonirritating to the patient?"  It could

23  still be within Dixon so that Dixon could include isotonic and

24  nonisotonic.

25          And he said, "I don't know.  I'm not sure."  Anything

1    but clear and convincing evidence that the isotonic solution

2    necessarily and always must be present in Dixon.

3            He further testified, not shown here, that the

4    skilled artisan would want to administer intravitreally

5    nonisotonic solutions in the prior art.  Now, remarkably, based

6    on the deck we got yesterday, Mylan and Biocon intend to

7    resuscitate this argument at trial.  But they cannot succeed in

8    doing so given the testimony.

9            So Mylan and Biocon shifted to a different

10   anticipation theory in summary judgment argument.  And it is

11   equally wrong.  Their new theory is that Dixon, which discusses

12   a clinical trial, is somehow to be conflated or combined with

13   the clinical trial itself shown here on the right where people

14   actually were injected.

15           But these are two different references.  Dixon is

16   just a publication.  It's a piece of paper.  It's not actual

17   injections that happened.  Mylan could have relied on the

18   actual clinical trial saying that those uses of aflibercept

19   somehow anticipated the claim, but it can't really do that

20   because the clinical trial itself was confidential and not

21   prior art.

22           So what they've done is suggest that, because the

23   clinical trial, unbeknownst to anyone in the field at the time,

24   used an isotonic formulation, that must have been present

25   somehow in Dixon.  But that's not so because that isotonic

1    formulation and the trial itself is not part of Dixon.  It's

2    part of something else.

3            And the issue of inherent anticipation for Dixon is

4    whether someone practicing Dixon necessarily and always --

5    always -- would practice the claim.  It's not enough that they

6    could practice the claim, as in the federal circuit's Glaxo v.

7    Novopharm case; they have to do it every time.  And Dr. Rabinow

8    agreed that you could practice with isotonic; you could

9    practice with something that's not isotonic.

10           Now, on obviousness, they've also made a fundamental

11   legal error.  The Court's Markman decision held that various

12   language here in the claims is not limiting.  However, the

13   Court did not rule that the longstanding principles of

14   obviousness jurisprudence somehow magically do not apply to

15   this case.  They do.  And Mylan asks the Court to cast them

16   aside improperly.

17           First, it is black letter law that obviousness must

18   consider the claim as a whole.  It's right in the statute.  And

19   it's improper to disaggregate the claim piece by piece -- A

20   plus B plus C, as the federal circuit says -- and say, well,

21   this was here and this was nonlimiting and this was here, and

22   so, therefore, because I can find something everywhere or it's

23   not limiting, the claim is obviousness.

24           That's not how obviousness works.  You have to look

25   at the claim as a whole and assess whether it's obvious.  And

1   their approach, crossing certain things out because they're not

2   limiting and finding isotonic formulations somewhere else, is

3   wrong.

4          Now, second, let me be clear about the effect of the

5   Court's claim construction.  We understand that the Court held

6   those limitations about certain eye improvements to be

7   nonlimiting.  And so they don't need to show those limitations

8   in the prior art.  They don't need to be shown.

9          But that does not mean that the inquiries about

10  motivation to practice the invention and expectation of success

11  get thrown out the window.  The skilled artisan is not somehow

12  lobotomized and all the sudden doesn't care about treating

13  patients and improving their vision just because language is

14  not in the claim.

15         The federal circuit has been clear that whether those

16  goals of the POSA are in the claim or out of the claim or, in

17  this case, in the claim and not limiting under Your Honor's

18  construction.  It doesn't matter.  There's still relevant

19  motivation and expectation of success.

20         They have to show someone would have been motivated

21  and expected to succeed in practicing the claim, and they can't

22  do it because the prior art simply did not disclose that this

23  every-eight-week regimen would be successful.  What they do

24  instead is rely on disclosures of people trying -- of Regeneron

25  trying this eight-week regimen, which, of course, we were.  We

1 were doing clinical studies with it.  But not that it would

2 succeed.  In fact, people thought it was a bad idea in the

3 prior art, which forecloses a finding of obviousness.

4         The prior art shown here was moving in an entirely

5 different direction, towards so-called pro re nata, or prn,

6 dosing, which is evaluate a patient and then dose if you think

7 he needs it rather than a fixed dosage regimen where there's a

8 prescribed amount of time between each dose.

9         Mylan's own expert agrees that individualized

10 assessments, this so-called prn dosing, is what most people

11 were doing at the time.  And those who tried extended fixed

12 dosing, including Genentech, failed spectacularly, including in

13 the important peer trial in the prior art, where patients lost

14 a whole lot of vision with extended fixed dosing.

15         The prior art was clear here.  Extended fixed dosing

16 was a bad idea.  It provides less benefit to patients.  And, in

17 fact, Genentech tried and failed with every-eight-week dosing

18 as well.

19         Regeneron at first tried prn dosing too.  That's the

20 way the wind was blowing.  I want to explain the nomenclature

21 for just a moment.  You'll see often a number followed by a Q

22 followed by another number in connection with these documents.

23 The first number is the dose.  That's how much of the drug

24 people are getting.

25         THE COURT:  The solution itself?  That's not

1  reflecting how much aflibercept is in the solution?

2        MR. BERL:  That's how much aflibercept is in the

3  solution, not the solution itself.  So the solution itself has

4  other things, and they usually get up to 50 microliters into

5  the eye.  And so that 50 microliters can either have a lot if

6  it's really concentrated, or it can have a little if it's less

7  concentrated.

8        THE COURT:  So the first number is actually the

9  active ingredient?

10        MR. BERL:  That's the amount of the active

11  ingredient.  Exactly right.

12        THE COURT:  Thank you.

13        MR. BERL:  .502.  And the -- after the Q is how often

14  it's given, every 4 weeks, every 12 weeks, every 8 weeks, et

15  cetera.  And in this trial, which is in the prior art, the

16  CLEAR-IT 2 trial, they did every four weeks, for example,

17  with .5.  And in all of these cases followed by prn dosing.

18  They were doing this pro re nata dosing too, just like everyone

19  does.

20        But then Dr. Yancopoulos shifted course contrary to

21  the conventional wisdom and chose to pursue a fixed-dosing

22  regimen at every eight weeks rather than prn as in the prior

23  art View 1 and View 2 trial.

24        The difference between what Regeneron did and what

25  the prior art previously did before the invention is stark and

1   important.

2        The prior art trial did not disclose every week --
3   every eight-week dosing, did not use three loading doses before
4   that, did not compare aflibercept to ranibizumab -- Genentech's
5   leading product -- in order to see whether it would work as
6   well, and switched to prn rather than having extending
7   fixed-dosing.

8        Now, quite surprisingly, Dr. Yancopoulos's invention
9   worked, and he showed that dosing aflibercept and Eylea every
10  two months, extended fixed-dosing will work as well as the
11  ranibizumab, Genentech Lucentis, treatment every four weeks.

12       As you'll hear, this was enormously consequential for
13  patients and caregivers alike, and it helped drive the success
14  of Eylea.

15       Claim 6 reflected in this invention here is not
16  obvious as a whole.  But even if obviousness inquiry were
17  limited improperly, as Biocon and Mylan urged, to the isotonic
18  aflibercept limitation added by Claim 6, they still would fail.
19  Their clinical expert, Dr. Albini, has no opinions about
20  formulation.  He defers to their formulation expert,
21  Dr. Rabinow, on this.

22       For his part, Dr. Rabinow in his report relied on the
23  Hecht prior art reference for a motivation to use an isotonic
24  formulation.  But then at deposition he agreed in no uncertain
25  terms repeatedly -- and this is his word, not mine -- that

1  Hecht is inadequate -- it's inadequate -- to motivate the POSA

2  to use an isotonic solution for intravitreal administration.

3  It's not good enough.  It's not even close.  And Mylan should

4  not be able to advance a new theory of obviousness here now

5  that its experts crumbled under oath as to the theory they

6  actually advanced.

7            Now let me turn to the DME or DR dosing, which

8  require five monthly loading doses.  An initial dose and four

9  secondary doses make five.

10           No prior art disclosed that regimen.  Zero.  It's a

11 big goose egg.

12           The published dosage regimen for the Phase II trials

13 shown here had a lot of different regimens but never, never

14 five loading doses followed by every eight weeks.

15           Now, Mylan's anticipation theory is actually based on

16 the prn arm of this published trial, of this published regimen.

17 What they say is that with prn dosing, it's possible somehow

18 that someone could have gotten a fourth and fifth dose at weeks

19 12 and 16 and then possibly, magically, could then have gotten

20 doses every eight weeks pursuant to his pro re nata treatment

21 appropriate after UR-inspected regimen.

22           But that potential treatment by happenstance is

23 exactly what inherent anticipation is not.  The furthest their

24 expert would go is that this prior regimen could easily result

25 in the claimed regimen.  But of course "could easily result"

1    isn't good enough.  That is probabilities or possibilities.

2    The law requires that it necessarily must result, and not even

3    their expert thinks that.

4           So their main argument here is obviousness.  And the

5    argument that they propose is contrary to what the inventor

6    actually did.

7           Dr. Yancopoulos chose a different regimen, never

8    disclosed in the prior art, and he used it in the ensuing

9    trials, called VIVID and VISTA.  Mylan must prove that it was

10   obviousness to do this, with an expectation of success.  And it

11   can't.

12          But, briefly, in order to evaluate what's prior art

13   and what's not, Your Honor will have to decide what the

14   priority date is for this invention, whether it's 2011, based

15   on Regeneron's claim to its initial application filed with the

16   patent office, or only 2013, if the initial application does

17   not support the claims.

18          Mylan and Biocon disputed this issue, unlike in the

19   product patent where they agree that the 2006 application

20   supports the provisional application and never fought it and

21   asserted the 2006 date in its expert reports.

22          But the 2011 application here supports the claim.  It

23   discloses the exact treatments that are in the claim, the

24   diseases of diabetic retinopathy and DME, the initial dose, and

25   four loaded doses.  That's five loading doses and then every

1  eight weeks.

2          Mylan's argument, essentially, is that Regeneron

3  disclosed too much in the 2011 application, that along with

4  five loading doses, it also disclosed three or four or six or

5  seven or eight.

6          But that doesn't work under the law.  If you disclose

7  the invention and more, you still describe the invention and

8  you get priority, as the federal circuit explained in the

9  Streck case where the disclosed priority application disclosed

10 the particular molecule and a bunch more.  That's good enough.

11 You don't have to disclose only your invention; you just have

12 to disclose your invention.

13         Now, on obviousness with the 2011 date, Mylan

14 pretends that it's really easy to go from three loading doses

15 to five.  They say you just add a box here and you add one

16 treatment.  But while it might look like that on a piece of

17 paper that you do that, that's not actually the intellectual

18 exercise one must go through in order to get the five loading

19 doses.  Rather, if one starts at three -- and let me be clear.

20         There's nothing in the prior art showing a problem

21 with three.  No one ever would have said they used three in the

22 prior art; that's a problem; I want to change that.  No reason

23 to do it.  And if you're going to do it, you actually want to

24 use fewer not more injections.

25         But even assuming that one considered it, it's not

1  just adding one treatment.  If you add one loading dose, there

2  you are, there is treatment at Week 12, and then you've got to

3  push out the ensuing every eight-week doses because, if you

4  keep that dose where it was before, at the 16-week point,

5  you're not doing every four weeks any longer -- every eight

6  weeks any longer after the four loading doses; so you push it

7  out.

8          And then the skilled artisan would have said four

9  isn't good enough -- even the prior art doesn't say go to

10  four -- I'm going to double down for some reason -- who knows

11  why? -- and go to five.  And then people dose at five, again

12  push out the ensuing treatments off the board, and change the

13  regimen entirely.

14          Mylan pretends here, and in its presentation today,

15  that whether you treat at these time intervals of 12 weeks, 16

16  weeks, or 20 weeks, it's just a simple coin flip exercise --

17  yes; no.  Do I do it?  Do I not?  That's not what's going on

18  here.

19          These are physicians and scientists actually trying

20  to make a decision about a dosing regimen.  They're not doing

21  it by law.  They're doing it based on analysis, based on the

22  prior art.  And the prior art told over and over fewer doses,

23  not more, relieve patient discomfort.  Don't make it worse,

24  especially for DME, where you don't need to use as many loading

25  doses, the prior art taught.

1          Indeed, Dr. Albini, their sole expert on this point,

2    agrees that there was a move toward reducing the number of

3    injections, not increasing them, flatly contrary to the theory

4    that Mylan must prove in order to go from three loading doses

5    to five.

6          In fact, the prior art itself, which is what matters

7    rather than coin flips that Mylan is conjuring in its

8    demonstratives, talked clearly -- and this the Lalwani article,

9    PTX 703 -- that treatment of DME will be more of an art form

10   with the tailoring of individual treatments for individual

11   patients, prn, treat each patient individually, not a fixed

12   extended dosage regimen like is claimed in our trial.

13          Now, with a 2013 priority date, there's one

14   additional piece of prior art that Mylan asserts, which is the

15   Do 2012 reference, which shows the initial data from the three

16   loading dose trial, and the every-eight-week regimen with three

17   loading doses is shown here in pink.

18          And what Mylan says, with classic impermissible

19   hindsight, is that these data somehow would have motivated the

20   skilled artisan, of all things, to add two loading doses.

21          That's not true.  The contemporaneous evidence will

22   show otherwise, including the fact that Regeneron, with all of

23   the assembled experts together staring at the data, never

24   thought that these published data tell you to use five loading

25   doses rather than three.  No one said it at the time, only

1   someone who comes in 12 years later and says it would have been

2   obvious.

3           The objective indicia of nonobviousness, including

4   commercial success, further confirm nonobviousness.  No one

5   would have wanted to use this regimen.  No one would have

6   wanted to do it or expected that it would work.

7           Finally, we get to Mylan's dog's breakfast of

8   different 112 defenses that it asserts.  There are, like, eight

9   of them.  It's not clear what they're actually running, but

10  I'll address a few that they actually mentioned in their

11  pretrial briefing.

12          The first is that somehow the patent doesn't disclose

13  treatment of angiogenic eye disorders in general.

14          Now, again, these arguments are so contradictory,

15  they have to bring two different experts in to advance them,

16  which they'll do again, because they're saying you wouldn't

17  have any idea, even with the specification, how to disclose,

18  how to treat these diseases.  But the specification tells you

19  how.  It tells you very clearly which diseases to treat, and it

20  tells you how to treat them, the extended eight-week dosing

21  regimen with different numbers of loading doses.

22          Now, this is sufficient as a matter of law.  Mylan's

23  complaint is that we didn't treat enough diseases in the

24  specification using actual clinical data that we said what we

25  should treat, but we had to prove somehow with clinical trials

1    that each disease would work, that more diseases would work.

2            But there is no requirement in the law of written

3    description that the disclosure contain either examples or an

4    actual reduction to practice.  On the contrary, Alcon v. Barr

5    again, the patent need not guarantee that the invention works

6    and efficacy data -- exactly what Mylan asserts is missing

7    here -- are generally not required -- not required -- in a

8    patent application.  And we do have clinical data in our

9    specification.  We meet this requirement easily.

10           Finally, Mylan and Biocon assert that the term

11   "approximately," which appears in the claim, somehow is

12   indefinite.

13           Now, first of all, that's wrong because their experts

14   know exactly what it means.  So it has to be reasonably certain

15   for people because it's used frequently in the art.  But more

16   importantly what we see on the right is the proposed label that

17   Mylan and Biocon would send if their product gets approved to

18   doctors.  This is what they're telling doctors to do with their

19   product.  And they use the word "approximately" in their

20   instructions to doctors.

21           Mylan and Biocon surely aren't trying to confuse

22   doctors by using a word that doctors have no idea what it means

23   so they'll have no idea how to use Mylan and Biocon's

24   treatment.  The real Occam's razor answer here is that everyone

25   knows in the field what "approximately" means and would have no

1   difficulty implementing this patent claim.  In fact, the

2   federal circuit, time after time, has clarified that words of

3   approximation -- "about," "substantially," and what we have

4   here, "approximately" -- are perfectly fine in patents in order

5   to provide some breadth to the claim rather than numerical

6   specificity.  And they are not here, and they never have been

7   indefinite.

8          With that, I thank Your Honor for patience.  We look

9   forward to presenting the case to Your Honor, and at the end

10  we'll ask for a judgment that the patents-in-suit are both

11  valid and infringed.  Thank you very much.

12         THE COURT:  Understood.  Thank you, Counsel.

13         As a housekeeping question, how long do you

14  anticipate opening statement to take?

15         MR. RAKOCZY:  Probably an hour, Your Honor.  Do you

16  want to take a quick break?

17         THE COURT:  Yes, let's take a quick break.  That will

18  give you all a chance to set up, and then we'll roll from

19  there.  We do have -- as I promised, we do have a proceeding

20  that's set for noon.  We can -- they can wait a few minutes,

21  but I'll give everybody a heads-up at noon we do have a

22  criminal hearing that we had to tend to.  So I'll ask everybody

23  to, as best you can, move some stuff back a row.  That

24  shouldn't take all that long, but this will all flow nicely.

25  If we can do that, we'll take a lunch break at that point.

**Confidential Material Omitted**

# Supp.Add277-384
# Redacted in Entirety

# EXHIBIT B-45

C Corrected Transcript

06-Sep-2023

# Regeneron Pharmaceuticals, Inc. (REGN)

Wells Fargo Healthcare Conference

**Regeneron Pharmaceuticals, Inc.** (REGN)
Wells Fargo Healthcare Conference

 Corrected Transcript
06-Sep-2023

# CORPORATE PARTICIPANTS

**Ryan Crowe**
*Vice President, Investor Relations, Regeneron Pharmaceuticals, Inc.*

**Marion McCourt**
*Executive Vice President-Commercial, Regeneron Pharmaceuticals, Inc.*

........................................................................................................................................................................................................................

# OTHER PARTICIPANTS

**Mohit Bansal**
*Analyst, Wells Fargo Securities LLC*

........................................................................................................................................................................................................................

# MANAGEMENT DISCUSSION SECTION

## Mohit Bansal
*Analyst, Wells Fargo Securities LLC*

Good morning. My name is Mohit Bansal. I'm one of the biopharma analysts here at Wells Fargo. And I'm very happy to start with Regeneron Pharmaceuticals today. We have Marion McCourt, Head of Commercial at Regeneron, and Ryan Crowe, Head of Investor Relations. Thank you very much for joining us. Over to you, Ryan.

........................................................................................................................................................................................................................

## Ryan Crowe
*Vice President, Investor Relations, Regeneron Pharmaceuticals, Inc.*

Thanks, Mohit. And it's great to be here. I always love coming to this conference. It's our second year in a row here, and I'm very excited to be here again. I'd like to remind you that our remarks today may include forward-looking statements about Regeneron. Each forward-looking statement is subject to risks and uncertainties that could cause actual results and events to differ materially from those projected in such statements. A description of material risks and uncertainties can be found in Regeneron's SEC filings. Regeneron does not undertake any obligation to update any forward-looking statements whether as a result of new information, future events, or otherwise.

I think it's appropriate to reminisce on our last seat at this stage, Mohit, when we announced the results from the first year of the PHOTON and PULSAR studies, or what's now known as EYLEA HD, at the time aflibercept 8 milligrams. And clearly, that was a very exciting and pivotal day for Regeneron and for patients with wet AMD and DME.

Almost to the day, one year later, we sit with an approved product in three indications. So in addition to wet AMD and DME, we're also approved in diabetic retinopathy. And, while the launch is in the early days, I believe it's business day 12, the early signals are very positive, and I'm sure we'll talk a lot about that.

But in addition to the approval, we've also put out very strong two-year data underscoring the clinical profile over a much longer period of time, showing that EYLEA HD is capable of putting a very high proportion of patients

**Supp.Add387**

AMG-AFL-US_00249085

## Regeneron Pharmaceuticals, Inc. *(REGN)*
Wells Fargo Healthcare Conference

C Corrected Transcript
06-Sep-2023

beyond even every 12-week dosing for both types of patients. So that's very exciting, all while maintaining the visual gains and the safety profile that EYLEA, the standard of care for a very long time, was able to put forward. So very excited about launching this product, and I'm sure we'll talk more about it.

Dupixent was another important – there were a lot of important milestones achieved for Dupixent over the last year, including the approval of prurigo nodularis in the US last September, as well as the readout for COPD in patients with type 2 inflammation that was in March. We look forward to the NOTUS study, which [ph] we (00:02:40) will read out the middle part of next year to facilitate a filing there.

And then lastly, more progress in the oncology pipeline with additional data for odronextamab, our CD20xCD3 bispecific in lymphoma and our BCMAxCD3 bispecific linvoseltamab in multiple myeloma. And then finally, fianlimab, we also made notable progress in both melanoma and lung cancer with pivotal trials now underway for both.

So lots of achievements. Obviously, the financials have continued to move along. Last quarter, revenues grew 11%, driven primarily by the Sanofi collaboration, including Dupixent, as well as Libtayo, which continues to make inroads in non-small cell lung cancer following its November 2022 approval.

So a lot's happened in the last year, Mohit. And I'm sure we can dive into all those topics. Why don't we get started with the Q&A?

# QUESTION AND ANSWER SECTION

### Mohit Bansal
*Analyst, Wells Fargo Securities LLC*

Q

[indiscernible] (00:03:41) [ph] by coming – like in 15 years, this is the time when you are announcing so many new (00:03:43) [indiscernible] (00:03:44) So, an amazing time for you to be here, Marion. So maybe let's just start with EYLEA here. There is a high dose EYLEA specifically. How you're thinking of this launch versus the first EYLEA launch back in 2012? Is it the same playbook you are playing? And how important is J-code, like what are the mechanisms wherein you can still get a share even without J-code? I mean, how should we think about that?

### Marion McCourt
*Executive Vice President-Commercial, Regeneron Pharmaceuticals, Inc.*



A

Sure, Mohit. Happy to. And good morning to everybody. So as Ryan mentioned, we're on business day 12 in the EYLEA HD launch, so I can give you some recent insights. And the first part of your question is, how is this similar or dissimilar from when we launched EYLEA? Let me start with the similarity, and that is that the level of enthusiasm prior to launch is now moving into the same level of excitement, albeit very early days for physicians as they now have the opportunity to evaluate EYLEA HD in the market.

And the way we have spoken about EYLEA HD is that we're bringing a product into the marketplace that fulfills the tremendous need of durability and with that being the ability to meaningfully extend the dosing interval with EYLEA HD as we saw in some of the recent clinical data that went out to two years for wet AMD and diabetic eye disease where you potentially can get patients out to 12 weeks, 16 weeks. That doesn't exist in the marketplace today. And at the same time, with the confidence that you have, the efficacy and safety that physicians have come to know with aflibercept.

Copyright © 2001-2023 FactSet CallStreet, LLC

　　　　　　　　　　　　AMG-AFL-US_00249086

# Regeneron Pharmaceuticals, Inc. (REGN)

Wells Fargo Healthcare Conference

**C** Corrected Transcript
06-Sep-2023

So the similarity is that level of enthusiasm and excitement of having something they haven't had before and that transcends then into the market today with this enthusiasm for EYLEA HD, what it brings that hasn't been available in the market for the approved indications. What I would say is dissimilar. It's a different market environment, and always, here we are, 11 years, 12 years later. But I do think the sophistication of our teams, our medical team that's in the market today, our medical affairs team, our commercial organization, our reimbursement team, are all working very, very well on the marketplace.

And I'll add for all of you very quickly, it's always kind of fun to hear the stories from companies on when the product was approved. So our approval came, as these things often do, late on a Friday evening in August. And with immediacy, every team member across Regeneron in all functions got to work through the entire weekend 24/7 so that we could launch as promised on Monday and start actually having patients treated by the Wednesday of the first week of product being in the market, which meant it had to get to the wholesalers, be distributed, get into the marketplace, get into physician offices. And we're already having reports of early use, which is really, really exciting.

---

**Mohit Bansal**
*Analyst, Wells Fargo Securities LLC*

Q

So that completely [ph] made (00:06:49) sense. And the importance of J-code.

---

**Marion McCourt**
*Executive Vice President-Commercial, Regeneron Pharmaceuticals, Inc.*

A

Yes, that was the second part of your question. So you can certainly trust that we are doing everything required so that our submissions will be at CMS, and we would then be planning for – of course, the date we have to shoot for is by October 1 in terms of submission. That would result in a permanent J-code generally being achieved by April 1.

In the window of time prior to the permanent J-code, we'll be working under a temporary J-code. Our retina specialists practice offices are quite sophisticated. They do know how to make certain that they check on coverage for patients. We certainly do anticipate that there will be use of EYLEA HD before we have a permanent J-code.

We look forward to that day, but certainly there is opportunity for trial evaluation and [ph] through (00:07:40) practice changing type of occurrences in offices where physicians deem that they would like to transition to EYLEA HD before we have the permanent J-code. So we believe there's an important opportunity in front of us immediately.

---

**Mohit Bansal**
*Analyst, Wells Fargo Securities LLC*

Q

Can you do some level of sampling or those kind of strategies in the beginning so that...

---

**Marion McCourt**
*Executive Vice President-Commercial, Regeneron Pharmaceuticals, Inc.*

A

Sampling is permitted. We do believe, though, at Regeneron that it's very appropriate that we work through the channels in the marketplace so that physicians are experiencing the product and also making certain that their patients will have enduring reimbursement and ability to use the product and have reimbursement and coverage for the products. So we do believe that that's very, very important.

---

**Supp.Add389**                                    AMG-AFL-US_00249087

## Regeneron Pharmaceuticals, Inc. *(REGN)*

Wells Fargo Healthcare Conference

**C** Corrected Transcript
06-Sep-2023

---

**Mohit Bansal**
*Analyst, Wells Fargo Securities LLC*

**Q**

Got it. That's super helpful. I have one question in my inbox. Sorry, Ryan, I'll have to direct it to you.

---

**Marion McCourt**
*Executive Vice President-Commercial, Regeneron Pharmaceuticals, Inc.*

**A**

Quite all right.

---

**Mohit Bansal**
*Analyst, Wells Fargo Securities LLC*

**Q**

So I think it is a question for both you and Ryan. So the question is, how important it is to push [ph] off standard dose EYLEA (00:08:40) biosimilar launch to convert as many patients as you can? I mean – and what should be the base case? And how should we think about the upcoming court case there?

---

**Marion McCourt**
*Executive Vice President-Commercial, Regeneron Pharmaceuticals, Inc.*

**A**

Yeah.

---

**Ryan Crowe**
*Vice President, Investor Relations, Regeneron Pharmaceuticals, Inc.*

**A**

Maybe...

---

**Marion McCourt**
*Executive Vice President-Commercial, Regeneron Pharmaceuticals, Inc.*

**A**

So maybe I'll make a quick comment on EYLEA HD and then over to Ryan to talk a little bit more about some of the other elements of your question. The one comment I wanted to make sure I share with you, because it is early days of launch, and I promise to give you some early insights, one thing that's really interesting is that as physicians are starting to evaluate EYLEA HD with their patients, we're hearing stories of physicians not only trying EYLEA HD on what you might describe as recalcitrant patients. But we're also hearing stories and instances where physicians are saying they may have a product or, excuse me, a patient who's on, for example, EYLEA, which obviously is a standard of care with about 46% of the market, but perhaps have a patient who is on a seven-week dosing interval. And they're excited to be able to share with that patient that they now have an alternative that could allow the patient to come back in many more weeks over time.

We're also hearing situations where a physician might have been trying a patient on another branded product. [ph] They'll (00:09:50) use EYLEA again, but it could be another branded product. We just happen to have more of the branded market with about 70% of the category. But they might be instead of starting EYLEA, starting the patient on EYLEA HD from the start, a patient transition from Avastin, a new patient. I share this because it is rather unique in this category to be hearing early use experience in a variety of patient types. So that also bodes well for the enthusiasm and product uptake.

---

**Ryan Crowe**
*Vice President, Investor Relations, Regeneron Pharmaceuticals, Inc.*

**A**

[indiscernible] (00:10:16) I'll take the question about EYLEA biosimilars. I think most people are now aware that the regulatory exclusivity expires on May 17, 2024. So that's the next day, May 18, would be the first day that the FDA can approve a biosimilar version of aflibercept 2 milligram. We have – we are currently litigating – in litigation

---

**Supp.Add390**

AMG-AFL-US_00249088

# Regeneron Pharmaceuticals, Inc. (REGN)

**C** Corrected Transcript

for three patents against Viatris and Biocon, with a decision currently pending from the Northern District of West Virginia. We believe the decision could come any day. And we are optimistic, but realistic with our expectations there.

I think the base case for people should remain biosimilar entry around the middle part of next year, with potential for upside should we receive a favorable judgment there. We'll have to see what that looks like. So obviously, the longer you have without biosimilars, I think the longer the runway to convert patients, appropriate patients to EYLEA HD, the better. But the strategy doesn't change. The strategy has always been, let's move this market to what we believe is the new standard of care EYLEA HD. So that's how we think about it. And that's how I think you guys should think about it.

---

**Mohit Bansal**
*Analyst, Wells Fargo Securities LLC*

**Q**

Got it. Got it. And bringing IRA into the discussion at this point, I mean, how are you thinking about IRA/any potential settlement here?

---

**Ryan Crowe**
*Vice President, Investor Relations, Regeneron Pharmaceuticals, Inc.*

**A**

Yeah. IRA brings in another dimension to the calculus, I guess. We think we're in a pretty strong position with regard to IRA. We are awaiting Part B guidance. Right now, we only have Part D guidance, and there has been some potential for read-through from Part D to Part B. But until we have it in hand and understand what it says, it's hard to make business decisions. Should the FDA decide to aggregate products similar to how they're doing in Part D with the same active moiety, we believe that so long as there is a biosimilar for aflibercept 2 milligram that then any aflibercept-containing product would be not subject to negotiation.

On the other hand, should we – should EYLEA HD be considered a new product, obviously, it would benefit from the 11-year shield from selection for negotiation. So we'll have to see what the guidance looks like. In either case, we think we're in a very strong position and certainly believe that the retinal franchise at Regeneron is one that we'll be enduring.

---

**Mohit Bansal**
*Analyst, Wells Fargo Securities LLC*

**Q**

Got it. If you have any questions, feel free to let me know. So maybe moving on to the pricing, because this is probably the first public forum for you after you announced the price. Can you talk a little bit about the thought process behind pricing high-dose EYLEA? And how has been the feedback from the payers/physician community so far?

---

**Marion McCourt**
*Executive Vice President-Commercial, Regeneron Pharmaceuticals, Inc.*

**A**

Sure. So, the pricing philosophy for EYLEA HD is very consistent with Regeneron's overall pricing philosophy, which is one of great responsibility keeping the patient at the center of the thought process in terms of product opportunity for that patient in need, so that responsibility and that thoughtfulness. When you look at the pricing for EYLEA HD quite deliberately, if you do kind of the translation of durability, you're looking at a price point that is very consistent with EYLEA.

In fact, you could even calculate that it's a little bit lower than EYLEA, but I would go more with consistent with EYLEA pricing. And then also remind everyone that EYLEA never took a price increase since launched 12 years

Copyright © 2001-2023 FactSet CallStreet, LLC

AMG-AFL-US_00249089

# Regeneron Pharmaceuticals, Inc. *(REGN)*

Wells Fargo Healthcare Conference

ago. And therefore, the thoughtfulness in being responsible with our pricing, but also recognizing that EYLEA HD brings in the opportunity for patients to have much greater durability while still benefiting from the confidence of aflibercept in terms of its efficacy and its safety.

So great – I [ph] said (00:14:35) something very quickly that the team's actually validated over months and years of work in making sure that our pricing was appropriate to the market. And to your comment of how has the external world reacted since we've launched, it's been quite favorable.

---

**Mohit Bansal** Q
*Analyst, Wells Fargo Securities LLC*

Got it.

---

**Marion McCourt** A
*Executive Vice President-Commercial, Regeneron Pharmaceuticals, Inc.*

The comments that I hear are, as expected from Regeneron, fair pricing, equitable pricing. There always will be room for those who would have gone to a different price point. But there's been a very consistent message of support for the pricing and the responsibility that we've brought to the category.

---

**Mohit Bansal** Q
*Analyst, Wells Fargo Securities LLC*

Got it. This is super helpful. One last question on EYLEA from my side. How do you think about – like, how has been the uptake of biosimilar Lucentis so far? And there were some rumblings that – or it probably happens already that this is like physicians are doing a little bit of – experiencing a little bit of prior [ph] auths (00:15:34) with Avastin and [indiscernible] (00:15:37). And so, is it happening [ph] the same way (00:15:39)? So how should we [indiscernible] ?

---

**Marion McCourt** A
*Executive Vice President-Commercial, Regeneron Pharmaceuticals, Inc.*

Sure. So the experience with biosimilars to date, obviously, biosimilars to Lucentis has predominantly impacted the Lucentis product category in the market, which obviously Lucentis is a smaller by market share and volume and by level of use product today. And that's primarily where the biosimilars have impacted and we've started to see some early use. Beyond that, I would say that there are step edits in the market today related to trial of – most frequently it's Avastin, trial of an Avastin before moving on to a branded product. That's not the majority of the marketplace, but certainly that exists in the market today. And I think our physicians and practitioners are quite experienced with how to navigate a use or trial of a less costly product before moving on to their branded selection product. They're very skilled with how to do that and how to operate in the best interest of their patients.

---

**Mohit Bansal** Q
*Analyst, Wells Fargo Securities LLC*

Great. Well, this is super helpful. Thank you. Any more EYLEA questions? Great. 50% time on EYLEA. So let's just talk about another small product you have called Dupixent. So help me understand from where – in what innings you are in terms of launch because the product is still growing five, six – more than five years after the launch, even in atopic dermatitis? So how should we think about growth in the areas Dupixent is in right now versus the new launches that are coming up?

---

AMG-AFL-US_00249090

## Regeneron Pharmaceuticals, Inc. (REGN)
Wells Fargo Healthcare Conference

**C** Corrected Transcript
06-Sep-2023

### Marion McCourt
*Executive Vice President-Commercial, Regeneron Pharmaceuticals, Inc.*

**A**

Sure. So, Dupixent on a worldwide basis has been an absolutely remarkable product in terms of transforming the lives of patients and the physicians who treat them. The experience, certainly in atopic dermatitis demonstrates not only in the US, but more broadly the tremendous unmet need. And, even today we're only penetrating the atopic dermatitis marketplace in adults in the – maybe – perhaps now we're up to the high teens or so in terms of percentage of market of patient capture versus those that still are untreated.

So there's tremendous opportunity not only in atopic dermatitis, but to Ryan's point, recent launches like prurigo nodularis, which is an incredibly difficult disease for patients who have had really no meaningful alternative until Dupixent was launched. And then we go into some of the other therapeutic or I should say indications where Dupixent is being used now. Biologic asthma has been an absolute godsend to so many patients in terms of making sure their lung function and exacerbations are brought under control. And they're minimizing the use of inhalers.

Similarly, in eosinophilic esophagitis, we launched [ph] the gastroenterologist (00:18:37) for the first time, brought relief to patients who are suffering so terribly from that disease. And I can go on with all the indications. It's not uncommon for patients who have nasal polyps to also suffer from asthma. So the other thing really important to think about with Dupixent is that it's treating type 2 disease.

Often, it's one indication that sends the patient to the physician like atopic dermatitis or asthma or EoE, but very often these patients also have concomitant type 2 diseases which are incredibly benefited by Dupixent. So to the – so the growth we see today, there's certainly tremendous future opportunity. And we very much look forward to future indication launches as well and helping more patients.

### Mohit Bansal
*Analyst, Wells Fargo Securities LLC*

**Q**

That's amazing. Maybe talk a little bit about the upcoming competition with Dupixent.

### Marion McCourt
*Executive Vice President-Commercial, Regeneron Pharmaceuticals, Inc.*

**A**

Sure.

### Mohit Bansal
*Analyst, Wells Fargo Securities LLC*

**Q**

I mean, we – like, I know we all – every year, we talk about something [ph] else. There was JAK inhibitor. But now with lebri (00:19:34), seems like they have shown pretty much similar data to Dupixent so far in atopic dermatitis. And Lilly has a history of – with taking some pricing tactics whenever they are a new player in a market where they don't have a play. So, how are you thinking about the upcoming competition from lebrikizumab? And what are the points that Dupixent could differentiate?

### Marion McCourt
*Executive Vice President-Commercial, Regeneron Pharmaceuticals, Inc.*

**A**

Sure. So, the first point of differentiation and what I was mentioning a moment ago, when you look at Dupixent in the treatment of type 2 disease, Dupixent [ph] is – it (00:20:13) has five indications. And the thing that's remarkable about that is, in each of the indications, Dupixent is the product that has the highest rate of new brand prescriptions. That's across biologic asthma, nasal polyps, atopic dermatitis, EoE.

**Supp.Add393**    AMG-AFL-US_00249091

# Regeneron Pharmaceuticals, Inc. (REGN)
Wells Fargo Healthcare Conference

 Corrected Transcript
06-Sep-2023

All the indication is where we have Dupixent in market, it's number one in terms of new scripts. And in every indication, except biologic asthma where we launched, I think, the fourth or fifth product into the marketplace, we're number one in total prescriptions. And again, it's the treatment not only of the single indication, but it's the co-morbidities often that come with type 2 disease.

But if I go specifically with atopic dermatitis, the other unique things that we hear from the specialist community and the key opinion leaders is that this dual mechanism of action of anti-IL-4, anti-IL-13 really is important. The Lilly product is an anti-IL-13. There is a product in the marketplace today that has that same mechanism of action. It hasn't been tremendously impactful to the market. We certainly always practice very, very thorough competitive readiness across all of our Regeneron teams.

So, certainly, we'll be ready as new entrants come into the marketplace. But I do think we hold a very distinctive profile in terms of Dupixent's efficacy, safety with indication down to patients as young as six months. These are very, very important characteristics of efficacy, safety, ease of use, reimbursement that are very important with Dupixent today.

The other thing I'll add is that, having additional competitors in the marketplace often is a good thing as well because it brings more attention to a disease category. So, certainly, we'll be ready for any incremental competition and certainly feel very confident in the profile that Dupixent brings to patients today.

**Mohit Bansal**
*Analyst, Wells Fargo Securities LLC*

Q

Got it. So this is super helpful. So one thing we often hear from experts is that Dupixent does better in real world than it did in clinical trials, so – which is a rare comment. Do you think a five years of head start and so many patients being on the treatment already, can it overcome any pricing tactic a competitor plays here?

**Marion McCourt**
*Executive Vice President-Commercial, Regeneron Pharmaceuticals, Inc.*

A

Yeah. Well, I think that most important in selection of biologic is the efficacy that it brings to the patient. And I say that also with [ph] line of sight of (00:22:51), we've been very conscious of making sure that we have coverage and affordability for patients with Dupixent, and that exists across all of our indications. And it's very important in the real-world setting that patients can actually access and use the medication.

But most important is the efficacy. And I'll share with you an anecdote. One of the key opinion leaders that I know well in the New York area taught me early days when I joined Regeneron that if a patient doesn't respond to Dupixent, then they don't have atopic [ph] dermatitis (00:23:24). This is a world renowned dermatologist who shared this. The product is so incredibly efficacious. So I think that's probably the number one thing.

By the side of that is safety. And it's really reassuring, whether to an adult or to a parent who potentially has a child who's being started on Dupixent, hearing that the product is approved down to the age of six months because the safety is so robust, is incredibly reassuring. Then you look at some of the elements of mechanism of action. It's not accidental that the Regeneron scientist in George Yancopoulos has anti-IL-4 and anti-IL-13 together.

When you have half the mechanism of action, it's probably not going to do all that you get when you combine the dual mechanism of action, which is really important. But as I said, we'll stay really attuned to the market

**Supp.Add394**

AMG-AFL-US_00249092

# Regeneron Pharmaceuticals, Inc. *(REGN)*
Wells Fargo Healthcare Conference

**C** Corrected Transcript
06-Sep-2023

environment. And competition actually coming into some of the categories where we have Dupixent in market has actually been helpful to growth of the overall category.

---

### Mohit Bansal
*Analyst, Wells Fargo Securities LLC*

Q

Great. This is helpful. Maybe moving on to COPD. So, a question for you, as a commercial leader, the first trial was – it was great. How important it is for the second trial to have a similar kind of effect when you talk to the prescribers? How are you thinking about the second trial? And what is the bar now? I mean...

---

### Marion McCourt
*Executive Vice President-Commercial, Regeneron Pharmaceuticals, Inc.*

A

Sure.

---

### Mohit Bansal
*Analyst, Wells Fargo Securities LLC*

Q

...sure, the bar has been raised now, so.

---

### Marion McCourt
*Executive Vice President-Commercial, Regeneron Pharmaceuticals, Inc.*

A

Yeah. So let's say – and Ryan will comment on this as well. But I would say in terms of potentially having the opportunity to bring Dupixent into the market for COPD is a tremendous opportunity. There's such incredible unmet need on a worldwide basis that that would be a remarkable opportunity. And certainly, our team would be ready for that upon completion of various trials, submission to FDA, and having a product approval. Ryan, maybe to you and some of the most recent information on timing.

---

### Ryan Crowe
*Vice President, Investor Relations, Regeneron Pharmaceuticals, Inc.*

A

Yeah. And I think the bar certainly has been raised when you can demonstrate a 30% reduction in exacerbations for patients that are already being maximally treated with inhaled triple therapy. In addition to that, we also improved lung function or, I should say, Dupixent improved lung function in these patients by 80 milliliters, 83 milliliters placebo adjusted. And their quality of life, because of those endpoints, also improved. So a really impressive data set overall for the first COPD trial for Dupixent.

And, Mohit, to your point, the bar certainly has gone up in terms of what the sort of the standard is for this disease. We hope that NOTUS can replicate the results. It is designed almost exactly the same. The readout is anticipated in mid-2024. And Sanofi and us are working together to try and expedite a filing to make that happen as quickly as possible. So, we are very excited about COPD and getting this to patients. We think it represents an important breakthrough. And hopefully, we can move this forward quickly.

---

### Mohit Bansal
*Analyst, Wells Fargo Securities LLC*

Q

Great. Maybe one more question for you, Ryan. I was a little bit surprised that for IL-33 – itepek – sorry, it's taking some time – itepekimab...

---

### Ryan Crowe
*Vice President, Investor Relations, Regeneron Pharmaceuticals, Inc.*

A

---

Supp.Add395

AMG-AFL-US_00249093

# Regeneron Pharmaceuticals, Inc. *(REGN)*

Wells Fargo Healthcare Conference

Ⓒ Corrected Transcript
06-Sep-2023

Yeah.

---

**Mohit Bansal**
*Analyst, Wells Fargo Securities LLC*

Q

...there are not many questions. Like, there were not many questions in the call. Help me understand your level of confidence with this drug versus Dupixent in COPD because there are more data with this one. So how should we think about this?

---

**Ryan Crowe**
*Vice President, Investor Relations, Regeneron Pharmaceuticals, Inc.*

A

Yeah. Itepekimab, which is a mouthful to say, it's anti-IL-33. And this one, I think, we have a pretty high level of confidence given the results that we have seen in Phase 2, which in the former smoker population demonstrated a 42% reduction in acute exacerbations related to COPD. Obviously, that's a little – that's higher than Dupixent's 30%, but this doesn't have any kind of type 2 phenotype. These are all comers in the former smoker population. So we, A, have great Phase 2 data. B, we've got a lot of information from our Genetics Medicine Center that suggests that anti-IL-33 should have effect in the COPD population. The IL-33 gene, when it has loss of function, you see a much higher rates of patients with COPD, so, therefore, blocking it should lead to very good outcomes, and that's what we've seen. So the AERIFY-1 and AERIFY-2 studies are our Phase 3 studies we're working with Sanofi on, they recently passed an interim futility analysis which is a good sign for moving forward to the final endpoint, the primary analysis, which is expected in 2025, which is another – this is a population, you're talking about 1 million patients in the G7 that are former smokers regardless of type 2 phenotype. So a really large opportunity. And we're very excited about it and hope to get to that readout as quickly as possible.

---

**Mohit Bansal**
*Analyst, Wells Fargo Securities LLC*

Q

Awesome. Moving on to oncology. So the Libtayo, you have a product. I mean, like, basically, the promise was that you will have the – as close to KEYTRUDA PD-1 as you can. And you have you have an antibody which is very similar to KEYTRUDA, albeit a few years later. Can you talk a little bit about the launch experience so far here? And then how -overall, how are you thinking about making this as a big backbone of the [ph] team, because you have LAG-3 coming up, so as it's – like (00:29:15) a commercial team, how are you thinking about leveraging on Libtayo long term?

---

**Marion McCourt**
*Executive Vice President-Commercial, Regeneron Pharmaceuticals, Inc.*

A

Sure. Very important. And Libtayo is the backbone of our future oncology portfolio. And certainly, we very much look forward to some of those opportunities for the future, both oncology and hematology. But just to focus on today with Libtayo, the team obviously did a very good job in launching Libtayo initially for cutaneous squamous cell carcinoma and basal cell carcinoma. In both cases, Libtayo very quickly became the standard of care in those non-melanoma skin indications.

Very importantly as well, we've seen a important uptick in use of Libtayo as we've launched as of last November the chemo combo indication in lung cancer. We previously, as you know, we had the mono indication, but having the chemo combo indication truly is important for lung cancer patients and having that optionality of chemotherapy for patients who need it. So, we're very pleased with our uptake.

We see growth in prescribers. We see growth in inclusion of Libtayo for lung cancer patients in standing order sets that academic institutions also use in the community setting. So I think the team is doing a really nice job. In

---

**Supp.Add396**

AMG-AFL-US_00249094

## Regeneron Pharmaceuticals, Inc. *(REGN)*
Wells Fargo Healthcare Conference

**C** Corrected Transcript
06-Sep-2023

the US and as well, we now have expansion of Libtayo Regeneron teams in select markets internationally on a worldwide basis. And we also – we're bringing in some incredible talents to run that area of our business. So we'll be positioned well for the future, not only for Libtayo, but for future products as well.

................................................................................................................................................

**Mohit Bansal**
*Analyst, Wells Fargo Securities LLC*

Q

Got it. And then how has been the interest in your LAG-3 so far now that you are prepping for that?

................................................................................................................................................

**Marion McCourt**
*Executive Vice President-Commercial, Regeneron Pharmaceuticals, Inc.*

A

Yeah.

................................................................................................................................................

**Ryan Crowe**
*Vice President, Investor Relations, Regeneron Pharmaceuticals, Inc.*

A

LAG-3, fianlimab as it's now known, has shown some really impressive data in the Phase 1 in metastatic melanoma where we have seen response rates in the below 60% and PFS of about 15%, median PFS of 15 months, median PFS, which when you look cross trial at PD-1 monotherapies, it's around triple median PFS of a monotherapy PD-1 and around double the response rate. And when you look cross trial once again at the end market, LAG-3, PD-1 combination, you still have significant benefit with mid-60s versus a low-40% ORR and a 15-month versus the 10-month median PFS.

So we think we have a differentiated combination. The metastatic melanoma studies are currently enrolling. And we are also beginning the lung cancer studies, which has a Phase 2 step in it, which we could see data for next year or into 2025, with the ability to expand those cohorts to a Phase 3 registration-enabling studies. So we're very excited about the anti-LAG-3. And not just in those two tumors, we're also exploring it in other tumors that have been sensitive to anti-PD-1 therapy. So more to come from the LAG-3 pipeline, I think.

................................................................................................................................................

**Mohit Bansal**
*Analyst, Wells Fargo Securities LLC*

Q

Awesome. So my last question, which I ask every year, so next year, September, first week after Labor Day, I hope you are here.

................................................................................................................................................

**Marion McCourt**
*Executive Vice President-Commercial, Regeneron Pharmaceuticals, Inc.*

A

Thank you.

................................................................................................................................................

**Mohit Bansal**
*Analyst, Wells Fargo Securities LLC*

Q

What would make you really happy about your – when you look back one year, what would make you really happy about your accomplishments at Regeneron next year same time?

................................................................................................................................................

**Mohit Bansal**
*Analyst, Wells Fargo Securities LLC*

Q

Yeah. Sure. I'll start, I'm sure Ryan will add to this, but – so what would make me very excited? I'll start where we ended. I think the advancements in our oncology portfolio, both in-line product and future products, is something that we'll be ideally talking with you about, I'm confident we will be able next year. Secondarily, I think we can

................................................................................................................................................

**Supp.Add397**                                      AMG-AFL-US_00249095

# Regeneron Pharmaceuticals, Inc. *(REGN)*
Wells Fargo Healthcare Conference

 Corrected Transcript
06-Sep-2023

expect to see Dupixent cross approved indications perform incredibly well in the marketplace. And it's truly been an amazing product like so many Regeneron products to be part of. And then, obviously, we'll be talking – I would imagine we will start conversation again next year talking about the launch of EYLEA HD. And at that point, we'll be celebrating a one-year birthday of time in marketplace and, certainly look forward to showcasing those results with all of you.

### Ryan Crowe
*Vice President, Investor Relations, Regeneron Pharmaceuticals, Inc.*

A

I think that that says – yeah, Marion's answer covered a lot of ground. I think, for me, obviously, continuing to see progress across oncology and potentially next year having two new products approved, odronextamab and linvoseltamab. We've previously signaled that we anticipate filings by the end of this year with approvals potentially next year.

So maybe not all of them approved by this time next year, but hopefully by the end of next year. EYLEA HD and monitoring the launch progress there will obviously be a critical importance. And then back to Dupixent and COPD where we would hope to at least be filed in that indication with another positive readout from NOTUS coming around the middle part of the year.

So there's plenty of things to be excited about at Regeneron. I think the growth profile for the company has never looked better. And we're certainly all about execution on the commercial side, as well as within the pipeline.

### Mohit Bansal
*Analyst, Wells Fargo Securities LLC*

Awesome. On that note, thank you very much for joining us today.

### Marion McCourt
*Executive Vice President-Commercial, Regeneron Pharmaceuticals, Inc.*

Thank you very much.

### Ryan Crowe
*Vice President, Investor Relations, Regeneron Pharmaceuticals, Inc.*

Thank you, Mohit.

### Marion McCourt
*Executive Vice President-Commercial, Regeneron Pharmaceuticals, Inc.*

Yes.

### Mohit Bansal
*Analyst, Wells Fargo Securities LLC*

Thank you.

### Marion McCourt
*Executive Vice President-Commercial, Regeneron Pharmaceuticals, Inc.*

Thank you, Mohit. And thank you, everyone.

Supp.Add398                                      AMG-AFL-US_00249096

Regeneron Pharmaceuticals, Inc. *(REGN)*

Wells Fargo Healthcare Conference

C Corrected Transcript
06-Sep-2023

Disclaimer
The information herein is based on sources we believe to be reliable but is not guaranteed by us and does not purport to be a complete or error-free statement or summary of the available data. As such, we do not warrant, endorse or guarantee the completeness, accuracy, integrity, or timeliness of the information. You must evaluate, and bear all risks associated with, the use of any information provided hereunder, including any reliance on the accuracy, completeness, safety or usefulness of such information. This information is not intended to be used as the primary basis of investment decisions. It should not be construed as advice designed to meet the particular investment needs of any investor. This report is published solely for information purposes, and is not to be construed as financial or other advice or as an offer to sell or the solicitation of an offer to buy any security in any state where such an offer or solicitation would be illegal. Any information expressed herein on this date is subject to change without notice. Any opinions or assertions contained in this information do not represent the opinions or beliefs of FactSet CallStreet, LLC. FactSet CallStreet, LLC, or one or more of its employees, including the writer of this report, may have a position in any of the securities discussed herein.

THE INFORMATION PROVIDED TO YOU HEREUNDER IS PROVIDED "AS IS," AND TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, FactSet CallStreet, LLC AND ITS LICENSORS, BUSINESS ASSOCIATES AND SUPPLIERS DISCLAIM ALL WARRANTIES WITH RESPECT TO THE SAME, EXPRESS, IMPLIED AND STATUTORY, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, ACCURACY, COMPLETENESS, AND NON-INFRINGEMENT. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NEITHER FACTSET CALLSTREET, LLC NOR ITS OFFICERS, MEMBERS, DIRECTORS, PARTNERS, AFFILIATES, BUSINESS ASSOCIATES, LICENSORS OR SUPPLIERS WILL BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES, INCLUDING WITHOUT LIMITATION DAMAGES FOR LOST PROFITS OR REVENUES, GOODWILL, WORK STOPPAGE, SECURITY BREACHES, VIRUSES, COMPUTER FAILURE OR MALFUNCTION, USE, DATA OR OTHER INTANGIBLE LOSSES OR COMMERCIAL DAMAGES, EVEN IF ANY OF SUCH PARTIES IS ADVISED OF THE POSSIBILITY OF SUCH LOSSES, ARISING UNDER OR IN CONNECTION WITH THE INFORMATION PROVIDED HEREIN OR ANY OTHER SUBJECT MATTER HEREOF.

The contents and appearance of this report are Copyrighted FactSet CallStreet, LLC 2023 CallStreet and FactSet CallStreet, LLC are trademarks and service marks of FactSet CallStreet, LLC. All other trademarks mentioned are trademarks of their respective companies. All rights reserved.

Supp.Add399

AMG-AFL-US_00249097

# EXHIBIT B-71

Supp.Add400

REFINITIV STREETEVENTS

# EDITED TRANSCRIPT

REGN.OQ - Q1 2024 Regeneron Pharmaceuticals Inc Earnings Call

EVENT DATE/TIME: MAY 02, 2024 / 12:30PM GMT

**OVERVIEW:**

Company Summary



MAY 02, 2024 / 12:30PM, REGN.OQ - Q1 2024 Regeneron Pharmaceuticals Inc Earnings Call

## CORPORATE PARTICIPANTS

**Christopher R. Fenimore** Regeneron Pharmaceuticals, Inc. - Senior VP of Finance & CFO

**George D. Yancopoulos** Regeneron Pharmaceuticals, Inc. - Co-Founder, President, Chief Scientific Officer & Co-Chairman

**Leonard S. Schleifer** Regeneron Pharmaceuticals, Inc. - Co-Founder, President, CEO & Co-Chairman

**Marion E. McCourt** Regeneron Pharmaceuticals, Inc. - EVP of Commercial

**Ryan Crowe** Regeneron Pharmaceuticals, Inc. - SVP of IR & Strategic Analysis

## CONFERENCE CALL PARTICIPANTS

**Brian Corey Abrahams** RBC Capital Markets, Research Division - Senior Biotechnology Analyst

**Carter Lewis Gould** Barclays Bank PLC, Research Division - Senior Analyst

**Christopher Joseph Raymond** Piper Sandler & Co., Research Division - MD & Senior Research Analyst

**Colin Nigel Bristow** UBS Investment Bank, Research Division - Analyst

**Evan David Seigerman** BMO Capital Markets Equity Research - MD & Senior BioPharma Research Analyst

**Mohit Bansal** Wells Fargo Securities, LLC, Research Division - Senior Equity Analyst

**Salveen Jaswal Richter** Goldman Sachs Group, Inc., Research Division - VP

**Terence C. Flynn** Morgan Stanley, Research Division - Equity Analyst

**Tyler Martin Van Buren** TD Cowen, Research Division - MD & Senior Equity Research Analyst

**William Pickering** Sanford C. Bernstein & Co., LLC., Research Division - Research Analyst

## PRESENTATION

**Operator**

Welcome to the Regeneron Pharmaceuticals First Quarter 2024 Earnings Conference Call. My name is Josh, and I will be your operator for today's call. (Operator Instructions). Please note that this conference call is being recorded. I will now turn the call over to Ryan Crowe, Senior Vice President, Investor Relations. You may begin.

**Ryan Crowe** - Regeneron Pharmaceuticals, Inc. - SVP of IR & Strategic Analysis

Thanks, Josh. Good morning, good afternoon and good evening to everyone listening around the world. Thank you for your interest in Regeneron and welcome to our first quarter 2024 earnings conference call. An archived and transcript of this call will be available on the Regeneron Investor Relations website shortly after the call ends. Joining me on today's call are Dr. Leonard Schleifer, Board Co-Chair, Co-Founder, President and Chief Executive Officer; Dr. George Yancopoulos, Board Co-Chair, Co-Founder, President and Chief Scientific Officer; Marion McCourt, Executive Vice President of Commercial; and Chris Fenimore, Senior Vice President and Chief Financial Officer. After our prepared remarks, the remaining time will be available for your questions. We anticipate today's call will last approximately 60 minutes.

I would like to remind you that remarks made on today's call may include forward-looking statements about Regeneron. Such statements may include, but are not limited to those related to Regeneron and its products and business, financial forecast and guidance, development programs and related anticipated milestones, collaborations, finances, regulatory matters, payer coverage and reimbursement issues, intellectual property, pending litigation and other proceedings and competition.



Each forward-looking statement is subject to risks and uncertainties that could cause actual results and events to differ materially from those projected in that statement. A more complete description of these and other material risks can be found in Regeneron's filings with the United States Securities and Exchange Commission, including its Form 10-Q for the quarter ended March 31, 2024, which was filed with the SEC this morning.

Regeneron does not undertake any obligation to update any forward-looking statements, whether as a result of new information, future events or otherwise. In addition, please note that GAAP and non-GAAP financial measures will be discussed on today's call. Information regarding our use of non-GAAP financial measures and a reconciliation of those measures to GAAP is available in our quarterly results press release and our corporate presentation, both of which can be accessed on the Regeneron Investor Relations website. Once our call concludes, Chris and the IR team will be available to answer any further questions.

With that, let me turn the call over to our President and Chief Executive Officer, Dr. Leonard Schleifer. Len?

**Leonard S. Schleifer** - Regeneron Pharmaceuticals, Inc. - Co-Founder, President, CEO & Co-Chairman

Thanks, Ryan. Thanks to everyone joining today's call. Regeneron is off to a strong start in 2024, reflected in our solid first quarter financial results as well as the progress we have made across our pipeline in the first 4 months of the year. For my remarks today, I'd like to briefly review some of our key performance drivers and then discuss a few of our more differentiated development programs, which have the potential to drive sustainable long-term growth for the company and value for our shareholders. After my remarks, George will provide an update on our pipeline. Marion will then review our commercial performance, and Chris will discuss our financial results. First quarter 2024 revenues grew 7% after excluding last year's revenue contribution from our COVID antibodies. Growth was primarily driven by Sanofi collaboration revenues and Libtayo global net product sales, which grew by 14% and 45%, respectively.

Dupixent global net product sales were $3.1 billion, up 24% reflecting strong growth across all approved indications. EYLEA HD generated $200 million in its second full quarter on the U.S. market outperforming recent launches in the anti-VEGF category. Now with the permanent J-Code in place, improving payer coverage, broad prescriber familiarity and satisfaction with the EYLEA HD clinical profile and direct-to-consumer TV promotion underway. We continue to position EYLEA HD as the new standard of care for retinal diseases.

Shifting to chronic obstructive pulmonary disease or COPD where Regeneron and Sanofi have 2 differentiated opportunities to transform the treatment paradigm for patients living with this debilitating disease. As announced in February, our sBLA for Dupixent for the treatment of COPD with type 2 inflammation was accepted by the FDA for priority review with a June 27 PDUFA date.

During its review of our submission, the FDA has requested additional efficacy analyses, including an information request received earlier this week regarding subpopulations from the BOREAS and NOTUS pivotal studies. Our analyses across these requested patient subgroups indicate a consistent and clinically meaningful reduction in COPD exacerbations. While the FDA has requested these analyses to be submitted by the end of May, we anticipate providing them substantially sooner. We and Sanofi are confident that these additional analyses strongly support the approval of Dupixent and eosinophilic COPD. If the FDA determines that they need additional time to review these analyses, a decision on the sBLA could be delayed for up to 3 months.

We and our partner, Sanofi, are preparing for launch that many pulmonologists, respiratory key opinion leaders and their patients are eagerly anticipating. If approved Dupixent will be the only biologic therapy for COPD and the first new treatment approach for this disease in more than a decade. There is a high unmet need in COPD with type 2 inflammation with approximately 300,000 eligible patients in the United States and another approximately 300,000 eligible patients in the EU and Japan, where we are also seeking regulatory approvals. Turning to itepekimab our IL-33 antibody, which is being evaluated in former smokers with COPD regardless of eosinophil phenotype. We remain on track to report results and enable potential regulatory filings in the second half of next year.

Itepekimab can potentially address up to 1 million patients in the G7 countries, while China also represents a significant opportunity. We are very excited about potentially bringing these important new therapies with COPD patients while expanding our commercial respiratory franchise. In a moment, George will describe another key opportunity in our pipeline involving Dupixent in combination with our BCMAxCD3 bispecific antibody



linvoseltamab which we believe has the potential to address any severe allergy and allow the millions of severe allergy sufferers to stop living in fear of an accidental exposure. Moving from linvoseltamab in severe allergy to its differentiated opportunity in multiple myeloma where it is currently under FDA and EMA review in the relapsed refractory setting. In our registration-enabling data set, while cross trial comparisons caveat supply, we believe linvoseltamab represents a best-in-class opportunity because it has the highest objective response rates and complete response rates at similar follow-ups observed across the BCMA bispecific class to date requires the least number of days in the hospital compared to other drugs in the category and is the only BCMAxCD3 agent currently under review or are already approved by the FDA that evaluated every 4-week dosing.

If approved, we believe these are all important considerations for patients, caregivers, providers and payers that could drive linvoseltamab adoption. In closing, I'm excited and energized by the differentiated opportunities in our pipeline, which now has over 35 programs in clinical development spanning many distinct therapeutic areas. Our commercial team continues to execute well and is building momentum in competitive categories, and we continue to deploy capital with the goal of driving shareholder returns over time. With that, I'll turn the call over to George.

**George D. Yancopoulos** - Regeneron Pharmaceuticals, Inc. - Co-Founder, President, Chief Scientific Officer & Co-Chairman

Thanks, Len. Since Len covered the status of the Dupixent and itepekimab programs in COPD in great detail, I'd like to start with a bit more about our innovative treatment approach for severe allergies, a first-ever combination of an immunomodulatory antibody that is DUPIXENT with a bispecific antibody. Despite the remarkable benefit demonstrated by DUPIXENT across multiple diseases characterized by allergic or type 2 inflammation, DUPIXENT alone does not immediately reverse severe allergies by itself. These allergies are caused by high levels of an immunoglobulin class known as IgE made by long-lived plasma cells. This has caused some to refer the E in IgE as E for evil. Although DUPIXENT will prevent formation of new IgE plasma cells, it does not eliminate those that have already formed.

Regeneron scientists have shown that these allergy causing IgE plasma cells can be rapidly eliminated with a short course of treatment with our bispecific antibody known as linvoseltamab. While Dupixent treatment will then prevent these cells from returning as recently highlighted in our publication in Science Translational Medicine. We have commenced our proof-of-concept clinical trial to explore the potential for this combination approach to eliminate severe food allergy. We are hoping to see initial observations from this small study later this year, which will inform next steps.

Moving on to oncology and libtayo combinations. Early clinical results of our LAG-3 antibody fianlimab in combination with libtayo suggest that these antibodies represent one of the most promising checkpoint inhibitor combinations in clinical development. Recall, fianlimab libtayo demonstrated potential for best-in-class efficacy in first-line metastatic melanoma with objective response rates of approximately 60% across 3 independent cohorts from our first-in-human study with a safety profile that is similar to that seen with anti-PD-1 monotherapy. With longer-term follow-up, these initial responses continue to deepen, including patients converting into complete responses. We look forward to presenting updated results from these expansion cohorts in the second half of this year.

Encouraged by these initial results, last year, we initiated a Phase II/III study of the combination of fianlimab and libtayo in first-line metastatic melanoma. This study is enrolling faster than expected and will now be conducted solely as a Phase III study with the final analysis to be reported during 2025. These pivotal melanoma data will inform whether fianlimab and libtayo have the potential to emerge as a new standard of care in melanoma.

Next, to our bispecifics for hematology oncology. Regarding odronextamab, our CD20xCD3 bispecific, as announced in March, we received complete response letters from the FDA for our BLA for relapsed/refractory follicular lymphoma and relapsed/refractory diffuse large B-cell lymphoma. The only approvability issue was related to the limited enrollment of these confirmatory trials, which we intend to address as we continue to enroll patients in these studies. The EU decision on odronextamab application is expected in the second half of this year.

Moving on to linvoseltamab. As Len noted, this bispecific continues to demonstrate a potentially best-in-class profile in late-line myeloma in terms of efficacy, safety, dosing and hospitalization burden. In an oral presentation at the recent AACR medical meeting, we presented results of an 11-month median follow-up of 117 patients. A 71% objective response rate with 46% of patients achieving a complete response or better. We are planning to present updated 14-month follow-up results at the upcoming EHA meeting in which we anticipate observing a further deepening of



responses. Regarding the ongoing FDA review, we believe the confirmatory study will be sufficiently enrolled to support approval. We're also evaluating linvoseltamab in earlier stages of myeloma and in precursor conditions such as smoldering myeloma and monoclonal gammophathy of unknown significance or MGUS.

Next, to bispecifics for solid tumors. Our cost inventory bispecific antibodies are being tested in numerous studies, including as monotherapies as well as in combination with CD3 bispecifics and with libtayo. Our EGFRxCD28 bispecific in combination with libtayo, we are planning to present updated dose escalation results in an oral presentation at ASCO, most notably, in microsatellite stable colorectal cancer, a tumor historically unresponsive to immunotherapy, EGFR by CD28 in combination with libtayo demonstrated antitumor activity.

Regarding safety, to date, we have not observed severe immune-related adverse events with this agent at our recommended Phase II dose. Based on these data, we are enrolling dose expansion cohorts testing our EGFRxCD28 costim bispecific plus libtayo in various cancers, including non-small cell lung cancer with or without EGFR mutations. Microsatellite stable colorectal cancer, head and neck squamous cell carcinoma and others.

On to our PSMA by CD28 costimulatory bispecific, which is already demonstrating promising activity in prostate cancer in combination with libtayo. We will soon initiate combination treatment of our PSMAxCD28 costim bispecific with our PSMAxCD3 bispecific, which based on preclinical studies, may maintain efficacy but with better tolerability.

We're also evaluating our MUC16xCD28 costimulatory bispecific with ubamatamab, or MUC16xCD3 bispecific as well as with libtayo, our CD38xCD28 costim with linvoseltamab for myeloma and our CD22xCD28 costim with odronextamab for lymphoma. Moving on to our classical hematology pipeline. Our C5 approach involves a first-in-class combination of an sRNA with an antibody for a more complete target blockade in our initial clinical data supports potential best-in-class efficacy in paroxysmal nocturnal hemoglobinuria or PNH.

Results from the preliminary cohort of the PNH Phase III study will be presented at the EHA conference in June with additional results expected later this year. In addition to PNH and myasthenia gravis, which are already enrolling their respective pivotal trials, we are planning on extending the systemic combination approach to geographic atrophy in dry AMD with the first pivotal study in GA expected to get underway this year.

We are also anticipating proof-of-concept data later this year for our 2 complementary Factor XI antibodies in the setting of prevention of venous thromboembolism after knee replacement surgery. Depending on these data, 1 or both of these antibodies could remain on a rapid path to registrational studies, which could begin by late 2024 or early 2025. We -- our first-in-class antibody TMPRSS6, a genetically validated target for iron overload diseases such as beta thalassemia, is also making progress. This antibody has potential to meaningfully reduce toxic organ iron in patients whom iron chelation is inadequate or intolerable.

Updated proof of mechanism data in healthy volunteers will be presented at the upcoming EHA conference. These results demonstrated deep sustained reductions in serum iron and robust induction of the liver hormone hepcidin, supporting the potential to release iron from organs. We are on track to start a Phase II proof-of-concept study in beta-thalassemia patients in the second half of the year.

Moving to obesity. Our most advanced approach is designed to address potential negative consequences of widespread use of GLP GIP receptor agonist. As it has been widely reported, the profound weight loss caused by these agents, unfortunately, can also result in substantial loss of muscle, which is particularly concerning in older, obese patients. Our antibodies to myostatin-related pathways may prevent this muscle loss. Indeed, our data in obese nonhuman primates show that combining semaglutide with trevogrumab, our antibody targeting myostatin with or without garetosmab, our antibody targeting Activin A, or myostatin 2, demonstrated a comparable reduction in body weight at week 20 relative to semaglutide monotherapy, but with improved quality of weight loss resulting in more fat loss while preserving or even increasing lean mass.

Part A of our proof-of-concept study in healthy volunteers intended to demonstrate safety of a higher dose of trevogrumab, has completed enrollment. Note that over 400 subjects, including healthy volunteers in sarcopenic patients have been dosed with trevogrumab throughout its clinical development with no meaningful safety or tolerability concerns observed to date. Part B of the study, which will evaluate muscle preservation antibodies in combination with semaglutide in obese participants remains on track to start enrolling mid-year assuming a reasonable pace of



enrollment, we expect to report top line results, including changes in body weight, fat mass and muscle mass in second half of 2025. I will conclude with our genetic medicines effort.

At the upcoming ASGCT conference, we will present updated data from our DB-OTO gene therapy program for genetic hearing loss. The first patient treated with this therapy, a 10-month old girl who is profoundly deaf at baseline. Now at 24 weeks after treatment had hearing in the normal range and the second treated patient is following a similar trajectory of improvement through earlier stages of follow-up. We are aiming to enroll several more patients this year, potentially enabling regulatory submissions by the end of next year, and we also look forward to bringing additional auditory gene therapy programs to the clinic in the coming years with the potential to address more common forms of monogenic hearing loss.

Our collaboration with Intellia on CRISPR gene editing continues to advance. We have begun to enroll patients in the Phase III MAGNITUDE study of NTLA-2001 for a lead indication of TTR amyloidosis with cardiomyopathy. The first in vivo CRISPR program clear to enter Phase III studies in the United States. We're also on track to be the first to use CRISPR technology to insert a corrective gene in vivo for a deficiency disease. We have now achieved clearance from both the U.S. and EU authorities for our insertion program for Factor IX, and we have already enrolled initial patients into the leading portion of this program.

Moving on to our siRNA collaboration with Alnylam, which has not only demonstrated successful silencing of genes in the liver, but also for the first time for siRNA in the brain. Additionally, we're excited about potentially initiating later this year a potentially pivotal study for our ALN SOD treatment in ALS patients with SOD1 mutations.

With that overview, I will turn the call over to Marion.

---

**Marion E. McCourt** - Regeneron Pharmaceuticals, Inc. - EVP of Commercial

Thanks, George. Our results in the first quarter demonstrate the strong performance of our commercial portfolio and future growth opportunity. We continue to strengthen and expand our leadership positions across our in-line brands, and we are preparing for potential upcoming launches. I'll start with our anti-VEGF franchise and the ongoing launch progress of EYLEA HD.

First quarter U.S. net sales grew 63% sequentially to $200 million as real-world experience with efficacy and safety continues to grow. EYLEA HD is delivering on its promise of extending the duration between treatments, but the majority of patients achieving this goal. Retina specialists are highly satisfied with EYLEA HD as demonstrated by prescribing across a broad range of patients. To date, most EYLEA HD patients are being switched from existing medicines most notably, EYLEA and faricimab, and we are also seeing an increase in treatment-naive patients.

For the quarter, EYLEA HD and EYLEA together secured 45% of the anti-VEGF category share combined U.S. net sales were $1.4 billion, which includes a reduction in wholesaler inventory of approximately $40 million. This reflects the sequential drawdown of EYLEA inventory that was partially offset by a modest increase in EYLEA HD inventory ahead of the permanent J-code on April 1. Since launch, our team has made significant progress to enhance reimbursement and market access for EYLEA HD. The permanent J-Code has increased prescribers reimbursement confidence, reflected by increased use among existing customers as well as a step-up in new customers ordering for the first time. We're very encouraged by EYLEA HD uptake despite a different payer market today compared to when EYLEA was launched more than a decade ago.

For example, while more than 80% of medical benefit lives are now covered for EYLEA HD increases in utilization management or step edits are impacting all branded products. We are also highly focused on educating patients about the potential for EYLEA HD to deliver best in category vision and safety benefits with fewer injections. In mid-March, we began our direct-to-consumer TV campaign designed to raise brand awareness among treatment experienced and treatment-naive patients. Since initiating the DTC campaign, retina specialists have reported a significant increase in patients actively asking about and being prescribed EYLEA HD. In summary, the EYLEA HD launch outperformed expectations, and we are on track to establish EYLEA HD as the new standard of care for retinal disease.

Turning now to Dupixent. From our first quarter global net sales grew 25% on a constant currency basis to $3.1 billion. In the U.S., net sales grew 17% to $2.2 billion, driven by continued robust demand and the impact of customary first quarter seasonality dynamics, including annual resets



of insurance plans. Dupixent is the clear leader in new-to-brand prescription share across all 5 FDA-approved indications and leads in total biologic prescriptions in 4 of its approved indications.

More than 850,000 patients are currently on therapy worldwide and 3 Dupixent indications have achieved blockbuster status, atopic dermatitis, asthma and nasal polyps. Across all 3 of these indications, Dupixent is competitively differentiated based on its clinical profile, depth of clinical experience and potential to be prescribed to very young patients as young as 6 months in the case of atopic dermatitis.

We continue to see great progress with our recent launches in EoE, Dupixent's GI indication and prurigo nodularis in dermatology. Patient initiations across both indications continue to reach all-time highs and in late January, Dupixent was approved in pediatric EOE, the brand's fourth pediatric indication. Early launch indicators are positive as Dupixent is transforming the standard of care for these children aged 1 to 11 as it has for adults and adolescents with EoE. In addition to its approved indications, there's great potential for Dupixent in an increasing list of additional type 2 diseases, including COPD. If approved, Dupixent will achieve 2 important first, the first biologic medicine for COPD and also the first new treatment in more than a decade for this devastating disease.

In the U.S., approximately 300,000 patients with uncontrolled COPD show evidence of type 2 inflammation. If approved, we will rapidly -- we work to rapidly establish the unique clinical benefits of Dupixent, activate physician adoption, motivate patients to seek treatment and also advance access and affordability. We are confident that COPD will drive meaningful growth for Dupixent, if approved in this indication and see an additional opportunity to address patient unmet need with itepekimab our investigational IL-33 antibody designed to help COPD patients who are former smokers. With significant runway for growth in existing and potential new indications, we are confident in Dupixent's ongoing growth trajectory.

And finally, to libtayo. In the first quarter, global net sales were $264 million, up 44% on a constant currency basis from the prior year, driven by our dual focus in skin and lung cancers. In non-melanoma skin cancer, libtayo continues to lead the immunotherapy category in CSCC and BCC with opportunity for continued market growth. In lung cancer, we are making steady progress in capturing category share in both monotherapy and chemotherapy combination patients. Our oncology team is also preparing for the upcoming August 22 linvoseltamab, PDUFA date recently to reinforces that linvoseltamab has the potential to be best-in-class for late-stage myeloma patients, and we look forward to its potential launch.

In summary, our commercial team continues to bring important medicines to patients across an expanding range of diseases. We are focused on differentiating our medicines to increase category share and drive market growth. Potential upcoming launches across our portfolio provide the opportunity to extend the benefits of our medicines to even more patients. And with that, I'll pass the call to Chris.

**Christopher R. Fenimore** - Regeneron Pharmaceuticals, Inc. - Senior VP of Finance & CFO

My comments today on Regeneron's financial results and outlook will be on a non-GAAP basis unless otherwise noted. Regeneron delivered solid financial results in the first quarter of 2024. Excluding contributions from our COVID antibodies, total revenues increased 7% year-over-year to $3.1 billion, primarily driven by continued sales growth and margin expansion from Dupixent and strong global sales growth from libtayo. First quarter diluted net income per share was $9.55 on net income of $1.1 billion.  Moving to collaboration revenue, first quarter ex-U.S. net sales of EYLEA and EYLEA HD, known as EYLEA 8mg outside the U.S., were $849 million, up 2% on a constant currency basis versus the prior year. Total Bayer collaboration revenue was $356 million, of which $334 million relate to our share of net profits outside the U.S.

Total Sanofi collaboration revenue grew 14% in the first quarter to $910 million. Our share of collaboration profits was $804 million, an increase of 26% versus the prior year, driven by Dupixent's continued volume growth and improving margins. Reimbursement for manufacturing of commercial supply, a component of Sanofi Collaboration Revenues, was $106 million for the quarter, which is expected to be the lowest of the year. On a full year basis, due to higher Dupixent volumes, we expect the amount of these reimbursements to be comparable to 2023.

The Sanofi development balance was approximately $2.2 billion at the end of the first quarter. We anticipate this balance will be fully reimbursed by the end of 2026, which we expect will result in a significant step-up in our Sanofi collaboration profits thereafter.



Before moving to expenses, I will mention that despite lower volumes, U.S. Praluent sales in the first quarter reflected a gross to net adjustment related to a true-up of rebates due to an adverse change in payer coverage. We now expect U.S. net sales of Praluent to be modestly higher in 2024 as compared to 2023, primarily due to this adjustment.

Now to our operating expenses. First quarter R&D expense grew 17% year-over-year to $1.1 billion, reflecting continued investment in our robust pipeline. SG&A grew 13% from the prior year to $544 million in the first quarter, driven by investment to support the launch of EYLEA HD, including direct-to-consumer promotion as well as higher headcount and related costs, primarily for our ongoing international commercial expansion. First quarter gross margin on net product sales was approximately 89%, which was impacted by ongoing start-up costs for our fill/finish manufacturing facility.

First quarter COCM was $193 million, reflecting a decline of 22% compared to the prior year, primarily due to lower Dupixent drug substance manufacturing costs. Now to cash flow and the balance sheet. Regeneron generated $1.4 billion in free cash flow in the first quarter and ended the quarter with cash and marketable securities less debt of approximately $14.8 billion. We repurchased approximately $300 million of our shares in the first quarter and had approximately $1.2 billion available for repurchases under our February 2023 authorization at the end of the first quarter. This morning, we also announced a new $3 billion share repurchase program, which provides us with additional flexibility to continue returning capital to shareholders over time, and we remain buyers of our shares.

Finally, we have made some minor changes to our full year 2024 financial guidance. A complete summary of our latest full year guidance is available in our press release issued earlier this morning. We now expect 2024 R&D expense to be in the range of $4.4 billion to $4.6 billion. The change in R&D guidance is solely due to the inclusion of operating expenses associated with the acquisition of 2seventy bio development programs, which closed on April 1. In summary, Regeneron performed well in the first quarter and is positioned to continue to deliver strong results in 2024 and beyond. With that, I'll pass the call back to Ryan.

**Ryan Crowe** - Regeneron Pharmaceuticals, Inc. - SVP of IR & Strategic Analysis

Thank you, Chris. This concludes our prepared remarks. We will now open the call for Q&A. To ensure we are able to address as many questions as possible, we will answer one question from each caller before moving to the next. Josh, can we please go to the first question?



## QUESTIONS AND ANSWERS

**Operator**

(Operator Instructions). And our first question comes from Colin Bristow with UBS.

**Colin Nigel Bristow** - UBS Investment Bank, Research Division - Analyst

Congrats on the quarter. A question for George. George, there's a lot of interest, obviously, in your muscle sparing obesity program. I was wondering if you could speak to how you think this will differentiate versus competitor muscle-sparing programs and then within that, what will you be specifically paying attention to whenever Lilly decides to disclose the bimagrumab Phase II data?

**George D. Yancopoulos** - Regeneron Pharmaceuticals, Inc. - Co-Founder, President, Chief Scientific Officer & Co-Chairman

Thanks. Great question. As when you block with other approaches like bimagrumab, you're blocking over a dozen members of the so-called BMP, GDF family and so forth. And that raises the concern because only a couple of those are actually involved in muscle preservation that you may end up doing more harm than good. What we have identified over the years is we identified 2 members of this very large family of almost 20 factors, which 2 are specifically involved in muscle preservation and we created antibodies to each of these 2 individually.

And we're testing these antibodies individually as well as together. And obviously, in this field of obesity, safety matters almost as much as efficacy here. So we believe we have the best program that is testing specifically just the specific members of this very large family that are involved in muscle preservation where they're blocking either one or both together is going to benefit the quality of the weight loss in terms of preserving muscle and maybe even causing more fat loss while creating hopefully the best possible safety profile.

So we think that's a big difference between our program and other programs that are blocking as I said, almost 20 different members that are involved in all sorts of things from growth factors for the bone marrow, for red blood cells, controlling all sorts of things from clotting to liver function and other things and so anyway, that's the major difference in our program.

**Operator**

Our next question comes from Evan Seigerman with BMO Capital Markets.

**Evan David Seigerman** - BMO Capital Markets Equity Research - MD & Senior BioPharma Research Analyst

Kind of a follow-up to Colin. When you think about endpoints in muscle sparing kind of approaches in obesity, what do you think FDA would accept. Right now, they're not really accepting dexa scans, they're just looking at weight loss. Do you think that they would evolve to look at quality of weight loss as a key endpoint asset space evolves?

**George D. Yancopoulos** - Regeneron Pharmaceuticals, Inc. - Co-Founder, President, Chief Scientific Officer & Co-Chairman

Well, just to remind you, if you look at our paper where we did the nonhuman primate studies and so forth, is the first thing we're going to be looking for is there is the very real possibility of increased weight loss. And that might be the simplest regulatory endpoint of all. After that, if we don't see that, but we see better quality of weight loss, that could be manifested in a variety of ways, though we, of course, recognize that those would perhaps create more complicated ways of being regulated. So obviously, if you increase the fat loss while preserving muscle you should have dramatic benefits in metabolic parameters, which are often used in the field, particularly in people with diabetes and so forth as well as ultimately in terms of function by having maintenance of function as opposed to losing function and maintaining those sort of functional endpoints.



So the simplest path might be simply weight loss one could then move into metabolic parameters or muscle actual functional outcome measures. But to us, the most important thing in the Phase II study is to really just demonstrate the quality of the weight loss in terms of fat versus muscle because ultimately, if you're preserving muscle and increasing the fat loss, it has to be much better for patients, and it may avoid a lot of catastrophic long-term effects of widespread GLP-1 use and so if we see that, we think that we have a real opportunity to turn that into real widespread benefit for patients using this class of drugs.

**Operator**

Our next question comes from Christopher Raymond with Piper Sandler.

**Christopher Joseph Raymond** - Piper Sandler & Co., Research Division - MD & Senior Research Analyst

I have a question on the EYLEA franchise. I just noticed that McKesson bought one of the largest GPOs, U.S. Retina earlier this year and there's actually been -- as you guys know, a relatively long march of retina practices being rolled up by various private equity firms over the last few years. So I know this is something that's happening across a number of therapeutic specialty areas, but maybe just talk about how you see this phenomenon impacting the practice of ophthalmology in the U.S. and any changes to your go-to-market strategy? And I guess related, the inventory drawdown, we didn't see that happen last year. Was there any effect from maybe some of these changes in your customer base that sort of drove that?

**Marion E. McCourt** - Regeneron Pharmaceuticals, Inc. - EVP of Commercial

Sure. So let me take the inventory item first, and then I'll come back to the overall marketplace. But this was in aggregate. As I mentioned, in the quarter, we saw a reduction in wholesaler inventory broadly of about $40 million. So that reflects market-wide. But that was a combination of 2 elements. It was a sequential drawdown of EYLEA inventory that was partially offset by a modest increase in EYLEA HD inventory ahead of the permanent J-Code on April 1. And then I would share on the overall market in all the categories where we participate, we're always very conscious of the segmentation of the market, targeting the market, what's occurring in terms of customer base and certainly, our strategies and our approach to the marketplace is reflective of that. And the range of customers we have, as you point out, in retina and how that market has evolved over time. And I think our commercialization approach has been very effective in addressing that market evolution.

**Operator**

Our next question comes from Salveen Richter with Goldman Sachs.

**Salveen Jaswal Richter** - Goldman Sachs Group, Inc., Research Division - VP

With regard to the COPD program here, it doesn't seem like this is an approvability question. So could you just speak to whether restrictions to specific subpopulations could be possible, albeit noting that you had a subpopulation analysis that was consistent with the broader data.

**Leonard S. Schleifer** - Regeneron Pharmaceuticals, Inc. - Co-Founder, President, CEO & Co-Chairman

Yes, Salveen, thanks for the question. You're right. From our perspective, we think the data broadly supports the entire BLA and as well as all these analyses, the approval of the drug in eosinophilic COPD. As you might imagine, the FDA went anticipating or looking at a new class of biologics is very interested in checking it up and down and down and up and making sure that there's no subpopulation of the study that might be driving the data. So they might -- if one saw that, one might think about labeling it differently, but none of that has occurred. We've looked at all these analyses. We're going to submit them a way ahead of the schedule that they've asked for, and all of the analyses show a consistent and clinically meaningful reduction in the COPD exacerbations across all of these subgroups that have been asked for.



**Operator**

Our next question comes from Tyler Van Buren with TD Cowen.

**Tyler Martin Van Buren** - TD Cowen, Research Division - MD & Senior Equity Research Analyst

For this initial severe food allergy study and the results by year-end, could you elaborate on exactly what will be reported and what you would hope to see to have early clinical proof of concept and how long do you anticipate that these patients would stay on Dupixent in order to maintain low or no IgE levels?

**George D. Yancopoulos** - Regeneron Pharmaceuticals, Inc. - Co-Founder, President, Chief Scientific Officer & Co-Chairman

These are great questions. We hope from the first few patients if the results are as dramatic as they are in the preclinical studies that we'll be seeing meaningful indicators that we are really reversing severe food allergy. Of course, the first thing and the most important biomarker, as I said, is this evil immunoglobulin IgE, which you can both measure, but they are also routinely tested using these skin prick tests, which are how people are actually evaluated for allergies.

So we expect, first of all, to be seeing that happening in the study in obvious ways. And then we can follow that up, and it is allowed in the study if we see dramatic responses in these markers of the actual allergy-causing immunoglobulin to then go on and do actual food challenges and so forth in the patients. So it all depends on how obvious the reductions in this IgE are and if they are really dramatic, we can go on and do additional allergen-challenged tests. But we hope if the humans behave like the nonhuman primate that we might be seeing something dramatic in the initial patients.

**Leonard S. Schleifer** - Regeneron Pharmaceuticals, Inc. - Co-Founder, President, CEO & Co-Chairman

George, can you comment? I think they also want to know how long you have to stay on Dupi...

**George D. Yancopoulos** - Regeneron Pharmaceuticals, Inc. - Co-Founder, President, Chief Scientific Officer & Co-Chairman

Yes. The interesting thing is the animal study suggests that the antibodies against the allergens come back as IgG, G for good antibodies. The whole point of -- if you guys are familiar with so-called immunotherapy or desensitization therapy, all of those therapies, what they're trying to do is induce production of IgG to overwhelm the IgE. That's a much harder thing to do because they're not really getting rid of the Ig. They just have to overwhelm with a lot more IgG. In the animal studies, it suggests that we get rid of the Ig and we replace it with IgG. We don't know, obviously, in the humans, it may be possible that short-term treatment, relatively short-term treatment, may allow patients who have replaced their IgE with IgG, and they will have long-term protection.

On the other hand, we may see that to prevent these patients from making Ig and more IgGs in the future that they may have to stay on the Dupixent for substantial long periods of time. The good news about that as we all know and as was highlighted in Marion's comments, Dupixent compared to most other immunomodulatory agents, it's not immunosuppressive. It actually is corrective for the immune system. And as indicated by its labeling to very, very young patients, it's a very, very relatively safe immunomodulator and biologic. And since most people who have severe allergies also have a lot of other concomitant atopic diseases.

It may be that it is best for these patients to keep their abnormal atopy or abnormal type 2 inflammation under control. So short answer is it's -- there's a possibility it could be relatively short term, but there's also a possibility at least for some or the majority of patients, it could be relatively long term. But the good news is that they may actually have a long-term benefit for the patients because these patients are almost by definition, what you call atopic patients who might need control of their type 2 excess inflammation.

**Operator**

Our next question comes from Terence Flynn with Morgan Stanley.



**Terence C. Flynn** - Morgan Stanley, Research Division - Equity Analyst

Just had one on your LAG-3 program. Obviously, you guys are aware that Bristol discussed seeing a signal in a subset of lung cancer that benefits from a combination of PD-1 and LAG-3. So I would just love your latest thoughts on how to think about that in the context of both your program and then what you're hoping to see with this Phase II data later this year?

**George D. Yancopoulos** - Regeneron Pharmaceuticals, Inc. - Co-Founder, President, Chief Scientific Officer & Co-Chairman

Right. That's a great question. Obviously, the thing that gets us excited about our program compare to the field is that we've seen levels of activity that haven't been seen in the other LAG-3 programs, particularly in melanoma. If that's true in melanoma, there would be hope that this would be seen broadly in other settings and indications. We are certainly excited to see the follow-up details on the BMS story with potential activity in a specific subpopulation that will certainly help point us in our own studies to see what we're seeing within that subpopulation that they are talking about as well as more broadly. But of course, the hope, as I said, is if it is indeed more active in one setting such as melanoma, the hope is it will be broadly more active across other cancer settings as well. So we are excited to see follow-up on their data. We're excited to see follow-up on our data, both in melanoma and in our lung studies.

**Operator**

Next question comes from William Pickering with Bernstein.

**William Pickering** - Sanford C. Bernstein & Co., LLC., Research Division - Research Analyst

I had a follow-up on the food allergy program. Could you comment on the dose of linvoseltamab that you'll be testing as compared to the myeloma setting? How -- what gives you confidence in the safety profile and if a patient misses a Dupixent dose, would they then need to start over again with linvo?

**George D. Yancopoulos** - Regeneron Pharmaceuticals, Inc. - Co-Founder, President, Chief Scientific Officer & Co-Chairman

Yes, these are all great questions. What we've already actually shown based on a variety of studies that we've done is that normal nonmalignant noncancerous plasma cells, the cells that are the immunoglobulin factory cells are the normal versions of the cells are much more susceptible to the bispecific than our malignant myeloma cells. So in discussions and communications with the FDA, we're actually starting at much lower doses than the doses that are used in the myeloma programs, though there is an intra-patient dose escalation process. So we're literally watching -- we're starting with low doses and we're going up in the doses until we actually hopefully see elimination of the IgE. That said, in terms of the safety, I'd just remind you that the much higher myeloma doses, we came up as Len briefly summarized in this program.

We believe that we have a differentiated program in terms of not only efficacy and hospitalization burden and so forth, but also in safety. We have less than 1% Grade 3 events at those high doses in the much sicker myeloma patients. So we hope and we expect that with lower doses in a much healthier population, that this will be a hopefully pretty well tolerated approach. And a much shorter, yes. We think that ultimately, we make it by with a single short course or a very short course of treatment. In terms of whether if somebody takes a holiday, whether one has to then start all over again with the elimination of the IgE cells, we think probably not because it takes a long time to get to those levels of IgE.

So just delaying for a short period of time, we may not bounce back to those levels. As I said, you may have converted all of those cells to IgG or good cellss by that point anyway. But of course, we have to be doing the studies, and we have to be looking at these patients in the clinic to really understand. When I -- I should mention that the Grade 3 events that I was talking about are reflected by cytokine release syndrome. A lot of that is also thought to be -- due to the load of the cancer cells. And obviously, these normal patients have much less of a load here. So it's just another reason to expect, hopefully, better safety. We're going to be going with lower doses, more gentle treatment, and they have much less load in there, so you would expect much less reason to be seeing things like cytokine release syndrome.



**Operator**

Our next question comes from Carter Gould with Barclays.

**Carter Lewis Gould** - Barclays Bank PLC, Research Division - Senior Analyst

I wanted to ask another follow-up sort of bispecifics in autoimmune, but I want to go down a little bit of a different path acknowledging the BCMA and Dupi effort. But we've seen sort of CAR-T efforts and ADC approaches sort of come to the rise in lupus and other autoimmune disorders and naturally, people have then started talking about T cell engagers. This seems like a natural place where Regeneron could leverage its bispecific capabilities, expertise. Are there efforts underway internally on this front? Has Regeneron looked at ways to leverage in that expertise?

**George D. Yancopoulos** - Regeneron Pharmaceuticals, Inc. - Co-Founder, President, Chief Scientific Officer & Co-Chairman

That's a phenomenal question. And first of all, let me remind you that with our long-term collaboration and recent acquisition of 2seventy. 2seventy had exactly the sort of CAR-T programs that you're referring to in lupus and other autoimmune settings, which we are now obviously pursuing together with them but that is one of the reasons why we were excited about turning the collaboration into a situation where we brought all the expertise and the scientists and leadership from 2seventy in-house because we're doing exactly what you suggested. We're hoping to actually literally look in side-by-side studies, how CAR-T approaches in these settings of autoimmune, severe autoimmune disease like lupus and so forth, compare directly head-to-head to our bispecifics. And as you are sort of suggesting, you would think that there would be really little reason to think that the CAR-T solutions would be preferable in this setting, both in terms of off-the-shelfness and the ability to eliminate the normal cells.

As I said, it's usually a lot easier to get rid of normal cells than it is malignant cells. So whatever advantages you might have in certain settings of CAR-Ts you would think in the normal disease setting or at least normal cells in autoimmune disease settings that bispecifics might be just as good, much more convenient and much safer. So together with now our internal Regeneron cell medicines group that has involved a lot of the expertise and leadership of 2seventy, we're exploring that exact question.

I should also say that as clearly been announced by the company and is available in our public disclosures, we have already initiated separately a variety of studies looking at our bispecifics to decrease autoantibodies and autoimmune diseases in other settings as well. So we were already looking at this, but now we're looking at these in direct comparison to our CAR-T approaches with our now internal Regeneron cell medicines efforts.

**Operator**

Next question comes from Brian Abrahams with RBC Capital Markets.

**Brian Corey Abrahams** - RBC Capital Markets, Research Division - Senior Biotechnology Analyst

Congrats on all the progress. I know docs are really excited for Dupi and COPD, but it is a new space for biologics. So I'm curious, the amount of education you think is going to be required and how this might affect the initial uptake trajectory. And then how you're thinking the introduction of other biologics, which have also been showing promise might impact the overall long-term market here in Dupi's positioning?

**Marion E. McCourt** - Regeneron Pharmaceuticals, Inc. - EVP of Commercial

So certainly, we look forward to the potential launch of Dupixent in COPD. There's such unmet need and such opportunity to help those patients with an eosinophilic COPD. Our team, as you know, is very experienced with launches in Dupixent. So work is very much underway at Regeneron and also with, obviously, under our collaboration with Sanofi to make sure that we apply the best practices and launch of new indications.



I will share that many of these physicians have already experienced use of Dupixent with tremendous results. We've made great progress, as you know, in asthma leading in new scripts and certainly making tremendous overall performance strides. But we will be very thoughtful on how best to reach physicians, how to make sure that we're aligned with reimbursement and affordability for patients, educating in the way we've come to understand is best for Dupixent in the various markets and indications that we've entered. So we look forward to this opportunity.

**Operator**

Our next question comes from Mohit Bansal with Wells Fargo.

**Mohit Bansal** - Wells Fargo Securities, LLC, Research Division - Senior Equity Analyst

I have a question on itepekimab so in our conversation and literature search, it suggests that there may be a potential for disease modification with some kind of air remodeling at this mechanism. Just wanted to see if you think that is possible? And what markets would you be looking forward to in the Phase III trial beyond exacerbation when the data come.

**George D. Yancopoulos** - Regeneron Pharmaceuticals, Inc. - Co-Founder, President, Chief Scientific Officer & Co-Chairman

Well, there's always the possibility of disease modification. We actually believe, for example, Dupixent in asthma may be doing exactly that sort of benefit. One of the best ways of actually looking at that is looking at overall loss of lung function over time because, as you know, in these lung diseases as Marion said, in both asthma and COPD, these are diseases of the lungs followed largely by pulmonologists, the same sort of doctors and it is well known that in both of these diseases over time, patients start permanently losing lung capacity and lung function. We are and have been and have early data suggesting that Dupixent may prefer that in asthma, and we'll certainly be looking at those sorts of things for not only Dupixent but itepekimab in the COPD patients in terms of modifying disease and long-term preservation and prevention of this otherwise unstoppable lung function loss.

**Operator**

And our last question comes from Chris Schott with JPMorgan.

**Unidentified Analyst**

This is Taylor on for Chris Schott. So we were wondering, would you elaborate a little bit more about how you're thinking about the linvoseltamab launch as we approach the August PDUFA and then thinking about the field more broadly in myeloma, how are you thinking about MRD negativity as a surrogate and thoughts on how you might be able to move into earlier lines in myeloma faster?

**Leonard S. Schleifer** - Regeneron Pharmaceuticals, Inc. - Co-Founder, President, CEO & Co-Chairman

Marion can take the question on the launch and everything. I mean, obviously, the MRD negativity as endorsed by that panel gives an opportunity to get these kinds of drugs to patients earlier in a variety of settings. So we are looking forward to applying that approach in our future studies as we move towards earlier in different lines of therapy. Marion on the launch?

**Marion E. McCourt** - Regeneron Pharmaceuticals, Inc. - EVP of Commercial

Sure. So we're certainly preparing for the potential launch with the August 22 PDUFA date. And we're really excited because as I've mentioned before, the recent data reinforces linvoseltamab as potentially a best-in-class product for late-stage myeloma patients. So it's a wonderful opportunity to extend our oncology franchise in the new disease area.



**Ryan Crowe** - Regeneron Pharmaceuticals, Inc. - SVP of IR & Strategic Analysis

All right. Thanks, Len and Marion, and thanks to everyone who dialed in for your interest in Regeneron. We apologize to those remaining in the queue that we did not have a chance to hear from. As always, the IR team here at Regeneron is available to answer any remaining questions that you may have. Thank you once again, and have a great day.

**Operator**

Thank you. This concludes the conference. Thank you for your participation. You may now disconnect.



**MAY 02, 2024 / 12:30PM, REGN.OQ - Q1 2024 Regeneron Pharmaceuticals Inc Earnings Call**

**DISCLAIMER**

Refinitiv reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES REFINITIV OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.

©2024, Refinitiv. All Rights Reserved.





BLA 761298/Original 1

**BLA APPROVAL**

Amgen, Inc.
Attention: Amanda Santoro
       Senior Manager, Global Regulatory Affairs
One Amgen Center Drive
Thousand Oaks, CA 91320

Dear Amanda Santoro:

Please refer to your biologics license application (BLA) dated and received August 23, 2023, and your amendments, submitted under section 351(k) of the Public Health Service Act for Pavblu (aflibercept-ayyh) injection.

This BLA provides for the licensure of Pavblu (aflibercept-ayyh) as follows:

- Pavblu (aflibercept-ayyh), 2 mg (0.05 mL of 40 mg/mL) injection, for intravitreal use in a single-dose vial (vial) ⬚⬚⬚⬚⬚ (b) (4) US-Eylea (aflibercept) 2 mg (0.05 mL of 40 mg/mL) injection, for intravitreal use in a single-dose vial kit (vial kit) and single-dose pre-filled syringe (PFS), and

- Pavblu (aflibercept-ayyh), 2 mg (0.05 mL of 40 mg/mL) injection, for intravitreal use in a PFS ⬚⬚⬚⬚⬚ (b) (4) US-Eylea (aflibercept) 2 mg (0.05 mL of 40 mg/mL) injection, for intravitreal use in a PFS.

Pavblu seeks licensure ⬚⬚⬚⬚⬚ (b) (4) US-Eylea for the following indications:
- Neovascular (wet) age-related macular degeneration (AMD),
- Macular edema following retinal vein occlusion (RVO),
- Diabetic Macular Edema (DME), and
- Diabetic Retinopathy (DR).

For administrative purposes, we have split BLA 761298 into the following applications:

- BLA 761298/Original 1 – biosimilarity
  - Pavblu, 2 mg (0.05 mL of 40 mg/mL) injection, for intravitreal use in a vial and PFS seeking biosimilarity to US-Eylea 2 mg (0.05 mL of 40 mg/mL) injection, for intravitreal use in a vial kit and PFS.

⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚ (b) (4)

**Supp.Add417**

BLA 761298/Original 1
Page 2

(b) (4)

(b) (4)

## LICENSING

We have approved your BLA for Pavblu (aflibercept-ayyh) effective this date. You are hereby authorized to introduce or deliver for introduction into interstate commerce, Pavblu under your existing Department of Health and Human Services U.S. License No. 1080. Pavblu is indicated for neovascular (wet) age-related macular degeneration (AMD), macular edema following retinal vein occlusion (RVO), diabetic macular edema (DME), and diabetic retinopathy (DR).

## MANUFACTURING LOCATIONS

Under this license, you are approved to manufacture Pavblu (aflibercept-ayyh) drug substance at Amgen Singapore Manufacturing Pte. Ltd., in Singapore 637026, Singapore. The final formulated product for the vial will be manufactured and filled at Amgen Inc., in Thousand Oaks, CA. The final formulated product for the vial will be labeled and packaged at Amgen Manufacturing Ltd., in Juncos, PR. The final formulated product for the PFS will be manufactured and filled at Amgen Manufacturing Limited, in Juncos, PR. The final formulated product for the PFS will be assembled, labeled, and packaged at (b) (4) You may label your product with the proprietary name, Pavblu, and market it as a 2 mg (0.05 mL of 40 mg/mL) solution in a vial, and as a 2 mg (0.05 mL of 40 mg/mL) solution in a PFS assembled with a non-retractable plunger rod and a backstop flange extender.

## DATING PERIOD

The dating period for Pavblu vial shall be 36 months from the date of manufacture when stored at 2°C to 8°C, with a single room temperature storage period of up to 3 days at a maximum of 30°C, and the dating period for Pavblu PFS shall be 24 months from the date of manufacture when stored at 2°C to 8°C, with a single room temperature storage period of up to 3 days at a maximum of 30°C. The date of manufacture shall be defined as the date of final sterile filtration of the formulated drug product. The dating period for your drug substance shall be (b) (4) months from the date of manufacture when stored at -

**U.S. Food and Drug Administration**
Silver Spring, MD 20993
www.fda.gov

Supp.Add418

BLA 761298/Original 1
Page 3

## FDA LOT RELEASE

You are not currently required to submit samples of future lots of Pavblu and each kit component to the Center for Drug Evaluation and Research (CDER) for release by the Director, CDER, under 21 CFR 610.2. We will continue to monitor compliance with 21 CFR 610.1, requiring completion of tests for conformity with standards applicable to each product prior to release of each lot.

Any changes in the manufacturing, testing, packaging, or labeling of Pavblu, or in the manufacturing facilities, will require the submission of information to your BLA for our review and written approval, consistent with 21 CFR 601.12.

## APPROVAL & LABELING

We have completed our review of this application, as amended. It is approved, effective on the date of this letter, for use as recommended in the enclosed agreed-upon labeling.

## CONTENT OF LABELING

As soon as possible, but no later than 14 days from the date of this letter, submit, via the FDA automated drug registration and listing system (eLIST), the content of labeling [21 CFR 601.14(b)] in structured product labeling (SPL) format.[1] Content of labeling must be identical to the enclosed labeling text for the Prescribing Information, Information on submitting SPL files using eLIST may be found in the guidance for industry *SPL Standard for Content of Labeling Technical Qs and As (October 2009)*.[2]

The SPL will be accessible via publicly available labeling repositories.

## CARTON AND CONTAINER LABELING

Submit final printed carton and container labeling that are identical to the enclosed carton and container labeling, as soon as they are available, but no more than 30 days after they are printed. Please submit these labeling electronically according to the guidance for industry *SPL Standard for Content of Labeling Technical Qs & As.* For administrative purposes, designate this submission "**Final Printed Carton and Container Labeling for approved BLA 761298/Original 1**." Approval of this submission by FDA is not required before the labeling is used.

## REQUIRED PEDIATRIC ASSESSMENTS

---

[1] See http://www.fda.gov/ForIndustry/DataStandards/StructuredProductLabeling/default.htm
[2] We update guidances periodically. For the most recent version of a guidance, check the FDA Guidance Documents Database at https://www.fda.gov/RegulatoryInformation/Guidances/default.htm.

**U.S. Food and Drug Administration**
Silver Spring, MD 20993
**www.fda.gov**

Reference ID: 5434822

BLA 761298/Original 1
Page 4

Under the Pediatric Research Equity Act (PREA) (21 U.S.C. 355c), all applications for new active ingredients (which includes new salts and new fixed combinations), new indications, new dosage forms, new dosing regimens, or new routes of administration are required to contain an assessment of the safety and effectiveness of the product for the claimed indication(s) in pediatric patients unless this requirement is waived, deferred, or inapplicable.

We have determined that, at this time, no pediatric studies will be required under PREA for your BLA.

## POSTMARKETING COMMITMENTS NOT SUBJECT TO THE REPORTING REQUIREMENTS UNDER SECTION 506B

We remind you of your postmarketing commitments:

4688-1      Perform real-time ABP938 pre-filled syringe (PFS) drug product commercial container closure system leachate studies using appropriate test methods to identify and quantify volatile organic compounds (VOC), semi-VOC, non-VOC and trace metals at regular intervals through the end of shelf-life. The final results of this study and the toxicology risk evaluation for the levels of leachates detected in the drug product will be provided in the final study report to the BLA.

The timetable you submitted on June 17, 2024, states that you will conduct this study according to the following schedule:

     Final Report Submission: 02/2026

4688-2      Perform a validation study for a suitable method for ____ (b) (4) testing and add ____ (b) (4) testing as an in-process control (IPC) test with acceptance criterion for ABP938 drug substance manufacture. Data and information to support method validation and the IPC limit will be provided in a Changes Being Effected in 30 days (CBE-30) by February 2025.

     Conduct ____ (b) (4) testing on the first 30 ABP938 drug substance lots manufactured and re-evaluate the proposed ____ (b) (4) IPC limit based on the drug substance manufacturing data.

The timetable you submitted on August 12, 2024, states that you will conduct this study according to the following schedule:

     Final Report Submission: 02/2025

Submit clinical protocols to your IND 135489 for this product. Submit nonclinical and chemistry, manufacturing, and controls protocols and all postmarketing final reports to

**U.S. Food and Drug Administration**
Silver Spring, MD 20993
**www.fda.gov**

**Supp.Add420**

BLA 761298/Original 1
Page 5

this BLA.  In addition, under 21 CFR 601.70 you should include a status summary of each commitment in your annual progress report of postmarketing studies to this BLA. The status summary should include expected summary completion and final report submission dates, any changes in plans since the last annual report, and, for clinical studies/trials, number of patients/subjects entered into each study/trial.  All submissions, including supplements, relating to these postmarketing commitments should be prominently labeled "**Postmarketing Commitment Protocol**," "**Postmarketing Commitment Final Report**," or "**Postmarketing Commitment Correspondence**."

## PROMOTIONAL MATERIALS

You may request advisory comments on proposed introductory advertising and promotional labeling. For information about submitting promotional materials, see the final guidance for industry *Providing Regulatory Submissions in Electronic and Non-Electronic Format-Promotional Labeling and Advertising Materials for Human Prescription Drugs*.[3]

You must submit final promotional materials and Prescribing Information, accompanied by a Form FDA 2253, at the time of initial dissemination or publication [21 CFR 601.12(f)(4)]. Form FDA 2253 is available at FDA.gov.[4] Information and Instructions for completing the form can be found at FDA.gov.[5]

## REPORTING REQUIREMENTS

You must submit adverse experience reports under the adverse experience reporting requirements at 21 CFR 600.80.

Prominently identify all adverse experience reports as described in 21 CFR 600.80.

You must submit distribution reports under the distribution reporting requirements at 21 CFR 600.81.

You must submit reports of biological product deviations under 21 CFR 600.14. You should promptly identify and investigate all manufacturing deviations, including those associated with processing, testing, packing, labeling, storage, holding and distribution. If the deviation involves a distributed product, may affect the safety, purity, or potency of the product, and meets the other criteria in the regulation, you must submit a report on Form FDA 3486 to:

---

[3] For the most recent version of a guidance, check the FDA guidance web page at https://www.fda.gov/media/128163/download.
[4] http://www.fda.gov/downloads/AboutFDA/ReportsManualsForms/Forms/UCM083570.pdf
[5] http://www.fda.gov/downloads/AboutFDA/ReportsManualsForms/Forms/UCM375154.pdf

**U.S. Food and Drug Administration**
Silver Spring, MD 20993
**www.fda.gov**

Supp.Add421

BLA 761298/Original 1
Page 6

Food and Drug Administration
Center for Drug Evaluation and Research
Division of Compliance Risk Management and Surveillance
5901-B Ammendale Road
Beltsville, MD 20705-1266

Biological product deviations, sent by courier or overnight mail, should be addressed to:

Food and Drug Administration
Center for Drug Evaluation and Research
Division of Compliance Risk Management and Surveillance
10903 New Hampshire Avenue, Bldg. 51, Room 4207
Silver Spring, MD 20903

Your product is a Part 3 combination product (21 CFR 3.2(e)); therefore, you must also comply with postmarketing safety reporting requirements for an approved combination product (21 CFR 4, Subpart B). Additional information on combination product postmarketing safety reporting is available at FDA.gov.

If you have any questions, please contact Ahmed Ayodeji, PharmD, Regulatory Project Manager, at Ahmed.Ayodeji@fda.hhs.gov, or call (301) 837-7390.

Sincerely,

*{See appended electronic signature page}*

William Boyd, MD
Deputy Director
Division of Ophthalmology
Office of Specialty Medicine
Office of New Drugs
Center for Drug Evaluation and Research

ENCLOSURE(S):
- Content of Labeling
  - Prescribing Information
- Carton and Container Labeling

**U.S. Food and Drug Administration**
Silver Spring, MD 20993
**www.fda.gov**

**Supp.Add422**

------------------------------------------------------------------------------------------------

**This is a representation of an electronic record that was signed electronically. Following this are manifestations of any and all electronic signatures for this electronic record.**

------------------------------------------------------------------------------------------------

/s/

-----------------------------------------------------------

WILLIAM M BOYD
08/23/2024 09:50:32 AM

Reference ID: 5434822

# Sheridan Ex. 3

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**
**FORM 10-K**

(Mark One)

☒   **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2022**

OR

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

**Commission File Number: 000-19034**

# REGENERON PHARMACEUTICALS, INC.

*(Exact name of registrant as specified in its charter)*

| **New York** | **13-3444607** |
|---|---|
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |

**777 Old Saw Mill River Road Tarrytown, New York 10591-6707**
*(Address of principal executive offices, including zip code)*

**(914) 847-7000**
*(Registrant's telephone number, including area code)*

**Securities registered pursuant to Section 12(b) of the Act:**

| *Title of each class* | *Trading Symbol* | *Name of each exchange on which registered* |
|---|---|---|
| **Common Stock - par value $.001 per share** | **REGN** | **NASDAQ Global Select Market** |

**Securities registered pursuant to section 12(g) of the Act: None**

| | | |
|---|---|---|
| Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. | Yes ☒ | No ☐ |
| Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. | Yes ☐ | No ☒ |
| Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. | Yes ☒ | No ☐ |
| Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). | Yes ☒ | No ☐ |

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☒        Accelerated filer ☐        Non-accelerated filer ☐        Smaller reporting company ☐        Emerging growth company ☐

| | |
|---|---|
| If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. | ☐ |

| | |
|---|---|
| Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. | ☒ |

| | | |
|---|---|---|
| Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). | Yes ☐ | No ☒ |

The aggregate market value of the voting and non-voting common stock held by non-affiliates of the registrant was $62.0 billion, computed by reference to the closing sales price of the stock on NASDAQ on June 30, 2022, the last trading day of the registrant's most recently completed second fiscal quarter. For purposes of this calculation only, the registrant has assumed that all of its directors and executive officers, and no other persons, are its affiliates. This determination of affiliate status is not necessarily a determination for other purposes.

The number of shares outstanding of each of the registrant's classes of common stock as of January 26, 2023:

| Class of Common Stock | Number of Shares |
|---|---|
| Class A Stock, $.001 par value | 1,818,146 |
| Common Stock, $.001 par value | 107,507,386 |

**Supp.Add425**

Table of Contents

**Patents, Trademarks, and Trade Secrets**

We rely on a combination of intellectual property laws, including patent, trademark, copyright, trade secret, and domain name protection laws, as well as confidentiality and license agreements, to protect our intellectual property and proprietary rights.

Our success depends, in part, on our ability to obtain patents, maintain trade secret protection, and operate without infringing on the proprietary rights of third parties (see Part I, Item 1A. "Risk Factors - Risks Related to Intellectual Property and Market Exclusivity - *We may be restricted in our development, manufacturing, and/or commercialization activities by patents or other proprietary rights of others, and could be subject to awards of damages if we are found to have infringed such patents or rights*"; and Note 16 to our Consolidated Financial Statements). Our policy is to file patent applications to protect technology, inventions, and improvements that we consider important to our business and operations. We hold an ownership interest in a number of issued patents in the United States and foreign countries with respect to our products and technologies. In addition, we hold an ownership interest in thousands of patent applications in the United States and foreign countries.

Our patent portfolio includes granted patents and pending patent applications covering our *VelociSuite* technologies, including our *VelocImmune* mouse platform which produces fully human antibodies. Our issued patents covering these technologies generally expire between 2022 and 2032. However, we continue to file patent applications directed to improvements to these technology platforms.

Our patent portfolio also includes issued patents and pending applications relating to commercialized products and our product candidates in clinical development. These patents cover, among other things, proteins, DNA and RNA molecules, manufacturing patents, method of use patents, and pharmaceutical compositions and formulations.

The following table describes our U.S. patents, European patents ("EP"), and Japanese patents ("JP") that are of particular relevance to key products marketed or otherwise commercialized by us and/or our collaborators, including the territory, patent number, general subject matter class, and expected expiration dates. The noted expiration dates include any patent term adjustments. Certain of these patents may also be entitled to term extensions. We continue to pursue additional patents and patent term extensions in the United States and other jurisdictions covering various aspects of our products that may, if issued, extend exclusivity beyond the expiration of the patents listed in the table below. One or more patents with the same or earlier expiry date may fall under the same "general subject matter class" for certain products and may not be separately listed.

| Product | Molecule | Territory | Patent No. | General Subject Matter Class | Expiration |
|---------|----------|-----------|-----------|------------------------------|------------|
| EYLEA[a] | aflibercept | US | 7,070,959 | Composition of Matter | June 16, 2023[b] |
| | | US | 8,092,803 | Formulation | June 21, 2027 |
| | | US | 10,464,992 | Formulation | June 14, 2027 |
| | | US | 10,857,231 | Formulation | March 22, 2026 |
| | | US | 11,066,458 | Formulation | June 14, 2027 |
| | | US | 11,084,865 | Formulation | June 14, 2027 |
| | | US | 9,254,338 | Methods of Treatment | May 22, 2032 |
| | | US | 10,857,205 | Methods of Treatment | January 11, 2032 |
| | | US | 10,828,345 | Methods of Treatment | January 11, 2032 |
| | | US | 10,888,601 | Methods of Treatment | January 11, 2032 |
| | | US | 11,253,572 | Methods of Treatment | January 11, 2032 |
| | | US | 10,406,226 | Method of Manufacturing | March 22, 2026 |
| | | EP | 1183353 | Composition of Matter (Supplementary Protection Certificate) | (May 23, 2025)[c] |
| | | EP | 2364691 | Formulation | June 14, 2027 |
| | | EP | 2944306 | Formulation | June 14, 2027 |
| | | JP | 4,723,140 | Composition of Matter | December 29, 2022 – December 25, 2023[d] |
| | | JP | 5,273,746 | Methods of Treatment | June 24, 2022 |
| | | JP | 5,216,002 | Formulation | February 27, 2028 – October 1, 2029[d] |

24

**Confidential Material Omitted**

# Supp.Add428-479
# Redacted in Entirety

FORM 31. Certificate of Confidential Material

Form 31
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF CONFIDENTIAL MATERIAL

**Case Number:** 24-2351

**Short Case Caption:** Regeneron Pharmaceuticals, Inc. v. Mylan Pharmaceuticals Inc.

> **Instructions:** When computing a confidential word count, Fed. Cir. R. 25.1(d)(1)(C) applies the following exclusions:
>
> - Only count each unique word or number once (repeated uses of the same word do not count more than once).
>
> - For a responsive filing, do not count words marked confidential for the first time in the preceding filing.
>
> The limitations of Fed. Cir. R. 25.1(d)(1) do not apply to appendices; attachments; exhibits; and addenda. *See* Fed. Cir. R. 25.1(d)(1)(D).

The foregoing document contains <u>12</u> number of unique words (including numbers) marked confidential.

[✔] This number does not exceed the maximum of 15 words permitted by Fed. Cir. R. 25.1(d)(1)(A).

[ ] This number does not exceed the maximum of 50 words permitted by Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28 U.S.C. § 1491(b).

[ ] This number exceeds the maximum permitted by Federal Circuit Rule 25.1(d)(1), and the filing is accompanied by a motion to waive the confidentiality requirements.

Date: 10/01/2024

Signature: /s/ Jeffrey A. Lamken

Name: Jeffrey A. Lamken

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 24-2351

**Short Case Caption:** Regeneron Pharmaceuticals, Inc. v. Mylan Pharmaceuticals Inc.

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 5,153 words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 10/01/2024

Signature: /s/ Jeffrey A. Lamken

Name: Jeffrey A. Lamken