**<span style="color:red">EMERGENCY RELIEF REQUESTED</span>**

**No. 24-2351**

# In the United States Court of Appeals for the Federal Circuit

REGENERON PHARMACEUTICALS, INC.,

*Plaintiff-Appellant,*

*v.*

MYLAN PHARMACEUTICALS INC., AMGEN USA, INC., BIOCON BIOLOGICS INC., CELLTRION, INC., FORMYCON AG, SAMSUNG BIOEPIS CO., LTD.,

*Defendants,*

AMGEN INC.,

*Defendant-Appellee,*

Appeal from the United States District Court for the Northern District of West Virginia in No. 1:24-md-3103-TSK, Chief Judge Thomas S. Kleeh

## APPELLANT REGENERON PHARMACEUTICALS, INC.'S NONCONFIDENTIAL REPLY IN SUPPORT OF EMERGENCY MOTION FOR AN INJUNCTION PENDING APPEAL

DAVID I. BERL
THOMAS S. FLETCHER
ANDREW V. TRASK
CHARLES L. MCCLOUD
SHAUN P. MAHAFFY
KATHRYN S. KAYALI
ARTHUR J. ARGALL III
ADAM PAN
CHRISTIAN GLADDEN-SORENSEN
RHOCHELLE KRAWETZ
WILLIAMS & CONNOLLY LLP
 *680 Maine Ave. SW*
 *Washington, DC 20024*
 *(202) 434-5000*

ELIZABETH S. WEISWASSER
WEIL, GOTSHAL & MANGES LLP
 *767 Fifth Ave.*
 *New York, NY 10153*
 *(212) 310-8022*

PRIYATA PATEL
WEIL, GOTSHAL & MANGES LLP
 *2001 M St. NW, Suite 600*
 *Washington, DC 20036*
 *(202) 682-7041*

*Attorneys for Plaintiff-Appellee*

JACOB E. HARTMAN
KELLOGG, HANSEN, TODD, FIGEL & FREDERICK PLLC
*1615 M St. NW, Suite 400*
*Washington, DC 20036*
*(202) 326-7989*

FORM 9. Certificate of Interest

Form 9 (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF INTEREST</u>

**Case Number** 2024-2351

**Short Case Caption** Regeneron Pharmaceuticals, Inc. v. Mylan Pharmaceuticals Inc.

**Filing Party/Entity** Regeneron Pharmaceuticals, Inc.

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 10/04/2024     Signature:  /s/ David I. Berl

Name:     David I. Berl

FORM 9. Certificate of Interest

Form 9 (p. 2)
March 2023

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Regeneron Pharmaceuticals, Inc. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

**FORM 9. Certificate of Interest**

---

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐   None/Not Applicable                ☑   Additional pages attached

| See Exhibit A | | |
|---|---|---|
| | | |
| | | |

---

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑   Yes (file separate notice; see below)     ☐   No     ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

---

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑   None/Not Applicable                ☐   Additional pages attached

| | | |
|---|---|---|
| | | |

**Exhibit A**

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

BIENERT KATZMAN LITTRELL WILLIAMS LLP: Anthony R. Bisconti

CAREY DOUGLAS KESSLER & RUBY PLLC: David R. Pogue, Jordan L. Damron, Michael W. Carey, Raymond S. Franks II, Steven R. Ruby, S. Benjamin Bryant

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, PLLC: Alyssa J. Picard, Andrew E. Goldsmith, Evan T. Leo, Grace W. Knofczynski, Mary Charlotte Y. Carroll, Sven Eric Henningson III

ROBINSON MILLER LLC: Keith J. Miller, Michael J. Gesualdo

UMHOFER, MITCHELL AND KING LLP: Matthew Donald Umhofer, Jonas Palmer Mann

WEIL, GOTSHAL & MANGES LLP: Anish R. Desai, Christopher M. Pepe, Jennifer Brooks Crozier, Kathryn Leicht, Kellie C. Van Beck, Matthew D. Sieger, Natalie C. Kennedy, Rocco Recce, Tom Yu, Yi Zhang, Zhen Lin

WILLIAMS & CONNOLLY LLP: Ellen E. Oberwetter, Haylee N. Bernal Anderson, Nicholas W. Jordan, Jennalee Beazley, Rebecca A. Carter, Renee M. Griffin, Teagan James Gregory

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................ii

I.    Regeneron Is Likely To Succeed on the Merits .......................................2

    A.    The District Court Legally Erred by Ignoring Its Existing
         Construction ....................................................................................2

    B.    The District Court Misapplied *Becton* ...........................................6

II.    The Equities Overwhelmingly Favor an Injunction ...............................11

III.    Amgen's Unsupported, Unreasonable Bond Request Should Be
      Rejected ...................................................................................................13

CONCLUSION...............................................................................................15

> *Confidential Material Omitted*
>
> Pursuant to Fed. Cir. R. 25.1(e)(1)(B), the material omitted on pages 13-15 relates generally to Amgen's forecasts for its proposed biosimilar product, which Amgen has maintained as confidential.

# TABLE OF AUTHORITIES

## CASES

*Aventis Pharma S.A. v. Hospira, Inc.*,
    675 F.3d 1324 (Fed. Cir. 2012) .................................................11

*Cannon Rubber Ltd. v. First Years, Inc.*,
    163 F. App'x 870 (Fed. Cir. 2005) .............................................6, 8

*Capella Photonics, Inc. v. Ciena Corp.*,
    546 F. Supp. 3d 977 (N.D. Cal. 2021)........................................5

*CommScope Techs. LLC v. Dali Wireless Inc.*,
    10 F.4th 1289 (Fed. Cir. 2021) .................................................2, 8

*EcoFactor, Inc. v. Google LLC*,
    104 F.4th 243 (Fed. Cir. 2024) .................................................14

*Google LLC v. EcoFactor, Inc.*,
    92 F.4th 1049 (Fed. Cir. 2024) .................................................7, 8, 9

*Google LLC v. Personal Audio, LLC*,
    743 F. App'x 978 (Fed. Cir. 2018) .............................................6

*In re Aflibercept Pat. Litig.*,
    2024 WL 1597512 (J.P.M.L. Apr. 11, 2024) ..............................5

*In re Aflibercept Pat. Litig.*,
    2024 WL 3423047 (N.D.W. Va. July 9, 2024).........................*passim*

*L.A. Biomed. Rsch. Inst. v. Eli Lilly and Co.*,
    849 F.3d 1049 (Fed. Cir. 2017) .................................................6, 10

*Linear Tech. Corp. v. ITC*,
    566 F.3d 1049 (Fed. Cir. 2009) .................................................7, 9

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*,
    521 F.3d 1351 (Fed. Cir. 2008) .................................................2

*Palmer v. Hoffman*,
    318 U.S. 109 (1943)....................................................................14

*Powell v. Home Depot U.S.A., Inc.*,
  663 F.3d 1221 (Fed. Cir. 2011) ..............................................................6

*Regeneron Pharm. Inc. v. Mylan Pharm. Inc.*,
  2024 WL 382495 (N.D.W. Va. Jan. 31, 2024) ........................................4, 9, 10

*Retractable Techs., Inc. v. Becton, Dickinson and Co.*,
  653 F.3d 1296 (Fed. Cir. 2011) .............................................................*passim*

*Sanofi-Synthelabo v. Apotex, Inc.*,
  470 F.3d 1368 (Fed. Cir. 2006) ......................................................................12

*Teva Pharm.USA v. Sandoz, Inc.*,
  574 U.S. 318 (2015)..........................................................................................5

Amgen's Opposition doubles down on the district court's manifest error and confirms the propriety of an injunction pending appeal. The district court previously construed "buffer" to include "proteins like aflibercept." Amgen neither refutes that construction nor contends the district court subsequently displaced it. Rather, Amgen asserts that the court's conclusion below that aflibercept "VEGF antagonist" and "buffer" are not overlapping—the sole basis for denying injunctive relief—is "logically distinct" from the claim construction question of what "buffer" means and whether it includes proteins like aflibercept. Dkt. 22 ("Opp.") at 12.

The law forecloses Amgen's approach. Whether claim limitations are "separate" or "overlapping" is not based superficially on the claim's use of different words or separate lines; what matters is whether the claim limitations have *meanings* that are overlapping. In a prior finding Amgen does not now dispute, Opp. 12-13, the district court applied the *Phillips* framework, concluding that the claim terms "VEGF antagonist" aflibercept and "buffer" do in fact overlap. *In re Aflibercept*, 2024 WL 3423047, at *15-17 (N.D.W. Va. July 9, 2024) ("*Formycon*"); Dkt. 6 ("Mot.") at 10-15. But in its subsequent, conflicting decision, the court bypassed the most fundamental requirement of claim construction: actually construing the claim language.

1

Neither *Becton* nor logic permitted the court to ignore its precedentially mandated, unchallenged construction. Legal errors are rarely so self-evident.

Solely due to that profound legal error, Amgen is poised to enter the market. Amgen agrees that its launch during this appeal would alter the Eylea® market immediately and irreversibly. The status quo would be shattered, causing irreparable injury to Regeneron's sales, pricing, relationships with payors, and reputation. This Court should preserve the status quo pending appeal.

## I.     Regeneron Is Likely To Succeed on the Merits

### A.     The District Court Legally Erred by Ignoring Its Existing Construction

The first step in an infringement analysis is to construe the meaning of disputed claim terms. *CommScope v. Dali Wireless*, 10 F.4th 1289, 1295 (Fed. Cir. 2021). The district court failed out of the gate. Regeneron advanced the court's *Formycon* construction of "buffer." Add646, Add698. Amgen disagreed and offered a competing construction to exclude proteins. Add698. The court shirked its obligation to resolve that dispute, *see O2 Micro v. Beyond Innovation*, 521 F.3d 1351, 1362 (Fed. Cir. 2008), concluding summarily that it "need not address the proper construction of the term 'buffer.'" Add698-699. But the court *already* had "address[ed] the proper construction of the

term 'buffer'"—in the same consolidated proceeding—interpreting "buffer" to include "proteins like aflibercept."

Amgen barely attempts to defend these indefensible errors. It suggests (Opp. 12-13) that the court in *Formycon* did not really construe "buffer" to include proteins. Not so. Formycon recognized that including histidine-containing proteins like aflibercept within the meaning of "buffer" rises and falls with including histidine generally, whether in free form (as in Formycon's product) or within a protein (as in Amgen's). Amgen's expert conceded this point, depicting both forms of histidine with the identical pentagonal imidazole ring:



**Histidine**
(free)

**Histidine**
(polypeptide)

Supp.Add140-141 (¶ 230, Fig. 14).

Formycon accordingly had every "incentive to vigorously contest" (Opp. 13), and actually "disputed," "that proteins like aflibercept" are buffers. *Formycon*, 2024 WL 3423047, at \*17 (citing Formycon's expert testimony). But the court expressly rejected Formycon's expert's opinion that "buffer" excludes proteins like aflibercept, agreeing instead with Regeneron's expert's "persuasive analysis." *Id.* The inclusion of "proteins like aflibercept" was no mere afterthought.

Amgen's aspersion that Regeneron "slipped [in] that language" (Opp. 13) only after learning Amgen's formulation is demonstrably false. In the *Mylan* case, long before Amgen disclosed its formulation, *both sides' experts expressly agreed* that "buffers" included proteins: Regeneron's expert explained "that proteins themselves have some buffering capacity," and Mylan's expert opined that "the protein itself can act as a buffer." Add695 (quoting Reply.Add446 (¶ 381)); Add586 (235:2-236:21); Reply.Add499 (¶ 54); Add592-594 (260:19-265:22). Regeneron's *Formycon* construction reflected this common understanding.

Amgen was not a party to the *Formycon* preliminary-injunction proceedings, having declined Regeneron's invitation to participate. Reply.Add654-655. Regardless, Regeneron sent Amgen the sealed *Formycon*

4

decision immediately upon obtaining permission.  Reply.Add669.  Amgen's preliminary-injunction submissions extensively attacked the *Formycon* construction and urged the court instead to limit "buffer" to "excipient buffers."  Reply.Add628-629; Supp.Add106-107.  Amgen's assertion that it "had no opportunity to object" (Opp. 13) is baseless.  Amgen objected; the court declined to adopt Amgen's alternative "buffer" construction.  Add698-699.

Amgen insists that courts' prior constructions are irrelevant.  The Supreme Court disagrees:  it advises "consolidat[ing] for discovery different cases that involve construction of the same claims" precisely to avoid "divergent claim construction[s]."  *Teva Pharm. v. Sandoz*, 574 U.S. 318, 329 (2015).  To head off that impermissible result, courts "afford[] *stare decisis* deference" to their "prior construction of claim terms," *Capella Photonics v. Ciena*, 546 F. Supp. 3d 977, 983 (N.D. Cal. 2021)—not "zero weight," as Amgen suggests (Opp. 14).  Consistency was especially important here, where the JPML consolidated specifically to "prevent inconsistent rulings as to claim construction."  *In re Aflibercept*, 2024 WL 1597512, at *1 (J.P.M.L. Apr. 11, 2024).  Yet the court did not even consider—much less apply—its existing construction of "buffer."  That was error.

5

### B.    The District Court Misapplied *Becton*

1.    Like the district court, Amgen assumes (Opp. 7-8) that the *Becton* presumption "foreclose[s]" (*id.*) the possibility that one substance can satisfy separately listed claim limitations, and thereby mandates non-infringement. This Court repeatedly has rejected that faulty assumption, holding that different claim terms may be construed to encompass overlapping structures without having to overcome any "presumption" of separateness. *See, e.g.*, *L.A. Biomed. Rsch. Inst. v. Eli Lilly*, 849 F.3d 1049, 1063 (Fed. Cir. 2017); *Google v. Personal Audio*, 743 F. App'x 978, 985 (Fed. Cir. 2018); *Powell v. Home Depot*, 663 F.3d 1221, 1231-32 (Fed. Cir. 2011); *Retractable Techs. v. Becton, Dickinson*, 653 F.3d 1296, 1304 (Fed. Cir. 2011); *Cannon Rubber v. First Years*, 163 F. App'x 870, 876 (Fed. Cir. 2005).  That claim limitations are separately recited does not displace the "principle that in infringement or obviousness analysis, a single element … can ordinarily satisfy multiple claim limitations." *Personal Audio,* 743 F. App'x at 985.  Nor does such overlap "compel [a court] to adopt an otherwise unsupported construction."  *L.A. Biomed.*, 849 F.3d at 1063.  But that is exactly what the court did below and what Amgen urges here.

Amgen argues, remarkably, that where claims list separate elements, *Becton* extirpates the entire *Phillips* claim construction analysis, so that "even if proteins like aflibercept could be buffers," the "buffer" and aflibercept "VEGF antagonist" limitations must be separate, not overlapping.  Opp. 12. No authority supports that breathtaking assertion.  Indeed, *Becton* and its progeny explicitly direct courts to consider the "claim language" in assessing whether limitations are separate or overlapping.  *Google v. EcoFactor*, 92 F.4th 1049, 1058 (Fed. Cir. 2024) ("the claim language supports a broader reading" permitting overlapping structures); *Linear v. ITC*, 566 F.3d 1049, 1055 (Fed. Cir. 2009).

Under this Court's precedent, if the claim recited:

(1) "a VEGF antagonist" [aflibercept]; and

(2) "a buffer within an optimal pH range, including proteins
like aflibercept";

then aflibercept unquestionably would satisfy both limitations.  *Retractable*, 653 F.3d at 1304; *Linear*, 566 F.3d at 1055.  The same result necessarily obtains where, as here, the claim recites:

(1) "a VEGF antagonist" [aflibercept]; and

(2) "a buffer";

where "buffer" is construed as "including … proteins like aflibercept" containing histidine "within an optimal pH range." That conclusion follows ineluctably from the rule that courts must apply the "properly construed claims" to assess infringement, not simply ignore the first step of the inquiry. *CommScope*, 10 F.4th at 1295. No case, including *Becton*, permits a contrary result. Rather, because the claim language here contemplates that a substance can "perform 'double duty," *Cannon*, 163 F. App'x at 876, the *Becton* presumption is simply inapplicable or immediately refuted. *Id.*; *Google*, 92 F.4th at 1058.

Had the court construed "buffer," as the law requires, it would have reaffirmed its *Formycon* construction, under which Amgen undisputedly infringes. As that construction reflects, "buffer" encompasses a genus "including … proteins like aflibercept" that contain histidine residues. *Formycon*, 2024 WL 3423047, at *16. Amgen's own expert candidly agreed that aflibercept at the claimed concentration "does serve as a buffer in Amgen's formulation." Add692 (quoting Add606 (316:10-12)); *see* Add309.

Implausibly, Amgen (Opp. 9-10) blames Regeneron for the court's manifest error. Amgen is wrong. Regeneron disputed below that the *Becton* presumption applied, arguing consistently that nothing in the claims says

"that one ingredient can't meet multiple claim limitations or that aflibercept cannot be a buffer." Reply.Add543. Amgen also references (Opp. 10) Regeneron's statement during the *Mylan* trial that "buffer" is a "structure[] that limit[s] what formulations are in the claim." That statement remains true; the court's construction limits "buffer" structurally to a known set of structures that have "proton-donating and/or proton-accepting groups." Mot. 12-14. "Proteins like aflibercept" are among those structures.

2. In any event, the *Becton* presumption is just that—a presumption, not an ironclad rule. *Google*, 92 F.4th at 1058. It is overcome where the claim language or other relevant evidence dictates that result. *Id.* The court's failure to apply its construction of "buffer" as overlapping with the aflibercept VEGF antagonist limitation—a dispositive construction Amgen does not refute—renders its remaining analysis (and Amgen's defense of it) irrelevant. *Id.*; *Linear*, 566 F.3d at 1055.

Even setting aside that fatal error, any presumption manifestly was overcome here. Unlike *Becton*, the claims here set forth no relationship, structural or otherwise, between "buffer" and "VEGF antagonist." Mot. 17-18. The claims simply recite an "ophthalmic formulation" "that comprises" a "[VEGF] antagonist" and "a buffer." Add914 (claim 1). Also unlike in *Becton*,

the "buffer" does not distinguish the prior art; "buffers" were "known structures." *Regeneron Pharm. v. Mylan Pharm.*, 2024 WL 382495, at \*67 (N.D.W. Va. Jan. 31, 2024).

Amgen's efforts to shoehorn the claims into *Becton* fail. Notably, Amgen abandons core aspects of the district court's *Becton* analysis. The court's demonstrably wrong conclusion that "buffer" would be nonsensical if it overlapped in scope with "VEGF antagonist" (Mot. 18) is reduced to the status of unnecessary dicta, "an alternative holding." Opp. 15. And Amgen mounts no defense of the erroneous analysis (*see* Add661-663) that interpreting "buffer" to include proteins like aflibercept would render "buffer" superfluous; it would not. *L.A. Biomed.*, 849 F.3d at 1063 (rejecting argument that construction permitting "overlap" "impermissibly renders [limitation] superfluous").

The arguments that Amgen does make fare no better. Amgen notes (Opp. 10) that certain specification embodiments and one unasserted dependent claim refer to concentration ranges of buffer in "mM" (millimolar) units, but disclose different VEGF antagonist concentrations in "mg/ml" (milligrams/milliliter). Amgen omits a critical fact: The asserted claims recite no concentration range for "a buffer," in mM or otherwise. That a buffer is

10

present at a lower concentration than the specification's preferred embodiments does not "limit a claim term beyond its ordinary meaning," *Aventis Pharma v. Hospira*, 675 F.3d 1324, 1330 (Fed. Cir. 2012), or render those claims the kind of nonsensical physical impossibility discussed in *Becton*.

Amgen also downplays the extrinsic evidence. Like its expert, Amgen concedes that prior art taught that proteins could act as buffers, but it asserts (Opp. 19) that no reference disclosed using proteins as buffers in a formulation. Amgen disregards its own Gokarn publication, §102(e) art *predating* the '865 patent's priority date. *Contra* Opp. 19; Mot. 14-15 (explaining Gokarn's prior-art status). Amgen's expert agreed that "Gokarn demonstrates that the buffering capacity of proteins can be used to control pH in formulations" and "discloses protein formulations in which the protein is substantially the only buffer." Add587, Add590 (240:15-18, 250:1-7).

## II.    The Equities Overwhelmingly Favor an Injunction

Amgen argues (Opp. 21-22) that an injunction will undercut its investment in ABP938. Such garden-variety considerations carry little or no weight in the balance-of-hardships analysis, where, as here, they are "the result of its own calculated risk" in launching before adjudication of an

innovator's patent rights. *Sanofi-Synthelabo v. Apotex*, 470 F.3d 1368, 1383 (Fed. Cir. 2006). In any event, Amgen inflates its alleged harms, arguing without citation that doctors will not switch patients from Eylea HD to ABP938. The record indicates otherwise. Add919-920, Add922; Reply.Add37.

Any harms from Amgen's delayed plans cannot outweigh the profound, irreparable harm that Regeneron will incur absent injunctive relief. If Amgen ultimately prevails, Regeneron's bond can make Amgen whole. *See infra* III. An injunction pending appeal will defer, not destroy, anticipated profits. And if Amgen prevails, the injunction will be short-lived. The parties agree this appeal should be set for argument by January. *See* Dkt. 20 at 1-2.

Amgen also claims "Regeneron itself" is causing "Eylea's dwindling market share" by selling Eylea HD. Opp. 21. The district court rejected that argument repeatedly in enjoining other biosimilars, and for good reason. The relevant questions are whether Amgen's launch would harm Regeneron, and whether that harm is readily calculable and redressable by monetary damages. That Regeneron also offers another aflibercept-containing product makes no difference in that analysis. And it certainly does not erase that ABP938's launch will drain a large, unquantifiable share of sales from Eylea, irreversibly alter Regeneron's pricing, and affect Regeneron's relationships

**Confidential Material Redacted**

with payors. Those harms are not "self-inflicted," *contra* Opp. 21— *Amgen's launch* will inflict them. To conclude otherwise effectively would permit infringers to escape injunctions whenever the patentee also offers other products.

## III.  Amgen's Unsupported, Unreasonable Bond Request Should Be Rejected

The record below contained Amgen's January 2024 projections for its 2024 and 2025 sales. Amgen's model assumed it would launch its product ▮ time ▮ of other biosimilars. Reply.Add9. Amgen's revenue forecasts ranged from ▮ dollar amount ▮ for 2024 and ▮ dollar amount ▮ for 2025. Applying Amgen's alleged ▮ percent ▮ profit margin (Supp.Add436), its highest forecasted profit through the end of 2025 is approximately ▮ dollar amount ▮. The merits decision likely will issue in early 2025; Regeneron thus proposes a ▮ dollar amount ▮ bond as a generous estimate of Amgen's potential harm, and ▮ dollar amount ▮ for the brief administrative stay.

Amgen instead seeks ▮ dollar amount ▮ —to counsel's knowledge, the largest in this Court's history and among the largest ever in American jurisprudence. Opp. 23. Amgen's exorbitant demand would require a syndicate of multiple underwriters that may be infeasible to assemble. Reply.Add670-671.

Amgen cites no record evidence to support this demand, instead proffering two new declarations. Amgen's declarants "cited no documents"

and provided "no underlying data" or model, making scrutiny impossible. *EcoFactor v. Google*, 104 F.4th 243, 259 (Fed. Cir. 2024) (Prost, J., dissenting in part).  Even so, some flaws are plain.  The expert's daily pro-rating directly contravenes Amgen's January 2024 projections, showing **rate** uptake in 2024 followed by **amount** uptake in 2025.  The employee's model assumed a **month** 2024 launch, Supp.Add434, but nowhere refutes Mr. Clark's testimony that Amgen advised customers it would not begin selling until October.  Add716.  To the extent this Court must choose between Amgen's ordinary-course forecasts or its declarants' new, untested, litigation-driven estimates, the former are far more reliable.  *Cf. Palmer v. Hoffman*, 318 U.S. 109, 113-14 (1943).  Amgen previously agreed on this point in obtaining an injunction pending appeal against a biosimilar competitor.  *Amgen v. Sandoz*, No. 15-1499, Dkt. 110 at 1, 5 (Fed. Cir. May 19, 2015) (criticizing $179M bond request as "wildly overstat[ed]" and arguing bond "should track [biosimilar's] internal forecasts" showing that "uptake will grow over time").

The Court should not let Amgen use its bond demand to deny, *de facto*, the injunctive relief to which Regeneron is entitled.  Regardless, the Court need not resolve this dispute; if this Court ultimately affirms, it can remand to

**Confidential Material Redacted**

assess Amgen's actual harm, if any. The Court otherwise should order a ▮dollar amount▮ bond to support an injunction until the merits decision.

## CONCLUSION

For the foregoing reasons, Regeneron respectfully requests an injunction pending appeal.

OCTOBER 4, 2024                    Respectfully submitted,

                                  /s/ David I. Berl

                                  DAVID I. BERL
                                  THOMAS S. FLETCHER
                                  ANDREW V. TRASK
                                  CHARLES L. MCCLOUD
                                  SHAUN P. MAHAFFY
                                  KATHRYN S. KAYALI
                                  ARTHUR J. ARGALL III
                                  ADAM PAN
                                  CHRISTIAN GLADDEN-
                                  SORENSEN
                                  RHOCHELLE KRAWETZ
                                  WILLIAMS & CONNOLLY LLP
                                  *680 Maine Ave. SW*
                                  *Washington, DC 20024*
                                  *(202) 434-5000*

                                  ELIZABETH S. WEISWASSER
                                  WEIL, GOTSHAL & MANGES LLP
                                  *767 Fifth Ave.*
                                  *New York, NY 10153*
                                  *(212) 310-8022*

                                  PRIYATA PATEL
                                  WEIL, GOTSHAL & MANGES LLP
                                  *2001 M St. NW, Suite 600*

*Washington, DC 20036*
*(202) 682-7041*

JACOB E. HARTMAN
KELLOGG, HANSEN, TODD,
FIGEL & FREDERICK PLLC
*1615 M St. NW, Suite 400*
*Washington, DC 20036*
*(202) 326-7989*

*Attorneys for Plaintiff-*
*Appellant*

No. 24-2351

# In the United States Court of Appeals for the Federal Circuit

---

REGENERON PHARMACEUTICALS, INC.,

*Plaintiff-Appellant,*

*v.*

MYLAN PHARMACEUTICALS INC., AMGEN USA, INC., BIOCON BIOLOGICS INC., CELLTRION, INC., FORMYCON AG, SAMSUNG BIOEPIS CO., LTD.,

*Defendants,*

AMGEN INC.,

*Defendant-Appellee,*

---

Appeal from the United States District Court for the Northern District of West Virginia in No. 1:24-md-3103-TSK, Chief Judge Thomas S. Kleeh

---

**NONCONFIDENTIAL ADDENDUM**

---

| Description | Page Range |
|---|---|
| Argall Ex. 5 (AMG-AFL-US_00250080) (Dkt. 180-2) (CONTAINS CONFIDENTIAL MATERIAL) | Reply.Add001 - Reply.Add030 |
| Clark Ex. 3 (King 2024) (Dkt. 180-24) | Reply.Add031 - Reply.Add041 |
| RESERVED | Reply.Add042 - Reply.Add285 |
| Chamow Ex. C-22 (Responsive Expert Report of Bernhardt L. Trout, Ph.D. in Case No. 1:22-cv-00061, Dkt. 206-7) | Reply.Add286 - Reply.Add464 |
| Chamow Deposition Exhibit 15 (Reply Expert Report of Gregory MacMichael Ph.D. in Case No. 1:22-cv-00061, Dkt. 441-19) | Reply.Add465 - Reply.Add526 |
| Transcript of Preliminary Injunction Hearing (Dkt. 243) (CONTAINS CONFIDENTIAL MATERIAL) | Reply.Add527 - Reply.Add618 |
| Amgen's Brief Opposing Regeneron's Preliminary Injunction Motion (Dkt. 206) (CONTAINS CONFIDENTIAL MATERIAL) | Reply.Add619 - Reply.Add653 |
| Email from Counsel for Regeneron to Counsel for Amgen sent January 10, 2024 (CONTAINS CONFIDENTIAL MATERIAL) | Reply.Add654 |
| Email from Counsel for Regeneron to Counsel for Amgen sent January 18, 2024 (CONTAINS CONFIDENTIAL MATERIAL) | Reply.Add655 - Reply.Add668 |
| Email from Counsel for Regeneron to Counsel for Amgen send June 27, 2024 | Reply.Add669 |
| Declaration of Donna Chiancone (CONTAINS CONFIDENTIAL MATERIAL) | Reply.Add670 - Reply.Add671 |

## <u>CONFIDENTIAL INFORMATION STATEMENT</u>

The nonconfidential version of this appendix redacts material filed under seal pursuant to the protective order issued by the district court, as well as material containing confidential Amgen business information.  As required by Federal Circuit Rule 25.1(e)(1)(B), the table below notes the specific pages with redacted material in the nonconfidential addendum and the general nature of that material.

| Description | Page Range | Description |
|---|---|---|
| Argall Ex. 5 (AMG-AFL-US_00250080) (Dkt. 180-2) | Reply.Add001 - Reply.Add030 | Contains Amgen's confidential business information related to ABP 938. |
| Transcript of Preliminary Injunction Hearing (Dkt. 243) | Reply.Add527 - Reply.Add618 | Contains Amgen's and Regeneron's confidential business and product information related to ABP 938 and Eylea®. |
| Amgen's Brief Opposing Regeneron's Preliminary Injunction Motion (Dkt. 206) | Reply.Add619 - Reply.Add653 | Contains Amgen's and Regeneron's confidential business and product information related to ABP 938 and Eylea®. |
| Email from Counsel for Regeneron to Counsel for Amgen sent January 10, 2024 | Reply.Add654 | Contains Amgen's confidential business information related to ABP 938. |
| Email from Counsel for Regeneron to Counsel for Amgen sent January 18, 2024 | Reply.Add655 - Reply.Add668 | Contains Amgen's confidential business information related to ABP 938. |
| Declaration of Donna Chiancone | Reply.Add670 - Reply.Add671 | Contains Amgen's confidential business information related to ABP 938. |

**Confidential Material from
Reply.Add1-Reply.Add30
Omitted**

# Clark Ex. 3


Optimize your product launch    cencora
Discover the key launch considerations to
a better commercialzation plan    Read more

 FirstWord HEALTHTECH    FirstWord REPORTS

☰  Q    FirstWord **PHARMA**⊕    

Pharma+ ▼    News ▼    Insight, Analysis & Views ▼    StoryWatch ▼    Events    Resources    More FW ▼

Physician Views Poll Results

# Physician Views Poll Results: Appetite for biosim Eylea healthy, but high-dose adoption could limit brand erosion

Simon King

PUBLISHED: JUNE 03, 2024



Three-quarters of US ophthalmologists recently snap-polled by *FirstWord* assert that they will be comfortable prescribing biosimilar versions of Regeneron's Eylea (aflibercept).

- Whilst 56% of respondents said they are comfortable with the prospect of prescribing a biosimilar, 21% described themselves as being "extremely" comfortable

- Three-in-four ophthalmologists polled also agree that use of the "buy and bill" model to purchase Eylea will potentially accelerate adoption of biosimilar versions when they launch in the US

**Reply.Add32**

RGN-EYLEA-BIOSIM-AMG-00000478

- A third of prescribers say they are adopting Regeneron's new higher-dose (HD) version of Eylea at a "moderate" pace, whilst a quarter of respondents suggest their uptake is occurring at a faster pace

- Feedback suggests that physicians will be less willing to switch patients from this HD version to biosimilar equivalents, putting onus on the continued launch of Regeneron's newer therapy

## The backstory

The FDA recently approved two biosimilar versions of Eylea with interchangeability status, although it remains unclear when they will launch in the US market, owing to ongoing litigation initiated by Regeneron.

## Poll results

We fielded the following questions to 34 US-based ophthalmologists, all of whom were screened as physicians who routinely prescribe injectable biologic therapies for the treatment of age-related macular degeneration (AMD) and other ophthalmologic conditions.



RGN-EYLEA-BIOSIM-AMG-00000479

**From a clinical standpoint would you be comfortable prescribing a biosimilar version of Eylea (aflibercept)?**



FirstWord **GROUP**

Share

**Do you anticipate that 'buy and bill' purchasing of Eylea (aflibercept) will accelerate use of biosimilar versions once available on the market?**



FirstWord **GROUP**

Share

RGN-EYLEA-BIOSIM-AMG-00000481

**How would you best describe your current/anticipated near-term adoption of high-dose Eylea (aflibercept 8mg)?**



FirstWord **GROUP**

Share

**In the future would you consider switching patients from high-dose Eylea (aflibercept 8mg) to biosimilar versions of Eylea (aflibercept)?**



FirstWord **GROUP**

Share

## Analysis

Feedback from this sample of ophthalmologists suggests that the overall level of comfort towards future use of Eylea biosimilars is relatively high, with just one physician suggesting that they are completely uncomfortable with the idea of prescribing a biosimilar aflibercept product. Furthermore, financial considerations associated with use of the "buy and bill" model to procure Eylea could feasibly accelerate biosimilar adoption, poll feedback indicates. This echoes the view of analysts at Wolfe Research who argue that due to "buy and bill" dynamics, erosion of branded Eylea sales could occur at a faster rate than Wall Street and investors anticipate.

In addition, this could slow the performance of HD Eylea, they argue. Sales of the new formulation product were nominally higher than consensus forecasts in the first quarter of 2024 and uptake is expected to accelerate following the issue of a permanent J code, which will support reimbursement. In the meantime, however, it could be a concern that four in 10 physicians polled continue to anticipate no or only slow adoption of Eylea HD. Whilst this may reflect typical barriers to use associated with a new drug launch, it could also reflect the availability of Roche's Vabysmo (faricimab) as a new and disruptive treatment option for AMD, diabetic macular oedema and macular oedema following retinal vein occlusion.

**Reply.Add37**

On a positive note for Regeneron, there appears to be recognition among a cohort of ophthalmologists that less-frequent dosing associated with Eylea HD represents a meaningful advantage over the original formulation. Whilst we would agree that biosimilar Eylea uptake could slow new patient starts on Eylea HD, many physicians are clearly unsure about moving patients from the latter to a biosimilar. Onus therefore remains on how quickly Regeneron can establish Eylea HD as a new standard of care.

**Related analysis:**

Physician Views Results: Regeneron's Eylea comes out top against Roche's Vabysmo in ophthalmologist poll

Spotlight On: Wet AMD treatments look towards longer treatment durations



**Add Interests to MyFW+**

AMD    Biocon    Biogen    Eylea    Focus on Biosimilars

Marketing & Sales    ✓ Regeneron    Roche    Samsung Group

Vabysmo

# RELATED NEWS

Press Release

## 1-Year Outcomes of Phase 3 Study for SB15, Proposed biosimilar to Eylea (aflibercept), Presented at the 2023 Association for Research in Vision and Ophthalmology (ARVO) Annual Meeting

APRIL 25, 2023

Top Story

## First Eylea biosimilars approved in US, but litigation blurs launch optics

RGN-EYLEA-BIOSIM-AMG-00000484

MAY 20, 2024

---

Top Story

## Regeneron looks to grow Eylea HD with J-code now in hand

FEBRUARY 02, 2024

---

Press Release

## Samsung Bioepis to Present New Data for SB15, a proposed biosimilar to Eylea (aflibercept), at the 2023 Association for Research in Vision and Ophthalmology (ARVO) Annual Meeting

APRIL 20, 2023

---

Top Story

## FDA approves Samsung, Biogen's Lucentis biosimilar

SEPTEMBER 20, 2021

**VIEW MORE RELATED NEWS >**



Increase your outreach

Connect with **over 168,000 active primary care professionals** – online and in-person – across the United States.

Explore Pri-Med

## RELATED ANALYSIS

Physician Views   + PLUS

**Physician Views Preview: Will ophthalmologists embrace biosimilar Eylea?**

RGN-EYLEA-BIOSIM-AMG-00000485



# ALL NEWS

Top Story

## ASCO24: Opdivo, Yervoy duo shows 21% OS benefit in first-line liver cancer
29 MINUTES AGO

Press Release

## Kindeva Drug Delivery Expands Loughborough, UK, Facilities at Charnwood Campus to Support Growth of Green Propellant Commercialization
1 HOUR AGO

Press Release

## Inocras and Massive Bio Forge Groundbreaking Alliance to Revolutionize Cancer Care with Whole-Genome Insights and Clinical Trial Matching
1 HOUR AGO

Press Release

## Seismic Therapeutic Announces Participation at Multiple Upcoming Scientific Conferences in June 2024
1 HOUR AGO

VIEW MORE ALL NEWS >

Reply.Add40



FirstWord HEALTHTECH

FirstWord REPORTS

© 2024 FirstWord. All rights reserved    |    1140 Avenue of the Americas, 14th Floor, New York, NY 10036

About FirstWord  |  Advertise With Us  |  Contact Us  |  Terms of Use  |  Privacy Policy

**Reply.Add41**

**Reply.Add42-Reply.Add285
Reserved**

# EXHIBIT C-22

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
CLARKSBURG DIVISION**

|  |  |
|---|---|
| REGENERON PHARMACEUTICALS, INC., | Case No. 1:22-cv-00061-TSK |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| MYLAN PHARMACEUTICALS INC., | **HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY** |
| Defendant. | |

## RESPONSIVE EXPERT REPORT
## OF BERNHARDT L. TROUT, PH.D.

I declare that the following is, to the best of my knowledge and belief, true and correct.

Dated: March 2, 2023

_____
Bernhardt L. Trout, Ph.D.

**TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................................1

II.     SCOPE OF OPINIONS ..........................................................................................2

III.    EXPERIENCE AND QUALIFICATIONS .............................................................3

IV.     MATERIALS CONSIDERED ................................................................................3

V.      LEGAL STANDARDS ...........................................................................................4

        A.      Validity ........................................................................................................4

                1.      Presumption of Validity, Burden of Proof ........................................4

                2.      Anticipation .......................................................................................4

                3.      Obviousness .......................................................................................5

                4.      Obviousness-Type Double Patenting ................................................9

                5.      Section 112 ........................................................................................9

                6.      Dependent Claims ............................................................................12

VI.     LEVEL OF ORDINARY SKILL .........................................................................12

VII.    CLAIM CONSTRUCTION ..................................................................................13

VIII.   STATE OF THE ART ...........................................................................................14

        A.      Antibodies .................................................................................................14

        B.      Fusion Proteins ..........................................................................................17

        C.      Protein aggregation ...................................................................................18

        D.      Lyophilization ...........................................................................................22

        E.      Glycosylation ............................................................................................23

        F.      Pharmacokinetics ......................................................................................25

        G.      Intravitreal Administration ........................................................................27

        H.      Size-Exclusion Chromatography (SEC) ....................................................29

        I.      Container Systems .....................................................................................32

        J.      Scope of the References Cited by Dr. Rabinow .........................................33

                1.      Fraser ...............................................................................................33

                2.      Holash ..............................................................................................34

                3.      Daly .................................................................................................36

                4.      Wulff ...............................................................................................39

                5.      Rudge ...............................................................................................39

                6.      Papadopoulos ...................................................................................40

**Reply.Add288**

7.      Chi ........................................................................................................... 46

8.      '226 Patent ............................................................................................... 47

9.      Dix ........................................................................................................... 47

10.    '747 Patent ............................................................................................... 47

11.    Liu ........................................................................................................... 49

12.    Shams ...................................................................................................... 50

13.    Gaudreault 2005 ...................................................................................... 51

14.    Lucentis PI 2006 ..................................................................................... 52

15.    Lam ......................................................................................................... 52

16.    '959 Petition for PTE .............................................................................. 53

17.    '546 Patent Response to July 13, 2011 Office Action .............................. 53

18.    Kaisheva '417 ......................................................................................... 54

19.    Kaisheva '316 ......................................................................................... 55

20.    Andya '801 .............................................................................................. 56

21.    Andya '326 .............................................................................................. 57

22.    Parkins .................................................................................................... 57

23.    Routier .................................................................................................... 58

24.    Frokjaer .................................................................................................. 58

25.    '261 Patent ............................................................................................... 58

26.    '842 Patent ............................................................................................... 59

27.    '594 Patent ............................................................................................... 59

28.    '489 Patent ............................................................................................... 59

29.    '763 Patent ............................................................................................... 59

30.    '992 Patent ............................................................................................... 59

31.    Arvinte .................................................................................................... 60

32.    Fyfe ........................................................................................................ 60

33.    Amersham ............................................................................................... 61

34.    Amersham Application Note .................................................................... 61

35.    Eylea Prescribing Information 2011 ........................................................ 62

36.    Avery ...................................................................................................... 62

37.    Avastin PI ............................................................................................... 63

38.    Daly II ..................................................................................................... 63

39.    Peyman .................................................................................................... 64

**Reply.Add289**

| | | | |
|---|---|---|---|
| | 40. | Wiegand | 64 |
| | 41. | Daly III | 65 |
| | 42. | Baffert | 65 |
| | 43. | Marra | 66 |
| | 44. | Avery 2006 | 66 |
| | 45. | Duvvuri 2003 | 67 |
| | 46. | Ghate 2006 | 67 |
| IX. | ASSERTED PATENTS | | 68 |
| | A. | The '865 Patent | 68 |
| | B. | The '572 Patent | 76 |
| | C. | Asserted Claims of the '865 and '572 Patents | 76 |
| X. | PRIORITY DATE | | 78 |
| VALIDITY OPINIONS UNDER REGENERON'S PROPOSED CONSTRUCTIONS | | | 79 |
| XI. | SUMMARY OF OPINIONS | | 79 |
| | A. | The '865 Asserted Claims Are Not Anticipated | 79 |
| | B. | The '865 Asserted Claims Would Not Have Been Obvious | 79 |
| | C. | The '865 Asserted Claims Are Not Invalid Under Section 112 | 80 |
| | D. | The '572 Claims Are Not Invalid | 80 |
| XII. | The '865 Asserted Claims Are Not Anticipated | | 80 |
| | A. | Fraser Does Not Anticipate the '865 Asserted Claims | 80 |
| | | 1. Claim 4 | 80 |
| | | 2. Claim 7 | 90 |
| | | 3. Claim 9 | 90 |
| | | 4. Claim 11 | 90 |
| | | 5. Claim 14 | 90 |
| | | 6. Claim 15 | 91 |
| | | 7. Claim 16 | 93 |
| | | 8. Claim 17 | 93 |
| | | 9. Claim 18 | 93 |
| | B. | Wulff Does Not Anticipate the '865 Asserted Claims | 94 |
| | | 1. Claim 4 | 94 |
| | | 2. Claim 7 | 100 |
| | | 3. Claim 9 | 100 |

| | | | |
|---|---|---|---|
| | 4. | Claim 11 | 100 |
| | 5. | Claim 14 | 101 |
| | 6. | Claim 15 | 101 |
| | 7. | Claim 16 | 103 |
| | 8. | Claim 17 | 103 |
| | 9. | Claim 18 | 103 |
| C. | | The '226 Patent Does Not Anticipate the '865 Asserted Claims | 104 |
| | 1. | The Entirety of the '226 Patent Is Not Prior Art To The '865 Patent | 104 |
| | 2. | Claim 4 | 106 |
| | 3. | Claim 7 | 110 |
| | 4. | Claim 9 | 110 |
| | 5. | Claim 11 | 110 |
| | 6. | Claim 14 | 110 |
| | 7. | Claim 15 | 110 |
| | 8. | Claim 16 | 111 |
| | 9. | Claim 17 | 111 |
| | 10. | Claim 18 | 112 |
| XIII. | | The '865 Asserted Claims Would Not Have Been Obvious | 112 |
| A. | | Fraser Does Not Render The '865 Asserted Claims Obvious | 113 |
| | 1. | Fraser Would Not Have Motivated The POSA To Make An Ophthalmic Formulation Suitable For Intravitreal Injection | 114 |
| | 2. | Dr. Rabinow's Cited Art Did Not Teach The Claimed Amino Acid Sequence, And The POSA Would Not Have Been Motivated To Use It | 115 |
| | 3. | The Prior Art Taught Away From Formulations With 40 mg/ml Of A VEGF Antagonist | 120 |
| | 4. | The Prior Art Did Not Teach Or Suggest A Formulation Of The Claimed Protein at 40 mg/ml That Achieves 98% Native Conformation | 125 |
| B. | | Wulff Does Not Render The '865 Asserted Claims Obvious | 127 |
| C. | | Neither Dix Nor The '226 Patent Renders The '865 Asserted Claims Obvious | 128 |
| D. | | LUCENTIS (ranibizumab) Does Not Render The '865 Asserted Claims Obvious | 128 |

**Reply.Add291**

E. Dr. Rabinow's Scattered Citations Fail to Establish Obviousness of the '865 Asserted Claims ..................................................................................... 131

F. Objective Evidence ............................................................................................... 134

XIV. The '865 Asserted Claims Are Not Invalid For Obviousness-Type Double Patenting ................................................................................................................. 140

XV. The '865 Asserted Claims Are Not Invalid Under Section 112 ..................................... 144

A. The '865 Asserted Claims Are Enabled ................................................................. 144

1. The Breadth of the Claims ........................................................................ 145

2. The Nature of the Invention ..................................................................... 149

3. The State of the Prior Art ......................................................................... 150

4. The Level of Ordinary Skill ....................................................................... 152

5. The Level of Predictability ........................................................................ 152

6. The Direction and Working Examples in the Specification ................... 153

7. Quantity of Experimentation .................................................................... 158

B. The '865 Asserted Claims Are Described ................................................................ 161

C. The '865 Asserted Claims Are Definite .................................................................... 166

1. Organic Co-Solvent .................................................................................. 166

2. Native Conformation ................................................................................ 167

3. An Ophthalmic Formulation Suitable for Intravitreal Injection ............. 167

VALIDITY OPINIONS UNDER MYLAN'S PROPOSED CONSTRUCTIONS ..................... 168

XVI. The '572 Claims Would Not Have Been Obvious ........................................................ 170

A. "Formulated as an Isotonic Solution" ................................................................... 170

B. "Formulated with a Nonionic Surfactant" ............................................................. 170

XVII. The '572 Claims Are Described ................................................................................... 171

A. "Formulated as an Isotonic Solution" ................................................................... 171

B. "Formulated with a Nonionic Surfactant" ............................................................. 171

XVIII. Conclusions .............................................................................................................. 172

EXHIBIT A ............................................................................................................................ 173

Reply.Add292

## I.    INTRODUCTION

1.      I have been asked by counsel for Plaintiff Regeneron Pharmaceuticals, Inc. ("Regeneron" or "Plaintiff") to serve as an expert and provide my professional opinions regarding certain issues relating to U.S. Patent Nos. 11,084,865 (the "'865 patent") and 11,253,572 (the "'572 patent").

2.      I understand Defendant Mylan Pharmaceuticals Inc. ("Mylan" or "Defendant") seeks FDA approval of Biologics License Application ("BLA") No. 761274 to manufacture and sell a biosimilar version of Regeneron's EYLEA® (aflibercept) product ("M710").

3.      On February 2, 2023, I submitted an expert report in which I explained the bases for my opinion that Mylan infringes claims 4, 7, 9, 11, and 14-18 (i.e., the asserted claims of the '865 patent, the "'865 Asserted Claims") of the '865 patent, and that Mylan's biosimilar product ("M710") meets the limitations that "aflibercept is formulated as an isotonic solution" (as recited in claims 6, 12, 18, and 22 of the'572 patent) and "aflibercept is formulated with a nonionic surfactant" (as recited in claims 7, 13, 19, and 23 of the '572 patent).

4.      I have been asked to offer opinions regarding the novelty, non-obviousness, written description, definiteness, and enablement of the '865 Asserted Claims, as well as the validity of claims 6, 7, 12, 13, 18, 19, 22, and 23 of the '572 patent (the "'572 Claims"). This report explains my opinions that the '865 Asserted Claims are not invalid due to anticipation, obviousness, lack of written description, lack of enablement, or indefiniteness.

5.      This report also explains my opinions that the '572 Claims are also not invalid.

6.      I reserve the right to respond to any additional arguments from Mylan regarding the validity of the claims above, if any, in a subsequent report, at deposition and/or at a hearing.

7.      I reserve the right to provide testimony—including at a hearing, in deposition, or through declaration—that explains, elaborates upon, or provides background and context

1

regarding: (a) the opinions and information set forth in this report; (b) the testimony that I might give in deposition or through declaration; (c) the testimony that other fact witnesses or expert witnesses may give or have given at a hearing, in deposition, or through declaration; (d) additional opinions that I form in response to opening expert reports, rebuttal expert reports, briefs, arguments, or other materials submitted by or on behalf of any party to this litigation; (e) additional opinions relating to facts that come to light through discovery after the date of this expert report; and (f) additional opinions in response to any arguments that Mylan or their expert(s) may assert.

## II.  SCOPE OF OPINIONS

8.  I have reviewed the Opening Expert Reports of Dr. Barrett E. Rabinow and Dr. Gregory MacMichael, dated February 2, 2023. Dr. Rabinow and Dr. MacMichael each filed two reports, one assuming that the Court accepts Regeneron's claim construction of the claim terms "organic co-solvent" and "native conformation" and the other assuming that the Court accepts Mylan's claim construction of those same terms. I reviewed all four reports and the substance of my analysis applies equally to both of each expert's reports unless otherwise specified. For simplicity, however, my citations to "Rabinow" or "Rabinow Report" refer to Dr. Rabinow's report applying Regeneron's construction, and my citations to "MacMichael" or "MacMichael Report" refer to Dr. MacMichael's report applying Regeneron's claim construction. I designate the reports applying Mylan's claim constructions as "Rabinow-M" and "MacMichael-M," respectively.

9.  The scope of this report is to respond to the Rabinow Report and MacMichael Report relating to the validity of the '865 Asserted Claims and the '572 Claims. I understand that Regeneron has asked other individuals to also offer their opinions regarding the validity of the '572 Claims. Accordingly, the reasons why the particular limitations set forth in the '572

2

**Reply.Add294**

Claims are not invalid that I discuss in this report are not intended to be an exclusive list of all reasons that may be applicable.

## III.   EXPERIENCE AND QUALIFICATIONS

10.     I described my experience and qualifications in Section II of my Opening Expert Report. A copy of my curriculum vitae, which describes my qualifications in greater detail, is attached as Exhibit A to my Opening Expert Report.  Section II of my Opening Report also states my rate of compensation for my work in this case.

## IV.   MATERIALS CONSIDERED

11.     In providing this report, I have considered the materials referenced in this report and listed in Exhibit A to this report, including the Rabinow Report, the MacMichael Report, and the materials and exhibits referenced therein, and my Opening Report and the materials and exhibits referenced therein.

12.     I have further relied upon my education and my knowledge and experience from decades of practicing, researching, and teaching in the area of protein formulations.

13.     My opinions are informed by the collection of materials I have considered. In setting forth my opinions, I have discussed in particular a number of these documents. In the body of my report, I have specified illustrative documents. In doing so, I have not provided an exhaustive discussion of all documents in the materials I have considered, which may further support my opinions and which I may be asked to testify on throughout this litigation. I further understand that expert discovery is ongoing, and that I may be asked to testify regarding other materials that further support my opinions but have not yet been provided to me or to Regeneron's counsel.

14.     I reserve the right to modify and/or supplement any of my opinions as needed, in response to (a) new information and evidence I receive, (b) further scientific analysis

**Reply.Add295**

demonstrating a need to supplement, (c) new issues that may arise, (d) any additional discovery, arguments, evidence, or testimony presented in this case, and (e) any decisions or orders by the Court.

15.     In response to any assertions made by any party or its experts in any submissions or during discovery, I expect to respond as appropriate or to provide additional evidence or testimony.

16.     If asked to testify, I may be required to explain the opinions and analyses described in the body of this report. I reserve the right to use demonstratives in support of my testimony.

## V.     LEGAL STANDARDS

### A.     Validity

#### 1.     Presumption of Validity, Burden of Proof

17.     I have been informed that a patent is presumed to be valid and that the party challenging the validity of a patent has the burden to prove invalidity by clear and convincing evidence.

#### 2.     Anticipation

18.     I have been informed that a claim is anticipated if each and every limitation is taught in a single prior art reference, either expressly or inherently.  Furthermore, I understand that every element of the claimed invention must be present and arranged as in the claim.  I understand that it is not enough that the prior art reference includes multiple, distinct teachings that a person of ordinary skill in the art (a "POSA") might somehow combine to achieve the claimed invention to show anticipation.

19.     I further understand that anticipation by inherent disclosure requires that the disclosure must necessarily and inevitably include the unstated limitation.

4

**Reply.Add296**

20.     I have been informed that disclosure of a genus does not generally anticipate a species, and disclosure of a genus in the prior art is not generally a disclosure of every species within the genus.  However, I understand that a very small genus may anticipate a species.  I also understand that anticipation may be shown if the POSA reading the reference would "at once envisage" the claimed invention.  Whether the POSA can "at once envisage" the claimed invention depends on whether the genus of combinations is too large or undefined, and whether the reference contemplates or suggests combinability of the components from different parts of the reference.  I understand that the POSA is not permitted to fill in any missing limitations, even if the POSA can immediately envisage them.

21.     Although anticipation requires that the teachings be within the four corners of a single prior art reference, I understand that in certain circumstances a reference may also include material that it expressly incorporates by reference.  I understand that to incorporate matter by reference, a host document must contain language clearly identifying the subject matter which is incorporated and where it is to be found.  I understand that merely referring to another patent or publication is not an incorporation of anything therein.

### 3.     Obviousness

22.     I have been informed that a patent claim is considered obvious if the subject matter of the claimed invention, including all elements, would have been obvious to a person of ordinary skill in the art (a "POSA") on the date of the invention in view of one prior art reference or combination of multiple prior art references.

23.     I have been informed that references that were publicly available prior to March 21, 2006, or alternatively June 16, 2006, qualify as prior art to the Asserted Claims.

5

**Reply.Add297**

24.     I have been informed that certain references do not qualify as prior art.  I understand that if the reference would qualify as prior art only under 35 U.S.C. § 102(e)[1] and the prior art is a patent owned by the same person who owns the patent at issue or subject to an obligation of assignment to the same person, then the reference may not be considered as an obviousness reference.

25.     I have been informed that an analysis of obviousness requires a factual inquiry into (1) the scope and content of the prior art; (2) the differences between the prior art and the claims at issue; (3) the level of ordinary skill in the art; and (4) objective indicia of non-obviousness. Thus, a claim is not rendered obvious by the mere fact that it has different elements that independently existed in the prior art.

26.     I have been informed that if obviousness is based on a combination of prior art references, a patent claim is not obvious unless a POSA would have been motivated to combine or modify prior art elements to obtain the invention as set forth in the claim with a reasonable expectation of success.  I have also been informed that a POSA should consider each prior art reference in its entirety as well as the prior art as a whole, for all of what it would have disclosed to a POSA at the time of the invention.  Thus, while a POSA may make reasonable inferences from the prior art, obviousness may not be based on hindsight or on selective picking of references that only support an obviousness argument.

---

[1] I understand that 35 U.S.C. § 102(e) states:  "A person shall be entitled to a patent unless — . . . (e) the invention was described in — (1) an application for patent, published under section 122(b), by another filed in the United States before the invention by the applicant for patent or (2) a patent granted on an application for patent by another filed in the United States before the invention by the applicant for patent, except that an international application filed under the treaty defined in section 351(a) shall have the effects for the purposes of this subsection of an application filed in the United States only if the international application designated the United States and was published under Article 21(2) of such treaty in the English language."

Reply.Add298

27.    I have been informed that a claimed invention may have been "obvious to try" if there were a limited number of already identified and predictable solutions to a known problem. By contrast, an invention would not have been "obvious to try" where, among other things, there were many possible choices and the prior art gave no direction as to which option was likely to be successful.

28.    I have been informed that the Court considers objective considerations of nonobviousness of challenged claims when determining whether the claims would have been obvious to a person of ordinary skill in the art.  Such objective considerations, or objective indicia, may include, for example, unexpected results, praise, failures of others, industry skepticism and teaching away, satisfaction of a long-felt need, commercial success, licensing, and copying.

29.    **Nexus.**  I have been informed that there should exist a nexus between the merits of the claimed invention and the objective considerations of nonobviousness.  This nexus may be shown, for example, by a demonstration that a certain product to which objective indicia are attributed, such as EYLEA, are embodiments of the claims.  Accordingly, unexpected benefits or praise, for example, that is directed to EYLEA may be attributed to the nonobviousness of the Asserted Claims.

30.    **Teaching Away.**  I have been informed that when the prior art "teaches away" from combining certain known elements, successful combination of those elements is more likely to be nonobvious.  I have been informed that a reference teaches away when a POSA, upon reading the reference, would be discouraged from following the path set out in the reference or the path taken by the inventor.

7

**Reply.Add299**

31.     ***Long-felt but unmet need.***  I understand that a finding of non-obviousness is supported when the invention solves a long-felt but unmet need.  I have been informed that evidence showing a long-felt but unsatisfied need includes evidence demonstrating that a demand existed for the claimed invention.

32.     ***Failure of others***.  I further understand that the failure of others to develop a solution to this long-felt but unmet need is additional evidence of non-obviousness.  I understand evidence of such failure can be shown by evidence that the inventors or others in the industry tried and failed to develop inventions similar to the claimed invention.

33.     ***Skepticism.***  I further understand that the skepticism of experts regarding whether the invention could be accomplished also supports nonobviousness.  I understand that evidence of such skepticism may be shown by evidence that skilled artisans doubted whether the claimed invention would work as intended.

34.     ***Praise.***  I further understand that praise of the invention by others also supports nonobviousness.  I understand that evidence of praise may be shown by evidence of industry acceptance and positive commentary of the invention.  I have been further informed that it is appropriate to consider praise and recognition of the invention in determining non-obviousness where the patented product embodies the claimed invention.

35.     ***Copying.***  I understand that copying of the invention by competitors is additional evidence of nonobviousness.  I understand that evidence of copying may be shown by evidence of a competitor substantially replicating the patented invention.  I understand that an accused infringer's copying of the claimed invention has an even greater indicia of nonobviousness if that copying was done after the accused infringer had failed in its own attempts to solve the problem the claimed invention solved.

### 4.   Obviousness-Type Double Patenting

36.     I have been informed that a patent claim is invalid for obviousness-type double patenting if the POSA would have concluded that the invention defined by that claim is not patentably distinct from an earlier claim in a commonly owned patent. I have been informed that a patent claim is not patentably distinct from an earlier claim if the later claim is obvious over or anticipated by the earlier claim. I further have been informed that the analysis of whether a later claim is obvious over an earlier claim is similar to an ordinary obviousness analysis, including the consideration of objective indicia of non-obviousness. In addition, I understand that the specification of the double patenting reference is not to be used as prior art in an obviousness-type double patenting analysis because obviousness-type double patenting involves a comparison of claims. However, I have been informed that an obviousness-type double patenting analysis may rely on the specification of the double patenting reference in interpreting the scope of the reference claim or understanding the utility of the reference claim.

### 5.   Section 112

#### a.   Enablement

37.     I understand that the specification of a patent must contain sufficient information that, when coupled with the knowledge of a person of ordinary skill in the art at the time of the invention, would allow that person to make and use the claimed invention without undue experimentation.  I understand that the test for enablement is whether any undue experimentation is necessary (i.e., not just whether or not any experimentation is necessary).  I understand that this inquiry is conducted from the perspective of one of ordinary skill and that the fact that experimentation may be complex does not necessarily make it undue, if persons skilled in the art would typically engage in such experimentation.

38.     I have been informed that, because patent descriptions are addressed to those skilled in the art to which the invention pertains, the patent need not expressly set forth subject matter which is commonly understood by a POSA.

39.     I understand that in determining whether undue experimentation would be required, several factors should be considered, including, but not necessarily limited to:

- the breadth of the claims;

- the nature of the invention;

- the state of the prior art;

- the level of one of ordinary skill in the art;

- the level of predictability in the art;

- the amount of direction provided in the specification;

- the existence of working examples in the specification; and

- the quantity of experimentation needed to make or use the invention based on the content of the disclosure.

40.     I understand that the test for undue experimentation is not merely quantitative, since a considerable amount of experimentation is permissible, if it is merely routine, or if the specification in question provides a reasonable amount of guidance with respect to the direction in which the experimentation should proceed to enable the determination of how to practice a desired embodiment of the claimed invention.  I understand that a patent need not teach the POSA how to make every composition comprising the invention, nor every possible permutation, form, or mixture.  I understand that the enablement requirement is met if the description enables any mode of making and using the invention.

### b. Written Description

41.     I understand that the test for sufficiency of a written description is whether the disclosure clearly allows a person of ordinary skill in the art at the time to recognize that the inventor invented what is claimed.  I understand that the test is whether the disclosure reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the priority date of the patent, and that it is not necessary to disclose information that is already known and available to a POSA.

42.     I understand that the specification does not have to provide word-for-word support for the claimed subject matter, or describe every conceivable and possible future embodiment.  Rather, I understand that it must disclose either a representative number of species falling within the scope of the genus or structural features common to the members of the genus so that the POSA can visualize or recognize the members of the genus.  I understand that reduction to practice and physical possession are not required.

43.     Furthermore, I understand that a patent does not need to contain specific examples to satisfy written description.  Instead, I understand that exemplary formulations within the scope of the claims are sufficient.

44.     I understand that original claims are part of the specification and in many cases will satisfy the written description requirement on that basis alone.

### c. Indefiniteness

45.     I have been informed that, although the definiteness requirement mandates clarity, it recognizes that absolute precision is unattainable.  Accordingly, I have been informed that a claim is not indefinite if the claim may be given a reasonable meaning with enough particularity to inform a POSA as to the scope of the claims with reasonable certainty, even if the ultimate conclusion is one over which reasonable persons will disagree.

11

### 6. Dependent Claims

46.     I understand that the claims at issue are dependent claims.  I am informed that a

dependent claim includes all of the limitations of the claim or claims from which it depends, as

well as the additional limitation or limitations stated in the dependent claim itself.

47.     I understand that in order for a dependent claim to be obvious, the claim or claims

from which it depends must be obvious.  I understand that each added limitation of the

dependent claim must be further disclosed in the prior art or otherwise known to one of ordinary

skill in the art.  I further understand that a claim reciting a method of treatment using a particular

composition can be patentable even if the composition was known in the art.

## VI.     LEVEL OF ORDINARY SKILL

48.     My opinions concerning the infringement of the Asserted Claims of the '865

patent are from the perspective of the person of ordinary skill in the art ("POSA"), which I am

informed is considered as of the priority date, which is no later than June 16, 2006.  In my

opinion and as explained in my Opening Report, based on my review of the '865 patent, its

prosecution history, and my research experience, the POSA would have held an advanced

degree, such as a Master's in a biopharmaceutical science, or a related discipline, such as

chemical engineering, and several years of experience in the development of biologics products.

Alternatively, the POSA could have a Ph.D. in such discipline and less experience.  The POSA

may collaborate with others, including a medical doctor with experience treating ophthalmic

diseases.

49.     My opinions concerning the limitations that "aflibercept is formulated as an

isotonic solution" and "formulated with a nonionic surfactant" as recited in claims of the '572

patent are as of the priority date of those patents, which I understand to be no later than January

13, 2011.  As with the '865 patent, my opinions are from the perspective of the POSA with an

12

**Reply.Add304**

advanced degree, such as a Master's in a biopharmaceutical science, or a related discipline, such
as chemical engineering, and several years of experience in the development of biologics
products. Alternatively, the POSA could have a Ph.D. in such discipline and less experience.
The POSA may collaborate with others, including a medical doctor with experience treating
ophthalmic diseases.

50.     I understand that Dr. MacMichael and Dr. Rabinow have articulated a slightly
different view as to the level of skill of the POSA. They argue that a POSA would "have at least
a Ph.D. in chemistry, chemical engineering, biochemistry, pharmacology, or a related field,
along with one to two years of experience in the development and manufacture of formulations
of therapeutic proteins (or a lower degree with more practical industrial experience). The POSA
would have access to biologists, biochemists, physicians, pharmaceutical formulators, and the
like, with knowledge and experience in fields such as drug discovery and development and the
treatment of ophthalmic conditions." MacMichael ¶ 39; Rabinow ¶ 63. In my view, Dr.
MacMichael's and Dr. Rabinow's depiction of the POSA does not differ meaningfully from the
one I have set forth. If their definition were applied, my opinions set forth below would not
change.

## VII.   CLAIM CONSTRUCTION

51.     I understand that the parties disagree as to the construction of two claim terms in
the '865 patent: (1) "organic co-solvent" and (2) "[present in] native conformation."

52.     With respect to "organic co-solvent," I understand that Regeneron has proposed
that the term be construed according to its plain and ordinary meaning in view of the claims and
specification, and to include the substances polysorbate 20, polysorbate 80, polyethylene glycol,
propylene glycol, or a combination thereof, as disclosed in the '865 patent. '865 patent, 2:39-43,
2:33-38, 2:49-52, 3:11-16, 3:28-31, 4:11-17, 7:2-7. I understand that Mylan has proposed that

13

**Reply.Add305**

the term be construed as "an organic substance added to a primary solvent to increase the solubility of said VEGF antagonist."

53. With respect to "[present in] native conformation," I understand that Regeneron has proposed that the term be given its plain and ordinary meaning in view of the claims and specification and the full context in which the term appears, *i.e.*, "wherein at least 98% of the VEGF antagonist is present in native conformation following storage at 5°C. for two months as measured by size exclusion chromatography." I understand that Mylan has proposed that the term be construed as "[present in] a form that does not exhibit chemical or physical instability."

54. I have applied each proposed construction in my analysis of M710 and the '865 Asserted Claims.

## VIII. STATE OF THE ART

55. The '865 patent is directed to ophthalmic formulations of glycosylated VEGF antagonist fusion proteins having a particular amino acid sequence. I review the pertinent state of the art as of the priority date below.

### A. Antibodies

56. Antibodies, also known as immunoglobulins, are naturally occurring proteins that make up a central part of the human immune system. They circulate in the bloodstream, binding to foreign antigens and tagging them for destruction. *See, e.g.*, Winter & Millstein, *Man-made Antibodies*, 349 Nature 293 (1991) ("Winter 1991"). Antibodies are Y-shaped molecules made up of multiple chains of amino acids, as shown in the diagram below.

14



The terminal ends of the arms of the Y (shown in dark red and blue) are called the "variable

region" of the antibody. This region is responsible for antigen binding. The rest of the Y is

known as the antibody's "constant" region; it is responsible for maintaining prolonged blood

circulation and interacting with effector cells. *Id.* The stem of the Y (shown below the disulfide

bond in dark gray) is known as the "Fc" (fragment crystallizable) region, which is connected to

the arms of the Y (the Fab region) with "hinge" regions. The amino acid chains are held together

by intermolecular interactions, including inter-chain disulfide bonds and inter-domain stabilizing

interactions.

57. Despite antibodies' complexity, their ability to form intermolecular interactions

confers remarkable stability. Bogard et al., *Practical Considerations in the Production,*

*Purification, and Formulation of Monoclonal Antibodies for Immunoscintigraphy and*

*Immunotherapy*, 19 Seminars in Nuclear Medicine 202, 203 (1989) ("Bogard 1989")

("Molecular integrity [in antibodies] is maintained both by specific covalent bonding mediated

through disulfide bridging and by strong non-covalent interactions[.]"); Wang et al., *Antibody*

15

*Structure, Instability, and Formulation*, 96 J. Pharm. Sci. 1, 7 (2007) ("Wang 2007") ("Through noncovalent interactions, a less stable domain becomes more stable, and thus, the whole molecule can be stabilized."). The relative stability of naturally occurring antibodies is a result of their having evolved over millennia to achieve molecular structures capable of conferring such stability.

58. Recognizing that antibodies can possess desirable biological selectivity and stability relative to other proteins, researchers have been developing antibody-based therapies for decades. The first monoclonal antibody ("mAb") product, OKT-3, was approved in 1986; and at least 22 mAb therapeutic products were available as of 2006. *See* Wang 2007 at 2-4 (Table 1). Antibody-based therapeutics were available for indications such as non-Hodgkins lymphoma (Bexxar® and Rituxin®), breast cancer (Herceptin®), rheumatoid arthritis (Humira® and Remicade®), and asthma (Xolair®), among others. *Id.*

59. One monoclonal antibody therapeutic product approved for use prior to 2006 was bevacizumab, sold under the brand name Avastin®. Approved in 2004 for the treatment of metastatic colorectal cancer, bevacizumab is a recombinant humanized monoclonal IgG1 antibody that binds to and inhibits the biologic activity of vascular endothelial growth factor, or VEGF. VEGF is a naturally occurring protein that binds to receptors on the surfaces of endothelial cells, causing new blood vessel formation and endothelial cell proliferation. By inhibiting VEGF, bevacizumab reduces cellular microvascular growth. Avastin was sold as a liquid formulation containing 25 mg/mL bevacizumab for intravenous infusion. *See* Wang 2007 at 2; Avastin® Prescribing Information (2004) ("Avastin PI").

60. Another monoclonal antibody-based therapeutic under investigation at the time (and first approved for use after June 16, 2006) was ranibizumab. Formulated as a 10 mg/mL

16

solution, ranibizumab is a recombinant humanized IgG1 kappa isotype monoclonal antibody fragment that binds to and inhibits VEGF.  Ranibizumab is the active ingredient in Lucentis®, which was first approved for intravitreal injection in patients with neovascular (wet) age-related macular degeneration.  Wang 2007 at 2; Lucentis® Prescribing Information (2006) ("Lucentis PI 2006").

### B.  Fusion Proteins

61.  Unlike antibodies, fusion proteins are not naturally occurring structures and have not evolved to possess features that confer stability.  Rather, fusion proteins are created by fusing two or more domains from different proteins to make up a single, non-naturally-occurring protein molecule.  Fusion proteins may include portions of antibodies.  So-called "immunoglobulin fusion proteins," for example, may include the constant region of a human or mouse antibody fused to an unrelated protein or protein fragment.  Aruffo, *Immunoglobulin Fusion Proteins*, *in* Antibody Fusion Proteins 221, 221 (Chamow & Ashkenazi eds., 1999) ("Aruffo 1999").  The synthesis of fusion proteins may be accomplished by genetic engineering, i.e., by altering the genes of cells so that they express the desired unnatural sequence of amino acids.  *Id.* at 222.

62.  As of 1999, immunoglobulin fusion proteins had not yet been approved for use in a clinical setting, although several were being studied at that time.  *Id.* at 236.  By 2005, fusion proteins were starting to emerge as therapeutics, but only three fusion proteins had been approved by that time—Enbrel (1998), Amevive (2003), and Orencia (2005).  Shukla et al., *Downstream Processing of Fc-fusion Proteins*, *in* Therapeutic Fc-Fusion Proteins 97, 98 & Table 4.1 (Chamow et al. eds., 2014) ("Shukla 2014").

63.  Aflibercept, which was approved for use by the FDA in 2011, is an example of an immunoglobulin fusion protein.  As shown in the diagram below, aflibercept involves the fusion

17

**Reply.Add309**

of domain 2 of VEGF receptor 1, domain 3 of VEGF receptor 2, and a portion of the Fc region

from a human IgG1 antibody. Moroney et al., *Aflibercept in Epithelial Ovarian Carcinoma*, 5

Future Oncol. 591, 4 & Fig. 2 (2009) (author manuscript); Eylea® Prescribing Information at 11

(2011) ("Eylea Prescribing Information 2011") (RGN-EYLEA-MYLAN-00051043-53).



Figure 2. Aflibercept/VEGF$_{R1R2}$ structure
Domain 2 of VEGFR1 and domain 3 of VEGFR2 complexed with the Fc portion of human IgG1.

### C. Protein aggregation

64. Therapeutic proteins can exhibit various forms of instability. As Wang explained

in 2005, "protein aggregation is arguably the most common and troubling manifestation of

protein instability, encountered in almost all stages of protein drug development" and is "one of

the major road barriers hindering rapid commercialization of potential protein drug candidates."

Wang, *Protein Aggregation and Its Inhibition in Biopharmaceutics*, 289 Int. J. Pharm. 1, 1

(2005) ("Wang 2005"). Protein aggregation could occur during a variety of steps in the

biopharmaceutical development process, including upon shearing, shaking, and storage. *Id.* at 3.

Potential mechanisms of physical and chemical protein aggregation were known. *Id.* at 3-7.

18

65.     Protein molecules may aggregate through physical association with one another, without any changes in primary structure (physical aggregation) or may aggregate by forming covalent bond(s) that affect protein aggregation (chemical aggregation).  *Id.* at 3; Chi et al., *Physical Stability of Proteins in Aqueous Solution: Mechanism and Driving Forces in Nonnative Protein Aggregation*, 20 Pharm. Res. 1325, 1325 (2003) (MYL-AFL0004776-4787) ("Chi"). The formation of soluble or insoluble aggregates can depend on the protein itself and its environmental conditions.  Wang 2005 at 7.  At a molecular level, physical aggregation can occur, for example, through associations among partially unfolded regions of a protein, such as hydrophobic regions.  *Id.* at 3.  In some cases, initial protein aggregates can be soluble and then gradually become insoluble as they exceed certain size and solubility limits.  *Id.* at 8.

66.     As of 2006, it was generally understood that the primary structure of a protein— i.e., its amino acid sequence—ultimately determines the propensity for protein aggregation, along with environmental conditions.  Wang 2005 at 7.  As Chi explained, "[e]ach protein is unique both chemically and physically and therefore will exhibit unique stability behavior."  Chi at 1326.  As stated in Wang 1999, "the structural differences among different proteins are so significant that generalization of universal stabilization strategies has not been successful. Very often, proteins have to be evaluated individually and stabilized on a trial-and-error basis." Wang, *Instability, Stabilization, and Formulation of liquid protein pharmaceuticals*, 185 Int. J. Pharm. 129, 130 (1999) ("Wang 1999").  Indeed, changing even a single amino acid in a peptide or protein could dramatically alter its aggregation propensity.  Wang 2005 at 7; *see also* Wang 1999 at 138 ("a change of one amino acid in a protein may substantially change its aggregation behavior").  Similarly, changing the hydrophobicity of a protein can also drastically change its

19

aggregation behavior.  Wang 2005 at 7.  Other aspects of the structure of a protein can also play a role in aggregation.  *Id.*

67.     Various external conditions also may affect the possibility of protein aggregation. *See* Wang 2005 at 7-9 & Table 1; *see also* Wang 1999 at 145-153 (describing factors that may affect protein stability).  Temperature has been described as "[t]he most important factor affecting protein stability."  Wang 1999 at 145; *see* Wang 2005 at 9.  A given protein may unfold above a certain temperature and begin to aggregate, e.g., due to interactions among its hydrophobic regions.  Wang 2005 at 9.  Protein concentration is an important factor affecting protein aggregation.  As Wang 2005 explained, "[p]rotein concentration is another important factor in protein aggregation."  *Id.* at 9.  "Increasing protein concentration generally increases protein aggregation."  *Id.*  Higher protein concentrations can result in greater aggregation "because proteins may need a critical concentration to form the initial nucleus for initiation of the aggregation process."  *Id.*  Exceptions do exist, however, due to the formation of multimers less prone to aggregation.  *Id.*  Other factors affecting a protein's propensity for aggregation may include the pH of the solution, the type of container, and other process parameters.  *Id.* at 9 & Table 1; *see also* Chi at 1326-1328 (describing the mechanisms by which different solution conditions may influence protein stability).

68.     As noted above, antibodies are natural substances that have evolved over millennia to possess features that confer characteristic stability, including resistance to aggregation.  Fusion proteins, by contrast, are unnatural substances; as a result, they may not possess the inherent stability that is characteristic of naturally occurring antibodies.  As a general matter, therefore, fusion proteins may be more susceptible than antibodies to instability, including aggregation.  For example, Wurm *et al.* noted in 1999 that "[a]ggregated product is

often of concern with immunoadhesins [i.e., immunoglobulin fusion proteins], since these proteins are nonnatural and so it is difficult to predict their solution behavior." Wurm et al., *Optimizing Production and Recovery of Immunoadhesins*, *in* Antibody Fusion Proteins 281, 299 (Chamow & Ashkenazi eds., 1999) ("Wurm 1999"). As Fast *et al.* explained, "[i]n comparison with native IgG proteins [i.e., antibodies], wherein interdomain interactions presumably have evolved to provide mutual stabilization, fusion proteins may lack such stabilizing interdomain stabilization." Fast et al., *Physical Instability of a Therapeutic Fc Fusion Protein: Domain Contributions to Conformation and Colloidal Stability*, 48 Biochem. 11724, 15 (2009) (author manuscript) ("Fast 2009"). As Fast 2009 noted, the instability of "artificial fusion proteins" was demonstrated in 2005 by Souillac. *Id.* at 15.

      69.     In 2005, Souillac *et al.* published the results of stability studies involving a "recombinant human homodimer fusion glycoprotein" consisting of "the first extracellular domain of a human protein (later referred to as the fused domain) fused to the hinge, $C_H2$, and $C_H3$ sequences of a human immunoglobulin G1 (IgG$_1$)." Souillac et al., *Biophysical Characterization of Insoluble Aggregates of s Multi-Domain Protein: An Insight Into the Role Of the Various Domains*, 94 J. Pharm. Sci. 2069, 2070 (2005) ("Souillac 2005"). Souillac 2005 compared differential scanning calorimetry (DSC) thermograms of the intact fusion protein against that of the cleaved Fc fragment of the fusion protein (i.e., the hinge, $C_H2$, and $C_H3$ domains). *Id.* The data showed that although the unfolding transition of the $C_H3$ domain occurred at approximately the same temperature in both the fusion protein and the Fc fragment, by contrast, there was a "significant difference in the melting temperature of the $C_H2$ domains between the Fc fragment (71.8 ± 0.3°C) and the reference fusion protein (68.0 ± 0.1°C)." Souillac 2005 at 2072-2073 & Fig. 1. This data, Souillac 2005 explained, indicated

21

"destabilization of the $C_H2$ domains by the fused domains." *Id.* at 2073. In other words, the interaction between the fused extracellular domain of a human protein with the antibody $C_H2$ domain destabilized the $C_H2$ domain relative to a version of the protein that lacked the fused domain. Accordingly, the Souillac 2005 study demonstrated that interactions between the domains of fusion proteins could serve to destabilize these molecules relative to naturally occurring proteins that do not contain such unnatural fused domains.

70.     Nevertheless, despite the potential for protein aggregation—including the enhanced aggregation propensity of fusion proteins—researchers were aware of strategies for attempting to stabilize therapeutic proteins against aggregation. For example, as Chi explained, although protein aggregation can be problematic, researchers may nonetheless "successfully stabilize protein against aggregation" by choosing solution conditions that stabilize the protein's native conformation and stabilize the protein against attractive intermolecular forces. Chi at 1333.

### D.     Lyophilization

71.     Lyophilization is a process where a protein product is freeze-dried into a solid cake, and later is reconstituted into a liquid form by the end user. Lyophilization was not a preferred method for protein formulations; "[f]or ease of preparation and cost containment by the manufacturer, and ease of handling by the end user, an aqueous therapeutic protein formulation usually is preferred." J.F. Carpenter et al., *Rational Design of Stable Lyophilized Protein Formulations: Theory and Practice*, *in* Rational Design of Stable Protein Formulations 109, 109 (J.F. Carpenter & M.C. Manning eds., 2002) ("Carpenter"); *see* Int'l Patent Publication No. WO 2006/047325 at 25:2-4 ("Shams"). Lyophilized formulations are more difficult to prepare because they require freeze-drying the protein product, which requires specialized (and costly) equipment and procedures. Furthermore, the "freezing and drying stresses . . . can denature

22

proteins to various degrees," so lyophilization itself can be a source of instability for protein

formulations.  E.N. Lee et al., *Stabilizing Peptide Fusion for Solving the Stability and Solubility

Problems of Therapeutic Proteins*, 22 Pharm. Res. 1735, 1745 (2005).  In addition, lyophilized

formulations are more difficult to handle by the end user because they require the end user to

perform additional steps before the drug may be administered, i.e., reconstituting the solid,

lyophilized formulation into a liquid form that may be administered to a patient.  *Id.* at 1745

("[L]yophilized formulations have disadvantages of complex processing, more manipulation, and

inconvenient application for patients.").  Notably, no intravitreal drug products were developed

as a lyophilized formulation before the invention of the '865 patent, nor has a lyophilized

intravitreal drug product been developed since.

72.     Notwithstanding the disadvantages of lyophilized formulations, drug developers

may develop lyophilized formulations in parallel to their development of liquid formulations.  As

Carpenter explained, "with many proteins it is not possible—especially considering the time

constraints for product development—to develop sufficiently stable aqueous formulations."

Carpenter at 109.  In some circumstances, a lyophilized formulation can maintain stability over

time.

**E.      Glycosylation**

73.     Glycosylation also affects the properties of a protein.  Glycosylation refers to the

attachment of carbohydrate groups (known as "glycans") to certain amino acid residues of a

protein.  As Wang 1999 explained, "[g]lycosylation can affect protein activity, antigenicity,

solubility, proteolytic resistance, and stability.  Different glycoforms frequently have different

physical and chemical properties.  Therefore, proteins can be properly glycosylated to increase

their stability."  Wang 1999 at 173.

23

74.    Wang explained possible mechanisms by which glycosylation affected protein stability.  "Several stabilization mechanisms of protein glycosylation have been proposed. These include formation of hydrogen bonds with the polypeptide backbone or surface hydrophilic amino acids, and steric interaction with adjacent peptide residues."  Wang 1999 at 173.

75.    Glycosylation requires specific molecular machinery to attach glycans to the protein.  Importantly, only eukaryotic cells possess this machinery; unicellular organisms such as *E. coli* cannot glycosylate proteins.  Thus, even if an amino acid sequence contains residues that may be glycosylated, a protein having that sequence will not be glycosylated if it is expressed in *E. coli*.  *See* U.S. Patent Application Publication No. US2006/0058234 ¶ 43 ("Daly").

76.    Glycosylation was also understood to affect the pharmacokinetic properties of a protein.  For example, Sinclair & Elliott described how a "hyperglycosylated analogue of erythropoietin that contains two additional N-linked carbohydrates [led to] a threefold increase in serum half-life."  A.M. Sinclair & S. Elliott, *Glycoengineering:  The Effect of Glycosylation on the Properties of Therapeutic Proteins*, 94 J. Pharm. Sci. 1626 (2005) ("Sinclair & Elliott"); *see also* J.A. Marinaro et al., *O-glycosylation Delays the Clearance of Human IGF-binding protein-6 from the Circulation*, 142 Eur. J. Endocrinology 512 (2000) ("Marinaro") (finding increased half life of recombinant human insulin-like growth factor binding protein 6 due to *O*-linked glycosylation).  "The sialic acid component of the carbohydrate in particular, can extend the half-life of protein therapeutics."  Sinclair & Elliott at 1626.  For example, isoforms of follicle stimulating hormone (FSH) "with high sialic acid content were found to have reduced renal clearance and increased *in vivo* bioactivity."  *Id.* at 1630.  Glycosylation may also result in a protein being "trapped by the extracellular matrix (ECM) and slowly released into the circulation."  *Id.* at 1627.

24

**Reply.Add316**

77. Sinclair & Elliott concluded that introducing N-linked glycosylation sites to a protein could increase serum half-life. *Id.* at 1632. The authors found that altering a protein sequence to introduce glycosylation sites could also increase the potential for generating neutralizing antibodies, but found that "the likelihood of immune reactions can be minimized by taking advantage of the beneficial properties that carbohydrates add to the molecule (antibody repulsion and shielding, increased solubility and reduced aggregation)." *Id.* at 1632.

### F.    Pharmacokinetics

78. Pharmacokinetics refer to the rate at which a protein is cleared through the body. When a protein is cleared quickly, both its desired and undesired effects will be limited. For example, Holash explained that a VEGFR1-Fc protein construct was "efficacious at approximately 500-fold lower concentration than a similar VEGFR-2 construct," but "[d]espite its high affinity, the VEGFR1-FC is not a feasible clinical candidate because of its poor pharmacokinetic profile; in rodent studies, this protein has to be administered frequently and at very high levels to achieve efficacious levels." J. Holash et al., *VEGF-Trap: A VEGF blocker with Potent Antitumor Effects*, 99 Proc. Nat'l Sci. Acad. 11393, 11393 (2002) ("Holash"). Notably, Holash was directed at systemic delivery of therapeutic agents. For that application, an important benefit of the VEGF Traps disclosed in Holash was that they remained in the bloodstream longer. *Id.* at 11395 ("VEGF-Trap$_{R1R2}$ had an AUC [area under the curve] that was almost 1,000-fold higher than that of the parental VEGF-Trap, raising the possibility that it might be a far superior pharmacologic agent, assuming it retained its ability to bind and block VEGF."). Furthermore, Holash found that the VEGF Traps had reduced adhesion to the extracellular matrix. *Id.* at 11395.

79. On the other hand, where the desired application for a therapeutic is local rather than systemic, prolonged systemic exposure may be undesirable. More specifically, the POSA

would have understood that systemic VEGF inhibition may cause harmful side effects. Bevacizumab (Avastin) is a VEGF inhibitor that was approved to treat cancer at the time of the invention of the '865 patent. In clinical trials, "the most common toxicities" of bevacizumab were "diarrhea, leukopenia, fever, and stomatitis." N.H. Fernando & H.I. Hurwitz, *Targeted Therapy of Colorectal Cancer: Clinical Experience with Bevacizumab*, 9 The Oncologist 11, 14 (2004); *see also* J. Gaudreault et al., *Preclinical Pharmacokinetics of Ranibizumab (rhuFabV2) After a Single Intravitreal Administration*, 46 Investigational Ophthalmology & Visual Sci. 726, 731 (2005) ("Gaudreault 2005") ("VEGF is necessary for normal physiological functions such as tissue repair and reproduction. Furthermore, VEGF is believed to be involved in attenuating ischemia in the brain, myocardium, and skeletal muscle, maintenance of adequate VEGF systemic concentration is particularly important in the elderly, who constitute most of the AMD patient population."). Furthermore, patients taking bevacizumab also experienced "hemorrhagic complications," including one that was fatal and others that required treatment for hypertension. *Id.* Thus, Daly explained that a smaller VEGF Trap (or "mini-Trap") had "optimized characteristics for local/intra-vitreal delivery, ie. a shorter serum half life for faster clearance and minimizing unwanted systemic exposure." Daly ¶ 43.

### G.  Intravitreal Administration

80.  Intravitreal administration is a method of drug delivery in which the substance is injected into the vitreous humor of the eye, that is, the chamber between the lens and the retina (pictured below as the orange space in the center, comprising most of the eye).



S. Duvvuri et al., *Drug Delivery to the Retina: Challenges and Opportunities*, 3 Expert Opinion Biological Therapy 45, 46 (2003) ("Duvvuri 2003").  While drug delivery to the eye's posterior can pose challenges, researchers have developed several techniques to accomplish this task. Intravitreal administration is one such method.  D. Ghate & H.F. Edelhauser, *Ocular Drug Delivery*, 3 Expert Opinion Biological Therapy 275, 280 (2006) ("Ghate 2006").  Ghate 2006 describes other methods including topical delivery, systemic administration, and periocular injections.  *Id.*

81.  Two anti-angiogenic compounds formulated for intravitreal administration are Macugen® (pegaptanib sodium) and Lucentis® (ranibizumab).  Int'l Patent Publication No. WO2005/102303 at 35:3-24 ("Peyman"); R.P.A. Manzano et al., *Testing Intravitreal Toxicity of Bevacizumab (Avastin)*, 26 Retina 257, 260 (2006) ("Manzano 2006").  Macugen® "consists of a synthetic fragment of genetic material [i.e., an aptamer] that specifically binds to the VEGF

27

molecule and blocks it from stimulating the receptor on the surface of endothelial cells."

Peyman at 35:18-20. It is specifically indicated for ophthalmic intravitreal injection only and is

formulated with a sodium phosphate buffer. Macugen Prescribing Information at 9 (2004)

("Macugen PI 2004") (MYL-AFL0007349). Macugen was approved as of the earliest priority

date of the '865 patent. That said, Macugen® "has led a peripatetic existence," with its sales

sharply declining by 2010. C.A. Stein & D. Castanotto, *FDA-Approved Oligonucleotide*

*Therapies in 2017*, 25 Molecular Therapy 1069, 1070 (2017) ("Stein"). Pegaptanib sodium

targets only the 165 isoform of VEGF, and results only in near-stabilization of vision rather than

visual improvement. M. Nagpal et al., *A Comparative Debate on the Various Anti-Vascular*

*Edothelial Growth Factor Drugs*, 55 Indian J. Ophthalmology 437, 437-38 (2007) ("Nagpal").

82. Lucentis® (ranibizumab) is a humanized monoclonal antibody antigen-binding

fragment directed against human VEGF-A that was "designed to bind all forms of VEGF,

thereby blocking vessel permeability and angiogenesis in neovascular age-related macular

degeneration." Gaudreault 2005 at 726. Testing of ranibizumab on rabbits represented "the first

demonstration of retinal penetration of an anti-VEGF therapy intended for AMD." *Id.* at 726.

By administering Lucentis® intravitreally, researchers aimed "to maximize the VEGF inhibitory

effect in the retina, while limiting systemic VEGF inhibition," thereby "minimiz[ing]

interference with the normal extraocular roles of VEGF." *Id.* Lucentis was not approved as of

June 16, 2006, the latest possible priority date for the '865 patent. *See* Rabinow ¶ 282 n.18.

83. The POSA would understand that there were a limited set of formulation

excipients that would be suitable for intravitreal administration. In rare cases, new excipients

could be proposed, but those would require significant regulatory risk and would not generally

be preferred by the POSA. Chang 2002 teaches that it is preferable to use excipients "with

similar frequency of dosing, history of chronic use and similar patient populations" to ensure approval and safety. Chang et al., *Practical Approaches to Protein Formulation Development*, *in* Rational Design of Stable Protein Formulations 1, 14 (J.F. Carpenter & M.C. Manning eds., 2002) ("Chang 2002"). It is also known that "[t]he use of excipients derived from animals (e.g., Tweens) or humans (e.g., human serum albumin) should be avoided if possible due to the risk associated with transmissible diseases like bovine spongiform encephalopathy, Creutzfeldt-Jakob Disease, hepatitis virus and HIY," and regulators "discourage the use of animal/human-derived excipients." *Id.* at 15.

### H.     Size-Exclusion Chromatography (SEC)

84.     As Wang 2005 detailed, available analytical techniques for characterizing protein aggregation were numerous and varied. *See* Wang 2005 at 11-13 & Table 2. Among the available techniques, Wang 2005 explained, "size exclusion HPLC (SEC-HPLC) is a commonly used technique for quantitative assessment of aggregate size and content." *Id.* at 12. Size-exclusion chromatography separates molecules or aggregates of molecules of different sizes using a liquid chromatographic column made up of a stationary phase. Larger molecules or aggregates elute first, and smaller species elute later due to their interactions with the pores of the stationary phase. Allen 1999 provided an overview of this concept in Chapter 18 of the Column Handbook for Size Exclusion Chromatography:

> The mode of SE-HPLC separation is an equilibrium distribution of molecular species between the mobile phase and the porous stationary phase. The resolution of SE-HPLC is the relationship of the molecule's hydrodynamic volume relative to the pore size of the stationary phase. Hydrodynamic volume refers to the combined physical properties of size and shape. Molecules of larger volume have a limited ability to enter the pores and elute the fastest. A molecule larger than the stationary phase pore volume elutes first and defines the column's void volume ($V_0$). In contrast, intermediate and smaller volume molecules may enter the pores and therefore elute later.

29

Allen, *Application of Size Exclusion High Performance Liquid Chromatography for Biopharmaceutical Protein and Peptide Therapeutics, in* Column Handbook for Size Exclusion Chromatography 531, 532 (1999) ("Allen 1999").

85.     Allen 1999 further explained that SEC is capable of quantitatively determining the purity or molecular heterogeneity of a protein sample by comparing the peak area for the species of interest compared to the summed peak area for all species:

> The primary application of analytical SE-HPLC is to quantitatively determine the apparent molecular heterogeneity of samples. As a purity method, resolved molecular species are quantitated by comparing the individual areas to the summed areas of all species. Data are typically reported as a percentage of the resolved species.

*Id.* at 532.

86.     Allen 1999 also summarized the routine process of developing and validating an SEC assay for use with therapeutic proteins. *Id.* at 534-535. As Allen 1999 explained, the development and validation of SEC assays for protein therapeutics was aided by available "industrial guidelines that describe assay validation include compendia and regulatory documents." *Id.* at 535. Such guidelines included International Conference on Harmonization initiatives and protocols published in the United States Pharmacopoeia. *See id.* As Allen noted, by "[f]ollowing these guidance documents, assay validation protocols for SE-HPLC analysis for purity and protein concentration are easily developed." *Id.*

87.     Barth et al. published review articles on size-exclusion chromatography in 1996 and in 1998. Barth et al., *Size Exclusion Chromatography*, 68 Analytical Chem. 445R (1996) ("Barth 1996"); Barth et al., *Size Exclusion Chromatography and Related Separation Techniques*, 70 Analytical Chem. 251R (1998) ("Barth 1998"). Barth 1996 explained that "SEC has become a mature and well-accepted technique for characterizing both synthetic polymers and

biopolymers" and that, "[w]ith the proper choice of mobile phase and packing type, most polymers and biopolymers can be characterized by SEC on a routine basis." Barth 1996 at 445R-446R. With respect to proteins in particular, Barth 1996 noted that "[p]rotein chemists continue to make heavy use of SEC for preparative separations, as well as for an analytical tool to monitor protein purification regimes and to study formulation stability." *Id.* at 459R. Barth 1998 similarly observed that "SEC remains a mainstay technique in protein chemistry, for both preparative and analytical separations." Barth 1998 at 269R. Indeed, Barth 1998 commented on the "vast number of reports of the use of SEC for the isolation or characterization of recombinantly expressed proteins." *Id.* As the article explained, "[d]evelopment of useful protein biopharmaceuticals requires attention in developing appropriate formulations, due to the potential for both physical and chemical alterations of proteins on storage[, and] SEC methods are generally used for determining the formation of protein oligomers during storage and formulation." *Id.*

88.     As of June 2006, size-exclusion chromatography was regularly used to determine the degree of protein aggregation. As Varley 1997 remarked, "[t]he aggregation of protein based pharmaceuticals is routinely monitored by size exclusion chromatography (SEC)," and "[t]raditionally SEC is the technique of choice for the analysis of the association properties of protein based pharmaceutical products. This is particularly true in the screening for unwanted aggregation and the relative quantitation of association states e.g. dimer vs. monomer." Varley et al., *A Case Study and Use of Sedimentation Equilibrium Analytical Ultracentrifugation as a Tool for Biopharmaceutical Development*, 25 Eur. Biophys. J. 437, 437, 442 (1997) ("Varley 1997").

31

**Reply.Add323**

89. As the literature illustrates, as of 2006 SEC was a common and routine analytical technique for assessing therapeutic protein aggregation.

## I. Container Systems

90. Several container/closure systems, including vials/stoppers and prefilled syringes, were available for protein-based therapeutics as of June 2006. Chang 2002 at 4, Table 2 (listing "Vial/stoppers" and "prefilled syringes" as options for "Container/closure" systems). Between vials and prefilled syringes, it was generally understood that prefilled syringes offered superior convenience for administration by a physician, as they obviated the step of withdrawing the liquid from a vial into the syringe prior to administration. Nayar 2002 explained that the "most preferred" dosage form for a therapeutic protein product was "a solution formulation that is typically stored in the refrigerator and preferably in a pre-filled syringe." Nayar et al., *High Throughput Formulation: Strategies for Rapid Development of Stable Protein Products*, *in* Rational Design of Stable Protein Formulations 177, 183 (J.F. Carpenter & M.C. Manning eds., 2002) ("Nayar 2002"). As Nayar 2002 explained, however, each dosage form "offers various advantages and disadvantages, in the speed of development, manufacturing, packaging and shipment logistics, and in administration of the product to the patient." *Id.*

91. Indeed, although prefilled syringes offered the prospect of convenience to the administering physician, they were also accompanied by potential downsides. As compared to a vial/stopper container system, a prefilled syringe—which includes a barrel and a movable plunger/stopper—is a more complicated device with greater and more varied surfaces for potential interaction with a protein formulation. As Randolph 2002 explained, "orientation and surface adsorption can also occur at solid/water interfaces such as those found in vials, syringes, and other containers. Protein molecules also exhibit surface activity … and as such will also tend to adsorb to and orient at these interfaces." Randolph et al., *Surfactant-protein Interactions*,

32

*in* Rational Design of Stable Protein Formulations 159, 161 (J.F. Carpenter & M.C. Manning eds., 2002) ("Randolph 2002"). The FDA likewise acknowledged that the multicomponent nature of syringes carried an increased risk of undesirable drug product interaction as compared to a container consisting of a single material: "A disposable syringe may be made of plastic, glass, rubber, and metal components, and such multicomponent construction provides a potential for interaction that is greater than when a container consists of a single material." U.S. Dep't of Health & Human Services et al., *Guidance for Industry: Container Closure Systems for Packaging Human Drugs and Biologics*, at 24 (1999), https://www.fda.gov/media/70788/download.

### J. Scope of the References Cited by Dr. Rabinow

#### 1. Fraser

92. Fraser is an article by Hamish M. Fraser et al. entitled "Single Injections of Vascular Endothelial Growth Factor Trap Block Ovulation in the Macaque and Produce a Prolonged, Dose-Related Suppression of Ovarian Function," published in the Journal of Clinical Endocrinology & Metabolism. The article states that it was "First Published Online November 23, 2004." MYL-AFL0005862 ("Fraser"). Fraser discloses that the "aim of the present study was to evaluate the effects of transient inhibition of VEGF on pituitary-ovarian function in the macaque." *Id.* Fraser did not involve intravitreal administration of any VEGF Trap or testing of the effect on the ocular system, but rather used intravenous administration in macaque monkeys to study ovarian function. MYL-AFL0005862, at -869.

93. As Fraser was directed to the biological function of VEGF in the ovary but not storage or shelf-life, it did not address the stability of aflibercept. Unlike the VEGF antagonist claimed in the '865 patent, which is identified by its amino acid sequence (i.e., amino acids 27-

457 of SEQ ID NO:4), Fraser identifies the VEGF Trap used in its study ("VEGF Trap$_{R1R2}$") only by protein domain. Fraser discloses that:

> Endogenous VEGF was inhibited by administration of VEGF Trap$_{R1R2}$, a recombinant, chimeric protein comprising Ig domain 2 of human VEGF-Rl and Ig domain 3 of human VEGF-R2, expressed in sequence with the human Fc.

MYLAFL0005862, at -863. Fraser cites to another article, Holash (discussed below), regarding the properties of VEGF Trap$_{R1R2}$ (*id.*) but does not discuss or comment on Holash; Holash is identified only in the list of references at the end of the paper.

94.    Fraser further discloses that VEGF Trap$_{R1R2}$ "was provided at a concentration of 24.3 mg/ml in 2-ml aliquots in buffer composed of 5 mM phosphate, 5 mM citrate, 100 mM NaCI (pH 6.0), and 0.1% wt/vol Tween 20, with either 20% glycerol or 20% sucrose." MYLAFL0005862, at -863. Fraser discloses that VEGF Trap$_{R1R2}$ was administered to monkeys using "iv injection." *Id.* Fraser also discloses administering a "control" that was formulated differently from the VEGF Trap$_{R1R2}$. In particular, it discloses using "Human Fc, for control treatments," which "was provided at a concentration of 19.7 mg/ml in buffer composed of 40 mM phosphate and 20 mM NaCl (pH 7.4)." MYLAFL0005862, at -863. Fraser does not disclose any testing of the stability of either of these compositions, nor does the article even comment on stability. However, Fraser does disclose that "[t]he compounds were stored at -20 C until required, at which time they were thawed. Any compound remaining was stored at 4 C and used within 2 wk."

### 2.    Holash

95.    Holash is an article by Jocelyn Holash and co-authors—19 scientists in total, all from Regeneron—entitled "VEGF-Trap:  A VEGF blocker with potent antitumor effects," published in the Proceedings of the National Academy of Sciences in 2002. MYL-AFL0006459.

34

**Reply.Add326**

Holash described a collection of various molecules called "VEGF-Traps" that could be used to

block VEGF. As Holash explained,

> The VEGF pathway is initiated when VEGF binds to its receptors
> on endothelial cells. The two best characterized VEGF receptors
> are termed VEGF receptor 1 (VEGFR1) and VEGF receptor 2
> (VEGFR2). VEGFR1 and VEGFR2 are highly related
> transmembrane tyrosine kinases that use their ectodomains to bind
> VEGF; this binding in turn activates the intrinsic tyrosine kinase
> activity of their cytodomains, initiating intracellular signaling.

*Id.*

96.     Holash described the creation of various VEGF-Traps (MYL-AFL0006459, at

-459-460), as summarized below.

| Parental VEGF-Trap | "The parental VEGF-Trap was created by **fusing the first three Ig domains of VEGFR1 to the constant region (Fc) of human IgG1**." |
|---|---|
| VEGF-Trap$_{\Delta B1}$ | "VEGF-Trap$_{\Delta B1}$ was created by **removing a highly basic 10-aa stretch from the third Ig** domain of the parental VEGF-Trap." |
| VEGF-Trap$_{\Delta B2}$ | "VEGF-Trap$_{\Delta B2}$ was created by removing the entire first Ig domain from VEGF-Trap$_{\Delta B1}$." |
| VEGF Trap$_{R1R2}$ | "VEGF Trap$_{R1R2}$ was created by **fusing the second Ig domain of VEGFR1 with the third Ig domain of VEGFR2**." |

Holash illustrated the VEGF-Traps below, along with native VEGFR1 and VEGFR2. However,

Holash did not disclose the amino acid sequence of any of these VEGF-Traps, nor did it disclose

any stability data regarding VEGF-Traps.



| MYL-AFL0006459, at -460 (Fig. 1A) |
|---|

97.     Holash evaluated the VEGF-Traps for their *in vivo* activity against tumors in mice, and described subcutaneously administering the VEGF-Traps to mice.  Holash did not disclose or suggest administering any VEGF-Trap intravitreally.  Holash found that pharmacokinetic properties of the VEGF-Traps varied with their pI (isoelectric point); "[e]very reduction in pI was accompanied by a corresponding improvement in $C_{max}$ and AUC," which means that the VEGF-Traps remained in the bloodstream for a longer period of time, which Holash considered desirable in the context of potential cancer treatments.  MYL-AFL0006459, at -461.  According to Holash, VEGF-Trap$_{R1R2}$ had the best pharmacokinetic profile with respect to its prospects as an anti-tumor agent.  MYL-AFL0006459, at -461-462.

### 3.     Daly

98.     Daly is U.S. Patent Application Publication No. U.S. 2006/0058234, dated March 16, 2006 and entitled "VEGF Traps and Therapeutic Uses Thereof."  Daly does not disclose stability data of aflibercept formulations.  Daly described Regeneron's work creating additional VEGF-Traps.  In particular, Daly disclosed that ***"[a] VEGF trap composed of two fusion polypeptides having at least one truncated multimerizing component is termed a 'truncated***

36

**Reply.Add328**

*mini-trap.'*" The multimeric VEGF-binding protein of the invention is capable of binding VEGF with an affinity (Kd) of at least $1 \times 10^{-10}$ M, preferably at least $1 \times 11^{-10}$ M, even more preferably at least $1 \times 10^{-12}$ M, as measured by Biacore-based assays." Daly ¶ 10 (emphasis added). Furthermore, Daly taught that "mini-traps" were particularly well-suited for intravitreal administration. Daly explained:

> A smaller, non-glycosylated mini-trap expressed in E. coli (Example 4), a glycosylated mini-trap expressed in CHO cells (Example 5), or a receptor-based monomeric trap (Example 6) has optimized characteristics for local/intra-vitreal delivery, ie. a shorter serum half life for faster clearance and minimizing unwanted systemic exposure. **In addition due to its smaller size, the mini-trap has the ability to penetrate through the inner-limiting membrane (ILM) in the eye, and diffuse through the vitreous to the retina/retinal pigment epithelial (RPE) layer which will help to treat retinal disease.** Additionally, the mini-trap can be used for local administration for the treatment of ocular disease such as choroidal neovascularization, diabetic macular edema, proliferative diabetic retinopathy, corneal neovascularization/transplant rejection.

Daly ¶ 43 (emphasis added). Daly disclosed that "[t]he molecular weight of purified mini-trap was estimated to be about 46 kD by SDS-PAGE" when expressed in *E. Coli*, Daly ¶ 74, and "approximately 64 kDa" when expressed in CHO cells. Daly ¶ 79.

99.     Daly further explained that "[i]n one exemplification of the mini-traps of the invention, a smaller VEGF trap was generated by directed cleavage of a dimerized VEGF trap having a cleavage region (C-region) generated in a Fc domain (Example 2). The truncated trap exhibited comparable affinity for VEGF and half-life as the full-sized parent trap." Daly ¶ 63. Furthermore, "[a]ffinity measurements showed that the non-glycosylated fusion polypeptides expressed in E. coli or the glycosylated polypeptides expressed in CHO cells had comparable binding affinity for VEGF as the full-sized parent trap." Daly ¶ 63.

37

100.     Daly described one VEGF mini-trap as having SEQ ID NO:21.  The comparison

of this sequence to SEQ ID NO:4 from the '865 patent is shown below.

```
CLUSTAL O(1.2.4) multiple sequence alignment


SEQIDNO:4      MVSYWDTGVLLCALLSCLLLTGSSSGSDTGRPFVEMYSEIPEIIHMTEGRELVIPCRVTS     60
SEQIDNO:21     MVSYWDTGVLLCALLSCLLLTGSSSGSDTGRPFVEMYSEIPEIIHMTEGRELVIPCRVTS     60
               ************************************************************

SEQIDNO:4      PNITVTLKKFPLDTLIPDGKRIIWDSRKGFIISNATYKEIGLLTCEATVNGHLYKTNYLT    120
SEQIDNO:21     PNITVTLKKFPLDTLIPDGKRIIWDSRKGFIISNATYKEIGLLTCEATVNGHLYKTNYLT    120
               ************************************************************

SEQIDNO:4      HRQTNTIIDVVLSPSHGIELSVGEKLVLNCTARTELNVGIDFNWEYPSSKHQHKKLVNRD    180
SEQIDNO:21     HRQTNTIIDVVLSPSHGIELSVGEKLVLNCTARTELNVGIDFNWEYPSSKHQHKKLVNRD    180
               ************************************************************

SEQIDNO:4      LKTQSGSEMKKFLSTLTIDGVTRSDQGLYTCAASSGLMTKKNSTFVRVHEKDKTHTCPPC    240
SEQIDNO:21     LKTQSGSEMKKFLSTLTIDGVTRSDQGLYTCAASSGLMTKKNSTFVRVHEKDKTHTCPPC    240
               ************************************************************

SEQIDNO:4      PAPELLGGPSVFLFPPKPKDTLMISRTPEVTCVVVDVSHEDPEVKFNWYVDGVEVHNAKT    300
SEQIDNO:21     ------------------------------------------------------------    240


SEQIDNO:4      KPREEQYNSTYRVVSVLTVLHQDWLNGKEYKCKVSNKALPAPIEKTISKAKGQPREPQVY    360
SEQIDNO:21     ------------------------------------------------------------    240


SEQIDNO:4      TLPPSRDELTKNQVSLTCLVKGFYPSDIAVEWESNGQPENNYKTTPPVLDSDGSFFLYSK    420
SEQIDNO:21     ------------------------------------------------------------    240


SEQIDNO:4      LTVDKSRWQQGNVFSCSVMHEALHNHYTQKSLSLSPGK         458
SEQIDNO:21     -------------------------------------         240
```

As the alignment illustrates, the mini-trap having SEQ ID NO:21 in Daly contains only the first

240 amino acid residues of SEQ ID NO:4 from the '865 patent (shown by asterisks denoting

common residues); residues 241-457 of SEQ ID NO:4 are not present (shown by dashed lines).

Thus, the mini-trap having SEQ ID NO:21 is approximately half the size of the protein having

amino acids 27-457 of SEQ ID NO:4 from the '865 patent.

101.     The inventors also created a VEGF mini-trap that "did not require a

multimerization domain (SEQ ID NO:19). This mini-trap was constructed by direct fusion of one

Flt1D2.Flk1D3 domain (R1R2) (amino acids 30-231 of SEQ ID NO:19) to a second

38

**Reply.Add330**

Flt1D2.Flk1D3 domain (R1R2) (amino acids 234-435 of SEQ ID NO:19) with a Gly-Pro linker

between the tandem receptor domains (amino acids 232-233 of SEQ ID NO:19)." Daly ¶ 77.

### 4. Wulff

102. Wulff is an article by Christine Wulff et al. entitled "Prevention of Thecal

Angiogenesis, Antral Follicular Growth, and Ovulation in the Primate by Treatment with

Vascular Endothelial Growth Factor Trap R1R2" published in the journal Endocrinology in

2002. Wulff "was designed to investigate the effects of inhibition of thecal angiogenesis on

follicular development in the marmoset monkey (*Callithrix jacchus*)." MYL-AFL0009609.

Wulff disclosed that VEGF Trap$_{R1R2}$ used in the study was expressed in CHO cells and "was

purified by protein A affinity chromatography followed by size-exclusion chromatography."

MYL-AFL0009609, at -610. Like Fraser, Wulff did not identify the amino acid sequence of

VEGF Trap$_{R1R2}$, did not disclose or suggest VEGF Trap$_{R1R2}$ for intravitreal administration, and

did not disclose or evaluate the stability of any formulation of VEGF Trap$_{R1R2}$. Wulff did

disclose that the marmoset monkeys were injected intravenously with "VEGF Trap" at 25 mg/kg,

and disclosed a "vehicle" used to treat "control animals containing 5 mM phosphate, 5 mM

citrate, 100 mM sodium chloride, 0.1% (wt/vol) Tween 20, and 20% (wt/vol) sucrose." MYL-

AFL0009609, at -610. Wulff did not disclose any information about the possible formulation of

"VEGF Trap" and did not suggest that the "VEGF Trap" was formulated similarly to the

"vehicle."

### 5. Rudge

103. Rudge is an article by J.S. Rudge et al. entitled "VEGF Trap as a Novel

Antiangiogenic Treatment Currently in Clinical Trials for Cancer and Eye Diseases, and

VelociGene®-based Discovery of the Next Generation of Angiogenesis Targets" and published

in Cold Spring Harbor Laboratory Press. Rudge reviewed the biology of VEGF and VEGF

receptors, VEGF's role in tumor angiogenesis, and the development of VEGF Traps. Rudge referred to the "chimeric fusion protein containing a modified domain 2 of VEGFR1 and the third Ig domain of VEGFR2 fused to the Fc region of human IgG1" as "VEGF Trap." MYL-AFL0008178, at -180. Rudge summarized the ongoing work to develop "VEGF Trap" as a cancer treatment and also noted efforts "for local delivery of the VEGF Trap, in multiple vascular eye diseases ranging from AMD and diabetic eye diseases to corneal injury and transplantation." MYL-AFL0008178, at -181. These included clinical trials for vascular eye diseases; Rudge noted that "VEGF Trap is now entering more advanced clinical trials in vascular eye diseases." *Id.* Rudge did not identify the amino acid sequence of any VEGF Trap protein.

104.     In addition, Rudge identified two additional "antiangiogenesis targets": Angiopoietin-2, and Delta-like ligand 4 (Dll4). MYL-AFL0008178, at -182. Rudge suggested that these targets could be among the "next generation of antiangiogenesis targets, which may work either alone or in combination with the VEGF Trap, or in settings of relative resistance to anti-VEGF therapies." MYL-AFL0008178, at -182.

### 6.     Papadopoulos

105.     Papadopoulos is International Patent Application Publication No. WO00/75319 entitled "Modified Chimeric Polypeptides with Improved Pharmacokinetic Properties," which was published December 14, 2000 and named the inventors Nicholas J. Papadopoulos, Samuel Davis, and George Yancopoulos, all from Regeneron. Papadopoulos does not disclose stability data regarding aflibercept formulations. Papadopoulos is directed to VEGF antagonists and discloses numerous embodiments of VEGF receptor fusion proteins. These include:

- "a fusion polypeptide comprising an amino acid sequence of a modified Flt1 receptor, wherein the amino acid sequence selected from the group consisting of (a) the amino acid sequence set forth in Figure 13A-13D; (b) the amino acid sequence set forth in

40

Figure 14A-14C; (c) the amino acid sequence set forth in Figure 15A-15C; (d) the amino acid sequence set forth in Figure 16A-16D; (e) the amino acid sequence set forth in Figure 21A-21C; (f) the amino acid sequence set forth in Figure 22A-220; and (g) the amino acid sequence set forth in Figure 24A-24C." (Papadopoulos at 15:19-27.)

Papadopoulos identifies these fusion proteins, along with others disclosed in the patent application, as follows (Papadopoulos at 19:11-22:3):

| Papadopoulos Figure | Fusion Protein Name |
|---|---|
| Fig. 10A-10D | Flt1(1-3)-Fc |
| Fig. 13A-13D | Flt1(1-3$_{\Delta B}$)-Fc |
| Fig. 14-14C | Flt1(2-3$_{\Delta B}$)-Fc |
| Fig. 15A-15C | Flt1(2-3)-Fc |
| Fig. 16A-16D | Flt1(1-3$_{R->N}$)-Fc |
| Fig. 21A-21C | Flt1D2.Flk1D3.Fc$\Delta$C1(a) |
| Fig. 22A-22C | Flt1D2.VEGFR3D3.Fc$\Delta$C1(a) |
| Fig. 24A-24C | VEGFR1R2-Fc$\Delta$C1(a) |

106.    Papadopoulos characterized the molecular weight of Flt1D2.Flk1D3.Fc$\Delta$C1(a), which had a molecular weight of 113,300 Daltons. Papadopoulos at 25:10-16.

107.    Papadopoulos disclosed a number of studies on the fusion protein Flt1D2.Flk1D3.Fc$\Delta$C1(a). That fusion protein is different from SEQ ID NO:4, a portion of which is claimed in the formulations recited in the '865 patent. The alignment of the sequences is shown below, where the "query" sequence is SEQ ID NO:4 from the '865 patent and the

Reply.Add333

"Sbjct" sequence is Flt1D2.Flk1D3.FcΔC1(a) from Papadopoulos.  As the alignment illustrates, the two sequences are different and diverge at multiple residues.

```
Query   1    MVSYWDTGVLLCALLSCLLLTGSSSGSDTGRPFVEMYSEIPEIIHMTEGRELVIPCRVTS   60
Sbjct   1    ...........................---............................   57

Query   61   PNITVTLKKFPLDTLIPDGKRIIWDSRKGFIISNATYKEIGLLTCEATVNGHLYKTNYLT   120
Sbjct   58   ............................................................   117

Query   121  HRQTNTIIDVVLSPSHGIELSVGEKLVLNCTARTELNVGIDFNWEYPSSKHQHKKLVNRD   180
Sbjct   118  ............................................................   177

Query   181  LKTQSGSEMKKFLSTLTIDGVTRSDQGLYTCAASSGLMTKKNSTFVRVHEK---DKTHTC   237
Sbjct   178  ...............................................GPG...........   237

Query   238  PPCPAPELLGGPSVFLFPPKPKDTLMISRTPEVTCVVVDVSHEDPEVKFNWYVDGVEVHN   297
Sbjct   238  ............................................................   297

Query   298  AKTKPREEQYNSTYRVVSVLTVLHQDWLNGKEYKCKVSNKALPAPIEKTISKAKGQPREP   357
Sbjct   298  ............................................................   357

Query   358  QVYTLPPSRDELTKNQVSLTCLVKGFYPSDIAVEWESNGQPENNYKTTPPVLDSDGSFFL   417
Sbjct   358  ...............................E..........................E.....   417

Query   418  YSKLTVDKSRWQQGNVFSCSVMHEALHNHYTQKSLSLSPGK   458
Sbjct   418  ......E...............E..........E...   458
```

108.    Papadopoulos later provides other names for these "chimeric molecules," and explains that they were "denoted R1R2 (F1t1.D2.Flk1D3.FcΔC1(a) and VEGFR1R2-FcΔC1(a) and R1R3 (F1t1D2.VEGFR3D3-FcΔC1(a) and VEGFR1R3-FcΔC1(a) respectively, wherein R1 and Flt1D2 = Ig domain 2 of Flt1 (VEGFR1); R2 and Flk1D3 = Ig domain 3 of Flk1 (VEGFR2); and R3 and VEGFR3D3 = Ig domain 3 of FIt4 (VEGFR3))."  Papadopoulos at 59:4-8. Papadopoulos described that these chimeric molecules "were much less sticky to ECM, as judged by an in vitro ECM binding assay as described infra, had 10 greatly improved PK as described infra."  Papadopoulos 59:8-10.

109.    The "ECM binding assay" refers to binding to the extracellular matrix.  Example 18 of Papadopoulos evaluated the ECM binding of Flt1D2.Flk1D3.FcΔC1(a) and Flt1D2.VEGFR3D3.FcΔC1(a) and found that they were "considerably less sticky to the ECM as compared to the Flt(1-3)-Fc protein."  Papadopoulos at 65:1-18.

42

110.   Papadopoulos also reports results from a phosphorylation assay that detects the efficacy of the fusion proteins on VEGF inhibition.  Papadopoulos at 71:7-73:5.   Papadopoulos reports the following results:

- "As is seen in Figure 25A, at a 1.5 molar excess of either Flt1(1-3)-Fc, Flt1(1-3)-Fc (A40) or transient Flt1D2F1k1D3.FcΔC1(a) there is complete blockage of receptor stimulation by these three modified Flt1 receptors as compared to control media challenge."  Papadopoulos at 72:6-9.

- "In contrast, transient Flt1D2VEGFR3D3.FcΔC1(a) does not show significant blockage at this molar excess, as compared with VEGF positive control challenge."  Papadopoulos at 72:9-11.

- "Similar results are seen in Figure 25B, where the modified Flt receptors are in a 3-fold molar excess to VEGF165 ligand. In Figure 25C, where the modified Flt1 receptors are in a 6-fold molar excess to VEGF165 ligand, transient Flt1 D2VEGFR3D3.FcΔC1 (a) can now be shown to be partially blocking VEGF165-induced stimulation of cell-surface receptors."  Papadopoulos at 72:12-17.

- "Figure 26A-26B. Phosphorylation assay. Detection by Western blot of tyrosine phosphorylated VEGFR2(Flk1) by VEGF165 ligand stimulation shows that cell-surface receptors are not phosphorylated by challenge samples which have VEGF165 preincubated with 1 and 2 fold molar excess (Figure 26A) or 3 and 4 fold molar excess (Figure 26B) of either transient Flt1 D2Flk1 D3.FcΔC1 (a), stable Flt1 D2Flk1 D3.FcΔC1 (a), or transient VEGFR1R2-FcΔC1 (a). At all modified Flt1 receptor concentrations tested there is complete binding of VEGF165 ligand during the preincubation, resulting in no detectable stimulation of cell- surface receptors by

43

**Reply.Add335**

unbound VEGF165 as compared to control media challenge." Papadopoulos at

72:19-72:4.

111.    Likewise, Papadopoulos also describes results from an ELISA assay used to

detect the affinity of several of the fusion proteins: "Flt1(1- 3)-Fc, Flt1(1-3)-Fc (A40),

transiently expressed Flt1D2Flk1D3.Fc$\Delta$C1(a), transiently expressed Flt1D2VEFGFR3D3-

Fc$\Delta$C1(a), Flt1-(1-3NAS)-Fc, Flt1(1-3R_>C)-Fc and Tie2-Fc. Flt1 (1-3 NAS)-Fc is a modified

version of Flt1(1-3)-Fc in which the highly basic amino acid sequence KNKRASVRRR is

replaced by NASVNGSR, resulting in the incorporation of two new glycosylation sites and a net

reduction of five positive charges, both with the purpose of reducing the unfavorable effects of

this sequence on PK." Papadopoulos at 89:15-90:2.  Papadopoulos found that "the modified Fltl

receptor variant with the highest affinity for VEGF165 (determined as the lowest amount of free

VEGF165) was Flt1 D2Flk1 D3.Fc$\Delta$C1 (a), followed by Flt1 (1-3)-Fc and Flt1(1-3)-Fc (A40)

and then by Flt1(1-3$_{R->C}$)-Fc, Flt1 (1-3$_{NAS}$)-Fc and Flt1 D2VEFGFR3D3-Fc$\Delta$C1(a). Tie2Fc has

no affinity for VEGF165."  Papadopoulos at 90:5-10.

112.    The above results demonstrate that multiple of the fusion proteins tested bound to

VEGF and blocked VEGF binding.

113.    Papadopoulos additionally evaluated several of the fusion proteins using a cell

proliferation bioassay.  Papadopoulos found:

- "The negative control receptor Tie2-Fc does not block VEGF165-induced cell

    proliferation at any concentration whereas Flt1 D2.Flk1 D3.Fc$\Delta$C1 (a) blocks 1.56nM

    VEGF165 with a half maximal dose of 0.8nM. Flt1 (1-3)- Fc and Flt1

    D2.VEGFR3D3.Fc$\Delta$C1 (a) are less effective in blocking VEGF165 in this assay with

44

a half maximal dose of ~ 2nM. VEGF165 alone gives a reading of 1.2 absorbance

units and the background is 0.38 absorbance units." Papadopoulos at 73:22-74:13.

114.     Papadopoulos also evaluated the binding stoichiometry of two of the fusion

proteins, Flt1D2Flk1D3.FcΔC1 and VEGFR1R2-FcΔC1. Papadopoulos found that the

stoichiometry was approximately one VEGF molecule per molecule of either fusion protein.

Papadopoulos at 75:12-76:10. For Flt1D2Flk1D3.FcΔC1, Papadopoulos also used size

exclusion chromatography to evaluate stoichiometry, and similarly found the ratio of VEGF165

to Flt1D2Flk1D3.FcΔC1(a) to be 1:1. Papadopoulos at 76:24-77:4.

115.     Papadopoulos also conducted peptide mapping of one fusion protein,

Flt1D2.Flk1D3.FcΔC1(a). Papadopoulos identified ten cysteine residues and disclosed that:

- "There are a total of ten cysteines in Flt1D2.Flk1D3.FcΔC1 (a); six of them belong to

  the Fc region. Cys27 is disulfide bonded to Cys76. Cys121 is disulfide bonded to Cys

  182. The first two cysteines in the Fc region (Cys211 and Cys214) form an

  intermolecular disulfide bond with the same two cysteines in another Fc chain.

  However, it can not be determined whether disulfide bonding is occurring between

  same cysteines (Cys211 to Cys211, for example) or between Cys211 and Cys214.

  Cys216 is disulfide bonded to Cys306. Cys 352 is disulfide bonded to Cys410."

  Papadopoulos at 81:8-18.

116.     With respect to Flt1D2.Flk1D3.FcΔC1(a), Papadopoulos further disclosed that the

fusion protein was glycosylated. Specifically, Papadopoulos disclosed:

- "There are five possible N-linked glycosylation sites in Flt1D2.Flk1D3.FcΔC1(a) and

  are found to be glycosylated to varying degrees. Complete glycosylation is observed

  at Asn33, Asn193, and Asn282. Partial glycosylation is observed on Asn65 and

45

**Reply.Add337**

Asn120. Sites of glycosylation are highlighted by underline in the Figure."

Papadopoulos at 81:20-82:2.

Papadopoulos did not disclose the glycosylation status of any other fusion protein.

117.    Papadopoulos also disclosed pharmacokinetic data for several of the fusion proteins.  For, Flt1(1-3)-Fc (A40), Flt1D2.Flk1D3.Fc$\Delta$C1(a), and VEGFR1R2-Fc$\Delta$C1(a).  Papadopoulos found:

- "The $T_{max}$ for Flt1(1-3)-Fc (A40) was at 6 hrs while the $T_{max}$ for the transient and stable Flt1D2.Flk1D3.Fc$\Delta$C1(a) and the transient VEGFR1R2-Fc$\Delta$C1(a) was 24hrs. The $C_{max}$ for Flt1(1-3)-Fc (A40) was 8$\mu$g/ml. For both transients (Flt1D2.Flk1D3.Fc$\Delta$C1(a) and VEGFR1R2-Fc$\Delta$C1(a)) the $C_{max}$ was 18$\mu$g/ml and the $C_{max}$ for the stable VEGFR1R2-Fc$\Delta$C1(a) was 30$\mu$g/ml."  Papadopoulos at 82:20-83:2.

118.    Papadopoulos also investigated the pharmacokinetics of Flt1(1-3)-Fc (A40), Flt1D2.Flk1D3.Fc$\Delta$C1(a), and Flt1D2.VEGFR3D3.Fc$\Delta$C1(a).  Papadopoulos disclosed that "Flt1(1-3)- Fc (A40) could no longer be detected in the serum after day 5 whereas, Flt1D2.Flk1D3.Fc$\Delta$C1(a) and Flt1D2.VEGFR3D3.Fc$\Delta$C1(a) were detectable for 15 days or more."  Papadopoulos at 83:7-19.

### 7.    Chi

119.    Chi is a review article by Eva Chi et al. published in 2003 in Pharmaceutical Research entitled "Physical Stability of Proteins in Aqueous Solution:  Mechanism and Driving Forces in Nonnative Protein Aggregation."  Chi explains the importance of protein stability and provides that "if a therapeutic protein cannot be stabilized adequately, its benefits to human health will not be realized."  Chi at 1325.  Chi explained that protein aggregation "is particularly problematic" and that, in general, "proteins are only marginally stable and are highly susceptible

46

**Reply.Add338**

to degradation, both chemical and physical." Chi at 1325. Chi also acknowledged that "[e]ach

protein is unique both chemically and physically and therefore will exhibit unique stability

behavior." Chi at 1326. Chi does not discuss any fusion proteins and thus does not disclose any

stability data on aflibercept formulations.

### 8.    '226 Patent

120.    U.S. Patent 10,406,226 (the "'226 Patent") is entitled "Method of manufacturing

VEGF antagonist fusion proteins," names as inventors Daniel B. Dix, Kelly Frye, and Susan

Kautz, and is assigned to Regeneron. The '226 Patent was filed on August 31, 2017 and claims

priority to a provisional application dated March 25, 2005. The '226 Patent discloses several

example formulations, none of which have 40 mg/ml aflibercept. '226 Patent at 7:60-12:30. The

'226 Patent also discloses formulations with concentration ranges of excipients and amounts of a

generic "fusion protein." The '226 Patent discloses some formulations with "10-50 mg/ml of the

fusion protein," and others with "50-100 mg/ml of the fusion protein." '226 Patent at 2:20-49.

### 9.    Dix

121.    U.S. Patent 8,110,546 ("Dix") is a parent patent of the '226 Patent, and shares the

same specification and inventors as the '226 Patent. Dix is also assigned to Regeneron. Dix is

entitled "VEGF antagonist formulations."

### 10.    '747 Patent

122.    U.S. Patent 7,303,747 (the "'747 patent") is entitled "Use of VEGF Inhibitors for

Treatment of Eye Disorders" and names as inventors Stanley J. Weigand, Nicholas J.

Papadopoulos, George D. Yancopoulos, James P. Fandl, and Thomas J. Daly. The '747 patent

was filed on September 1, 2005, issued on December 4, 2007, and is assigned to Regeneron. The

'747 patent does not disclose any stability data on aflibercept formulations.

123.    The '747 patent is directed to treating eye disorders by using VEGF inhibitors. The '747 patent discloses several such inhibitors, and explains:

- In specific embodiments, the VEGF inhibitor is a fusion polypeptide "VEGF trap" selected from the group consisting of SEQ ID NO:2 (Flt1D2.Flk1D3FcΔC1(a)), SEQ ID NO:4 (Flt1D2.VEGFR3D3.FcΔC1(a)), SEQ ID NO:6 (VEGFR1R2 FcΔC1(a)), and SEQ ID NO:23. '747 patent at 1:64-2:2.

124.    The '747 patent discloses treating eye disorders through both intravenous and intravitreal delivery of VEGF antagonists.  The '747 patent disclosed a clinical trial using intravenous delivery of a VEGF antagonist to treat patients with neovascular age-related macular degeneration (AMD).  '747 patent at 21:1-12.  The '747 patent disclosed that:  "A dose-dependent improvement in ERT as evaluated by OCT was suggested in this small number of patients, with a longer initial duration in improvement at the 3.0 mg/kg as compared to the 1.0 mg/kg dose level. A trend towards a dose-related improvement in BCVA was also suggested." '747 patent at 22:35-42.

125.    The '747 patent also discloses an example where a patient with "age-related macular degeneration is treated with an intravitreal injection of the VEGF trap protein of SEQ ID NO:6 or 23."  '747 patent 20:20-22.  I understand that the use of the present verb tense ("is treated") indicates that this injection was not actually performed and is instead a "prophetic example."  This is further supported by statements in the Example such as "the patient is to receive a full ophthalmic examination . . . ," "[i]f both eyes are affected, they may be treated separately," and "[a]fter treatment, the patients' eyes are to be examined . . . ."  '747 patent at 20:34-37, 44-45, and 49-51.  Accordingly, unlike the example using intravenous delivery that

48

disclosed actual clinical results, this example does not provide data indicating whether intravitreal administration of either VEGF trap protein would have been successful in patients.

126.    Notably, SEQ ID NO:23 is a much shorter protein with only 240 amino acids, as compared to the over 400 amino acid residues that comprise amino acids 27-457 of SEQ ID NO:4.  The '747 patent discloses that SEQ ID NO:23 is a "truncated version termed a 'mini-VEGF trap' lacking the human Fc component."  '747 patent at 18:31-34.  The '747 disclosed a pharmacokinetic study comparing a full-length VEGF trap with the mini-VEGF Trap.  The '747 patent teaches as follows:

> "The results of this study demonstrate that both full-length VEGF trap and mini-VEGF trap can be injected intravitreally and that the proteins penetrate to the desired site of action, i.e. retina or related structure. The results show that the protein is present in the eye tissue for up to 672 hrs, thus allowing for monthly treatment paradigms. Further, once the mini-VEGF trap moves out of the eye tissue into the systemic circulation, it is cleared more quickly from the body than the full-length VEGF trap, thus reducing unwanted systemic action."  '747 patent at 20:4-14.

### 11.    Liu

127.    Liu is a patent application publication (U.S. 2004/0197324) dated October 7, 2004 entitled "High Concentration Antibody and Protein Formulations."   Liu is directed to formulations of antibody molecules and does not disclose any fusion protein formulations (or stability data on aflibercept formulations).  Liu explains that "[a]ntibodies tend to form viscous solutions at high concentration because of their macromolecular nature and potential for intermolecular interactions. Moreover, pharmaceutically acceptable sugars are often used in large amounts as stabilizers. Such sugars can enhance the intermolecular interactions, thereby increasing the viscosity of the formulation. Highly viscous formulations are difficult to

49

manufacture, draw into a syringe and inject subcutaneously. The use of force in manipulating the viscous formulations leads to excessive frothing, which can lead to denaturation and inactivation of active biologics. Satisfactory solution of this problem is lacking."  Liu ¶ 6.

128.     Liu also discloses size exclusion chromatography data for antibody formulations. Liu ¶ 280; Rabinow Report ¶ 136.  Because it does not disclose any fusion protein formulations, it discloses no size exclusion chromatography data for them.

### 12.     Shams

129.     Shams is an International Patent Application Publication (WO 2006/047325) published May 4, 2006 and entitled "Method for Treating Intraocular Neovascular Diseases." Shams discloses "[a]nti-VEGF antagonistic antibodies includ[ing], but not limited to, antibodies A4.6.1, rhuMab VEGF (bevacizumab), Y0317 (ranibizumab), G6, B20, 2C3, and others as described in, for example, WO98/45331 , US2003/0190317, U.S. Patents 6,582,959 and 6,703,020; WO98/45332; WO 96/30046; WO94/10202; WO2005/044853; EP 0666868B1; and Popkov et al., 288 Journal of Immunological Methods 149 (2004).  More preferably, the anti-VEGF antagonistic antibody of the invention is ranibizumab, which is a humanized, affinity matured anti-human VEGF antibody Fab fragment having the light and heavy chain variable domain sequences of Y0317 as described in WO98/45331 and Chen et al *J Mol Biol* 293:865-881 (1999)."  Shams at 7:5-16.  Shams does not disclose aflibercept or other VEGF Trap molecules, or formulations thereof.

130.     WO98/45331 identifies "Y0317" as having a "CDRHl comprising the amino acid sequence: GYDFTHYGMN (SEQ ID NO: 126) and a CDRH3 comprising the amino acid sequence: YPYYYGTSHWYFDV (SEQ ID NO: 127)."  Neither of those sequences is related to SEQ ID NO:4 as disclosed in the '865 patent.

131.    Shams taught that ranibizumab is produced in *E. coli*, is not glycosylated, and has

a molecular mass of 48,000 Daltons.  Shams at 31:20-25.  For intravitreal administration, Shams

taught that vials of ranibizumab contain either 6 mg/ml or 10 mg/ml of ranibizumab.  Shams at

31:27-32.  Shams does not describe any other concentration of ranibizumab.

132.    Shams further taught that "[p]referably, therapeutic peptides and proteins are

stored as aqueous solutions, although lyophilized formulations for reconstitution are acceptable."

Shams at 25:2-4.

### 13.    Gaudreault 2005

133.    Gaudreault 2005 is an article by Jacques Gaudreault et al. entitled "Preclinical

Pharmacokinetics of Ranibizumab (rhuFabV2) after a Single Intravitreal Administration,"

published in February 2005 in the journal Investigative Ophthalmology & Visual Science.

Gaudreault does not disclose aflibercept or stability data on aflibercept formulations.  Gaudreault

disclosed a study in which monkeys received intravitreal doses of the experimental antibody

drug ranibizumab at varying dosages and formulated with 10 mM sodium succinate, 10%

trehalose, and 0.05% Tween-20 (pH 5.0).  Gaudreault 2005 at 726-27.  The dosages delivered to

the monkeys are set forth below:

TABLE 1. Treatment Groups Assignment

| Group | Number per Group (M/F) | Route | Day Administered | Dose | Dose Concentrations (mg/mL) | Dose Volume |
|---|---|---|---|---|---|---|
| 1 | 3/3 | ITV | 1 | 500 μg/eye | 10 | 50 μL/eye |
| 2 | 3/3 | ITV | 1 | 2000 μg/eye | 40 | 50 μL/eye |
| 3 | 2/2 | IV | 1 | 1000 μg/animal | 1 | 1 mL |
| 4 | 2/2 | IV | 1 | 4000 μg/animal | 4 | 1 mL |

134.    Gaudreault 2005 found that "ranibizumab cleared in parallel from all ocular

compartments, with a terminal half-life of approximately 3 days. It distributed rapidly to the

**Reply.Add343**

retina (6-24 hours), and concentrations were approximately one third that in the vitreous. After ITV injection, bioavailability (F) was 50% to 60%. Serum concentrations were very low, reflecting wider distribution and faster clearance when ranibizumab reached the serum. After IV administration, the terminal half-life was approximately 0.5 day."  Gaudreault 2005 at 726.

135.    Gaudreault 2005 disclosed that "[a]fter ITV administration, transient ocular inflammation, primarily vitreous cloudiness, ranged from absent to moderate (500 μg/eye) and moderate to severe (2000 μg/eye)."  As shown in the table above, 2000 μg/eye corresponds to the 40 mg/ml concentration of ranibizumab.

**14.    Lucentis PI 2006**

136.    Lucentis PI 2006 is the approved label for Lucentis, which was first approved after the latest priority date of the '865 patent of June 16, 2006.  Lucentis PI 2006 does not disclose aflibercept or stability data on aflibercept formulations.  As the publicly available FDA website reflects, Lucentis was first approved on June 30, 2006, and Dr. Rabinow has not pointed to any evidence that the approved label for Lucentis was publicly available before that date. (https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=1 25156).

137.    Lucentis PI 2006 discloses that Lucentis contains 10 mg/ml ranibizumab and is indicated for patients with wet age-related macular degeneration.  MYL-AFL0092511.  Lucentis is provided as "a sterile, colorless to pale yellow solution in a single-use glass vial."  MYL-AFL0092514.  Lucentis contains the excipients 10 mM histidine HCl, 10% trehalose dihydrate, and 0.01% polysorbate 20, at pH 5.5.

**15.    Lam**

138.    Lam is a U.S. Patent (No. 6,171,586) entitled "Antibody Formulation" that issued January 9, 2001.  Lam does not disclose any formulations of aflibercept, any formulations of a

**Reply.Add344**

VEGF antagonist, or any fusion protein formulations. Lam also does not disclose any
formulations intended for intravitreal use. Rather, Lam was directed to antibody formulations,
and disclosed size exclusion chromatography data for certain antibody formulations, reporting
the native conformation of antibody as the "percent monomer." Lam at 5:34-43.

### 16. '959 Petition for PTE

139.    I understand that the '959 Petition for PTE is Regeneron's application for patent
term extension for U.S. Patent 7,070,959. As evident from the date stamp on the document, the
'959 Petition for PTE is dated December 22, 2011, over five years after the June 2006 priority
date for the '865 patent. MYL-AFL0004056. Accordingly, I understand that the '959 Petition
for PTE is not prior art to the '865 patent. The '959 Petition for PTE identifies Figures 24A-C as
including the amino acid sequence of aflibercept. MYL-AFL0004056, at -061.

### 17. '546 Patent Response to July 13, 2011 Office Action

140.    The '546 Patent Response to the July 13, 2011 Office Action is a submission of
remarks and papers from Daniel Dix and other inventors regarding their Application No.
12/835,065, dated November 10, 2011, responding to an action by the U.S. Patent and
Trademark Office on July 13, 2011. The July 13 Office Action contended that claims 1, 3, 4,
and 6 of Application No. 12/835,065 were anticipated by Fraser because limitations regarding
the properties after storage were intrinsic to the composition. Additionally, the Office Action
stated that the difference in the fusion protein concentration between the claimed composition
(50 mg/mL) and the Fraser composition (24.3 mg/mL) was due to "routine optimization." Office
Action at 3-5.

141.    In the '546 Patent Response, the inventors presented evidence to demonstrate that
the formulations claimed in Application No. 12/835,065 were made prior to the date of
publication of Fraser on November 23, 2004. '546 Patent Response at 2-3. Specifically, the

**Reply.Add345**

inventors showed completion of a 25 mg/mL VEGF Trap formulation containing 5 mM phosphate, 5 mM citrate, 5% sucrose, 50 mM NaCl, and 0.1% polysorbate-20; the completion of a 35.4 mg/mL VEGF Trap protein formulation containing 5 mM phosphate, 5 mM citrate, 100 mM NaCl, and 0.04% polysorbate-20, pH 6.17; and the completion of a 24.3 mg/mL VEGF Trap protein formulation containing 5 mM phosphate, 5 mM citrate, 100 mM NaCl, 20% sucrose, and 0.1% polysorbate-20, pH 6.05, before the Fraser publication date. *Id.* Therefore, the '546 Patent Response requested that the Office withdraw its rejection of the asserted claims in Application No. 12/835,065 based on Fraser and allow the patent to grant. *Id.* at 3-5.

### 18. Kaisheva '417

142.     Kaisheva '417 is a publication of a U.S. Patent application (US2003/0138417) dated July 24, 2003 and entitled "Stable Liquid Pharmaceutical Formulation of IGG Antibodies." It described "a stable liquid pharmaceutical formulation comprising a high concentration, e.g. 50 mg/ml or more, of antibody in about 20-60 mM succinate buffer or 30-70 mM histidine buffer, having pH from about pH 5.5 to about pH 6.5, about 0.01-0.1% polysorbate, and a tonicity modifier that contributes to the isotonicity of the formulation."   Kaisheva '417 ¶ 14.  Kaisheva '417 specified "preferred antibodies" including "Daclizumab, a humanized anti-IL-2 receptor monoclonal antibody; HAIL-12, a humanized anti-IL-12 monoclonal antibody; HuEP5C7, a humanized anti-L selectin monoclonal anti-body; and Flintozumab, a humanized anti-gamma interferon monoclonal antibody." *Id.*  Kaisheva '417 did not disclose any fusion protein formulations and does not disclose aflibercept or stability data on aflibercept formulations.

143.     Kaisheva '417 noted in its background section the "need for a stable liquid antibody preparation, wherein the antibody concentration is 50 mg/ml or greater; such preparation is suitable for parenteral administration, including intravenous, intramuscular, intraperitoneal, or subcutaneous injection to a human." *Id.* ¶ 13.  The formulation in Kaisheva

'417 is stable at 2-8° C for at least 1 year and stable at 23-27° C for at least six months, and is

suitable for subcutaneous injection. *Id.* ¶ 14.

### 19. Kaisheva '316

144. Kaisheva '316 is a publication of a U.S. Patent application (US2003/113316)

dated June 19, 2003 and entitled "Stable Lyophilized Pharmaceutical Formulation of IGG

Antibodies." It described "a stable lyophilized pharmaceutical formulation prepared by

lyophilizing an aqueous formulation comprising a high concentration, e.g. 50 mg/ml or more, of

an IgG antibody in about 5-25 mM histidine buffer having pH from about 5.5 to about 6.5, about

0.005%-0.03% polysorbate, sucrose, and optionally serine, and/or mannitol." Kaisheva '316 ¶ 2.

Kaisheva '316 does not disclose aflibercept or stability data on aflibercept formulations.

145. The formulation described in Kaisheva '316 "is stable at room temperature for at

least 6 months, "and is suitable for parenteral administration such as intravenous, intramuscular,

intraperitoneal, or subcutaneous injection." *Id.* It names the anti-IL2 receptor antibody as an

exemplar. *Id.* Kaisheva '316 is not directed to fusion proteins or intravitreal administration of

fusion protein formulations. Kaisheva '316 taught a formulation development process consisting

of "selecting the optimum solution pH, selecting buffer type and concentration, evaluating the

effect of various excipients of the liquid and lyophilized stability, and optimizing the

concentration of the screened excipients using an I-optimal experimental design." *Id.* ¶ 54. It

identified a monoclonal IgG antibody as the preferred antibody and used a buffer of pH 5.5-6.5

in the composition. *Id.* ¶¶ 57-58.

146. Kaisheva '316 listed "examples of buffers that control the pH in this range," such

as "succinate (such as sodium succinate), gluconate, histidine, citrate and other organic acid

buffers," and noted that excipient concentrations may have to be decreased to maintain the

desired osmolarity depending on the buffer used. For its formulation, a "preferred buffer

contains about 5-25 mM histidine.  A more preferred buffer contains about 10-20 mM histidine."

*Id.* ¶ 58.

### 20.    Andya '801

147.    Andya '801 is an international patent application (WO97/04801) entitled "Stable Isotonic Lyophilized Protein Formulation," which was published February 13, 1997.  Andya '801 is directed to generating a stable reconstituted formulation suitable for subcutaneous administration.  Andya '801 at 1:4-6.  It teaches that "a stable lyophilized protein formulation can be prepared using a lyoprotectant (preferably a sugar such as sucrose or trehalose), which lyophilized formulation can be reconstituted to generate a stable reconstituted formulation having a protein concentration which is significantly higher (e.g. from about 2-40 times higher, preferably 3-10 times higher and most preferably 3-6 times higher) than the protein concentration in the pre-lyophilized formulation."  *Id.* at 1:32-36.  Andya '801 does not disclose any fusion protein formulations and instead lists only examples of antibodies (Andya '801 at 7:10-16) and native proteins, Andya '801 at 6:20-7:4.  Andya '801 does not disclose aflibercept or stability data on aflibercept formulations.

148.    Andya '801 describes a reconstituted formulation with a protein concentration of generally 50 mg/mL or more that remains stable at 2-8°C for at least about 30 days, and notes that "[s]uch high protein concentrations in the reconstituted formulation are considered to be particularly useful where the formulation is intended for subcutaneous administration."  *Id.* at 1:37-2:3.  Some embodiments of the reconstituted formulation are isotonic, while others are not. *Id.* at 2:3-5.  Andya '801 does not disclose any formulations intended for intravitreal administration, nor does Andya '801 even mention intravitreal formulations.

149.    Andya '801 also disclosed a process for developing a lyophilized formulation, in which "excipients and buffers are initially screened by measuring the stability of the protein after

56

lyophilization and reconstitution. The lyophilized protein in each formulation is also subjected to accelerated stability studies to determine the potential stability of the protein over its shelf-life." *Id.* at 19:3-6.

### 21. Andya '326

150. Andya '326 is a patent application publication (US2001/0014326) dated August 16, 2001 and entitled "Protein formulation." Andya '326 has a substantially identical disclosure to Andya '801.

### 22. Parkins

151. Parkins is an article by Dave A. Parkins and Ulla T. Lashmar entitled "The Formulation of Biopharmaceutical Products," published in Pharmaceutical Science & Technology Today in April 2000. Parkins "focuses on approaches to the formulation of macromolecules into biopharmaceutical products, and provides examples of studies that have been undertaken within the authors' laboratories." Parkins at 129. Parkins describes a number of techniques to evaluate degradation. *Id.* at 130. SEC-HPLC is one such technique. *Id.* As Parkins explains, "SEC-HPLC is commonly used to determine soluble covalent protein aggregation." *Id.* at 131. Parkins does not disclose aflibercept or stability data on aflibercept formulations.

152. Parkins additionally discloses formulation strategies to improve the bioavailability and stability of macromolecules. *Id.* at 132. Parkins lists a "wide range of formulation components" that have to be considered," including "buffer type and strength, use of ionic compounds, sugars, polyols and certain amino acids, the incorporation of surfactants, inclusion of antioxidants, chelating agents and other substances." *Id.*

Reply.Add349

### 23. Routier

153.    Routier is an article by Francoise H. Routier et al. entitled "The Glycosylation Pattern of a Humanized IgG1 antibody (D1.3) expressed in CHO cells," published in the Glycoconjugate Journal in 1997.  Routier describes the expression in CHO-DUKX cells of a humanized IgG antibody that retains murine complementarity regions specific for the antigen lysozyme.  It teaches that "the expressed protein has only one consensus N-linked glycosylation site at Asn 297 thus all the oligosaccharides isolated are located in the $CH_2$ domain."  Routier at 202.  Routier used multiple chromatography techniques to analyze the expression.  *Id.*  Routier does not disclose aflibercept or stability data on aflibercept formulations.

### 24. Frokjaer

154.    Frokjaer is a book entitled Pharmaceutical Formulation Development of Peptides and Proteins," edited by Sven Frokjaer and Lars Hovgaard, that was published in 2000.  Chapter 8, written by Michael J. Akers and Michael R. Defelippis, discusses "the basics of chemical stabilization, physical stabilization, and microbiological quality of proteins and peptides in solution."  Frokjaer at 145.  Frokjaer teaches that the "effect of solution pH on stability is a very important factor to study in early protein solution development."  *Id.* at 147.  It also describes multiple approaches for minimizing hydrolytic stability of peptides and proteins, including formulation at optimal solution pH.  *Id.* at 150.  Frokjaer does not disclose aflibercept or stability data on aflibercept formulations.

### 25. '261 Patent

155.    The '261 patent is related to the '865 patent and shares a common specification, which I describe further below.  The '261 patent claims priority to the same provisional application as the '865 patent, and I understand that the '261 patent is not prior art to the '865 patent.

### 26.    '842 Patent

156.    U.S. Patent 8,647,842 ("the '842 Patent"), which has a publication date of
February 11, 2014, contains substantially the same specification as Papadopoulos, described
above.

### 27.    '594 Patent

157.    The '594 patent is related to the '865 patent and shares a common specification,
which I describe further below.  The '594 patent claims priority to the same provisional
application as the '865 patent, and I understand that the '594 patent is not prior art to the '865
patent.

### 28.    '489 Patent

158.    The '489 patent is related to the '865 patent and shares a common specification,
which I describe further below.  The '489 patent claims priority to the same provisional
application as the '865 patent, and I understand that the '489 patent is not prior art to the '865
patent.

### 29.    '763 Patent

159.    The '763 patent is related to the '865 patent and shares a common specification,
which I describe further below.  The '763 patent claims priority to the same provisional
application as the '865 patent, and I understand that the '763 patent is not prior art to the '865
patent.

### 30.    '992 Patent

160.    The '992 patent is related to the '865 patent and shares a common specification,
which I describe further below.  The '992 patent claims priority to the same provisional
application as the '865 patent, and I understand that the '992 patent is not prior art to the '865
patent.

**Reply.Add351**

### 31. Arvinte

161.    Arvinte is a publication of a U.S. patent application (US2004/0170623) dated

September 2, 2004 and entitled "Stable Liquid Formulations of Antibodies." It describes "a

stable aqueous solution comprising an antibody at a concentration of at least 50 mg/ml, and

further comprising at least one acidic component." Arvinte ¶ 9. Arvinte teaches that the

"solutions of the invention are stable not only with regard to aggregation but also with regard to

the chemical stability of the antibody" and notes that multiple methods are "suitable to measure

the stability of the solutions of the invention," including hydrophobic interaction

chromatography and capillary electrophoresis. Arvinte ¶¶ 32-33. Arvinte does not disclose

aflibercept or stability data on aflibercept formulations.

### 32. Fyfe

162.    Fyfe is an international patent application entitled "Treatment with Anti-VEGF

Antibodies," which was published January 6, 2005 (WO2005/000900). It teaches "methods of

using anti-VEGF antibody for treating diseases and pathological conditions" and specifically

describes "an effective approach for treating cancers, partially based on the unexpected results

that adding anti-VEGF antibody to a standard chemotherapy results in statistically significant

and clinically meaningful improvements among cancer patients." Fyfe at 4:16-20. Fyfe does not

disclose aflibercept or other VEGF Trap molecules, or formulations thereof.

163.    Fyfe uses the term VEGF to refer to the 165-amino acid vascular endothelial cell

growth factor and related 121-, 189-, and 206- amino acid vascular endothelial cell growth

factors, as well as to truncated forms of the polypeptide comprising amino acids 8 to 109 or 1 to

019 of the 165-amino acid human vascular endothelial cell growth factor. *Id.* at 8:9-18.

**Reply.Add352**

164. The anti-VEGF antibody described in Fyfe "can be produced recombinantly using techniques and materials readily available." *Id.* at 39:2-3. "Intravenous of subcutaneous administration of the antibody is preferred." *Id.* at 53:2.

### 33. Amersham

165. Amersham is a book entitled "Antibody Purification Handbook," published by Amersham Biosciences in 2002. Amersham notes "the potential to create an infinite number of combinations between immunoglobulins, immunoglobulin fragments, tags and selected proteins." Amersham at 5. Amersham does not disclose aflibercept or stability data on aflibercept formulations.

166. Chapter 5 of Amersham is entitled "Multi-step Purification Strategies." *Id.* at 55. It teaches that "a single, rapid purification step using affinity chromatography is often sufficient to achieve the level of purity and quantity of product required for research purposes." *Id.* Amersham further describes how "alternative techniques need to be combined effectively into a multi-step purification strategy" when a higher degree of purity is required. *Id.*

### 34. Amersham Application Note

167. Amersham Application Note is an article entitled "Rapid Optimisation And Development of An Automated Two-Step Purification Procedure For Monoclonal IgG Antibodies," published by Amersham Biosciences in 1998. Amersham Application Note teaches a "[c]onvenient and rapid standard purification protocol for monoclonal IgG antibodies in the 1-10 mg range" in the form of an "automated two-step purification procedure using affinity and gel filtration chromatography." Amersham Application Note at 1. Amersham Application Note does not disclose aflibercept or stability data on aflibercept formulations.

168. Amersham Application Note describes the use of cell culture supernatants containing monoclonal IgG1 as a model system. *Id.* Amersham Application Note used a capture

61

**Reply.Add353**

step and a polishing step in its purification method, and captured the antibodies by affinity

chromatography on HiTrap rProtein A.  *Id.*  The method described in Amersham Application

Note "was developed for MAbs."  *Id.* at 2.

### 35.  Eylea Prescribing Information 2011

169.  Eylea Prescribing Information 2011 is the label for Eylea® (aflibercept) Injection,

issued in November 2011.  It describes Eylea's indication, intravitreal administration, dosage

forms and strengths, contraindications, and more.  Eylea Prescribing Information 2011 at 1-5.

Eylea Prescribing Information 2011 also provides a description stating that Eylea is "a

recombinant fusion protein consisting of portions of human VEGF receptors 1 and 2

extracellular domains fused to the Fc portion of human IgG1 formulated as an iso-osmotic

solution for intravitreal administration."  *Id.* at 9.

### 36.  Avery

170.  Avery is an article by Robert L. Avery et al. entitled "Intravitreal Bevacizumab

(Avastin) for Neovascular Age-Related Macular Degeneration," published in the journal

Ophthalmology.  Dr. Rabinow fails to establish that Avery was published before the invention of

the '865 patent (no later than March 21, 2006) or the filing of the provisional patent on June 16,

2006, *see infra* Section X.  Avery describes a study performed to report the short-term safety,

biologic effect, and a possible mechanism of action of intravitreal bevacizumab in patients with

neovascular age-related macular degeneration.  Avery at 363.  In the study, participants received

intravitreal bevacizumab (1.25 mg) on a monthly basis until macular edema, subretinal fluid,

and/or pigment epithelial detachment resolved.  The participants were evaluated using

nonstandardized Snellen visual acuity, complete ophthalmic examination, fluorescein

angiography, and optical coherence tomography.  *Id.*  Avery does not disclose aflibercept or

stability data on aflibercept formulations.

**Reply.Add354**

171. Avery "acknowledge[d] the shortcomings of this study: retrospective design, limited number of patients, nonstandard visions, and limited follow-up," and noted that "the visual results of this study are difficult to interpret." *Id.* at 368. But Avery stated that bevacizumab was "well tolerated in this short series," as no cases of uveitis, endophthalmitis, ocular toxicity, hypertension, or thromboembolic events after injection," were identified, "a finding consistent with that of other investigators." *Id.*

### 37. Avastin PI

172. Avastin PI is labeling text for the drug Avastin (bevacizumab), published in February 2004. Avastin PI specifies that Avastin, "a recombinant humanized monoclonal IgG1 antibody that binds to and inhibits the biologic activity of human vascular endothelial growth factor (VEGF) in in vitro and in vivo assay systems," is for intravenous use to treat certain cancers. Avastin PI at 1-2. Avastin PI does not disclose aflibercept or stability data on aflibercept formulations.

173. Avastin PI describes the production and formulations of Avastin in both 100 mg and 400 mg vials. "The 100 mg product is formulated in 240 mg α,α-trehalose dihydrate, 23.2 mg sodium phosphate (monobasic, monohydrate), 4.8 mg sodium phosphate (dibasic, anhydrous), 1.6 mg polysorbate 20, and Water for Injection, USP. The 400 mg product is formulated in 960 mg α,α-trehalose dihydrate, 92.8 mg sodium phosphate (monobasic, monohydrate), 19.2 mg sodium phosphate (dibasic, anhydrous), 6.4 mg polysorbate 20, and Water for Injection, USP." *Id.* at 2.

### 38. Daly II

174. Daly II contains substantially the same specification as Daly, described above.

### 39. Peyman

175.     Peyman is an international patent application entitled "Antiprostaglandins for the Treatment of Ocular Pathologies," which was published November 3, 2005.  Peyman lists Gholam Peyman as the inventor.  Peyman discloses formulations and methods useful to treat ocular neovascularization, in particular "a formulation suitable for the treatment of ocular neovascularization comprising antiprostaglandins in a concentration and dose suitable for treating ocular neovascularization, characterized in that said compound is in a pharmaceutically acceptable form suitable for delivery to the eye."  Peyman at 3:22-28.  Peyman does not disclose aflibercept or other VEGF Trap molecules, or formulations thereof.

176.     Peyman states that the pharmaceutically acceptable formulations can be "prepared for topical ocular application, ocular injection, or ocular implantation, and may be contained in liposomes or slow release capsules."  *Id.* at 4:9-11.  Peyman also teaches that "formulations of the invention may be injected with anti-angiogenic agents designed to block the actions of VEGF on endothelial cells," naming Lucentis and Macugen as "potent anti-angiogenic compounds" that can be used.  *Id.* at 34:29-35:4.

177.     Additionally, Peyman discloses that the formulation may also include "buffers, diluents, carriers, adjuvants or excipients," with a list of many possible vehicles.  *Id.* at 25:23-24.  Peyman teaches that "[t]hese agents may be present in individual amounts of from about 0.001% to about 5% by weight and preferably about 0.01% to about 2%."  *Id.* at 25:11-12.

### 40. Wiegand

178.     Wiegand is an international patent application (WO2006/088650) entitled "Method of Treating Eye Injury with Local Administration of a VEGF Inhibitor," which was published on August 24, 2006.  It discloses "the finding that local administration of an agent capable of blocking, inhibiting, or reducing the activity of vascular endothelial growth factor

(VEGF) is useful in treating of angiogenesis and inflammation associated with eye injuries or infection." Wiegand ¶ 4. Wiegand does not disclose aflibercept formulations or stability data on such formulations.

179. Wiegand discloses a method of treating an eye injury via local administration of "an effective amount of a first agent capable of blocking or inhibiting vascular endothelial growth factor (VEGF)-mediated activity to a subject in need thereof, such that the eye injury is ameliorated or improved." *Id.* ¶ 5. Disclosed local administration methods in one aspect include "liquid, gel, ointment, salve, or sustained release formulation, for example, in eye drop or by subconjunctival injection." *Id.* ¶ 18.

180. Wiegand teaches various embodiments in which "the VEGF antagonist ('trap') is selected from the group consisting of acetylated Flt-1 (1-3)-Fc, Flt-1 (1-3R->N)-Fc, Flt-1 (1-3L\8)-Fc, Flt-1 (2-3L\8)-Fc, Flt-1 (2-3)-Fc, Flt-1 D2-VEGFR3D3-Fc~C1 (a), Flt-1 D2-Flk-1 D3-Fc~C1 (a), and VEGFR1 R2-Fc~C1 (a)." *Id.* ¶ 36.

181. Wiegand states that the liquid composition is preferably aqueous but can alternatively take the form of an ointment. *Id.* ¶ 46. It discloses that the composition can also "comprise an ophthalmic depot formulation comprising an active agent for subconjunctival administration," or may "comprise a solid article that can be inserted in a suitable location in the eye." *Id.* ¶ 48-49.

### 41. Daly III

182. Daly III contains substantially the same specification as Daly, described above.

### 42. Baffert

183. Baffert is an article by Fabienne Baffert et al. entitled "Age-Related Changes in Vascular Endothelial Growth Factor Dependency and Angiopoietin-1-Induced Plasticity of Adult Blood Vessels," published in the Circulation Research journal on April 16, 2004. Baffert

discloses the results of a study in which 4-, 8-, and 16-week-old mice were treated with VEGF-

Trap systemically over 10 days, leading to a reduction in the number of capillaries in the tracheal

mucosa by 39%, 28%, and 14% for each respective group of mice. Baffert at 984. Baffert does

not disclose SEQ ID NO:4 disclosed in the '865 patent or evaluate the stability of any VEGF

Trap formulation.

184.    Baffert stated that the mice were treated with VEGF-Trap (25 mg/kg, IP) or its

vehicle (5 mmol/L phosphate, 5 mmol/L citrate, pH 6.0, 100 mmol/L NaCl, 20% glycerol, and

0.1% Tween-20) and studied on day 10. *Id.* at 985. Baffert disclosed that "VEGF-Trap

treatment significantly reduced the number of capillary branch points at all ages, with the largest

change at 4 weeks." *Id.* at 986.

### 43.    Marra

185.    Marra is an article by Michelle T. Marra et al entitled "Solution Formulation

Development of a VEGF Inhibitor for Intravitreal Injection," published in the journal AAPS

PharmSciTech in March 2011. Marra is not prior art to the '865 patent. It discloses the

development of ophthalmic solution formulation of PF-00337210, a selective small molecule

inhibitor of VEGFRs, for intravitreal injection. Marra at 362. Marra does not disclose

aflibercept or stability data on aflibercept formulations.

186.    Marra states that extensive buffer studies were conducted. *Id.* at 363. After

safety studies, "10 mM citrate was selected as the preferred buffer for the formulation over

phosphate." *Id.* at 367.

### 44.    Avery 2006

187.    Avery 2006 is an article by Robert L. Avery et al. entitled "Intravitreal

Bevacizumab (Avastin) in the Treatment of Proliferative Diabetic Retinopathy," published in the

journal Ophthalmology in October 2006. It disclosed the results of a study on "the biologic

effect of intravitreal bevacizumab in patients with retinal and iris neovascularization secondary to diabetes mellitus." Avery 2006 at 1695. Avery 2006 stated that the short-term results suggested "that intravitreal bevacizumab is well tolerated and associated with a rapid regression of retinal and iris neovascularization secondary to PDR." *Id.* Avery 2006 does not disclose aflibercept or stability data on aflibercept formulations.

188. Avery 2006 also discussed the development and studies of VEGF inhibitors including pegaptanib, bevacizumab, and ranibizumab. *Id.* at 1697.

### 45. Duvvuri 2003

189. Duvvuri 2003 is an article by Sridhar Duvvuri entitled "Drug Delivery to the Retina: Challenges and Opportunities," published in the journal Expert Opinion Biological Therapy in 2003. It discusses systems for retinal drug delivery. Duvvuri 2003 states that conventional ophthalmic dosage forms including solutions, ointments and creams, are not sufficiently effective but that newer forms, such as intravitreal injections, implants, and subconjunctival implants had had only limited success to date. Duvvuri 2003 at 45-46. Duvvuri further explains that although intravitreal injections can offer advantages over systemic and topical routes for drug delivery to the retina and vitreous, "[i]ntravitreal injections suffer from several major deficiencies, such as patient non-compliance, need for repeated injections (once a week), injection-associated infections like endophthalmitis and retinal detachment, and so on." Duvvuri 2003, at 49. Duvvuri 2003 does not disclose aflibercept or stability data on aflibercept formulations.

### 46. Ghate 2006

190. Ghate 2006 is an article by Deepta Ghate and Henry F. Edelhauser entitled "Ocular Drug Delivery," published in the journal Expert Opinion Biological Therapy in 2006. It discloses "the major routes of ocular drug delivery, the science behind drug delivery by these

routes, and the newer techniques developed to enhance drug delivery to the eye." Ghate 2006 at

275. Ghate 2006 does not disclose aflibercept or stability data on aflibercept formulations.

191. Ghate 2006 explains that, as a method of drug delivery to the posterior segment of

the eye, intravitreal injection is "the most invasive and the route with the most serious

complications." Ghate 2006, at 281. Furthermore, Ghate 2006 explains that "[t]he internal

limiting membrane is impermeable to linear molecules > 40 kDa and globular molecules > 70

kDa [99]. Thus, larger macromolecules will have a longer retention time, possibly weeks, but

their effect on the retina after an intravitreal injection is limited." *Id.* at 281-282.

## IX.    ASSERTED PATENTS

### A.    The '865 Patent

192. The '865 patent generally discloses stable ophthalmic formulations of a VEGF-

specific fusion protein antagonist for intravitreal administration. The '865 patent discloses

several "VEGF trap" fusion proteins and states that in a specific embodiment "the fusion protein

comprises amino acids 27-457 of SEQ ID NO:4 and is glycosylated at Asn residues 62, 94, 149,

222 and 308." '865 patent, 6:35-37.

193. The '865 patent discloses various ophthalmic formulations. For example, it

teaches a stable liquid ophthalmic formulation that comprises 1-100 mg/ml VEGF-specific

fusion protein antagonist, 0.01-5% of one or more organic cosolvent(s), 30-150 mM of one or

more tonicity agent(s), 5-40 mM of a buffering agent, and optionally, 1.0-7.5% of a stabilizing

agent, pH between about 5.8-7.0. '865 patent at 2:33-38. The specification also provides

substantial guidance to the POSA about excipients that may be used in the stable ophthalmic

formulations, for example:

> In one or more specific embodiments, the organic co-
> 40 solvent may be polysorbate, for example, polysorbate 20 or
> polysorbate 80, polyethylene glycol (PEG), for example,
> PEG 3350, or propylene glycol, or a combination thereof;
> the tonicity agent may be, for example, sodium chloride or
> potassium chloride; the stabilizing agent may be sucrose,
> 45 sorbitol, glycerol, trehalose, or mannitol; and the buffering
> agent may be, for example, phosphate buffer. In a specific
> embodiment, the phosphate buffer is a sodium phosphate
> buffer.
> In various embodiments, the organic co-solvent is poly-
> 50 sorbate and/or PEG, the stabilizing agent is sucrose, the
> buffering agent is phosphate buffer, and the tonicity agent is
> sodium chloride.

'865 patent at 2:39-52; *see also* 3:25-33. The specification further discloses numerous specific

embodiments of stable liquid ophthalmic formulations. '865 patent at 2:53–4:6.

194. In one embodiment, the '865 Patent discloses a composition of about 50 mg/ml of

the VEGF antagonist, 10 mM sodium phosphate buffer, 50 mM sodium chloride, 0.1%

polysorbate, and 5% sucrose, with a pH of about 6.2-6.3. *Id.* at 2:69-62. This formulation

provided a turbidity of 0.01 or lower at OD405 and more than 98% of VEGF antagonist fusion

protein present in native conformation (denoted with the synonymous term "native

configuration" below):

Example 1. Stability of 50 mg/ml VEGF Trap Liquid Formulation Stored at 5° C. in 3 ml Glass Vials

35

An ophthalmic liquid formulation containing 50 mg/ml VEGF Trap (SEQ ID NO:4), 10 mM phosphate, 50 mM NaCl, 0.1% polysorbate 20, 5% sucrose, and pH 6.25, was stored at 5° C. in 3 ml glass vials and samples tested at 3, 6, 9, 12, 18 and 24 months. Stability was determined by SE-HPLC The results are shown in Table 1. Turbidity was measured at $OD_{405}$ nm; and percent recovered protein and purity by size exclusion HPLC.

45

### TABLE 1

Stability of 50 mg/ml VEGF Trap Protein (VGFT-SS065)

| Months | Visual Appearance | Turbidity ($OD_{405}$ nm) | pH | % VEGF Trap Recovered | % VEGF Trap Native Configuration |
|--------|-------------------|---------------------------|-----|-----------------------|----------------------------------|
| 0 | Pass | 0.00 | 6.2 | 100 | 98.8 |
| 3 | Pass | 0.00 | 6.2 | 101 | 98.7 |
| 6 | Pass | 0.01 | 6.3 | 100 | 98.3 |
| 9 | Pass | 0.01 | 6.3 | 101 | 98.3 |
| 12 | Pass | 0.01 | 6.3 | 104 | 98.4 |
| 18 | Pass | 0.01 | 6.3 | 96 | 98.1 |
| 24 | Pass | 0.01 | 6.3 | 105 | 98.1 |

'865 patent at 8:32-59 (annotated).

195.    In another embodiment, the stable liquid ophthalmic formulation is comprised of about 50 mg/ml of the VEGF antagonist, 10 mM sodium phosphate buffer, 50 mM sodium chloride, 3% polyethylene glycol, and 5% sucrose, with a pH of about 6.2-6.3.  *Id.* at 63-67.  Its stability results appear in the table below and were (like each of the liquid formulations disclosed) evaluated using the same methods as Example 1:

70

**Reply.Add362**

Example 2. Stability of 50 mg/ml VEGF Trap
Liquid Formulation Stored at 5° C. in 3 ml Glass
Vials

A liquid formulation containing 50 mg/ml VEGF Trap
(SEQ ID NO:4), 10 mM phosphate, 50 mM NaC1, 3%
polyethylene glycol 3350, 5% sucrose, and pH 6.25, was
stored at 5° C. in 3 nil glass vials and samples tested at 3, 6,

9, 12, 18 and 24 months. Stability results are shown in Table
2. Turbidity, percent recovered protein and purity was deter-
mined as described above.

TABLE 2

Stability of 50 mg/ml VEGF Trap Protein (VGFT-SS065)

| Months | Visual Appearance | Turbidity | pH | % VEGF Trap Recovered | % VEGF Trap Native Configuration |
|--------|-------------------|-----------|-----|-----------------------|----------------------------------|
| 0  | Pass | 0.00 | 6.2 | 100 | 98.9 |
| 3  | Pass | 0.00 | 6.1 | 104 | 98.5 |
| 6  | Pass | 0.01 | 6.3 | 99  | 98.3 |
| 9  | Pass | 0.00 | 6.3 | 102 | 97.6 |
| 12 | Pass | 0.01 | 6.3 | 103 | 98.0 |
| 18 | Pass | 0.00 | 6.3 | 113 | 97.7 |
| 24 | Pass | 0.00 | 6.2 | 106 | 97.6 |

'865 patent at 8:60-9:17.

196.    The '865 patent discloses that another liquid ophthalmic formulation, comprised

of about 40 mg/ml VEGF Trap, 10 mM phosphate, 40 mM sodium chloride, 0.03% polysorbate

20, and 5% sucrose, with a pH of 6.3, resulted in a turbidity of 0.01 or less and more than 99% of

VEGF antagonist fusion protein present in native conformation:

**Reply.Add363**

Example 3. Stability of 40 mg/ml VEGF Trap Liquid Formulation Stored at 5° C. in 3 ml Glass Vials

A liquid formulation containing 40 mg/ml VEGF Trap (SEQ ID NO:4), 10 mM phosphate, 40 mM NaCl, 0.03% polysorbate 20, 5% sucrose, and pH 6.3, was stored at 5° C. in 3 ml glass vials and samples tested at 0.5, 1, 2, 3, and 4 months. Stability results are shown in Table 3. Turbidity, percent recovered protein and purity was determined as described above.

TABLE 3

| Stability of 40 mg/ml VEGF Trap Protein (VGFT-SS207) | | | | | |
|---|---|---|---|---|---|
| Months | Visual Appearance | Turbidity | pH | % VEGF Trap Recovered | % VEGF Trap Native Configuration |
| 0 | Pass | 0.00 | 6.3 | 100 | 99.5 |
| 0.5 | Pass | 0.00 | 6.3 | 99 | 99.4 |
| 1 | Pass | 0.00 | 6.2 | 98 | 99.5 |
| 2 | Pass | 0.00 | 6.2 | 95 | 99.2 |
| 3 | Pass | 0.01 | 6.4 | | |
| 4 | Pass | 0.01 | 6.3 | | |

72

**Reply.Add364**

'865 patent at 9:19-44.  Similar stability results were achieved for this formulation in different

storage conditions as well:

> ### Example 4. Stability of 40 mg/ml VEGF Trap Liquid Formulation Stored at 5° C. in Pre-Filled Glass Syringe
>
> A liquid formulation containing 40 mg/ml VEGF trap (SEQ ID NO:4), 10 mM phosphate, 40 mM NaCl, 0.03% polysorbate 20, 5% sucrose, and pH 6.3, was stored at 5° C. in 1 ml prefilled luer glass syringe with 4023/50 FluroTec coated plunger and samples tested at 0.5, 1, 2, 3, and 4 months. Stability results are shown in Table 4. Turbidity, percent recovered protein and purity was determined as described above.
>
> #### TABLE 4
>
> Stability of 40 mg/ml VEGF Trap Protein (VGFT-SS207)
>
> | Months | Visual Appearance | Turbidity | pH | % VEGF Trap Recovered | % VEGF Trap Native Configuration |
> |--------|-------------------|-----------|-----|----------------------|----------------------------------|
> | 0 | Pass | 0.00 | 6.3 | 100 | 99.4 |
> | 0.5 | Pass | 0.00 | 6.3 | 100 | 99.3 |
>
> Stability of 40 mg/ml VEGF Trap Protein (VGFT-SS207)
>
> | Months | Visual Appearance | Turbidity | pH | % VEGF Trap Recovered | % VEGF Trap Native Configuration |
> |--------|-------------------|-----------|-----|----------------------|----------------------------------|
> | 1 | Pass | 0.00 | 6.3 | 100 | 99.4 |
> | 2 | Pass | 0.00 | 6.3 | 97 | 99.1 |
> | 3 | Pass | 0.01 | 6.4 | | |
> | 4 | Pass | 0.01 | 6.3 | | |

'865 patent at 9:46-10:11.

197.    An additional liquid formulation disclosed in the '865 patent contains 40 mg/ml

VEGF Trap, 10 mM phosphate, 135 mM sodium chloride, 0.03% polysorbate 20, and 5%

sucrose, with a pH of 6.3.  It, too, achieved turbidity of 0.01 or less and more than 98% of VEGF

Trap present in native conformation in two different storage conditions:

## Example 5. Stability of 40 mg/ml VEGF Trap Liquid Formulation Stored at 5° C. in 3 ml Glass Vials

A liquid formulation containing 40 mg/ml VEGF trap (SEQ ID NO:4), 10 mM phosphate, 135 mM NaCl, 0.03% polysorbate 20, and pH 6.3, was stored at 5° C. in 3 ml glass vials and samples tested at 0.5, 1, 2, 3, and 4 months. Stability results are shown in Table 5. Turbidity, percent recovered protein and purity was determined as described above.

TABLE 5

Stability of 40 mg/ml VEGF Trap Protein (VGFT-SS203)

| Months | Visual Appearance | Turbidity | pH | % VEGF Trap Recovered | % VEGF Trap Native Configuration |
|--------|-------------------|-----------|-----|-----------------------|----------------------------------|
| 0 | Pass | 0.00 | 6.3 | 100 | 99.3 |
| 0.5 | Pass | 0.00 | 6.2 | 87 | 99.2 |
| 1 | Pass | 0.00 | 6.2 | 88 | 99.1 |
| 2 | Pass | 0.00 | 6.3 | 103 | 99.2 |
| 3 | Pass | 0.00 | 6.3 | 88 | 99.0 |
| 4 | Pass | 0.00 | 6.2 | 85 | 98.9 |
| 5 | Pass | 0.00 | 6.3 | 84 | 99.0 |

## Example 6. Stability of 40 mg/ml VEGF Trap Liquid Formulation Stored at 5° C. in 1 ml Pre-Filled Glass Syringe

A liquid formulation containing 40 mg/ml VEGF trap (SEQ ID NO:4), 10 mM phosphate, 135 mM NaCl, 0.03% polysorbate 20, and pH 6.3, was stored at 5° C. in 1 ml prefilled glass luer syringe with 4023/50 FluroTec coated plunger and samples tested at 0.5, 1, 2, 3, 4, and 5 months. Stability results are shown in Table 6. Turbidity, percent recovered protein and purity was determined as described above.

TABLE 6

Stability of 40 mg/ml VEGF Trap Protein (VGFT-SS203)

| Months | Visual Appearance | Turbidity | pH | % VEGF Trap Recovered | % VEGF Trap Native Configuration |
|--------|-------------------|-----------|-----|-----------------------|----------------------------------|
| 0 | Pass | 0.00 | 6.3 | 100 | 99.2 |
| 0.5 | Pass | 0.01 | 6.3 | 101 | 99.2 |
| 1 | Pass | 0.00 | 6.3 | 101 | 99.2 |
| 2 | Pass | 0.00 | 6.3 | — | — |
| 3 | Pass | 0.01 | 6.3 | 102 | 99.1 |
| 4 | Pass | 0.01 | 6.3 | 103 | 98.8 |
| 5 | Pass | 0.00 | 6.3 | 99 | 98.9 |

'865 patent at 10:13-66.

198.    In two other embodiments described in the '865 patent, formulations containing 20 mg/ml VEGF trap that was reconstituted to a final concentration of 40 mg/ml VEGF Trap likewise resulted in turbidity of 0.01 or less and at least 98% of VEGF Trap present in native conformation:

**Example 7. Stability of Lyophilized 20 mg/ml VEGF Trap Formulation Stored at 5° C. in 3 ml Glass Vials and Reconstituted to 40 mg/ml**

0.8 ml of a liquid formulation containing 20 mg/ml VEGF trap (SEQ ID NO:4), 5 mM phosphate, 20 mM NaCl, 0.015% polysorbate 20, 2.5% sucrose, and pH 6.3, were lyophilized in 3 ml glass vials. Samples were stored at 5° C. and tested at 1, and 2 months. VEGF trap was reconstituted to a final concentration of 40 mg/ml VEGF Trap (final volume of 0.4 ml). Stability results are shown in Table 7 (t=time in months; *=visual appearance; **=reconstitution time). Turbidity, percent recovered protein and purity was determined as described above.

TABLE 7

Stability of Lyophilized 20 mg/ml VEGF Trap Protein (VGFT-SS216)

| t | Vis. App.* | Recon. Time** (min) | Vis. App.* Reconst'd Liquid | Tur-bidity | pH | % VEGF Trap Recovered | % VEGF Trap Native Config. |
|---|---|---|---|---|---|---|---|
| 0 | Pass | 0.6 | Pass | 0.00 | 6.3 | 100 | 99.5 |
| 1 | Pass | 0.6 | Pass | 0.01 | 6.3 | 106 | 99.4 |
| 2 | Pass | 0.4 | Pass | 0.01 | 6.2 | 103 | 99.3 |

**Example 8. Stability of Lyophilized 20 mg/ml VEGF Trap Formulation Stored at 5° C. in 3 ml Glass Vials**

0.8 ml of a liquid formulation containing 20 mg/ml VEGF trap (SEQ ID NO:4), 5 mM phosphate, 67.5 mM NaCl, 0.015% polysorbate 20, and pH 6.3, were lyophilized in 3 ml glass vials. Samples were stored at 5° C. and tested at 1, 2, and 3 months. VEGF trap was reconstituted to a final concentration of 40 mg/ml VEGF trap (final volume of 0.4 ml). Stability results are shown in Table 8 (t=time in months; *=visual appearance; **=reconstitution time).

TABLE 8

Stability of Lyophilized 20 mg/ml VEGF Trap Protein (VGFT-SS216)

| t | Vis. App.* | Recon. Time** (min) | Vis. App. Reconst'd Liquid | Tur-bidity | pH | % VEGF Trap Recovered | % VEGF Trap Native Config. |
|---|---|---|---|---|---|---|---|
| 0 | Pass | 0.7 | Pass | 0.00 | 6.3 | 100 | 99.0 |
| 1 | Pass | 0.7 | Pass | 0.01 | 6.2 | 105 | 98.9 |
| 2 | Pass | 0.4 | Pass | 0.01 | 6.2 | 103 | 98.9 |

'872 patent at 11:1-26, 12:1-26.

199.    Therefore, each of the formulations disclosed in the '865 patent's Examples, summarized below, resulted in turbidity of 0.01 or less and at least 98% of VEGF Trap present in native conformation.

|  | **Example 1 (vial)** | **Example 2 (vial)** | **Examples 3 (vial) & 4 (pre-filled syringe)** | **Examples 5 (vial) & 6 (pre-filled syringe)** | **Examples 7 (vial) & 8 (vial)** |
|---|---|---|---|---|---|
| **VEGF Antagonist** | 50 mg/ml VEGF Trap, SEQ ID NO:4 | 50 mg/ml VEGF Trap, SEQ ID NO:4 | 40 mg/ml VEGF Trap, SEQ ID NO:4 | 40 mg/ml VEGF Trap, SEQ ID NO:4 | 20 mg/ml VEGF Trap, reconstituted to 40 mg/ml, SEQ ID NO:4 |

75

| | 0.1% polysorbate 20 | 3% polyethylene glycol 3350 | 0.03% polysorbate 20 | 0.03% polysorbate 20 | 0.015% polysorbate 20 |
|---|---|---|---|---|---|
| **Organic co-solvent** | | | | | |
| **Tonicity agent** | 50 mM NaCl | 50 mM NaCl | 40 mM NaCl | 135 mM NaCl | 20 mM NaCl |
| **Buffering agent** | 10 mM phosphate | 10 mM phosphate | 10 mM phosphate | 10 mM phosphate | 5 mM phosphate |
| **Stabilizing agent** | 5% sucrose | 5% sucrose | 5% sucrose | None | 2.5% sucrose |
| **pH** | 6.25 | 6.25 | 6.3 | 6.3 | 6.3 |

### B.  The '572 Patent

200.   The '572 patent discloses methods for treating angiogenic eye disorders by sequentially administering multiple doses of a VEGF antagonist to a patient over time.  '572 patent at 2:14-17.  It further discloses that a formulation that contains the VEGF antagonist and is administered by injection "may be prepared by dissolving, suspending or emulsifying a VEGF antagonist in a sterile aqueous medium or an oily medium conventionally used for injections." '572 patent at 6:18-22.  It discloses physiological saline, "an isotonic solution containing glucose and other auxiliary agents, etc.," as an example of an aqueous medium that may be used for injections in combination with an appropriate solubilizing agent such as an alcohol, a polyalcohol, and "a nonionic surfactant" such as "polysorbate 80" or "HCO-50 (polyoxyethylene (50 mol) adduct of hydrogenated castor oil))."  '572 patent at 6:22-30.

### C.  Asserted Claims of the '865 and '572 Patents

201.   As noted above, I have been informed that Regeneron is currently asserting claims 4, 7, 9, 11, and 14-18 of the '865 patent.  I have reproduced those claims, and those from which they depend, below.

> 1. A vial comprising an ophthalmic formulation suitable for
> intravitreal administration that comprises:

76

a vascular endothelial growth factor (VEGF) antagonist

an organic co-solvent,

a buffer, and

a stabilizing agent,

wherein said VEGF antagonist fusion protein is glycosylated and comprises amino acids 27-457 of SEQ ID NO:4; and

wherein at least 98% of the VEGF antagonist is present in native conformation following storage at 5° C. for two months as measured by size exclusion chromatography.

2. The vial of claim 1, wherein the concentration of said VEGF antagonist fusion protein is 40 mg/ml, and wherein said organic co-solvent comprises polysorbate.

4. The vial of claim 2, wherein said organic co-solvent comprises about 0.03% to about 0.1% polysorbate 20.

7. The vial of claim 5, wherein said buffer comprises 5-25 mM buffer.

9. The vial of claim 5, wherein said buffer comprises a pH about 6.2-6.3.

10. The vial of claim 5, wherein said stabilizing agent comprises a sugar.

11. The vial of claim 10, wherein said sugar is selected from the group consisting of sucrose, sorbitol, glycerol, trehalose, and mannitol.

14. The vial of claim 5, wherein said VEGF antagonist fusion protein is glycosylated at asparagine residues corresponding to asparagine residues 62, 94, 149, 222 and 308 of SEQ ID NO: 4.

15. The vial of claim 5, wherein said formulation is capable of providing a turbidity of 0.01 or lower at OD405 after 2 month storage at 5° C.

16. The vial of claim 5, wherein at least 99% of said VEGF antagonist fusion protein is present in native conformation after 2 month storage at 5° C. as measured by size exclusion chromatography.

Reply.Add369

17. The vial of claim 5, wherein at least 98% of said VEGF antagonist fusion protein is present in native conformation following storage at 5° C. for 24 months as measured by size exclusion chromatography.

18. The vial of claim 5, wherein said formulation does not contain phosphate.

202.     I have been informed that Regeneron is currently asserting claims 1-23 and 25-30 of the '572 patent.  I have been asked to respond to the MacMichael Report's assertions regarding the validity of claims 6, 7, 12, 13, 18, 19, 22, and 23 of the '572 patent, and I understand Regeneron has asked other individuals to offer their opinions regarding the validity of these and other asserted claims of the '572 patent.  Claims 6, 12, 18, and 22 of the '572 patent recite that "aflibercept is formulated as an isotonic solution."  Claims 7, 13, 19, and 23 of the '572 patent recite that "aflibercept is formulated with a non-ionic surfactant."

## X.     PRIORITY DATE

203.     As explained in my Opening Report (¶ 32), I understand that the priority date of the '865 patent is no later than June 16, 2006, the filing date of the provisional application from which the '865 patent claims priority.  Dr. Rabinow applies this priority date.  Rabinow ¶ 198.  Dr. MacMichael does as well.  MacMichael ¶ 97.  My opinions would not change if the claims of the '865 patent had a later priority date, including June 14, 2007, the filing date of U.S. Application No. 11/818,463.

204.     I further understand that the priority date can be the date on which the inventions were conceived and reduced to practice, even if that is earlier than the filing date of the earliest application to which the applicants claim priority.  Based on my review of internal Regeneron development documents, it is my opinion that Drs. Furfine, Dix, Graham, and Frye conceived of the inventions recited in the '865 claims and reduced these inventions to practice no later than March 21, 2006.  This is evidenced by Regeneron's internal development documents and lab

78

notebooks.  *See* RGN-EYLEA-MYLAN-00475679 (pull schedule for SS207, with 2 month pull Mar. 21, 2006); RGN-EYLEA-MYLAN-00710718 (additional technical documents regarding SS207); RGN-EYLEA-MYLAN-00710562 (technical documents regarding SS203, including 2-month pull February 9, 2006); RGN-EYLEA-MYLAN-00477257, at -290 (Notebook 5946 to K. Frye, Protocol for SS065 dated December 4, 2003); RGN-EYLEA-MYLAN-00471343 (SS065 pull schedule, with 3-month pull February 24, 2004).  Specifically, these development documents establish that the inventors made on or before March 21, 2006 the formulations described and claimed in the '865 patent, which references the stability studies above in the Examples.

### VALIDITY OPINIONS UNDER REGENERON'S PROPOSED CONSTRUCTIONS

## XI.    SUMMARY OF OPINIONS

### A.    The '865 Asserted Claims Are Not Anticipated

205.    As I will discuss in further detail below, my opinion is that the '865 Asserted Claims were not anticipated by the prior art cited by Dr. Rabinow.  None of the references— Fraser, Wulff, or the '226 Patent—teach every limitation of the '865 Asserted Claims expressly or inherently.

### B.    The '865 Asserted Claims Would Not Have Been Obvious

206.    Dr. Rabinow relies on the same references (along with two references related to ranibizumab) to argue obviousness.  I again disagree, because the prior art cited by Dr. Rabinow does not teach or suggest the inventions claimed.  To the contrary, the prior art taught away from the claims, and objective evidence including skepticism of others, unexpected results, and copying further support nonobviousness.

79

**Reply.Add371**

### C. The '865 Asserted Claims Are Not Invalid Under Section 112

207.    As I discuss in further detail below, the '865 Asserted Claims are not invalid for lack of enablement, written description, or indefiniteness.  Guided by the '865 patent's disclosure and several examples, the POSA could practice the '865 Asserted Claims without undue experimentation, and the POSA would recognize that the specification described what is claimed.

### D. The '572 Claims Are Not Invalid

208.    As discussed further below, I also disagree with Dr. Rabinow's and Dr. MacMichael's opinions that the '572 Claims are invalid.  Neither Dr. Rabinow nor Dr. MacMichael demonstrate that the '572 Claims are obvious over the prior art, or invalid for lack of written description.

## XII. The '865 Asserted Claims Are Not Anticipated

### A. Fraser Does Not Anticipate the '865 Asserted Claims

209.    Dr. Rabinow first argues that the '865 Asserted Claims are anticipated by Fraser. Because Fraser does not teach numerous limitations from these claims, I disagree with Dr. Rabinow's opinion.

#### 1. Claim 4

210.    Claim 4 depends from claim 2, which depends from claim 1.  Claims 1, 2, and 4 recite:

> 1. A vial comprising an ophthalmic formulation suitable for intravitreal administration that comprises:
>
> a vascular endothelial growth factor (VEGF) antagonist
>
> an organic co-solvent,
>
> a buffer, and
>
> a stabilizing agent,

**Reply.Add372**

wherein said VEGF antagonist fusion protein is glycosylated and
comprises amino acids 27-457 of SEQ ID NO:4; and

wherein at least 98% of the VEGF antagonist is present in native
conformation following storage at 5° C. for two months as
measured by size exclusion chromatography.

2. The vial of claim 1, wherein the concentration of said VEGF
antagonist fusion protein is 40 mg/ml, and wherein said organic
co-solvent comprises polysorbate.

4. The vial of claim 2, wherein said organic co-solvent comprises
about 0.03% to about 0.1% polysorbate 20.

### a.  Fraser does not teach a "vial comprising an ophthalmic formulation suitable for intravitreal administration"

211.    Dr. Rabinow argues that Fraser expressly teaches a "vial comprising an

ophthalmic formulation suitable for intravitreal administration." Rabinow ¶ 203. I disagree. As

Dr. Rabinow acknowledges, Fraser was a study of "pituitary-ovarian function" in macaque

monkeys. Rabinow ¶ 203. First, Fraser nowhere discloses or suggests to the POSA that the

product it used was an "ophthalmic formulation"; Fraser contains no indication that its authors

were studying any ophthalmic application. Second, Fraser also does not teach that its product

was "suitable for intravitreal administration." Again, as Fraser does not disclose any ophthalmic

application (its composition was administered intravenously, Fraser at 1121), it does not teach

that the product it uses is suitable for intravitreal administration. Notably, the product used in

Fraser contains citrate buffer and "either 20% glycerol or 20% sucrose." Fraser at 1115. Dr.

Rabinow has not presented any evidence to support his assertion that formulations containing

either citrate or glycerol would be suitable for intravitreal injection, nor has he pointed to any

examples of any intravitreal formulations that contain either citrate or glycerol. Third, Dr.

Rabinow does not point to any evidence that the product in Fraser was a "vial." Fraser discloses

only that the VEGF Trap$_{R1R2}$ was provided "in 2-ml aliquots" and does not teach the use of a vial.  Fraser at 1115.

>    **b.**  **Fraser does not teach "a vascular endothelial growth factor (VEGF) antagonist . . . wherein said VEGF antagonist fusion protein is glycosylated and comprises amino acids 27-457 of SEQ ID NO:4"**

212.  Dr. Rabinow does not point to any teaching in Fraser of the claimed amino acid sequence recited in the '865 Asserted Claims, i.e., amino acids 27-457 of SEQ ID NO:4.  That is because Fraser does not teach any amino acid sequence for VEGF Trap$_{R1R2}$.  Instead, Fraser teaches that VEGF Trap$_{R1R2}$ is "a recombinant, chimeric protein comprising Ig domain 2 of human VEGF-R1 and Ig domain 3 of human VEGF-R2, expressed in sequence with the human Fc." Fraser at 1115.  I understand that to anticipate a claim, a *single reference* must disclose each and every limitation of the claim.  Dr. Rabinow acknowledges this principle (Rabinow ¶ 39) but does not apply it.  Dr. Rabinow instead argues that the POSA "would look at reference 21, Holash, to obtain further information about Fraser's VEGF Trap$_{R1R2}$."  Rabinow ¶ 204. However, I understand that the POSA's motivation to consider a different reference is not a relevant consideration for anticipation.

213.  Dr. Rabinow elsewhere asserts that Fraser "incorporates by reference . . . Holash for its VEGF antagonist fusion protein, 'VEGF Trap$_{R1R2}$.'" Rabinow ¶ 206.  But Fraser does not state that it incorporates Holash by reference.  Rather, Fraser simply cites Holash in an endnote (along with 29 other references).  I understand that merely citing a reference is not sufficient to incorporate it by reference, let alone incorporate the reference in its entirety, and in my opinion the POSA would not have understood Fraser as having incorporated the disclosure of Holash by listing it as one of many references in the endnotes.

214.     Regardless, even if Fraser did incorporate Holash by reference (it did not), Holash does not teach the claimed amino acid sequence either.  Rather, as Dr. Rabinow's citations illustrate (¶ 205), Holash describes VEGF Trap$_{R1R2}$ at the same level of detail as Fraser, explaining that  "VEGF-TrapR1R2 possesses the second Ig domain of VEGFR1 and the third Ig domain of VEGFR2 fused to the Fc portion of human IgG1."  Holash at 11394.  Dr. Rabinow fails to offer any support or explanation for his inference that either the disclosure in Fraser or the disclosure in Holash teaches the specific amino acid sequence recited in the '865 Claims. Rabinow ¶ 205.

215.     Last, Dr. Rabinow argues that Regeneron conceded during prosecution of a different patent (related to Dix) that Fraser disclosed the claimed ophthalmic formulations. Rabinow ¶ 209.  I disagree.  Regeneron never identified Fraser's formulation as any specific formulation tested in the Dix patent disclosure, or as the specific formulation tested in Table 9 of Dix.  Rather, in the prosecution history cited by Dr. Rabinow (RGN-EYLEA-MYLAN-00015706-709), Regeneron noted that Fraser was not prior art to the Dix patent at issue by pointing to the completion of several VEGF Trap formulations to demonstrate that the "claimed invention was made before the Fraser publication date."  RGN-EYLEA-MYLAN-00015707.  In so doing, Regeneron stated that it made "the actual lot and formulation used in Fraser" before Fraser's publication date.  *Id.*  Contrary to Dr. Rabinow's suggestion (Rabinow ¶ 209 & n.9), Regeneron did not represent that the Fraser formulation was the same lot or formulation used in Table 9 (Example 5) of the Dix patent.  In fact, the data on which Regeneron relied is from a stability study labeled "VEGF-SS017," RGN-EYLEA-MYLAN-00015711, whereas the stability study reported in Table 9 of the Dix patent, upon which Dr. Rabinow relies, is titled "VGT-FS405."  Furthermore, the formulation in the Dix patent has 25 mg/ml of the VEGF Trap, while

the composition in Fraser has only 24.3 mg/ml of VEGF Trap$_{R1R2}$.  Accordingly, Dr. Rabinow is

wrong to conclude that the Fraser formulation corresponded to the same lot or formulation in the

Dix specification.

216.    The '865 Asserted Claims further require that the VEGF antagonist fusion protein

"is glycosylated."  Fraser nowhere teaches or suggests that VEGF Trap$_{R1R2}$ is glycosylated, and

Dr. Rabinow offers no opinion that the disclosure of Fraser itself teaches glycosylated VEGF

Trap$_{R1R2}$.  Rather, Dr. Rabinow argues that other articles that Fraser "incorporates by reference"

teach glycosylation.  But the articles relied upon by Dr. Rabinow are not incorporated by

reference into Fraser, let alone in their entirety or with respect to this particular disclosure, and

regardless, they do not teach that the specific amino acid sequence claimed in the '865 Asserted

Claims is glycosylated.

217.    First, Dr. Rabinow asserts that Fraser, through its citation to Holash, discloses that

VEGF Trap$_{R1R2}$ is glycosylated.  Again, as above, I disagree that Fraser incorporates Holash by

reference.  And regardless, Holash does not teach that VEGF Trap$_{R1R2}$ is glycosylated.  Dr.

Rabinow relies on Holash's disclosure that "[a]ll of the VEGF-Trap variants were produced and

purified from Chinese hamster ovary cells."  Rabinow ¶ 206 (citing Holash at 11394).  Dr.

Rabinow argues that Holash's disclosure of expression in CHO cells is tantamount to a

disclosure that Fraser's "VEGF-Trap$_{R1R2}$" is glycosylated, but he cites no evidence in support.

To the contrary, the POSA would not have understood that every protein produced in a CHO cell

is glycosylated.  Glycosylation only occurs at specific amino acid residues, *supra* Section VIII.E,

and because Holash does not disclose the sequence of VEGF-Trap$_{R1R2}$, the POSA would not

have known whether it was glycosylated.  Furthermore, simply because the VEGF-Trap variants

in Holash were produced in CHO cells does not mean that Fraser's "VEGF-Trap$_{R1R2}$" necessarily

84

was produced in CHO cells.  Fraser does not specify how the product used in its study was

produced, and prior art at the time described that VEGF Trap molecules could also be produced

in *E. Coli*, which would result in nonglycosylated proteins.  Daly ¶ 43.

218.    Second, Dr. Rabinow also attempts to rely on Fraser's citations to Wulff

(reference 17 in Fraser), which are in three places in Fraser:

- "In subsequent studies a successor molecule, VEGF Trap$_{R1R2}$, was employed to
  evaluate the effects of inhibition of VEGF throughout the follicular phase. These
  studies confirmed that selective inhibition of VEGF markedly attenuated thecal
  angiogenesis and restricted follicular growth in the marmoset (17)."  Fraser at 1114.

- "The present findings in macaques confirm and extend our previous observations on
  effects of VEGF inhibition on ovarian structure and function in the marmoset, which
  focused on molecular and cellular changes (16, 17).  In marmosets, VEGF inhibition
  throughout the follicular phase severely inhibits thecal angiogenesis and inhibits the
  growth of secondary follicles beyond the early antral stage (17)."  Fraser at 1119.

219.    Dr. Rabinow advances a theory that attempts to chain together Fraser's citation to

Wulff (not referring to glycosylation), and Wulff's citation to Papadopoulos (which does not

disclose that the claimed fusion protein is glycosylated), effectively asserting a three-reference

anticipation argument that still does not disclose that the VEGF antagonist fusion protein of the

'865 Asserted Claims is glycosylated.  Dr. Rabinow asserts that "Fraser expressly cites to, and

incorporates by reference, Wulff for its VEGF antagonist fusion protean [sic] (VEGF-Trap$_{R1R2}$),

and Wulff further cites to, and incorporates by reference, Papadopoulos."  Rabinow ¶ 207.  As he

did with Holash, Dr. Rabinow provides no support or explanation for his assertion that Fraser

incorporates Wulff by reference.  Again, I understand that simply referencing an article does not

incorporate the article by reference in its entirety or with respect to a particular disclosure, and in

my opinion the POSA would not have understood Fraser as having incorporated the disclosure of

Wulff.  Next, Dr. Rabinow's assertion that Wulff incorporates by reference Papadopoulos is also

unfounded.  Rabinow ¶ 207.  Dr. Rabinow provides no support or explanation for his assertion

that Wulff "incorporates by reference" Papadopoulos.  *Id.*  Dr. Rabinow likewise provides no

support for or explanation of how Fraser could have incorporated by reference Papadopoulos,

which Fraser does not even cite or mention.

220.    Regardless, Papadopoulos does not teach that the specific amino acid sequence in

the '865 Asserted Claims (amino acids 27-457 of SEQ ID NO:4) is glycosylated.  Papadopoulos

teaches that a different protein is glycosylated, i.e., Flt1D2.Flk1D3.FcΔC1(a).  The sequence of

that protein is not the same as amino acids 27-457 of SEQ ID NO:4, as the alignment below

illustrates (where the "query" sequence is SEQ ID NO:4 from the '865 patent and the "Sbjct"

sequence is Flt1D2.Flk1D3.FcΔC1(a) from Papadopoulos):

```
Query   1     MVSYWDTGVLLCALLSCLLLTGSSSGSDTGRPFVEMYSEIPEIIHMTEGRELVIPCRVTS   60
Sbjct   1     ...........................---................................   57

Query   61    PNITVTLKKFPLDTLIPDGKRIIWDSRKGFIISNATYKEIGLLTCEATVNGHLYKTNYLT   120
Sbjct   58    ............................................................   117

Query   121   HRQTNTIIDVVLSPSHGIELSVGEKLVLNCTARTELNVGIDFNWEYPSSKHQHKKLVNRD   180
Sbjct   118   ............................................................   177

Query   181   LKTQSGSEMKKFLSTLTIDGVTRSDQGLYTCAASSGLMTKKNSTFVRVHEK---DKTHTC   237
Sbjct   178   ..........................................................GPG......   237

Query   238   PPCPAPELLGGPSVFLFPPKPKDTLMISRTPEVTCVVVDVSHEDPEVKFNWYVDGVEVHN   297
Sbjct   238   ............................................................   297

Query   298   AKTKPREEQYNSTYRVVSVLTVLHQDWLNGKEYKCKVSNKALPAPIEKTISKAKGQPREP   357
Sbjct   298   ............................................................   357

Query   358   QVYTLPPSRDELTKNQVSLTCLVKGFYPSDIAVEWESNGQPENNYKTTPPVLDSDGSFFL   417
Sbjct   358   .............................E...................E.....   417

Query   418   YSKLTVDKSRWQQGNVFSCSVMHEALHNHYTQKSLSLSPGK   458
Sbjct   418   ......E...................E..........E...   458
```

**Reply.Add378**

221.    The POSA would have understood that different protein sequences may result in different glycosylation or no glycosylation. The sites identified in Papadopoulos are all N-linked glycosylation sites. Papadopoulos at 81:20-82:2; Rabinow ¶ 207. As Sinclair & Elliott explained, despite the presence of potential glycosylation sites, "[m]ost naturally occurring consensus sequences in secreted proteins are not glycosylated. Consensus sequences are therefore necessary but not sufficient for N-linked carbohydrate addition." Sinclair & Elliott at 1627. Thus, the POSA could not deduce from the glycosylation of a different protein whether amino acids 27-457 of SEQ ID NO:4 would be glycosylated.

### c.    Fraser does not teach "wherein the concentration of said VEGF antagonist fusion protein is 40 mg/ml"

222.    Claim 2 of the '865 patent recites that "the concentration of said VEGF antagonist fusion protein is 40 mg/ml." Fraser teaches that the concentration of VEGF Trap$_{R1R2}$ used in its study was 24.3 mg/ml, not 40 mg/ml. Fraser at 1115. Indeed, Dr. Rabinow acknowledges that "the Fraser formulation's VEGF Trap concentration was 24.3 mg/ml." Rabinow ¶ 215 n.10. The claimed concentration of 40 mg/ml is approximately 65% greater than the 24.3 mg/ml concentration used in Fraser. Thus, Fraser does not teach the claimed concentration.

223.    Dr. Rabinow nevertheless argues that "the 40 mg/ml limitation does not distinguish Claim 2 from the prior art that renders Claim 1 anticipated." Rabinow ¶ 215. Again, I understand that anticipation requires disclosure, either expressly or inherently, of every limitation. Dr. Rabinow points to no prior-art teaching of 40 mg/ml of the specific protein claimed in the '865 Asserted Claims. Instead, for purposes of his anticipation theory (and only his anticipation theory), Dr. Rabinow points to disclosures in references that purportedly show that proteins could be lyophilized and reconstituted at higher concentrations. Rabinow ¶ 215 (citing Andya '326; Wiegand). But Fraser does not teach or suggest lyophilizing or

87

reconstituting VEGF Trap$_{R1R2}$, or even mention lyophilization or reconstitution at all; rather, Fraser teaches that the compositions were provided in "2-ml aliquots," which refers to a liquid composition. To the extent Dr. Rabinow argues that the possibility of lyophilizing and reconstituting a formulation means that Fraser inherently discloses any concentration of VEGF Trap$_{R1R2}$, I disagree. Dr. Rabinow does not explain why the POSA would have to reconstitute at the higher concentration of 40 mg/ml as compared to Fraser; the POSA could, for example, instead reconstitute at a lower concentration. Simply because, in Dr. Rabinow's view, the POSA could modify Fraser in a certain way that could result in a fusion protein concentration of 40 mg/ml, fails to show that Fraser anticipates the limitation of claim 2 that the concentration of the VEGF antagonist fusion protein be 40 mg/ml.

224.    In a footnote, Dr. Rabinow argues that the POSA "would have been motivated to generate a stable formulation having a significantly higher protein concentration" than what was taught in Fraser. Rabinow ¶ 215 n.10. Dr. Rabinow raises this argument solely with respect to his anticipation position. I understand that arguments that the POSA would be motivated to modify a reference are not relevant to anticipation, because anticipation requires that each limitation must be disclosed within the four corners of a single prior art reference.

225.    I note that Dr. Rabinow's opinion is contradicted by Mylan's own expert, Dr. MacMichael. According to Dr. MacMichael, only one formulation (Example 3) falls within the scope of the '865 Asserted Claims. For example, Dr. MacMichael contends that Example 7 of the '865 patent does not fall within claim 2 because it does not meet the 40 mg/ml limitation. MacMichael ¶¶ 88, 91. In other words, contrary to Dr. Rabinow's view that disclosure of lyophilization effectively discloses multiple concentrations, Dr. MacMichael contends that a

lyophilized formulation (even one that is then reconstituted to 40 mg/ml) does not meet the '865

Asserted Claims.

> **d.     Fraser does not teach "wherein at least 98% of the VEGF antagonist is present in native conformation following storage at 5° C. for two months as measured by size exclusion chromatography"**

226.     Dr. Rabinow does not argue that Fraser expressly teaches the claim limitation "at

least 98% of the VEGF antagonist is present in native conformation following storage at 5° C.

for two months as measured by size exclusion chromatography."  Rabinow ¶ 211.  Nor could he;

Fraser does not teach this limitation and does not perform any evaluation of whether "at least

98% of the VEGF antagonist is present in native conformation following storage at 5° C. for two

months as measured by size exclusion chromatography."  Dr. Rabinow nevertheless argues that

this limitation "is inherent in Fraser's" composition.  Rabinow ¶ 211.  Dr. Rabinow asserts that

Fraser's formulation "is identical to the Dix formulation."  As I explained above, *supra* Section

XII.A.1.b, the formulation in Fraser is not identical to any formulation in Dix because (at a

minimum) Dix does not disclose any formulation with 24.3 mg/ml, and Regeneron did not argue

to the USPTO that Dix disclosed a formulation with "the identical formulation and . . . stability

properties as Fraser."  Rabinow ¶ 211.

227.     More fundamentally, Dr. Rabinow's inherency argument ignores that the asserted

claims of the '865 patent all require that the concentration of the VEGF antagonist fusion protein

is 40 mg/ml.  Neither Fraser nor Dix assessed the native conformation of a 40 mg/ml

formulation—accordingly, neither taught whether a formulation within the claims would have

98% native conformation after two months storage at 5°C as measured by size exclusion

chromatography.  Dr. Rabinow's cited disclosures of Fraser and Dix involved formulations with

24.3 or 25 mg/ml of a VEGF antagonist, respectively.  Even if the composition in Fraser had the

same native conformation as the formulation shown in Table 9 of Dix—a proposition for which Dr. Rabinow provides no support—the POSA would not have understood that a formulation with a 65% higher protein concentration (i.e., increasing from 24.3 mg/ml to 40 mg/ml) necessarily and always would have the same native conformation after two months storage.  To the contrary, the POSA would have understood that the substantial increase in protein concentration potentially could lead to increased aggregation, and thus a smaller percent native conformation. *See* Wang 2005, at 9 ("Increasing protein concentration generally increases protein aggregation."); *supra* VIII.C.

### 2.    Claim 7

228.    Claim 7 depends from claim 5, which depends from claim 2.  In my opinion, Fraser does not anticipate claim 7 for at least the same reasons that it does not anticipate claim 4 (which also depends from claim 2).

### 3.    Claim 9

229.    Claim 9 depends from claim 5, which depends from claim 2.  In my opinion, Fraser does not anticipate claim 9 for at least the same reasons that it does not anticipate claim 4 (which also depends from claim 2).

### 4.    Claim 11

230.    Claim 11 depends from claim 10, which depends from claim 5, which depends from claim 2.  In my opinion, Fraser does not anticipate claim 11 for at least the same reasons that it does not anticipate claim 4 (which also depends from claim 2).

### 5.    Claim 14

231.    Claim 14 depends from claim 5, which depends from claim 2.  In my opinion, Fraser does not anticipate claim 14 for at least the same reasons that it does not anticipate claim 4 (which also depends from claim 2).

232.    Claim 14 recites that "said VEGF antagonist fusion protein is glycosylated at asparagine residues corresponding to asparagine residues 62, 94, 149, 222 and 308 of SEQ ID NO: 4." As explained above, *supra* Section XII.A.1.b, Fraser does not teach the amino acid sequence of VEGF Trap$_{R1R2}$ or whether it is glycosylated. Accordingly, Fraser also does not teach the specific residues that are glycosylated according to the limitation of claim 14.

233.    As explained above, I disagree with Dr. Rabinow's anticipation theory that considers Wulff and Papadopoulos as somehow incorporated within Fraser. *Supra* XII.A.1.b. And regardless, as explained above, *id.*, Papadopoulos does not disclose whether any particular sites are glycosylated within amino acids 27-457 of SEQ ID NO:4—it discloses only the glycosylation of Flt1D2.Flk1D3.FcΔC1(a), which is a different protein from amino acids 27-457 of SEQ ID NO:4.

### 6.    Claim 15

234.    Claim 15 depends from claim 5, which depends from claim 2. In my opinion, Fraser does not anticipate claim 15 for at least the same reasons that it does not anticipate claim 4 (which also depends from claim 2).

235.    Claim 15 recites that "said formulation is capable of providing a turbidity of 0.01 or lower at OD405 after 2 month storage at 5° C." A formulation's turbidity generally results from the formation of insoluble aggregates. As with native conformation, Dr. Rabinow relies exclusively on data from Dix, which (as I explain above, *supra* Section XII.A.1.d) is not part of Fraser and discloses a different formulation from the formulations of Fraser and the formulations of the asserted claims. In addition, the data from Dix on which Dr. Rabinow relies does not include any turbidity data. The data cited by Dr. Rabinow comes from Table 9 of Dix, which is reproduced below:

Reply.Add383

|  | TABLE 9 | | | |
| --- | --- | --- | --- | --- |
|  | Stability and Activity of Liquid Formulation (VGT-FS405) | | | |
| Months | % Native Configuration | Bioassay | Binding Assay | Protein Content mg/ml |
| 0 | 99.7 | 106 | 72 | 25.0 |
| 1 | 99.9 | 119 | 4.4 ρM* | 25.2 |
| 2 | 99.6 | 102 | 5.4 ρM* | 25.1 |
| 3 | 99.6 | 97 | 88 | 25.1 |
| 6 | 99.6 | 101 | 106 | 25.0 |
| 9 | 99.4 | 89 | 126 | 25.4 |
| 12 | 99.5 | 85 | 95 | 25.2 |
| 18 | 99.4 | 99 | 81 | 25.5 |
| 24 | 99.3 | 75 | 95 | 25.6 |
| 36 | 98.8 | 109 | 79 | 25.6 |

236.    Dix Table 9 reports data for native conformation, bioassay, binding assay, and protein content, but does not report turbidity.  Dr. Rabinow asserts that the *turbidity* level recited in claim 15 is "inherent" based on the *native conformation* data in Table 9.  But these are different measurements measuring different phenomena, and Dr. Rabinow does not offer evidence that a given formulation turbidity (measured at OD405) could be predicted with certainty from a size exclusion chromatography measurement.  Thus, the POSA could not conclude based on data about a formulation's native conformation measured by size exclusion chromatography what the formulation's turbidity will be.  Dr. Rabinow simply ignores the difference between the two measurements and asserts they would be the same, and cites no evidence in support.

237.    Moreover, and as explained above, the data in Dix on which Dr. Rabinow relies involved a much lower concentration of a VEGF antagonist (25 mg/ml) than the concentration claimed in the '865 patent (40 mg/ml), and the POSA would not assume that the levels of

**Reply.Add384**

insoluble aggregates would remain unchanged despite an increase in protein concentration of 60%. To the contrary, the POSA would have understood that the substantial increase in protein concentration potentially could lead to increased aggregation, and thus a smaller percent native conformation and greater turbidity. Thus, even if the Dix disclosure were considered part of Fraser, and even if Dix did disclose turbidity data for the formulation on which Dr. Rabinow relies (it does not), Fraser still could not anticipate the claims, for this reason and those set forth above. *See* Wang 2005, at 9 ("Increasing protein concentration generally increases protein aggregation."); *supra* Section VIII.C.

### 7. Claim 16

238. Claim 16 depends from claim 5, which depends from claim 2. In my opinion, Fraser does not anticipate claim 16 for at least the same reasons that it does not anticipate claim 4 (which also depends from claim 2).

### 8. Claim 17

239. Claim 17 depends from claim 5, which depends from claim 2. In my opinion, Fraser does not anticipate claim 17 for at least the same reasons that it does not anticipate claim 4 (which also depends from claim 2).

### 9. Claim 18

240. Claim 18 depends from claim 5, which depends from claim 2. In my opinion, Fraser does not anticipate claim 18 for at least the same reasons that it does not anticipate claim 4 (which also depends from claim 2).

241. Claim 18 recites that "said formulation does not contain phosphate." Fraser expressly discloses that its composition contains phosphate, i.e., VEGF Trap$_{R1R2}$ "was provided at a concentration of 24.3 mg/ml in 2-ml aliquots in buffer **composed of 5 mM phosphate**," among other substances. Fraser at 1115. Thus, Fraser does not teach a formulation that "does

93

**Reply.Add385**

not contain phosphate" as recited in claim 18. Dr. Rabinow does not offer any contrary evidence and instead only cites to Dr. MacMichael's report addressing written description and enablement (which I address below). Rabinow ¶ 224.

### B. Wulff Does Not Anticipate the '865 Asserted Claims

242. Dr. Rabinow also argues that the '865 Asserted Claims are anticipated by Wulff. Because Wulff does not teach numerous limitations from these claims, I disagree with Dr. Rabinow's opinion.

#### 1. Claim 4

243. Claim 4 depends from claim 2, which depends from claim 1. Wulff does not teach multiple limitations of claim 4 and thus does not anticipate it, contrary to Dr. Rabinow's opinion.

##### a. Wulff does not teach a "vial comprising an ophthalmic formulation suitable for intravitreal administration"

244. Dr. Rabinow contends that Wulff expressly teaches a "vial comprising an ophthalmic formulation suitable for intravitreal administration." Rabinow ¶ 226. I disagree. As Dr. Rabinow acknowledges, Wulff was a study of "Thecal Angiogenesis, Antral Follicular Growth, and Ovulation" in marmoset monkeys. Rabinow ¶ 226. First, Wulff nowhere suggests to the POSA that the product it used was an "ophthalmic formulation"; Wulff contains no indication that its authors were studying any ophthalmic application. Second, Wulff also does not teach that its product was "suitable for intravitreal administration." Again, as Wulff does not disclose any ophthalmic application (its composition was delivered subcutaneously, Rabinow ¶ 226 (citing Wulff at 2797)), it does not teach that the product it uses is suitable for intravitreal administration. Notably, Wulff does not even disclose *any* formulation for "VEGF Trap R1R2" used in the study. Wulff does disclose an unspecified "vehicle" composition used as a control.

94

Wulff at 2798. The POSA would not presume that the "vehicle" composition is the same as the

formulation (if any) used for VEGF Trap R1R2. Notably, in Fraser (sharing multiple authors

with Wulff) the formulations used for the VEGF Trap and the control were different. Fraser at

1115. Even if the "vehicle" composition were the one used for Wulff's VEGF Trap R1R2, that

composition contains citrate buffer. Wulff at 2798. Dr. Rabinow has not presented any evidence

to support his assertion that formulations containing citrate were suitable for intravitreal

injection, nor has he pointed to any examples of any intravitreal formulations that contain citrate.

Rabinow ¶ 226. Third, Dr. Rabinow does not point to any evidence that the product in Wulff

was a "vial," and ignores this limitation of the '865 Asserted Claims.

> **b.  Wulff does not teach "a vascular endothelial growth factor
> (VEGF) antagonist . . . wherein said VEGF antagonist fusion
> protein is glycosylated and comprises amino acids 27-457 of
> SEQ ID NO:4"**

245.    Dr. Rabinow does not point to any teaching in Wulff of the claimed amino acid

sequence recited in the '865 Asserted Claims, i.e., amino acids 27-457 of SEQ ID NO:4.

Rabinow ¶¶ 227-32. That is because Wulff does not teach any amino acid sequence for VEGF

Trap R1R2; instead, Wulff teaches that VEGF Trap R1R2 is "a recombinant chimeric protein

comprising portions of the extracellular, ligand binding domains of the human VEGF receptors

Flt-1 (VEGF-R1, Ig domain 2) and KDR (VEGF-R2, Ig domain 3) expressed in sequence with

the Fc portion of human IgG." Wulff at 2798. I understand that to anticipate a claim, a *single*

*reference* must disclose each and every limitation of the claim. Dr. Rabinow acknowledges this

principle (Rabinow ¶ 39) but does not apply it. Dr. Rabinow instead argues that the POSA

would consider Wulff as a "starting point for a [POSA] to formulate" a VEGF antagonist.

Rabinow ¶ 229. However, I understand that anticipation requires more than a "starting point,"

from which different undisclosed formulations are prepared, and instead requires that each

**Reply.Add387**

limitation be disclosed in a single reference as arranged in the claim. In any event, I disagree

with Dr. Rabinow that Wulff would serve as a "starting point" to develop a VEGF antagonist

ophthalmic formulation, since Wulff did not disclose any formulation for VEGF Trap R1R2 and

was not directed to developing a formulation that achieves the function recited in the '865

Asserted Claims, i.e., 98% native conformation following storage at 5°C for two months as

measured by SEC.

246. Dr. Rabinow elsewhere asserts that Wulff incorporates by reference Papadopoulos

Rabinow ¶ 230. But Wulff does not state that it incorporates Papadopoulos by reference. Wulff

at 2798 n.1. I understand that merely citing a reference is not sufficient to incorporate it by

reference, and Dr. Rabinow has not explained how Wulff's citation to Papadopoulos meets the

standard for incorporation by reference. In my opinion the POSA would not have understood

Wulff as having incorporated the disclosure of Papadopoulos.

247. Even if Wulff incorporated Papadopoulos by reference, it would still fail to

disclose the specific amino acid sequence claimed. As described above, Papadopoulos describes

multiple VEGF antagonists having different amino acid sequences, and Wulff does not identify

any specific sequence for VEGF Trap R1R2. *Supra* Section VIII.J.6. For example, as Dr.

Rabinow notes, Papadopoulos describes the protein Flt1D2.Flk1D3.FcΔC1(a), which falls within

the class of structures described in Wulff ("a recombinant chimeric protein comprising portions

of the extracellular, ligand binding domains of the human VEGF receptors Flt-1 (VEGF-R1, Ig

domain 2) and KDR (VEGF-R2, Ig domain 3) expressed in sequence with the Fc portion of

human IgG," Wulff at 2798), but does *not* have the same sequence as amino acids 27-457 of

SEQ ID NO:4 of the '865 Patent. *See* Rabinow ¶ 232 (contending that Flt1D2.Flk1D3.FcΔC1(a)

corresponds to SEQ ID NO:2 of the '865 patent). Dr. Rabinow asserts that SEQ ID NO:2 would

96

**Reply.Add388**

"fall within the scope of claim 1," but that is incorrect because SEQ ID NO:2 does not comprise amino acids 27-457 of SEQ ID NO:4. The sequence of that protein is not the same as amino acids 27-457 of SEQ ID NO:4, as the alignment below illustrates (where the "query" sequence is SEQ ID NO:4 from the '865 patent and the "Sbjct" sequence is Flt1D2.Flk1D3.FcΔC1(a) from Papadopoulos):

```
Query   1     MVSYWDTGVLLCALLSCLLLTGSSSGSDTGRPFVEMYSEIPEIIHMTEGRELVIPCRVTS   60
Sbjct   1     ...........................---................................   57

Query   61    PNITVTLKKFPLDTLIPDGKRIIWDSRKGFIISNATYKEIGLLTCEATVNGHLYKTNYLT   120
Sbjct   58    ..............................................................   117

Query   121   HRQTNTIIDVVLSPSHGIELSVGEKLVLNCTARTELNVGIDFNWEYPSSKHQHKKLVNRD   180
Sbjct   118   ..............................................................   177

Query   181   LKTQSGSEMKKFLSTLTIDGVTRSDQGLYTCAASSGLMTKKNSTFVRVHEK---DKTHTC   237
Sbjct   178   ..........................................GPG......   237

Query   238   PPCPAPELLGGPSVFLFPPKPKDTLMISRTPEVTCVVVDVSHEDPEVKFNWYVDGVEHN   297
Sbjct   238   ..............................................................   297

Query   298   AKTKPREEQYNSTYRVVSVLTVLHQDWLNGKEYKCKVSNKALPAPIEKTISKAKGQPREP   357
Sbjct   298   ..............................................................   357

Query   358   QVYTLPPSRDELTKNQVSLTCLVKGFYPSDIAVEWESNGQPENNYKTTPPVLDSDGSFFL   417
Sbjct   358   .......................................E.....E.....   417

Query   418   YSKLTVDKSRWQQGNVFSCSVMHEALHNHYTQKSLSLSPGK   458
Sbjct   418   ......E....................E..........E...   458
```

248. The '865 Asserted Claims further require that the VEGF antagonist fusion protein "is glycosylated." Wulff nowhere teaches or suggests that VEGF Trap R1R2 is glycosylated, and Dr. Rabinow offers no opinion that the disclosure of Wulff itself teaches glycosylated VEGF Trap R1R2. Rather, Dr. Rabinow argues that Wulff "incorporates by reference Papadopoulos," which teaches glycosylation. Rabinow ¶ 230. But as I explained above Wulff does not incorporate Papadopoulos, and regardless, Papadopoulos does not teach that the specific amino acid sequence claimed in the '865 patent (i.e., 27-457 of SEQ ID NO:4 of the '865 patent) is glycosylated. Instead, Papadopoulos teaches that a different protein is glycosylated, i.e.,

Flt1D2.Flk1D3.FcΔC1(a).  The sequence of that protein is not the same as amino acids 27-457 of SEQ ID NO:4, described above.

249.    The POSA would have understood that different protein sequences may result in different glycosylation or no glycosylation.  The sites identified in Papadopoulos are all N-linked glycosylation sites.  Papadopoulos at 81:20-82:2; Rabinow ¶ 207.  As Sinclair & Elliott explained, despite the presence of potential glycosylation sites, "[m]ost naturally occurring consensus sequences in secreted proteins are not glycosylated.  Consensus sequences are therefore necessary but not sufficient for N-linked carbohydrate addition."  Sinclair & Elliott at 1627.  Thus, the POSA could not deduce from the glycosylation of a different protein whether amino acids 27-457 of SEQ ID NO:4 would be glycosylated.

> **c.    Wulff does not teach "wherein the concentration of said VEGF antagonist fusion protein is 40 mg/ml"**

250.    Claim 2 of the '865 patent recites that "the concentration of said VEGF antagonist fusion protein is 40 mg/ml."  Wulff does not disclose the concentration of VEGF Trap R1R2 used in its study.  Thus, Wulff does not teach the claimed concentration.

251.    Dr. Rabinow does not contend that Wulff expressly discloses the 40 mg/ml limitation.  Dr. Rabinow instead argues that the 40 mg/ml limitation is inherently disclosed by Wulff.  Rabinow ¶ 236.  But Dr. Rabinow points to no prior-art teaching, in Wulff or any other reference, of 40 mg/ml of the specific protein claimed in the '865 Asserted Claims.  Instead, for purposes of his anticipation theory (and only his anticipation theory), Dr. Rabinow points to disclosures in references that purportedly show that a protein could be lyophilized and reconstituted at a higher concentration.  Rabinow ¶ 236 (citing Andya '326; Wiegand).  But Wulff does not teach or suggest lyophilizing or reconstituting VEGF Trap R1R2, or even mention lyophilization or reconstitution at all.  To the extent Dr. Rabinow argues that the

possibility of lyophilizing and reconstituting a formulation means that Wulff inherently discloses

any concentration of VEGF Trap R1R2, I disagree. Simply because, in Dr. Rabinow's view, the

POSA could modify Wulff in a certain way, fails to show that Wulff anticipates the limitation of

claim 2 that the concentration of the VEGF antagonist fusion protein be 40 mg/ml.

> **d.** **Wulff does not teach "wherein at least 98% of the VEGF antagonist is present in native conformation following storage at 5° C. for two months as measured by size exclusion chromatography"**

252. Dr. Rabinow does not argue that Wulff expressly teaches the claim limitation "at

least 98% of the VEGF antagonist is present in native conformation following storage at 5° C.

for two months as measured by size exclusion chromatography." Rabinow ¶ 234. Nor could he;

Wulff does not teach this limitation and does not perform any evaluation of whether "at least

98% of the VEGF antagonist is present in native conformation following storage at 5° C. for two

months as measured by size exclusion chromatography." Dr. Rabinow nevertheless argues that

this limitation "is inherent in Wulff's" composition. Rabinow ¶ 234. But as I explained above,

Wulff does not specify a formulation for VEGF Trap R1R2. Dr. Rabinow attempts to rely on a

formulation disclosed in Dix. Rabinow ¶ 234. But even assuming Wulff's "vehicle" was used to

formulate Wulff's VEGF Trap R1R2 (a conclusion Wulff does not support), Wulff fails to

disclose any concentration of VEGF Trap R1R2 in such "formulation." Dr. Rabinow can thus

cite no evidence that any "formulation" in Wulff is identical to the 25 mg/ml formulation in Dix

Table 9. Rabinow ¶ 234.

253. More fundamentally, Dr. Rabinow's inherency argument ignores that the asserted

claims of the '865 patent all require that the concentration of the VEGF antagonist fusion protein

is 40 mg/ml. Neither Wulff nor Dix assessed the native conformation of a 40 mg/ml

formulation—accordingly, neither taught whether a formulation within the claims would have

**Reply.Add391**

98% native conformation after two months storage at 5°C as measured by size exclusion chromatography. Dr. Rabinow's cited disclosures of Wulff and Dix involved compositions with either an unspecified amount of VEGF Trap R1R2 (Wulff) or 25 mg/ml of a VEGF antagonist (Dix Table 9). Even if the composition in Wulff had the same native conformation as shown in Table 9 of Dix—a proposition for which Dr. Rabinow provides no support—the POSA would not have understood that a composition with a 60% higher protein concentration (i.e., increasing from 25 mg/ml to 40 mg/ml) would have the same native conformation after two months storage. To the contrary, the POSA would have understood that the substantial increase in protein concentration potentially could lead to increased aggregation, and thus a smaller percent native conformation. *See* Wang 1995 at 9 ("Increasing protein concentration generally increases protein aggregation."); *supra* Section VIII.C.

### 2. Claim 7

254. Claim 7 depends from claim 5, which depends from claim 2. In my opinion, Wulff does not anticipate claim 7 for at least the same reasons that it does not anticipate claim 4 (which also depends from claim 2).

### 3. Claim 9

255. Claim 9 depends from claim 5, which depends from claim 2. In my opinion, Wulff does not anticipate claim 9 for at least the same reasons that it does not anticipate claim 4 (which also depends from claim 2).

### 4. Claim 11

256. Claim 11 depends from claim 10, which depends from claim 5, which depends from claim 2. In my opinion, Wulff does not anticipate claim 11 for at least the same reasons that it does not anticipate claim 4 (which also depends from claim 2).

### 5. Claim 14

257.    Claim 14 depends from claim 5, which depends from claim 2.  In my opinion,

Wulff does not anticipate claim 14 for at least the same reasons that it does not anticipate claim 4

(which also depends from claim 2).

258.    Claim 14 recites that "said VEGF antagonist fusion protein is glycosylated at

asparagine residues corresponding to asparagine residues 62, 94, 149, 222 and 308 of SEQ ID

NO: 4."  As explained above, *supra* Section XII.B.1.b, Wulff does not teach the amino acid

sequence of VEGF Trap$_{R1R2}$ or whether it is glycosylated.  Accordingly, Wulff also does not

teach the specific residues that are glycosylated according to the limitation of claim 14.

259.    As explained above, I disagree with Dr. Rabinow's anticipation theory that

considers Wulff as having incorporated Papadopoulos by reference.  *Supra* Section XII.B.1.b.

And regardless, as explained above, *supra* VIII.J.6, Papadopoulos does not disclose whether any

particular sites are glycosylated within amino acids 27-457 of SEQ ID NO:4—it discloses only

the glycosylation of Flt1D2.Flk1D3.FcΔC1(a), which is a different protein from amino acids 27-

457 of SEQ ID NO:4.

### 6. Claim 15

260.    Claim 15 depends from claim 5, which depends from claim 2.  In my opinion,

Wulff does not anticipate claim 15 for at least the same reasons that it does not anticipate claim 4

(which also depends from claim 2).

261.    Claim 15 recites that "said formulation is capable of providing a turbidity of 0.01

or lower at OD405 after 2 month storage at 5° C."  A formulation's turbidity generally results

from the formation of insoluble aggregates.  As with native conformation, Dr. Rabinow relies

exclusively on data from Dix (Rabinow ¶ 241 (citing Rabinow ¶ 221)), which (as I explain

above, *supra* Section XII.B.1.d) is not part of Wulff.  In addition, the data from Dix on which Dr.

101

Rabinow relies does not include any turbidity data.  The data cited by Dr. Rabinow comes from

Table 9 of Dix, which is reproduced below:

TABLE 9

Stability and Activity of Liquid Formulation (VGT-FS405)

| Months | % Native Configuration | Bioassay | Binding Assay | Protein Content mg/ml |
|--------|--------|--------|--------|--------|
| 0 | 99.7 | 106 | 72 | 25.0 |
| 1 | 99.9 | 119 | 4.4 pM* | 25.2 |
| 2 | 99.6 | 102 | 5.4 pM* | 25.1 |
| 3 | 99.6 | 97 | 88 | 25.1 |
| 6 | 99.6 | 101 | 106 | 25.0 |
| 9 | 99.4 | 89 | 126 | 25.4 |
| 12 | 99.5 | 85 | 95 | 25.2 |
| 18 | 99.4 | 99 | 81 | 25.5 |
| 24 | 99.3 | 75 | 95 | 25.6 |
| 36 | 98.8 | 109 | 79 | 25.6 |

262.

263.    Dix Table 9 reports data for native conformation, bioassay, binding assay, and

protein content, but does not report turbidity.  Dr. Rabinow asserts that the *turbidity* level recited

in claim 15 is "inherent" based on the *native conformation* data in Table 9.  But these are

different measurements measuring different phenomena, and Dr. Rabinow does not offer

evidence that a given formulation turbidity (measured at OD405) could be predicted with

certainty from a size exclusion chromatography measurement.  Thus, the POSA could not

conclude based on data about a formulation's native conformation measured by size exclusion

chromatography what the formulation's turbidity will be.  Dr. Rabinow simply ignores the

difference between the two measurements and asserts they would be the same, and cites no

evidence in support.

264.    Moreover, and as above, the data in Dix on which Dr. Rabinow relies involved a much lower concentration of a VEGF antagonist (25 mg/ml) than the concentration claimed (40 mg/ml), and the POSA would not assume that the levels of insoluble aggregates would remain unchanged despite an increase in protein concentration of 60%. To the contrary, the POSA would have understood that the substantial increase in protein concentration potentially could lead to increased aggregation, and thus a smaller percent native conformation and greater turbidity. Thus, even if the Dix disclosure were considered part of Wulff, and even if Dix did disclose turbidity data for the formulation on which Dr. Rabinow relies (it does not), Wulff still could not anticipate the claims. *See* Wang 1995 at 9 ("Increasing protein concentration generally increases protein aggregation."); *supra* Section VIII.C.

### 7.    Claim 16

265.    Claim 16 depends from claim 5, which depends from claim 2. In my opinion, Wulff does not anticipate claim 16 for at least the same reasons that it does not anticipate claim 4 (which also depends from claim 2).

### 8.    Claim 17

266.    Claim 17 depends from claim 5, which depends from claim 2. In my opinion, Wulff does not anticipate claim 17 for at least the same reasons that it does not anticipate claim 4 (which also depends from claim 2).

### 9.    Claim 18

267.    Claim 18 depends from claim 5, which depends from claim 2. In my opinion, Wulff does not anticipate claim 18 for at least the same reasons that it does not anticipate claim 4 (which also depends from claim 2).

268.    Claim 18 recites that "said formulation does not contain phosphate." The "vehicle" composition in Wulff expressly contains phosphate, i.e., 5 mM phosphate, among

**Reply.Add395**

other substances.  Wulff at 2798.  Thus, Wulff does not teach a formulation that "does not contain phosphate" as recited in claim 18.  Dr. Rabinow does not offer any contrary evidence and instead only cites to Dr. MacMichael's report addressing written description and enablement (which I address below).  Rabinow ¶ 244.

### C.    The '226 Patent Does Not Anticipate the '865 Asserted Claims

269.    Dr. Rabinow argues that the '226 Patent anticipates the '865 Asserted Claims. Because the '226 Patent does not teach each limitation of the '865 Asserted Claims, I disagree.

270.    As an initial matter, I disagree with Dr. Rabinow's assertion that the '226 Patent incorporates by reference four references—Fraser, Kaisheva '316, Papadopoulos, and Liu—that the '226 Patent simply lists in its opening pages under "Other Publications" cited during prosecution, among dozens of other references and without any discussion or context.  Rabinow ¶ 245 (citing '226 Patent at Page 2).  As I explained above, I understand that merely citing a reference is not sufficient to meet the standard for incorporation by reference (either with respect to incorporating an entire reference or portions of a reference), but that is all Dr. Rabinow points to here.  I thus disagree that any of these references are incorporated by reference in the '226 Patent.

### 1.    The Entirety of the '226 Patent Is Not Prior Art To The '865 Patent

271.    As I explained above, the ophthalmic formulations recited in the '865 Asserted Claims were invented no later than March 21, 2006.  *Supra* Section X.  The earliest patent application from which the '226 Patent claims priority (U.S. Patent Application No. 11/387,256) was filed after that date, on March 22, 2006.  '226 Patent at 1:24-25.  The '226 Patent also claims priority to U.S. Provisional Application No. 60/665,125, dated March 25, 2005 (the "Dix Provisional").  '226 Patent at 1:26-27.  I understand that in order to rely on the provisional application filing date under 35 U.S.C. § 102(e), the patent challenger may rely only on

104

disclosures that are contained in the provisional application. Dr. Rabinow ignores the teachings

of the Dix Provisional, which does not include all of the disclosures from the '226 Patent. I do

not understand Dr. Rabinow to advance any invalidity opinion on the basis of the Dix

Provisional.

272.     The Dix Provisional does not disclose any exemplary formulations containing a

VEGF antagonist and thus does not disclose any data regarding whether "at least 98% of the

VEGF antagonist is present in native conformation following storage at 5° C. for two months as

measured by size exclusion chromatography." Thus, the disclosures in the Dix Provisional fail

to anticipate the '865 Asserted Claims.

273.     Furthermore, the Dix Provisional does not disclose whether any of the VEGF

antagonists disclosed are glycosylated. Accordingly, the Dix Provisional does not teach that any

VEGF antagonist "is glycosylated" as recited in the '865 Asserted Claims.

274.     In addition, the Dix Provisional does not disclose any formulation where the

concentration of the VEGF antagonist is 40 mg/ml. The Dix Provisional thus fails to teach this

limitation of the '865 Asserted Claims as well.

275.     Furthermore, I understand that to be prior art under 35 U.S.C. § 102(e), the

reference must be "by another." The '226 Patent has overlapping inventors with the '865 patent,

i.e., Daniel Dix and Kelly Frye are named inventors on both patents. I understand that this

overlap may result in the '226 Patent not qualifying as "by another" and thus not qualifying as

prior art under § 102(e). To the extent the '226 Patent is not prior art, it cannot anticipate the

'865 Asserted Claims for that reason as well.

## 2. Claim 4

276.    Even if the '865 Patent could claim priority only to June 16, 2006, it is still not

anticipated, because the '226 Patent fails to teach numerous limitations of the claims, as set forth

below.

### a. The '226 Patent does not teach "wherein the concentration of said VEGF antagonist fusion protein is 40 mg/ml"

277.    Claim 2, from which claim 4 depends, recites that "the concentration of said

VEGF antagonist fusion protein is 40 mg/ml." The '226 Patent does not describe any

embodiment that meets this limitation. The examples in the '226 Patent have the following

concentrations: 25 mg/ml (Example 5, Table 9), 50 mg/ml (Example 1), 75 mg/ml (Example 2),

100 mg/ml (Example 3, Example 5 (Table 8, lyophilized and reconstituted)). Thus, the '226

Patent does not disclose any formulation with 40 mg/ml of the claimed VEGF antagonist fusion

protein.

278.    Dr. Rabinow cites to a more general disclosure in the '226 Patent that discloses as

follows:

> In a specific embodiment, the stable liquid formulation of a VEGF-
> specific fusion protein antagonist comprises 1-10 mM phosphate
> buffer, 1-10 mM citrate, 25-150 mM NaCl, 5-30% sucrose, 10-50
> mg/ml of the fusion protein, at a pH of about 6-6.5. In a more
> specific embodiment, the stable liquid formulation comprises 5
> mM phosphate buffer, 5 mM citrate buffer, 100 mM NaCl, 20%
> sucrose, 25 mg/ml of the fusion protein, at a pH of about 6.0.
> Additionally, polysorbate may be present, for example 0.05-0.15%
> polysorbate 20. The stable liquid formulation of the VEGF-specific
> fusion protein antagonist of the invention exhibits little or no
> precipitation after storage of a 25 mg/ml VEGF formulation for
> about 6 months at −80° C. and little or no precipitation after
> storage for 6 months at 5° C.

Rabinow ¶ 251 (citing '226 Patent at 2:20-24). Dr. Rabinow suggests that the disclosure of "10-

50 mg/ml" anticipates the limitation of claim 2 requiring 40 mg/ml. I disagree with Dr. Rabinow

106

for at least two reasons. First, this disclosure does not identify the sequence of the "VEGF-specific fusion protein antagonist," and thus does not disclose every element of the VEGF antagonist as claimed in the '865 Asserted Claims, including the amino acid sequence 27-457 of SEQ ID NO:4. Second, I understand that a genus, such as the range of 10-50 mg/ml, does not generally anticipate a species falling within that genus; and disclosure of a genus in the prior art is not generally a disclosure of every species within the genus. Accordingly, the disclosed range here does not anticipate every concentration within it, such as 29.3 mg/ml, 37.7 mg/ml, or 40 mg/ml. Dr. Rabinow does not acknowledge this principle and does not explain how the disclosure above specifically teaches 40 mg/ml. Nor does Dr. Rabinow argue that the range of 10-50 mg/ml is the type of very small genus that may, in some circumstances, permit the POSA to immediately envisage each member of the genus and may anticipate species within the genus.

279. Dr. Rabinow additionally cites to his prior footnote asserting that because a protein may be lyophilized and reconstituted at a higher concentration, a disclosure of one concentration also discloses, other, higher concentrations. Rabinow ¶ 251 (citing Rabinow ¶ 215 n.12). On this view, Dr. Rabinow appears to assert that the '226 Patent's disclosure of a 25 mg/ml formulation is also a disclosure of a 40 mg/ml formulation. I disagree with this opinion for at least the same reasons expressed previously. *Supra* XII.A.1.c. Furthermore, although the '226 Patent does disclose lyophilization, it nowhere teaches reconstituting to a concentration of 40 mg/ml, but rather teaches reconstituting to different concentrations. '226 Patent at 3:53-4:2, Example 5.

          **b.**   **The '226 Patent does not teach "wherein at least 98% of the VEGF antagonist is present in native conformation following storage at 5° C. for two months as measured by size exclusion chromatography"**

280. Dr. Rabinow contends that the '226 Patent discloses formulations that resulted in 98% native conformation following 2 months storage at 5°C. Rabinow ¶ 249. I disagree that this proposition, even were it true, meets the claim limitation regarding native conformation, which in the context of the claims must be achieved by a formulation that (unlike those of the '226 patent) meets the other limitations of the claims. I understand that to anticipate, a single reference must disclose every claimed element as arranged in the claim. Because the '226 Patent does not disclose any formulation where the concentration of the VEGF antagonist is 40 mg/ml, it also does not inevitably show any such formulation where "at least 98% of the VEGF antagonist is present in native conformation following storage at 5° C. for two months as measured by size exclusion chromatography." *See* Wang at 9.

281. In addition, the only disclosure in the '226 Patent upon which Dr. Rabinow relies for a teaching of 40 mg/ml—the range from 10-50 mg/ml, Rabinow ¶ 251—does not recite a specific VEGF Trap fusion protein. This disclosure from the '226 Patent (at 2:20-24) does not identify the sequence recited in the '865 Asserted Claims, and instead refers more generally to "a VEGF-specific fusion protein antagonist." Notably, SEQ ID NO:4 is not the only VEGF antagonist sequence identified in the '226 Patent; it also discloses SEQ ID NO:2, which is different from SEQ ID NO:4, as illustrated by the sequence alignment below (where the "query" sequence is SEQ ID NO:4 from the '865 patent, and the "sbjct" sequence is SEQ ID NO:2 from the '226 Patent). *See* '226 Patent at 2:13-15 ("In a more specific embodiment the fusion protein has the amino acid sequence of SEQ ID NO:2 or SEQ ID NO:4.").

```
Query   1    MVSYWDTGVLLCALLSCLLLTGSSSGSDTGRPFVEMYSEIPEIIHMTEGRELVIPCRVTS   60
             MVSYWDTGVLLCALLSCLLLTGSSSG   GRPFVEMYSEIPEIIHMTEGRELVIPCRVTS
Sbjct   1    MVSYWDTGVLLCALLSCLLLTGSSSG---GRPFVEMYSEIPEIIHMTEGRELVIPCRVTS   57


Query   61   PNITVTLKKFPLDTLIPDGKRIIWDSRKGFIISNATYKEIGLLTCEATVNGHLYKTNYLT   120
```

```
              PNITVTLKKFPLDTLIPDGKRIIWDSRKGFIISNATYKEIGLLTCEATVNGHLYKTNYLT
Sbjct   58    PNITVTLKKFPLDTLIPDGKRIIWDSRKGFIISNATYKEIGLLTCEATVNGHLYKTNYLT   117


Query   121   HRQTNTIIDVVLSPSHGIELSVGEKLVLNCTARTELNVGIDFNWEYPSSKHQHKKLVNRD   180
              HRQTNTIIDVVLSPSHGIELSVGEKLVLNCTARTELNVGIDFNWEYPSSKHQHKKLVNRD
Sbjct   118   HRQTNTIIDVVLSPSHGIELSVGEKLVLNCTARTELNVGIDFNWEYPSSKHQHKKLVNRD   177


Query   181   LKTQSGSEMKKFLSTLTIDGVTRSDQGLYTCAASSGLMTKKNSTFVRVHEK---DKTHTC   237
              LKTQSGSEMKKFLSTLTIDGVTRSDQGLYTCAASSGLMTKKNSTFVRVHEK   DKTHTC
Sbjct   178   LKTQSGSEMKKFLSTLTIDGVTRSDQGLYTCAASSGLMTKKNSTFVRVHEKGPGDKTHTC   237


Query   238   PPCPAPELLGGPSVFLFPPKPKDTLMISRTPEVTCVVVDVSHEDPEVKFNWYVDGVEVHN   297
              PPCPAPELLGGPSVFLFPPKPKDTLMISRTPEVTCVVVDVSHEDPEVKFNWYVDGVEVHN
Sbjct   238   PPCPAPELLGGPSVFLFPPKPKDTLMISRTPEVTCVVVDVSHEDPEVKFNWYVDGVEVHN   297


Query   298   AKTKPREEQYNSTYRVVSVLTVLHQDWLNGKEYKCKVSNKALPAPIEKTISKAKGQPREP   357
              AKTKPREEQYNSTYRVVSVLTVLHQDWLNGKEYKCKVSNKALPAPIEKTISKAKGQPREP
Sbjct   298   AKTKPREEQYNSTYRVVSVLTVLHQDWLNGKEYKCKVSNKALPAPIEKTISKAKGQPREP   357


Query   358   QVYTLPPSRDELTKNQVSLTCLVKGFYPSDIAVEWESNGQPENNYKTTPPVLDSDGSFFL   417
              QVYTLPPSRDELTKNQVSLTCLVKGFYPSDIAVEWESNGQPENNYKTTPPVLDSDGSFFL
Sbjct   358   QVYTLPPSRDELTKNQVSLTCLVKGFYPSDIAVEWESNGQPENNYKTTPPVLDSDGSFFL   417


Query   418   YSKLTVDKSRWQQGNVFSCSVMHEALHNHYTQKSLSLSPGK   458
              YSKLTVDKSRWQQGNVFSCSVMHEALHNHYTQKSLSLSPGK
Sbjct   418   YSKLTVDKSRWQQGNVFSCSVMHEALHNHYTQKSLSLSPGK   458
```

Thus, the '226 Patent does not disclose each element of the claimed VEGF antagonist fusion protein as arranged in the '865 Asserted Claims.

282.    In summary, because the '226 Patent did not disclose a formulation with 40 mg/ml of the specific VEGF antagonist claimed in the '865 Asserted Claims, and because the POSA would have understood that both a protein's sequence and its concentration can affect whether "98% of the VEGF antagonist is present in native conformation following storage at 5°

**Reply.Add401**

C. for two months as measured by size exclusion chromatography," *supra* Section XII.A.1.d, the
'226 Patent does not disclose this limitation.

### 3. Claim 7

283.   Claim 7 depends from claim 5, which depends from claim 2.  In my opinion, the
'226 Patent does not anticipate claim 7 for at least the same reasons that it does not anticipate
claim 4 (which also depends from claim 2).

### 4. Claim 9

284.   Claim 9 depends from claim 5, which depends from claim 2.  In my opinion, the
'226 Patent does not anticipate claim 9 for at least the same reasons that it does not anticipate
claim 4 (which also depends from claim 2).

### 5. Claim 11

285.   Claim 11 depends from claim 10, which depends from claim 5, which depends
from claim 2.  In my opinion, the '226 Patent does not anticipate claim 11 for at least the same
reasons that it does not anticipate claim 4 (which also depends from claim 2).

### 6. Claim 14

286.   Claim 14 depends from claim 5, which depends from claim 2.  In my opinion, the
'226 Patent does not anticipate claim 14 for at least the same reasons that it does not anticipate
claim 4 (which also depends from claim 2).

### 7. Claim 15

287.   Claim 15 depends from claim 5, which depends from claim 2.  In my opinion, the
'226 Patent does not anticipate claim 15 for at least the same reasons that it does not anticipate
claim 4 (which also depends from claim 2).

288.   Claim 15 recites that "said formulation is capable of providing a turbidity of 0.01
or lower at OD405 after 2 month storage at 5° C."  Dr. Rabinow contends that the '226 Patent

Reply.Add402

"discloses a specific embodiment" that teaches this limitation.  Rabinow ¶ 256 (citing '226

Patent at 2:20-24).  But that cited portion of the '226 Patent does not disclose any results with

respect to turbidity, much less the specific measurement of turbidity claimed.  Furthermore, I

disagree with Dr. Rabinow's suggestion that the cited portion discloses a "specific"

formulation—the cited disclosure instead describes a genus of formulations, with ranges of

concentrations, as set forth below:

> In a specific embodiment, the stable liquid formulation of a VEGF-
> specific fusion protein antagonist comprises 1-10 mM phosphate
> buffer, 1-10 mM citrate, 25-150 mM NaCl, 5-30% sucrose, 10-50
> mg/ml of the fusion protein, at a pH of about 6-6.5.

'226 Patent at 2:20-24.

289.    Dr. Rabinow also points to the disclosure in the '226 Patent regarding how

turbidity was measured.  Rabinow ¶ 256 (citing '226 Patent at Example 1, Table 1).  But

Example 1 does not meet the limitations of the '865 Asserted Claims, at least because the

concentration of the VEGF antagonist in that Example is 50 mg/ml, not 40 mg/ml as claimed.

'226 Patent at 7:60-65.  Thus, Example 1 does not teach every limitation of claim 15 as arranged

in that claim.

### 8.    Claim 16

290.    Claim 16 depends from claim 5, which depends from claim 2.  In my opinion, the

'226 Patent does not anticipate claim 16 for at least the same reasons that it does not anticipate

claim 4 (which also depends from claim 2).

### 9.    Claim 17

291.    Claim 17 depends from claim 5, which depends from claim 2.  In my opinion, the

'226 Patent does not anticipate claim 17 for at least the same reasons that it does not anticipate

claim 4 (which also depends from claim 2).

111

**Reply.Add403**

### 10. Claim 18

292.     Claim 18 depends from claim 5, which depends from claim 2.  In my opinion, the '226 Patent does not anticipate claim 18 for at least the same reasons that it does not anticipate claim 4 (which also depends from claim 2).

293.     Claim 18 recites that "said formulation does not contain phosphate."  For this limitation, Dr. Rabinow cites only to the '226 Patent's disclosure of a disclosed formulation comprising "10 mM histidine, 50 mM NaCl, 5-20% sucrose, 50-100 mg/ml VEGF trap, and one of 0.1% polysorbate 20 or TY° [sic] PEG 3350."  Rabinow ¶ 259 (citing '226 Patent at 10:27-40).  Again, this genus of formulations does not teach every limitation of claim 18 as arranged in the claim.  Specifically, the disclosure of "50-100 mg/ml VEGF Trap"—to the extent it discloses any individual concentration within that range—does not disclose 40 mg/ml of the specific VEGF antagonist recited in the '865 Asserted Claims.  Rather, 40 mg/ml is outside the scope of that range.  I thus disagree with Dr. Rabinow's assertion that "the 50-100 mg/ml VEGF trap express disclosure in this embodiment further inherently discloses a 40 mg/ml formulation."  Rabinow ¶ 259.  Dr. Rabinow does not explain this theory and offers no evidence that a concentration of 40 mg/ml is inherently within 50-100 mg/ml.

## XIII.   The '865 Asserted Claims Would Not Have Been Obvious

294.     Dr. Rabinow also argues that the '865 Asserted Claims would have been obvious.  Dr. Rabinow's analysis largely focuses on claim 1 (Rabinow ¶¶ 260-288), and his opinions regarding the '865 Asserted Claims are presented in tabular format with no explanation or analysis (Rabinow ¶¶ 289-302).  For these claims, Dr. Rabinow lists scattered citations from a number of references but does not explain how they teach or suggest the claimed invention to the POSA, how or why the POSA would have been motivated or had reason to combine the disclosures he lists (and only the disclosures he lists) from the particular references he selected

(and only the particular references he selected), or how such disclosures would provide the
POSA with a reasonable expectation of success of achieving the invention of the '865 Asserted
Claims.  To the extent Dr. Rabinow seeks and is permitted to articulate an obviousness theory as
to the '865 Asserted Claims in a reply report beyond that set forth in his initial report, I reserve
the right to respond to any such opinion or theory.

295.    Furthermore, many of Dr. Rabinow's purported grounds of obviousness cite to
Dix or the '226 Patent.  Dr. Rabinow only asserts that Dix and the '226 Patent are prior art under
35 U.S.C. § 102(e).  Rabinow ¶¶ 122, 128.  However, I understand that under 35 U.S.C.
§ 103(c), a reference that is prior art only under § 102(e) and that is assigned to the same entity
as the challenged patent does not qualify as an obviousness reference.  Accordingly, because Dix
and the '266 Patent (like the '865 patent) are assigned to Regeneron, I understand that they
cannot be used as obviousness references.

**A.      Fraser Does Not Render The '865 Asserted Claims Obvious**

296.     As I explained above, Fraser is an article that was not directed to developing a
formulation of any VEGF Trap and does not teach numerous limitations of the claims.  *Supra*
Section XII.A.  I incorporate in full my analysis of Fraser and its teachings here.

297.    Dr. Rabinow contends that the '865 Asserted Claims would have been obvious
over Fraser, either alone or in combination with Dix and/or Liu and/or Andya '801 (or Andya
'326).  Rabinow ¶¶ 260, 290.  Dr. Rabinow also cites to Holash.  Rabinow ¶ 261.  In my opinion,
none of these references, either alone or in combination, renders obvious the '865 Asserted
Claims.

**Reply.Add405**

### 1. Fraser Would Not Have Motivated The POSA To Make An Ophthalmic Formulation Suitable For Intravitreal Injection

298. The '865 claims require an "ophthalmic formulation suitable for intravitreal injection." As I explained above, Fraser was an academic study investigating the biological effects of VEGF Trap$_{R1R2}$ on ovarian function in monkeys, and administered VEGF Trap$_{R1R2}$ systemically via intravenous injection. Fraser at 1114; *supra* Section XII.A.1.a. This study had nothing to do with the eye, and the POSA, reading Fraser, would not have been motivated or had reason to take the disclosed composition and use it as an ophthalmic formulation. Nor would the POSA have considered the composition in Fraser to have been "suitable for intravitreal injection," because it contained excipients such as citrate and glycerol that, based on the information cited by Dr. Rabinow, had never been administered to the eye in a therapeutic. Fraser at 1115.

299. Dr. Rabinow also cites to Holash, but Holash would, if anything, have motivated the POSA to make a *cancer* therapeutic using one of the VEGF inhibitors disclosed in that reference, not an *ophthalmic* formulation suitable for intravitreal use. As Dr. Rabinow's citation from Holash demonstrates, Holash disclosed "a very potent high-affinity VEGF blocker that has prolonged in vivo pharmacokinetics and pharmacodynamics, lacks nonspecific toxicities, and can effectively *suppress the growth and vascularization of a number of different types of tumors in vivo*." Rabinow ¶ 261 (citing Holash at 11393). Dr. Rabinow does not explain why the POSA would reasonably expect the advantageous properties Holash described regarding cancer would translate to an ophthalmic administration.

300. As Dr. Rabinow notes (Rabinow ¶ 261), Holash states that "studies have shown that various versions of the VEGF-Trap can efficaciously treat a cancer-associated condition in mice similar to liver peliosis (33), as well as noncancer-associated disease models, such as

**Reply.Add406**

diabetic retinopathy (34-36) and psoriasis (. . . unpublished results)." Holash at 11397.

However, the "various versions" of VEGF-Trap in the articles Holash cites as references 34-

36—i.e., Joussen, Poulaki, and Qaum—used VEGF Traps with significantly different structures

than the VEGF Trap on which Holash focused, and administered the molecules systemically.

Qaum et al., *VEGF-initiated Blood-Retinal Barrier Breakdown in Early Diabetes*, 42 Invest.

Opthalmol. Visual Sci. 2408, 2409 (2001) (using "VEGF TrapA$_{40}$," comprising

"immunoglobulin repeats 1 to 3 of the extracellular domain of human Flt-1 fused to the Fc

portion of human IgG . . . The recombinant VEGF TrapA40 was then chemically modified to

improve the pharmacokinetic profile of the parent molecule, without affecting its ability to bind

VEGF with high affinity"); Poulaki et al., *Acute Intensive Insulin Therapy Exacerbates Diabetic*

*Blood-Retinal Barrier Breakdown Via Hypoxia-Inducible Factor*, 109 J. Clin. Invest 805, 807

(2002) (same); Joussen at 502 (same). Dr. Rabinow ignores these studies entirely, but they

would have informed the POSA that if anything is potentially suitable for ophthalmic application

it is the "versions" of VEGF Traps disclosed in those references and not the amino sequence

claimed in the '865 patent.

301.    None of the other prior art on which Dr. Rabinow relies for purposes of his

obviousness position even mentions ophthalmic formulations or intravitreal injections. Aside

from Dr. Rabinow's reference to Holash discussed above, none of the art on which he relies

(including Dix, which may not be considered in an obviousness analysis, as well as Liu and

Andya '801) even arguably suggests treatment of any disease of the eye.

## 2.    Dr. Rabinow's Cited Art Did Not Teach The Claimed Amino Acid Sequence, And The POSA Would Not Have Been Motivated To Use It

302.    The '865 claims each are limited to a "VEGF antagonist fusion protein [that] is

glycosylated and comprises amino acids 27-457 of SEQ ID NO:4." Only Dix discloses SEQ ID

NO:4, and I understand that it may not be considered in an obviousness analysis as I noted

above.  Accordingly, Dr. Rabinow fails to establish that it would have been obvious to formulate

the specific protein claimed in the '865 Asserted Claims, as it is not taught in any of the prior art

on which Dr. Rabinow may rely that are part of his purported ground of obviousness (i.e., Fraser,

Holash, Liu, and Andya '801).

303.    Dr. Rabinow cites Holash and asserts that a "POSA reading Holash would have

understood that SEQ ID NO:4 is encompassed by VEGF-Trap$_{R1R2}$."  Rabinow ¶ 261.  I disagree

with Dr. Rabinow, who offers no rationale for his opinion.  There are countless proteins that

could meet the general structure identified in Holash but not comprise amino acids 27-457 of

SEQ ID NO:4.  To take just one example, Flt1D2.Flk1D3.FcΔC1(a) from Papadopoulos is

assembled from "the second Ig domain of VEGFR1 with the third Ig domain of VEGFR2"

(Rabinow ¶ 261; Holash at 11393-94) but does not comprise amino acids 27-457 of SEQ ID

NO:4.  *Supra* Section VIII.J.6.  Other proteins that vary individual amino acids or different

portions of VEGFR1 D2 or VEGFR2 D3 could fall within the genus identified in Holash but not

contain amino acids 27-457 of SEQ ID NO:4, i.e., the specific amino acid sequence of the '865

Asserted Claims.

304.    More fundamentally, I disagree with Dr. Rabinow that the POSA would have

been motivated to proceed with Holash's VEGF Trap$_{R1R2}$ for an ophthalmic formulation.  VEGF

Trap$_{R1R2}$ would have been only one among many options—even considering only VEGF

inhibitors—and as I explain further below, other VEGF inhibitors were designed specifically for

intravitreal applications and had specific advantages for that method of delivery.

305.    The intended applications of VEGF antagonists in the eye at the time of the '865

invention were directed at the retina.  *See* Rabinow ¶ 261; Gaudreault 2005 at 726 (administering

**Reply.Add408**

ranibizumab intravitreally, and noting that ranibizumab was developed to treat macular

degeneration).  In order for a drug to have therapeutic activity in the retina, it must reach the

retina.  *See* Gaudreault 2005 at 731 ("[P]enetration of ranibizumab into the retina is critical for

tis clinical use.").  For an intravitreal injection, Gaudreault 2005 explained that, in addition to

VEGF binding, a critical aspect of ranibizumab was that it "has also been shown to penetrate all

layers of the rabbit retina—the first demonstration of retinal penetration of an anti-VEGF therapy

intended for AMD."  Gaudreault 2005 at 726.  And Gaudreault 2005 explained that

ranibizumab's "ability [to penetrate to the retina] has been attributed to the small molecule size

(48 kDa), because a full-length antibody (trastuzumab, 148 kDa) was not able to penetrate all the

retinal layers of rhesus monkeys."  Gaudreault 2005 at 726 (citing J. Mordenti et al.,

*Comparisons of the intraocular tissue distribution, pharmacokinetics, and safety of 1251-labeled*

*full-length and Fab antibodies in rhesus monkeys following intravitreal administration*, 27

Toxicol Pathol. 536 (1999)).  "The small molecular radius of ranibizumab probably also

contributes to its demonstrated ability to penetrate the retina."  Gaudreault 2005 at 726.  Thus,

the prior art taught away from using significantly larger protein molecules for intravitreal

injection.  Papadopoulos, however, taught that proteins like VEGF Trap$_{R1R2}$ (a fusion protein

with a different structure than the antibody fragment ranibizumab) would have a molecular

weight on the order of 113 kDa, Papadopoulos at 25:14-16—that is, over *twice* the molecular

weight of ranibizumab of 48 kDa.  Gaudreault 2005 at 726.  Gaudreault 2005 taught away from

using such a molecule.  Furthermore, the POSA would not have been motivated to use such a

large molecule for intravitreal injection to treat a retinal disease with a reasonable expectation of

success.

**Reply.Add409**

306.    Notably, the POSA understood that ranibizumab was not the only therapeutic

protein designed specifically for intravitreal injection as a lower-molecular weight protein.

Regeneron also developed such a protein, called "mini-Trap," that Daly described as having

"optimized characteristics for local/intra-vitreal delivery, i.e., a shorter serum half life for faster

clearance and minimizing unwanted systemic exposure."  Daly ¶ 43.  Daly further explained that

"due to its smaller size, the mini-trap has the ability to penetrate through the inner-limiting

membrane (ILM) in the eye, and diffuse through the vitreous to the retina/retinal pigment

epithelial (REP) layer which will help to treat retinal disease."  Daly ¶ 43.  Furthermore, mini-

Trap exhibited comparable binding affinity to the "full-sized parent trap."  Daly ¶ 63.  The mini-

Trap does not comprise amino acids 27-457 of SEQ ID NO:4 of the '865 patent, and has a much

lower molecular weight:  approximately 46 kDa for the nonglycosylated version produced in *E.*

*Coli*, Daly ¶ 74, and 64 kDa for the glycosylated version produced in CHO cells, Daly ¶ 79

(these two versions had comparable affinity for VEGF, Daly ¶ 63).  *See also* Shams at 31:21-25

(Ranibizumab is produced by standard recombinant technology methods in Escherichia coli

expression vector and bacterial fermentation. Ranibizumab is not glycosylated and has a

molecular mass of ~48,000 daltons").  In contrast, the larger VEGF-Trap$_{R1R2}$ protein led to

greater suppression of vascularization when delivered subcutaneously as opposed to by

intravitreal injection, suggesting difficulties in retinal penetration by VEGF-Trap$_{R1R2}$.  Y. Saishin

et al., *VEGF-Trap$_{R1R2}$ suppresses choroidal neovascularization and VEG-induced breakdown of*

*the blood-retinal barrier*, 195 J. Cell. Physiol. 241, Figs. 1, 2 (2003); *see infra* XIII.F (discussing

Ferrara 2006 ("Interestingly, these studies show that systemic administration of the VEGF-trap

inhibits neovascularization by ~75%. However, intravitreal administration of the same agent

resulted in ~25% inhibition.")).  That was consistent with teachings in the prior art that the

**Reply.Add410**

"retinal exclusion limit (REL)," i.e., the "maximum size of molecule capable of freely diffusing

across human retina," was around 76 kDa, substantially smaller than the size of VEGF Trap$_{R1R2}$

(approximately 113 kDa, Papadopoulos at 80:10). T.L. Jackson et al., *Human Retinal Molecular*

*Weight Exclusion Limit and Estimate of Species Variation*, 44 IOVS 2141, 2141 (2003); *see also*

Ghate at 281-82 ("The internal limiting membrane is impermeable to linear molecules > 40 kDa

and globular molecules > 70 kDa. Thus, larger macromolecules will have a longer retention time,

possibly weeks, but their effect on the retina after an intravitreal injection is limited.").

307.    In view of the results from Gaudreault 2005 and Daly, the POSA would have

been motivated to develop an ophthalmic formulation of mini-Trap, not VEGF Trap$_{R1R2}$, because

the mini-Trap protein had comparable molecular weight to ranibizumab (approximately 46 kDa

nonglycosylated, Daly ¶ 74, approximately 64 kDa glycosylated, Daly ¶ 79, compared to 48 kDa

for ranibizumab, Shams at 31:21-25) and would have been expected to have a better probability

of penetrating the retina to deliver a therapeutic effect.

308.    Dr. Rabinow does not address these teachings of the prior art in his obviousness

analysis and instead focuses exclusively on VEGF Trap$_{R1R2}$. However, the POSA would have

understood that the properties of VEGF Trap$_{R1R2}$ identified in Holash—prolonged systemic half-

life—that were considered advantageous for systemic treatment, would not have been considered

clear advantages for an ophthalmic formulation suitable for intravitreal injection, since the

motivation in that context is to ensure retinal access and minimize the time that the VEGF

antagonist is systemically active. Gaudreault 2005 at 726; Daly ¶ 43.

309.    Separately, the '865 Asserted Claims each require that the VEGF antagonist

fusion protein "is glycosylated." The prior art also would have led the POSA away from using a

glycosylated form of the claimed protein. First, Daly taught that "[a]ffinity measurements

showed that the non-glycosylated fusion polypeptides expressed in E. coli or the glycosylated

polypeptides expressed in CHO cells had comparable binding affinity for VEGF as the full-sized

parent trap." Daly ¶ 63. This would have suggested to the POSA that the full-sized protein

claimed would also exhibit similar affinity to VEGF if it was not glycosylated, since the removed

portion of the mini-Trap is in the Fc region, not at the VEGF receptor domains where VEGF

binding occurs. Second, the POSA would have understood that glycosylation necessarily

increases the mass of the protein, which would have been expected to reduce the retinal

penetration based on the prior art discussed above. *See* Daly ¶¶ 74, 79 (18 kDa difference

between glycosylated and nonglycosylated mini-Trap); Gaudreault 2005 at 726. Accordingly, to

the extent the POSA sought to use the claimed protein (contrary to my opinion set forth above),

the POSA would not have been motivated to use a glycosylated form, due to the concerns

regarding retinal penetration and the comparable VEGF affinity for glycosylated and

nonglycosylated mini-Traps. Dr. Rabinow does not meaningfully address glycosylation in

making his obviousness assertions and thus does not address these teachings in the prior art.

### 3. The Prior Art Taught Away From Formulations With 40 mg/ml Of A VEGF Antagonist

310. Each of the '865 Asserted Claims requires that "the concentration of said VEGF

antagonist fusion protein is 40 mg/ml." Even assuming the POSA would seek to develop an

intravitreal formulation of amino acids 27-457 of SEQ ID NO:4 of the '865 patent and decided to

use a glycosylated version of that protein, no prior art cited by Dr. Rabinow discloses using 40

mg/ml of that protein. Nor does Dr. Rabinow offer any explanation as to why, or how, the

POSA would have chosen to use that concentration. Rabinow ¶¶ 290-291. To the extent Dr.

Rabinow seeks and is allowed to offer an explanation on reply, I reserve the right to respond.

311.    An important benefit of the VEGF Trap molecules invented by Regeneron

scientists was their high affinity for VEGF.  These properties were widely recognized, as shown

below:

| Disclosure | Reference |
|---|---|
| "To determine binding affinity of the Traps for VEGF, equilibrium binding assays were performed in which different concentrations of the Traps were incubated with VEGF165, and the amount of unbound VEGF165was measured, revealing that parental VEGF-Trap displays a kD of ~5 pM, whereas VEGF Trap$_{R1R2}$ has a binding affinity of about 1 pM (Fig. 2A). Preliminary analyses show that VEGF-Trap$_{R1R2}$ has a kD of 1-10 pM for VEGF121 and approximately 45 pM for placental growth factor 2 (not shown); other VEGF isoforms and relatives have not been analyzed." | Holash at 11395. |
| "Using a metastasizing murine model of neuroblastoma (3), we tested the effects of anti-VEGF reagents with differing targets.  We evaluated NX1838, an RNA-based fluoropyrimidine polyethylene glycol-conjugated aptamer, which has an estimated dissociation constant (Kd) for human VEGF165 of 200 pM (NeXstar) (13, 14); the monoclonal anti-VEGF antibody (A.4.6.1, Genentech) (11) that specifically binds to human VEGF with an affinity of 0.1–10 nM but not murine VEGF; and VEGF-Trap, a soluble composite decoy receptor consisting of Ig-like domains of VEGFR-1 and VEGFR-2 fused to an Fc segment (VEGF-Trap, Regeneron Pharmaceuticals) (12), which binds with very high affinity (~1 pM) to multiple isoforms of VEGF from several species (including human and murine). The VEGF-Trap also binds to placental growth factor. Tumor weight was evaluated at 6 weeks." | E.S. Kim et al., *Potent VEGF blockade causes regression of coopted vessels in a model of neuroblastoma*, 99 P.N.A.S. 11399, 11400 (2002) |
| "Flt1D2Flk1D3.FcAC1(a) or VEGFR1R2-FcAC1(a) at a concentration of 1nM (estimated to be 1000 times higher than the KD of the Flt1D2Flk1D3.FcΔC1(a) or VEGFR1R2-FcΔC1(a)/VEGF165 interaction) were mixed with varied concentrations of VEGF165." | Papadopoulos at 24:1-11. |
| "An alternative anti-VEGF approach at early-stage clinical development is represented by the VEGF-trap (see previous discussion). It has been proposed that fusions between the constant region of IgG and the extracellular | N. Ferrara et al., *Discovery and Development of Bevacizumab, an Anti-VEGF Antibody for Treating Cancer*, 3 Nature Rev. |

121

| domains of two distinct receptor components represent an advantage over antibodies because they can result in higher binding affinity." | Drug Discovery 391, 397 (2004) ("Ferrara 2004"). |

312.    Thus, the POSA would have understood that amino acids 27-457 of SEQ ID NO:4 would have had a binding affinity (KD) of around 1 pM, given the data in Papadopoulos and Holash.  Ranibizumab, on the other hand, has a KD substantially higher than that of VEGF Trap, reporting KD values of between 20 pM and 190 pM.  Y. Chen et al., *Selection and analysis of an Optimized Anti-VEGF Antibody:  Crystal Structure of an Affinity-matured Fab in Complex with Antigen*, 293 J. Mol. Biol. 865, 870-71 (1999) (denoting ranibizumab as Y0317); *see also* Kim 2002 at 11400 (noting increased affinity of VEGF Trap$_{R1R2}$ compared to antibody A.4.6.1 from Genentech, i.e., bevacizumab, of which ranibizumab is a fragment).  Furthermore, the POSA would have understood that VEGF Trap$_{R1R2}$ bound "to multiple isoforms of VEGF."  Kim 2002 at 11400.

313.    Furthermore, the POSA would also have understood that Gaudreault 2005 evaluated an intravitreal dose of ranibizumab at 40 mg/ml, among other doses, as shown below:

TABLE 1.  Treatment Groups Assignment

| Group | Number per Group (M/F) | Route | Day Administered | Dose | Dose Concentrations (mg/mL) | Dose Volume |
|---|---|---|---|---|---|---|
| 1 | 3/3 | ITV | 1 | 500 µg/eye | 10 | 50 µL/eye |
| 2 | 3/3 | ITV | 1 | 2000 µg/eye | 40 | 50 µL/eye |
| 3 | 2/2 | IV | 1 | 1000 µg/animal | 1 | 1 mL |
| 4 | 2/2 | IV | 1 | 4000 µg/animal | 4 | 1 mL |

314.    Gaudreault 2005 at 727 Table 1.  This is the sole teaching cited by Dr. Rabinow in the prior art of intravitreal administration of a 40 mg/ml composition of a VEGF antagonist composition, and it would have taught the POSA away from using a 40 mg/ml concentration.

Specifically, Gaudreault 2005 taught that administration of 40 mg/ml (2000 µg/eye) resulted in "moderate to severe" ocular inflammation.  Gaudreault 2005 at 727.  In contrast, administering 10 mg/ml (500 µg/eye) resulted in "absent to moderate" ocular inflammation.  *Id.*  In addition to reduced inflammation, Gaudreault 2005 taught that the 10 mg/ml dose provided superior efficacy.  Specifically, the authors explained that "[a]fter administration of 500 µg/eye, retinal exposure to ranibizumab was >3000-fold larger than retinal exposure to VEGF, *suggesting that this ranibizumab dose provides maximum inhibition of VEGF*."  Gaudreault 2005 at 732; *see also id.* ("Ocular VEGF inhibition over time by ranibizumab ITV injection can be predicted using the inhibitory effect of ranibizumab on VEGF activity in a human umbilical vein endothelial cell assay, and its ocular $t_{1/2}$ as determined in this study (Fig.4). This prediction indicates that ranibizumab concentrations, capable of inhibiting VEGF in the eyes of patients with AMD, are expected to be achieved after ITV doses of 300 to 500 µg/mo.").  These findings would have discouraged the POSA from proceeding with a 40 mg/ml concentration and instead motivated the POSA to use a formulation that does not lead to potentially severe inflammation.  Indeed, that is exactly what occurred when ranibizumab was ultimately administered to patients.  And notably, Shams discloses an illustrative clinical trial using intravitreal administration of ranibizumab and used concentrations of 6 mg/ml and 10 mg/ml, not 40 mg/ml.  Shams at 31:27-32.

315.    Thus, the POSA would have understood that (1) VEGF Trap$_{R1R2}$ had a much higher affinity than ranibizumab for VEGF, and bound to different forms of VEGF whereas such binding was unknown with respect to ranibizumab; (2) Gaudreault 2005, the closest prior art relied on by Dr. Rabinow with respect to the teaching of 40 mg/ml of a VEGF inhibitor delivered intravitreally, taught that delivering that concentration resulted in potentially severe

inflammation; and (3) Gaudreault 2005 taught that 10 mg/ml ranibizumab achieved the "maximum inhibition" of VEGF, and that dosage (along with an even lower dosage) was the one taught in Shams regarding clinical use. Considering the prior art as a whole, the POSA would have been motivated *against* formulating VEGF Trap$_{R1R2}$ at 40 mg/ml. Given the much higher affinity (by a factor of at least 20) and long half-life of VEGF Trap$_{R1R2}$, the POSA would have expected that a *lower* dose of VEGF Trap$_{R1R2}$ was necessary for VEGF inhibition as compared to ranibizumab.[2] Furthermore, given the increased inflammation that resulted from a higher dose of ranibizumab (i.e., "moderate to severe" inflammation, Gaudreault 2005 at 727), the POSA would have been taught against using 40 mg/ml of VEGF Trap$_{R1R2}$, and indeed would have considered the 40 mg/ml dose undesirable and unsuitable.

316. The risk of complications would have been amplified with VEGF Trap$_{R1R2}$ because, unlike ranibizumab, VEGF Trap$_{R1R2}$ is a chimeric fusion protein, not an antibody or antibody fragment. *Supra* Section VIII.B. Although ranibizumab did not result in an immunogenic response, Gaudreault 2005 at 728, the POSA would not have been assured that result would apply to VEGF Trap$_{R1R2}$. That is because the POSA would have understood that fusion proteins like VEGF Trap$_{R1R2}$ gave rise to the possibility "that the junctions between the various structural elements in such multi-component molecules can generate an immune response." Ferrara 2004 at 397. Those concerns would be enhanced by exposure to a higher

---

[2] Although VEGF Trap$_{R1R2}$ has a higher molecular weight than ranibizumab (by a factor of about 2.35), meaning that a greater mass is needed per mole, that difference is dwarfed by the higher affinity of VEGF Trap$_{R1R2}$ as compared to ranibizumab (higher by a factor of 20). Even if the relativity affinity of the two proteins was ignored, the POSA sought only to replicate the preferred dosage of ranibizumab on a molar basis, that would still lead the POSA only to a dosage less than 23.5 mg/ml, substantially less than the 40 mg/ml dose claimed.

**Reply.Add416**

concentration, especially a higher concentration that was unnecessary or unhelpful with respect to efficacy.

317. In addition to these concerns that would discourage the POSA from developing the claimed protein as a 40 mg/ml intravitreal injection, the POSA would also have understood that an increased concentration of protein could also have an increased potential for aggregation as compared to a lower concentration. *Supra* Section VIII.C. Aggregation, in turn, could potentially increase the risk of inflammation, immunogenicity, and decreased efficacy. This would have further motivated the POSA against using 40 mg/ml.

318. Moreover, the POSA would also have understood that increased protein concentration can lead to increased viscosity. Liu ¶ 6. The prospect of increased viscosity would have dissuaded the POSA from increasing concentration, since a high viscosity could make it more difficult to inject the formulation into the eye, and, as taught by Liu, could lead to denaturation and inactivation of the protein. Liu ¶ 6.

### 4. The Prior Art Did Not Teach Or Suggest A Formulation Of The Claimed Protein at 40 mg/ml That Achieves 98% Native Conformation

319. The '865 Asserted Claims each require that "at least 98% of the VEGF antagonist is present in native conformation following storage at 5° C. for two months as measured by size exclusion chromatography." Even if the POSA would have been motivated to proceed with an ophthalmic formulation for intravitreal injection of amino acids 27-457 of SEQ ID NO:4 of the '865 patent, and even if the POSA selected a concentration of the protein of 40 mg/ml, Dr. Rabinow has failed to establish that the POSA would have reasonably expected to obtain 98% native conformation following storage at 5° C. for two months as measured by size exclusion chromatography.

**Reply.Add417**

320.    None of the prior art on which Dr. Rabinow can properly rely included any information regarding percent native conformation, following storage, of VEGF Trap$_{R1R2}$.  Dr. Rabinow argues that Holash's disclosure that VEGF Trap molecules "were produced and purified from [CHO] cells" teaches the 98% native conformation limitation, but that is mistaken. Rabinow ¶ 261.  First, this does not disclose the concentration of the protein, nor does it indicate that the protein was in formulation.  Second, even ignoring those omissions, Holash's disclosure would, at most, suggest to the POSA that the protein was pure when it was used in Holash's assays—it would provide no information (let alone a reasonable expectation) as to whether and how much the protein would be in native conformation following two months of storage (as measured by size exclusion chromatography under the conditions claimed).

321.    Second, Dr. Rabinow points to other references—Liu and Andya '801—that evaluated *other* proteins by size exclusion chromatography.  Rabinow ¶¶ 263-265.  But the POSA would have no reasonable expectation that because one protein exhibits a certain level of aggregation, an *entirely different* protein—like the protein recited in the asserted claims, with amino acids 27-457 of SEQ ID NO:4—would exhibit the same level of aggregation if it were formulated with the same excipients.  That is especially the case here, because Liu and Andya '801 were directed to antibodies, *supra* Sections VIII.J.11, VIII.J.20, which have evolved naturally to be stable, *supra* Sections VIII.A, VIII.B.  Fusion proteins, like those claimed here, are artificial and created in the laboratory, and the POSA would not expect them to exhibit high levels of native conformation *ab initio*.  Nor has Dr. Rabinow demonstrated that, even if the POSA prepared a formulation containing the ingredients recited in the claims, it would necessarily and always achieve 98% native conformation (or 99% according to 16) as measured by size exclusion chromatography as set forth in the '865 Asserted Claims.

Reply.Add418

**B. Wulff Does Not Render The '865 Asserted Claims Obvious**

322. Dr. Rabinow contends that the '865 claims would have been obvious over Wulff

for largely the same reasons as his obviousness ground over Fraser, relying on the same

secondary references, i.e., Dix (which may not be referenced in an obviousness analysis), Liu,

and/or Andya '801. Rabinow ¶¶ 267-278. I disagree. I incorporate my analysis from XII.B

here, which explains the multiple differences between Wulff and the inventions claimed in the

'865 claims.

323. Furthermore, Dr. Rabinow's obviousness combination over Wulff suffers from

the same defects I analyzed above with respect to Fraser. *First*, the POSA would not have been

motivated to develop VEGF Trap$_{R1R2}$ as an ophthalmic formulation suitable for intravitreal

injection. *Supra* Section XIII.A.1. *Second*, neither Wulff nor the other prior art on which Dr.

Rabinow relies teaches the amino acid sequence of the claimed protein, and even if the POSA

did consider the sequence, the POSA would have been taught away from it in view of the prior

art's teachings. *Supra* Section XIII.A.2. *Third*, even if the POSA sought to use the claimed

protein, the POSA would not have been motivated to formulate it at 40 mg/ml for an ophthalmic

formulation. *Supra* Section XIII.A.3. *Fourth*, the POSA would not have had a reasonable

expectation of success in achieving the claimed ophthalmic formulations wherein "at least 98%

of the VEGF antagonist is present in native conformation following storage at 5° C. for two

months as measured by size exclusion chromatography," nor was that property inherent in the

disclosed compositions. *Supra* Section XIII.A.4.

324. As with Dr. Rabinow's analysis of Fraser, Dr. Rabinow suggests that the

teachings of Andya '801 and Liu would have taught the POSA to make compositions with the

specific fusion protein claimed (or, presumably, any protein imaginable) because Andya '801

and Liu taught that certain antibodies compositions disclosed therein achieved high levels of

native conformation over time. Rabinow ¶¶ 272-277. As above, I disagree with Dr. Rabinow's

assumption that the POSA could so generalize the teachings of these references to the specific

fusion protein claimed. *Supra* Section XIII.A.4.

    **C.**    **Neither Dix Nor The '226 Patent Renders The '865 Asserted Claims Obvious**

    325.    I understand that Dix may not be considered in an obviousness analysis under 35

U.S.C. § 103. Accordingly, Dix cannot render the claims invalid as obvious. That alone is

sufficient to dispense with Dr. Rabinow's opinion with respect to Dix and the '226 Patent.

Rabinow ¶¶ 279-281.

    **D.**    **LUCENTIS (ranibizumab) Does Not Render The '865 Asserted Claims Obvious**

    326.    Dr. Rabinow also argues that the claims would have been obvious over

"LUCENTIS (ranibizumab) formulations (as evidenced by Shams or Gaudreault [2005])."

Rabinow ¶¶ 282-288. As Dr. Rabinow concedes, LUCENTIS was not approved and its label

was not published until June 30, 2006, after the latest priority date of the '865 Patent. Rabinow

¶ 282 n.18. I again disagree with Dr. Rabinow that Gaudreault 2005 or Shams would have

rendered the '865 Asserted Claims obvious.

    327.    Dr. Rabinow's obviousness combination over Gaudreault 2005 or Shams suffers

from the same defects I analyzed above with respect to Fraser. *First*, the POSA would not have

been motivated to develop VEGF Trap$_{R1R2}$ as an ophthalmic formulation suitable for intravitreal

injection. *Supra* Section XIII.A.1. Dr. Rabinow cites to the '747 patent, Rabinow ¶ 285, but the

'747 patent disclosed clinical data showing efficacy of a VEGF Trap molecule using *intravenous*

administration, but disclosed only a prophetic example (with no information or data) involving

intravitreal administration in human patients. '747 patent at 21:1-22:42 (intravenous), 20:20-67

(discussing intravitreal). Further in view of other data showing that intravenous administration

of a VEGF Trap molecule resulted in greater efficacy than intravitreal administration, Saishin at 244-45, *infra* XIII.F, the '747 patent would not have motivated the POSA to use an ophthalmic formulation suitable for intravitreal injection.

328.    *Second*, neither Wulff nor the other prior art on which Dr. Rabinow relies teaches the amino acid sequence of the claimed protein, and even if the POSA did consider the sequence, the POSA would have been taught away from it in view of the prior art's teachings.  *Supra* Section XIII.A.2.  Again, Gaudreault 2005 taught that larger molecules like the claimed fusion protein likely would not penetrate the into the retinal tissue as desired, and the POSA would thus have been taught to use a molecule like ranibizumab (or other options, as set forth above) rather than the much larger claimed fusion protein.  Gaudreault 2005 at 726.  Furthermore, Genentech scientists taught against using chimeric fusion proteins such as the fusion protein claimed because of the possibility of an immunogenic response against the (non-natural) junctions between the fusion protein domains.  Ferrara 2004 at 397.  Thus, the POSA reading Gaudreault 2005 and Shams would have been led towards using ranibizumab or mini-Trap, not the claimed fusion protein.

329.    *Third*, even if the POSA sought to use the claimed protein, the POSA would not have been motivated to formulate it at 40 mg/ml for an ophthalmic formulation.  *Supra* Section XIII.A.3.  Gaudreault 2005 taught that using 40 mg/ml of ranibizumab resulted in moderate to severe inflammation, while 10 mg/ml resulted in maximum VEGF inhibition.   Gaudreault 2005 at 727, 732.  Thus, Gaudreault 2005 taught away from using 40 mg/ml of the claimed fusion protein (to the extent the POSA would have considered it in the first place).  In accordance with Gaudreault 2005's teaching, Shams did not disclose a clinical trial using 40 mg/ml of ranibizumab and instead taught to use a dosage of 10 mg/ml or lower.  *Supra* Section VIII.J.12.

330.    *Fourth*, the POSA would not have had a reasonable expectation of success in achieving the claimed ophthalmic formulations wherein "at least 98% of the VEGF antagonist is present in native conformation following storage at 5° C. for two months as measured by size exclusion chromatography" based on the teachings of Gaudreault 2005 or Shams.  *Supra* Section XIII.A.4.  Those studies do not even indicate whether the *ranibizumab* formulations achieved the claimed native conformation, let alone the distinct protein recited by the asserted claims.  Dr. Rabinow cites to no specific teaching in Shams or Gaudreault 2005 indicating that the ranibizumab formulations disclosed therein achieved 98% native conformation as claimed. Rabinow ¶ 287; *supra* XIII.A.4.  And contrary to Dr. Rabinow's opinion, the POSA would have had no reasonable expectation that the same excipients would result in 98% native conformation as claimed for an entirely different protein with an entirely different structure, i.e., a chimeric fusion protein (amino acids 27-457 of SEQ ID NO:4) unlike an antibody fragment (ranibizumab).

331.    Furthermore, claim 9 of the '865 patent requires that "said buffer comprises a pH about 6.2-6.3."  Both Gaudreault 2005 and Shams taught a different pH:  5.0 in Gaudreault 2005 (Gaudreault 2005 at 727), and 5.5 in Shams (Shams at 31:27-32).  Dr. Rabinow offers no reason why the POSA would depart from the pH in these formulations and instead use a higher pH of about 6.2-6.3 as claimed.  In my opinion, if the POSA sought to follow the formulation approach in either of these references with the claimed fusion protein, then the POSA would have used a pH taught in these references, *not* a pH of about 6.2-6.3.

332.    In addition, Shams illustrated a clinical trial of ranibizumab formulated with 0.01% polysorbate 20.  Claim 4, however, requires a minimum of 0.03% polysorbate 20.  The POSA would have sought to minimize the amount of polysorbate necessary in the formulation,

because polysorbates are animal-derived substances and had not previously been used in an

approved intravitreal product.  *Supra* Section VIII.G.  Given Shams' teaching, the POSA would

have been motivated to use 0.01% polysorbate 20, not 0.03% or higher as recited in claim 4.

Although Gaudreault 2005 used a higher amount of polysorbate (0.05%), Gaudreault 2005, like

Fraser and Wulff, was a preclinical study not directed to stable formulations, while the

illustrative composition in Shams contemplated clinical use.  If, as Dr. Rabinow argues, the

POSA were inclined to consider using polysorbate, then the POSA would have been led toward

the amount of polysorbate 20 in Shams, not in Gaudreault 2005.

    **E.**    **Dr. Rabinow's Scattered Citations Fail to Establish Obviousness of the '865 Asserted Claims**

333.    Dr. Rabinow's opinions that the '865 Asserted Claims would have been obvious

lack any explanation.  Instead, Dr. Rabinow includes a table of citations (Rabinow ¶ 290) and

then proceeds to assert, without reference to evidence or explanation, that the POSA would have

been motivated to make the claimed formulations in each of the '865 Asserted Claims and would

have had a reasonable expectation of success in achieving each limitation.  I disagree, for the

reasons expressed above and below, including because the prior art would not have motivated

the POSA to select the disclosures cited by Dr. Rabinow, to combine those disclosures (and only

those disclosures), or make formulations meeting the specific limitations of the '865 Asserted

Claims with a reasonable expectation of success.

334.    Claim 4 recites that "said organic co-solvent comprises about 0.03% to about

0.1% polysorbate 20."  No prior art cited by Dr. Rabinow teaches or suggests a formulation of

the VEGF antagonist comprising amino acids 27-457 of SEQ ID NO:4 that achieves the claimed

level of native conformation and that includes the claimed amount of polysorbate 20.

**Reply.Add423**

Accordingly, for at least these reasons and others set forth in this report, I disagree with Dr. Rabinow that claim 4 would have been obvious.

335. Claim 7 recites that "said buffer comprises 5-25 mM buffer." No prior art cited by Dr. Rabinow teaches or suggests a formulation of the VEGF antagonist comprising amino acids 27-457 of SEQ ID NO:4 that achieves the claimed level of native conformation and that includes the claimed amount of buffer. Accordingly, for at least these reasons and others set forth in this report, I disagree with Dr. Rabinow that claim 7 would have been obvious.

336. Claim 9 (depending from claim 5) recites that "said buffer comprises a pH about 6.2-6.3." No prior art cited by Dr. Rabinow teaches or suggests a formulation of the VEGF antagonist comprising amino acids 27-457 of SEQ ID NO:4 that achieves the claimed level of native conformation and is formulated at the pH claimed. Accordingly, for at least these reasons and others set forth in this report, I disagree with Dr. Rabinow that claim 9 would have been obvious.

337. Claim 11 (depending from claims 10, which depends from claim 5) recites that "said sugar is selected from the group consisting of sucrose, sorbitol, glycerol, trehalose, and mannitol." No prior art cited by Dr. Rabinow teaches or suggests a formulation of the VEGF antagonist comprising amino acids 27-457 of SEQ ID NO:4 that achieves the claimed level of native conformation and is formulated a sugar selected from the group recited in claim 11. Accordingly, for at least these reasons and others set forth in this report, I disagree with Dr. Rabinow that claim 11 would have been obvious.

338. Claim 14 (depending from claim 5) recites that "said VEGF antagonist fusion protein is glycosylated at asparagine residues corresponding to asparagine residues 62, 94, 149, 222 and 308 of SEQ ID NO: 4." No prior art cited by Dr. Rabinow teaches or suggests a

Reply.Add424

formulation of the VEGF antagonist comprising amino acids 27-457 of SEQ ID NO:4 that

achieves the claimed level of native conformation and is glycosylated at these residues. As

explained above, *supra* Section XIII.A.2, the POSA would not have been motivated to use a

glycosylated fusion protein, including because the POSA would have understood that increased

molecular mass could reduce retinal penetration. Accordingly, for at least these reasons and

others set forth in this report, I disagree with Dr. Rabinow that claim 14 would have been

obvious.

339. Claim 15 (depending from claim 5) recites that "said formulation is capable of

providing a turbidity of 0.01 or lower at OD405 after 2 month storage at 5° C." No prior art

cited by Dr. Rabinow teaches or suggests a formulation of the VEGF antagonist comprising

amino acids 27-457 of SEQ ID NO:4 that achieves the claimed level of native conformation and

also achieves the claimed turbidity. Accordingly, for at least these reasons and others set forth in

this report, I disagree with Dr. Rabinow that claim 15 would have been obvious.

340. Claim 16 (depending from claim 5) recites that "at least 99% of said VEGF

antagonist fusion protein is present in native conformation after 2 month storage at 5° C. as

measured by size exclusion chromatography." No prior art cited by Dr. Rabinow teaches or

suggests a formulation of the VEGF antagonist comprising amino acids 27-457 of SEQ ID NO:4

that achieves the claimed level of native conformation. Accordingly, for at least these reasons

and others set forth in this report, I disagree with Dr. Rabinow that claim 16 would have been

obvious.

341. Claim 17 (depending from claim 5) recites that "at least 98% of said VEGF

antagonist fusion protein is present in native conformation following storage at 5° C. for 24

months as measured by size exclusion chromatography." No prior art cited by Dr. Rabinow

**Reply.Add425**

teaches or suggests a formulation of the VEGF antagonist comprising amino acids 27-457 of SEQ ID NO:4 that achieves the claimed level of native conformation for 24 months. Accordingly, for at least these reasons and others set forth in this report, I disagree with Dr. Rabinow that claim 17 would have been obvious.

342.    Claim 18 (depending from claim 5) recites that "said formulation does not contain phosphate."  No prior art cited by Dr. Rabinow teaches or suggests a formulation of the VEGF antagonist comprising amino acids 27-457 of SEQ ID NO:4 that achieves the claimed level of native conformation and that does not contain phosphate.  Accordingly, for at least these reasons and others set forth in this report, I disagree with Dr. Rabinow that claim 18 would have been obvious.

###    F.    Objective Evidence

343.    I understand that the Court considers objective considerations of nonobviousness of challenged claims when determining whether the claims would have been obvious to a person of ordinary skill in the art.  Such objective considerations, or objective indicia, may include, for example, unexpected results, praise, failures of others, industry skepticism and teaching away, satisfaction of a long-felt need, commercial success, licensing and copying.

344.    There was significant industry skepticism both towards VEGF Trap molecules and using VEGF Trap molecules in the eye.  Specifically, Ferrara 2004 disclosed that:

> An alternative anti-VEGF approach at early-stage clinical development is represented by the VEGF-trap (see previous discussion). It has been proposed that fusions between the constant region of IgG and the extracellular domains of two distinct receptor components represent an advantage over antibodies because they can result in higher binding affinity.  This concept, however, remains to be validated. It is also possible that the junctions between the various structural elements in such multicomponent molecules can generate an immune response.

345. The lead author of Ferrara 2004 was Napoleone Ferrara, a scientist at Genentech. While at Genentech, Dr. Ferrara had an important contribution in discovering VEGF. N. Ferrara & W.J. Henzel, *Pituitary follicular cells secrete a novel heparin-binding growth factor specific for vascular endothelial cells*, 161 Biochem. Biophys. Res. Comm. 851 (1989) ("A growth factor for vascular endothelial cells was identified in the media conditioned by bovine pituitary follicular cells . . . . On the basis of its apparent target cell selectivity, we proposed to name this factor vascular endothelial growth factor (VEGF)."). He was later inducted into the National Academy of Sciences in 2006.[3] Genentech is regarded as the world's first biotechnology company, E. Russo, *Special Report: The Birth of Biotechnology*, 421 Nature 456 (2003), and developed the first drug targeting VEGF, Avastin, which is approved to treat cancer. The POSA would have understood that Genentech was an important part of the biotechnology industry, and would have considered its skepticism towards VEGF Trap—including the suggestion in Ferrara 2004 that "multicomponent molecules" like VEGF Trap could lead to immunogenicity— seriously. Ferrara 2004 at 327. Notably, Ferrara 2004 was published in Nature Reviews Drug Discovery, a leading journal, and has been cited 2,976 times. That Regeneron elected to proceed with developing an intravitreal drug product containing a VEGF Trap molecule, despite skepticism by Dr. Ferrara and Genentech, leaders in the field of biotechnology in general and VEGF in particular, is important evidence supporting the nonobviousness of the composition.

346. In addition, in a later review article,[4] Dr. Ferrara suggested that large molecules like VEGF Trap molecules were unable to penetrate the retina. *N. Ferrara et al.*, *Development*

---

[3] http://www.nasonline.org/member-directory/members/20012448.html

[4] I understand that objective evidence of nonobviousness may be relevant even if published after the priority date of the patent.

**Reply.Add427**

*of ranibizumab, an anti–vascular endothelial growth factor antigen binding fragment, as therapy*

*for neovascular age-related macular degeneration*, 26 Retina 859 (2006) (Ferrara 2006).

Specifically, Ferrara 2006 explained, citing prior art to the '865 patent:

> Intravitreal administration of ranibizumab resulted in marked suppression of neovascularization and leakage in a primate model of CNV.  In addition, the "VEGF-trap," a chimeric soluble VEGF receptor, has been reported to reduce neovascularization in a murine model of CNV. Interestingly, these studies show that systemic administration of the VEGF-trap inhibits neovascularization by ~75%. However, intravitreal administration of the same agent resulted in ~25% inhibition. This limited efficacy occurred in spite of the high binding affinity of the VEGF-trap for VEGF, and it may be due, at least in part, to the existence of a barrier to the transretinal penetration of large molecules such as the VEGF-trap.

Ferrara 2006 at 862 (citing Saishin 2003; Jackson 2003).  This provides further evidence of

industry skepticism specifically directed at an intravitreal compositions comprising high

molecular weight proteins such as VEGF Trap fusion proteins, and further supports

nonobviousness.

347.    The efficacy of EYLEA as an intravitreal injection demonstrated unexpected

properties.  Contrary to the industry skepticism that VEGF Trap fusion proteins could generate

an immune response, or not be able to reach the retina due to their large size, EYLEA was

ultimately found "to be a well-tolerated drug" with a similar safety profile to LUCENTIS.[5]

M. Thomas et al., *Comparative Effectiveness of aflibercept for the treatment of patients with*

---

[5] There is no dispute that EYLEA is an embodiment of every claim but claim 18.  Rabinow ¶ 314.  EYLEA contains 40 mg/ml of the VEGF antagonist fusion protein comprising amino acids 27-457 of SEQ ID NO:4, a buffer (10 mM sodium phosphate), a stabilizing agent (5% sucrose), and an organic co-solvent (0.03% polysorbate 20, which falls within the ranges of both claim 4 and claim 5), along with 40 mM sodium chloride. *E.g.*, MYL-AFL-BLA0002879, at -921.  Dr. MacMichael recognizes the Example 3 is an embodiment of the claims, MacMichael ¶ 91, which contains the same components as EYLEA.

136

*neovascular age-related macular degeneration*, 7 Clin. Ophthal. 495, 498 (2013). "Side effects, either ocular or systemic, were similar across treatment groups, with no differences between aflibercept administered every 2 months and monthly ranibizumab." *Id.* That safety profile coincided with a much longer half-life as compared to LUCENTIS, which proved to be an important feature contributing to EYLEA's efficacy. Thomas noted specifically that aflibercept's "large molecular weight of 115 Kd" contributed to the drug's half-life, *id.* at 498, which in turn advantageously permits bimonthly dosing (as compared to LUCENTIS, which must be delivered monthly). *Id.* Thus, contrary to the industry's skepticism regarding VEGF Trap proteins' ability to penetrate the retina and risk of generating an immune response, and the prior art's teachings that a 40 mg/ml dose of ranibizumab caused moderate to severe inflammation (Gaudreault 2005 at 727), EYLEA ultimately proved to be an unexpectedly safe and efficacious drug. This unexpected safety and efficacy holds both in comparison to the closest prior art relating to LUCENTIS (the 40 mg/mL dose tested in Gaudreault 2005) and in comparison to any of the other prior art cited by Dr. Rabinow (none of which demonstrated a safe and effective intravitreal formulation of aflibercept).

348. Furthermore, evidence of copying supports the nonobviousness of the '865 Asserted Claims. In developing its M710 product, Mylan investigated formulations without an organic co-solvent, as set forth below:

**Reply.Add429**

| Table 2: Formulation matrix for the accelerated stability study | | | | | | |
|---|---|---|---|---|---|---|
| Form. No. | Form. Code | Buffer | pH | Tonicity Modifier | Surfactant | API (mg/mL) |
| 1 | U6.2NS | N/A | 6.2 | 40 mM NaCl, 5% Sucrose | None | 40 |
| 2 | UT | N/A | N/A | 10% Trehalose | None | 40 |
| 3 | A5N | 10 mM Sodium Acetate | 5.0 | 150 mM NaCl | None | 40 |
| 4 | A5S | 10 mM Sodium Acetate | 5.0 | 10% Trehalose | None | 40 |
| 5 | H6N | 10 mM Histidine | 6.0 | 150 mM NaCl | None | 40 |
| 6 | H6S | 10 mM Histidine | 6.0 | 10% Trehalose | None | 40 |
| 7 | P7N | 10 mM Sodium Phosphate | 7.0 | 150 mM NaCl | None | 40 |
| 8 | P7S | 10 mM Sodium Phosphate | 7.0 | 10% Trehalose | None | 40 |
| 9 | CTRL | 10 mM Sodium Phosphate, 40mM NaCl, 5% Sucrose, 0.03% P20, pH 6.2 | | | | 40 |

Mylan's efforts with respect to these formulations resulted in turbidity levels that were disfavored.  *See* MYL-AFL0011219, at -235 ("After 4 hours of agitation at 1,000 RPM, formulations F1, F3, F4, F7, and F8 were all visibly turbid."), -236.  The results are shown below:



MYL-AFL0011219, at -236.  As a result, it was recommended that "a surfactant may be necessary to stabilize M710 against agitation-induced shear stresses."  MYL-AFL0011219, at -237; *see id.* at -261-262 ("Although no surfactant was selected for this phase of the study, a surfactant is recommended to stabilize M710.").  The formulation F9 (i.e., EYLEA) did not exhibit turbidity, and instead had the lowest agitation-induced turbidity of Mylan's tested

**Reply.Add430**

samples, as shown in the photograph above (where EYLEA is shown as the right-most formulation) and the data below (where EYLEA is at the bottom of the table):

| Table 9: Turbidity results for static and agitated formulations | | | |
| --- | --- | --- | --- |
| Form. # | Form. Code | Static Samples ($A_{650}$) | Agitated Samples ($A_{650}$) |
| F1 | U6.2NS | 0.004 | 0.012 |
| F2 | UT | 0.003 | 0.005 |
| F3 | A5N | 0.003 | 0.016 |
| F4 | A5S | 0.003 | 0.009 |
| F5 | H6N | 0.005 | 0.006 |
| F6 | H6S | 0.003 | 0.006 |
| F7 | P7N | 0.004 | 0.010 |
| F8 | P7S | 0.005 | 0.025 |
| F9 | CTRL | 0.006 | 0.005 |

MYL-AFL0011219, at -237. Rather than proceed with a formulation lacking an organic co-solvent, Mylan proceeded to seek approval of a formulation copying EYLEA's polysorbate 20 (at exactly the same concentration, 0.03%). This evidence further establishes the nonobviousness of the '865 Asserted Claims, each of which requires an organic co-solvent comprising polysorbate 20.

349. In sum, each category of objective evidence discussed above supports the nonobviousness of the '865 Asserted Claims, and I conclude that the evidence as a whole demonstrates that the '865 Asserted Claims would not have been obvious to the POSA. I understand that another expert retained by Regeneron is providing an opinion that the formulations claimed in the '865 Asserted Claims are associated with evidence of commercial success. Although my opinion does not rest on that evidence, a finding that the '865 Asserted Claims are associated with evidence of commercial success would further support my conclusion that the '865 Asserted Claims are nonobvious.

**XIV.   The '865 Asserted Claims Are Not Invalid For Obviousness-Type Double Patenting**

350.    Dr. Rabinow asserts that the '865 Asserted Claims are invalid for obviousness-type double patenting ("ODP") over several references.  However, Dr. Rabinow's conclusions with respect to ODP lack any explanation:   Dr. Rabinow simply asserts that he compared the '865 Asserted Claims to the claims of several purported ODP references (all related patents sharing the same inventors and specification as the '865 patent) and that his view is that they are invalid for ODP, without any analysis.  To the extent Dr. Rabinow seeks and is allowed to articulate an analysis of ODP in his reply report, I reserve the right to respond.

351.    Dr. Rabinow asserts ODP over four purported references:  U.S. Patents (1) 11,066,458 (the "'458 patent"), claims 1-66; (2) 9,340,594 (the "'594 patent"), claims 1-9; (3) 9,580,489 (the "'489 patent"), claims 1-29; and (4) 7,608,261 (the "'261 patent"), claims 1-5. Rabinow ¶ 304.  Each of these patents is related to the '865 patent through continuation applications, and are what I understand to be "parent" patents of the '865 patent.  '865 patent at page 1.  Dr. Rabinow also relies on Papadopoulos for each ground.  Dr. Rabinow asserts that each of these patents "expire no later than March 7, 2021," but does not explain his basis for that opinion.  I understand that the statutory term of a patent is 20 years from the earliest nonprovisional filing date, which here was June 14, 2007.  Thus, the statutory term of each of these patents runs until June 14, 2027.  Dr. Rabinow offers no explanation how patents sharing the same statutory term as the '865 patent could be considered appropriate ODP references.

352.    Dr. Rabinow first asserts ODP over the '458 patent.  Dr. Rabinow asserts that the 66 claims of the '458 patent on which he relies "recite a specific formulation that falls within the scope of" the '865 claims.  Rabinow ¶ 305.  However, Dr. Rabinow does not provide any analysis to support that view, let alone on a claim by claim basis, which I understand to be the relevant inquiry.  Instead, Dr. Rabinow addresses his opinion, such as it is, to 66 claims

140

**Reply.Add432**

generally, without any distinction between them, even though the 66 claims of the '458 patent

differ in many respects material to double patenting.  Dr. Rabinow addresses none of them.

Furthermore, Dr. Rabinow has not explained why the POSA would have been motivated or had

reason to change the claims from the '458 patent on which he relies (without differentiation) to

arrive at the invention of one or more of the asserted claims of the '865 patent, with a reasonable

expectation of success.  I disagree that the POSA would have had any such motivation or reason

or any reasonable expectation of success.  *Supra* XIII.A.

353.    To the extent Dr. Rabinow's opinions can be discerned, I disagree with them, at

least because the '458 claims do not recite the specific amino acid sequence claimed in the '865

patent, i.e., amino acids 27-457 of SEQ ID NO:4.  I incorporate my analysis from Section XIII,

*supra*, explaining why the '865 Asserted Claims are not obvious over the prior art.  Again, to the

extent that Dr. Rabinow is allowed to provide an obviousness type double patenting analysis

with respect to particular claims of the '458 patent (something that, again, he did not do in his

report), I reserve the right to respond to any such argument.

354.    Dr. Rabinow next asserts ODP over the '594 patent.  Dr. Rabinow asserts that the

9 claims of the '594 patent on which he relies "recite a specific formulation that falls within the

scope of" the '865 claims.  Rabinow ¶ 306.  To the extent that Dr. Rabinow is allowed to provide

an obviousness type double patenting analysis with respect to particular claims of the '594 patent

(something that, again, he did not do in his report), I reserve the right to respond to any such

argument.  To the extent Dr. Rabinow's opinions can be discerned, I disagree, at least because:

- the '594 claims each recite a "pre-filled syringe," which has different properties than the
  vial claimed in the '865 Asserted Claims, *supra* Section VIII.I;

141

**Reply.Add433**

- the '594 claims do not recite the structural features required by the '865 claims, e.g., the specific amino acid sequence claimed in the '865 patent, i.e., amino acids 27-457 of SEQ ID NO:4, that the VEGF antagonist is glycosylated (including, per claim 14, at specific residues), and that the concentration of the VEGF antagonist is 40 mg/ml, *see supra* XIII.A.2-3;

- the '594 claims do not recite that the VEGF antagonist achieves 98% native conformation as recited in each of the '865 claims, or the additional properties recited in claims 15-17, *see supra* XIII.A.4.

Dr. Rabinow has not explained why the POSA would have been motivated or had reason to change the claims from the '594 patent on which he relies (without differentiation) to arrive at the invention of one or more of the asserted claims of the '865 patent, with a reasonable expectation of success. I disagree that the POSA would have had any such motivation or reason or any reasonable expectation of success. I incorporate my analysis from Section XIII, *supra*, explaining why the '865 Asserted Claims are not obvious over the prior art.

355. Dr. Rabinow next asserts ODP over the '489 patent. Dr. Rabinow asserts that the 29 claims of the '489 patent on which he relies "recite a specific formulation that falls within the scope of" the '865 claims. Rabinow ¶ 307. To the extent that Dr. Rabinow is allowed to provide an obviousness type double patenting analysis with respect to particular claims of the '489 patent (something that, again, he did not do in his report), I reserve the right to respond to any such argument. To the extent Dr. Rabinow's opinions can be discerned, I disagree, at least because:

- the '489 claims do not recite the specific amino acid sequence claimed in the '865 patent, i.e., amino acids 27-457 of SEQ ID NO:4, and most of the claims do not recite that the (unspecified) VEGF antagonist is glycosylated, *see supra* XIII.A.2;

- the '489 claims do not recite that the concentration of the VEGF antagonist is 40 mg/ml, *see supra* XIII.A.3;

- the '489 claims do not recite that the VEGF antagonist achieves 98% native conformation as recited in each of the '865 claims, or the additional properties recited in claims 15-17, *see supra* XIII.A.4.

Again, Dr. Rabinow has not explained why the POSA would have been motivated or had reason to change the claims from the '489 patent on which he relies (without differentiation) to arrive at the invention of one or more of the asserted claims of the '865 patent, with a reasonable expectation of success. I disagree that the POSA would have had any such motivation or reason or any reasonable expectation of success. I incorporate my analysis from Section XIII, *supra*, explaining why the '865 Asserted Claims are not obvious over the prior art.

356. Dr. Rabinow next asserts ODP over the '261 patent. Dr. Rabinow asserts that the 5 claims of the '261 patent on which he relies "recite a specific formulation that falls within the scope of" the '865 claims. Rabinow ¶ 308. To the extent that Dr. Rabinow is allowed to provide an obviousness type double patenting analysis with respect to particular claims of the '261 patent (something that, again, he did not do in his report), I reserve the right to respond to any such argument. To the extent Dr. Rabinow's opinions can be discerned, I disagree, at least because:

- the '261 claims do not recite the specific amino acid sequence claimed in the '865 patent, i.e., amino acids 27-457 of SEQ ID NO:4, and the claims do not recite that the (different) VEGF antagonist is glycosylated, *see supra* XIII.A.2;

- the '261 claims do not recite that the concentration of the VEGF antagonist is 40 mg/ml, *see supra* XIII.A.3;

**Reply.Add435**

- the '261 claims do not recite that the VEGF antagonist achieves 98% native conformation as recited in each of the '865 claims, or the additional properties recited in claims 15-17, *see supra* XIII.A.4.

Again, Dr. Rabinow has not explained why the POSA would have been motivated or had reason to change the claims from the '261 patent on which he relies (without differentiation) to arrive at the invention of one or more of the asserted claims of the '865 patent, with a reasonable expectation of success. I disagree that the POSA would have had any such motivation or reason or any reasonable expectation of success. I incorporate my analysis from Section XIII, *supra*, explaining why the '865 Asserted Claims are not obvious over the prior art.

## XV. The '865 Asserted Claims Are Not Invalid Under Section 112

### A. The '865 Asserted Claims Are Enabled

357. Dr. MacMichael contends that the claims are not enabled, focusing largely on claim 1, which I understand is not one of the '865 Asserted Claims asserted in this case by Regeneron against Mylan. MacMichael ¶¶ 104-143. I disagree with Dr. MacMichael that any of the claims that he addresses are not enabled.

358. I understand that in determining whether undue experimentation would be required, several factors (which I understand are referred to as the "*Wands* factors") should be considered, including, but not necessarily limited to:

- the breadth of the claims;

- the nature of the invention;

- the state of the prior art;

- the level of one of ordinary skill in the art;

- the level of predictability in the art;

144

**Reply.Add436**

- the amount of direction provided in the specification;

- the existence of working examples in the specification; and

- the quantity of experimentation needed to make or use the invention based on the content of the disclosure.

### 1.    The Breadth of the Claims

359.    Dr. MacMichael characterizes that the claims are "broad" and cover a "large genera" of "near infinite" formulations.  MacMichael ¶ 105.  I disagree.  In my opinion, the scope of the claims reasonably correlates to the scope of the disclosure of ophthalmic formulations in the '865 patent specification.  Those formulations, which Regeneron invented and described in the '865 patent, uniformly achieved the claimed property recited in each of the '865 Asserted Claims, i.e., "at least 98% of the VEGF antagonist is present in native conformation following storage at 5° C. for two months as measured by size exclusion chromatography."  *Supra* Section IX.A.

360.    Dr. MacMichael asserts that the claims cover "any type of formulation that can be administered by intravitreal administration" and focuses specifically on liquid and lyophilized formulations.  MacMichael ¶ 106.  In my opinion, the POSA reading the specification and practicing the claims would proceed with a liquid formulation.  As I explained above, "[f]or ease of preparation and cost containment by the manufacturer, and ease of handling by the end user, an aqueous therapeutic protein formulation usually is preferred."  Carpenter at 109; *supra* Section VIII.D.  Because the specification taught multiple liquid formulations that achieved the claimed native conformation (*see, e.g.*, Tables 1-6), the POSA would not seek to add the complexity, cost, and inconvenience of a lyophilized formulation.  And to the extent the POSA did seek to make a lyophilized formulation, the POSA would follow the '865 patent's teachings,

including the disclosure of lyophilized formulations. '865 patent at 11:1-12:23 (Examples 7 and 8). I understand that the patent need not teach, and preferably omits, what is already known in the art, and the '865 patent explains that "[t]he lyophilization process is well known to those of ordinary skill in the art, and typically includes sublimation of water from a frozen formulation under controlled conditions." '865 patent at 7:37-40.

361.     Dr. MacMichael contends that Examples 7 and 8 are not within the scope of the '865 Asserted Claims because, for these examples, the formulation is stored in lyophilized form at 20 mg/ml of the VEGF antagonist, rather than in a liquid, reconstituted form at the claimed concentration of 40 mg/ml, and thus there is no "storage" of the claimed VEGF antagonist for two months. MacMichael ¶ 90. I agree that Examples 7 and 8 do not contain data showing percent native conformation following storage of a *liquid formulation* at 5° C for two months. However, this further supports my view that the POSA would not use a lyophilized formulation to practice the claimed inventions. Examples 7 and 8 illustrate a practical use for a lyophilized formulation. Ordinarily, a formulation is lyophilized because the liquid formulation has unacceptable stability, and the formulation is kept in lyophilized form until its reconstitution at the time of use. Lee at 1745; Carpenter at 109-110. As in Examples 7 and 8, the formulation is stored in lyophilized form and not stored again as a liquid. But the claim specifies storing the formulation for a period of months in a liquid form—*contrary to the very purpose of lyophilizing in the first place*. I understand that the enablement inquiry requires that the POSA must be able to practice the invention without undue experimentation, but I also understand that the POSA practices the invention using common sense and ordinary skill in view of the specification's teachings, and does not try to subvert the invention. Here, the POSA practicing the invention would not lyophilize a formulation, then reconstitute it and store it for a period of months.

146

362.     Dr. MacMichael also points to the possibility of using "suspensions" or "emulsions" to practice the claims.  MacMichael ¶ 106.  These applications are even further afield from the claimed invention, and are not what the POSA would use to practice the invention.  Although the specification of the '865 patent does refer generally to suspensions and emulsions, '865 patent at 7:31-33, the claims do not recite either such dosage form, and the POSA would not understand them to be within the claims.  First, Dr. Rabinow points to no evidence that a POSA would (or even could) measure the native conformation of a protein in a suspension or an emulsion "following storage at 5° C. for two months *as measured by size exclusion chromatography*."  In a suspension, the protein would be in an insoluble particulate form and would not ordinarily be detected by size exclusion chromatography.  *See* Hollar et al., *Factors affecting the denaturation and aggregation of whey proteins in heated whey protein concentrate mixtures*, 78 J. Dairy Sci. 260, 262 (1995) (using size exclusion chromatograph to detect "soluble aggregates").  An emulsion, on the other hand, involves the mixture of immiscible liquids.  Dr. MacMichael points to no example where a protein formulation emulsion was evaluated by size exclusion chromatography, nor does Dr. MacMichael suggest any reason why a POSA would use an emulsion (or an example of a therapeutic protein formulation in an emulsion).  Second, Dr. MacMichael also does not explain how a suspension or an emulsion could be an "ophthalmic formulation suitable for intravitreal injection" and he has not pointed to any such formulations as of the time of the '865 patent.

363.     Dr. MacMichael next asserts that claim 1 encompasses any concentration of the claimed VEGF antagonist fusion protein.  MacMichael ¶ 107.  The '865 Asserted Claims, however, are each limited specifically to 40 mg/ml.

364.    The '865 Claims recite a buffer.  Claim 7 recites that "said buffer comprises 5-25

mM buffer," while claim 18 recites that "said formulation does not comprise phosphate."

Buffers were known excipients and have been used for decades to stabilize the pH of solutions,

including in formulations.  Certain embodiments of the '865 patent use a phosphate buffer,

which was a known buffer at the time.  *E.g.*, '865 patent at 2:39-48, 9:19-30.  The POSA would

have understood that other buffers could be used in an ophthalmic formulation suitable for

intravitreal injection, such as histidine.  Shams at 31:27-32.  The POSA would have understood

that the role of a buffer in a formulation is to maintain a stable pH, and would have understood

that buffers have suitable pH ranges at which they function.

365.    Claim 2, from which each of the '865 Claims depends, recites an organic co-

solvent that "comprises polysorbate."  Claim 4 further recites that "said organic co-solvent

comprises 0.03% to about 0.1% polysorbate 20," while claim 5 recites that "said organic co-

solvent comprises 0.01% to 3% polysorbate 20."  Polysorbate (and polysorbate 20) was a known

excipient in protein formulations.  MacMichael ¶ 61.  Accordingly, Dr. MacMichael's opinions

as to the boundaries of the term "organic co-solvent" in isolation, MacMichael ¶ 109

(considering whether substances such as dimethylformamide are organic co-solvents), are

irrelevant because they do not address the '865 Asserted Claims, each of which requires a

specified amount of "polysorbate 20."

366.    The '865 claims additionally recite that the claimed ophthalmic formulations

comprise a "stabilizing agent."  The specification of the '865 patent exemplifies several

stabilizing agents, which include "sucrose, sorbitol, glycerol, trehalose, or mannitol."  '865

patent at 2:44-46.  Claim 11 recites that the stabilizing agent is selected from one of those five

disclosed stabilizing agents.  As Dr. MacMichael's citation illustrates (MacMichael ¶ 110),

**Reply.Add440**

sugars and sugar alcohols like those described in the '865 patent have been known for over four

decades to provide thermal stability to proteins.  Back at 5193.

367.    The '865 Asserted Claims further require that "at least 98% of the VEGF

antagonist is present in native conformation following storage at 5° C. for two months as

measured by size exclusion chromatography."  Size exclusion chromatography was a known and

routine assay that the POSA readily would have been able to perform.  *Supra* Section VIII.H.

The examples disclose several formulations that achieve the claimed level of native

conformation as measured by size exclusion chromatography.

368.    In summary, the '865 patent identifies the claimed elements and provides multiple

examples of formulations achieving the claimed native conformation.  Accordingly, I disagree

with Dr. MacMichael that the '865 Asserted Claims are broad.  This factor favors enablement.

### 2.    The Nature of the Invention

369.    The '865 patent explains that the "present invention is directed to pharmaceutical

formulations suitable for intravitreal administration comprising agents capable of inhibiting

[VEGF]."  '865 patent at 1:45-48.  The patent further explains that the "invention includes liquid

pharmaceutical formulations having increased stability."  '865 patent at 1:49-50.  The patent then

describes multiple such formulations.  '865 patent at 8:5-12:24.  The '865 Claims set forth a

specific agent that inhibits VEGF—i.e., a glycosylated VEGF antagonist fusion protein

comprising amino acids 27-457 of SEQ ID NO:4—along with several recited excipients (an

organic co-solvent, a buffer, and a stabilizing agent) that together make up an "ophthalmic

formulation suitable for intravitreal administration."  Consistent with the examples, the '865

claims further recite that "at least 98% of the VEGF antagonist is present in native conformation

following storage at 5° C. for two months as measured by size exclusion chromatography."

**Reply.Add441**

370. Dr. MacMichael asserts that "not all of the formulations with the claimed
excipients would exhibit the claimed stability," i.e., native conformation. MacMichael ¶ 112.
However, Dr. MacMichael does not point to any concrete examples of formulations having the
components recited in the '865 Asserted Claims that do not achieve the claimed level of native
conformation. Nor does Dr. MacMichael identify any formulation within the scope of the claims
that would require undue experimentation to make and test. Accordingly, this factor favors
enablement.

### 3. The State of the Prior Art

371. Dr. MacMichael contends that the prior art "fails to remedy" unspecified
"deficiencies" in the '865 patent. MacMichael ¶ 128. I disagree with Dr. MacMichael that the
'865 patent is deficient.

372. The excipients used in the claimed ophthalmic formulations were known in the
prior art, as explained above; the inventors did not invent any new excipients or classes of
excipients. To the contrary, Dr. Furfine explained that the inventors selected phosphate for the
ultimate formulation used in EYLEA (and described in the '865 patent) because "[p]hosphate is
a natural substance" and "one of the most common buffer[s]," and thus "seemed like something
that would have a reasonable probability of being tolerated in the eye." Furfine Dep. 60:6-13.
Notably, the intravitreally administered product MACUGEN also used a phosphate buffer.
MYL-AFL0007349 ("The [MACUGEN] product is a sterile, clear, preservative-free solution
containing . . . sodium phosphate monohydrate, dibasic sodium phosphate heptahydrate."). Dr.
Furfine explained that was a "[r]ecurrent theme" in the inventors' approach to formulation
development. In addition, Dr. Furfine explained that other excipients listed in the '865 patent
(but not used in the examples) were known in the art. Dr. Furfine explained, for example, that
"trehalose is a commonly used thermal stabilizer." Furfine Dep. 186:10-11. And still others

would have been known to the POSA: as Dr. Furfine explained, "histidine is commonly thought

of as a buffer if you're a formulation scientist." Furfine Dep. 190:6-7. The POSA would have

shared this approach and these views.

373. In addition, as explained above, *supra* Section VIII.H, the test recited in the

claims—size exclusion chromatography—was a known and routine method to measure native

conformation of a protein. Dr. MacMichael criticizes the '865 patent for not including

parameters of size exclusion chromatography. MacMichael ¶ 129. However, as above, I

understand that it is not required (or encouraged) to include details well known in the prior art in

patent specifications, and is not required for enablement. Accordingly, multiple references cited

by Drs. Rabinow and MacMichael describe size exclusion chromatography without providing the

details of how the assay was performed. Arvinte at ¶ 162; Fyfe at 58:2-9. Indeed, Mylan itself

has obtained patents with similar descriptions of size exclusion chromatography. *See* U.S. Patent

11,058,768 at 34:1-6 (in patent assigned to Mylan GmbH, explaining that "the result drug

substance was monitored via size exclusion chromatography (SEC) for any possible changes in

the size variants distribution," but providing no further details how that was done). The POSA

knows how to obtain reliable data with SEC testing, without any recitation of the particular

parameters to be used. I thus disagree with Dr. MacMichael that the absence of parameters

favors nonenablement.

374. Although the prior art did not teach several limitations—for example, an

ophthalmic formulation of the claimed VEGF antagonist fusion protein, that protein's

glycosylation, and the specific claimed dosage—the patent provides substantial and particular

guidance regarding these limitations.

375. In summary, the prior art as a whole supports the enablement of the claims.

**Reply.Add443**

### 4. The Level of Ordinary Skill

376.    Dr. MacMichael agrees that the level of ordinary skill is high.  MacMichael ¶ 127;

*supra* Section VI.  Dr. MacMichael then points to the prosecution history of a different, unrelated

patent in arguing that Regeneron took the position that the POSA would have to engage in

significant trial-and-error experimentation.  However, Dr. MacMichael omits that in his cited

passage, Regeneron was discussing the teachings of Remington's (which did not address the

claimed VEGF antagonist fusion protein), not how the POSA would practice the claims in view

of the examples and substantial guidance in the specification of the '865 patent.  The full

quotation reads:  "Thus, one of ordinary skill in the art upon reading Remington's would expect

to engage in significant non-routine experimentation to develop a successful formulation as

claimed herein."  '840 App. Dec. 6, 2016 Response to Office Action at 11, MYL-AFL0092893,

at -909.  Likewise, the statement of Dr. Dix (again, with reference to a different, unrelated

patent) cited by Dr. MacMichael was also addressing whether it was "straightforward" to "apply

a formulation for one drug to another."  MYL-AFL0092321, at -323-324.  But that is irrelevant

to the enablement inquiry here, because the claims are limited to a *specific* VEGF antagonist

fusion protein, and examples in the specification likewise address formulations of that protein.

Accordingly, this factor favors enablement.

### 5. The Level of Predictability

377.    Dr. MacMichael cites to the same evidence above with respect to the *Wands*

factor regarding predictability.  *Compare* MacMichael ¶ 113 *with* MacMichael ¶ 127.  I disagree

with Dr. MacMichael for the same reasons as above.  Dr. MacMichael further points to other

statements regarding the effect of certain PEG excipients, but again, the statements are from a

different, unrelated patent application.  MacMichael ¶ 114 (citing '256 App Dix Declaration ¶¶

5-10).  Dr. Dix's statements regarding the effect of certain types of PEG are also irrelevant

**Reply.Add444**

because the '865 Asserted Claims recite that the organic co-solvent comprises polysorbate, not PEG. MYL-AFL0092325, at -326-327 ("This stabilizing effect of the organic cosolvents polysorbate 20 or PEG 3350, which is not shared by the organic cosolvent PEG 300, is an effect that could not be predicted by a [POSA] in light of the references cited by the Examiner."). And regardless, the statements do not address the teachings of the '865 patent specification.

378.    There is no evidence that experimentation, with the specification of the '865 patent specification in hand, would be unpredictable. On the contrary, the specification's examples reflect that, despite changes in the formulations, the claimed level of native conformation can be achieved repeatedly and consistently in view of the specification's teachings. The specification provides considerable guidance as to other excipients that may be used to obtain claimed formulations within the scope of the claims, *e.g.*, '865 patent at 2:39-52, and these formulations can be prepared and tested routinely, and that any experimentation to practice the full scope of the asserted claims, beginning with the examples and making modifications to make additional formulations, would not be undue. Accordingly, this factor favors enablement.

### 6.    The Direction and Working Examples in the Specification

379.    Unlike the prior art, the '865 patent disclosed ophthalmic formulations of the claimed VEGF antagonist fusion proteins. '865 patent at 2:20-32. These disclosures and examples, *supra* Section IX.A, enabled the POSA to make and use the claimed ophthalmic formulations without undue experimentation.

380.    Dr. MacMichael attempts to minimize the disclosures of the '865 patent. Dr. MacMichael criticizes the patent for not setting forth "the order of addition of the excipients and VEGF antagonist, mixing times, concentrations, temperatures, etc." MacMichael ¶ 115. These basic steps, however, were routine in the art, and Dr. MacMichael does not point to any undue

experimentation that would be required based on these factors (or unspecified others).  For example, the '865 patent cites to a patent disclosing ophthalmic formulations of a different VEGF-binding molecule, '865 patent at 2:1-5 (citing U.S. Patent 6,676,941), which describes simply that an "ophthalmic preparation" may be "prepared in accordance with conventional pharmaceutical science."  '941 patent at 99:60-65.  Dr. MacMichael does not point to any undue experimentation that results from these supposed omissions, on topics distant from the subject of the claimed inventions.  And in any event, the claims address temperature, requiring that storage take place for two months at 5°C (claim 1).

381.    Dr. MacMichael next criticizes the patent regarding the concentration of the VEGF antagonist fusion protein and argues that it fails to teach "how to prepare a sufficient buffer system."  MacMichael ¶ 116.  But the patent provides several examples, *supra* Section IX.A, and the POSA would have recognized that the invention was not limited to a single buffer.  Dr. MacMichael cites to Gokarn, but the cited disclosure only teaches that proteins themselves have some buffering capacity.  MacMichael ¶ 116 (citing Gokarn at 3:15-21).  Again, Dr. MacMichael does not point to any experimentation that would be necessary to make or use the claimed invention with the disclosure of the '865 patent in hand.  Moreover, the '865 Asserted Claims are each limited to a specific concentration of the claimed VEGF antagonist fusion protein, i.e., 40 mg/ml.

382.    Dr. MacMichael next asserts that the scope of "organic co-solvents" is "extremely broad and diverse" and the "POSA would require undue experimentation to determine" how to prepare formulations with an organic co-solvent.  MacMichael ¶ 117.  However, Dr. MacMichael fails to explain what experimentation would be necessary to practice even the scope of (unasserted) claim 1.  Again, the patent describes appropriate organic co-solvents, '865 patent

154

**Reply.Add446**

at 3:28-31, and further describes examples of formulations with an organic co-solvent, *supra* Section IX.A.  Furthermore, the '865 Asserted Claims are each limited to an "organic co-solvent comprising polysorbate" (or polysorbate 20).

383.    Similarly, Dr. MacMichael also does not identify any undue experimentation that would be necessary to make and use the claimed ophthalmic formulations with a stabilizing agent.  The patent describes several stabilizing agents ("sucrose, sorbitol, glycerol, trehalose, and mannitol"), '865 patent at 3:25-27, and further describes examples of formulations with a stabilizing agent, *supra* Section IX.A.  Dr. MacMichael incorrectly asserts (at ¶ 118) that the specification discloses only "one stabilizing agent," but it plainly discloses others.

384.    Dr. MacMichael also does not point to any undue experimentation that would be necessary in view of the patent's disclosure of a buffer.  Although the patent's examples use a phosphate buffer, MacMichael ¶ 119, the POSA would have understood that other buffers were known in the art.  *E.g.*, Shams at 31:27-32 (ranibizumab formulation with 10 mM histidine buffer).  Although Dr. MacMichael asserts that "different buffers can have different effects on a formulation," MacMichael ¶ 119, Dr. MacMichael does not demonstrate any undue experimentation that would result from testing different buffers.  And importantly, the POSA would have understood from the specification that the preferred pH was 6.2-6.3.  '865 patent at 2:57, 2:61, 2:67, 3:5, 3:10, 3:52, 4:2, 4:6, 4:35, 4:40, 4:44, 4:48, 4:53.  The POSA would have understood that at this preferred pH, limited buffers would have been contemplated for an ophthalmic formulation suitable for intravitreal injection.  Dr. MacMichael acknowledges that the POSA would select a buffer based on the desired pH.  MacMichael ¶ 79 (describing buffers according to their pH ranges, citing Bontempo at 97).

385.     Dr. MacMichael faults the specification for not disclosing a histidine buffer. MacMichael ¶ 120.  But as explained above, histidine was a well-known buffer at the time. Furfine Dep. 185:8-12.  I understand that the specification need not list, and preferably omits, what was well known in the prior art.  Dr. MacMichael does not point to any undue experimentation that would have been necessary in using a histidine buffer, which was known to serve as a buffer at the preferred pH range of 6.2-6.3 described in the '865 patent (which Dr. MacMichael does not dispute).

386.     Dr. MacMichael also cites to Regeneron's disclaimer of a different patent (Dix '231) that recited a histidine buffer.  MacMichael ¶ 121; *see also* MacMichael ¶ 127.  That patent is not related to, and has a different specification than, the '865 patent, and there is no basis to believe that the disclaimer of that Dix '231 patent had any relationship to enablement of the Dix '231 patent (much less the '865 patent).  The statement by Regeneron cited by Dr. MacMichael refers to a "question whether the data presented in Table 7 of the Dix '231 Patent corresponds to the formulation described in Example 4 at column 10, lines 27-38."  MacMichael ¶ 121.  Neither that table nor the example appears in the '865 patent.  Accordingly, I disagree with Dr. MacMichael that the disclaimer has any relevance to the enablement of the '865 patent.

387.     Finally, Dr. MacMichael states that the "specification does not provide any guidance on how to make formulations with the claimed excipients that exhibit the claimed stability properties" (presumably referring to the native conformation limitation of claim 1). MacMichael ¶ 123.  I disagree.  As set forth above, *supra* Section IX.A, the specification provides multiple examples of formulations that meet this claimed property.  The formulations in the '865 patent's examples are set forth below:

156

**Reply.Add448**

|  | Example 1 (vial) | Example 2 (vial) | Examples 3 (vial) & 4 (pre-filled syringe) | Examples 5 (vial) & 6 (pre-filled syringe) | Examples 7 (vial) & 8 (vial) |
|---|---|---|---|---|---|
| **VEGF Antagonist** | 50 mg/ml VEGF Trap, SEQ ID NO:4 | 50 mg/ml VEGF Trap, SEQ ID NO:4 | 40 mg/ml VEGF Trap, SEQ ID NO:4 | 40 mg/ml VEGF Trap, SEQ ID NO:4 | 20 mg/ml VEGF Trap, reconstituted to 40 mg/ml, SEQ ID NO:4 |
| **Organic co-solvent** | 0.1% polysorbate 20 | 3% polyethylene glycol 3350 | 0.03% polysorbate 20 | 0.03% polysorbate 20 | 0.015% polysorbate 20 |
| **Tonicity agent** | 50 mM NaCl | 50 mM NaCl | 40 mM NaCl | 135 mM NaCl | 20 mM NaCl |
| **Buffering agent** | 10 mM phosphate | 10 mM phosphate | 10 mM phosphate | 10 mM phosphate | 5 mM phosphate |
| **Stabilizing agent** | 5% sucrose | 5% sucrose | 5% sucrose | None | 2.5% sucrose |
| **pH** | 6.25 | 6.25 | 6.3 | 6.3 | 6.3 |

388.    Each of these examples achieved 98% or greater native conformation when stored at 5°C over two months storage (in a liquid formulation for Examples 1-6, and in lyophilized form for Examples 7-8) as measured by size exclusion chromatography. *Supra* Section IX.A. Furthermore, each also achieved the claimed level of turbidity set forth in claim 15; Examples 3-7 met the 99% native conformation set forth in claim 16; and Examples 1 and 2 both met the 24-month native conformation limitation set forth in claim 17 (the other examples were not tested for that period of time; no example was tested for 24 months but did not achieve the claimed level of native conformation).  Thus, the specification teaches the POSA that these formulations achieve the claimed properties, and the POSA would begin with these formulations in order to practice the invention and make and test others through routine experimentation that formulators practice without difficulty.  This factor thus favors enablement.

157

**Reply.Add449**

### 7.     Quantity of Experimentation

389.     Dr. MacMichael asserts that the POSA would have to make and test tens of millions of formulations in order to practice the claimed invention.  MacMichael ¶¶ 79, 124-126.  I disagree.  I understand that the test for undue experimentation does not require the POSA to exhaust a genus and test every conceivable embodiment.  The '865 patent describes a genus of formulations comprising the specific claimed VEGF antagonist fusion protein that is glycosylated, together with a buffer, a stabilizing agent, and an organic co-solvent.  The patent then exemplifies multiple such formulations and discloses testing data demonstrating that they achieve the claimed level of native conformation set forth in claim 1.  As Dr. Furfine explained, the patent provides a "recipe book," Furfine Dep. 196:15-197:15.  The specification, unlike the prior art, thus teaches the POSA how to make and use the claimed formulations without undue experimentation.

390.     I disagree with Dr. MacMichael that the POSA would practice the claimed invention by making "over 35 million different formulations."  MacMichael ¶ 124.  Among other problems with Dr. MacMichael's calculation is that it assumes the POSA would make and test formulations within the claims at random and that each formulation would have to be tested to predict its properties with respect to native conformation, but that is not how the POSA would practice the claims.  MacMichael ¶ 79.  Rather, the POSA would begin with the patent's examples and preferred embodiments.  To the extent the POSA sought to deviate from the Examples, the POSA would turn to other excipients that would have been considered suitable for an "ophthalmic formulation suitable for intravitreal injection," e.g., excipients that were tested or contemplated in other intravitreal drug products.  *See* Shams at 31:27-32; Gaudreault 2005 at 727.  Furthermore, the POSA would understand that the concentration of excipients may have to be increased or decreased to maintain a desired osmolarity.  Kaisheva '316 ¶ 58.  Then, the

POSA would confirm whether the formulation meets the property set forth in the claims, i.e., by performing size exclusion chromatography, a routine method known in the art that does not require undue experimentation to perform. *Supra* Section VIII.H.  On the basis of those data, as well as the data in the patent, the POSA would understand what formulations would have the claimed native conformation, without the need to test every distinct formulation.

391.    Dr. MacMichael presumes that the POSA would select and test concentrations and ranges of various excipients arbitrarily.  MacMichael ¶ 79.  For example, Dr. MacMichael asserts that, to practice claim 1, the POSA would evaluate 336 permutations of organic co-solvent and 210 permutations of a stabilizing agent.  I disagree that the POSA would have any need to evaluate so many different options.  To the contrary, the POSA would evaluate the particular options set forth in the specification, rather than evaluating every single option within a range.  And, of course, the '865 Asserted Claims further narrow the organic co-solvent (claims 4, 5) along with the stabilizing agent (claim 11).  Dr. Rabinow's permutational analysis fails to account for these limitations.  Under Dr. Rabinow's approach, any genus could be made to appear massive.  Notably, Mylan itself owns patents directed to formulations reciting both structural components and functional aspects.  *See* U.S. Patent 7,052,717 (where claim 1 recites a "storage stable pharmaceutical composition in unit dosage form which comprises a therapeutically effective amount of a thyroxine active drug, an amount of an antioxidant sufficient to inhibit oxidative degradation of said drug," and other classes of excipients such as "an alditol" and "a saccharide").

392.    Dr. MacMichael again points to the prospect of "suspensions" and "emulsions." MacMichael ¶ 125.  However, Dr. MacMichael provides no rationale for how such dosage forms

**Reply.Add451**

fall within the '865 Claims, or, even if they did (they do not, *supra* Section XV.A.1), why a

POSA would seek to use them in practicing the claims.

393.    Dr. MacMichael asserts, without any rationale, that the POSA would need "years

of additional experimentation" to evaluate the native conformation of the VEGF antagonist

fusion protein as claimed.  MacMichael ¶ 126.  I disagree.  For many formulations within the

claims, the POSA would not have to undertake any experimentation at all.  For example,

Example 1 shows that a formulation with 0.1% polysorbate 20 results in greater than 98% native

conformation following storage for over two months, and Examples 3 and 4 show the same with

0.03% polysorbate 20.  Given these teachings in the specification, the POSA would expect that

formulations with amounts of polysorbate 20 in between those tested values would likewise

result in over 98% native conformation after two months.  To the extent the POSA sought to

carry out the size exclusion chromatography testing to further establish that property, such

experimentation would be routine and not undue.

394.    Mylan's own development of its proposed aflibercept biosimilar product

underscores the absence of undue experimentation.  When Mylan considered different

formulations in developing M710, it did not evaluate tens of millions of formulations, as Dr.

MacMichael hypothesizes.  No skilled formulator would do so.  Rather, the screening studies in

Mylan's BLA involved fewer than a dozen formulations, not millions.  MYL-AFL-

BLA0002879, at -886-899, -904.  And as I explained in my opening report, Mylan's testing of its

ultimate formulation established that its formulation achieved 98% native conformation.

Opening Rep. Appendix A.

395.    Dr. MacMichael argues that "only one" example formulation falls within the '865

Asserted Claims.  MacMichael ¶¶ 88-89, 124.  Contrary to Dr. MacMichael's argument,

**Reply.Add452**

however, the examples, whether within or without the claim scope, are not irrelevant to how the POSA would practice the claims. I understand that inventors may disclose to the public in the patent specification more than they claim, but the specification's full guidance must be considered in the enablement inquiry. For example, although Example 1 has a higher VEGF antagonist fusion protein concentration (50 mg/ml) than what is claimed in the '865 Asserted Claims (40 mg/ml), the POSA would expect, on the basis of all the data and information disclosed in the '865 patent specification, that the formulation in Example 1 would also have over 98% native conformation after two months as claimed if it had a lower concentration of 40 mg/ml. *Supra* Section VIII.C. This factor thus favors enablement.

### B.     The '865 Asserted Claims Are Described

396.     Dr. MacMichael argues that the claims are invalid for lack of written description, for reasons that largely echo his non-enablement opinions. MacMichael ¶¶ 144-163. I disagree, for similar reasons set forth above with respect to enablement.

397.     I understand that the test for written description is whether the disclosure reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the priority date of the patent, and that it is not necessary to disclose information that is already known and available to a POSA. I understand that the specification does not have to provide word-for-word support for the claimed subject matter, or describe every conceivable and possible future embodiment. Rather, I understand that it must disclose either a representative number of species falling within the scope of the genus or structural features common to the members of the genus so that the POSA can visualize or recognize the members of the genus. The genus here can be visualized easily, as the formulations must have the structural components set forth in the '865 Asserted Claims and are thereby limited by structure.

398.     Dr. MacMichael asserts that "the specification does not describe anything more than was taught in the prior art or was known to a POSA at the time of the alleged invention." MacMichael ¶ 144.  I disagree.

399.     Contrary to Dr. MacMichael's opinion, unlike the prior art, the '865 patent discloses formulations of the claimed VEGF antagonist fusion protein that achieve the claimed levels of native conformation as measured by size exclusion chromatography, both in exemplary form and in its disclosure of additional ingredients that may be used.

400.     Dr. MacMichael argues that the claims recite only "functionally-defined genera" that are not described in the specification.  I disagree.

401.     Contrary to Dr. MacMichael's opinion, the specification describes both common structural features of the claimed genus and representative species within the genus.

402.     The claims are defined by common structural features recited in the claims and reflected in the specification, which inform the scope of the claimed invention.  As recited in claim 1, these are:  (1) a VEGF antagonist fusion protein that is glycosylated and comprises amino acids 27-457 of SEQ ID NO:4; (2) an organic co-solvent; (3) a buffer; and (4) a stabilizing agent.  The '865 Asserted Claims narrow these structures further by reciting additional structural limitations to the ophthalmic formulations.  *Supra* Section IX.C.  Dr. MacMichael asserts that such formulations "are not described anywhere," but they are described plainly both through description (*e.g.*, '865 patent at 2:33-48) as well as the examples, as described above.

403.     Dr. MacMichael criticizes the patent for not disclosing "all buffers," "all stabilizing agents," and "all organic co-solvents."  MacMichael ¶¶ 147-149.

**Reply.Add454**

404.    However, I understand that the specification does not need to include laundry lists of excipients known in the prior art.  The patent describes suitable examples of these excipients, '865 patent at 2:39-52, and the POSA would have understood that there were other options available within the art.  In addition, as described above with respect to enablement, the '865 patent provides multiple examples of formulations that achieve the claimed functions.

405.    The '865 patent also describes species representative of the genus.  The formulations in the Examples are set forth below:

|  | Example 1 (vial) | Example 2 (vial) | Examples 3 (vial) & 4 (pre-filled syringe) | Examples 5 (vial) & 6 (pre-filled syringe) | Examples 7 (vial) & 8 (vial) |
|---|---|---|---|---|---|
| **VEGF Antagonist** | 50 mg/ml VEGF Trap, SEQ ID NO:4 | 50 mg/ml VEGF Trap, SEQ ID NO:4 | 40 mg/ml VEGF Trap, SEQ ID NO:4 | 40 mg/ml VEGF Trap, SEQ ID NO:4 | 20 mg/ml VEGF Trap, reconstituted to 40 mg/ml, SEQ ID NO:4 |
| **Organic co-solvent** | 0.1% polysorbate 20 | 3% polyethylene glycol 3350 | 0.03% polysorbate 20 | 0.03% polysorbate 20 | 0.015% polysorbate 20 |
| **Tonicity agent** | 50 mM NaCl | 50 mM NaCl | 40 mM NaCl | 135 mM NaCl | 20 mM NaCl |
| **Buffering agent** | 10 mM phosphate | 10 mM phosphate | 10 mM phosphate | 10 mM phosphate | 5 mM phosphate |
| **Stabilizing agent** | 5% sucrose | 5% sucrose | 5% sucrose | None | 2.5% sucrose |
| **pH** | 6.25 | 6.25 | 6.3 | 6.3 | 6.3 |

406.    Each of these examples above achieved 98% or greater native conformation over two months storage as measured by size exclusion chromatography (in a liquid formulation for Examples 1-6, and in lyophilized form for Examples 7-8).  *Supra* Section IX.A.  Furthermore, each also achieved the claimed level of turbidity set forth in claim 15; Examples 3-7 met the 99% native conformation set forth in claim 16; and Examples 1 and 2 both met the 24-month

163

native conformation limitation set forth in claim 17 (the other examples were not tested for that period of time; no example was tested for 24 months that did not achieve the claimed level of native conformation). Thus, the specification teaches the POSA representative formulations with the claimed elements and possession of the claimed genus.

407. With respect to the '865 Asserted Claims, Dr. MacMichael again criticizes the examples that do not fall within the claims as irrelevant. MacMichael ¶¶ 150-163. I disagree for the same reasons as explained above.

408. Claim 4 recites that the "organic co-solvent comprises about 0.03% to about 0.1% polysorbate 20." The '865 patent specifically describes a range of 0.03% to 0.1% polysorbate. '865 patent at 3:36-47. Further, the '865 patent describes embodiments having 0.03% (Examples 3-6) and 0.1% (Examples 1) polysorbate 20. With respect to claim 4, Dr. MacMichael argues that the word "comprising" renders the claim invalid, MacMichael ¶ 152, but I understand that the use of the open-ended word "comprising" does not render claims invalid. Rather, I understand that it simply means that a formulation that meets the claim limitations but also includes other components would still be within the claims.

409. Dr. MacMichael argues similarly with respect to claim 5. MacMichael ¶ 153. Claim 5 recites that the "organic co-solvent comprises 0.01% to 3% polysorbate 20." The '865 patent describes this range as well and supports the claim limitation. '865 patent at 2:53-57.

410. Claim 7 recites that the "buffer comprises 5-25 mM buffer." Dr. MacMichael also argues that this limitation lacks support. MacMichael ¶ 154. Again, I disagree. The patent describes this range of buffer concentrations. '865 patent at 4:15.

411. Claim 9 recites that the "buffer comprises a pH about 6.2-6.3." The '865 patent teaches repeatedly to use this pH range. *E.g.*, '865 patent at 2:57, 2:62, 2:67. Furthermore,

**Reply.Add456**

every Example in the specification uses a formulation within this pH range. I thus disagree with Dr. MacMichael that claim 9 lacks written description support.

412. Claim 10 recites that the "stabilizing agent comprises a sugar," and claim 11 recites that "said sugar is selected from the group consisting of sucrose, sorbitol, glycerol, trehalose, and mannitol." These stabilizing agents are described expressly in the specification with respect to the claimed ophthalmic formulations. '865 patent at 2:44-45. I disagree with Dr. MacMichael that the "specification contemplates the use of only sucrose." MacMichael ¶ 158. Although the examples use sucrose, I understand that claims are not limited to the embodiments disclosed in the specification, and the specification's guidance expressly contemplate other stabilizing agents, '865 patent at 2:44-45. I disagree with Dr. MacMichael that claim 11 lacks written description support.

413. Dr. MacMichael does not address any arguments specifically to claims 14, 15, or 16 of the '865 Asserted Claims. MacMichael ¶¶ 159-160. Dr. MacMichael argues that the formulation in Example 3 does not include 24-month testing data and thus that the claim lacks written description support. I disagree.

414. The patent describes an embodiment with 50 mg/ml of the claimed VEGF antagonist fusion protein that achieved over 98% native conformation for 24 months as measured by size exclusion chromatography. '865 patent at 8:33-57. In view of these findings, along with the other native conformation data disclosed in the patent, the POSA would have understood that the inventors possessed other formulations with over 98% native conformation for 24 months as measured by size exclusion chromatography.

415. Claim 18 recites that "said formulation does not contain phosphate." The '865 patent describes "a buffering agent." '865 patent at 2:37. Because the examples each use

phosphate, Dr. MacMichael argues that the specification cannot support claims reciting a formulation that does not contain phosphate. MacMichael ¶¶ 161-162. I disagree that the specification is limited to phosphate-containing formulations.

416. To the contrary, the specification describes formulations with a "buffering agent" that "may be, for example, phosphate buffer," '865 patent at 2:45-46, which the POSA would understand teaches a phosphate buffer as well as known non-phosphate buffers suitable for intravitreal administration. *E.g.*, Shams at 31:27-32. Thus, I disagree with Dr. MacMichael that the inventors were only in possession of formulations with phosphate.

### C. The '865 Asserted Claims Are Definite

#### 1. Organic Co-Solvent

417. Dr. MacMichael argues that under Regeneron's claim construction, the term "organic co-solvent" is indefinite. MacMichael ¶ 164. I disagree. I understand that a claim is not indefinite if the claim may be given a reasonable meaning with enough particularity to inform a POSA as to the scope of the claims with reasonable certainty, even if the ultimate conclusion is one over which reasonable persons will disagree. Under Regeneron's construction, there is no uncertainty: the POSA only needs to acknowledge the specification's explicit teaching that polysorbates like polysorbate 20 are organic co-solvents. '865 patent at 2:39-41, 2:49-50. Dr. MacMichael postulates some "zone of uncertainty" as to the '865 Asserted Claims, MacMichael ¶ 164, but I disagree. Claim 4 requires that the "organic co-solvent comprises about 0.03% to about 0.1% polysorbate 20," while claim 5 and the other '865 Asserted Claims require that the "organic co-solvent comprises 0.01% to 3% polysorbate 20." If a formulation has an amount of polysorbate 20 within the claimed range, then it meets the limitation. If the formulation does not have an amount of polysorbate 20 within the claimed range, then it does not meet the limitation. There is no ambiguity and "organic co-solvent" is thus not indefinite.

166

418.    Dr. MacMichael's other argument appears to focus on the word "comprises,"

which, according to Dr. MacMichael, renders the phrase "organic co-solvent comprises

polysorbate" indefinite.  MacMichael ¶ 165.  I disagree that this phrase is indefinite—the word

"comprises" means "includes" and there is thus no ambiguity in what the word means.

### 2.    Native Conformation

419.    Dr. MacMichael also asserts that "native conformation" is indefinite under

Regeneron's construction.  MacMichael ¶¶ 166-168.  First. Dr. MacMichael appears to reiterate

Mylan's claim construction position, MacMichael ¶ 167, but Dr. MacMichael fails to point to

any lack of reasonable certainty under Regeneron's construction.  Second, as with his

enablement argument, Dr. MacMichael argues that the patent fails to identify the parameters for

size exclusion chromatography.  MacMichael ¶ 168.  I disagree with Dr. MacMichael for the

same reasons expressed above.  *Supra* Section XV.A.3.  Size exclusion chromatography was a

well-known method used to evaluate proteins, and Dr. MacMichael does not provide any

evidence that the different parameters would yield "different results."

### 3.    An Ophthalmic Formulation Suitable for Intravitreal Injection

420.    Dr. MacMichael argues that the POSA would not understand with reasonable

certainty the scope of "ophthalmic formulation suitable for intravitreal injection" and criticizes

the term as "purely subjective."  MacMichael ¶ 169.  I disagree that the term is subjective.  The

POSA would know that a formulation was "suitable for intravitreal injection" if it contained

excipients suitable for such use in view of the '865 patent and the knowledge of the POSA

(based on, e.g., others' disclosures or relevant pharmacopeial standards).  Notably, Mylan

expressed to FDA that its "excipients comply with applicable pharmacopeial standards,"  MYL-

AFL-BLA0001654, at -1662, and they were also disclosed in ranibizumab intravitreal

formulations, Shams at 31:27-32.  Dr. MacMichael points to no difficulty in ascertaining that

167

**Reply.Add459**

such a formulation suitable for intravitreal injection, nor does Dr. MacMichael point to any examples of formulations that the POSA could not evaluate with reasonable certainty. Accordingly, I disagree that the term "ophthalmic formulation suitable for intravitreal injection" is indefinite.

### VALIDITY OPINIONS UNDER MYLAN'S PROPOSED CONSTRUCTIONS

421.    Dr. Rabinow and Dr. MacMichael both submitted separate reports ostensibly applying Mylan's proposed claim constructions.  *See generally* Rabinow-M, MacMichael-M. However, the opinions expressed in those reports are largely identical to those expressed in their reports applying Regeneron's claim constructions.  I thus incorporate in full my analysis above under Regeneron's proposed claim constructions here, and explain several additional responses under Mylan's proposed claim constructions below.

422.    ***Anticipation and Obviousness.***  I understand that Mylan has proposed that the term "organic co-solvent" be construed as "an organic substance added to a primary solvent to increase the solubility of said VEGF antagonist."  As I explained in my opening report, polysorbate 20 increased solubility of the VEGF antagonist in M710 by preventing the formation of insoluble aggregates.  Opening Rep. ¶¶ 76-83.  Dr. Rabinow appears to adopt this argument in asserting that the prior art disclosure of polysorbate teaches an organic co-solvent.  Rabinow-M ¶ 210.  However, I understand that invalidity must be proved by clear and convincing evidence, and inherency requires that the disclosure inevitably and necessarily includes the unstated limitation.  Dr. Rabinow makes no showing under Mylan's proposed claim construction that polysorbate in any prior art compositions serves to "increase the solubility of the VEGF antagonist."  Rabinow-M ¶ 210.  Accordingly, Dr. Rabinow has failed to establish anticipation or obviousness under Mylan's proposed construction.

423. I understand that under Mylan's proposed construction, "present in native conformation" means "present in a form that does not exhibit chemical or physical instability." As with "organic co-solvent," Dr. Rabinow ignores the requirements of Mylan's proposed construction and instead relies only on size exclusion chromatography data and inherency. Rabinow-M ¶¶ 211-14. Dr. Rabinow fails to provide any evidence that formulations in the prior art exhibited the other types of stability required under Mylan's proposed construction.

424. *Section 112.* Dr. MacMichael argues that under Mylan's proposed construction, more than size exclusion chromatography would be necessary to determine if the claimed VEGF antagonist fusion protein is "present in native conformation." MacMichael-M ¶ 125. However, as Dr. MacMichael acknowledges, "[t]echniques were known long before 2006 for how to detect, measure, and elucidate the various types of degradation in protein samples." MacMichael-M ¶ 64; *see* '865 patent at 7:8-19. Dr. MacMichael fails to identify what analytical techniques would be necessary under Mylan's construction, nor does he point to any undue experimentation in performing techniques "known long before 2006" to which he refers. In my view, the POSA would be capable of performing techniques in addition to size exclusion chromatography for assessing protein stability without undue experimentation. Furthermore, for the same reasons, the inventors were in possession of ophthalmic formulations with the claimed native conformation.

425. Dr. MacMichael contends that under Mylan's construction, polysorbate would not be considered an "organic co-solvent," even though it is expressly recited as such in the claims and described as such in the specification. Regardless, as I explained above (¶ 422), the POSA would have expected that including polysorbate in a formulation would reduce the formation of insoluble aggregates and thus increase the solubility of the VEGF antagonist. Dr. MacMichael

**Reply.Add461**

has not pointed to any contrary evidence. Furthermore, in addition to polysorbates, the '865

patent describes other organic co-solvents such as PEG (e.g., PEG 3350) and propylene glycol,

'865 patent at 3:28-31, which Dr. MacMichael agrees could serve as organic co-solvents.

MacMichael Dep. 62:12-17. The POSA could additionally have used these organic co-solvents

in practicing the invention without undue experimentation. Likewise, the inventors were in

possession of such formulations. '865 patent at 2:53-57; Example 2.

426.     Accordingly, for both the reasons explained under Regeneron's proposed claim

constructions and the reasons above, I disagree with Dr. Rabinow and Dr. MacMichael that the

'865 Asserted Claims are invalid under Mylan's proposed claim constructions.

## XVI.  The '572 Claims Would Not Have Been Obvious

### A.      "Formulated as an Isotonic Solution"

427.     Claims 6, 12, 18 and 22 of the '572 patent recite that "aflibercept is formulated as

an isotonic solution." Dr. Rabinow acknowledges that no prior art specifically discloses that

aflibercept was formulated as an isotonic solution. Rabinow ¶ 312 (citing J.A. Dixon et al.,

*VEGF Trap-Eye for the Treatment of Neovascular Age-Related Macular Degeneration*, 18

Expert Opin. Investig. Drugs 1573 (2009) ("Dixon")). Accordingly, Dr. Rabinow relies on

Hecht, but Hecht does not teach an isotonic aflibercept formulation either. *Id.* (citing G. Hecht,

*Ophthalmic Preparations*, *in* 2 Remington: The Science & Practice of Pharmacy 1563 (19th ed.

1995)). I disagree with Dr. Rabinow that the claim limitation would have been obvious.

### B.      "Formulated with a Nonionic Surfactant"

428.      Claims 7, 13, 19, and 23 of the '572 patent recite that "aflibercept is formulated

with a nonionic surfactant." Again, Dr. Rabinow relies on Dixon, but Dixon discloses only that

aflibercept is "formulated with different buffers," not a nonionic surfactant. Rabinow ¶ 313

(citing Dixon at 1575). Dr. Rabinow thus cites to the use of surfactants in Randolph, *id.* (citing

170

**Reply.Add462**

Randolph & Jones, *Surfactant-Protein Interactions*, *in* Rational Design of Stable Protein

Formulations 159 (J.F. Carpenter & M.C. Manning eds., 2002) ("Randolph")), but fails to

establish a motivation to use a nonionic surfactant in the methods claimed with a reasonable

expectation of success.  Hecht does note the class of nonionic surfactants but explains that they

are typically used in "steroid suspensions," not aflibercept, and warns that nonionic surfactants

may react with preservatives and create other complications.  Hecht at 1571.  I thus disagree with

Dr. Rabinow that the cited art renders the '572 Claims obvious.

429.    Dr. Rabinow also cites to U.S. Patent 7,608,261, which Dr. Rabinow argues

corresponds to the EYLEA label.  However, Dr. Rabinow does not argue that the EYLEA label

was prior art, and Dr. Rabinow's reference to the '261 patent is thus guided by hindsight, which

cannot render the '572 Claims obvious.

## XVII.  The '572 Claims Are Described

### A.    "Formulated as an Isotonic Solution"

430.    Dr. MacMichael asserts that claims 6, 12, 18, and 22 of the '572 patent are invalid

for lack of written description.  MacMichael ¶ 173.  I disagree.  The '572 patent describes what it

claims:  that pharmaceutical formulations for aflibercept include "physiological saline, an

*isotonic solution* containing glucose and other auxiliary agents."  '572 patent at 6:22-25.  Dr.

MacMichael offers no reason why this straightforward description is insufficient.  Dr.

MacMichael criticizes the '572 patent for not disclosing examples, but I understand that written

description does not require examples or reduction to practice.  In my opinion, the '572 patent's

description of isotonic solutions adequately supports the claim reciting an isotonic solution.

### B.    "Formulated with a Nonionic Surfactant"

431.    Dr. MacMichael also argues lack of written description with respect to claims 7,

13, 19, and 23 of the '572 patent.  MacMichael ¶ 176.  The '572 patent discloses that that the

pharmaceutical formulations may include a "nonionic surfactant" such as polysorbate 80 or

"polyoxyethylene (50 mol) adduct of hydrogenated castor oil."  '572 patent at 6:29-30.  Again,

Dr. MacMichael offers no reason why that is insufficient description.  In my opinion, the '572

patent specification supports the claims reciting a nonionic surfactant by disclosing that this type

of excipient may be used in pharmaceutical formulations of aflibercept and providing examples.

## XVIII. Conclusions

432.    For the reasons set forth above, it is my opinion that the '865 Asserted Claims and

the '572 Claims are not invalid.

**Reply.Add464**



# Exhibit P

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
AT CLARKSBURG**

| | |
|---|---|
| REGENERON PHARMACEUTICALS, INC., <br><br>       Plaintiff, <br><br>   v. <br><br> MYLAN PHARMACEUTICALS INC., <br><br>       Defendant. | Case No. 1:22-cv-00061-TSK <br><br> **CONFIDENTIAL** |

### REPLY EXPERT REPORT OF GREGORY MACMICHAEL PH.D. REGARDING THE INVALIDITY OF THE ASSERTED CLAIMS OF U.S. PATENT NO. 11,084,865 UNDER 35 U.S.C. § 112

### AND

### REGARDING THE INVALIDITY OF CLAIMS 6, 7, 12, 13, 18, 19, 22, AND 23, OF U.S. PATENT NO. 11,253,572 UNDER 35 U.S.C. § 112

## TABLE OF CONTENTS

I.      INTRODUCTION. ........................................................................................................ 1

II.     PROFESSIONAL QUALIFICATIONS AND BACKGROUND. .................................. 2

III.    UNDERSTANDING OF THE LAW. ......................................................................... 2

IV.     TUTORIAL – BACKGROUND OF THE FIELD AND TECHNOLOGY. .................... 3

V.      THE ASSERTED '865 PATENT. ............................................................................... 3

        B.      The '865 Patent Intrinsic Evidence. ............................................................... 4

VI.     SUMMARY OF MY OPINIONS. ............................................................................... 4

VII.    THE '865 ASSERTED CLAIMS ARE INVALID UNDER SECTION 112. .................. 5

        A.      The '865 Asserted Claims Are Not Enabled. .................................................. 5

                1.      *Wands* Factor No. 8: The Breadth of the Asserted Claims. ................ 10

                2.      *Wands* Factor No. 4: The Nature of the Invention. .......................... 22

                3.      *Wands* Factor No. 5: The State of the Prior Art. ............................. 23

                4.      *Wands* Factor No. 6: The Level of Ordinary Skill. .......................... 27

                5.      *Wands* Factor No. 7: The Level of Predictability. ........................... 28

                6.      *Wands* Factor No. 2:  The Direction and Working Examples in the Specification. ................................................................................... 29

                7.      *Wands* Factor No. 1: Quantity of Experimentation. ......................... 34

        B.      The '865 Asserted Claims Are Not Described. ............................................. 39

        C.      The '865 Asserted Claims Are Indefinite. ................................................... 44

                1.      Organic Co-Solvent. ...................................................................... 44

                2.      Native Conformation. .................................................................... 44

                3.      An Ophthalmic Formulation Suitable for Intravitreal Injection. ........ 45

VIII.   U.S. PATENT NO. 11,253,572 ("THE '572 PATENT"). ........................................... 46

                1.      "Formulated as an Isotonic Solution" ............................................. 49

                2.      "Formulated with a Nonionic Surfactant" ....................................... 49

IX.     THE PRIOR ART DISCLOSED VEGF TRAP-EYE/AFLIBERCEPT. ...................... 50

X.      REGENERON'S PRIOR ART PATENTS. ............................................................... 52

XI.     CONCLUSION. ..................................................................................................... 56

XII.    TRIAL EXHIBITS/TUTORIAL. ............................................................................. 56

XIII.   REQUIRED DISCLOSURES. ................................................................................. 57

*CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

**Reply.Add467**

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Reply.Add468**

## I.    INTRODUCTION.

1.    I, Dr. Gregory MacMichael, having been retained to testify as an expert in this case on behalf of Mylan Pharmaceuticals Inc. ("Mylan") in the above-captioned action submit this Reply Expert Report.

2.    I am the same Gregory MacMichael that submitted Opening Expert Reports in this case dated February 2, 2023 ("MacMichael Opening Reports"),[1] and a Responsive Expert Report dated March 2, 2023 ("MacMichael Responsive Report").[2]   I am also the same Gregory MacMichael that submitted a declaration entitled "Declaration of Gregory MacMichael, Ph.D. in Support of Defendant's Claim Construction Brief" dated November 28, 2022 ("MacMichael Declaration").   I incorporate by reference the MacMichael Opening Reports, MacMichael Responsive Report, and the MacMichael Declaration and all Exhibits to the extent relevant and necessary, and reserve the right to provide testimony on any issues or subject matter contained therein.

3.    This Report discloses my opinions, and the bases and reasons supporting my opinions, regarding, among other things, issues that I understand relate to Regeneron Pharmaceuticals, Inc.'s ("Plaintiff" or "Regeneron") claims for alleged validity of U.S. Patent No.

---

[1] My opening reports are entitled: "Opening Expert Report of Gregory MacMichael, Ph.D. Regarding the Invalidity of The Asserted Claims of U.S. Patent No. 11,084,865 Under 35 U.S.C. § 112 Assuming Mylan's Construction of the Claim Terms 'Organic Co-solvent' and 'Native Conformation' and Regarding the Invalidity of Claims 6, 7, 12, 13, 18, 19, 22, and 23, of U.S. Patent No. 11,253,572 Under 35 U.S.C. § 112" and "Opening Expert Report of Gregory MacMichael, Ph.D. Regarding the Invalidity of The Asserted Claims of U.S. Patent No. 11,084,865 Under 35 U.S.C. § 112 Assuming Regeneron's Claim Construction Proposal of the Claim Terms 'Organic Co-Solvent' and 'Native Conformation' and Regarding the Invalidity of Claims 6, 7, 12, 13, 18, 19, 22, and 23, of U.S. Patent No. 11,253,572 Under 35 U.S.C. § 112."

[2] My responsive report is entitled: "Responsive Expert Report of Gregory MacMichael, Ph.D. Regarding the Non-infringement of the Asserted Claims of U.S. Patent No. 11,084,865."

*CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

**Reply.Add469**

11,084,865 ("the '865 patent") and U.S. Patent No. 11,253,572 ("the '572 patent"), including in reply to the Opening Expert Report of Bernhardt L. Trout, Ph.D., dated February 2, 2023 ("Trout Open.") and the Responsive Expert Report of Bernhardt L. Trout, Ph.D., dated March 2, 2023 ("Trout Resp.").

4.      This Report sets forth the opinions I have formed based on information available as of the date below.  In the event Regeneron submits any expert report or other response to the subject matter addressed in this Report, I reserve the right to respond to such submission.  I expect to be called to testify at trial in the above-captioned action.

## II.     PROFESSIONAL QUALIFICATIONS AND BACKGROUND.

5.      Details regarding my background, education, and experience are summarized in paragraphs 2-14 of the MacMichael Opening Reports and are incorporated by reference herein. (*See also* MacMichael Declaration at ¶¶ 3-14).

6.      A copy of my current *curriculum vitae* is attached to this Report as Exhibit A.

## III.    UNDERSTANDING OF THE LAW.

7.      My understanding of the principles concerning patent law that have guided me in arriving at my stated conclusions in this report (as well as in my Opening Reports) is set forth in my Opening Expert Reports at paragraphs 16-36. (*See also* MacMichael Declaration at ¶¶ 27-33). I incorporate by reference those portions of my prior reports and declaration.

8.      While I am not an attorney, I understand and have applied these principles in reaching my opinions provided in this report.

*CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

**Reply.Add470**

## IV.    TUTORIAL – BACKGROUND OF THE FIELD AND TECHNOLOGY.

9.      The '865 patent is directed to stable formulations of vascular endothelial growth factor ("VEGF")-specific fusion proteins.  As such, in order to frame my analysis and provide proper context for my opinions, I provided an overview in my Opening Expert Reports of some of the relevant technology at issue.  (*See* MacMichael Opening Reports at ¶¶ 42-70; *see also* MacMichael Declaration at ¶¶ 40-44).  I incorporate by reference as fully set forth herein my prior technology background and tutorial opinions.  I also reserve the right to expand on my prior technology background and tutorial opinions as needed to address any Regeneron expert opinions and/or testimony submitted in response to my Opening Expert Reports, my Responsive Report, and/or this Reply expert report.

10.      If I testify at trial in this case, I may rely on exhibits and/or visual aids to demonstrate the basis for my opinions.  I have not yet prepared any such exhibits or visual aids.  I also reserve the right to provide a tutorial relating to the general topics contained in either this report or any of my prior reports or declaration in this matter, which I incorporate herein by reference, including a discussion of the references discussed.

## V.    THE ASSERTED '865 PATENT.

### A.    Person of Ordinary Skill in the Art of the '865 Patent.

11.      My definition of a person of ordinary skill in the art ("POSA") has not changed since my declaration and opening reports.  (*See* MacMichael Declaration at ¶¶ 34-38; MacMichael Opening Reports at ¶¶ 37-41).

12.      I understand that Dr. Trout provided the following definition for a POSA for the Asserted Claims of the '865 patent:

> In my opinion, based on my review of the '865 patent, its prosecution history, and my research experience, the POSA would have held an

advanced degree, such as a Master's in a biopharmaceutical science, or a related discipline, such as chemical engineering, and several years of experience in the development of biologics products. Alternatively, the POSA could have a Ph.D. in such discipline and less experience. The POSA may collaborate with others, including a medical doctor with experience treating ophthalmic diseases.

(Trout Open. at ¶ 32; *see also* Trout Resp. at ¶ 48).

13.    In my opinion, there are no appreciable differences between the definition that I offered in my opening reports and Dr. Trout's definition, though, in my opinion, it is easier for someone to meet Dr. Trout's definitional standards as compared to mine in the context of education status and level of experience. Nevertheless, I qualify (and qualified as of the priority date of the '865 patent) as at least a POSA under either definition and I am qualified to testify from the perspective of a POSA under either definition. Further, my opinions regarding the '865 patent would not change even if one were to apply Dr. Trout's definition.

### B.    The '865 Patent Intrinsic Evidence.

14.    I provided an overview of the '865 patent in my Opening Expert Reports, which I incorporate by reference herein. (*See* MacMichael Opening Reports at ¶¶ 71-97;[3] MacMichael Declaration at ¶¶ 45-50).

### C.    The Asserted Claims of the '865 Patent.

15.    I understand that Regeneron is asserting against Mylan claims 4, 7, 9, 11, and 14-18 of the '865 patent (i.e., the "Asserted Claims"). (MacMichael Opening Reports at ¶ 98).

## VI.    SUMMARY OF MY OPINIONS.

---

[3] From this point forward, any citation to the "MacMichael Opening Reports" refers to my statements to the report entitled "Opening Expert Report of Gregory MacMichael, Ph.D. Regarding the Invalidity of The Asserted Claims of U.S. Patent No. 11,084,865 Under 35 U.S.C. § 112 Assuming Regeneron's Claim Construction Proposal of the Claim Terms 'Organic Co-Solvent' and 'Native Conformation' and Regarding the Invalidity of Claims 6, 7, 12, 13, 18, 19, 22, and 23, of U.S. Patent No. 11,253,572 Under 35 U.S.C. § 112" unless otherwise stated.

*CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

16.    As I set forth in more detail below, I disagree with Dr. Trout's validity analysis provided in his responsive report.  In my opinion, Dr. Trout's opinions do not demonstrate that the Asserted Claims of the '865 patent are enabled, described, or definite under either Mylan's Proposed Constructions or Regeneron's Claim Construction Proposals, and therefore, I stand by my opinions set forth in my Opening Reports and Declaration.   In forming my opinions in this Reply Report, the materials I have considered, in addition to my experience, education, and training, are identified herein in the MacMichael Opening Reports, MacMichael Responsive Report, the MacMichael Declaration, and/or in Exhibit B.

## VII.    THE '865 ASSERTED CLAIMS ARE INVALID UNDER SECTION 112.

### A.    The '865 Asserted Claims Are Not Enabled.

17.    I disagree with Dr. Trout's opinions that the Asserted Claims are enabled.  (Trout Resp. ¶¶ 357-416).  As I explained in my Opening Reports (¶¶ 104-143), the specification and Asserted Claims do not provide a sufficient disclosure to enable a POSA to make and use the claimed formulations.  In my opinion, a POSA, after reading the '865 patent specification, would be unable to make or use the formulations of the Asserted Claims without undue experimentation. Dr. Trout's assertions do not change any of my opinions.

18.    As a threshold matter, Dr. Trout first complains that I focused my enablement analysis "largely on claim 1" instead of the Asserted Claims which all depend from claim 1 of the '865 patent.   (Trout Resp. at 357).   Dr. Trout seems to misunderstand my opinions but, notwithstanding, I did specifically address *all* the Asserted Claims in my Opening Reports. (MacMichael Opening Reports at ¶¶ 132-143).  Therein, I set forth my conclusions that the added limitations of those dependent claims do not sufficiently narrow the breadth of the claimed formulations to render them enabled to a POSA.

*CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

**Reply.Add473**

19.     For example, claim 11 (like claim 1) is nearly unlimited in scope despite its added limitations.   (MacMichael Opening Reports at ¶¶ 139).  Specifically, the formulation of claim 11 must only meet the following elements (in addition to those required under claim 1):

- the concentration of VEGF Trap-Eye/aflibercept is 40 mg/ml **[from claim 2]**;

- an organic co-solvent that "comprises" 0.01% to 3% polysorbate 20 **[from claim 5]** [4]; and

- a stabilizing agent that "comprises" a sugar **[from claim 10]** selected from the group consisting of sucrose, sorbitol, glycerol, trehalose, and mannitol **[from claim 11]**.

Other than these requirements, the claimed formulation remains nearly unlimited with respect to at least the following formulation characteristics:

- The type of formulation (e.g., liquid or lyophilized).[5]  Claim 11 (like all the Asserted Claims) only requires that the formulation be in a vial and be suitable for intravitreal administration[6];

- The type or amount of "organic co-solvent."  Claim 11 only requires (via claim 5) that the organic co-solvent "comprises" (i.e., includes) polysorbate 20 within a very wide percentage range (0.01% to 3%).  The claim does not inform a POSA as to *what exactly* the organic co-solvent is;

---

[4] As I explain in more detail below (¶ 21), Dr. Trout seems to ignore the "comprises" transitional language in each of the Asserted Claims.

[5] As I explain in more detail below, it is my opinion that Dr. Trout is wrong in his opinion that lyophilized formulations are not encompassed by the Asserted Claims.  (*See, e.g.*, ¶ 27). Lyophilized formulations are extensively discussed in the '865 patent specification and, in my opinion, nothing in the Asserted Claims excludes lyophilized formulations. (*See* MacMichael Opening Reports at ¶¶ 56, 88, 90, 106, 125).

[6] It is my understanding that Regeneron did not ask the Court to construe the claim term "an ophthalmic formulation suitable for intravitreal administration."  In my opinion, a POSA would understand that the full scope of that claim term encompasses more than mere liquid formulations, and therefore, I disagree with Dr. Trout's attempt to exclude all "non-liquid" formulations from the scope of the Asserted Claims.

*CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

**Reply.Add474**

- The type[7] or amount of buffer[8];

- The pH. Only claim 9 limits the pH to 6.2-6.3; the remaining Asserted Claims have no pH limitation however the specification explains that the claimed formulation pH is to be within the wide range of 5.8 and 7.0[9]; and

- The type or amount of stabilizing agent. Claim 11 (which depends from claim 10) only requires that the sugar of claim 10 (which does not otherwise limit the stabilizing agent) be selected from the group consisting of "sucrose, sorbitol, glycerol, trehalose, and mannitol," but does not provide the amount or concentration, nor does it indicate whether the selected sugar *is* the stabilizing agent under claim 10 or whether the stabilizing agent of the formulation merely "comprises" the selected sugar of claim 11.

(*See also* MacMichael Opening Reports at ¶¶ 138-139).

20.      Similarly, claim 7 (like claims 1 and 11) is nearly unlimited in scope despite its added limitations.  Specifically, the formulation of claim 7 must only meet the following elements (in addition to those set forth in claim 1):

- The concentration of the VEGF Trap-Eye/aflibercept is 40 mg/ml **[from claim 2]**;

- an organic co-solvent that "comprises" 0.01% to 3% polysorbate 20 **[from claim 5]**; and

- a buffer that "comprises" 5-25 mM buffer **[from claim 7]**.

Otherwise, much like claim 11, the formulation of claim 7 remains nearly unlimited with respect to at least the following elements:

- The type of formulation (e.g., liquid or lyophilized);

- The type or amount of "organic co-solvent." Claim 7 only requires (via claim 5) that the organic co-solvent "comprises" (i.e., includes) polysorbate 20 within a very

---

[7] As I explain in more detail below (¶ 22), a POSA would have considered several buffers for a formulation of the Asserted Claims,

[8] By comparison, claim 7 requires that the buffer must fall within the very large range of 5-25mM; however, that also provides little guidance because it does not identify the buffer (or even narrow the list of acceptable buffers for the claimed formulations).

[9] *See, e.g.*, '865 patent at 2:33-38, 3:11-16, 4:11-18.

*CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

**Reply.Add475**

wide percentage range (0.01% to 3%).  The claim does not inform a POSA as to *what exactly* the organic co-solvent is;

- The type or amount of buffer;

- The pH.  The specification only limits the formulation pH to within the wide range of 5.8 and 7.0; and

- The type or amount of stabilizing agent.

(*See also* MacMichael Opening Reports at ¶¶ 135-136).

21.    ***"Comprises" Transition.***  I have been informed that claims containing the word "comprising" are open-ended and provide broad coverage so long as the term is not used to remove or abrogate claim limitations that are otherwise required.  I have been further informed that the use of the transitional phrase "comprising" indicates that the body of the claim is open, creating a presumption that the claim does not exclude additional, unrecited elements.  Applied to the '865 patent, while claim 1 requires, for example, a very specific VEGF antagonist—namely, VEGF Trap-Eye/aflibercept—the claimed formulation is not limited to only one active ingredient. Dependent claim 2, from which all the Asserted Claims depend either directly or indirectly, similarly does not limit the claimed formulation to only one active ingredient.  Accordingly, although the amount of VEGF Trap-Eye/aflibercept of the Asserted Claims is limited to 40 mg/ml, a POSA would understand that the breadth of the claims encompasses formulations with one *or more* active ingredients—such additional ingredients dramatically increase the complexity of the possible formulations covered by the Asserted Claims.

22.    ***Buffers.***  As I explain in my Opening Reports, a POSA reading the claims and specification of the '865 patent would have considered at least the following buffers as suitable for the formulations of the Asserted Claims: succinate, citrate, phosphate, and histidine, as well as combinations thereof.  (*See, e.g.* MacMichael Opening Reports at ¶ 79).  The Asserted Claims in no way limit these options to a POSA.  Moreover, I disagree with Dr. Trout's apparent contempt

*CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

**Reply.Add476**

for citrate as an acceptable buffer for the claimed formulations. (*See, e.g.*, Trout Resp. ¶¶ 211, 244, 298). Nothing in the Asserted Claims excludes citrate. In fact, Eric Furfine—the first named inventor of the '865 patent, vice president of preclinical development, and supervisor of the other named inventors (Drs. Dix and Graham)—refused to characterize citrate as a buffer that was "not suitable for intravitreal administration." (Furfine Tr. at 93:15-94:4 ("Q: So at this time, you considered that a solution containing citrate buffer would not have been suitable for intravitreal administration? A: *I would not say that* ... it's possible also that [citrate] would have been fine.") (emphasis added); *see also* Graham Tr. at 138:25-140:5 ("I would not have been able to deem a citrate-containing formulation as either suitable or not suitable...")). Further to my point, an intravitreal formulation comprising citrate was disclosed in Marra, confirming its suitability: "The selected formulation consisted of an isotonic solution comprised of [a VEGF inhibitor] in a citrate-buffered vehicle ... The selected formulation exhibited sufficient chemical stability upon storage with no precipitation, and acceptable potency and recovery through an intravitreal dosing syringe." (Marra at 362)

23.    In short, all the Asserted Claims (not just claim 1, from which the Asserted Claims depend) are nearly unlimited in scope because most characteristics of the claimed formulations are neither provided nor enabled, and thus are left to the POSA to figure them all out through extensive experimentation. (*See, e.g.*, MacMichael Opening Reports at ¶¶ 78-79, 132, 150). In fact, the <u>only</u> known component / concentration of the Asserted Claims' formulations is the 40 mg/ml VEGF Trap-Eye/aflibercept, and therefore, the <u>only</u> formulation described in the '865 patent that can purportedly meet *any* of the Asserted Claims is Example 3. (*See id.* at ¶¶ 82, 91, 133-149). Accordingly, as I previously explained, a POSA would be forced to engage in undue experimentation to make and use other formulations covered by the Asserted Claims (e.g., a

citrate-buffered or histidine-buffered formulation). (*See id.* at ¶¶ 133-149). Specifically, a POSA would need to determine through extensive experimentation at least the following:

- Whether to use a liquid or lyophilized formulation? If lyophilized, whether to use a reconstituted solution, suspension, or emulsion?

- What buffer to use (e.g., citrate, succinate, phosphate, or histidine)? Alone or in combination? What concentration?

- What pH to target (likely within the 5.8 to 7.0 range described in the specification)?

- What organic co-solvent to use? Alone or in combination? At what concentration?

- What stabilizing agent to use? Alone or in combination? At what concentration?

24.    I further reply to Dr. Trout's opinions regarding the *Wands* factors[10] as follows:

**1.    *Wands* Factor No. 8: The Breadth of the Asserted Claims.**

25.    Dr. Trout's enablement opinions hinge on his flawed assertion that "the scope of the claims reasonably correlates to the scope of the disclosure of ophthalmic formulations in the '865 patent specification." (Trout Resp. at ¶¶ 359-68). A POSA can only identify **_one_** formulation disclosed in the specification that may actually fall within the scope of the Asserted Claims (if one assumes that polysorbate 20 is an organic co-solvent): Example 3.[11] However, a POSA would also immediately recognize that the breadth of the Asserted Claims is far broader than what Dr. Trout suggests and that Example 3 does not inform a POSA how to make and use the countless other formulations that fall within the scope of the Asserted Claims.

---

[10] My understanding of the *Wands* factors is set forth in paragraphs 33-35 of my Opening Expert Reports. I specifically apply the *Wands* factors in paragraphs 101-149.

[11] All of the Asserted Claims depend on claim 2 (either directly or indirectly), and therefore it is my understanding that the Asserted Claims all require 40 mg/ml of the VEGF antagonist required under independent claim 1.

*CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

**Reply.Add478**

a.   **The added limitations of the dependent Asserted Claims <u>do not exclude</u> lyophilized formulations from the breadth of available formulations.**

26.   Dr. Trout's enablement opinions rely on his incorrect conclusion that lyophilized formulations do not fall within the scope of the Asserted Claims. (*See, e.g.*, Trout Resp. at ¶ 360 ("In my opinion, the POSA reading the specification and practicing the claims would proceed with a liquid formulation."); *id.* at ¶ 361 ("[T]he POSA would not use a lyophilized formulation to practice the claimed inventions."). Dr. Trout also misstates my opinions regarding Examples 7 and 8 to support his incorrect conclusion. (*Id.* at ¶ 361).

27.   First, nothing in the Asserted Claims or the specification excludes or disclaims lyophilized formulations and Dr. Trout does not confirm or even suggest otherwise. As I explained in detail in my Opening Reports, (i) "[p]roteins are typically formulated as either a liquid formulation or a lyophilized formulation"; and (ii) the '865 patent expressly *includes* lyophilized formulations in its claimed invention:

> Ophthalmic Lyophilized Formulations
>
> In one aspect of the invention, an ophthalmically accept-able formulation comprising a VEGF antagonist is provided, wherein the formulation is a lyophilizable formulation. Lyophilizable formulations can be reconstituted into solu-tions, suspensions, emulsions, or any other suitable form for administration or use. Lyophilizable formulations are typi-cally first prepared as liquids, then frozen and lyophilized. The total liquid volume before lyophilization can be less, equal to, or more than, the final reconstituted volume of the lyophilized formulation. The lyophilization process is well known to those of ordinary skill in the art, and typically includes sublimation of water from a frozen formulation under controlled conditions.

(*See* MacMichael Opening Reports at ¶ 88, 90, 106, 125; *see also* '865 patent at 7:26-41 (emphasis added); *see also id.* 1:45-52 ("***The invention includes*** liquid pharmaceutical formulations having

increased stability, as well as formulations that may be lyophilize and reconstituted for intravitreal administration.") (emphasis added); *id.* 5:32-38 ("The present invention *is not limited* to particular methods, and experimental conditions described, as such methods and conditions may vary. It is also to be understood that the terminology used herein is for the purpose of describing particular embodiments only, and *is not intended to be limiting* unless indicated, since *the scope of the present invention will be limited only by the appended claims*.") (emphasis added); *id.* at 8:7-10). Consequently, in my opinion, a POSA "reading the specification and practicing the claims" of the '865 patent would necessarily conclude that lyophilized formulations are encompassed by the Asserted Claims.

28.　　Disregarding the express *inclusion* of lyophilized formulations in "the invention" of the '865 patent, Dr. Trout declares (without any proof) that a POSA "would not use a lyophilized formulation to practice the claimed inventions" but would instead "proceed" with (or "prefer[]" (citing Carpenter)) a liquid formulation over a lyophilized formulation. (Trout Resp. at ¶ 71, 360-361). I disagree and find Dr. Trout's opinion irrelevant to establishing the breadth of the Asserted Claims. It is my understanding that claims are not to be limited by preferred embodiments absent a clear disavowal. (MacMichael Declaration at ¶¶ 29-30). Here, Dr. Trout never contends that Regeneron disclaimed lyophilized formulations from the scope of the Asserted Claims, nor does he argue for a claim construction that would exclude lyophilized formulations. In fact, Dr. Trout separately agrees that lyophilized formulations are expressly contemplated throughout the '865 patent specification. (*See, e.g.*, Trout Resp. at ¶¶ 360-361, 388, 406). In total, Dr. Trout's opinions actually concede that the Asserted Claims do, in fact, encompass lyophilized formulations. Dr.

*CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

**Reply.Add480**

Trout, however, never attempts to explain how such formulations are enabled.[12]

29.     Second, Dr. Trout misrepresents my opinions regarding Examples 7 and 8. Specifically, after acknowledging that the Example 7 and 8 formulations do not reflect embodiments of the Asserted Claims, Dr. Trout claims this fact somehow *supports* his opinion that a POSA "would not use a lyophilized formulation to practice the claimed inventions." (Trout Resp. at 361). I disagree. To be clear, I describe Examples 7 and 8 in my Opening Reports at paragraphs 86 and 87, and my actual opinions regarding whether Examples 7 and 8 represent embodiments of the Asserted Claims are at paragraphs 89 and 90. My disagreement with Dr. Trout is simple: Dr. Trout, in my opinion, conflates the questions of (i) enablement and (ii) breadth of the claims. It is Dr. Trout's opinion that *because* lyophilized formulations meeting the elements of the Asserted claims are not enabled, such formulations cannot be within the breadth of the claims. In my opinion, Dr. Trout's approach is the opposite of the appropriate inquiry. In other words, it is my understanding that one should first identify the breadth of the claims (read in view of the intrinsic record) and then determine whether the claims are enabled by the disclosures. Here, in my opinion, Examples 7 and 8 do not define the breadth of the claims one way or the other— lyophilized formulations (and reconstituted solutions, suspensions and emulsions thereof) are expressly (and undeniably) *within* the breadth of the Asserted Claims (*see* ¶ 27 above).

30.     Moreover, I disagree with Dr. Trout's suggestion that the reconstituted liquid formulations of Example 7 *cannot* fall within the scope of the claims. (Trout Resp. at ¶ 361). Here, Dr. Trout seems to conflate FDA requirements with patentability. Specifically, absolutely nothing in the claims or specification would preclude a POSA from reconstituting a lyophilized

---

[12] To the extent Dr. Trout is asserting that the specification does not need to enable lyophilized formulations because the POSA would "prefer" a liquid formulation (and thus not use a lyophilized formulation), I disagree with his opinions in that regard as well for all the same reasons.

*CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

**Reply.Add481**

formulation in accordance with Example 7 and storing that reconstituted liquid formulation at 5°
C for two months (and subsequently testing it under size exclusion chromatography ("SEC")).
While, yes, it may not be "practical" to do so for purposes of complying with FDA requirements
to administer such a formulation, Dr. Trout cites nothing suggesting that such a formulation would
be unsuitable in the context of the '865 patent simply because it was stored at 5° C for two
months—i.e., the '865 patent does not require an FDA-approved (or FDA-approvable)
formulation. Consequently, I disagree with Dr. Trout's conclusion that Examples 7 and 8 (which
are not embodiments of the Asserted Claims) support his opinion that lyophilized formulations (or
reconstituted solutions, suspensions or emulsions thereof) are not within the "breadth" of the
Asserted Claims—they are.

> **b.     The added limitations of the dependent, Asserted Claims <u>do not</u> <u>exclude</u> suspensions or emulsions from the breadth of available formulations.**

31.     Dr. Trout next asserts that suspensions and emulsions "are even further afield from
the claimed invention [than lyophilized formulations], and are not what the POSA would use to
practice the invention." (Trout Resp. at ¶ 362). I disagree. Dr. Trout's opinions again contradict
the express disclosures in the '865 patent specification.

32.     As I explained above and in my Opening Reports (¶¶ 79, 106, 125), the '865 patent
provides as exemplary formulations, lyophilized formulations that can be reconstituted as
solutions, suspensions, or emulsions. ('865 patent at 7:31-34, 7:63-65). In my opinion, the
inventors fully intended to inform POSAs that the Asserted Claims encompassed such
formulations and Dr. Trout provides no opinion or argument that "lyophilized formulations that
can be reconstituted as solutions, suspensions, or emulsions" were somehow disclaimed or
excluded from the Asserted Claims. Instead, Dr. Trout declares that such formulations are not
encompassed by the Asserted Claims simply because they are too difficult or impractical—but, in

*CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

my opinion, that does not overcome the simple fact the inventors chose to *expressly include* such formulations as part of their claimed invention. (*See* ¶ 27 above). I further disagree with Dr. Trout's suggestion that the "present in native conformation following storage at 5° C for two months" element somehow *excludes* lyophilized formulations (and reconstituted solutions, suspensions and emulsions thereof).[13] The purported difficulties and impracticalities of such formulations, in my opinion, only emphasize the lack of enablement in the '865 patent for the Asserted Claims.

**c.    Dr. Trout reverses the "breadth of the claims" analysis.**

33.    Dr. Trout asserts that because formulations disclosed in the specification meet one claim element—i.e., the "native conformation" wherein clause of claim 1—the full scope of the Asserted Claims as a whole is somehow enabled. I disagree. In my opinion, Dr. Trout is analyzing the "breadth of the claims" *Wands* factor incorrectly. It is my understanding that this factor focuses on determining claim scope—whereas the question of enablement is directed to determining whether that scope of the claims exceeds the embodiments enabled by the specification. Dr. Trout takes a reverse (specification→claims) approach, asserting that the "formulations, which Regeneron [purportedly] invented and described in the '865 patent, uniformly achieved the claimed property recited in each of the '865 Asserted Claims, i.e., 'at least 98% of the VEGF antagonist is present in native conformation following storage at 5° C. for two months as measured by size exclusion chromatography.'" (Trout Resp. at ¶ 359). I disagree.

---

[13] It is my understanding that neither Regeneron nor Dr. Trout ever offered a proposed construction (or argument) for the "native conformation" claim term that would exclude lyophilized formulations. Moreover, as I explain above, there is nothing in the claims or specification that would preclude a POSA from reconstituting a lyophilized formulation in accordance with Example 7 and storing that reconstituted liquid formulation at 5° C for two months (and subsequently testing it under SEC).

15

*CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

**Reply.Add483**

34.     Dr. Trout's statement here is incorrect. Only _**one**_ formulation described in the '865 patent specification purportedly "achieved the claimed [98% native conformation] property recited in each of the '865 _**Asserted Claims**_." (Trout Resp. at ¶ 359 (emphasis added)). As I explain in my Opening Report (¶¶ 80-91), Example 3 is the only formulation in the '865 patent that purportedly describes a vial formulation that both (i) comprises 40 mg/ml VEGF Trap-Eye/aflibercept "wherein at least 98% of the VEGF antagonist is present in native conformation following storage at 5° C. for two months as measured by size exclusion chromatography" and (ii) purportedly meets the other required elements of the Asserted Claims (assuming polysorbate is an organic co-solvent as Regeneron argues). Dr. Trout's statement incorrectly implies that the patent describes multiple such formulations—it does not. With that correction, I understand Dr. Trout's opinion as asserting that because _**one**_ formulation described in the specification purportedly satisfies the Asserted Claims, the "breadth of the claims" must be bound by that example. Stated another way, Dr. Trout is using a single, preferred embodiment to limit the "breadth of the claims" (i.e., reading the limitations of Example 3 into the Asserted Claims). I disagree. For the reasons I explain above, the Asserted Claims are not so limited.

35.     Dr. Trout also contends (again, from specification→claims) that "the POSA reading the specification and practicing the claims would proceed with a liquid formulation" and "would not use a lyophilized formulation to practice the claimed inventions." (Trout Resp. at ¶ 360-361). I again disagree. The Asserted Claims very clearly cover many more possible embodiments. Dr. Trout asserts that the POSA would only proceed with a liquid formulation (_Id._ at ¶ 360) but the POSA would understand from the Asserted Claims _and_ the specification (as I explain above, ¶ 27) that the inventors expressly intended to ensnare more than just Regeneron's preferred embodiment. The claim language encompasses any type of formulation (liquid or

lyophilized) in a vial that is "suitable" for intravitreal administration—the specification expressly states that such formulations include *both* liquid and lyophilized formulations, where lyophilized formulations can be reconstituted as solutions, suspensions, or emulsions. (*See, e.g.,* MacMichael Opening Reports at ¶ 106 (citing '865 patent at 7:32-34)).

36.     The heart of Dr. Trout's opinion is that "[a]lthough the specification of the '865 patent does refer generally to suspensions and emulsions, '865 patent at 7:31-33, the claims do not recite either such dosage form, and the POSA would not understand them to be within the claims." (Trout Resp. at ¶ 362). I disagree. The preamble to the Asserted Claims recites an "ophthalmic formulation suitable for intravitreal administration" and the specification (likewise) expressly *includes* lyophilized formulations as embodiments of that exact, purported invention. ('865 patent at 1:45-52 (Field of the Invention) ("***The present invention*** is directed to pharmaceutical formulations suitable for intravitreal administration … ***The invention includes*** liquid pharmaceutical formulations having increased stability, as well as formulations that may be ***lyophilize and reconstituted for intravitreal administration***.")). The specification also repeatedly tells the POSA that its claimed invention is not limited by the disclosed embodiments.[14] Dr. Trout provides no opinion or argument that there is anything *un*suitable about a lyophilized formulation (or a reconstituted solution, suspension or emulsion thereof), nor can he, in my opinion, given the express inclusion of such formulations within the breadth of the Asserted Claims. In my opinion, **no** POSA would agree with Dr. Trout's conclusion that upon reading the specification—including the above-mentioned disclosures—a POSA would interpret the Asserted Claims as somehow

---

[14] *See, e.g.,* '865 patent at 5:32-38 ("The present invention *is not limited* to particular methods, and experimental conditions described, as such methods and conditions may vary. It is also to be understood that the terminology used herein is for the purpose of describing particular embodiments only, and *is not intended to be limiting* unless indicated, since ***the scope of the present invention will be limited only by the appended claims***.") (emphasis added); *id.* at 8:7-10.

*CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

**Reply.Add485**

*excluding* lyophilized formulations.

> **d.    Dr. Trout offers conflicting, unsupported opinions regarding the excipients falling within the breadth of the Asserted Claims.**

37.    ***Buffers.*** The Asserted Claims require a buffer. Claim 7 limits only the amount of "buffer" to "5-25 mM." Claim 18 states that the claimed formulation "does not contain phosphate," which would seem to eliminate at least a phosphate-buffered formulation. Other than those two claims, the Asserted Claims provide no specificity regarding *what* buffers fall within the breadth of the claimed formulation, or how much. Accordingly, it is my opinion that the Asserted Claims (including claims 7, and those depending from claim 7) are nearly unlimited with respect to the formulation buffer[15] and concentration thereof. (*See, e.g.*, MacMichael Opening Reports at ¶¶ 105, 108, 119). That said, the '865 patent specification does not provide a single example, instruction, guidance or mention (much less an enabling disclosure) of a formulation using a buffer other than a phosphate buffer.[16] Therefore, to the extent any formulation (other than a phosphate-buffered formulation) is determined to be within the scope of the Asserted Claims, they are not (and cannot be) enabled in my opinion.

38.    Dr. Trout, on the other hand, seems to pick and choose buffers without any support in the patent claims or specification for differentiating between those available to a POSA (e.g.,

---

[15] At minimum, a POSA would know that at least the following buffers fall within the scope of the pH range discussed in the '865 patent specification (i.e., 5.8-7.0 (*see* '865 patent at 2:33-38; *id.* at claim 8)) and/or the Asserted Claims: acetate (pH 3.8-5.8), succinate (pH 3.2-6.6), citrate (pH 2.1-6.2), histidine (pH 5.5-6.5), phosphate (pH 6.2-8.2), and triethanolamine (pH 7.0-9.0). (*See* MacMichael Opening at ¶ 79).

[16] By comparison, Regeneron's disclaimed '231 patent (with a priority date over 1 year before the '865 patent's earliest priority date) disclosed at least phosphate, citrate and histidine buffers as being suitable for VEGF Trap-Eye/aflibercept formulations. It is my understanding that, before it was disclaimed, Regeneron believed that the '231 patent "could reasonably be asserted" against Mylan's intravitreal formulation.

*CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

**Reply.Add486**

acetate, succinate, citrate, histidine, phosphate, and triethanolamine).  For example, Dr. Trout

seems to favor phosphate and histidine buffers, but rejects citrate and succinate buffers.  Dr. Trout

provides no support for his opinion in this regard.  Dr. Trout also erroneously states that "*[c]ertain*

*embodiments* of the '865 patent use a phosphate buffer"—presumably to suggest that the '865

patent provides non-phosphate buffered formulations as embodiments.  (Trout Resp. at ¶ 364

(emphasis added)).  This is incorrect.  *__All__* embodiments of the '865 patent use a phosphate buffer.

The '865 patent does not mention a single other buffer, much less disclose an embodiment using

one.  As I explain above (¶¶ 19-20, 36, 36 n.14), the inventors expressed an interest to not narrow

or limit the scope of the claimed formulations.  Therefore, in my opinion, there is no basis for Dr.

Trout to cherry-pick certain buffers (phosphate and histidine) and eliminate others (e.g., succinate,

citrate, acetate and triethanolamine).[17]

39.      Dr. Trout also contradicts his opinions regarding what a POSA would have

"understood" regarding the use of such buffers in intravitreal formulations.  For example, when

arguing against the prior art Dr. Rabinow asserts as rendering the claims invalid, Dr. Trout

contends that the POSA would have been unable to use the prior art teachings to routinely achieve,

for example, a histidine-buffered VEGF Trap-Eye/aflibercept formulation at pH 6.2-6.3.  (*See,*

*e.g.*, Trout Resp. at ¶ 331, 336).  However, when replying to my opinions, Dr. Trout states that the

POSA "would have understood that other [non-phosphate] buffers could be used in an ophthalmic

formulation suitable for intravitreal injection, such as histidine" and "would have understood that

the role of a buffer in a formulation is to maintain a stable pH, and would have understood that

buffers have suitable pH ranges at which they function" without undue experimentation.  (*Id.* at ¶

---

[17] In my opinion, either the Asserted Claims must be limited to phosphate-buffered formulations
(as those are the only embodiment disclosed in the '865 patent) or the "breadth of the claims"
covers all buffers within the 5.8-7.0 pH range available to a POSA.

*CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

**Reply.Add487**

364). I disagree with Dr. Trout's two-sided opinions here. In my view, if (as Dr. Trout alleges) a

(e.g.) histidine-buffered formulation meeting the Asserted Claims was not obvious to a POSA,

then the Asserted Claims cannot be enabled because the '865 patent specification provides no

information regarding such formulations that wasn't already known to a POSA at the time the '865

patent application was filed. Conversely, if the Asserted Claims are enabled with respect to a (e.g.)

a histidine-buffered formulation meeting the Asserted Claims (as Dr. Trout also alleges), then the

Asserted Claims must be invalid as obvious because, again, the '865 patent specification provides

no information regarding such formulations that wasn't already known to a POSA at the time the

'865 patent application was filed.

40.    ***Organic Co-solvents.*** I disagree with Dr. Trout's opinions provided in paragraph

365 of his Reply report. Like many of his other opinions regarding enablement, Dr. Trout does

not acknowledge the full scope of the Asserted Claims. Specifically, Dr. Trout points out that

claim 2, from which all the Asserted Claims depend either directly or indirectly, "recites an organic

co-solvent that 'comprises polysorbate.'" (Trout Resp. at ¶ 365). However, Dr. Trout does not

address the effect of the "comprises" transition on the breadth of the formulation. As I explain

above (¶¶ 19-20), the added limitations of claims 2, 4, and 5 only require that polysorbate be

included in the overall formulation (i.e., "wherein said organic co-solvent ***comprises*** polysorbate)

and be within a wide concentration range for claim 4 ("said organic co-solvent ***comprises*** about

0.03% to about 0.1% polysorbate 20") or claim 5 ("said organic co-solvent ***comprises*** 0.01% to

3% polysorbate"). Accordingly, the added limitations of claims 2, 4, and 5 neither require that

polysorbate is (or must be) the "organic co-solvent," nor inform a POSA as to *what exactly* the

organic co-solvent is. In other words, the claims expressly <u>do not</u> limit the "organic co-solvent"

to polysorbate as Dr. Trout seems to suggest. Instead, a POSA reading claims 2, 4, and 5 would

know from the *repeated disclosures* in the '865 patent specification that formulations within the scope of the Asserted Claims may consist of "one or more" organic co-solvents.[18]   (*See, e.g.*, '865 patent at 2:33-38 ("In one aspect, a stable liquid ophthalmic formulation is provided that comprises … 0.01-5% of one or more organic co-solvent(s)…"); *id.* at 3:11-16 (same); 4:11-22 (same); 3:28-31 ("…*the* organic co-solvent is selected from *one or more* of…") (emphasis added)). Consequently, even assuming polysorbate is an organic co-solvent (as Regeneron argues, but I disagree), claims 2, 4, and 5 are expressly open-ended with respect to the type and amount of "organic co-solvent" used in the claimed formulation and therefore are only slightly narrower in scope than claim 1.

    41.    ***Stabilizing Agents.***   The '865 claims recite that the claimed ophthalmic formulations comprise a "stabilizing agent," with claim 11 reciting that the stabilizing agent is selected from "sucrose, sorbitol, glycerol, trehalose, and mannitol."   In my opinion, Dr. Trout offers conflicting opinions regarding the POSA's knowledge of stabilizing agents in intravitreal formulations.   Specifically, in response to Dr. Rabinow, Dr. Trout asserts that the prior art would not teach a POSA how to routinely achieve a formulation of the Asserted Claims using a sugar stabilizing agent selected from the group consisting of sucrose, sorbitol, glycerol, trehalose, and mannitol.   (Trout Resp. at ¶ 337).   However, in response to my opinions regarding the lack of enablement of the Asserted Claims, Dr. Trout shifts gears and states that "sugars and sugar alcohols like those described in the '865 patent have been known for over four decades to provide thermal stability to proteins."   (*Id.* at ¶ 366).   I disagree with Dr. Trout's two-sided opinions here, as well. As I explained in my Opening Reports (¶¶ 110, 139), "each different sugar, has unique biochemical

---

[18] For example, a formulation of the Asserted Claims might comprise 3% polyethylene glycol (a known organic co-solvent) and 0.1% polysorbate 20.

*CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

**Reply.Add489**

and biophysical properties that can affect its ability to work as a stabilizer" and "[t]here is not a single example of a working formulation with a sugar stabilizing agent other than sucrose [in the '865 patent]." In my view, if (as Dr. Trout asserts) a (e.g.) trehalose-stabilized formulation meeting the Asserted Claims was not obvious to a POSA, then the Asserted Claims cannot be enabled because the '865 patent specification provides no information regarding such formulations that wasn't already known to a POSA at the time the '865 patent application was filed. Conversely, if the Asserted Claims are enabled with respect to a (e.g.) a trehalose-stabilized formulation meeting the Asserted Claims (as Dr. Trout also asserts), then the Asserted Claims are invalid as obvious because, again, the '865 patent specification provides no information regarding such formulations that wasn't already known to a POSA at the time the '865 patent application was filed.

42.    In sum, the '865 patent identifies a broad set of claim elements and covers large genera of formulations defined by their function—that is, the formulation's ability to maintain "at least 98% of the VEGF antagonist" in "native conformation" after the formulation is "stor[ed] at 5° C. for two months." Accordingly, I disagree with Dr. Trout that "the scope of the [Asserted Claims] reasonably correlates to the scope of the disclosure of ophthalmic formulations in the '865 patent specification." (Trout Resp. at ¶ 359).

### 2.    *Wands* Factor No. 4: The Nature of the Invention.

43.    As I stated above, a POSA would have understood that not all of the formulations with the claimed excipients would exhibit the claimed stability. Even with the disclosure in the '865 patent specification, (Trout Resp. at ¶ 369-70), the POSA would understand that the breadth of the claims reveals that undue experimentation would be required to make and test all the formulations within the scope of the claims. For example, just considering liquid formulations, the POSA would know that "with many proteins it is not possible—especially considering the time

*CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

**Reply.Add490**

constraints for product development—to develop sufficiently stable aqueous formulations. Unacceptable denaturation and aggregation can be induced readily by the numerous stresses to which a protein in aqueous solution is sensitive; e.g., heating, agitation, freezing, pH changes, and exposure to interfaces or denaturants." (Carpenter at 109). The POSA would also understand that, "even under conditions that thermodynamically greatly favor the native state of proteins, aggregation can arise during months of storage in aqueous solution [and] several chemical degradation pathways (e.g., hydrolysis and deamidation) are mediated by water [and] the rates of these and other (e.g., oxidation) chemical degradation reactions can be unacceptably rapid on the time scale of storage (e.g., 18-24 months) for pharmaceutical products." (*Id.* at 110). As such, in my opinion, *Wands* Factor No. 4 favors a lack of enablement.

### 3. *Wands* Factor No. 5: The State of the Prior Art.

44. ***Excipients.*** Dr. Trout responds to my opening opinions regarding "the state of the art" by declaring that (i) the excipients used in the Asserted Claims were all known in the prior art and (ii) the '865 patent inventors did not invent any new excipients or classes of excipients. (Trout Resp. at ¶¶ 371-372). While I agree with Dr. Trout's first statement, I never offered an opinion related to his second statement. As I stated in my Opening Reports, (MacMichael Opening Reports at ¶¶ 128-129), the prior art teachings do not fill the *significant* gaps in the '865 patent specification regarding how to make and use the broad scope of formulations under the Asserted Claims – for example: What buffer to use? Alone or in combination? At what concentration? I presented my opinions in this regard in express anticipation of Dr. Trout opining that the prior art Dr. Rabinow asserted in his invalidity analyses do not teach a POSA how to achieve a formulation of the Asserted Claims, which Dr. Trout did. (*See, e.g.*, Trout Resp. at Sections XII-XIII). As I state above and in my Opening Reports, (MacMichael Opening Reports at ¶¶ 128-129), the '865 patent

**Reply.Add491**

specification offers no information or teaching that was not otherwise previously disclosed in the prior art (including the list of excipients). Therefore, it is my opinion that, if the prior art does not render the claims invalid in accordance with Dr. Rabinow's opinions, the Asserted Claims are not (and cannot be) sufficiently enabled, and thus, are invalid.

45.     In apparent support of his opinion, Dr. Trout cites to the testimony of Dr. Furfine who stated at deposition that "histidine is commonly thought of as a buffer if you're a formulation scientist." (Trout Resp. at ¶ 372 (citing Furfine Tr. at 190:6-7)). While I agree with that statement, I strongly disagree with Dr. Trout's suggestion that this supports the '865 patent disclosing and enabling a histidine-buffered formulation that meets the Asserted Claims. Dr. Trout did not address the deposition testimony that confirms the named inventors of the '865 patent never considered histidine a viable option for their intravitreal formulation.[19] Dr. Graham explained that co-inventor on the '865 patent, Dr. Dan Dix (Director of Formulation Development Group),[20] "would never have a liquid formulation with histidine as a buffer." (Graham Dep. 107:9-16; *id.* at 118:10-20 (Q. What was Dr. Dix's disfavor for histidine in a liquid formulation? A. He believed it would turn yellow. Q. Any other problems that Dr. Dix had with using histidine in a liquid formulation? A. Not that I recall at this time, no. Q. And would the formulation turning yellow be an undesirable property for an intravitreal administration? A. A change in color in a formulation is undesirable.")). Dr. Furfine described Dr. Dix's expertise and contributions to the '865 patent as follows:

> Dan [Dix] was an experienced formulations scientist, and he would
> have contributed very strongly to the kinds of excipients that could

---

[19] Dr. Furfine also testified that he could not recall Regeneron ever producing a histidine-buffered intravitreal formulation (Furfine Tr. at 129:16-22, 130:1-7, 192:6-22, 216:17-21) and that he had not seen any documents reflecting such a formulation (Furfine Tr. at 130:8-19, 193:1-8).

[20] *See* RGN-EYLEA-MYLAN-00554962

*CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

**Reply.Add492**

stabilize the VEGF-Trap to various types of stresses and would have had a lot of strategic direction in choosing what we might try, analyzing the results, and -- there's one other thing I was thinking of but has now evaporated from my brain. Well, certainly, those -- those two aspects he would have -- oh, and -- and also how to assess the -- the stability as well, what -- what methods were used to understand the variety of degradation pathways that a protein can undergo. He was an expert at all of those things…

(Furfine Dep. at 237:1-16). Accordingly, Drs. Furfine and Graham's testimony confirms that Regeneron never possessed (and quite likely never even considered) a histidine-buffered solution that meets the Asserted Claims. (*See also* MacMichael Opening Reports at ¶ 136 ("There simply is no indication in the '865 patent that the inventors possessed anything but a phosphate-buffered / sucrose-stabilized formulation."); *id.* at ¶¶ 137, 139, 140, 142).

46. *Size Exclusion Chromatography.* I disagree with Dr. Trout's response to my Opening Report at paragraph 129. Dr Trout claims that the absence of parameters from the specification somehow favors enablement, especially regarding the absence of any parameters of SEC. (Trout Resp. at ¶ 373). In the '865 patent, SEC is not merely one test among many used to test the formulations, it is the only test that is cited in the claims that all the formulations must satisfy. In my opinion, the POSA would understand that based on the importance of the SEC testing, details in the specifications would be required for enablement. Dr. Trout was able to find only two references to support his proposition that "multiple references cited by Drs. Rabinow and MacMichael describe size exclusion chromatography without providing the details of how the assay was performed. Arvinte at ¶ 162; Fyfe at 58:2-9." (*Id.*). Arvinte uses SEC as one of many tests discussed in the specification, is not required by any of the claims, and Dr. Trout's citation is to the one- and only-time SEC is mentioned in the Examples. Dr. Trout's citation to Fyfe is also to the only place in the document that mentions SEC and it is not required by any of the claims that are directed to methods for treating cancer. As such, it is my opinion that as SEC is a

*CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

**Reply.Add493**

cornerstone in the Asserted Claims of the '865 patent, the POSA, understanding that using different parameters would produce different results and in order to obtain reliable data with the SEC testing, would deem the claims lacking enablement without any recitation of the particular parameters to be used.

47.    Dr. Trout claims that following guidance documents, such as the United States Pharmacopoeia, "assay validation protocols for SE-HPLC analysis for purity and protein concentration are easily developed." (Trout Resp. at ¶ 86). I disagree. As Dr. Trout and Allen 1999[21] state, this "assay validation protocol" is the second step *after assay development*. (*Id.; see also* Allen 1999 at 534-535). The first step, assay development, "produces a method that requires validation for the analysis and release of materials." (Allen 1999 at 534). In particular, Allen 1999 discusses the varied parameters that must be considered in assay development:

> In the development of a SE-HPLC method the variables that may be manipulated and optimized are the column (matrix type, particle and pore size, and physical dimension), buffer system (type and ionic strength), pH, and solubility additives (e.g., organic solvents, detergents). Once a column and mobile phase system have been selected the system parameters of protein load (amount of material and volume) and flow rate should also be optimized. A beneficial approach to the development of a SE-HPLC method is to optimize the multiple variables by the use of statistical experimental design. Also, information about the physical and chemical properties such as pH or ionic strength, solubility, and especially conditions that promote aggregation can be applied to the development of a SE-HPLC assay. Typical problems encountered during the development of a SE-HPLC assay are protein insolubility and column stationary phase effects. These issues are best addressed by the manipulation and optimization of the column matrix type and mobile-phase parameters.

(*Id.* at 534-535). Without including parameters for the SEC testing in the '865 patent specification, the POSA would be required to develop the parameters as outlined above in Allen 1999, which, in my opinion, would require undue experimentation. Further, in support of his opinion that "[a]s of

---

[21] Dr. Trout relies on Allen 1999 at paragraphs 84-86 of this Responsive Report.

June 2006, size-exclusion chromatography was regularly used to determine the degree of protein aggregation," Dr. Trout cites to Varley 1997. (Trout Resp. at ¶ 88). I note that Varley 1997 clearly disclosed the parameters of the SEC analysis that was performed in the study.

> SEC analysis ,was performed using a Pharmacia Superdex G-75 HR 10/30 column (Pharmacia, Uppsala, Sweden) pre-equilibrated in phosphate buffered saline (PBS). 50 μl of sample was loaded onto the column and eluted at 1 mL/min in PBS. The absorbance of the eluate was monitored at 280 nm. Where required molecular weight was estimated by comparison of the elution position to those of molecular weight markers (BioRad Laboratories, Hercules CA, USA).

(Varley 1997 at 438). Dr. Trout does not even address the simple fact that each of the various formulations need to be tested in accordance with the Asserted Claims, compounding the enablement problem with the '865 patent. As such, in my opinion, the absence of any such parameters for the SEC testing that is required by the Asserted Claims favors lack of enablement.

48.    In summary, the prior art as a whole does not support the enablement of the claims, especially as the prior art already discloses an ophthalmic formulation of the claimed VEGF antagonist fusion protein, that protein's glycosylation, and the specific claimed dosage.

### 4.    *Wands* Factor No. 6: The Level of Ordinary Skill.

49.    I disagree with Dr. Trout that I somehow misquoted Regeneron's arguments made to the U.S. Patent and Trademark Office ("USPTO") in support of the patentability of the '840 application (the application that lead to the '546 patent). In fact, the additional language supplied by Dr. Trout further belies his opinion that the claims are enabled. Dr. Trout states that "[t]he full quotation reads: 'Thus, one of ordinary skill in the art upon reading Remington's would expect to engage in significant non-routine experimentation to develop a successful formulation as claimed herein.'" (Trout Resp. at ¶ 376). My opinion stands – the POSA, now including all the knowledge of Remington's, would still "expect to engage in significant non-routine experimentation to develop a successful formulation." (*See* MacMichael Opening Reports at ¶ 127). Further, my

citation to Dr. Dix that "[f]ormulation of pharmaceutical preparations and achieving a stable composition is not a simple or routine matter," in the prosecution of the European equivalent of the '546 patent, EP459, bearing the specification and claims as outlined above (and thus equivalent to the '865 patent), is clearly relevant as the claims contain formulations of the same VEGF antagonist fusion protein, VEGF TrapR1R2, and the examples in the specification likewise address formulations of that protein. (*See id.*). Accordingly, in my opinion, *Wands* Factor No. 6 favors a lack of enablement.

### 5.    *Wands* Factor No. 7: The Level of Predictability.

50.     Although Dr. Trout disagrees, (Trout Resp. at ¶ 377), I stand by my opinions regarding my citation to Dr. Dix that "[f]ormulation of pharmaceutical preparations and achieving a stable composition is not a simple or routine matter," as outlined during the prosecution of the European equivalent of the '546 patent, EP459. (*See also* MacMichael Opening Reports at ¶ 127). Dr. Trout states that the inventors did not invent any new excipients or classes of excipients, (Trout Resp. at ¶¶ 371-372), so, in my opinion, Dr. Dix was discussing that, with the excipients known at the time, formulating pharmaceutical preparations was unpredictable. (*See* EP459 Dix Declaration ¶ 10). As outlined above, Dr. Furfine testified that " [Dr. Dix] was an experienced formulations scientist, and he would have contributed very strongly to the kinds of excipients that could stabilize the VEGF-Trap to various types of stresses and would have had a lot of strategic direction in choosing what we might try, analyzing the results, and [] also how to assess the [] stability as well, what [] methods were used to understand the variety of degradation pathways that a protein can undergo. He was an expert at all of those things." (Furfine Tr. at 237:1-16). The specification of the '256 application is almost identical to that of the '865 patent and the proposed claims were to formulations similar to those found in the '865 patent. Dr. Dix's statements to the USPTO to

*CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

obtain issuance of this related patent, in my opinion, are highly relevant. As such, I disagree with Dr. Trout that Dr. Dix's statements do not address the teachings of the '865 patent specification. (Trout Resp. at ¶ 377). More importantly, as I outlined in my Opening Report (¶ 114), Dr. Dix told the Examiner that even among the same family of excipients, the effects on stability of the formulation were unpredictable as one PEG excipient (e.g., PEG 3500) was able to provide a stable formulation, whereas another PEG excipient (PEG 300) was not. ('256 App Dix Declaration at ¶¶ 5-10). In addition, Dr. Dix also declared to the Examiner that different combinations, ratios, and ranges can impact the stability profile of a formulation. (*Id.* at ¶ 5).

51.    From the above declaration of Dr. Dix based on the '256 application, the POSA would know that experimentation, even with the specification of the '865 patent specification in hand, would be unpredictable, as the '256 application is almost identical to the '865 patent specification. Based on this, I disagree with Dr. Trout that the '865 patent specification provides guidance. (Trout Resp. at ¶ 378). Other than the excipients expressly used in the Examples and at the specific concentrations disclosed therein, the specification is lacking in guidance as to other excipients (e.g., citrate, succinate, histidine, trehalose, etc.) that may be used to obtain the formulations of the Asserted Claims. Preparing and testing such formulations (including by running SEC experiments) as I outline in my Opening Report (¶¶ 79, 115-123), in order to practice *any other formulation* (much less the full scope) of the Asserted Claims, even beginning with the examples and making modifications to make additional formulations, would be undue. Accordingly, in my opinion, *Wands* Factor No. 7 favors a lack of enablement.

### 6.    *Wands* Factor No. 2:  The Direction and Working Examples in the Specification.

52.    I disagree with Dr. Trout that the disclosures and Examples in the '865 patent would enable the POSA to make and use the claimed ophthalmic formulations without undue

*CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

**Reply.Add497**

experimentation.   (Trout Resp. at ¶ 379).   I also disagree with Dr. Trout that the undue experimentation resulting from the lack of important details in making the claimed formulation (such as the order of addition of the excipients and VEGF antagonist, mixing times, concentrations, temperatures, etc.) are "topics distant from the subject of the claimed inventions." (*Id.* at ¶ 380). The '865 patent is directed to pharmaceutical formulations having increased stability. ('865 patent at 1:49-50). The POSA would understand that determining these details (such as the order of addition) is important to the stability of a formulation. I note that the only step in making the claimed formulations that Dr. Trout could find in the '865 specification happens ***after*** the assembly of the formulation and concerns the storage temperature of the assembled formulation—namely, the second wherein clause of claim 1. (Trout Resp. at ¶ 380).

53.    Dr. Trout cites to Wang 2005 for the explanation that "protein aggregation is arguably the most common and troubling manifestation of protein instability, encountered in almost all stages of protein drug development." (Trout Resp. ¶ 64 (citing Wang 2005 at 1)). Dr. Trout also states that "[t]he formation of soluble or insoluble aggregates can depend on the protein itself and its environmental conditions. (*Id.* at ¶ 65 (citing Wang 2005 at 7)). As Wang 2005 discusses, temperature, pH, ionic strength, protein concentration, and organic solvent are some of the external factors affecting protein aggregation. (Wang 2005 at 8, Table 1). How the formulations are assembled, including order of addition, could expose the protein to various ranges of temperature, pH, ionic strength, protein concentration, and organic solvent that could lead to instability of the VEGF TrapR1R2. (*See* Chi at 1333 ("solution conditions need to be chosen not only to stabilize the protein native conformation but also to stabilize protein against attractive intermolecular forces" achieved through optimizing "ionic strength, pH, and buffer type [] to minimize precipitation and other adverse events (e.g., deamidation).")). Again, the '865 patent

**Reply.Add498**

provides no guidance regarding the assembly or order of addition for the claimed formulations. Accordingly, in my opinion, Dr. Trout's own references confirm the lack of enablement of the Asserted Claims.

54.     ***Buffer Systems.***  I disagree with Dr. Trout that the '865 patent teaches how to prepare a sufficient buffer system and that the POSA would have recognized that the invention was not limited to a single buffer. (Trout Resp. at ¶ 381). I also disagree that Gokarn only teaches that proteins themselves have some buffering capacity. (*Id.*). Gokarn shows that not only does the POSA have to take into consideration the buffer system, but also the fact that the protein itself can act as a buffer. (*See*, *e.g.*, Gokarn at 3:15-21). The '865 patent does not provide any guidance for preparing a sufficient buffer system—even for the single buffer found in the specification, phosphate. Accordingly, in my opinion, Gokarn confirms the lack of enablement of the Asserted Claims.

55.     ***Organic Co-solvents.***  In paragraph 382 of his Responsive Report, Dr. Trout repeats the same misinterpretation of the Asserted Claims I addressed above (*see* ¶¶ 25-51)—specifically, Dr. Trout states that "the '865 Asserted Claims are each limited to an 'organic co-solvent comprising polysorbate' (or polysorbate 20)." This is incorrect. The Asserted Claims *only* require that the "organic co-solvent ***comprises*** polysorbate"—they neither require that polysorbate is (or must be) the "organic co-solvent," nor inform a POSA as to *what exactly* the organic co-solvent is. Consequently, even assuming polysorbate is an organic co-solvent (as Regeneron argues, but I disagree), the Asserted Claims are expressly open-ended with respect to the type and amount of "organic co-solvent" used in the claimed formulation and therefore are nearly unlimited in scope, like claim 1. Accordingly, in my opinion, a POSA would require undue (and indeed extensive) experimentation to practice *any* formulation (other than the Example 3 preferred embodiment)

*CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

**Reply.Add499**

much less the full scope of the "organic co-solvent" element of the Asserted Claims.[22]

56.    ***Stabilizing Agents.***    I disagree with Dr. Trout that the patent describes several stabilizing agents.    (Trout Resp. at ¶ 383).    At best, the '865 patent only lists the following stabilizing agents: "sucrose, sorbitol, glycerol, trehalose, and mannitol."  ('865 patent at 3:25-27). The '865 patent only describes examples of formulations with a single stabilizing agent, sucrose. (MacMichael Opening Reports at ¶¶ 118).    The POSA would understand that the specification discloses only one stabilizing agent, as such, in my opinion, it would require undue experimentation for a POSA to develop working formulations using any stabilizing agent at any concentration as the claims purportedly cover.  (*Id.*).

57.    ***Buffers.***    I disagree with Dr. Trout that I didn't demonstrate any undue experimentation that would result from testing different buffers.  (Trout Resp. at ¶ 384).  The entire '865 patent (specification, examples and claims) use only one buffer, phosphate.    Dr. Trout (focusing on histidine) admits that other buffers were known in the art, but he fails to address (or even acknowledge) the different effects different buffers may have on a formulation.  (MacMichael Opening Reports at ¶ 119).  Instead, Dr. Trout again focuses his responsive opinions on the single, preferred embodiment described in the patent that purportedly falls within the scope of the Asserted Claims, stating that the "POSA would have understood that at this preferred pH [6.2-6.3], limited buffers would have been contemplated for an ophthalmic formulation suitable for intravitreal injection," but then doesn't describe this limited list.  (*See* Trout Resp. at ¶ 384). Neither does the '865 patent specification.    I disagree with Dr. Trout that this single embodiment

---

[22] Dr. Trout also accuses me of failing to explain the experimentation necessary to practice the scope of the Asserted Claims.  (Trout Resp at ¶ 382).  This seems to turn to the enablement analysis on its head.    In essence, Dr. Trout is placing the burden on the POSA to fill in all the gaps in the '865 patent specification.    In my opinion, Dr. Trout's accusations against my opinions only emphasize that the Asserted Claims are not enabled.

*CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

**Reply.Add500**

either (i) narrows the scope (or breadth) of the Asserted Claims or (ii) enables their full scope. For example, the preferred pH range Dr. Trout keeps referencing (6.2-6.3) is required by only one Asserted Claim, claim 9—all the other Asserted Claims encompass at least the full pH range described in the specification (5.8-7.0). As I explain above, *several* known buffers were commonly used in the prior art within that range: acetate (pH 3.8-5.8), succinate (pH 3.2-6.6), citrate (pH 2.1-6.2), histidine (pH 5.5-6.5), phosphate (pH 6.2-8.2), and triethanolamine (pH 7.0-9.0). (*See* MacMichael Opening Reports at ¶ 79).

58.    Dr. Trout claims that histidine was "preferably omit[ted]" from the specification of the '865 patent. (Trout Resp. at ¶ 385). I disagree. Although histidine was well known to a POSA, the named inventors of the '865 patent never possessed, developed, or even considered developing a histidine-buffered formulation that meets the Asserted Claims. (*See* ¶ 45). As Drs. Furfine and Graham testified, their co-inventor, Dr. Dix, "would never have a liquid formulation with histidine as a buffer." (*See, e.g.*, Graham Tr. at 107:9-16). Accordingly, histidine was never intended to be included in, much less enabled by, the '865 patent specification.

59.    I disagree with Dr. Trout that the Dix '231 patent disclaimer doesn't have any relevance to the enablement of the '865 patent. (Trout Resp. at ¶ 386). The fact that Regeneron refused to use histidine in any of its liquid formulations prior to June 2006, (*see* Graham Tr. at 118:4-23; *id.* at 107:5-16), that Dr. Dix had "things that you would never do, and one was you would never have a liquid formulation with histidine as a buffer … he was resistant to that," (Graham Tr. 107:9-16), and that Regeneron had to disclaim histidine-buffered formulations of the same VEGF antagonist fusion protein in a similar patent, reflects the '865 patent's lack of disclosure, description, or enablement of such formulations.

60.    I disagree with Dr. Trout that the specification provides multiple examples of

**Reply.Add501**

formulations that meet the "stability properties (presumably referring to the native conformation limitation of claim 1)." (Trout Resp. at ¶ 387). Despite his admonitions throughout his report that claim 1 is not being asserted, he bases his opinion in paragraph 387 on claim 1 when he states in the chart on page 157 that all of these formulations meet the claim limitations. In fact, as I outlined in my Opening Report, only Example 3 purportedly falls within the scope of the Asserted Claims. (MacMichael Opening Reports at ¶¶ 88-91). As such, I disagree that "the POSA would begin with these formulations in order to practice the invention." (Trout Resp. at ¶ 388). In my opinion, there is only one example that purportedly falls within the scope of the Asserted Claims, and to make and test all the other claimed excipients based on one example would be undue. Thus, in my opinion, *Wands* Factor No. 2 favors a lack of enablement.

### 7.    *Wands* Factor No. 1: Quantity of Experimentation.

61.    Dr. Trout states that the "'865 patent describes a genus of formulations comprising the specific claimed VEGF antagonist fusion protein that is glycosylated, together with a buffer, a stabilizing agent, and an organic co-solvent." (Trout Resp. at ¶ 389). Although I agree that the '865 patent describes a broad genus of formulations, I disagree with Dr. Trout's assertion that the patent "then exemplifies *multiple* such formulations and discloses testing data demonstrating that they achieve the claimed level of native conformation set forth in claim 1." (*Id.* (emphasis added)). As I explain above and in my Opening Reports, *only* Example 3 purportedly exemplifies a formulation meeting any of the Asserted Claims (assuming that polysorbate is an organic solvent in the formulation as Regeneron contends, to which I disagree). (MacMichael Opening Reports at ¶¶ 88-91). Examples 1, 2, and 7 purportedly exemplify unasserted claim 1 but <u>do not</u> meet the added limitation of claim 2, which I understand is incorporated by each of the Asserted Claims; Examples 4, 5, 6, and 8 all lack at least one required component of claim 1 and therefore also do

**Reply.Add502**

not embody any of the Asserted Claims. (*Id.*).

62. Moreover, Dr. Trout fails to mention that all of the '865 patent Examples are phosphate-buffered and are sucrose-stabilized (when containing a stabilizing agent). *No other buffer or stabilizing agent is used in any formulation described in the '865 patent* even though the Asserted Claims are nearly unlimited with respect to the type and amount of buffer or stabilizing agent used in the claimed formulations. Quoting Dr. Furfine (named inventor of the '865 patent) as support, Dr. Trout describes the '865 patent as providing a "recipe book," purportedly "teach[ing] the POSA how to make and use the claimed formulations without undue experimentation." (Trout Resp. at ¶ 389 (citing Furfine Tr. at 196:15 – 197:15)). I disagree. At best, the '865 patent is a book of only *one* recipe for the Asserted Claims. The POSA would require undue (and indeed extensive) experimentation to make and use *any other formulation* captured by the incredibly broad scope of the Asserted Claims. (*See, e.g.*, MacMichael Opening Reports at ¶¶ 130-131).

63. Over several paragraphs, ¶¶ 390-95, Dr. Trout attempts to discredit my opinion that it would require a large amount of experimentation to make *any* formulation other than the one preferred embodiment of the Asserted Claims (much less the full scope of formulations encompassed by the '865 patent claims). (*See* MacMichael Opening Reports at ¶ 124). Dr. Trout states that my opinion "assumes the POSA would make and test formulations within the claims at random and that each formulation would have to be tested to predict its properties with respect to native conformation." (Trout Resp. at ¶ 390). Dr. Trout also states that "the POSA would evaluate the particular options set forth in the specification, rather than evaluating every single option within a range." (*Id.* at ¶ 391). Further, Dr. Trout states that "[f]or many formulations within the claims, the POSA would not have to undertake any experimentation at all," citing in support Example 1.

*CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

**Reply.Add503**

(*Id.* at ¶ 393). Dr. Trout then states that the POSA can look at all the examples by just ignoring certain differences in the formulations, such as concentration of the VEGF antagonist. (*Id.* at ¶ 395). I disagree for at least the following reasons.

64. First, I never offered an opinion that "the POSA would practice the claimed invention by ***making*** 'over 35 million different formulations.'" (Trout Resp. at ¶ 390 (emphasis added) (citing MacMichael Opening Reports at ¶ 124). My calculations were very clearly directed toward illustrating the ***breadth*** of the '865 patent claims. (*See* MacMichael Opening Reports at ¶ 79). Nor did I ever suggest that "the POSA would make and test formulations within the claims ***at random.***" (Trout Resp. at ¶ 390 (emphasis added) (citing MacMichael Opening Reports at ¶ 79). As I explained in detail above and in my Opening Reports, the ***only*** formulation described in the '865 patent that purportedly meets the Asserted Claims is phosphate-buffered, sucrose-stabilized, and comprises polysorbate 20 (i.e., Example 3). Accordingly, the POSA has *no other teaching* to "begin with" in her quest to make and use *any* other formulation covered by the Asserted Claims (e.g., a histidine-buffered and/or trehalose-stabilized formulation). My opinions expressly assume that a POSA would use the "examples and preferred embodiments" of the '865 patent—the problem, which Dr. Trout does not mention, is that those disclosures can only teach how to make and use a very specific, narrow embodiment.[23,24]

---

[23] Examples 1 and 2 (which are not embodiments of the Asserted Claims) provide no meaningful teachings compared to Example 3 for a POSA to make and use any other formulation (e.g., histidine-buffered and/or trehalose-stabilized formulations) that falls within the scope of the Asserted Claims.

[24] In my opinion, Dr. Trout contradicts his opinions regarding "excipients that were tested or contemplated in other intravitreal drug products." (Trout Resp. at ¶ 390). In response to my opinions, Dr. Trout asserts that the '865 patent would enable a POSA to use such excipients (which are not disclosed in the specification) to achieve a formulation meeting the Asserted Claims (*id.* (citing Shams and Gaudreault 2005)); however, in response to Dr. Rabinow's opinions, Dr. Trout states that those exact same prior art teachings would not teach a POSA to achieve such a

65.     Second, I never asserted "that, to practice claim 1, the POSA would evaluate 336 permutations of organic cosolvent and 210 permutations of a stabilizing agent." (Trout Resp. at ¶ 391 (citing MacMichael Opening Reports at ¶ 79)). Again, my calculations were very clearly directed toward illustrating the **breadth** of the '865 patent claims. (*See* MacMichael Opening Reports at ¶ 79). I reject Dr. Trout's misrepresentations of my opinions. Moreover, Dr. Trout's responsive opinions are significantly flawed in that he, again, ignores the full scope of the Asserted Claims and exaggerates the teachings of the '865 patent specification. Specifically, Dr. Trout states: "the POSA would evaluate the particular options set forth in the specification, rather than evaluating every single option within a range." (Trout Resp. at ¶ 391). As I explain in detail above and in my Opening Reports, the "options set forth in the specification" themselves are extremely broad—for example:

> In one aspect, a stable liquid ophthalmic formulation is provided that comprises 1-100 mg/ml VEGF-specific fusion protein antagonist, 0.01-5% of one or more organic co-solvent(s), 30-150 mM of one or more tonicity agent(s), 5-40 mM of a buffering agent, and optionally, 1.0-7.5% of a stabilizing agent, pH between about 5.8-7.0.

('865 patent at 2:33-38 (emphasis added); *id.* at 3:11-16 (same);

> In another aspect, a lyophilizable formulation of a vascular endothelial growth factor (VEGF)-specific fusion protein antagonist is provided, comprising 5-50 mg/ml of the VEGF antagonist, 5-25 mM buffer, such as phosphate buffer, 0.01 to 0.15% of one or more of an organic co-solvent, such as polysorbate, propylene glycol and/or PEG, and optionally 1-10% of a stabilizing agent such as sucrose, sorbitol, trehalose, glycerol, or mannitol, pH about 5.8-7.0. In various

formulation. (*See, e.g., id.* at Sections XIII.A.2., XIII.D.). This makes no sense. In my opinion, the Asserted Claims cannot be both enabled and non-obvious.

*CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

**Reply.Add505**

*id.* at 4:11-18 (emphasis added)). Likewise, the Asserted Claims are not reasonably limited to the single embodiment of those claims disclosed in the specification (Example 3).

66.     Third, Dr. Trout again wrongly asserts that "the '865 Asserted Claims further narrow the organic co-solvent (claims 4, 5) along with the stabilizing agent (claim 11)." (Trout Resp. at ¶ 391). As I explain above, (i) the added limitations of claims 2, 4, and 5, neither require that polysorbate is (or must be) the "organic co-solvent," nor inform a POSA as to *what exactly* the organic co-solvent is; and (ii) claim 11 (which depends from claim 10) only requires that the sugar of claim 10 (which does not otherwise limit the stabilizing agent) be selected from the group consisting of "sucrose, sorbitol, glycerol, trehalose, and mannitol"—claim 11 does not provide the amount or concentration, nor does it indicate whether the selected sugar *is* the stabilizing agent under claim 10 or whether the stabilizing agent of the formulation merely "comprises" the selected sugar of claim 11. In short, the Asserted Claims are only *slightly* less unlimited than claim 1.

67.     Fourth, Dr. Trout accuses me of "provid[ing] no rationale for how [lyophilized formulations reconstituted as suspensions and emulsions] fall with the '865 Claims, or, even if they did …, why a POSA would seek to use them in practicing the claims." (Trout Resp. at ¶ 392). I disagree with Dr. Trout's approach here. It is my understanding that the claims of a patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction. Neither the '865 patent specification nor the Asserted Claims exclude lyophilized formulations (or reconstituted solutions, suspensions or emulsions thereof). To the contrary, the '865 patent specification *expressly includes* such formulations (as I explain above, *see* ¶¶ 19, 19 n.5, 26-32). Accordingly, my "rationale" for including such formulations comes directly from the '865 patent itself. Dr. Trout, however, (using his words) "provides no rationale for how such dosage forms" ***would be excluded***

*from* the '865 Claims, or how such formulations are enabled.

68.    In ¶¶ 393-395 of his report, Dr. Trout repeats the same assertions he makes in the previous paragraphs of his report. Therefore, for the same reasons I state above in reply to ¶¶ 390-392 of Dr. Trout's report, I disagree with his opinions in ¶¶ 393-395.

**B.    The '865 Asserted Claims Are Not Described.**

69.    Dr. Trout responds to my opinions that the Asserted Claims are invalid for lack of written description "for similar reasons set forth above with respect to enablement." (Trout Resp. at ¶ 396). Although I disagree that my opinions regarding written description "largely echo" my opinions regarding enablement, my replies to Dr. Trout and disagreements with his opinions are consistent with reasons I've outlined herein (*see* ¶¶ 17-68) and in my Opening Report, (MacMichael Opening Reports at ¶¶ 144-163), all of which I incorporate by reference.

70.    Dr. Trout states that "the '865 patent discloses formulations of the claimed VEGF antagonist fusion protein that achieve the claimed levels of native conformation as measured by size exclusion chromatography, both in exemplary form and in its disclosure of additional ingredients that may be used." (Trout Resp. at ¶ 399). I disagree. The Examples provide only one (1) formulation that falls within the scope of the Asserted Claims. (MacMichael Opening Reports at ¶¶ 80-91). As such, the '865 patent does not disclose a sufficient number of representative species to demonstrate the patentee invented or possessed the claimed genera of formulations. As there is only one example, the claims recite only "functionally-defined genera," (Trout Resp. at ¶ 400), that are not described in the specification.

71.    I disagree with Dr. Trout that the "claims are defined by common structural features recited in the claims and reflected in the specification, which inform the scope of the claimed invention." (Trout Resp. at ¶ 402). The one example that falls within the scope of the Asserted

Claims (*see* above) and Dr. Trout's one instance in the specification that simply gives a laundry list of possible excipients, (*Id.* at ¶ 402 (citing '865 patent at 2:33-48)), is not sufficient to convey to a POSA that the '865 patent inventors possessed the full scope of the claimed subject matter. The claims require some combination of (1) a VEGF antagonist fusion protein that is glycosylated and comprises amino acids 27-457 of SEQ ID NO:4; (2) an organic co-solvent; (3) a buffer; and (4) a stabilizing agent. And, as I explain above, the Asserted Claims only *slightly* narrow that large scope. Further, there is no description in the '865 specification for all the possible buffers, organic co-solvents, and stabilizing agents that can be used in the Asserted Claims, or the concentrations at which they can be used.

72.    I disagree with Dr. Trout that the '865 patent describes species representative of the genus. (Trout Resp. at ¶¶ 405-407). As I discussed above and in my Opening Report, I disagree with Dr. Trout that the Examples provide more than one (1) formulation that falls within the scope of the Asserted Claims. (MacMichael Opening Reports at ¶¶ 80-91). As such, despite what Dr. Trout states in paragraph 406, based on the one example, Example 3, that allegedly falls within the scope of the Asserted Claims: (i) only Example 3 comprises the 40 mg/ml of the required VEGF antagonist and purports to achieve 98% or greater native conformation over two months' storage as measured by size exclusion chromatography, (ii) only Example 3 achieves the claimed level of turbidity set forth in claim 15, (iii) only Example 3 purports to meet the 99% native conformation set forth in claim 16, and (iv) no example meets native conformation limitation set forth in claim 17. The specification fails to teach the POSA representative formulations with the claimed elements and fails to teach possession of the claimed genus.

73.    Dr. Trout misrepresents my opinion regarding the lack of written description for claims 4-5. (Trout Resp. at ¶¶ 408-409 (citing MacMichael Opening Reports at ¶¶ 152-153). I

*CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

**Reply.Add508**

never stated "that the word 'comprising' renders the claim invalid." (*Id.*). My actual opinions are set forth in my Opening Reports, wherein I stated my understanding that the transitional term "comprises" means "includes" and thus leaves the claim term (here, "organic co-solvent") open-ended. (MacMichael Opening Reports at ¶ 152). The reason why claims 4 and 5 are invalid for a lack of written description, in my opinion, is that the '865 patent specification is completely devoid of any description as to what else may be included in the "organic co-solvent" of the claimed formulation. For example, the specification *repeatedly* discloses that formulations within the scope of the Asserted Claims may consist of "one or more" organic co-solvents.[25] (*See, e.g.,* '865 patent at 2:33-38 ("In one aspect, a stable liquid ophthalmic formulation is provided that comprises … 0.01-5% of one or more organic co-solvent(s)…"); *id.* at 3:11-16 (same); 4:11-21 (same); 3:28-31 ("…*the* organic co-solvent is selected from *one or more* of…") (emphasis added)). But that is it—no further description is provided and therefore, in my opinion, a POSA would not have understood the inventors to be in possession of formulations comprising the entire scope of claims 4 and 5.

74.     I disagree with Dr. Trout that the patent describes the 5-25 mM range of buffer concentrations listed in claim 7. (Trout Resp. at ¶ 410). Dr. Trout points to one place, the only place, in the specification that lists a range of buffers but has no explanation for why the specification contemplates only phosphate buffer, (MacMichael Opening Reports at ¶ 154), and that phosphate buffer is only used in in concentrations of less than 10 mM. (*Id.* at ¶ 155). I stand by my opinion that a POSA would not have understood the inventors to be in possession of formulations comprising the entire scope of this excipient in view of the limited teachings of the

---

[25] For example, a formulation of the Asserted Claims might comprise 3% polyethylene glycol (a known organic co-solvent) and 0.1% polysorbate 20.

*CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

**Reply.Add509**

'865 patent.

75.      I also disagree with Dr. Trout that claim 9 has written description support. (Trout

Resp. at ¶ 411). Dr. Trout cites to three places in the '865 specification that lists the contemplated

pH range. (*Id.* (citing '865 patent at 2:57, 2:62, 2:67)). Dr. Trout fails to address that the

specification only contemplates the use of a phosphate buffer, (MacMichael Opening Reports at ¶

156), and thus the specification does not convey to a POSA that the patentee possessed the entire

range of working 40 mg/ml VEGF antagonist fusion protein formulations with *any buffer*

comprising a pH about 6.2-6.3.

76.      I disagree with Dr. Trout's opinion that the specification expressly contemplates

other stabilizing agents. (Trout Resp. at ¶ 412). The specification does not offer any "guidance"

on using any stabilizing agent other than sucrose. (MacMichael Opening Reports at ¶ 158). In my

opinion, a POSA would not consider a mere listing of sugars as "guidance" on how to use them in

a formulation. Dr. Trout fails to explain how a POSA would have understood the inventors to be

in possession of formulations comprising any stabilizing agent other than sucrose, much less the

entire scope of claims 10 or 11, which include non-sucrose sugars as well as non-sugar stabilizing

agents. (*See* ¶¶ 19-20, 41, 56 above).

77.      Based on the data in the '865 specification, I disagree with Dr. Trout that the POSA

would have understood that the inventors possessed other formulations with over 98% native

conformation for 24 months as measured by size exclusion chromatography. (Trout Resp. at ¶

413-414). The only example, Example 3, that includes a VEGF antagonist fusion protein where

the concentration is 40 mg/ml and contain 0.03% polysorbate 20, was only "tested at 0.5, 1, 2, 3,

and 4 months." ('865 patent at 9:27-28, 9:54-55). I disagree that a POSA would view the result

at 4 months to support that this formulation would have over 98% native conformation for 24

months as measured by SEC as required by claim 17. Dr. Trout uses Example 1, a different formulation with different percentages of excipients and concentration of VEGF antagonist, to support his opinion that "the POSA would have understood that the inventors possessed other formulations with over 98% native conformation for 24 months as measured by size exclusion chromatography." (Trout Resp. at ¶ 414). The POSA, however, would not understand that with only 4 months of data for Example 3, the only example that allegedly falls within the scope of the Asserted Claims, that the inventors possessed a formulation with over 98% native conformation for 24 months as measured by SEC.

78.    Dr. Trout states that the POSA would understand that the '865 patent specification teaches a phosphate buffer as well as known non-phosphate buffers suitable for intravitreal administration, based on the language a "buffering agent" that "may be, for example, phosphate buffer." (Trout Resp. at ¶ 415-416). I disagree. The specification does not mention any other buffer than phosphate, and there is not a single example of a working formulation with a buffer other than phosphate. (MacMichael Opening Reports at ¶ 161). Dr. Trout's only explanation is to go outside of the '865 patent specification and point to other art for other buffers. (Trout Resp. at ¶ 416).[26] Based on the total absence of any other buffer being mentioned in the '865 patent, and Dr. Trout's inability to identify intrinsic support for the same, a POSA would not have understood the inventors to be in possession of formulations comprising the entire scope of this excipient in view of the limited teachings of the '865 patent.

79.    For at least the reasons discussed above and in my Opening Reports, the '865 patent Asserted Claims are invalid for lack of written description because the '865 patent does not convey

---

[26] As I explain above, Dr. Trout completely contradicts his own opinions in this regard with his responses to Dr. Rabinow's asserted prior art and obviousness opinions. (*See* ¶¶ 22, 24, 38-39 above).

to those skilled in the art that the named inventors were in possession of the full scope of the claims.

### C.    The '865 Asserted Claims Are Indefinite.

#### 1.    Organic Co-Solvent.

80.    Dr. Trout states that "[u]nder Regeneron's construction, there is no uncertainty: the POSA only needs to acknowledge the specification's explicit teaching that polysorbates like polysorbate 20 are organic co-solvents." (Trout Resp. at ¶ 417). I disagree. As I outlined in my Opening Reports, the specification teaches neither (i) that polysorbates are organic co-solvents (in all formulations at any concentration), nor (ii) that the claims are limited to formulations that only include polysorbate. (MacMichael Opening Reports at ¶¶ 164-165). I note that Dr. Trout does not deny that polysorbate is categorically known to a POSA as a surfactant, not as a co-solvent. (*See* Trout Resp. at ¶ 417 (failing to rebut MacMichael Opening Reports at 164, n.14); *see also* Wang 2007 at 2-4, Table 1 ("PS20" listed under column heading "Surfactant"); Nayar 2002 at 187, Table 2 ("Tween 20" listed under "Excipient Class" column heading "Surfactants")). This is where the uncertainty lies: a POSA knows that although polysorbate may be used as a co-solvent under the correct conditions and at the correct concentration, it is categorically a surfactant, not a co-solvent. As the specification and the claims do not notify a POSA as to the full scope of the claimed formulation as to whether the polysorbate is acting as a co-solvent or whether the organic co-solvent includes a polysorbate, there is a zone of uncertainty around what constitutes infringement under the Asserted Claims. (MacMichael Opening Reports at ¶ 164-165).

#### 2.    Native Conformation.

81.    Native conformation, regardless of either Mylan's construction or Regeneron's claim construction proposal, has meaning to a POSA. As such, I disagree with Dr. Trout that I

reiterated Mylan's claim construction position in determining that the term "native conformation" is indefinite. (Trout Resp. at ¶ 419). As I outlined above, the specification lacks important details in how the formulations are assembled, the details of which can affect the stability of the VEGF antagonist. (*See* ¶¶ 46-48). In conjunction with the fact that the POSA would understand that "native conformation" concerns the fundamental chemical and/or physical instability of the VEGF antagonist and not just its size and shape, the POSA would have been aware that SE-HPLC merely measures certain types of instability products and does not account for many other forms of instability listed in the '865 patent. (*See* '865 patent at 5:53-60). Add to this the fact that the '865 patent specification is devoid of all details as to how the POSA is to test the formulations using SEC, it is still my opinion that the Asserted Claims are indefinite and nothing that Dr. Trout asserts convinces me otherwise.

### 3.    An Ophthalmic Formulation Suitable for Intravitreal Injection.

82.    I disagree with Dr. Trout's opinion that the POSA would know that a formulation was "suitable for intravitreal injection" if it contained excipients suitable for such use in view of the '865 patent and the knowledge of the POSA (based on, e.g., others' disclosures or relevant pharmacopeial standards). (Trout Resp. at ¶ 420). Dr. Trout fails to give any reason why this term is not subjective as it is merely based on the claim requirement "at least 98% of the VEGF antagonist is present in native conformation following storage at 5° C. for two months as measured by size exclusion chromatography." Dr. Trout cites to Mylan's documents, not the specification, in support. (*Id.*). I don't understand how Mylan's documents can help the POSA interpret the indefiniteness of the '865 patent. I therefore disagree with Dr. Trout's reliance on Mylan's documents. I also disagree with Dr. Trout's opinion that compliance "with applicable pharmacopeial standards" makes an excipient "suitable for intravitreal injection." (*Id.*). Dr. Trout

*CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

**Reply.Add513**

cites no authority for equating these two.

83.    I also disagree with Dr. Trout's opinion that disclosure "in ranibizumab intravitreal formulations" makes an excipient "suitable for intravitreal injection." (Trout Resp. at ¶ 420). If this was the criteria, then Regeneron's phosphate buffer and sucrose in its Eylea formulation would not be "suitable for intravitreal injection" as these were not used in Lucentis (which uses a histidine buffer and trehalose). (Shams at 31:27-32). Accordingly, the term "ophthalmic formulation suitable for intravitreal injection" is indefinite.

## VIII.    U.S. PATENT NO. 11,253,572 ("THE '572 PATENT").

### A.    Person of Ordinary Skill in the Art of the '572 Patent.

84.    I understand that Dr. Trout provided his opinions "from the perspective of" the following, purported "[person of ordinary skill in the art]" of the '572 patent:

> [T]he POSA would have an advanced degree, such as a Master's in a biopharmaceutical science, or a related discipline, such as chemical engineering, and several years of experience in the development of biologics products. Alternatively, the POSA could have a Ph.D. in such discipline and less experience. The POSA may collaborate with others, including a medical doctor with experience treating ophthalmic diseases.

(Trout Open. at ¶ 32).

85.    It is also my understanding that Regeneron has offered several other definitions for a person or ordinary skill in the art of the '572 patent. Specifically, I have been informed of the following, which I have listed in the chronological order that they were presented:

- **2022-Feb-10:** Regeneron and its expert witness, Dr. Diana Do, offered the following definition for a person of ordinary skill in the art of the '338 patent, which I understand is a parent of the '572 patent, and shares the same specification:

> [T]he skilled artisan is an ophthalmologist with experience in treating angiogenic eye disorders, including through the use of VEGF

> antagonists. In the event that Mylan argues that the skilled artisan need not be a licensed physician (ophthalmologist), whatever other qualification they must possess, I disagree because ***only an ophthalmologist*** would have the firsthand experience of diagnosing and treating angiogenic eye disorders to which the patent is plainly directed.

(*Mylan Pharms. Inc. v. Regeneron Pharms., Inc.*, IPR2021-00881, Ex.2051 at ¶ 28 (P.T.A.B. Feb. 10, 2022) (emphasis added));

- **2022-Oct-13:** Regeneron did not dispute the following Mylan definition for a person of ordinary skill in the art of U.S. Patent No. 10,888,601 ("the '601 patent") and U.S. Patent No. 10,130,681 ("the '681 patent"), which I understand are parents of the '572 patent, and share the same specification:

> A [person of ordinary skill in the art] would have: (1) knowledge regarding the diagnosis and treatment of angiogenic eye disorders, including the administration of therapies to treat said disorders; and (2) the ability to understand results and findings presented or published by others in the field, including the publications discussed herein. Typically, such a person would have an advanced degree, such as an M.D. or Ph.D. (or equivalent, or less education but considerable professional experience in the medical, biotechnological, or pharmaceutical field), with practical academic or medical experience in (i) developing treatments for angiogenic eye disorders (such as AMD), including through the use of VEGF antagonists, or (ii) treating of same, including through the use of VEGF antagonists.

(*See Mylan Pharms. Inc. v. Regeneron Pharms., Inc.*, IPR2022-01226, Paper 2, 25-26 (P.T.A.B. July 1, 2022); *id.*, Paper 13, 1-5 (failing to define a POSA); *Mylan Pharms. Inc. v. Regeneron Pharms., Inc.*, IPR2022-01225, Paper 2, 28-29 (P.T.A.B. July 1, 2022); *id.*, Paper 14, 1-4 (failing to define a POSA)); and

- **2023-Feb-2:** Regeneron and its expert witness, Dr. Karl Csaky, offered the following definition for a person of ordinary skill in the art of the '572 patent in the Opening Expert Report of Karl G. Csaky, M.D., Ph.D. Regarding Infringement of U.S. Patent Nos. 11,253,572 and 10,888,601 ("Csaky Report"):

*CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

**Reply.Add515**

> [T]he POSA relevant to the Yancopoulos patents [which includes the 572 patent] is an ophthalmologist with experience in treating angiogenic eye disorders, including through the use of VEGF antagonists, and would have access to individuals with experience with intravitreal injection formulations.

(Csaky Report at ¶ 60).

86.    It is also my understanding that the Patent Trial and Appeal Board ("PTAB") for the United States Patent and Trademark Office ("PTO") adopted Mylan's definition of the person for ordinary skill in the art as "reasonable and consistent with the '338 patent and the prior art." (*Mylan Pharms. Inc. v. Regeneron Pharms., Inc.*, IPR2021-00881, Paper 21, 15-16 (P.T.A.B. Nov. 10, 2021)). That definition reads as follows:

> A [person of ordinary skill in the art] would have [:] (1) knowledge regarding the diagnosis and treatment of angiogenic eye disorders, including the administration of therapies to treat said disorders; and (2) the ability to understand results and findings presented or published by others in the field, including the publications discussed herein. Typically, such a person would have an advanced degree, such as an M.D. or Ph.D. (or equivalent, or less education but considerable professional experience in the medical, biotechnological, or pharmaceutical field), with practical academic or medical experience in (i) developing treatments for angiogenic eye disorders (such as AMD), including through the use of VEGF antagonists, or (ii) treating of same, including through the use of VEGF antagonists.

(*Id.* at 15). I understand that the PTAB also adopted this definition in IPR2022-01226 and IPR2022-01225 regarding the '601 and '681 patents, respectively. (*See* Dkt. No. 254-2 at 15-16 ('601 Institution Decision); Dkt. No. 254-1 at 20-21 ('681 Institution Decision)).

87.    In my opinion, the "perspective" Dr. Trout applied to form his opinions regarding the '572 patent is not consistent with the education and experience for the person of ordinary skill in the art that Regeneron and the PTAB have respectively applied to the parent patents of the '572 patent. Dr. Trout's perspective is also inconsistent with Dr. Csaky's definition of a person of ordinary skill in the art for the '572 patent. Nevertheless, I qualify (and qualified as of the earliest

priority date of the '572 patent) as at least a person of ordinary skill in the art under Dr. Trout's definition. Further, my opinions regarding the '572 patent would not change even if one were to apply Dr. Trout's definition.

### B. Claims 6, 12, 18, and 22 of the ''572 Patent Are Not Adequately Described.

#### 1. "Formulated as an Isotonic Solution"

88.    I disagree with Dr. Trout's complaint that I offered "no reason" why the language in the '572 patent regarding "formulated as an isotonic solution" is insufficient. (Trout Resp. at ¶ 430). I clearly did. I emphasized in my Opening Report that "[t]he only mention in the '572 specification of 'an isotonic solution' is in an exemplary statement that '[a]s the aqueous medium for injections, there are, *for example*, physiological saline, an isotonic solution containing glucose and other auxiliary agents, etc.'" ('572 patent at 6:22-25 (emphasis added))."  (MacMichael Opening Reports at ¶ 173). That's all that is found in the '572 patent regarding isotonic solutions. This is a hypothetical – a POSA would not have understood the inventors to be in possession of "an isotonic solution" (much less the full variety of isotonic solutions covered by the claims) based on this one exemplary statement. In my opinion, the '572 patent's one exemplary use of "isotonic solution" fails to adequately support the claim reciting an isotonic solution.

#### 2. "Formulated with a Nonionic Surfactant"

89.    I also disagree with Dr. Trout's complaint that I offered "no reason" why the language in the '572 patent regarding "formulated with a nonionic surfactant" is insufficient. (Trout Resp. at ¶ 431). I clearly did. I emphasized in my Opening Report that "[t]he only mention in the '572 specification of "a nonionic surfactant" is in an exemplary and prophetic statement that … '*for example*, [] *an appropriate* [] *nonionic surfactant* [e.g., polysorbate 80, HCO-50 (polyoxyethylene (50 mol) adduct of hydrogenated castor oil)], etc.' ('572 patent at 6:22-30

(emphasis added))". (MacMichael Opening Reports at ¶ 176). That's all that is found in the '572 patent regarding a nonionic surfactant. This is a hypothetical – a POSA would not have understood the inventors to be in possession of "a nonionic surfactant" (much less the full variety of nonionic surfactants covered by the claims) based on this one exemplary statement. In my opinion, the '572 patent's one exemplary use of "a nonionic surfactant" fails to adequately support the claim reciting an isotonic solution.

## IX.    THE PRIOR ART DISCLOSED VEGF TRAP-EYE/AFLIBERCEPT

90.     I have been asked to review statements that Regeneron made to the USPTO in connection with Regeneron's efforts to obtain patent term extension for some of their prior art patents. Based on my review of those applications for patent term extension, I understand that Regeneron represented to the USPTO that multiple prior art Regeneron patents disclosed the exact sequence of VEGF Trap-Eye/aflibercept. In my opinion, the representations by Regeneron to the USPTO leave no doubt that the VEGF Trap-Eye/aflibercept sequences were set forth in the prior art to the '865, '601 and '572 patents.

91.     I have reviewed Regeneron's submissions to the USPTO with respect to U.S. Patent No. 7,374,758 ("'758 patent") and U.S. Patent No. 7,070,959 ("'959 patent"), including Regeneron's Applications for Extension of Patent Term Under 35 U.S.C. § 156. ("'758 FH, 12/22/2011 PTE" and "'959 FH, 12/22/2011 PTE").

92.     Regeneron states that "[a]t least the following claims of the '758 patent claim a method of using the approved product: claims 1 and 2." ('758 FH, 12/22/2011 PTE at 4). Claims 1 and 2 of the '758 patent read as follows:

We claim:

**1.** A method of inhibiting vascular endothelial growth factor (VEGF) activity in a mammal, comprising:

administering a pharmaceutical composition to the mammal, wherein the pharmaceutical composition comprises

(a) a VEGF antagonist, and

(b) a pharmaceutically acceptable carrier

wherein the VEGF antagonist comprises a dimeric fusion polypeptide comprising two fusion polypeptides, each fusion polypeptide comprising:

(i) a VEGF receptor component consisting of an immunoglobulin-like (Ig) domain 2 of a first VEGF receptor human Flt1 and Ig domain 3 of a second VEGF receptor human Flk1 or human Flt4; and

(ii) a multimerizing component,

wherein VEGF activity is inhibited.

**2.** The method of claim **1**, wherein the mammal is a human.

('758 patent at 97:10-28).

93.    In the '959 patent PTE Application, Regeneron states that "[a]t least the following claim of the '959 patent claims a method of manufacturing the approved product: claim 11." ('959 FH, 12/22/2011 PTE at 4). Claim 11, and the claim that it incorporates, claim 8, from the '959 patent, are set forth below:

*CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

**Reply.Add519**

> **8.** A host-vector system for the production of a fusion polypeptide comprising an expression vector encoding a fusion protein capable of binding vascular endothelial growth factor (VEGF), wherein the fusion protein consists of immunoglobulin-like (Ig) domain 2 of VEGF receptor human Flt1, Ig domain 3 of VEGF receptor human Flk1, and a multimerizing component, In a suitable isolated host cell.
>
> **9.** The host-vector system of claim **8**, wherein the host cell is a bacterial cell, yeast cell, insect cell, or mammalian cell.
>
> **10.** The host-vector system of claim **9**, wherein the host cell is selected from the group consisting of *E. coli* and CHO.
>
> **11.** A method of producing a fusion polypeptide, comprising growing cells of the host-vector system of claim **8**, under conditions permitting production of the fusion polypeptide and recovering the fusion polypeptide so produced.

('959 patent at 40:5-23).

## X.    REGENERON'S PRIOR ART PATENTS.

94.    I have also been asked to offer my opinion as to how certain patents, specifically patents assigned to Regeneron, would have influenced the development of the subject matter claimed by the '601 and '572 patents as of January 13, 2011, the patents' earliest priority date; and (2) the subject matter claimed by the '865 patent as of June 16, 2006, the '865 patent's earliest priority date.

95.    In my opinion, a POSA would have been aware that numerous patents assigned to Regeneron include claims directed to certain VEGF antagonists, which include claims directed to the VEGF Trap-Eye/aflibercept molecule, the coding sequences, and methods for manufacturing VEGF Trap-Eye/aflibercept.  A POSA would appreciate that the practice of the method, or even the commercial manufacture of the molecule claimed in the '601/'572 patents would infringe such patents.  A POSA therefore would have been discouraged from developing the subject matter claimed by the '601/'572 patents by at least January 2011.

*CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

**Reply.Add520**

96.     For example, I have been informed that several versions of the EYLEA label explicitly recite numerous "Regeneron U.S. Patents" that Regeneron itself purports cover EYLEA. I have been informed that these include, but are not limited to, U.S. Patent Nos. 7,070,959 ("'959 patent") (MYL-AFL00046894); 7,303,746 ("'746 patent") (MYL-AFL0002670); 7,303,747 ("'747 patent") (MYL-AFL0002727); 7,306,799 ("'799 patent") (MYL-AFL0003406); 7,374,757 ("'757 patent") (MYL-AFL0002760); 7,374,758 (MYL-AFL0003263); and 7,531,173 ("'173 patent") (MYL-AFL0000455).

97.     The '959 patent is drawn to isolated nucleic acids, expression vectors, and methods of producing VEGF Trap-Eye/aflibercept. As I discuss above, Regeneron informed the Patent Office that the '959 patent covered a method of manufacturing aflibercept, the active ingredient in EYLEA. Aflibercept would also be the active ingredient in any biosimilar version of EYLEA. Accordingly, a POSA would have known that the claims of the '959 patent would prevent one from commercially manufacturing aflibercept while the '959 patent is in force.

98.     I understand the '959 patent issued from U.S. Application No. 10/009,852, which was published on Dec. 14, 2000, as international patent application number WO 00/75319 ("WO 319"). (MYL-AFL0007832 to 7990). The cover page states that WO 319 is assigned to Regeneron. Regeneron claimed isolated nucleic acids. (MYL-AFL0007923 to 7931). These claims ultimately issued in the '959 patent and, consistent with the publicly available WO 319, cover VEGF Trap-Eye/aflibercept. Furthermore, I understand the '959 patent notice of allowance was issued by the PTO on Nov. 25, 2005. (RGN-EYLEA-MYLAN-00048126 to -00048132). As a result, before the earliest priority date of the '865 patent, it was known by persons of skill in the art that Regeneron was seeking and, per the notice of allowance, was obtaining patent protection covering VEGF Trap-Eye/aflibercept and that would prevent one from commercially

*CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

**Reply.Add521**

manufacturing the protein while the '959 patent is in force.

99. The '746, '747, '799, and '758 patents are drawn to therapeutic methods. I have not been asked to provide an opinion on the methods themselves, but I have been asked whether the amino acid sequences claimed in those patents match the amino acid sequence claimed in the '601/'572 patents (i.e., whether the sequences correspond to VEGF Trap-Eye/aflibercept). Based on an alignment of the sequences, I can state that yes, the amino acid sequences—SEQ ID NO:16 in claims 1, 3, 4 and 5 of the '746 patent; SEQ ID NO:6 in claims 1 and 3 of the '747 patent; and SEQ ID NO:6 in claims 2 and 11 of the '799 patent—match the amino acid sequence set forth in claim 1 of the '601/'572 patents. The '799 patent at claims 1 and 4 and the '758 patent at claims 1 and 3 do not have specific sequences set forth, but those claims recite the domain architecture of the VEGF Trap-Eye/aflibercept.

100. The application from which the '746 patent issued was published and publicly available on Aug. 11, 2005 as US 2005/0175610. The application from which the '747 patent issued was published and publicly available on Feb. 9, 2006 as US 2006/0030529. The application from which the '799 patent issued was published and publicly available on Nov. 24, 2005 as US 2005/0260203. The application from which the '758 patent issued was published and publicly available on Nov. 3, 2005 as US 2005/0245447. The cover pages for each of these published patents applications recite that Regeneron is the assignee. These published applications, like their corresponding issued '746, '747, '799, and '758 patents, include claims that cover amino acid sequences that correspond to VEGF Trap-Eye/aflibercept.

101. The '757 patent and '173 patent claim the VEGF Trap-Eye/aflibercept molecule and a composition comprising the molecule, respectively. For example, claims 6 and 7 of the '757 patent claim the nucleotide and amino acid sequences of VEGF Trap-Eye/aflibercept. Claim 1 of

the '173 patent is drawn to an ophthalmic composition comprising a VEGF antagonist called VEGFR1R2-FcΔC1(a), which a POSA would have known was VEGF Trap-Eye/aflibercept. The application from which the '757 patent issued was published and publicly available on July 28, 2005 as US 2005/0163798. The '798 application cover page recites that Regeneron is the assignee, and the published claims are directed to amino acid sequences that correspond to VEGF Trap-Eye/aflibercept.

102. A POSA would have understood that the subject matter claimed by the '757 and '959 patents is required to practice the subject matter claimed by the '865 patent. A POSA could not practice the claims of the '865 patent without necessarily infringing the claims of the '959 and '757 patents. Consequently, it is my opinion that one would not have been able to practice the formulations claimed in the '865 patent without also practicing the claimed inventions in the '959 and '757 patents. Furthermore, prior to the priority date of the '865 patent, the published '798 application and WO 319 application, as well as the notice of allowance for the '959 patent, informed persons of skill in the art of the '865 patent that Regeneron was seeking claims – and in fact had secured claims -- directed to VEGF Trap-Eye/aflibercept. This public knowledge acts as deterrent for others to develop the formulations of the '865 patent.

103. Moreover, the published applications that eventually issued as the '746, '747, '799, and '758 patents further put persons of ordinary skill in the art of the '865 patent on notice before the priority date of the '865 patent that Regeneron was seeking claims directed to methods of treatment using aflibercept. This further would discourage persons of ordinary skill in the art from developing the subject matter claimed by either the '865 patent or the '601/'572 patents.

104. Consequently, it is my opinion that one would not have been able to practice the invention claimed in the '601/'572 patents without also practicing the inventions claimed in the

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Reply.Add523**

above patents (assuming the therapeutic methods of the '746, '747, '799, and '758 patents also would have foreclosed practicing the '601/'572 patents, which I have not provided an opinion on).

## XI.    CONCLUSION.

105.    For the reasons set forth above and in my Opening Report, it is my opinion that the '865 Asserted Claims and the '572 Claims are invalid.

106.    This Report sets forth the opinions I have formed based on information available as of the date of this report.  Because other as yet unknown and unidentified material may be introduced during this litigation, which may fall within my area of expertise, I may have relevant and important opinions regarding such as yet unknown and unidentified material.  I reserve the right to be able to offer such opinions if they may become relevant or important as such material becomes known. I further reserve the right and intend to testify and offer additional opinions in response to any opinions offered by Regeneron or its purported experts.

107.    I further reserve the right to supplement or amend this Report based on additional information made available to me, including in light of ongoing fact discovery (including third party discovery) and any expert reports submitted on behalf of Regeneron, or in order to clarify the information provided herein.  I also reserve the right to supplement or amend this Report in light of any claim interpretations (or changes or supplements thereto) made by the Court.

## XII.    TRIAL EXHIBITS/TUTORIAL.

108.    If I testify at trial in this case, I may rely on exhibits and/or visual aids to demonstrate the basis for my opinions. I have not yet prepared any such exhibits or visual aids. I also reserve the right to provide a tutorial relating to the general topics contained in this report, including a discussion of the prior art references discussed herein.

*CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

**Reply.Add524**

## XIII.  REQUIRED DISCLOSURES.

109.   The terms of my retention, compensation, or the matters in which I have given

testimony over the last four years, have not changed since the MacMichael Opening Reports.

*CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER*

**Reply.Add525**

Dated: March 30, 2023

_Gregory MacMichael_
Gregory MacMichael, Ph.D.

**Reply.Add526**

**Confidential Material from
Reply.Add527-Reply.Add668
Omitted**

| | |
|---|---|
| **From:** | Trask, Andrew |
| **To:** | MGB-Amgen-ABP938; ABP938; Ashley Hardesty Odell; Kaitlyn McKitrick |
| **Cc:** | Eylea; Eylea.Biosimilars@weil.com; REGENERONPATENT@lists.kellogghansen.com; Steve Ruby; David Pogue |
| **Subject:** | Regeneron v. Amgen, 1:24-cv-00039-TSK-JPM (N.D.W. Va.) |
| **Date:** | Thursday, June 27, 2024 7:34:41 PM |
| **Attachments:** | Formycon proposed redactions_2024-06-21 D241 SEALED Order Granting Mot for Prelim Inj against Formycon_Redactions Applied.pdf |

Counsel for Amgen,

The Court recently issued a decision granting Regeneron's preliminary injunction motion against Formycon.  Regeneron and Formycon have not yet agreed on a version of the decision that redacts all confidential information.  Formycon, however, has provided Regeneron with a copy of the decision that redacts information that Formycon contends is confidential, and Formycon consented today to Regeneron's production of this version of the decision to Amgen.  Regeneron therefore provides this version of the decision as an attachment to this email.  Please note that this version of the decision contains unredacted Regeneron confidential information, and therefore it should be treated as Confidential under the Protective Order governing this litigation.

Best,
Andrew

Andrew Trask | Williams & Connolly LLP | 202-434-5023 | atrask@wc.com

**Confidential Material from
Reply.Add670-Reply.Add671
Omitted**

## CERTIFICATE OF SERVICE

I certify that today, October 4, 2024, I electronically filed the foregoing Reply with the Clerk of the Court for the U.S. Court of Appeals for the Federal Circuit using the appellate CM/ECF system.  Counsel of record for all parties will be served by the appellate CM/ECF system.

OCTOBER 4, 2024

/s/ David I. Berl
DAVID I. BERL

*Attorney for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE LIMITATION AND WORD-COUNT

1.    This reply complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(C).  This reply contains 2,599 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b).

2.    This reply complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6).  This reply has been prepared in a proportionally-spaced typeface using Microsoft Word in fourteen-point CenturyExpd BT style.

OCTOBER 4, 2024

/s/ David I. Berl
DAVID I. BERL

*Attorney for Plaintiff-Appellant*


## CERTIFICATE OF CONFIDENTIAL MATERIAL

The foregoing document contains 11 unique words (including numbers) marked confidential for the first time in this filing.  This number does not exceed the maximum of 15 words permitted by Fed. Cir. R. 25.1(d)(1)(A).

OCTOBER 4, 2024

/s/ David I. Berl
DAVID I. BERL

*Attorney for Plaintiff-Appellee*