No. 24-2351

# In the United States Court of Appeals for the Federal Circuit

REGENERON PHARMACEUTICALS, INC.,
*Plaintiff-Appellant,*

*v.*

MYLAN PHARMACEUTICALS INC., AMGEN USA, INC., BIOCON BIOLOGICS INC., CELLTRION, INC., FORMYCON AG, AMGEN INC., SAMSUNG BIOEPIS CO., LTD.,
*Defendants-Appellees.*

Appeal from the United States District Court for the Northern District of West Virginia in No. 1:24-md-3103-TSK, Chief Judge Thomas S. Kleeh

## CORRECTED NONCONFIDENTIAL BRIEF OF APPELLANT REGENERON PHARMACEUTICALS, INC.

DAVID I. BERL
THOMAS S. FLETCHER
ANDREW V. TRASK
CHARLES L. MCCLOUD
SHAUN P. MAHAFFY
KATHRYN S. KAYALI
ARTHUR J. ARGALL III
ADAM PAN
CHRISTIAN GLADDEN-SORENSEN
RHOCHELLE KRAWETZ
WILLIAMS & CONNOLLY LLP
*680 Maine Ave. SW*
*Washington, DC 20024*
*(202) 434-5000*

ELIZABETH S. WEISWASSER
WEIL, GOTSHAL & MANGES LLP
*767 Fifth Ave.*
*New York, NY 10153*
*(212) 310-8022*

PRIYATA PATEL
WEIL, GOTSHAL & MANGES LLP
*2001 M St. NW, Suite 600*
*Washington, DC 20036*
*(202) 682-7041*

*Attorneys for Plaintiff-Appellant*

*Counsel listing continues on inside cover*

JACOB E. HARTMAN
KELLOGG, HANSEN, TODD, FIGEL & FREDERICK PLLC
*1615 M St. NW, Suite 400*
*Washington, DC 20036*
*(202) 326-7989*

## U.S. Patent 11,084,865, Claim 2

1. A vial comprising an ophthalmic formulation suitable for intravitreal administration that comprises:

a vascular endothelial growth factor (VEGF) antagonist

an organic co-solvent,

a buffer, and

a stabilizing agent,

wherein said VEGF antagonist fusion protein is glycosylated and comprises amino acids 27-457 of SEQ ID NO:4; and

wherein at least 98% of the VEGF antagonist is present in native conformation following storage at 5° C. for two months as measured by size exclusion chromatography.

2. The vial of claim 1, wherein the concentration of said VEGF antagonist fusion protein is 40 mg/ml, and wherein said organic co-solvent comprises polysorbate.

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2024-2351

**Short Case Caption** Regeneron Pharmaceuticals, Inc. v. Mylan Pharmaceuticals Inc.

**Filing Party/Entity** Regeneron Pharmaceuticals, Inc.

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 10/17/2024

Signature: /s/ David I. Berl

Name: David I. Berl

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Regeneron Pharmaceuticals, Inc. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☑ Additional pages attached

| | | |
|---|---|---|
| See Exhibit A | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below) ☐ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

**Exhibit A**

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

BIENERT KATZMAN LITTRELL WILLIAMS LLP: Anthony R. Bisconti

CAREY DOUGLAS KESSLER & RUBY PLLC: David R. Pogue, Jordan L. Damron, Michael W. Carey, Raymond S. Franks II, Steven R. Ruby, S. Benjamin Bryant

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, PLLC: Alyssa J. Picard, Andrew E. Goldsmith, Evan T. Leo, Grace W. Knofczynski, Mary Charlotte Y. Carroll, Sven Eric Henningson III

ROBINSON MILLER LLC: Keith J. Miller, Michael J. Gesualdo

UMHOFER, MITCHELL AND KING LLP: Matthew Donald Umhofer, Jonas Palmer Mann

WEIL, GOTSHAL & MANGES LLP: Anish R. Desai, Christopher M. Pepe, Jennifer Brooks Crozier, Kathryn Leicht, Kellie C. Van Beck, Matthew D. Sieger, Natalie C. Kennedy, Rocco Recce, Tom Yu, Yi Zhang, Zhen Lin

WILLIAMS & CONNOLLY LLP: Ellen E. Oberwetter, Haylee N. Bernal Anderson, Nicholas W. Jordan, Jennalee Beazley, Rebecca A. Carter, Renee M. Griffin, Teagan James Gregory

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..... iii

STATEMENT OF RELATED CASES ..... viii

STATEMENT OF JURISDICTION ..... 1

STATEMENT OF THE ISSUE ..... 1

STATEMENT OF THE CASE ..... 1

I. Introduction ..... 1

II. Background ..... 4

A. Patent-in-Suit ..... 5

B. District Court Proceedings ..... 9

1. The Court's Bench Trial in the *Mylan* Case ..... 11

2. The Court's Preliminary Injunction Decisions and Its Construction of "Buffer" That Includes Histidine-Containing Proteins Like Aflibercept ..... 13

3. The Court's *Amgen* Decision and Its Claim Interpretation of No Overlap Between Aflibercept and "Buffer" ..... 18

SUMMARY OF ARGUMENT ..... 24

ARGUMENT ..... 27

III. Standard of Review ..... 27

IV. The District Court Erred in Construing the Claims To Require That the "VEGF Antagonist" and "Buffer" Be Met by Separate Ingredients of the Accused Product ..... 28

A. The District Court Legally Erred by Ignoring Its Own Construction of "Buffer" ..... 28

B. The District Court Erroneously Interpreted the Claims To Require Separate Structures....34

1. *Becton* Is Inapposite Where the Terms as Construed Overlap....35

2. Any Presumption Under *Becton* Is Overcome....40

3. The District Court's Additional Reasons for Applying *Becton* Fail....44

C. The District Court's Construction of Buffer in *Formycon* Is Correct....60

1. The Ordinary Meaning of "a Buffer" Is Not Limited to an "Excipient"....61

2. Amgen's Construction Improperly Limits the Claims to the Embodiments....67

3. Regeneron Did Not Previously Argue That Buffers Were Limited to Excipients....68

CONCLUSION....71

*Confidential Material Omitted*

Pursuant to Fed. Cir. R. 25.1(e)(1)(B), the material omitted on page 19 relates generally to Amgen's statements made in its regulatory application seeking approval for its biosimilar product, which Amgen has maintained as confidential. Regeneron has no objection to the public disclosure of this information.

# TABLE OF AUTHORITIES

## CASES

*Allergan, Inc. v. Sandoz, Inc.*,
796 F.3d 1293 (Fed. Cir. 2015) ....................12

*Applied Med. Res. Corp. v. U.S. Surgical Corp.*,
448 F.3d 1324 (Fed. Cir. 2006) ....................45

*Aventis Pharma S.A. v. Hospira, Inc.*,
675 F.3d 1324 (Fed. Cir. 2012) ....................67, 68

*Barkan Wireless IP Holdings v. T-Mobile U.S., Inc.*,
2021 WL 4399514 (E.D. Tex. Sept. 26, 2021)....................33

*Becton, Dickinson and Co. v. Tyco Healthcare Grp., LP.*,
616 F.3d 1249 (Fed. Cir. 2010) ....................*passim*

*Boss Indus., Inc. v. Yamaha Motor Corp.*,
333 F. App'x 531 (Fed. Cir. 2009) ....................50

*Brady Constr. Innovations, Inc. v. Perfect Wall, Inc.*,
290 F. App'x 358 (Fed. Cir. 2008) ....................32

*Cadence Pharm. Inc. v. Exela PharmSci Inc.*,
780 F.3d 1364 (Fed. Cir. 2015) ....................20, 65

*CAE Screenplates, Inc. v. Heinrich Fiedler GmbH & Co. KG*,
224 F.3d 1308 (Fed. Cir. 2000) ....................45

*Cannon Rubber Ltd. v. First Years, Inc.*,
163 F. App'x 870 (Fed. Cir. 2005) ....................38, 39

*Capella Photonics, Inc. v. Ciena Corp.*,
546 F. Supp. 3d 977 (N.D. Cal. 2021)....................32

*CommScope Techs. LLC v. Dali Wireless Inc.*,
10 F.4th 1289 (Fed. Cir. 2021)....................28, 39

*Cont'l Circuits LLC v. Intel Corp.*,
915 F.3d 788 (Fed. Cir. 2019) ....................27

*Embrex, Inc. v. Serv. Eng'g Corp.*,
216 F.3d 1343 (Fed. Cir. 2000) ....................66

*Exigent Tech., Inc. v. Atrana Sols., Inc.*,
442 F.3d 1301 (Fed. Cir. 2006) ....................29, 66

*Falko-Guntner Falkner v. Inglis*,
448 F.3d 1357 (Fed. Cir. 2006) ....................51

*Gaus v. Conair Corp.*,
363 F.3d 1284 (Fed. Cir. 2004) ....................38

*Google LLC v. Ecofactor, Inc.*,
92 F.4th 1049 (Fed. Cir. 2024)....................*passim*

*Google LLC v. Personal Audio, LLC*,
743 F. App'x 978 (Fed. Cir. 2018) ....................37

*Hill-Rom Servs., Inc. v. Stryker Corp.*,
755 F.3d 1367 (Fed. Cir. 2014) ....................48, 68

*HTC Corp. v. Cellular Commc'ns Equip., LLC*,
701 F. App'x 978 (Fed. Cir. 2017) ....................42, 43, 54

*In re Aflibercept Pat. Litig.* (Celltrion),
1:24-md-3103, Dkt. 248 (N.D.W. Va. July 9, 2024)....................9

*In re Aflibercept Pat. Litig.*,
2024 WL 1597512 (J.P.M.L. Apr. 11, 2024) ....................10, 31

*In re Aflibercept Pat. Litig.* (Samsung Bioepis),
2024 WL 3422971 (N.D.W. Va. June 24, 2024)....................9

*In re Aflibercept Pat. Litig.* (Formycon),
2024 WL 3423047 (N.D.W. Va. July 9, 2024)....................*passim*

*In re Glass*,
492 F.2d 1228 (C.C.P.A. 1974)....................55, 56

*In re Kelley*,
305 F.2d 909 (C.C.P.A. 1962)....................38

*In re Nebivolol Pat. Litig.*,
867 F. Supp. 2d 1354 (J.P.M.L. 2012) ............................................................32

*In re RAH Color Techs. Pat. Litig.*,
347 F. Supp. 3d 1359 (J.P.M.L. 2018) ............................................................32

*In re Varma*,
816 F.3d 1352 (Fed. Cir. 2006) ....................................................................49

*Innogenetics v. Abbott Labs.*,
512 F.3d 1363 (Fed. Cir. 2008) ...............................................................57, 58

*Kyocera Senco Indus. Tools Inc. v. ITC*,
22 F.4th 1369 (Fed. Cir. 2022) ................................................................*passim*

*L.A. Biomed. Rsch. Inst. v. Eli Lilly & Co.*,
849 F.3d 1049 (Fed. Cir. 2017) ..........................................................37, 39, 45

*Luminara Worldwide LLC v. Liown Elecs. Co. Ltd.*,
814 F.3d 1343 (Fed. Cir. 2016) ...............................................................27, 33

*Markman v. Westview Instruments*,
52 F.3d 967 (Fed. Cir. 1995) (en banc) ...................................................*passim*

*Merck Sharp & Dohme, LLC v. Mylan Pharm. Inc.*,
2022 U.S. Dist. LEXIS 195204 (N.D.W. Va. Sept. 21, 2022) .................44, 45

*Otsuka Pharm. Co. v. Mylan Labs. Ltd.*,
2023 WL 5928313 (D. Del. Sept. 12, 2023) ..............................................43

*Phillips v. AWH Corp*,
415 F.3d 1303 (Fed. Cir. 2005) ..............................................................*passim*

*Pinney v. Nokia, Inc.*,
402 F.3d 430 (4th Cir. 2005) .........................................................................32

*Powell v. Home Depot U.S.A., Inc.*,
663 F.3d 1221 (Fed. Cir. 2011) .....................................................................37

*Purdue Pharm. Products v. Actavis Elizabeth, LLC*,
2014 WL 2624787 (D.N.J. June 11, 2014) ..........................................20, 21, 65

*Reckitt Benckiser Pharm. Inc. v. Watson Labs., Inc.*,
2015 WL 3978883 (D. Del. June 26, 2015) .......... 65

*Regeneron Pharm., Inc. v. Mylan Pharm., Inc.*,
2024 WL 382495 (N.D.W. Va. Jan. 31, 2024) .......... *passim*

*Riverwood Int'l Corp. v. R.A. Jones & Co., Inc.*,
324 F.3d 1346 (Fed. Cir. 2003) .......... 66

*Schoenhaus v. Genesco, Inc.*,
440 F.3d 1354 (Fed. Cir. 2006) .......... 41

*Sciele Pharma Inc. v. Lupin Ltd.*,
684 F.3d 1253 (Fed. Cir. 2012) .......... 27

*Scripps Clinic & Rsch. Found. v. Genentech, Inc.*,
927 F.2d 1565 (Fed. Cir. 1991) .......... 67

*SightSound Techs., LLC v. Apple, Inc.*,
809 F.3d 1307 (Fed. Cir. 2015) .......... 70

*Sun Pharm. Indus. Ltd. v. Saptalis Pharm., LLC*,
2019 WL 2549267 (D. Del. June 19, 2019) .......... 43

*SuperGuide Corp. v. DirecTV Enterprises, Inc.*,
358 F.3d 870 (Fed. Cir. 2004) .......... 58

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
574 U.S. 318 (2015) .......... 31, 32

*Thorner v. Sony Comput. Ent. Am. LLC*,
669 F.3d 1362 (Fed. Cir. 2012) .......... *passim*

*Wind Tower Trade Coal. v. United States*,
741 F.3d 89 (Fed. Cir. 2014) .......... 27

## OTHER SOURCES

28 U.S.C. § 1292 .......... 1

28 U.S.C. § 1407 .......... 10, 32

35 U.S.C. § 112 ........................................................................................ 48, 50

Oxford Dictionary of Biochemistry and Molecular Biology ............................ 64

Price Competition and Innovation Act ................................................................ 9

Webster's Medical Desk Dictionary .................................................................. 64

## STATEMENT OF RELATED CASES

Regeneron Pharmaceuticals, Inc. ("Regeneron") brought suit in the Northern District of West Virginia against Mylan Pharmaceuticals Inc. ("Mylan"), *Regeneron Pharmaceuticals, Inc. v. Mylan Pharmaceuticals Inc.*, No. 1:22-cv-61 (N.D.W. Va.); against Samsung Bioepis Co., Ltd. ("SB"), *Regeneron Pharmaceuticals, Inc. v. Samsung Bioepis Co., Ltd.*, Nos. 1:23-cv-94, 1:23-cv-106 (N.D.W. Va.); against Formycon AG ("Formycon"), *Regeneron Pharmaceuticals, Inc. v. Formycon AG*, No. 1:23-cv-97 (N.D.W. Va.); and against Celltrion, Inc. ("Celltrion"), *Regeneron Pharmaceuticals, Inc. v. Celltrion, Inc.*, Nos. 1:23-cv-89, 1:24-cv-53 (N.D.W. Va.). In this matter, Regeneron brought suit against Amgen Inc. in the Central District of California, *Regeneron Pharmaceuticals, Inc. v. Amgen Inc.*, No. 2:24-cv-264 (C.D. Cal.), and the U.S. Judicial Panel on Multidistrict Litigation ("JPML") transferred the action to the Northern District of West Virginia, *Regeneron Pharmaceuticals, Inc. v. Amgen Inc.*, No. 1:24-cv-39 (N.D.W. Va.), and instituted a multidistrict litigation incorporating the aforementioned actions, *In re Aflibercept Pat. Litig.*, No. 1:24-md-3103 (N.D.W. Va.). Regeneron later brought suit against Sandoz Inc. in the District of New Jersey, which also was transferred to the multidistrict litigation in the Northern District of West

Virginia. *In re Aflibercept Pat. Litig.*, No. 1:24-md-3103, Dkt. 332; *Regeneron Pharm., Inc. v. Sandoz Inc.*, No. 24-cv-08760 (D.N.J.). The *Mylan* litigation parties previously filed protective appeals that this Court dismissed. *Regeneron Pharm., Inc. v. Mylan Pharm. Inc.*, Nos. 24-1402, 24-1405 (Fed. Cir.).

Following a bench trial in the Northern District of West Virginia, Mylan appealed a judgment that it infringes U.S. Patent 11,084,865 (the patent at issue in this appeal) and that the ’865 patent is not invalid. *Regeneron Pharm., Inc. v. Mylan Pharm. Inc.*, No. 24-2002 (Fed. Cir.). SB, Formycon, and Celltrion each appealed from decisions of the same court issuing preliminary injunctions based on the ’865 patent. *Regeneron Pharm., Inc. v. Mylan Pharm. Inc.*, Nos. 24-1965, 24-1966, 24-2082, 24-2083 (Fed. Cir.) (SB appeal); *Regeneron Pharm., Inc. v. Mylan Pharm. Inc.*, Nos. 24-2009, 24-2019, 24-2156 (Fed. Cir.) (Formycon appeal); *Regeneron Pharm., Inc. v. Mylan Pharm. Inc.*, Nos. 24-2058, 24-2147 (Fed. Cir.) (Celltrion appeal).

Each of the above-listed cases may affect or be affected by this Court’s decision in this appeal.

## STATEMENT OF JURISDICTION

This Court has jurisdiction under 28 U.S.C. §§ 1292(a)(1) and 1292(c)(1), because this appeal arises from the district court's denial of Regeneron's motion for preliminary injunction. Appx89. Regeneron timely appealed. Appx26958.

## STATEMENT OF THE ISSUE

Whether the district court erred in construing the claims to require the aflibercept "VEGF antagonist" protein and "buffer" limitations to be separate and non-overlapping, such that they must be satisfied by distinct components of an accused formulation, where the court previously construed "buffer" in the same claims to include "proteins like aflibercept" and neither revisited nor applied that construction.

## STATEMENT OF THE CASE

### I. Introduction

The district court's decision to deny Regeneron's motion for a preliminary injunction against Amgen explicitly turned on a single "central dispute between the parties" as to the "construction" of the asserted claims: "whether the claimed 'buffer' must be a separate and distinct component from the claimed 'VEGF antagonist'" aflibercept, the active ingredient in Regeneron's Eylea® product. Appx35. In addressing this issue, the district

court recognized this Court's consistent and binding precedent that "the claim construction issue of separate versus overlapping claim elements," Appx28, depends, first and foremost, on the "claim language." Appx38 (quoting *Google v. Ecofactor*, 92 F.4th 1049, 1058 (Fed. Cir. 2024); *Kyocera v. ITC*, 22 F.4th 1369, 1382 (Fed. Cir. 2022)).

Yet in a remarkable, Hamlet-without-the-Prince-of-Denmark approach to claim interpretation, the district court proceeded to assess whether "buffer" and the "VEGF antagonist" aflibercept are "separate" limitations or "overlapping" limitations without ever construing what those claim terms mean. Worse yet, the district court expressly declined to construe the disputed claim term "buffer" despite the fact that it had done just that, only two months earlier, in another preliminary injunction proceeding in the same coordinated multidistrict litigation. The district court's July 2024 opinion enjoining Formycon (another biosimilar applicant) construed "buffer" as overlapping explicitly with the "VEGF antagonist" aflibercept, holding that a "buffer" is "a substance that resists changes to pH … within an optimal pH range … including, for example, histidine, phosphate, and *proteins like aflibercept*." Appx26 (emphasis added). Rather than assessing the meaning of "buffer" as the law requires—either by applying its existing construction or

undertaking a new claim-construction inquiry for that term to displace the existing construction—the court held squarely that it "need not address the proper construction of the term 'buffer' and decline[d] to do so." Appx78.

It is difficult to conjure a legal error more brazen and self-evident than the one the district court announced it committed here: construing claims without addressing what the claim language means. What matters for purposes of determining whether the limitations are "separate" or "overlapping" is not that the "VEGF antagonist" aflibercept and "buffer" are different words, but rather whether those words have meanings that are overlapping. By ignoring the need to understand and apply the scope and meaning of the words as used in the claim, not just the words in isolation, the district court contravened the most basic, fundamental purpose of claim construction: to "determin[e] the meaning and scope" of the claims. *Markman v. Westview Instruments*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).

The district court's resulting conclusion that "buffer" and "VEGF antagonist" aflibercept are "separate" rather than "overlapping" limitations was the sole basis to deny Regeneron injunctive relief. It cannot stand. Stripped of that legal error, Amgen does not—and cannot—dispute

infringement. Accordingly, this Court should vacate the denial of injunctive relief and remand.

## II. Background

This case concerns Regeneron's patent covering its flagship product, Eylea. Regeneron invented and markets Eylea, an ophthalmic drug product containing the fusion protein aflibercept that treats the most common causes of blindness. *In re Aflibercept*, 2024 WL 3423047, at *1 (N.D.W. Va. July 9, 2024) ("*Formycon*"). Regeneron discovered that aflibercept, although originally developed as a cancer therapeutic, could be used to treat angiogenic eye disorders associated with uncontrolled blood vessel growth in the retina, by blocking a protein called VEGF. *Id.* Eylea is administered by intravitreal injection—injection into the vitreous of a patient's eye. *Id.*

Eylea has become the "gold standard of care" for treating ophthalmic disorders associated with angiogenesis. *Id.* The claimed composition—"40 mg/ml of aflibercept, with polysorbate 20, a buffer, and a stabilizing agent"—"became the leading medicine in its class and a revolutionary treatment for treating angiogenic eye disorders." *Regeneron Pharm. v. Mylan Pharm.*, 2024 WL 382495, at *60 (N.D.W. Va. Jan. 31, 2024) ("*Mylan*").

### A. Patent-in-Suit

**Technology Background.** At trial against Mylan and in subsequent preliminary injunction proceedings, Regeneron asserted U.S. Patent 11,084,865. The ’865 patent is directed to ophthalmic formulations of aflibercept, the fusion protein identified in the patent as a specific “VEGF antagonist” or “VEGF Trap.” Appx94 (2:27-36). Fusion proteins have domains from different proteins fused into a single, non-naturally-occurring molecule. Appx4700-4701 (¶ 91); *Mylan*, 2024 WL 382495, at *13-14.

The asserted claims—2, 3, 27, and 28—are directed to ophthalmic formulations comprising 40 mg/ml of glycosylated aflibercept, an “organic co-solvent” that “comprises polysorbate,” “a buffer,” and “a stabilizing agent.” Claim 2 is illustrative:

> 1. A vial comprising an ophthalmic formulation suitable for intravitreal administration that comprises:
>
> a vascular endothelial growth factor (VEGF) antagonist
>
> an organic co-solvent,
>
> a buffer, and
>
> a stabilizing agent,
>
> wherein said VEGF antagonist fusion protein is glycosylated and comprises amino acids 27-457 of SEQ ID NO:4; and

> wherein at least 98% of the VEGF antagonist is present in native conformation following storage at 5° C. for two months as measured by size exclusion chromatography.
>
> 2. The vial of claim 1, wherein the concentration of said VEGF antagonist fusion protein is 40 mg/ml, and wherein said organic co-solvent comprises polysorbate.

Appx103 (claims 1-2).

Amgen did not assert anticipation or obviousness, as the court previously found after a bench trial that "the prior art taught away from the claimed concentration of 40 mg/ml of glycosylated aflibercept." *Mylan*, 2024 WL 382495, at *51. There was likewise no dispute that the limitation reciting "vascular endothelial growth factor (VEGF) antagonist" refers to a set of proteins that inhibit VEGF, Appx12878-79 (¶ 61); Appx4700 (¶ 89), and that the additional claim limitation reciting "wherein said VEGF antagonist fusion protein is glycosylated and comprises amino acids 27-457 of SEQ ID NO:4" limits that set of VEGF antagonist proteins to aflibercept in glycosylated form. *Formycon*, 2024 WL 3423047, at *28-29.

**"Buffer" Limitation.** The claims require, and the specification teaches, that the ophthalmic formulations comprise "a buffer." Appx94, Appx103 (2:33-37, 2:45-46, claim 1 (19:29-33)). It provides that "the buffering agent may be,

for example, phosphate buffer." Appx94 (2:45-46). Each of the patent's examples contains phosphate buffer. Appx97-99 (8:33-12:25, Examples 1-8).

The patent, which is directed to "ophthalmic formulation[s] suitable for intravitreal administration," does not define "buffer," provide a listing of all known buffers, or enumerate previously unknown buffers. Instead, the patent provides that "[u]nless defined otherwise, all technical and scientific terms used herein have the same meaning as commonly understood by one of ordinary skill in the art to which this invention belongs." Appx97 (8:23-26). Buffers were undisputedly "known structures" in protein formulations used to resist changes in pH. *Formycon*, 2024 WL 3423047, at *15; *Mylan*, 2024 WL 382495, at *67; Appx4693-94, Appx4884-85 (¶¶ 80, 491); Appx12891-92 (¶ 82). As known to the POSA, pH reflects the concentration of protons (*i.e.*, hydrogen ions) in solution; buffers resist changes in pH by accepting and donating protons using particular chemical structures. *Formycon*, 2024 WL 3423047, at *16; Appx4688-93, Appx4696 (¶¶ 74-79, 82).

The phosphate buffer exemplified in the '865 patent was one well-known buffer. Appx12893 (¶ 85). Another known buffer was histidine, a naturally occurring amino acid. It contains a five-membered ring structure called an imidazole ring that was known to be capable of accepting and donating

protons, thereby resisting changes to pH. *Formycon*, 2024 WL 3423047, at *16. It was known that histidine may exist as a discrete chemical added to a solution. *Id.* It was also known that histidine, as an amino acid, also may exist in solution as a constituent of a protein molecule. *Id.* Whether as a discrete chemical (free histidine) or as part of a protein, histidine possesses the same proton-donating and proton-accepting imidazole ring structure that resists changes to pH, as Amgen's expert Dr. Chamow illustrated in the bottom portion of both structures below:




Appx12972-73 (¶ 230, Fig. 14).

Aflibercept is a protein made up of amino acids. As the POSA was aware, including through the aflibercept amino-acid sequence expressly disclosed and claimed in the '865 patent, aflibercept contains 14 histidines per monomer.

Appx102-03 (SEQ ID NO:4, cols. 17-20); Appx4696, Appx4786-88 (¶¶ 82, 280-81). And because aflibercept exists as a dimer, it was known to contain a total of 28 histidines—and thus 28 imidazole rings—per aflibercept dimer. Appx4786-88 (¶¶ 280-81) (Trout); Appx26325 (302:6-12) (Chamow).

Regeneron never relied on the "buffer" limitation to distinguish the prior art during prosecution, during extensive litigation against Mylan, or during the preliminary injunction proceedings against Formycon, SB, or Celltrion. *See generally*, *e.g.*, *Mylan*, 2024 WL 382495; *Formycon*, 2024 WL 3423047; *In re Aflibercept*, 2024 WL 3422971 (N.D.W. Va. June 24, 2024) ("*SB*"); *In re Aflibercept*, 1:24-md-3103, Dkt. 248 (N.D.W. Va. July 9, 2024) ("*Celltrion*"). The novelty and non-obviousness of the claimed formulations relates to their use of 40 mg/mL of glycosylated aflibercept and their achievement of the recited stability. *Mylan*, 2024 WL 382495, at *51-56; *Formycon*, 2024 WL 3423047, at *29-38; *SB*, 2024 WL 3422971, at *25-33; *Celltrion*, at 86-118.

### B. District Court Proceedings

Numerous companies have filed abbreviated biologics license applications ("aBLAs") with FDA to market Eylea biosimilars. The first was Mylan, which Regeneron sued pursuant to the Biologics Price Competition

and Innovation Act ("BPCIA") in the Northern District of West Virginia, where Mylan is incorporated. Formycon, SB, and Celltrion filed aBLAs after Mylan, and Regeneron sued each in the same court. Amgen was the fifth aBLA filer, and Regeneron sued Amgen in its home forum of the Central District of California.

Regeneron moved to consolidate the proceedings under 28 U.S.C. § 1407 in the Northern District of West Virginia. Regeneron asserted that multidistrict consolidation would remove the risk of inconsistent claim interpretations across the various defendants. Appx2633. In opposing multidistrict consolidation, Amgen did not argue that inconsistent claim constructions were desirable or permissible; rather, it asserted that Regeneron "exaggerates the risk of inconsistent claim construction rulings if the actions are not centralized," because "the case against Amgen is likely to involve different claim construction issues from the other defendants," Appx3386, focused on "non-infringement issues unique to Amgen's product," Appx3976-77 (7:24-8:2). The JPML rejected Amgen's argument and centralized all the actions in West Virginia, on the explicit basis that "[c]entralization will … prevent inconsistent rulings as to claim construction." *In re Aflibercept*, 2024 WL 1597512, at *1 (J.P.M.L. Apr. 11, 2024).

Over the past two years, the district court has presided over extensive proceedings regarding the ’865 patent—including construing “buffer,” the claim term at issue here, in the *Formycon* case to adjudicate Formycon’s infringement. Pertinent aspects of these proceedings are summarized below.

### 1. The Court’s Bench Trial in the *Mylan* Case

In Regeneron’s suit against Mylan, the court presided over a two-week bench trial involving the ’865 patent and two other patents. Regeneron asserted ’865 patent claim 4 (among others), which differs from claim 2 only in further limiting the organic co-solvent to a concentration range of polysorbate 20. Appx103 (claims 2-4). The court heard testimony from two ’865 patent inventors and three technical experts (including Regeneron’s Dr. Bernhardt Trout). The court issued a 313-page decision holding the ’865 patent infringed and not invalid. *Mylan*, 2024 WL 382495, at *1, *96.

***Infringement.*** Unlike the phosphate used in Eylea and exemplified in the ’865 patent, Mylan’s formulation contains a “histidine” buffer, *id.* at *18. Mylan did not contest that histidine met the “buffer” limitation, *id.* at *25. Dr. Trout testified that “a buffer is a chemical compound that has a particular structure that leads to the formulation staying at a particular pH; so it resists

pH changes," and that the POSA would "have known the structure of buffers" within the claimed invention. Appx14189 (2097:10-18).

***Enablement***. The court rejected Mylan's enablement challenge. The court credited Dr. Trout's testimony that "the patent's disclosure of 'known structures' as the claimed components" favored enablement, including "a buffer such as phosphate and other known buffers that would achieve the disclosed pH range, such as succinate or histidine buffer." *Mylan*, 2024 WL 382495, at *67. The court found that "only routine and not undue experimentation" was necessary to practice the claims, again crediting Dr. Trout's testimony. *Id.*

***Written Description***. The court similarly upheld the '865 patent on written description. "Because the claims are drawn to a specific protein at a specific concentration with specific concentration ranges of polysorbate 20," "the specification allows the POSA 'to visualize or recognize the identity of the subject matter purportedly described' and thus meets the written description requirement." *Id.* at *63 (quoting *Allergan v. Sandoz*, 796 F.3d 1293, 1308 (Fed. Cir. 2015)). "Since the specification here identifies the common structural features of the claimed compositions—40 mg/ml aflibercept,

polysorbate 20, a buffer, and a stabilizing agent—and provides multiple examples thereof, it satisfies the written description requirement." *Id.* at *64.

In presenting and resolving the enablement and written description challenges in *Mylan*, both Regeneron and the court listed the aflibercept, polysorbate, buffer, and stabilizing agent limitations separately, as in the claims. But as the court observed in the *Amgen* decision on review here, and as Amgen agreed, the court in the *Mylan* case had not "previously addressed th[e] claim construction dispute" of "whether the claimed aflibercept can also satisfy the separately claimed buffer." Appx27; Appx26615 (20:9-16) ("[W]hether one ingredient can meet multiple limitations … was not at issue in the Mylan case.").

### 2. The Court's Preliminary Injunction Decisions and Its Construction of "Buffer" That Includes Histidine-Containing Proteins Like Aflibercept

Regeneron sought a permanent injunction against Mylan after prevailing at trial. Regeneron also sought preliminary injunctions against Formycon, SB, and Celltrion. The court granted each of these requested injunctions, finding that Regeneron would be irreparably harmed by the launch of each proposed biosimilar, including by having to compete against its

own invention, *e.g.*, *Formycon*, 2024 WL 3423047 at *55, and that the balance of equities and public interest favored an injunction, *id.* at *54-57.

In its preliminary injunction decisions, the court also found that Regeneron was likely to succeed on both infringement and validity of the '865 patent. *E.g.*, *id.* at *7. As relevant here, Formycon—whose biosimilar product includes a histidine buffer—disputed infringement of the "buffer" limitation. *Id.* at *19. Formycon argued that because the specification's express disclosure is limited to phosphate buffer, the claimed "buffer" should be limited to phosphate and should not include histidine, either in free form or in the form of histidine-containing proteins like aflibercept. *Id.* at *15-17. Regeneron, by contrast, maintained that the term's ordinary meaning included phosphate, histidine, and histidine-containing proteins like aflibercept. *Id.*

The district court resolved this dispute by conducting a thorough claim-construction analysis of the term "buffer" pursuant to this Court's *Phillips* rubric. *Id.* at *15-18. The Court "adopt[ed] Regeneron's construction of the term 'buffer' because Regeneron's construction is consistent with the claim language, specification, and a POSA's understanding of the term." *Id.* at *15. The Court found, upon extensive review of the intrinsic and extrinsic record,

that the "POSA would have understood in the context of the specification that both free histidine and certain proteins (polypeptides) containing histidine residues could act as buffers within a pH range of roughly 5-7." *Id.* at *16. Citing Dr. Trout's testimony and the relevant scientific literature, the court found that "the imidazole ring" in histidine "may act as a buffer either when histidine is present as a chemical added to a solution or when it is present as an amino acid making up a protein structure." *Id.* Particular to proteins, the court found that "the POSA understood [that] the imidazole groups of the histidine residues in proteins 'are utilized as potent proton buffering constituents.'" *Id.* (quoting Appx9208); *see* Appx4691-92 (¶ 78).

The court also made findings regarding the teachings of the prior art, including "Gokarn," a reference titled "'Self-Buffering Protein Formulations'" that is directed to formulations in which the protein serves as the only buffer. *Id.* at *17. The court found that "Gokarn, which is prior art and is directed to the relevant field here," disclosed that "'[h]ighly preferred'" proteins for self-buffering formulations included "'fusion proteins.'" *Id.* (quoting Appx9266, 9306 (41:6-7, 41:14-18)). "[A]flibercept undisputedly is a fusion protein." *Id.* at *17.

In view of the ’865 patent’s disclosure and the POSA’s understanding as reflected in the prior art, the court rejected Formycon’s attempt to limit “buffer” to “phosphate buffer,” as that construction improperly would exclude “buffers such as histidine or proteins like aflibercept that contain histidine residues.” *Id.* at *15. The court agreed with Regeneron, construing “buffer” as “a substance that resists changes to pH upon addition of an acid or base within an optimal pH range through a proton-donating component and/or a proton-accepting component, including, for example, histidine, phosphate, and proteins like aflibercept.” *Id.* With detailed analysis and findings, the court explained why its construction was “consistent with the claim language, specification, and a POSA’s understanding of the term,” *id.* at *15-17.

Notably, the inclusion of “proteins like aflibercept” in the construction of “buffer” was no mere afterthought. Formycon and its expert recognized that the inclusion of histidine-containing proteins like aflibercept within the meaning of “buffer” necessarily would mean that the “buffer” encompasses histidine generally, as histidine has the same relevant imidazole ring structure in free form and as part of a protein. Accordingly, Formycon’s expert Dr. Forrest, during cross-examination, fiercely disputed that proteins like aflibercept are buffers. *See Formycon*, 2024 WL 3423047, at *17 (citing

testimony of Dr. Forrest (Tr. 95:21-98:19)). But the court, reviewing the evidence, expressly rejected the opinion of Formycon's Dr. Forrest that "buffer" excludes proteins like aflibercept, agreeing instead with the "persuasive analysis" of Dr. Trout "that proteins like aflibercept could act as a buffer":

> [A]lthough Dr. Forrest disputed Dr. Trout's opinion that proteins like aflibercept could act as a buffer (Forrest Tr. 95:21-98:19) within the meaning of the ['865] Patent claims, the Court agrees with the persuasive analysis of Dr. Trout based on the disclosure of the specification and the prior art's teachings.

*Id.* at *17.

In holding that "buffer" in the context of the '865 patent includes "proteins like aflibercept," the court recognized an important limitation on this principle. The court's construction did not list all possible buffers. Rather, it recognized the function of a buffer as well—to resist pH changes—which is accomplished by certain structural elements (proton-donating and/or proton-accepting components). *Formycon*, 2024 WL 3423047, at *16. It recognized that those components only resist pH changes and act as a buffer at certain pH levels. *Id.* Accordingly, the court's construction embodied (1) the functional requirement of resisting pH changes, (2) the structural requirement of proton-donating and/or proton-accepting components, and (3) the limitation

as to pH. It construed buffer to mean: "a substance that resists changes to pH upon addition of an acid or base within an optimal pH range through a proton-donating component and/or a proton-accepting component, including, for example, histidine, phosphate, and proteins like aflibercept." *Id.* at *17. As it pertained to histidine-containing proteins, the court was explicit that "proteins (polypeptides) containing histidine residues could act as buffers within a pH range of roughly 5-7." *Id.* at *16.

The court granted a preliminary injunction against Formycon, concluding that Regeneron was likely to succeed in proving infringement of the "buffer" limitation under the court's construction. *Id.* at *19. On appeal, despite raising numerous issues, Formycon did not dispute the court's construction of "buffer." No. 24-2009, Dkt. 28 (Fed. Cir.).

### 3. The Court's *Amgen* Decision and Its Claim Interpretation of No Overlap Between Aflibercept and "Buffer"

Regeneron next sought a preliminary injunction against Amgen, the fifth company to seek approval for an aflibercept biosimilar product. Regeneron again asserted the '865 patent and advanced the same construction of "buffer"—based on its ordinary meaning that includes "proteins like aflibercept"—that the court adopted in *Formycon*, 2024 WL 3423047, at *15-

17. Appx26230. Regeneron asserted that the “buffer” limitation is met by the 40 mg/ml of aflibercept protein in Amgen’s product. In support, Regeneron relied on Amgen’s aBLA, which admits that the aflibercept protein in Amgen’s product provides “regulatory information” to its formulation. Appx5016. Regeneron also relied on the testimony of its expert, Dr. Bernhardt Trout, *see* Appx4659-4897, and of Amgen’s expert, Dr. Steven Chamow. Dr. Trout confirmed that “aflibercept serves as the buffer in [Amgen’s] formulation.” Appx4785-86 (¶ 279). So too did Dr. Chamow, who expressly agreed that aflibercept serves as a buffer in Amgen’s formulation at the claimed concentration of 40 mg/ml:

> Q. Right. Aflibercept does serve as a buffer in Amgen’s formulation; right?
>
> A. At 40 mgs per ml.

Appx26327 (316:10-12). Amgen’s expert also agreed that the literature known to the POSA taught that proteins like aflibercept with ionizable groups, such as the imidazole ring structure of histidine residues, serve as buffers:

> Q. Okay. And what is that literature you’re referring to?
>
> A. The literature that indicates the *proteins* are – are macro molecules that *contain ionizable groups*, a number of different ionizable groups, and that those ionizable groups create a charge on the molecule *that*

> *can modulate pH and provide – and allow the protein to provide buffering capacity to solutions.*
>
> Q. And *that was literature that was known to the POSA* for purposes of the ’865 patent; right?
>
> A. *Yeah.*

Appx26323 (297:7-19) (emphases added); *accord* Appx4691-92 (¶ 78) (Trout).

In opposing Regeneron’s preliminary injunction motion, Amgen advanced two claim-construction arguments. First, Amgen—like Formycon before it—argued that “buffer” should be construed narrowly to exclude its otherwise infringing formulation. According to Amgen, a limitation should be read into “buffer” to narrow it to “an excipient” and exclude “the active ingredient,” *i.e.*, the aflibercept protein in Amgen’s product. Appx12699. But Amgen identified no disclaimer or disavowal compelling this narrow construction that departs from the ordinary meaning of buffer, *see Thorner v. Sony*, 669 F.3d 1362, 1365 (Fed. Cir. 2012); Appx12693-99—a term previously recognized by the district court and other courts as a “substance” or “agent” that resists pH changes, *see*, *e.g.*, *Cadence Pharm. v. Exela PharmSci*, 780 F.3d 1364, 1369 (Fed. Cir. 2015) (construing “buffering agent” as “an agent that helps the formulation resist change in pH”); *Purdue Pharm. v. Actavis*, 2014 WL 2624787, at *15 (D.N.J. June 11, 2014), *aff’d*, 627 F. App’x 931 (Fed. Cir. 2016) (construing “buffering agent” as “a proton-donating component or

proton-accepting component used to maintain and/or achieve an approximate pH range"). As Amgen acknowledged, its construction conflicted with the court's construction in *Formycon* of "buffer," which it asked the court to revisit and reverse. Appx12690.

Second, Amgen argued that the claim language "an ophthalmic formulation … that comprises: a vascular endothelial growth factor (VEGF) antagonist[,] an organic co-solvent, a buffer, and a stabilizing agent" should be construed to require "four separate components." Appx12693. Thus, according to Amgen, claim 1 requires that the "buffer" limitation (construed as an "excipient" buffer) and "VEGF antagonist" (aflibercept) limitation cannot be met by the same substance. *Id.* In urging that construction, Amgen relied heavily on *Becton, Dickinson v. Tyco Healthcare*, 616 F.3d 1249, 1254 (Fed. Cir. 2010), which held that "there is a 'presumption' that separately listed claim limitations may indicate separate and distinct physical structure." *Google*, 92 F.4th at 1058 (discussing *Becton*). In response, Regeneron explained that the *Becton* line of cases does not apply, because the claim language, other intrinsic evidence, and extrinsic evidence establish that substances in the patent meet multiple categories—as the court's construction

of "buffer" as including "proteins like aflibercept" plainly demonstrates for the "buffer" and aflibercept limitations. Appx26235.

The district court denied Regeneron's motion, holding that Regeneron was not likely to succeed in proving infringement. Appx80-81. The court expressly avoided the claim-construction dispute as to the meaning of buffer, concluding that it "need not address the proper construction of the term 'buffer' and declines to do so." Appx78. The court thus explicitly left its existing construction of "buffer" undisturbed, choosing neither to apply its construction in analyzing Amgen's likelihood of infringing, nor to revisit or modify any aspect of that construction, *inter alia* that the term "buffer" includes "proteins like aflibercept."

On the second claim-construction dispute, however, the court "construe[d] the disputed claim term 'an ophthalmic formulation … that comprises …' to require a 'buffer' that is separate and distinct from the 'VEGF antagonist.'" Appx33. The court applied *Becton*, presuming that claim terms listed separately require separate components. The court acknowledged that, in applying the presumption and ascertaining whether it is rebutted, courts must look to the "claim language" itself—the starting point for any claim-construction analysis. Appx38 (quoting *Google*, 92 F.4th at 1058; *Kyocera*, 22

F.4th at 1382). But the court then ignored that instruction. It explicitly declined to construe the disputed claim term "buffer" in concluding that "buffer" and aflibercept "VEGF antagonist" are separate rather than overlapping claim limitations. Appx28-29, Appx78. And it did so without even attempting to reconcile its finding in *Formycon* that the meaning of "buffer" to the POSA in the context of the '865 patent includes "proteins like aflibercept," with its finding in *Amgen* that the "extrinsic evidence supports Amgen's contention that the POSA … would not consider a therapeutic fusion protein like aflibercept to be a 'buffer' in the context of the '865 patent." Appx65. The court nevertheless concluded, in direct conflict with its *Formycon* construction, that the "buffer" and aflibercept "VEGF antagonist" limitations were separate and distinct, rather than overlapping, so the "buffer" could *not* be satisfied by the VEGF antagonist protein aflibercept. Appx35-36. Thus, according to the district court, the aflibercept in Amgen's product cannot meet the "buffer" limitation, and Amgen therefore was unlikely to infringe. Appx80-81.

Having found that Regeneron had not shown a likelihood of success in proving infringement, the court did not consider the allegations of lack of written description and lack of irreparable harm that Amgen—like the

preceding, enjoined biosimilar applicants—advanced in an attempt to avoid injunctive relief. Appx30-31.

Regeneron appealed from the court's decision the same day that it issued, Appx26958, simultaneously seeking an injunction pending appeal (Dkt. 6) and an expedited schedule (Dkt. 8).

## SUMMARY OF ARGUMENT

The question before the district court was whether aflibercept, the VEGF antagonist protein in Amgen's biosimilar product, is a buffer. In reality, there is no dispute on that question. As the district court acknowledged, Amgen's own expert candidly agreed that aflibercept at the claimed concentration "does serve as a buffer in Amgen's formulation." Appx72 (quoting Appx26327 (316:10-12)); *see* Appx5016.

Undeterred, Amgen argued that "buffer" in the '865 patent should have a narrower meaning that excludes the aflibercept protein. This issue, however, was not one of first impression. Just two months earlier, in a related, co-pending case that is part of the same consolidated multidistrict litigation, the same district court construed the same "buffer" claim term in the same '865 patent to mean any "substance that resists changes to pH upon addition of an acid or base within an optimal pH range," including histidine-containing

"proteins like aflibercept." *Formycon*, 2024 WL 3423047, at *15. The court arrived at that construction based on a thorough application of the *Phillips* framework, including detailed findings regarding the relevant intrinsic and extrinsic evidence. *Id.* at *15-17.

Inexplicably, however, without either applying that construction or undertaking a new claim-construction inquiry for the term "buffer," Appx78, the district court held in this case that the "buffer" and aflibercept "VEGF antagonist" protein limitations were not overlapping, because the claims "require a 'buffer' that is separate and distinct from the 'VEGF antagonist.'" Appx33. The court did not, and could not, reconcile its prior finding that the meaning of "buffer" in the context of the '865 patent includes proteins like aflibercept with its subsequent conclusion that the same "buffer" term is separate from, and does not overlap with, aflibercept. The court arrived at this illogical result only by sweeping its prior legal analysis and factual findings under the proverbial rug and proclaiming that it "need not address the proper construction of the term 'buffer.'" Appx78.

The court erred below by failing to engage in the first and most fundamental step of any proper claim-construction analysis—an inquiry into the meaning of claim terms. *Markman*, 52 F.3d at 976. The court did not

apply, renounce through an ensuing claim-construction analysis, or even consider its existing construction of "buffer," while enforcing a rigid separation between the claimed buffer and the claimed aflibercept protein. The "buffer" claim term previously and correctly was construed to encompass subject matter (a "substance" that resists changes in pH, including "proteins like aflibercept," "within an optimal pH range") separately recited in the aflibercept "VEGF antagonist" claim element; thus, the claim's plain language itself evinces overlap between these two claim elements and resolves conclusively the inquiry of whether the elements are "separate versus overlapping." Appx26. Neither *Becton* nor its progeny—the principal cases relied on by the district court to reach its unfounded conclusion—involved this scenario or permitted this result. On the contrary, they require the very analysis of the "claim language" that the court boldly—and incorrectly—announced that it opted to forgo. *Google*, 92 F.4th at 1058; *Kyocera*, 22 F.4th at 1382; Appx78. When "buffer" is interpreted in light of its meaning to the POSA, as the law requires and as the same court held only a few months earlier, Amgen's biosimilar—which includes the histidine-containing protein aflibercept within an optimal pH range—undisputedly infringes. Appx5016; Appx26327 (316:10-12); Appx4785-86 (¶ 279). The court's contrary decision

should be vacated and remanded for resolution of Amgen's other arguments that the district court did not reach.

## ARGUMENT

### III. Standard of Review

This Court reviews a decision to grant or deny a preliminary injunction for abuse of discretion, which occurs where a court "exercise[s] discretion based upon an error of law." *Sciele Pharma v. Lupin*, 684 F.3d 1253, 1259 (Fed. Cir. 2012). Thus, "[t]o the extent a court's decision to grant or deny a preliminary injunction 'hinges on questions of law,' this court's review is de novo." *Wind Tower Trade v. United States*, 741 F.3d 89, 95 (Fed. Cir. 2014). Here, the district court denied a preliminary injunction based solely on its claim construction, Appx27-31, which is ultimately a legal question reviewed de novo, with findings based on the extrinsic evidence reviewed for clear error, *Cont'l Circuits v. Intel*, 915 F.3d 788, 795 (Fed. Cir. 2019). This Court vacates preliminary injunction decisions based upon erroneous claim constructions. *E.g.*, *Luminara Worldwide v. Liown Elecs.*, 814 F.3d 1343, 1351-54 (Fed. Cir. 2016).

## IV. The District Court Erred in Construing the Claims To Require That the "VEGF Antagonist" and "Buffer" Be Met by Separate Ingredients of the Accused Product

### A. The District Court Legally Erred by Ignoring Its Own Construction of "Buffer"

The first step in an infringement analysis is to construe the meaning of the disputed claim terms. *CommScope Techs. v. Dali Wireless*, 10 F.4th 1289, 1295 (Fed. Cir. 2021). The court failed out of the gate. Every asserted claim of the '865 patent includes the term "buffer." The parties, moreover, expressly disputed the meaning of "buffer." Regeneron contended that the district court's existing construction of "buffer" that resulted in the injunction against Formycon was correct: "a substance that resists changes to pH upon addition of an acid or base within an optimal pH range through a proton-donating component and/or a proton-accepting component, and thereby includes phosphate, histidine, and proteins like aflibercept." Appx26230; Appx4219. Amgen urged a different construction, limiting "buffer" to "[*a*]*n excipient* that resists changes to pH upon addition of an acid or base within an optimal pH range through a proton-donating component *and* a proton-accepting component." Appx12699. The court sidestepped the dispute, concluding that it "need not address the proper construction of the term 'buffer.'" Appx78. But the court *already* had "address[ed] the proper construction of the term

'buffer'"—in the same patent and in the same consolidated multidistrict litigation proceeding. It simply declined, erroneously, to apply or even consider that construction.

In *Formycon*, the court extensively analyzed the meaning of the claim term "buffer" in the '865 patent under the proper *Phillips* framework. *Formycon*, 2024 WL 3423047, at *15-17. As the law requires, it undertook its analysis of "the proper construction of the term 'buffer' in claim 1" of the '865 patent by "address[ing] this term in 'light of the claim language' and other pertinent evidence, '*not* in light of the accused device.'" *Id.* at *15 (quoting *Exigent Tech. v. Atrana Sols.*, 442 F.3d 1301, 1309 n.10 (Fed. Cir. 2006)). The court reviewed the claims and specification, as well as the relevant art, to determine "how a POSA would understand the term" in light of the intrinsic evidence, finding that "a POSA would have understood, in the context of the ['865 patent's] specification, that several molecules would be suitable for use as a buffer in the claimed formulations." *Id.* at *16. As the court explained through detailed findings based on multiple sources of intrinsic and extrinsic evidence, "the POSA would have understood in the context of the specification that both free histidine and certain proteins (polypeptides) containing histidine residues could act as buffers." *Id.* The court thus construed "buffer"

"according to its ordinary meaning to the POSA: 'a substance that resists changes to pH upon addition of an acid or base within an optimal pH range through a proton-donating component and/or a proton-accepting component, *including, for example*, histidine, phosphate, *and proteins like aflibercept*.'" *Id.* at *15 (emphases added).

In denying injunctive relief against Amgen, however, the court neither applied nor revisited its well-founded construction of "buffer." Rather, it simply "decline[d] to construe the term 'buffer' at this stage." Appx79. Confoundingly, the court then proceeded to find that the claimed "buffer" must be "separate from" and not include aflibercept—without undertaking any further claim-construction analysis of the term "buffer." Appx78-79. In other words, after granting injunctive relief against Formycon upon concluding that "buffer" includes "proteins like aflibercept," the court then denied injunctive relief against Amgen on the basis that "buffer" is "separate from" aflibercept, rather than "overlapping." Appx78-79; Appx28-29. The Court never explained how both of those findings could be correct. They cannot be.

The court unquestionably committed legal error by failing to consider the meaning of the claim terms and abused its discretion by failing to reconcile these facially contradictory holdings.

In its quest to achieve "uniformity in the treatment of a given patent," *Markman*, 517 U.S. at 390, the Supreme Court has advised that courts may "consolidate for discovery different cases that involve construction of the same claims" in order to prevent "divergent claim construction[s]." *Teva Pharm. v. Sandoz*, 574 U.S. 318, 329 (2015). That directive went awry here. Recognizing that each of its cases against Eylea biosimilar applicants involves the '865 patent, Regeneron sought to centralize these actions before the JPML. As Regeneron explained, pretrial consolidation of these actions would "eliminate the potential for inconsistent rulings on pretrial motions, including but not limited to any claim construction rulings." Appx2633. Amgen opposed consolidation, arguing that Regeneron "exaggerates the risk of inconsistent claim construction rulings if the actions are not centralized." Appx3386.

The JPML agreed with Regeneron and consolidated the *Amgen* case with the related cases into the same multidistrict litigation to "prevent inconsistent rulings as to claim construction," among other salient benefits. *In re Aflibercept*, 2024 WL 1597512, at *1. Indeed, the JPML and other courts

repeatedly have observed that centralization is necessary to "prevent inconsistent pretrial rulings," "particularly on claim construction issues." *See, e.g.*, *In re RAH Color Techs. Pat. Litig.*, 347 F. Supp. 3d 1359, 1360 (J.P.M.L. 2018); *In re Nebivolol Pat. Litig.*, 867 F. Supp. 2d 1354, 1355 (J.P.M.L. 2012); *see also Pinney v. Nokia*, 402 F.3d 430, 452 (4th Cir. 2005) (affirming centralization under § 1407 to further statutory purpose to "prevent inconsistent pretrial rulings").

The district court, however, defied its mandate. Despite consolidation undertaken to "prevent inconsistent rulings as to claim construction," the court issued facially "divergent claim construction[s]" in the *Formycon* and *Amgen* actions, including "proteins like aflibercept" in the scope of "buffer" in the former, while deeming "buffer" separate rather than overlapping with aflibercept in the latter. *Cf. Teva*, 574 U.S. at 329. To avoid that impermissible result, courts "afford[] *stare decisis* deference" to their "prior construction of claim terms, for the Supreme Court has recognized 'the importance of uniformity in the treatment of a given patent.'" *Capella Photonics v. Ciena*, 546 F. Supp. 3d 977, 983 (N.D. Cal. 2021) (quoting *Markman*, 517 U.S. at 390); *see also Brady Constr. v. Perfect Wall*, 290 F. App'x 358, 363 (Fed. Cir. 2008) ("Under the principles of stare decisis and the Supreme Court's guidance in

*Markman*, this court follows the claim construction of prior panels absent exceptional circumstances."); *Barkan Wireless v. T-Mobile*, 2021 WL 4399514, at *3 (E.D. Tex. Sept. 26, 2021) (similar). Here, the district court did not even consider—much less defer to or apply—its existing construction of "buffer" in the same patent claims. The court's failure to do so was erroneous, and its decision should be vacated. *See, e.g.*, *Luminara*, 814 F.3d at 1351-54 (vacating preliminary injunction decision due to erroneous claim construction).

In opposing Regeneron's motion for injunction pending appeal, Amgen argued that the *Formycon* construction resulted from Regeneron having "slipped [in] that language" regarding proteins acting as buffers only "after learning the details of Amgen's formulation." Dkt. 21 at 13. That is flatly wrong. First, long before Regeneron (or Mylan) learned of Amgen's formulation, Regeneron's expert explained "that proteins themselves have some buffering capacity," Appx75; *see* Appx26307 (235:2-236:21), and Mylan's expert opined that "the protein itself can act as a buffer," *Id.* (quoting Appx15322 (¶ 381)) (citing Gokarn); No. 22-cv-61, Dkt. 441-19, ¶ 54 (MacMichael Reply Rep.); Appx26313-15 (260:19-265:22). Regeneron simply reflected this common understanding when it first advanced a construction of "buffer," in *Formycon*. Second, Regeneron supported its construction of

"buffer" based on that undisputed scientific understanding, citing the patent and literature explaining that histidine in proteins acts as a buffer. *Formycon*, 2024 WL 3423047, at *16-17. Recognizing that the inclusion of histidine-containing proteins like aflibercept within the meaning of "buffer" rises and falls with the inclusion of histidine generally, whether in free form (as in Formycon's product) or as part of a protein (as in Amgen's), Formycon disputed that histidine could serve as a buffer both as a discrete chemical substance and as a protein constituent. *Id.* at *17 (explaining that "Dr. Forrest disputed Dr. Trout's opinion that proteins like aflibercept could act as a buffer"). Amgen's contrary notion—that only evidence about free histidine mattered or was disputed in *Formycon*—is premised on its fallacy that the patent confines "a buffer" to an excipient, which lacks any intrinsic or extrinsic support. *Infra* IV.C. Third, Amgen had a full opportunity to address—and did address—Regeneron's "buffer" construction below, including by advancing a contrary construction, *id.*, but the court (correctly) did not adopt Amgen's construction importing an "excipient" limitation.

### B. The District Court Erroneously Interpreted the Claims To Require Separate Structures

Had the court properly considered its existing construction of "buffer," it could not have arrived at its conflicting interpretations in the *Amgen* and

*Formycon* decisions. But rather than apply (or even acknowledge) its construction, the court relied on this Court's *Becton* decision to invoke "a presumption that each element is a separate and distinct component of the invention." Appx36. The court's prior, undisturbed "buffer" construction lays bare the legal flaw in the district court's application of *Becton* and its progeny: where the claim terms as construed have overlapping scope, *Becton* does not permit, much less require, erasure of that scope.

#### 1. *Becton* Is Inapposite Where the Terms as Construed Overlap

The district court fundamentally erred in applying the *Becton* line of precedent. "Under *Becton*," the court held, "the separate listing of these [claim] elements establishes a presumption the claimed 'VEGF antagonist' and 'buffer' are distinct components." Appx37. But *Becton* has no application to these claims, and no presumption it invokes possibly can survive, given the overlap between the "buffer" and "VEGF antagonist" terms—overlap that the court's undisturbed construction of "buffer" plainly reflects. Where, as here, the construction of the term at issue encompasses what the patent recites in a different limitation, the presumption of separateness under *Becton* is simply inapplicable.

As this Court's *Google* decision explains, *Becton* did not pronounce a "*per se* rule" that separately recited limitations require separate accused components, but rather turned on the particular evidence at issue in the case. 92 F.4th at 1058-59. Thus, in deciding whether to apply *Becton*, just as in construing claims generally, the meaning of the claim language itself is paramount. *E.g.*, *id.*; *Phillips v. AWH Corp*, 415 F.3d 1303, 1314 (Fed. Cir. 2005). For example, in *Retractable Technologies v. Becton, Dickinson*, the claim language contemplated that two separate components could "structurally overlap," which "indicate[d] that the two limitations need not be separate pieces" notwithstanding their separate listing in the claims. 653 F.3d 1296, 1303 (Fed. Cir. 2011). Accordingly, the *Becton* presumption never was invoked. *Id.* Similarly, in *Linear Technology v. ITC*, the claims recited separately a "second circuit" and a "third circuit," and this Court rejected the argument that the two terms should be construed to "require entirely separate and distinct circuits," because "nothing in the claim language or specification" required such a limitation, there was no "clear disavowal or contrary definition," and both terms were thus "accorded their full scope." 566 F.3d 1049, 1055 (Fed. Cir. 2009) (quotation omitted). All that was required was for an accused device to meet the plain language of both terms, *i.e.*, the "circuits

must only perform their stated functions," regardless of whether the two limitations were met by "overlapping components." *Id.*

Likewise here, the court's undisturbed construction of "buffer" encompasses any "substance" that resists pH changes at an optimal pH, including "proteins like aflibercept" that contain histidine. *Formycon*, 2024 WL 3423047, at *16-17. The court erred by ignoring its existing construction and—divorced from any construction of "buffer"—proclaiming that a "separate listing" invoked the *Becton* presumption. Appx37, Appx78-79. To the contrary, this Court repeatedly has held that two terms may be construed to encompass overlapping structures without having to overcome any "presumption" of separateness. *See L.A. Biomed. Rsch. Inst. v. Eli Lilly*, 849 F.3d 1049, 1063 (Fed. Cir. 2017) (construing limitations as overlapping based on "their plain meaning" and explaining that "[t]he fact that the limitations overlap is not fatal, nor does it compel us to adopt an otherwise unsupported construction of the claims"); *Google v. Personal Audio*, 743 F. App'x 978, 985 (Fed. Cir. 2018) (applying the "principle that in infringement or obviousness analysis, a single element, feature, or mechanism can ordinarily satisfy multiple claim limitations"); *Powell v. Home Depot*, 663 F.3d 1221, 1231-32 (Fed. Cir. 2011) (finding that two claim terms did not require "separate

components for purposes of the infringement analysis"); *Retractable*, 653 F.3d at 1303-04; *Linear*, 566 F.3d at 1055.

This Court's decision in *Cannon Rubber v. First Years*, 163 F. App'x 870, 876 (Fed. Cir. 2005), confirms the district court's error. There, the claims were directed to a breast pump and separately recited a "valve means" and a "deformable diaphragm." *Id.* Notwithstanding the separate listing and language of the terms, the district court construed "valve means" to "include[] a deformable diaphragm as a corresponding structure." *Id.* The accused infringer argued, as Amgen argues here (Dkt. 21 at 18), that the diaphragm "cannot perform 'double duty' and thereby satisfy two separate limitations of a claim." *Id.* (citing *Gaus v. Conair*, 363 F.3d 1284 (Fed. Cir. 2004)). This Court disagreed: "*Because the district court construed the claims to require a single diaphragm that meets both the 'deformable diaphragm' and 'valve means' limitations*, the fact that the accused products have a single diaphragm that meets those claim limitations does not preclude a finding of literal infringement." *Id.* (emphasis added) (citing *In re Kelley*, 305 F.2d 909, 914 (C.C.P.A. 1962)). Rather, the presence of one structure meeting both limitations "would prove that the two limitations have been met." *Id.*

Here, just as in *Cannon*, "the court's construction" of buffer in *Formycon* "*requires*" overlap in scope between claim terms. *Id.* at 877. Accordingly, nothing prohibits aflibercept from "perform[ing] 'double duty'" and meeting both terms, *id.* at 876, *see L.A. Biomed.*, 849 F.3d at 1063—as it undisputedly does in Amgen's biosimilar product. Appx5016; Appx26327 (316:10-12) (Chamow).

Under this Court's precedent, if the claim recited the limitations (1) "a VEGF antagonist" aflibercept and (2) "a buffer, including, within an optimal pH range, a histidine-containing protein like aflibercept, histidine, or phosphate," then the VEGF antagonist aflibercept, within its optimal pH range, would satisfy both limitations. *Retractable*, 653 F.3d at 1303-04; *Linear*, 566 F.3d at 1055. Nor can it reasonably be disputed that aflibercept would satisfy both limitations where, as here, the claim recites the limitations (1) "a VEGF antagonist" aflibercept and (2) "a buffer," and "buffer" is construed to include, in its optimal pH range, histidine-containing proteins like aflibercept. That principle follows ineluctably from the rule that courts must apply "the properly construed claims" to the ensuing infringement analysis, not simply ignore the first step of the inquiry. *CommScope*, 10 F.4th at 1295. No case, including *Becton*, permits a contrary result.

Amgen's only response is to double down on the district court's approach, elevating claim form over the meaning of claim words under *Phillips*, arguing that "even if 'proteins like aflibercept' could be buffers," the claimed VEGF antagonist, as a "single structure," could not meet both the buffer and VEGF antagonist limitations. Dkt. 21 at 12. The precedent above refutes, squarely and repeatedly, Amgen's argument that overlap between separately listed claim terms is prohibited.

### 2. Any Presumption Under *Becton* Is Overcome

The district court declared that "[t]he parties' dispute is not … whether the [*Becton*] presumption applies." Appx37 (citing Appx26615 (20:2-3) (Hearing Tr.)). That was incorrect. Regeneron asserted consistently, including in the hearing excerpt the court cited to support its misapprehension, that nothing in the claims says "that one ingredient can't meet multiple claim limitations or that aflibercept cannot be a buffer." Appx26615 (20:2-8). As Regeneron maintained, *Becton* was inapposite; the properly construed claims overlap because the construction of "buffer" encompasses substances that resist changes in pH through a proton-donating and/or proton-accepting group within an optimal pH range, including proteins

like aflibercept. Appx4223; Appx26235-36; *Formycon*, 2024 WL 3423047, at *15.

Regardless, any presumption of separateness invoked by the asserted claims necessarily was overcome. In *Becton*, the claim at issue recited two hardware elements, a "hinged arm" and a "spring means connected to said hinged arm." 616 F.3d at 1254. The Court did not construe one term to recite a genus (such as buffers) that includes subject matter recited in another claim element, as the district court did here. In *Becton*, nothing in the claims or otherwise suggested those two terms could be satisfied by the same structure; rather, by reciting that one element was "connected to" the other element, the claim language strongly indicated that the two elements could not be "one and the same." *Id.* at 1255. As the Court explained,

> If the hinged arm and the spring means are one and the same, then the hinged arm must be "connected to" itself and must "extend between" itself and a mounting means, *a physical impossibility*. A claim construction that renders asserted claims facially nonsensical "cannot be correct."

*Id.* (emphasis added) (quoting *Schoenhaus v. Genesco*, 440 F.3d 1354, 1357 (Fed. Cir. 2006)). The separateness of the claim elements was also important to the claims' validity; "if the hinged arm and spring means are not separate

structures, then the asserted claims *are clearly invalid* as obvious over the prior art." *Id.* (emphasis added).

The scenario here is the exact opposite of *Becton*. As the court's construction in *Formycon* reflects, the POSA understood that "a buffer" encompasses a genus of "substance[s]" with certain structures that resist changes to pH within an optimal pH range, "including … proteins like aflibercept" "that contain histidine residues." 2024 WL 3423047, at *15-16. In contrast, in *Becton* there was no evidence that the "hinged arm" could "function as springs"; the specification indicated the opposite—that the hinged arm could not "store[] energy" like a spring. 616 F.3d at 1254-55. And unlike *Becton*, the asserted claims here do not set forth any relationship, structural or otherwise, between the recited "buffer" and "VEGF antagonist" that would require them to be separate rather than overlapping. The claims simply recite "an ophthalmic formulation" "that comprises" "a [VEGF] antagonist" and "a buffer." Appx103 (claim 1). Also unlike *Becton*, there has never been any contention that the "buffer" distinguished the claims from the prior art. Rather, a "buffer" was a "known structure[]." *Mylan*, 2024 WL 382495, at *67.

The district court cited two other cases applying *Becton*'s "presumption" of separateness. Appx36 (citing *Kyocera*, 22 F.4th at 1382; *HTC v. Cellular*

*Commc'ns Equip.*, 701 F. App'x 978, 982 (Fed. Cir. 2017)). Like *Becton*, however, neither case addressed a situation where one term was construed to overlap with another term. In *Kyocera*, the Court did not construe either of the separately recited terms as overlapping, and instead construed the terms to require distinct components in view of the intrinsic record. 22 F.4th at 1382. The same was true in *HTC*, where there was likewise no construction of either term resulting in overlap of the separately recited terms and, similar to *Becton*, the patent included language "distinguish[ing]" the two claim terms. 701 F. App'x at 982-83. Thus, like *Becton*, neither case is apposite here.

Likewise, the court's reliance on unreported district court decisions applying *Becton* cannot sustain its judgment. Appx50-53. To the extent these decisions are considered, they also did not involve a term construed to overlap with another term, as here. *See Sun Pharm. v. Saptalis Pharm.*, 2019 WL 2549267, at *7 (D. Del. June 19, 2019) (specification's disclosure of "preferred ratios" between two recited elements would be meaningless if the same structure met both); *Otsuka Pharm. v. Mylan Labs.*, 2023 WL 5928313, at *3 (D. Del. Sept. 12, 2023) (concluding that nothing "in the claims or the specification or any other evidence" supported overlap). Again, here the evidence—as the district court previously acknowledged in its only

construction of "buffer"—supported that the scope of "buffer" overlapped with the scope of "VEGF antagonist." *Formycon*, 2024 WL 3423047, at *17; *see Merck v. Mylan Pharm.*, 2022 U.S. Dist. LEXIS 195204, at *60-61 (N.D.W. Va. Sept. 21, 2022) (finding infringement where "[n]othing in the [patent] prevents a single ingredient … from satisfying multiple claim limitations").

#### 3. The District Court's Additional Reasons for Applying *Becton* Fail

The court's analysis could not be sustained even absent its fatal error of not applying its construction of buffer. Specifically, the court erred in concluding that "buffer" would be superfluous and nonsensical if it overlapped with the claimed "VEGF antagonist," and that the patent was required to list aflibercept as a buffer to overcome the *Becton* presumption. The patent's straightforward teachings and the undisputed expert testimony refute both conclusions.

##### a. "Buffer" Is Not Superfluous

Because the claims recite both aflibercept (the claimed "VEGF antagonist") and "a buffer," the court reasoned that "permitting the 'VEGF antagonist' to also be the recited 'buffer' would render the term 'buffer' superfluous." Appx42. The court misunderstood the superfluousness inquiry, which does not prohibit overlap between the scope of two claim limitations. As

this Court has explained, "the use of two terms in a claim requires that they connote different meanings, *not that they necessarily refer to two different structures*." *Applied Med. v. U.S. Surgical*, 448 F.3d 1324, 1333 n.3 (Fed. Cir. 2006) (emphasis added) (citing *CAE Screenplates v. Heinrich Fiedler*, 224 F.3d 1308, 1317 (Fed. Cir. 2000)); *see L.A. Biomed.*, 849 F.3d at 1063 (rejecting argument that construction permitting "overlap" "impermissibly renders [it] superfluous"); *Linear*, 566 F.3d at 1055-56.

Here, the claimed "VEGF antagonist" and "buffer" undeniably have different meanings. The "VEGF antagonist" limitation requires a specific glycosylated protein having a specific amino-acid sequence, "SEQ ID NO:4." Appx103 (claims 1, 2). In contrast, "buffer" as construed refers to a known genus of substances that resist changes to pH, within an optimal pH range, through structures that accept and/or donate protons. *Formycon*, 2024 WL 3423047, at *16-17. The terms thus carry different meanings, notwithstanding that their structures overlap.

Even were it relevant that one structure may meet two terms, the court ignored undisputed testimony that aflibercept does not necessarily act as a buffer. The court's existing construction recognizes as much, clarifying that substances only are buffers "within an optimal pH range." *Id.* at *17. Dr.

Trout identified situations in which a protein like aflibercept would *not* meet the "buffer" limitation, including at "a pH at which aflibercept does not buffer; in the presence of other components that interact with aflibercept to hinder its buffering capacity"; or when aflibercept has "post-translational modifications that reduce solvent exposure of relevant residues." Appx4697 (¶ 84). Dr. Chamow similarly explained that the "microenvironment" of a protein's amino-acid residues would affect its buffering capacity. Appx12884-85 (¶ 68). Thus, aflibercept does not necessarily meet the "buffer" limitation, even in the pH-limited unasserted claim 9 upon which the court focused. Appx42-43. The court simply ignored this evidence, despite Regeneron's reliance upon it, Appx26231, in holding the claims "superfluous and nonsensical" under Regeneron's construction, Appx42-43.

The court also referenced Regeneron's counsel's statement about "buffer" during the *Mylan* trial that "[w]hether it works or not, it's structurally limited." Appx13400 (33:1-7). That statement, of course, is true. As explained above, the "buffer" is structurally limited under the court's existing construction—it refers to a known set of structures that have "proton-donating and/or proton-accepting groups." *See supra* II.B.2; *e.g.*, No. 24-md-

3103, Dkt. 247 at 52 (showing structures). That structural language limits the claim irrespective of whether a given substance works as a buffer or not.

#### b. The Claim Limitations' Overlap Is Not "Nonsensical"

The court further erred in holding that Regeneron's interpretation would render the claims nonsensical. Appx40-41. The court based this conclusion on the fact that certain embodiments in the specification and one unasserted dependent claim refer to concentration ranges of the buffer in "mM" (millimolar) units, but describe different concentrations of the VEGF antagonist in "mg/ml" (milligrams per milliliter) units that do not fall within the embodiments' buffer concentration ranges when converted to mM. *Id.* This was erroneous for several reasons.

First, the court read into the claims a limitation that does not exist. None of the asserted claims recites a concentration range for "a buffer"—in mM or otherwise. That a buffer is present at a lower concentration than in preferred embodiments of the specification therefore does not remove them from the claims' scope or render those claims nonsensical.

Second, whether the claimed 40 mg/ml concentration of aflibercept recited in claim 2 is outside the concentration range of unasserted claim 7 (requiring "5-25 mM buffer") is irrelevant to the claim-construction dispute

here. Appx40. As a dependent claim, claim 7 necessarily narrows the subject matter within the scope of "a buffer." 35 U.S.C. § 112, ¶ 4. That 40 mg/ml aflibercept is within the scope of the claim 2 "buffer" (not limited by concentration) but outside the scope of unasserted claim 7 (limited by concentration) merely reflects the commonplace scenario of a patentee obtaining claims with varying scope. Indeed, recitation of a buffer concentration range in claim 7 but not in claim 2 underscores that this range is *not* a requirement of asserted claim 2, as "a dependent claim that adds a particular limitation gives rise to a presumption that the limitation … is not present in the independent claim." *Phillips*, 415 F.3d at 1314-15. In no sense does this result in the kind of nonsensical "physical impossibility" of one element "connected to" itself and "extend[ing] between" itself and another element, as in the independent claims in *Becton*. 616 F.3d at 1255; *see* Appx26255 (25:14-26:3) (Chamow).

The same is true with respect to the court's discussion of the specification's embodiments, including the disclosed buffer concentration ranges. Appx46-47. Again, the ranges from those embodiments are not recited in the asserted claims, and the claims are not limited to the disclosed embodiments. *Hill-Rom v. Stryker*, 755 F.3d 1367, 1371 (Fed. Cir. 2014). The

court's failure to appreciate and apply these basic principles of claim construction confirms its error.

Third, the court's analysis disregarded undisputed evidence that applying the known method of estimating buffering capacity to the claimed 40 mg/ml aflibercept concentration indicated to the POSA that aflibercept is a suitable buffer. As Dr. Trout explained, citing the Gokarn prior art, the POSA would estimate the protein's buffering capacity using its concentration and its number of histidine residues. Appx4791-92 (¶ 283) (citing Appx9304 (39:26-34)). Performing that calculation for 40 mg/ml aflibercept using the 28 histidine residues per aflibercept dimer (which the '865 patent discloses by sequence, *see* Appx4786-88 (¶ 280)) results in an estimated buffering-capacity value that the prior art described as "especially particularly preferabl[e]," Appx4791-92 (¶ 283) (citing Appx9270 (5:13-22)); *cf.* Appx26261 (52:13-54:4) (Chamow). This buffering-capacity estimate—the accuracy of which Amgen never contested—further confirmed that the POSA would have understood aflibercept at 40 mg/ml to be a suitable buffer.

Fourth, the court misapplied the principle that "the same phrase in different claims of the same patent should have the same meaning." Appx43 (quoting *In re Varma*, 816 F.3d 1352, 1363 (Fed. Cir. 2006)). "Buffer" does

have the same meaning in every claim; the dependent claims just have a narrower *scope*, as they must under 35 U.S.C. § 112, ¶ 4, by limiting the buffer concentration. No authority supports the proposition that a construction is rendered nonsensical merely because it results in an accused embodiment falling within an independent but not a dependent claim. The court also cited (Appx43) *Boss Industries v. Yamaha Motor*, but there the Court merely applied claim differentiation to construe an independent claim so that a particular limitation would not be "essentially meaningless," 333 F. App'x 531, 541-42 (Fed. Cir. 2009); *see Phillips*, 415 F.3d at 1314. That is irrelevant here; the "buffer" of claim 2 and claim 7 plainly encompasses different subject matter, because claim 7 is limited to a specified concentration range, and claim 2 is not. That elementary principle does not render either term nonsensical.

#### c. Neither the Specification nor the Prior Art Was Required To Identify Aflibercept as a Buffer

The court found that the specification did not list aflibercept as a buffer, Appx49, and that it was not "well known" that aflibercept could act as a buffer, Appx62-63, *see also* Appx64-66. But neither finding supports—much less compels—the court's interpretation that "buffer" and aflibercept "VEGF antagonist" are distinct rather than overlapping.

#### 1) The Specification Did Not Need To List Known Buffers or Buffer Categories

1. The patent did not need to list known or unknown buffers in order for "a buffer" to overlap with the "VEGF antagonist" limitation and rebut any presumption from *Becton*. A requirement to repeat what is known "would neither enforce the quid pro quo between the patentee and the public by forcing the disclosure of new information, nor would it be necessary to demonstrate to a [POSA] that the patentee was in possession of the claimed invention"; to the contrary, "the forced recitation of known sequences in patent disclosures would only add unnecessary bulk to the specification." *Falko-Guntner Falkner v. Inglis*, 448 F.3d 1357, 1368 (Fed. Cir. 2006).

As the district court previously held, other buffers like histidine and histidine-containing "proteins like aflibercept"—not aflibercept in particular—were known buffers or categories of buffers. *Formycon*, 2024 WL 3423047, at *16. The specification excludes none of these substances or categories; it simply instructs that its scientific terms be understood according to their "commonly understood" meaning to the POSA. Appx97 (8:23-26). Just as the patent undisputedly did not have to list ingredients like histidine in order for them to be within the scope of "buffer," Appx26; *Formycon*, 2024 WL 3423047, at *16; *Mylan*, 2024 WL 382495, at *18, *25, it also did not have

to list proteins as buffers where, as the experts agreed, proteins like aflibercept that contain histidine residues were understood to act as buffers, *Formycon*, 2024 WL 3423047, at *16-17; Appx26323 (297:7-19) (explaining that the "literature" taught that "proteins … contain ionizable groups, … and that those ionizable groups create a charge on the molecule that can modulate pH and … *allow the protein to provide buffering capacity to solutions*" (emphasis added)); *accord* Appx4691-93 (¶¶ 78-79).

2. The evidence was unequivocal that proteins containing histidine were known buffers. There was no dispute that "proteins have been known for decades to be buffers or have buffering capacity." Appx63. Dr. Trout cited numerous references spanning the past century reflecting the scientific understanding that proteins act as buffers, including through their histidine residues. Appx4691-93 (¶¶ 78-79) (citing Appx9619-32 (Wyman 1939); Appx9235-63 (Nozaki 1967); Appx9222-34 (Christensen 1966) (entitled "Proteins as Buffers"); Appx9207-16 (Abe 2000); Appx9264-368 (Gokarn)). In *Formycon*, the court recognized this literature as teaching that "the imidazole groups of the histidine residues in proteins 'are utilized as potent proton buffering constituents.'" 2024 WL 3423047, at *16 (quoting Appx9208). The court further found that Gokarn, an Amgen patent application "entitled 'Self-

Buffering Protein Formulations,'" was "prior art … directed to the relevant field here" and disclosed using fusion proteins in such self-buffering formulations. *Id.* at *17. And Dr. Chamow agreed expressly that the POSA understood at the priority date that proteins "provide buffering capacity to solutions" through "ionizable groups," Appx26323 (297:7-19), which include histidine's imidazole ring, Appx26326-27 (311:7-18, 312:22-314:10).

Although presented with the same testimony from Dr. Trout and the same (and more) scientific literature as in *Formycon* regarding the POSA's understanding of "the technical aspects of the patent," *Phillips*, 415 F.3d at 1318, along with consistent testimony from Dr. Chamow, the court inexplicably determined that the evidence failed to overcome a *Becton* presumption that the unconstrued "buffer" and "VEGF antagonist" limitations were distinct rather than overlapping. Appx61-63. Aside from its effort to interpret the claims without considering the meaning of the claim terms, *supra* IV.B.1, the court thereby committed two errors: (1) concluding that extrinsic evidence was irrelevant to whether claim terms could overlap under *Becton* and its progeny, Appx61; and (2) disregarding Gokarn as § 102(e) prior art, directly contrary to precedent, Appx67-69.

First, the court wrongly concluded that whether claim terms are separate or overlapping was an issue solely "based on intrinsic evidence" and not extrinsic evidence. Appx62; *see also* Appx61. None of the court's cited cases so hold. Although *Becton* and other cases arrived at their constructions based on intrinsic evidence, that was because only intrinsic evidence was presented. None of those cases held that when proper extrinsic evidence is submitted by both parties, it should nonetheless be ignored. *E.g.*, *HTC*, 701 F. App'x at 981-82 (noting that decision under review "relied entirely on intrinsic evidence"). Here, as the patent does not recapitulate the POSA's background knowledge about known buffers, both parties submitted expert testimony that properly and necessarily addressed "background on the technology at issue," "to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a [POSA]." *Phillips*, 415 F.3d at 1318. That was proper under *Phillips*, as the court concluded just two months prior in relying on extrinsic evidence regarding the POSA's technical understanding of "buffer." *Formycon*, 2024 WL 3423047, at *16. In finding that the terms were separate rather than overlapping, in direct contravention of the ordinary-meaning construction of buffer adopted in *Formycon*, the court erred in disregarding the same extrinsic evidence equally relevant to its

*Becton* analysis here. The court's contradictory conclusions alone demonstrate that this is hardly a case with a "clear and unambiguous" record. Appx61.

Second, in alternatively considering the extrinsic evidence, the court legally erred in disregarding Gokarn as irrelevant to claim construction. Appx67-69. Gokarn undisputedly predated the filing of the '865 patent, and so it unquestionably *confirmed* to the POSA that "biopharmaceutical proteins" could "be formulated in self-buffering compositions." Appx9292 (27:10-12); *see* Appx26233-34. Even Amgen's expert agreed that "Gokarn demonstrates that the buffering capacity of proteins can be used to control pH in formulations" and "discloses protein formulations in which the protein is substantially the only buffer." Appx26308, Appx26311 (240:9-18, 250:1-7).

The court deemed Gokarn irrelevant, citing its status as § 102(e) art. But this Court's predecessor court explained that "reference may be made to" § 102(e) art "to construe claim language." *In re Glass*, 492 F.2d 1228, 1232 & n.6 (C.C.P.A. 1974). The district court justified ignoring *Glass* because it "discuss[ed] indefiniteness, … which is not at issue here." Appx68 n.23. But *Glass* does not countenance that approach; rather, the Court concluded that § 102(e) art could be used "to construe claim language," *including* to address

indefiniteness. *Glass*, 492 F.2d at 1232 n.6. The district court offered no reason to confine arbitrarily the holding in *Glass* to the indefiniteness context; there is none. Appx68 n.23.

The court's fleeting reference to the substance of Gokarn also was flawed. Quoting Gokarn, the court stated that "Gokarn supports Amgen's contention that at the time of the '865 patent, 'the utility of proteins, particularly biopharmaceutical proteins, to be formulated in self-buffering compositions, particularly pharmaceutically acceptable compositions, has not been recognized' by those skilled in the art." Appx69 (quoting Appx9292 (27:10-13)). But, bafflingly, the court expurgated the end of Gokarn's quoted sentence—"*prior to the invention herein disclosed*"—which demonstrates that the exact opposite of the court's assertion is true. Appx9292 (27:10-13) (emphasis added).

#### 2) Whether Aflibercept Specifically Was Known as a Buffer Is Irrelevant

The court's finding that it was not "well known" that aflibercept in particular was a buffer does not support its conclusion that the limitations are separate rather than overlapping. Appx63. The trenchant question in this case was whether the claim limitations overlap, not whether the particular aflibercept protein was known to be a buffer. That histidine-containing

proteins, within an optimal pH range, indisputably were known to resist pH changes through proton-donating and/or proton-accepting groups, thereby meeting the usual, accepted definition of "buffer," necessarily confirms the overlap in scope between "buffer" and aflibercept "VEGF antagonist" (claimed by reference to its sequence that contains 28 histidines, Appx103 (claim 1); Appx102-03 (cols. 17-20, SEQ ID NO:4)). *Formycon*, 2024 WL 3423047, at *16-17; Appx26323 (297:7-19). Whether aflibercept in particular was a known buffer—the issue on which the district court narrowly and repeatedly focused, Appx57-58, Appx62-66, Appx69-70—is not relevant, let alone dispositive.

Even had Amgen discovered a new buffer (it did not—Amgen simply copied the identical protein (aflibercept) and concentration (40 mg/ml) used by Regeneron and claimed in the '865 patent), that would not make aflibercept separate from the scope of buffer. The district court's contrary holding defies this Court's express rejection of the proposition that "a patent can never be literally infringed by embodiments that did not exist at the time of filing," because "case law allows for after-arising technology to be captured within the literal scope of valid claims that are drafted broadly enough." *Innogenetics v.*

*Abbott Labs.*, 512 F.3d 1363, 1371-72 (Fed. Cir. 2008) (citing *SuperGuide v. DirecTV*, 358 F.3d 870, 878-80 (Fed. Cir. 2004)).

#### d. *Mylan* Did Not Address Whether the Claims Required Separate Structures

The court concluded that it had not previously addressed the overlap between "buffer" and "VEGF antagonist" and that it was doing so "for the first time" in this case. Appx27. As explained, the court's conclusion was manifestly erroneous. In finding that "Regeneron did not disagree" with that proposition, the court cited only Regeneron's statement at the preliminary injunction hearing that whether one ingredient can meet multiple limitations "was not at issue *in the Mylan case*." *Id.* (citing Appx26615 (20:9-16) (emphasis added)). That statement is correct. But the question of whether "buffer" encompassed substances that resist pH changes, including histidine-containing proteins like aflibercept, squarely was at issue *in the Formycon case*. Regeneron never conceded that the court's construction of "buffer" in the *Formycon* case was irrelevant and should be ignored. Appx78. To the contrary, in advancing the same construction in *Amgen* as in *Formycon*, Regeneron consistently argued that the court's existing construction resolved the infringement issue here. Appx26230, Appx26232, Appx26234.

The district court referenced statements from the *Mylan* litigation that both aflibercept "plus a buffer" are required, Appx75, along with similar statements, *see* Appx75-77. But in *Mylan*, neither the proper construction of "buffer" nor whether the claim elements required separate structures was at issue, as Amgen acknowledged. Appx26615, Appx26647 (20:9-16, 52:7-17). That was because Mylan conceded that its histidine buffer met the buffer limitation, 2024 WL 382495, at *18, *25, and the issue of overlap in claim terms never arose. Both Regeneron's statements and the court's reasoning that the claims require aflibercept "plus a" buffer or "along with" a buffer simply reflect that both limitations are required, Appx75, not that they mandate separate structures. The court thus erred in finding that Dr. Trout testified at trial that the claims required a separate buffer "in addition" to aflibercept, Appx76; Dr. Trout said no such thing, but rather applied the POSA's ordinary understanding of a buffer as "a chemical compound that has a particular structure" that allows it to "resist pH changes," Appx14189 (2097:10-18).

Moreover, the experts agreed in *Mylan* that proteins could serve as buffers, just as they do here. Dr. Trout explained in the *Mylan* litigation, as Regeneron again asserts here, that Gokarn taught "that proteins themselves have some buffering capacity," Appx75 (quoting Appx15322 (¶ 381)) (citing

Gokarn), consistent with the opinion of Mylan's expert, who asserted that "the protein itself can act as a buffer." No. 22-cv-61, Dkt. 441-19, ¶ 54 (MacMichael Reply Rep.). *Mylan* thus further supports that the claimed "VEGF antagonist" and "buffer" may overlap.[1]

### C. The District Court's Construction of Buffer in *Formycon* Is Correct

The district court did not address Amgen's argument for a narrow construction of "buffer" that departs from its ordinary meaning and limits the term to an "excipient." Appx79; Appx12699. Because Amgen cannot credibly defend the court's indefensible conclusion that "buffer" and "VEGF antagonist" are separate and not overlapping limitations under the court's existing construction of "buffer," Regeneron expects Amgen to advance its "excipient" construction again as an alternative basis for affirmance. But both the intrinsic and extrinsic evidence compel the court's construction in *Formycon* applying the ordinary meaning of "a buffer" as any "substance"—not limited to an "excipient"—that resists pH changes within optimal ranges through the recited structures, including histidine and histidine-containing

[1] Regeneron addresses *infra* (IV.C.3) the court's discussion of "excipient[s]" in *Mylan*, Appx76-77, which likewise does not support abandoning the ordinary meaning of "buffer."

proteins like aflibercept. 2024 WL 3423047, at *17. Thus, even if this Court (unlike the district court, Appx78) chooses to address the proper construction of "buffer," the ordinary meaning of "buffer" and the undisputed extrinsic evidence here confirm that the court's existing *Formycon* construction is correct.

#### 1. The Ordinary Meaning of "a Buffer" Is Not Limited to an "Excipient"

Amgen argued below that "buffer" did not refer to any buffer but instead was limited to an "excipient" buffer, which it then interpreted as an "ingredient[] *other than* the active ingredient." Appx12699. The court correctly declined to adopt Amgen's construction, which arbitrarily reads in an "excipient" limitation without any intrinsic support.

"There are only two exceptions to" the "general rule" that claim terms take their "ordinary and customary meaning as understood by a [POSA] when read in the context of the specification and prosecution history": "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner*, 669 F.3d at 1365. Undisputedly, neither exception applies here. The patent nowhere defines buffer as limited to excipients and thus should be afforded its full scope.

First, the claim language here is dispositive. *See Phillips*, 415 F.3d at 1314. The claims do not recite the term "excipient" or otherwise indicate that the term "buffer" must be an excipient. Thus, the claim language itself does not support reading in Amgen's proposed limitation. *Id.*

Second, the specification nowhere describes a buffer as limited to an excipient. *Id.* at 1315. The patent teaches that "[u]nless stated otherwise, all technical and scientific terms and phrases used herein have the same meaning as commonly understood by one of ordinary skill in the art to which the invention belongs," Appx96 (5:39-42), and it does not "state otherwise[]" regarding "buffer." The patent does not define "buffer," and refers to buffers and excipients *separately*. The patent's "Definitions" section defines "excipient" as follows:

> The term "excipient" includes a non-therapeutic agent added to a pharmaceutical composition to provide a desired consistency or stabilizing effect. Suitable pharmaceutical excipients include, for example, starch, glucose, lactose, sucrose, gelatin, malt, rice, flour, chalk, silica gel, sodium stearate, glycerol monostearate, talc, sodium chloride, dried skim milk, glycerol, propylene, glycol, water, ethanol and the like.

Appx96 (6:12-19). Although the patent lists numerous substances as excipients, it does not list buffers. Moreover, this definition says nothing about

maintaining pH, the undisputed role of buffers; rather, the excipient "includes a non-therapeutic agent added to a pharmaceutical composition to provide a desired consistency or stabilizing effect." Appx96 (6:12-14).

Additionally, the patent repeatedly distinguishes the terms "excipient" and "buffer," refuting conclusively Amgen's assertion that a "buffer" must be an "excipient." The patent teaches that "[t]he formulation can also comprise one or more pharmaceutically acceptable carriers, *buffers*, tonicity agents, stabilizers, *and/or excipients*." Appx96-97 (6:67-7:2) (emphasis added); *see* Appx96 (7:60-62) ("[S]olutions comprising *buffers and/or excipients* and/or one or more pharmaceutically acceptable carrie[r]s can also be used." (emphasis added)). Accordingly, the patent does not teach that "a buffer" must be an "excipient," and its disclosure is inconsistent with such a limitation.

Thus, in *Formycon*, the court correctly held that the POSA would have understood in the context of the '865 patent that proteins containing histidine were buffers, because their histidine residues possess the imidazole ring structures that resist pH changes, just like free histidine that possesses the same structural and functional feature. 2024 WL 3423047, at *16; *see supra* II.B.2.

In Amgen's case, both experts again agreed with that fundamental proposition supported by decades of scientific literature and technical references. Dr. Trout explained that histidine, whether "added to a formulation as a discrete chemical substance, *i.e.*, 'free histidine,'" or when "present in a formulation as part of a protein," acts as a buffer "using the same structure, *i.e.*, its imidazole ring which can donate or accept protons and thereby resist changes to pH." Appx4689-93 (¶¶ 75, 78). Dr. Trout's opinion was supported by extensive and unrebutted literature. *See* Appx9206 (Oxford Dictionary of Biochemistry and Molecular Biology) (defining "buffer" as "*any substance* or mixture of substances that, when dissolved (usually in water), will maintain its solution at approximately constant pH despite small additions of acid or base," and listing "imidazole" as such a substance (emphasis added)); Appx9220-21 (Webster's Medical Desk Dictionary) (similarly defining "buffer" as "*a substance or mixture of substances* (as bicarbonates *and some proteins in biological fluids*) that in solution tends to stabilize the hydrogen-ion concentration by neutralizing within limits both acids and bases" (emphases added)); *supra* IV.B.3.c.1 (discussing five scientific prior-art references describing buffering capacity of proteins).

Dr. Chamow agreed with Dr. Trout on the science. With regard to histidine residues in a protein or free histidine, Dr. Chamow agreed that "chemically, it's the same imidazole group," Appx26324 (301:10-302:4), and that proteins were understood to provide "buffering capacity" through such "ionizable groups." Appx26323 (297:7-19). The court in *Formycon* correctly declined to limit "a buffer" to a phosphate buffer; and the evidence here equally supports rejecting an "excipient" limitation that arbitrarily narrows the ordinary meaning of "a buffer." 2024 WL 3423047, at *16-17; *see Thorner*, 669 F.3d at 1367.

In addition, the court's *Formycon* construction accords with other courts, including this Court, that have construed the commonplace "buffer" term as a substance or component that resists pH changes, without excluding active ingredients or proteins. *Cadence*, 780 F.3d at 1369 (construing "buffering agent" as "*an agent* that helps the formulation resist change in pH" (emphasis added)); *Purdue*, 2014 WL 2624787, at *15 (construing "buffering agent" as "a proton-donating component or proton-accepting component used to maintain and/or achieve an approximate pH range"); *Reckitt Benckiser v. Watson Labs.*, 2015 WL 3978883, at *2 (D. Del. June 26, 2015) (similar). Under that ordinary meaning, proteins like aflibercept containing histidine meet the

definition of "a buffer," regardless of whether they are expressly included in the claim construction. *Thorner*, 669 F.3d at 1367 ("The patentee is free to choose a broad term and *expect to obtain the full scope of its plain and ordinary meaning* unless the patentee explicitly redefines the term or disavows its full scope." (emphasis added)); *Riverwood v. R.A. Jones & Co.*, 324 F.3d 1346, 1357 (Fed. Cir. 2003) (same).

The court's existing construction of "buffer" properly clarified its scope without reference to the "accused device." *Formycon*, 2024 WL 3423047, at *15 (quoting *Exigent*, 442 F.3d at 1309 n.10). That prudentially-mandated approach stands in stark contrast to the distinct (improper) inquiry the district court undertook to determine whether the *Becton* presumption was rebutted, which explicitly was limited to the intrinsic evidence, Appx61-62, and interrogated whether the patent disclosed that aflibercept could serve as a buffer in the claimed formulations. Appx73-74; Appx63-66. The court clarified that its *Amgen* inquiry was not construing the meaning of "buffer" or performing the requisite *Phillips* analysis of ascertaining the plain meaning of a claim term in view of the specification, without regard to the particular accused element. *Compare* Appx78, *with Exigent*, 442 F.3d at 1309 n.10, *and Embrex v. Serv. Eng'g*, 216 F.3d 1343, 1347 (Fed. Cir. 2000) ("[T]he words of

the claims are construed independent of the accused product, in light of the specification, the prosecution history, and the prior art." (quoting *Scripps Clinic v. Genentech*, 927 F.2d 1565, 1580 (Fed. Cir. 1991))). On appeal, Amgen agrees that the district court, in discussing whether the *Becton* presumption was rebutted, did not construe "buffer." Dkt. 21 at 12-13.

### 2. Amgen's Construction Improperly Limits the Claims to the Embodiments

The patent does not disavow the ordinary meaning of "buffer." Although the specification only explicitly discloses phosphate buffer, it contains no "expressions of manifest exclusion or restriction" as to non-excipient buffers and thus does not disavow them. *Thorner*, 669 F.3d at 1366; *Aventis Pharma v. Hospira*, 675 F.3d 1324, 1330 (Fed. Cir. 2012) (it is "not enough that … all of the embodiments[] contain a particular limitation to limit a claim term beyond its ordinary meaning" (quotation omitted)).

While the patent's example of a phosphate buffer is an excipient buffer (as Amgen uses "excipient"), that does not support reading in an "excipient" limitation, just as it did not support limiting "buffer" to phosphate buffer in *Formycon*. 2024 WL 3423047, at *17. Rather, reading in such a limitation would "commit[] a 'cardinal sin[] of patent law—reading a limitation from the written description into the claims.'" *Id.* at *15 (quoting *Phillips*, 415 F.3d at

1320); *see Hill-Rom*, 755 F.3d at 1371; *Aventis*, 675 F.3d at 1330. The term thus carries its ordinary meaning to the POSA as already articulated in *Formycon*. *Thorner*, 669 F.3d at 1365-66.

#### 3. Regeneron Did Not Previously Argue That Buffers Were Limited to Excipients

In assessing whether the *Becton* presumption was overcome, Appx78, the court observed that in the *Mylan* litigation, Regeneron and Dr. Trout "referred to the 'buffer' of the '865 patent as an 'excipient.'" Appx76. But at no point did Regeneron or Dr. Trout argue that buffers were *limited to* excipients. To the contrary, Dr. Trout and Mylan's expert agreed that proteins could act as buffers. *Supra* IV.B.3.d; Appx15322 (¶ 381); *see* No. 22-cv-61, Dkt. 441-19, ¶ 54 (MacMichael Reply Rep.).

In *Mylan* (unlike in *Formycon*), the court did not construe "buffer," and Mylan never disputed that its histidine buffer or proteins containing histidine met the "buffer" limitation. The references of Dr. Trout, Mylan's attorney during cross examination, and the court's *Mylan* decision to buffers as excipients (Appx76 (quoting Appx14217 (2125:21-25))) hardly support displacing the ordinary meaning of "buffer" by excluding proteins. Although the construction of "buffer" was not at issue in *Mylan*, Dr. Trout's testimony addressing the POSA's understanding of a buffer was fully consistent with the

ordinary meaning: "a buffer is a chemical compound that *has a particular structure* that leads to the formulation staying at a particular pH; *so it resists pH changes*," and the POSA would "have known the structure of buffers" within the claimed invention. Appx14189 (2097:10-18) (emphases added). The testimony cited by the court only demonstrates the parties and the district court addressing the facts and issues before them, where Mylan used an excipient buffer and the distinction Amgen now draws between excipient and non-excipient buffers was irrelevant to the parties' arguments at trial. Thus, while the testimony reflects that buffers of course *include* excipient buffers, it does not support construing buffers as *limited to* excipients.

In any event, Regeneron and Dr. Trout did not use "excipient" in a manner that excludes active proteins, so the statements are unhelpful to Amgen's argument. Rather, Regeneron and Dr. Trout used "excipient" consistent with the '865 patent's use of that term, which "includes a non-therapeutic agent," but is not limited to a non-therapeutic agent. Appx96 (6:12). In U.S. Patent 8,092,803, a parent of the '865 patent that shares the same specification, claim 16 recites:

> [C]ombining in a liquid solution the following *excipients*:

> (i) about *5-50 mg/ml of the VEGF antagonist*,
> comprising amino acids 27-475 of SEQ ID NO:4.

Appx26364 (emphasis added). Thus, the related ’803 patent expressly *includes* a specific VEGF antagonist protein as an “excipient.” “Where multiple patents derive from the same parent application and share many common terms, [the Court] must interpret the claims consistently across all asserted patents.” *SightSound Techs. v. Apple*, 809 F.3d 1307, 1316 (Fed. Cir. 2015) (quotation marks omitted). The ’803 patent reflects that the ’865 patent uses “excipient” as a generic term for a component that includes aflibercept, rather than excluding it. And that is consistent both with Dr. Trout’s testimony below (Appx4887 (¶ 498 n.12) (“For convenience, I use ‘excipient’ synonymously with ‘ingredient.’”)) and in the *Mylan* case. Not only does the ’865 patent’s meaning of “excipient” eviscerate Amgen’s reliance on statements from the *Mylan* case using that term, it also means that, even were Amgen’s construction limiting “buffer” to “excipients” adopted, it would not exclude its use of aflibercept as a buffer. *See* Appx26304 (223:11-19) (Chamow).

Nor does the court’s finding in *Mylan* that buffers were known “structures” support displacing the ordinary meaning of buffer. *Mylan*, 2024 WL 382495, at *70; Appx77. Rather, a “buffer” as correctly construed in

*Formycon* is indeed structurally limited, both because the POSA understood the structure of buffers and because it requires certain structures—"a proton-donating component and/or a proton-accepting component, including, for example, histidine, phosphate, and proteins like aflibercept." 2024 WL 3423047, at *15. That is why the court's decision in *Formycon* included extensive analysis of the known imidazole ring structure of histidine, which is common both to Formycon's histidine buffer and to the histidine residues in proteins like aflibercept. *Id.* at *16.

## CONCLUSION

The district court's judgment should be vacated and remanded for further proceedings.

OCTOBER 17, 2024

Respectfully submitted,

/s/ David I. Berl

DAVID I. BERL
THOMAS S. FLETCHER
ANDREW V. TRASK
CHARLES L. MCCLOUD
SHAUN P. MAHAFFY
KATHRYN S. KAYALI
ARTHUR J. ARGALL III
ADAM PAN
CHRISTIAN GLADDEN-SORENSEN
RHOCHELLE KRAWETZ
WILLIAMS & CONNOLLY LLP

*680 Maine Ave. SW*
*Washington, DC 20024*
*(202) 434-5000*

ELIZABETH S. WEISWASSER
WEIL, GOTSHAL & MANGES LLP
*767 Fifth Ave.*
*New York, NY 10153*
*(212) 310-8022*

PRIYATA PATEL
WEIL, GOTSHAL & MANGES LLP
*2001 M St. NW, Suite 600*
*Washington, DC 20036*
*(202) 682-7041*

JACOB E. HARTMAN
KELLOGG, HANSEN, TODD,
FIGEL & FREDERICK PLLC
*1615 M St. NW, Suite 400*
*Washington, DC 20036*
*(202) 326-7989*

*Attorneys for Plaintiff-Appellant*

**No. 24-2351**

# In the United States Court of Appeals for the Federal Circuit

REGENERON PHARMACEUTICALS, INC.,
*Plaintiff-Appellant,*

*v.*

MYLAN PHARMACEUTICALS INC., AMGEN USA, INC., BIOCON BIOLOGICS INC., CELLTRION, INC., FORMYCON AG, AMGEN INC., SAMSUNG BIOEPIS CO., LTD.,
*Defendants-Appellees.*

Appeal from the United States District Court for the Northern District of West Virginia in No. 1:24-md-3103-TSK, Chief Judge Thomas S. Kleeh

**NONCONFIDENTIAL ADDENDUM TABLE OF CONTENTS**


| Description | Appx |
|---|---|
| Order Denying Motion for Preliminary Injunction, Case No. 1:24-cv-00039-TSK, Dkt. No. 263 (Oct. 1, 2024) | Appx0001-Appx0090 |
| U.S. Patent No. 11,084,865 | Appx0091-Appx0104 |


*Confidential Material Omitted*

The nonconfidential version of this addendum contains a redacted version of the district court's decision, which redacts information Amgen has maintained as confidential. Pursuant to Fed. Cir. R. 25.1(e)(1)(B), the material redacted on Appx7 relates to the amounts of the ingredients in Amgen's biosimilar formulation; the material redacted on Appx8 relates to Amgen's statements made in its regulatory application seeking approval for its biosimilar product; and the material redacted on Appx87 relates to the manufacturing process and functionality of Amgen's biosimilar. Amgen has maintained the information redacted on these pages is confidential, and Regeneron has no objection to its disclosure. The other redactions on Appx1-90 redact the word "sealed" and do not redact the contents of the court's decision.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

IN RE: AFLIBERCEPT PATENT LITIGATION

MDL NO. 1:24-MD-3103-TSK

THIS DOCUMENT RELATES TO CASE NO. 1:23-CV-39

REDACTED PUBLIC VERSION

** [redacted] **

**ORDER DENYING REGENERON'S MOTION FOR PRELIMINARY INJUNCTION**

Pending before the Court is Plaintiff Regeneron's Motion for Preliminary Injunction. ECF No. 180.[1] The Court has considered the parties' briefing and evidence. ECF Nos. 180, 206, 224, 231-1. The Court convened for oral argument on August 13, 2024. ECF Nos. 241, 243. The motion is fully briefed and ripe for decision. For the reasons set forth herein, the motion is **DENIED**.

## I. PRELIMINARY STATEMENT

Plaintiff Regeneron Pharmaceuticals, Inc. ("Regeneron") filed this patent infringement action against Defendant Amgen Inc. ("Amgen"). Amgen disputes the infringement and validity of the patents asserted by Regeneron. At issue in Regeneron's motion for preliminary injunction is one of those patents: U.S. Patent No. 11,084,865 (the "'865 patent" or the "Product Patent"). ECF No.

[1] All docket references are to member case 1:24-cv-39 unless otherwise indicated.

** [redacted] **

**ORDER DENYING REGENERON'S MOTION FOR PRELIMINARY INJUCTION**

180-10, Trout Ex. 65.[2] Regeneron's motion asserts infringement of claims 2, 3, 27, and 28 (the "Asserted Claims"). The Asserted Claims are associated with Regeneron's product Eylea® ("Eylea") and Amgen's filing of an abbreviated Biologics License Application ("BLA") seeking authorization to commercialize "ABP 938," a biosimilar version of Eylea. For the reasons set forth herein, the Court **DENIES** Regeneron's motion. Regeneron has not shown a reasonable likelihood of success on the merits because Amgen has raised a substantial question of noninfringement based on the specific formulation of Amgen's proposed biosimilar product.

This Court has resolved preliminary injunction motions in related cases involving the '865 patent against other defendants in this multidistrict litigation ("MDL"). Those cases are presently on appeal. See In re: Aflibercept Patent Litig., 1:24-md-3103, ECF Nos. 276, 277, 302, 307 (N.D.W. Va.). The Court's ruling on Regeneron's motion against Amgen is resolved on grounds not addressed in the other cases and based on Amgen's formulation.

The Court, having considered the record as a whole, concludes Regeneron has failed to satisfy its burden here. Specifically,

[2] Citations to "Trout Decl." refer to the June 7, 2024 Opening Expert Declaration of Bernhardt L. Trout, Ph.D. ECF No. 180-3. Citations to "Trout Ex." refer to the exhibits attached to the Trout Decl. ECF Nos. 180-4 to 180-16.

the Court finds Regeneron has not demonstrated it is likely to prevail on the merits of its claim – that being, infringement. See Henderson for Nat'l Labor Rels. Bd. v. Bluefield Hosp. Co., LLC, 902 F.3d 432, 438-39 (4th Cir. 2018) (finding district courts not required to evaluate all Winter factors "if one is clearly absent"). For that reason, the Court **DENIES** the pending motion.

## II. BACKGROUND INFORMATION

### A. Regeneron's Eylea Product

Regeneron developed, markets, and sells Eylea, which the U.S. Food and Drug Administration ("FDA") approved on November 18, 2011. The Court has previously addressed the pertinent background and development of Eylea. See Regeneron Pharm., Inc. v. Mylan Pharm. Inc., --- F. Supp. ---, 2024 WL 382495, at *13-14 (N.D.W. Va. Jan. 31, 2024) ("Mylan") (discussing relevant background of Eylea). Eylea is an ophthalmic drug product that has been used to treat patients suffering from diseases that can cause vision loss or even blindness. Id. at *13.

The active ingredient in Eylea is the fusion protein aflibercept. Id. Aflibercept was initially developed as a cancer therapeutic, and Regeneron later discovered that aflibercept could be used to treat angiogenic eye diseases — eye diseases caused by uncontrolled blood vessel growth in the retina — through

Case: 24-2351 Document: 35 F[redacted] Filed: 09/23/2024


intravitreal injections (injection into the vitreous of the eye). Id. at *13-14.

Regeneron developed an aflibercept formulation for treating wet Age-Related Macular Degeneration ("AMD") known as Eylea. Id. at *14 (citing Mylan Trial Tr. at 466:22-467:9, 495:15-496:17 (Furfine) (ECF No. 206-6, Chamow Ex. C-4)).[3] Regeneron tested Eylea's effectiveness in patients with various other angiogenic eye disorders, obtaining approval for Eylea's use to treat those conditions as well. Id. at *13. Following the FDA's approval of Eylea for administration in a vial presentation, in November 2011, Regeneron subsequently obtained FDA approval to market Eylea in a pre-filled syringe ("PFS") presentation. See Sheridan Decl. ¶ 33.[4]

The Eylea formulation contains 40 mg/ml aflibercept, 10 mM sodium phosphate, 40 mM sodium chloride, 0.03% polysorbate 20, and 5% sucrose, pH 6.2. Mylan, 2024 WL 382495, at *14. The Eylea formulation is the same as Examples 3 and 4 of the '865 patent.

---

[3] Citations to "Chamow Decl." refer to the July 3, 2024 Expert Declaration of Steven M. Chamow, Ph.D. ECF No. 206-2. Citations to "Chamow Ex. C-" refer to the exhibits attached to the Chamow Decl. ECF Nos. 206-3 to 206-25.

[4] Citations to "Sheridan Decl." refer to the June 7, 2024 Declaration of Sean D. Sheridan, Ph.D. ECF No. 180-17. Citations to "Sheridan Ex." refer to the exhibits attached to the Sheridan Decl. ECF Nos. 180-18 to 180-23.

See ’865 patent at 9:19-10:11; see also Trout Decl. ¶ 428 (“Examples 3 and 4 contain the same components as EYLEA and are embodiments of the claims.”). As shown below, Eylea contains a sodium phosphate buffer.

| Component | Function | Concentration |
|---|---|---|
| **Active Ingredient** | | |
| Aflibercept | active ingredient | 40 mg/ml |
| **Excipients** | | |
| sodium phosphate | buffering agent | 10 mM |
| sodium chloride | tonicity agent | 40 mM |
| Sucrose | stabilizing agent | 5% (w/v) |
| polysorbate 20 | organic co-solvent | 0.03% (w/v) |

See Eylea PI 2011 at 9 (ECF No. 180-7, Trout Ex. 16); Trout Decl. ¶ 428; Chamow Decl. ¶ 119.

In August 2023, Regeneron received FDA approval to market Eylea® HD (“Eylea HD”), a formulation containing 114.3 mg/mL aflibercept with a histidine buffer and other excipients. Clark Decl. ¶ 3;[5] Chamow Decl. ¶ 92; Eylea HD PI 2023 at 5 (ECF No. 206-

[5] Citations to “Clark Decl.” refer to the June 7, 2024 Declaration of Kevin Clark. ECF No. 180-24. Citations to “Clark Ex.” refer to the exhibits attached to the Clark Decl. ECF Nos. 180-24, 180-25.

6, Chamow Ex. C-11). Eylea HD is currently approved to treat wet AMD, Diabetic Macular Edema ("DME"), and Diabetic Retinopathy ("DR"). Clark Decl. ¶ 3. While Eylea contains a phosphate buffer, Eylea HD contains a histidine buffer. Chamow Decl. ¶ 92.

**B. Amgen's BLA and Proposed Biosimilar Product**

Amgen is a research-based biotechnology company headquartered in Thousand Oaks, California and is the developer of ABP 938, a proposed biosimilar version of Eylea. Heath Decl. ¶¶ 1, 8.[6] Amgen filed BLA No. 761298 ("Amgen's BLA") with FDA on August 23, 2023, seeking approval under the Biologics Price Competition and Innovation Act ("BPCIA"), 42 U.S.C. §§ 262 (k)-(l), to market and distribute its proposed biosimilar, "ABP 938," in the United States. Heath Decl. ¶ 20; October 17, 2023 Letter to FDA at AMG-AFL-US_00145633[7] (ECF No. 180-2, Argall Ex. 2).

Amgen's BLA seeks approval to market ABP 938 for the treatment of wet AMD, macular edema following retinal vein occlusion ("RVO"),

[6] Citations to "Heath Decl." refer to the July 3, 2024 Declaration of Brian Heath in Support of Defendant Amgen Inc.'s Opposition to Plaintiff Regeneron Pharms., Inc.'s Motion for Preliminary Injunction. ECF No. 206-37. Citations to "Heath Ex. H-" refer to the exhibits attached to the Heath Decl. ECF Nos. 206-38 to 206-41.

[7] Citations to "Argall Ex." refer to the exhibits attached to the June 7, 2024 and July 24, 2024 Declarations of Arthur J. Argall III [sic] Support of Regeneron Pharmaceuticals, Inc.'s Motion for Preliminary Injunction. ECF Nos. 180-2, 224-1.

DME, and DR. Heath Decl. ¶ 20. Amgen's BLA seeks approval for two presentations of ABP 938: (1) a single-dose vial containing 2 mg aflibercept, sucrose, α,α-Trehalose dihydrate, polysorbate 80, and water for injection; and (2) a single-dose PFS containing 2 mg aflibercept, sucrose, α,α-trehalose dihydrate, polysorbate 80, and water for injection, as shown the chart below reproduced from Amgen's BLA. Id.

| Component | Function | Concentration |
|---|---|---|
| **Active Ingredient** | | |
| ABP 938 | active ingredient | 40 mg/ml |
| **Excipients** | | |
| sucrose | stabilizing agent and tonicity modifier | [redacted] |
| α,α-trehalose dihydrate | stabilizing agent and tonicity modifier | [redacted] |
| polysorbate 80 | surfactant | [redacted] |
| Water for injection | aqueous solvent | qs to target volume |

ABP 938 QOS [Vial] at AMG-AFL-US_00000640 (ECF No. 206-38, Heath Ex. H-4); ABP 938 QOS [PFS] at AMG-AFL-US_00000529-530 (ECF No. 206-38, Heath Ex. H-3).

** [redacted] **

**ORDER DENYING REGENERON'S MOTION FOR PRELIMINARY INJUCTION**

The parties do not dispute the contents of Amgen's formulation. See Chamow Decl. ¶ 125 (Table 6); ABP 938 QOS [Vial] at AMG-AFL-US_00000640 (Table 1) (ECF No. 180-4, Trout Ex. A-4); ABP 938 QOS [PFS] at AMG-AFL-US_00000530 (Table 1) (ECF No. 180-4, Trout Ex. A-5). Amgen's BLA states that "ABP 938 has a different formulation than Eylea." ABP 938 Nonclinical Overview at AMG-AFL-US_00000911 (ECF No. 206-20, Chamow Ex. C-112). As is relevant here, ABP 938 does not contain a separate buffer component. Chamow Decl. ¶¶ 223-233; Trout Decl. ¶ 232. As stated in Amgen's BLA, [redacted]

**C. Other Aflibercept Biosimilars**

To date, Regeneron has initiated patent infringement lawsuits against five defendant groups that are seeking FDA approval to market aflibercept biosimilars: Mylan and Biocon Biologics Inc. ("Biocon"), Samsung Bioepis Co., Ltd. ("Samsung"), Celltrion, Inc. ("Celltrion"), Formycon AG ("Formycon"), and Amgen. Although the various defendants' proposed products contain the same active ingredient as Eylea (aflibercept), in the same 2 mg dosage strength, the defendants' formulations differ in their inactive

ingredients. Opp. at 1;[8] Chamow Decl. ¶¶ 126-127. The formulation components for the defendant groups, as well as Regeneron, are summarized below:

| '865 patent Components | Regeneron's EYLEA Formulation | Mylan's M710 Formulation | Samsung's SB15 Formulation | Celltrion's CT-P42 Formulation | Formycon's FYB203 Formulation | Amgen's ABP 938 Formulation |
|---|---|---|---|---|---|---|
| **Active Ingredient** | | | | | | |
| **VEGF Antagonist** | 40 mg/ml aflibercept | 40 mg/ml aflibercept | 40 mg/ml aflibercept | 40 mg/ml aflibercept | 40 mg/ml aflibercept | 40 mg/ml aflibercept |
| **Excipients** | | | | | | |

[8] Citations to "Opp." refer to Amgen Inc.'s Brief in Opposition to Regeneron's Motion for Preliminary Injunction, filed July 3, 2024. ECF No. 206.

** [redacted] **

**ORDER DENYING REGENERON'S MOTION FOR PRELIMINARY INJUCTION**

| | | | | | | |
|---|---|---|---|---|---|---|
| **Organic Co-Solvent** | Polysorbate 20 | Polysorbate 20 | Polysorbate 20 | Polysorbate 20 | Polysorbate 20 | Polysorbate 80 |
| **Buffer** | phosphate | histidine | phosphate | histidine | histidine | |
| **Stabilizing Agent** | Sucrose | Trehalose | Sucrose | Trehalose | Sucrose | Sucrose / Trehalose |
| **(Optional) Tonicity Agent** | Sodium chloride | | Sodium chloride | Sodium chloride | Sodium chloride | |

See Chamow Decl. ¶ 126 (Table 7); Opp. at 1.

Following a bench trial conducted in June 2023, the Court granted Regeneron's Motion for a Permanent Injunction against Biocon related to Biocon's aflibercept biosimilar ("M710"). See Regeneron Pharms., Inc. v. Mylan Pharms. Inc., 1:22-cv-61, 2024 WL 3177913 (N.D.W. Va. June 21, 2024). The Court also granted Regeneron's Motions for Preliminary Injunction against Samsung (Regeneron Pharms., Inc. v. Samsung Bioepis, Co., Ltd., 1:23-cv-

94, ECF No. 250 (N.D.W. Va. June 24, 2024); see also 1:23-cv-106, ECF No. 232 (N.D.W. Va. June 24, 2024) ("Samsung")), Formycon (Regeneron Pharms., Inc. v. Formycon AG, 1:23-cv-97, ECF No. 252 (N.D.W. Va. July 9, 2024)) ("Formycon"), and Celltrion (Regeneron Pharms., Inc. v. Celltrion, Inc., 1:23-cv-89, ECF No. 201 (N.D.W. Va. July 9, 2024)) ("Celltrion"). In Samsung, Formycon, and Celltrion, the Court found that Regeneron was likely to succeed in proving that the '865 patent is infringed by Samsung's aflibercept biosimilar product ("SB15"), Formycon's aflibercept biosimilar product ("FYB203"), and Celltrion's aflibercept biosimilar product ("CT-P42"), that those defendants did not raise a substantial question of invalidity or noninfringement with respect to the claims asserted in their respective proceedings, and that Regeneron would suffer irreparable harm if those defendants were permitted to commercialize their respective proposed biosimilar products in the United States.

## III. PROCEDURAL BACKGROUND

On January 10, 2024, Regeneron filed this lawsuit against Amgen in the United States District Court for the Central District of California asserting 32 of its patents. ECF No. 1.

Pursuant to 42 U.S.C. § 262(l)(8)(A), a biosimilar applicant must provide notice to the reference product sponsor no later than

180 days before the date of the first commercial marketing of the applicant's product. On February 23, 2024, Amgen transmitted its "Notice of Commercial Marketing" to Regeneron. Under the BPCIA, Amgen may therefore begin commercial marketing of ABP 938 on or after August 21, 2024, if Amgen has received FDA approval.

On April 11, 2024, the United States Judicial Panel on Multidistrict Litigation ordered Regeneron's case against Amgen to be consolidated for pretrial proceedings before this Court with Regeneron's cases against other aflibercept biosimilar applicants. In re: Aflibercept Patent Litig., 1:24-md-3103, ECF No. 1 (N.D.W. Va. Apr. 11, 2024).

On May 24, 2024, the Court issued an Order Setting Briefing Schedule with Respect to Any Motion for Preliminary Injunction Against Amgen. ECF No. 172. The same day, Amgen filed a motion to clarify whether Regeneron's preliminary injunction motion would be limited to the '865 patent. ECF No. 174. On May 28, 2024, the Court issued an Order granting Amgen's motion for clarification limiting any preliminary injunction motion filed against Amgen to the '865 patent, while also amending the preliminary injunction briefing schedule with respect to Amgen. ECF No. 175 ("Scheduling Order"). On June 7, 2024, Regeneron filed a motion for a preliminary injunction against Amgen, based on the '865 patent.

ECF No. 180-1 ("Motion").[9] Regeneron's motion asserted claims 2-3 and 27-28 of the '865 patent (the "Asserted Claims"). Id. at 5-6. On July 3, 2024, Amgen filed its opposition. ECF No. 206 ("Opp."). On the same day, Amgen filed a request for oral argument. ECF No. 207. On July 15, 2024, Regeneron filed a response, indicating that Regeneron did not oppose Amgen's request for oral argument. ECF No. 215. On July 22, 2024, Amgen filed a reply in further support of oral argument. ECF No. 217. On July 24, 2024, Regeneron filed its reply brief in support of its preliminary injunction motion. ECF No. 224 ("Reply").[10] On July 29, 2024, Amgen filed a motion for leave to file a surreply (ECF No. 231), with an attached surreply to address issues in Regeneron's Reply. ECF No. 231-1 ("Surreply").[11] On July 31, 2024, Regeneron filed an opposition to Amgen's motion for leave to file a surreply. ECF No. 234.

On July 25, 2024, the Court ordered oral argument on Regeneron's motion for preliminary injunction to be held on August

[9] Citations to "Motion" refer to Regeneron's Opening Brief in Support of Motion for Preliminary Injunction, filed June 7, 2024. ECF No. 180-1.
[10] Citations to "Reply" refer to Regeneron's Reply Brief in Support of Motion for Preliminary Injunction, filed July 24, 2024. ECF No. 224.
[11] Citations to "Surreply" refer to Amgen Inc.'s Surreply in Opposition to Regeneron's Motion for Preliminary Injunction, filed July 29, 2024. ECF No. 231-1.

6, 2024. ECF No. 228. On July 26, 2024, the Court continued the oral argument until August 13, 2024, to accommodate a conflict identified by Regeneron's counsel. ECF No. 229. Oral argument was held before this Court on August 13, 2024. ECF No. 241; ECF No. 243 ("Hearing Tr.").[12]

## IV. FACTUAL BACKGROUND

### A. Expert Declarants

In support of its preliminary injunction motion, Regeneron filed declarations from two expert witnesses, Dr. Bernhardt Trout and Dr. Sean Sheridan, and one fact witness, Mr. Kevin Clark. Amgen deposed Dr. Sheridan and Mr. Clark. Amgen did not depose Dr. Trout. Amgen presented declarations from two expert witnesses, Dr. Steven Chamow and Dr. David Blackburn, and one fact witness, Mr. Brian Heath. Regeneron deposed all of Amgen's witnesses.

#### 1. Regeneron's Declarants

In support of its motion for a preliminary injunction, Regeneron filed an expert declaration from Dr. Trout addressing infringement and validity with respect to the '865 patent. Dr. Trout had provided testimony on infringement and validity of the '865 patent at the Mylan trial and this Court previously found his

[12] Citations to "Hearing Tr." refer to the transcript of the oral argument held before the Court on August 13, 2024. ECF No. 243.

testimony to be credible and reliable. Dr. Trout is a professor of Chemical Engineering at the Massachusetts Institute of Technology ("MIT") and holds a Ph.D. in chemical engineering. Trout Decl. ¶¶ 9-10. At MIT, Dr. Trout performs pharmaceutical development and manufacturing research on biopharmaceutical (e.g., protein-based) therapeutics and has worked on approximately fifty biologic therapeutics. Id. ¶¶ 12-13.

Regeneron filed an expert declaration from Dr. Sheridan regarding whether Regeneron would be irreparably harmed. Dr. Sheridan is a Vice President at Charles River Associates, an international business consulting firm, and has a Ph.D. in genetics as well as an MBA with concentrations in finance and economics from the University of Chicago. Sheridan Decl. ¶¶ 1-2. Dr. Sheridan's previous experience has included the quantification of economic damages, and he has experience in modeling and valuation in a variety of intellectual property matters. Id. ¶¶ 3-5.

Regeneron filed a fact witness declaration from Mr. Clark regarding the effect of biosimilar market entry on Regeneron and Eylea and Eylea HD. Mr. Clark is Vice President of Regeneron's Ophthalmology Commercial Business Unit, a role he has held since 2020. Clark Decl. ¶ 1. Mr. Clark's focus at Regeneron has been on the commercialization of Eylea and Eylea HD. Id. ¶ 3.

**2. Amgen's Declarants**

Amgen filed an expert declaration from Dr. Chamow regarding infringement and validity of the '865 patent. Dr. Chamow holds a Ph.D. in Biochemistry and is the founder of Chamow and Associates, Inc., a consulting firm that provides product development and guidance and advice to pharmaceutical and biotechnology companies. Chamow Decl. ¶¶ 14, 20. Chamow and Associates, Inc. was acquired by Alira Health, and in 2024, Dr. Chamow transitioned to Principal Consultant. Id. ¶ 20. Dr. Chamow's work includes the characterization of and formulation development for recombinant proteins (including fusion proteins). Id. Dr. Chamow has more than 35 years of biopharmaceutical experience. Id. ¶ 14. Dr. Chamow was employed as a research scientist at Genentech from 1987 to 1998, where he designed and developed recombinant Fc-fusion proteins and monoclonal antibodies, including for manufacturing and testing at clinical scale. Id.

Amgen filed an expert declaration from Dr. David Blackburn addressing irreparable harm, balance of the hardships, and public interest. Dr. Blackburn holds a Ph.D. in Economics from Harvard University and is an applied microeconomist. Blackburn Decl.

¶ 1.[13] Dr. Blackburn is the managing director and head of the life science practice for NERA, an economic consulting firm, where he focuses on intellectual property, antitrust, and damages issues, with a substantial portion of this work focused on the pharmaceutical industry. Id. ¶¶ 1-2. Dr. Blackburn has analyzed damages in numerous patent-infringement cases and has taught courses on economics. Id. ¶ 2.

Amgen filed a declaration from a fact witness, Mr. Brian Heath, regarding the harms that Amgen would suffer if the Court were to enjoin Amgen and prevent it from launching ABP 938 until after a trial on the merits. Mr. Heath serves as Vice President & General Manager of the U.S. Oncology Business Unit at Amgen. Heath Decl. ¶ 1. Mr. Heath’s responsibilities involve leading marketing, coverage, pricing, strategy, and contract operations at Amgen for ABP 938. Id. ¶¶ 1-3.

**B. Regeneron’s ’865 Patent**

The United States Patent and Trademark Office (“USPTO”) issued the ’865 patent, titled “VEGF Antagonist Formulations Suitable for Intravitreal Administration,” on August 10, 2021, to

[13] Citations to “Blackburn Decl.” refer to the July 3, 2024 Expert Declaration of David Blackburn, Ph.D. ECF No. 206-26. Citations to “Blackburn Ex. B-” refer to the exhibits attached to the Blackburn Decl. ECF Nos. 206-27 to 206-36.

Regeneron Pharmaceuticals, Inc. as assignee from named inventors Eric Furfine, Daniel Dix, Kenneth Graham, and Kelly Frye. '865 patent at Cover Page. The '865 patent claims priority through continuation and divisional applications to Provisional Patent Application No. 60/814,484 ("'484 provisional") (ECF No. 180-12, Trout Ex. 96), which is identified as having been filed on June 16, 2006. Id.

**C. Asserted Claims**

The following table lists the Asserted Claims Regeneron alleges that Amgen infringes on this motion and the claims from which they depend. See Motion at 5-6.

| **Claims of the '865 patent** | |
|---|---|
| Claim 1<br>(*unasserted*) | 1. A vial comprising an ophthalmic formulation suitable for intravitreal administration that comprises:<br>a vascular endothelial growth factor (VEGF) antagonist,<br>an organic co-solvent,<br>a buffer,<br>a stabilizing agent, |

** [redacted] **



| | |
|---|---|
| | wherein said VEGF antagonist fusion protein is glycosylated and comprises amino acids 27-457 of SEQ ID NO:4; and<br>wherein at least 98% of the VEGF antagonist is present in native conformation following storage at 5° C. for two months as measured by size exclusion chromatography. |
| Claim 2 | 2. The vial of claim 1, wherein the concentration of said VEGF antagonist fusion protein is 40 mg/ml, and wherein said organic co-solvent comprises polysorbate. |
| Claim 3 | 3. The vial of claim 2, wherein said organic co-solvent comprises 0.01% to 3% polysorbate. |
| Claim 26<br>(*unasserted*) | 26. A pre-filled syringe comprising an ophthalmic formulation suitable for intravitreal administration comprising:<br>a vascular endothelial growth factor (VEGF) antagonist fusion protein,<br>an organic co-solvent,<br>a buffer, and<br>a stabilizing agent; |

| | |
|---|---|
| | wherein said VEGF antagonist fusion protein is glycosylated and comprises amino acids 27-457 of SEQ ID NO:4; and<br>wherein at least 98% of said VEGF antagonist fusion protein is present in native conformation following storage at 5° C. for two months as measured by size exclusion chromatography. |
| Claim 27 | 27. The pre-filled syringe of claim 26, wherein the concentration of said VEGF antagonist fusion protein is 40 mg/ml, and wherein said organic co-solvent comprises polysorbate. |
| Claim 28 | 28. The pre-filled syringe of claim 27, wherein said organic co-solvent comprises 0.01% to 3% polysorbate. |

**D. Definition of a POSA**

The parties have advanced slightly differing definitions of a Person of Ordinary Skill in the Art ("POSA"). The definition does not appear to be an issue of material dispute at this time, as neither party contends the differences between these

definitions affect assessment of the issues raised. The findings detailed below would be no different were the Court to perform the required analysis under the definition of the POSA adopted in the Mylan case or under Amgen's proposed definition. The Court adopts the definition applied in the Mylan case, for the reasons given in the Mylan case:

> [T]he POSA 'would be a professional with a master's degree at least in a relevant field, so a technical field directly relevant to formulations here.' Tr. 2092:6-17 (Trout); PDX-9.002 (explaining that the POSA 'would have held an advanced degree, such as a Master's in a biopharmaceutical science, or a related discipline, such as chemical engineering, and several years of experience in the development of biologics products. Alternatively, the POSA could have a Ph.D. in such discipline and less experience. The POSA may collaborate with others, including a medical doctor with experience treating ophthalmic diseases.').

Mylan, 2024 WL 382495, at *22.

**E. Prior Claim Constructions**

In the earlier Mylan case, the Court was asked to expressly construe two claim terms:

> The Court construed "organic cosolvent" to mean "an organic substance added to the primary solvent to increase the solubility of the solute, here a VEGF antagonist" . . . [and] construed "native conformation" to mean "the original intact form of the VEGF antagonist, which is a form

> that does not exhibit chemical or physical instability."

Mylan, 2024 WL 382495, at *17 (quoting Mylan, 1:22-cv-61, ECF No. 427 at 20, 25-26). The parties have applied those constructions in these preliminary injunction proceedings.

In Mylan, the Court also addressed Mylan's challenge to the validity of the claims of the '865 patent under 35 U.S.C. § 112 for lack of written description and lack of enablement. Id. at *63-70. In Mylan, the defendants "criticize[d] the claims for reciting the structural categories of 'buffer' and 'stabilizing agent' instead of specific chemical structures." Id. at *64. Regeneron responded to this challenge by adducing testimony at trial that "buffers were 'a known set of structures,'" represented by the "handful of buffers that the POSA would consider in a formulation . . . ." Id. (citing Mylan Trial Tr. at 1509:13-1510:9, 1494:6-25 (ECF No. 206-6, Chamow Ex. C-5)). Dr. Trout offered trial testimony in support of Regeneron's position. Following trial, after considering the trial testimony and admitted evidence, the Court issued a decision upholding the validity of the asserted claims of the '865 patent. In doing so, the Court made rulings on the scope of the claims and whether the properly construed claims are commensurate with the scope of the specification. See Revolution Eyewear Inc. v. Aspex Eyewear Inc.,

563 F.3d 1358, 1367 (Fed. Cir. 2009) ("[A] claim construction and a written description analysis are two separate processes. However, they serve related functions in determining whether a claim is commensurate with the scope of the specification — a court looks to the specification for guidance to ascertain the scope of the claim in claim construction; it also looks to the specification to decide whether the disclosure provides adequate support for the claims in written description analysis."); McRO, Inc. v. Bandai Namco Games Am., Inc., 959 F.3d 1091, 1100 (Fed. Cir. 2020) ("[T]he 'enablement inquiry necessarily depends on an interpretation of the claims.'") (quoting Liquid Dynamics Corp. v. Vaughan Co., 449 F.3d 1209, 1224 n. 2 (Fed. Cir. 2006)).

The Court's trial decision, upholding validity over Mylan's written description challenge, credited Dr. Trout's analysis and conclusion. Mylan, 2024 WL 382495, at *64 ("The Court credits Dr. Trout's analysis and conclusion."). The Court also credited Regeneron's expert testimony "that each of the claim limitations in the Product Patent have 'common structural features,' including the 'very specific' VEGF antagonist and the categories of organic co-solvent, buffer, and stabilizing agent." Id. at *64 (citing Mylan Trial Tr. at 2109:17-2110:3 (ECF No. 206-6, Chamow Ex. C-6)); see also id. at *65 ("[H]ere the claims are limited to a

specific protein molecule at a specific concentration along with other known structures (a buffer, stabilizing agent, and polysorbate 20)") (emphasis added).

In Mylan, the Court found that buffers were "a known set of structures" represented by the "handful of buffers" that the POSA would consider for the claimed formulation, and the POSA therefore could "visualize or recognize" the claimed buffer structures. Id. at *64 (citing Mylan Trial Tr. at 1494:6-25 (ECF No. 206-6, Chamow Ex. C-5)). The Court thus found that, for such known classes of structures, the patent did not need to provide an exhaustive description to the POSA. Id. The Court concluded that "[s]ince the specification here identifies the common structural features of the claimed compositions — 40 mg/ml aflibercept, polysorbate 20, a buffer, and a stabilizing agent — and provides multiple examples thereof," the written description requirement was satisfied. Id.; see also id. ("Following this analysis, Dr. Trout testified that the Product Patent provided 'species or examples representative of the genus,' claimed structures rather than function, and thus provided adequate written description for the asserted claims.") (citing Mylan Trial Tr. at 2111:1-21 (ECF No. 206-6, Chamow Ex. C-6)).

Case: 24-2351 Document: 35 Filed: 10/17/2024



The Court similarly credited testimony from Dr. Trout in the context of rejecting Mylan's enablement challenges. The Court credited Dr. Trout's testimony that "the asserted claims are 'narrow' rather than broad, because they claim 'one specific biologic molecule . . . with a specific sequence ID' at just one concentration (40 mg/m), in a vial for intravitreal administration, and further claim specific structural components including a buffer, stabilizing agent, and the organic co-solvent of polysorbate 20 within a 'narrow range.'" Id. at *66 (emphasis added) (citing Mylan Trial Tr. at 2089:10-2090:4 (ECF No. 206-6, Chamow Ex. C-6)). The Court found that the defendants had not proven that identifying formulations having the claimed structure "40 mg/ml of glycosylated aflibercept and polysorbate 20 within the specified concentration range, plus a buffer and a stabilizing agent" would require undue experimentation. Id. at *70 (emphasis added).

With respect to the claimed component of "a buffer," the Court found that the "excipients recited in the claims are also structures: categories for the buffer and stabilizing agent, and a specific substance (polysorbate 20) for the organic co-solvent." Id. (emphasis added).

**ORDER DENYING REGENERON'S MOTION FOR PRELIMINARY INJUCTION**

The Court granted Regeneron's preliminary injunction motion in Formycon. In that case, Formycon proposed that the "buffer" term be construed to refer "to a phosphate buffer, and not any other type of buffer." Formycon, 1:23-cv-97, ECF No. 252 at 47. Regeneron proposed the term be construed as "a substance that resists changes to pH upon addition of an acid or base within an optimal pH range through a proton-donating component and/or a proton-accepting component, including, for example, histidine, phosphate, and proteins like aflibercept." Id. The Court adopted Regeneron's construction for the purpose of resolving the disputes at issue in Formycon. Id. Like Mylan's product (which the Court had earlier found to be infringing), Formycon's product contains a separate histidine buffer. Id. at 62-63. Formycon argued that the claim term "a buffer" should be construed as limited to a phosphate buffer. Based on this proposed limiting construction, Formycon argued that it does not infringe. Id. at 61-62. As discussed in the Formycon decision, "a buffer" is not so limited. Id. Because the term "buffer" in the '865 patent is not limited to a phosphate buffer, and Formycon's product contains a separate histidine buffer, the Court found that Regeneron had established a likelihood that Formycon's product would infringe the claims.

As noted above, in Formycon, the Court did not address the claim construction issue that Amgen raises in this case. Id. at 62-63.

## V. DECISION SUMMARY

For readability, the Court provides this brief summary of its findings here.

As reflected during the arguments presented during the hearing conducted on this motion, the parties' central dispute is whether the Asserted Claims require that the "VEGF antagonist" and the "buffer" be separate and distinct components of the claimed formulation. During the hearing, the Court inquired whether it had previously addressed this claim construction dispute in any of its prior rulings in the MDL. Hearing Tr. at 52:10-11. Counsel for Amgen confirmed that the Court has not been asked to consider whether the claimed aflibercept can also satisfy the separately claimed buffer of the Asserted Claims. Id. at 52:1-17. Counsel for Regeneron did not disagree. Id. at 20:9-16. Accordingly, this Court resolves this dispute, as it has arisen for the first time in the context of this case.

Amgen proposes that the Asserted Claims require that the claimed "VEGF antagonist" and the claimed "buffer" be separate components. Opp. at 1-2, 6-12. Regeneron argues that the VEGF antagonist can also satisfy the limitation of the claimed buffer.

Reply at 1-12. This dispute requires the Court to construe for the first time the claim term "an ophthalmic formulation . . . that comprises: a vascular endothelial growth factor (VEGF) antagonist[,] an organic co-solvent, a buffer, and a stabilizing agent." '865 patent at claims 1 and 26. The Court addresses the parties' various arguments in detail below and briefly summarizes its ruling on this claim construction issue, and the implications of the Court's construction, here.

The Federal Circuit addressed the claim construction issue of separate versus overlapping claim elements in Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP, 616 F.3d 1249 (Fed. Cir. 2010), stating: "Where a claim lists elements separately, the clear implication of the claim language is that those elements are distinct components of the patented invention." Id. at 1254 (cleaned up). Both parties cite and discuss Becton, as well as later cases applying Becton, in their briefs. Becton and its progeny were likewise a focus of the hearing. Hearing Tr. at 26:17-32:10, 56:18-59:7, 62:23-66:16.

Having considered the parties' arguments, legal precedent, and evidence, and for the reasons set forth in detail below, the Court construes the Asserted Claims to require that the claimed "VEGF antagonist" be a separate component from the claimed

**ORDER DENYING REGENERON'S MOTION FOR PRELIMINARY INJUCTION**

"buffer." There is no dispute that ABP 938 lacks a separate buffer.[14] Amgen has therefore raised a substantial question of noninfringement, and Regeneron has not demonstrated a likelihood of success on merits. Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008) (identifying factors as: (1) likelihood of success on the merits, (2) irreparable harm, (3) balancing of the hardships, (4) public interest).

On this record, where there is no dispute as to infringement under the Court's construction, the first Winter factor outweighs any other basis for preliminary injunctive relief, even if the other three factors are assumed to weigh in Regeneron's favor. "A preliminary injunction should not issue if the accused infringer raises a substantial question concerning either infringement or validity." Metalcraft of Mayville, Inc. v. The Toro Co., 848 F.3d 1358, 1364 (Fed. Cir. 2017) (internal quotations and citation omitted); see also Mylan Institutional LLC v. Aurobindo Pharma Ltd., 857 F.3d 858, 866 (Fed. Cir. 2017) ("A preliminary injunction should not issue if the accused infringer raises a substantial question [of] infringement . . . ."); see also Genentech, Inc. v. Novo Nordisk A/S, 108 F.3d 1361, 1364 (Fed. Cir. 1997) ("[I]f [Defendant] raises a 'substantial question' concerning validity,

[14] Trout Decl. ¶ 232; Chamow Decl. ¶ 125.

enforceability, or infringement (i.e., asserts a defense that [Plaintiff] cannot show 'lacks substantial merit') the preliminary injunction should not issue."); Sofamor Danek Grp., Inc. v. DePuy-Motech, Inc., 74 F.3d 1216, 1219 (Fed. Cir. 1996) (holding that likelihood of success on the merits is "central to the movant's burden."). The Court finds that the substantial question raised is central and weighs heavily against granting a preliminary injunction.

A preliminary injunction cannot issue absent a "clear showing" that all four requirements are satisfied. Leaders of a Beautiful Struggle v. Baltimore Police Dep't, 979 F.3d 219, 226 (4th Cir. 2020). Plus, the "[p]laintiff bears the burden of establishing that each of these factors supports granting the injunction." Direx Israel Ltd. v. Breakthrough Med. Corp., 952 F.2d 802, 812 (4th Cir. 1991) (internal quotations and citation omitted); see Winter, 555 U.S. at 22 (recognizing that because a preliminary injunction is "an extraordinary remedy," it "may only be awarded upon a clear showing that plaintiff is entitled to such relief"). Accordingly, a court need not address all four Winter factors if one or more factors is not satisfied. See Henderson, 902 F.3d at 439.

** [redacted] **

**ORDER DENYING REGENERON'S MOTION FOR PRELIMINARY INJUCTION**

The Court, therefore, does not address the other Winter factors. See Jack Guttman, Inc. v. Kopykake Enterprises, Inc., 302 F.3d 1352, 1356 (Fed. Cir. 2002) ("While granting a preliminary injunction requires analysis of all four factors . . . a trial court may . . . deny a motion based on a patentee's failure to show any one of the four factors — especially either of the first two — without analyzing the others.") (citing Polymer Techs., Inc. v. Bridwell, 103 F.3d 970, 973-974 (Fed. Cir. 1996)); Henderson, 902 F.3d at 439 (holding "nothing . . . suggests that a district court must mechanically consider all four Winter factors if one is clearly absent").

## VI. ANALYSIS

### A. Preliminary Injunction Standards

The Patent Act provides that in patent infringement cases, courts "may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable." 35 U.S.C. § 283. "A preliminary injunction is an extraordinary remedy never awarded as of right." Takeda Pharms. U.S.A., Inc. v. Mylan Pharms. Inc., 967 F.3d 1339, 1345 (Fed. Cir. 2020) (quoting Winter, 555 U.S. at 24). The movant must establish that: (1) the plaintiff likely will succeed on the merits at trial; (2) the plaintiff will be

irreparably injured if an injunction is not granted; (3) the balance of hardships favors the plaintiff; and (4) the public interest will be furthered by an injunction. See Winter, 555 U.S. at 20.

The likelihood of success factor is "central to the movant's burden" and "requires proof on both validity and infringement." Sofamor, 74 F.3d at 1219. Accordingly, if an alleged infringer "raises a 'substantial question' concerning validity, enforceability, or infringement (i.e., asserts a defense that [the patentee] cannot show 'lacks substantial merit') the preliminary injunction should not issue." Genentech, 108 F.3d at 1364. When the patentee fails to show a likelihood of success on infringement, preliminary injunctive relief may be denied. See, e.g., id.; Mylan, 857 F.3d at 866; Sofamor, 74 F.3d at 1219; Takeda Pharms. U.S.A., Inc. v. West-Ward Pharm. Corp., 785 F.3d 625, 634 (Fed. Cir. 2015) (affirming denial of preliminary injunction for lack of likelihood of success on infringement); Abbott Labs. v. Sandoz, Inc., 566 F.3d 1282, 1299 (Fed. Cir. 2009).

**B. Regeneron is not likely to succeed on the merits.**

**1. The Court construes the disputed claim term "an ophthalmic formulation . . . . that comprises . . ." to require a "buffer" that is separate and distinct from the "VEGF antagonist."**

"Only when a claim is properly understood can a determination be made whether the claim 'reads on' an accused device or method." Amazon.com, Inc. v. Barnesandnoble.com, Inc., 239 F.3d 1343, 1351 (Fed. Cir. 2001). Thus, "[b]efore deciding whether an accused device infringes asserted claims, a court must first construe the claim language to determine the meaning and scope of the claims." Rambus Inc. v. Infinion Techs, AG, 318 F.3d 1081, 1087 (Fed. Cir. 2003).

The Supreme Court has explained: "[A] district court's construction of a patent claim, like a district court's interpretation of a written instrument, often requires the judge only to examine and to construe the document's words without requiring the judge to resolve any underlying factual disputes. As all parties agree, when the district court reviews only evidence intrinsic to the patent (the patent claims and specifications, along with the patent's prosecution history), the judge's determination will amount solely to a determination of law . . . ." Teva Pharms. USA, Inc. v. Sandoz, Inc., 574 U.S. 318, 331 (2015). Likewise, "the ultimate question of the proper

construction of the patent [is] a question of law in the way that we treat document construction as a question of law . . . ." Id. at 325 (citing Markman v. Westview Instruments, Inc., 517 U.S. 388-391).

"[T]he claims of a patent define the invention to which the patentee is entitled the right to exclude." Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (cleaned up). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a [POSA] in question at the time of the invention." Id. at 1313. Claim construction "begin[s] with the intrinsic evidence, which includes the claims, written description, and prosecution history." Seabed Geosolutions (US) Inc. v. Magseis FF LLC, 8 F.4th 1285, 1287 (Fed. Cir. 2021). "The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." Phillips, 415 F.3d at 1316 (quoting Renishaw PLC v. Marposs Societa' per Azioni, 158 F.3d 1243, 1250 (Fed. Cir. 1998)).

The parties dispute how to construe the claim term "an ophthalmic formulation . . . that comprises: a vascular endothelial growth factor (VEGF) antagonist[,] an organic co-solvent, a buffer, and a stabilizing agent." Amgen proposes that

this term should be construed to mean "a formulation that comprises four separate components: (1) a VEGF antagonist; (2) an organic co-solvent; (3) a buffer; and (4) a stabilizing agent." Regeneron argues that the Asserted Claims permit one formulation component category, namely, the "VEGF antagonist," to satisfy multiple of the claim elements, namely, both the "VEGF antagonist" element and the "buffer" element.

Accordingly, the central dispute between the parties on the construction of this term is whether the claimed "buffer" must be a separate and distinct component from the claimed "VEGF antagonist." As explained infra, the Court construes the claims to require a buffer that is separate and distinct from the VEGF antagonist. In particular, the Court construes the term "an ophthalmic formulation . . . that comprises: a vascular endothelial growth factor (VEGF) antagonist[,] an organic co-solvent, a buffer, and a stabilizing agent" to mean "a formulation that comprises four separate components: (1) a VEGF antagonist; (2) an organic co-solvent; (3) a buffer; and (4) a stabilizing agent."

**2. The claims separately list "a VEGF antagonist" and "a buffer," giving rise to a presumption that they are separate and distinct components of the claimed formulation.**

Both parties cite and discuss a line of cases addressing the issue of whether separately listed elements should be construed to require separate components. The Federal Circuit has consistently held that separately listing elements in a claim creates a presumption that each element is a separate and distinct component of the invention. In Becton, the Federal Circuit held:

> Where a claim lists elements separately, the clear implication of the claim language is that those elements are distinct components of the patented invention." 616 F.3d at 1254 (cleaned up). The Federal Circuit has further explained that by listing elements separately, there is "a presumption that those components are distinct."

Kyocera Senco Indus. Tools Inc. v. Int'l Trade Comm'n, 22 F.4th 1369, 1382 (Fed. Cir. 2022) ("The asserted claims list those elements separately . . . . There is, therefore, a presumption that those components are distinct."); Google v. Ecofactor, 92 F.4th 1049, 1058 (Fed. Cir. 2024) ("[T]here is a 'presumption' that separately listed claim limitations may indicate separate and distinct physical structure. . . ."); HTC Corp. v. Cellular Commc'ns Equip., LLC, 701 F. App'x 978, 982 (Fed. Cir. 2017) ("The separate naming of two structures in the claim strongly implies

that the named entities are not one and the same structure.") (citing Becton, 616 F.3d at 1254). The Court considers this line of cases in construing the claims.

Initially, the parties do not dispute the Asserted Claims separately list the claimed "VEGF antagonist" and the "buffer." '865 patent at claims 1 and 26; Hearing Tr. at 20:2-3. Under Becton, therefore, the separate listing of these elements establishes a presumption the claimed "VEGF antagonist" and "buffer" are distinct components. Id.; see also Kyocera, 22 F.4th at 1382; Google, 92 F.4th at 1058. The parties' dispute is not whether the claims list these four elements separately, or whether the presumption applies, but whether this presumption is rebutted by the evidence of record.

**a. The claim language does not overcome the presumption of separateness and further supports that the claimed "VEGF antagonist" and the claimed "buffer" are separate components.**

To determine whether the presumption of separateness is rebutted, the Court must look to the intrinsic evidence, that is, the patent itself, including the claims and the specification. The cases the parties cite consistently hold that to overcome the presumption of separateness, the intrinsic record must indicate that the inventors disclosed and intended to claim a composition where one component can satisfy multiple claim limitations.

Becton, 616 F.3d at 1254-55 ("A long line of cases indicates that evidence intrinsic to the patent—particularly the patent's specification . . . is the primary source for determining claim meaning," finding "[t]here is nothing in the asserted claims to suggest that the hinged arm and the spring means can be the same structure" and "[t]he specification, moreover confirms that the spring means is a separate element from the hinged arm") (quoting in part Astrazeneca AB v. Mut. Pharm. Co., 384 F.3d 1333, 1336 (Fed. Cir. 2004)); Kyocera, 22 F.4th at 1382 ("No party has identified claim language overcoming the presumption . . . . Nor is there any language in the written description that overcomes that presumption"); Google, 92 F.4th at 1058 ("Here, the claim language and specification rebut any presumption . . . ."); Merck Sharp & Dohme, LLC v. Mylan Pharms. Inc., 1:19-cv-00101, 2022 U.S. Dist. LEXIS 195204, at *61 (N.D.W. Va. Sept. 21, 2022) ("Nothing in the '921 patent prevents a single ingredient, such as [REDACTED] from satisfying multiple claim limitations").

In the context of pharmaceutical formulation claims presenting a similar listing of elements, courts have looked to whether the intrinsic evidence shows that the patentee intended, as expressed through the patent's disclosures, that separately listed elements could be satisfied by a single component. See Sun

Pharm. Indus. Ltd. v. Saptalis Pharms., LLC, 18-cv-648, 2019 WL 2549267, at *7 (D. Del. June 19, 2019) (Bryson, J.) ("[T]he Court must look beyond the functionality of the claim terms to determine whether the patentee intended a single ingredient to satisfy both the sweetener and the polyhydroxy alcohol limitations."); Otsuka Pharm. Co., Ltd. v. Mylan Lab'ys Ltd., 22-cv-464, 2023 WL 5928313, at *3 (D. Del. Sept. 12, 2023) ("Nothing else in claim 9 or any of the rest of the claims suggests that a single excipient can satisfy more than one of the agent terms. Neither does the specification.").

Courts may also consider other factors arising from the intrinsic evidence. In Becton, referring to the intrinsic record only, the Court considered whether having two claim elements satisfied by the same structure would have "render[ed] the asserted claims nonsensical." Becton, 616 F.3d at 1255; see also Bot M8 LLC v. Sony Interactive Entm't. LLC, 2022-cv-1569, 2023 WL 5606978, at *4 (Fed. Cir. Aug. 30, 2023). The Federal Circuit has held that claims should not be construed in a manner that renders a term "superfluous." Digital-Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc., 672 F.3d 1270, 1275 (Fed. Cir. 2012) (noting "the importance of construing claim terms in light of the surrounding claim language, such that words in a claim are not rendered

superfluous"); SSI Techs., LLC v. Dongguan Zhengyang Elec. Mech. LTD., 59 F.4th 1328, 1335 (Fed. Cir. 2023) (rejecting construction rendering a claim element "superfluous"); Exxon Chem. Patents, Inc. v. Lubrizol Corp., 64 F.3d 1553, 1557 (Fed. Cir. 1995) (holding that the court "must give meaning to all the words in [the] claims."). These principles guide the Court's analysis.

The Court first addresses the claim language. All the claims of the '865 patent obviously list the "VEGF antagonist" and "buffer" separately. See '865 patent at claims. Regarding the dependent claims, claim 2 recites a VEGF antagonist concentration of "40 mg/ml." Claim 7 recites a different concentration range of the buffer, of "5-25 mM." '865 patent at claims 2 and 7.[15] The components are listed with different concentrations and different units of measurement. The VEGF antagonist is measured in "mg/mL" (a unit of measurement), whereas the buffer is measured in the "mM" (a different unit of measurement). The clear implication of the claims' use of different units of measurement for these two components is that the components are separate and distinct.[16]

---

[15] Claim 7 depends from claim 2 (claim 7 refers back to claim 5, which refers back to claim 2, which refers back to claim 1). Thus, claim 7 includes all the limitations of claims 1, 2, and 5.

[16] Dr. Chamow explains, and Dr. Trout does not dispute, the different units of measurement in the dependent claims are consistent with how the POSA would measure distinct components.

** [redacted] **

**ORDER DENYING REGENERON'S MOTION FOR PRELIMINARY INJUCTION**

The parties do not dispute that a POSA would have been able to convert the claimed 40 mg/ml of aflibercept in claim 2 to its corresponding amount measured in mM, which equals 0.347 mM of aflibercept.[17] Chamow Decl. ¶ 171; Reply at 11 n.3 ("[T]he POSA would perform an 'easy calculation' to convert between the two, Chamow Tr. 52:13-54:4."). This amount (0.347 mM of aflibercept) is substantially outside of the claimed concentration range of 5-25 mM recited for the "buffer" in claim 7. This claim language is rendered nonsensical unless the "VEGF antagonist" and the "buffer" are interpreted as separate and distinct components. Accordingly, the dependent claims are consistent with the clear implication that the claimed "buffer" must be separate from the "VEGF antagonist," and further support that this is the proper construction.

In addition, it is undisputed that aflibercept is always present in the claimed formulation, as indicated by the claim language specifying the amino acid sequence for aflibercept

---

Chamow Decl. ¶¶ 39-40 (explaining "mg/ml" is the standard way to refer to concentration of an active ingredient in a pharmaceutical formulation whereas "mM" designates a concentration of a buffer, by denoting the number of ionizable molecules available to provide buffering capacity).

[17] As discussed later herein, similar calculations in the context of the '865 patent specification were also discussed at the hearing. Hearing Tr. at 61:8-62:7.

("wherein said VEGF antagonist fusion protein . . . comprises amino acids 27-457 of SEQ ID NO:4 . . ."). In view of this claim language, which requires aflibercept be present in the formulation, permitting the "VEGF antagonist" to also be the recited "buffer" would render the term "buffer" superfluous and nonsensical in this context.

Regeneron argues that the recited "buffer" is not necessarily superfluous because the POSA would have understood that the aflibercept does not always function as a buffer. Motion at 12-13. Amgen responds that Regeneron has not cited any disclosure in the specification of the '865 patent that references this concept, or that would lead a POSA to understanding such a concept. Opp. at 14. Regeneron further argues that while the Asserted Claims are not limited with respect to pH, the POSA would have understood that aflibercept is a buffer within a narrow pH range, and that, in situations outside of that pH range, the formulation might also require a separate buffer. Motion at 12-13; Reply at 4. Amgen responds that the '865 patent includes dependent claims that recite the requirements of both aflibercept and a "buffer" even though the recited pH ranges are within the narrow range in which Regeneron asserts aflibercept has buffering capacity, thus rendering "buffer" superfluous and nonsensical. '865 patent at

claims 9 and 34 (requiring a formulation with 40 mg/ml of aflibercept and "a buffer," wherein "said buffer comprises a pH about 6.2-6.3"); Opp. at 14-15; Chamow Decl. ¶¶ 203-214.[18] See In re Varma, 816 F.3d 1352, 1363 (Fed. Cir. 2016) (rejecting a claim construction that was inconsistent with all of the claims of a patent, noting "the principle that the same phrase in different claims of the same patent should have the same meaning is a strong one, overcome only if it is clear that the same phrase has different meanings in different claims") (cleaned up); see also Boss Indus., Inc. v. Yamaha Motor Corp. U.S.A., Inc., 333 F. App'x 531, 541 (Fed. Cir. 2009) (rejecting construction that is "contradicted by the unasserted claims"). In view of these dependent claims, the Court finds that the intrinsic evidence supports construing the Asserted Claims to require a separate buffer. A contrary construction renders the term "buffer" superfluous and nonsensical.

Additionally, Amgen notes that Regeneron's argument is inconsistent with its arguments in the Mylan case where it admitted

[18] The '865 patent discloses that the VEGF antagonist (aflibercept) is only stable within a pH range of 5.8-7.0, and not at just any pH. '865 patent at 2:38; Chamow Decl. ¶¶ 209-210. Consistent with the specification's teaching, the Court held in Mylan that the claims were directed to "a buffer such as phosphate and other known buffers that would achieve the disclosed pH range" (i.e., a pH of 5.8-7.0). Mylan, 2024 WL 382495, at *67 (emphasis added).

with respect to the "buffer" that "whether it works or not, it's structurally limited." Mylan Trial Tr. at 33:1-7 (ECF No. 206-6, Chamow Ex. C-3). If aflibercept has a structure that satisfies the "buffer" element, "whether it works or not," then the term "a buffer" would be rendered superfluous because aflibercept, which is undisputedly a required element of the asserted claims, would likewise always satisfy the "buffer" limitation.

Having considered the claims through the prism of the above principles, the Court finds the claim language does not rebut the presumption of separateness and, in fact, further supports that the "VEGF antagonist" and "buffer" must be separate components.

**b. The specification does not provide any evidence to overcome the presumption of separateness and further supports that the "VEGF antagonist" and "buffer" are separate components.**

"[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" Phillips, 415 F.3d at 1315 (quoting Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

As instructed by Becton and its progeny, the Court looks to the specification to determine whether there is evidence sufficient to rebut the presumption that the claims require separate and distinct components. 616 F.3d at 1254. Like the

claims, the specification of the '865 patent uniformly describes the "VEGF antagonist" and the "buffer" as separate and distinct components of the formulation. The specification describes a VEGF antagonist as "a compound capable of blocking or inhibiting the biological action of vascular endothelial growth factor (VEGF), and includes fusion proteins capable of trapping VEGF." '865 patent at 6:27-30. In a separate description, the specification describes that "the buffering agent, may be, for example, phosphate buffer." Id. at 2:45-48. The specification does not suggest that the VEGF antagonist can be a buffer or vice versa. Regeneron has not identified any such disclosure in the specification of the '865 patent. See Reply at 10.

The specification states: "Preferably, the liquid formulation comprises a pharmaceutically effective amount of the VEGF antagonist. The formulation can also comprise one or more pharmaceutically acceptable carriers, buffers, tonicity agents, stabilizers, and/or excipients." '865 patent at 6:65-7:2 (emphasis added). The phrase "can also comprise" indicates the "buffer" is separate from the "pharmaceutically effective" VEGF antagonist. Id.; Chamow Decl. ¶ 175.

There is no dispute that, in every example and every embodiment in the '865 patent, the formulation is described as

containing both a VEGF antagonist and a separate buffer. The specification includes eight example formulations and twenty-two (22) embodiments, each of which describes the VEGF antagonist (aflibercept) plus a buffer. ’865 patent at Examples (8:32-58, 8:60-9:17, 9:19-44, 9:45-10:10, 10:13-38, 10:40-67, 11:1-26, 12:1-26); id. at Embodiments (2:33-38, 2:53-57, 2:58-62, 2:63-67, 3:1-5, 3:6-10, 3:11-16, 3:36-40, 3:40-43, 3:48-52, 3:53-57, 3:66-4:2, 4:2-6, 4:11-19, 4:22-26, 4:31-35, 4:36-40, 4:40-44, 4:45-48, 4:48-53, 4:54-58, 4:58-62). Regeneron has not cited any contrary examples or embodiments in the specification indicating that the VEGF antagonist could serve as the buffer. See Reply at 10.

Amgen identifies evidence in the specification indicating the VEGF antagonist and the buffer cannot be the same component. Amgen notes that, in all but two embodiments of the ’865 patent, the buffer is described as a phosphate buffer. Hearing Tr. at 61:8-14. Thus, in all those embodiments it is clear the VEGF antagonist is not the buffer, because the buffer is a phosphate buffer. In the two embodiments that do not expressly identify the buffer as a phosphate buffer, the specification discloses that the VEGF antagonist is present in an amount of “1-100 mg/ml.” ‘865 patent at 2:34, 3:12. These two disclosures further specify the amount of the “buffering agent” as “5-40 mM.” Id. at 2:37, 3:14. Amgen

argues that, even at the highest amount disclosed in the '865 patent (100 mg/ml of aflibercept) a conversion of 100 mg/ml of aflibercept to its corresponding mM concentration equals, at most, 0.87 mM of aflibercept. Chamow Decl. ¶ 171; Reply at 11 n.3. This is significant because the highest amount of aflibercept disclosed in the '865 patent (0.87 mM aflibercept) is well below the lowest concentration of "buffer" described in the '865 patent (5 mM of buffer). Chamow Decl. ¶ 171. Based on this calculation, which is not disputed, the VEGF antagonist and the buffer could not possibly be the same. It is also the case throughout the entire specification that the highest concentration of VEGF antagonist described is 100 mg/ml (or 0.87 mM aflibercept), and the lowest concentration of buffer described is 5 mM. Accordingly, a construction permitting the "buffer" and the "VEGF antagonist" to be the same, as Regeneron proposes, would be nonsensical because these concentration ranges do not overlap.

In terms of intrinsic evidence, Regeneron identifies two passages from the specification in support of its argument that the VEGF antagonist and buffer are not separate and distinct. One passage is from the background section of the '865 patent and

refers to U.S. Patent No. 6,777,429 ("the '429 patent").[19] '865 patent at 2:1-4; Motion at 12; Trout Decl. ¶ 81; Reply at 9-10. Regeneron argues that the '429 patent teaches certain components (other than the VEGF antagonist and the buffer) disclosed by the '865 patent can have different functions than those specified in the '865 patent, such that all components can be presumed to have more than one function within the formulation. Motion at 12; Reply at 10. Amgen responds that a citation to something outside the '865 patent, that does not disclose that aflibercept can be a buffer, does not overcome what is in the specification, including the fact that every example and embodiment in the specification describes the VEGF antagonist and buffer as separate components. Opp. at 11.

Regardless of whether the '429 patent was properly incorporated by reference into the '865 patent, the Court finds that it is insufficient to overcome what is repeatedly and consistently described in the specification of the '865 patent. Trustees of Columbia Univ. v. Symantec Corp., 811 F.3d 1359, 1368 (Fed. Cir. 2016) ("[F]leeting references cannot overcome the

[19] The '429 patent is cited in the background section of the '865 patent for the proposition that: "Ophthalmic formulations are known, see for example, U.S. Pat. Nos. 7,033,604 and 6,777,429. An ophthalmic formulation of a VEGF antibody is described in U.S. Pat. No. 6,676,941." '865 patent at 2:1-4.

** [redacted] **

**ORDER DENYING REGENERON'S MOTION FOR PRELIMINARY INJUCTION**

overwhelming evidence in the specification[.]"). Regeneron does not contend that the '429 patent addresses whether aflibercept can serve as a buffer, and there is no dispute that the '429 patent does not relate to either aflibercept or protein formulations where the protein serves as a buffer. See Reply at 10.

Second, Regeneron points to a passage in the specification, which states: "Unless stated otherwise, all technical and scientific terms and phrases used herein have the same meaning as commonly understood by one of ordinary skill in the art to which the invention belongs." '865 patent at 5:39-42. This passage is not specific to the subject matter of the claims and describes and does not suggest that aflibercept can serve as a buffer in an ophthalmic formulation and does not otherwise support that proposition. The passage falls into the category of generic boilerplate language. D Three Enters., LLC v. SunModo Corp., 890 F.3d 1042, 1051 (Fed. Cir. 2018) ("[B]oilerplate language at the end of the . . . specification is not sufficient to show adequate disclosure of the actual combinations and attachments used in the . . . [c]laims.").

Having assessed the intrinsic evidence of record, the Court finds that neither of the passages Regeneron cited to the Court overcome the presumption that the "VEGF antagonist" and "buffer"

are separate components of the claimed formulation. The parties direct the Court to various decisions applying the Becton principles discussed above. Having considered these cases, the Court finds this case most similar to Sun Pharm. Indus. Ltd. v. Saptalis Pharms., LLC, No. 18-cv-648-WCB, 2019 WL 2549267 (D. Del. June 19, 2019) and Otsuka Pharm. Co. v. Mylan Lab'ys Ltd., No. 22-cv-464-CFC-JLH, 2023 WL 5928313 (D. Del. Sept. 12, 2023). In Sun, the court concluded that a single ingredient recited in the claims could not satisfy both the "sweetener" and "polyhydroxy alcohol" elements, because the description of the invention in the patent-in-suit "does not contemplate that a single ingredient can satisfy both the 'sweetener' and the 'polyhydroxy alcohol' limitations." 2019 WL 2549267, at *6. The court observed that "every exemplary formulation in the specification" lists the components as separate components. Id. Here, the '865 patent does not exemplify or suggest that the aflibercept can satisfy both the "VEGF antagonist" and "buffer" limitations, and every example and embodiment includes a buffer that is separate from, and present in addition to, the aflibercept. '865 patent at 8:32-12:26.

In Sun, the court considered that "it would be difficult for a single ingredient to fall within the concentration ranges for both the sweetener and the polyhydroxy alcohol limitations in claim

4." 2019 WL 2549267, at *6 n.3. The Sun court noted that a dependent claim required a sweetener to be in a range of about 55% to 65%, which incorporated the requirement of the independent claim that polyhydroxy alcohol be present in an amount of about 15% to 55%. Id. The court noted that those two amounts "overlap only at 'the about 55%' point, so the only way the ingredient could satisfy both requirements would be for the amount of the ingredient to be 'about 55%.'" Id. The court found that even if "it may be true that certain components" satisfy multiple components, the claims still required "separate ingredients" given the difficulty of that result. Id. at *7. Amgen argues that the situation in the '865 patent even more clearly dictates separateness, because the '865 patent discloses only ranges that do not overlap at all, even at a single point. Amgen notes the non-overlapping ranges make it a "physical impossibility" for the "VEGF antagonist" to also be the "buffer." Becton, 616 F.3d at 1255. A finding that the claimed VEGF antagonist and the claimed buffer could be met by a single component would thus lead to a nonsensical result.[20]

[20] Regeneron has not explained how to avoid these nonsensical results, which weighs in favor of concluding that the '865 patent "prevents" the possibility of the VEGF antagonist and buffer being one and the same component. Merck v. Mylan, 2022 U.S. Dist. LEXIS 195204, at *61 (N.D.W. Va. Sept. 26, 2022).

Case: 24-2351 Document: 35 Filed: 09/27/2024


** [redacted] **

**ORDER DENYING REGENERON'S MOTION FOR PRELIMINARY INJUCTION**

In Otsuka v. Mylan, another case cited and discussed by the parties as relevant to this issue, the court construed the claims to require four separate components (or agents) because the examples of each component provided in the specification "do not overlap," and because the specification "discusses each agent separately." 2023 WL 5928313, at *3. The court noted that in every example, the specification "discusses each agent separately." Id. Giving weight to that fact, the court concluded: "[T]he claims suggest that the elements have to be distinct components, and nothing else in the claims or the specification or any other evidence changes my mind about that." Id. Here, there is no dispute that the specification of the '865 patent identifies the VEGF antagonist and the buffer as separate and distinct components in every example and embodiment, and there is no dispute that the '865 patent lacks any disclosure stating that the functions are overlapping. Reply at 10; '865 patent at Examples (8:32-58, 8:60-9:17, 9:19-44, 9:45-10:10, 10:13-38, 10:40-67, 11:1-26, 12:1-26).

Regeneron argues that a POSA would have generally understood that one ingredient could satisfy multiple functions, relying on extrinsic evidence to do so. Motion at 12; Reply at 11. Amgen relies on Sun and Otsuka, where the courts considered the same

type of argument and found that a POSA's understanding that an ingredient may have multiple functions does not overcome the presumption of separateness absent support in the intrinsic record. Opp. at 9-10; Surreply at 5; Hearing Tr. at 63:25-65:7. In Sun, the court found that a POSA's understanding that formulation components may "share overlapping functionality" could not overcome the clear implication of the claim language and specification, which consistently identified those components separately. 2019 WL 2549267, at *6 ("[T]he Court must look beyond the functionality of the claim terms to determine whether the patentee intended a single ingredient to satisfy both the sweetener and the [] alcohol limitations."). Similarly, in Otsuka, the court agreed that "a person of ordinary skill in the art would generally understand that a given excipient can serve multiple pharmaceutical functions." 2023 WL 5928313, at *3. But the court explained: "[T]hat doesn't change the fact that the appropriate claim construction requires the claimed injection vehicle to have four components." Id. Thus, even if the Court were to credit Regeneron's contention that formulation components, generally, can have more than one function (Reply at 10), the Court must still give primacy to the intrinsic evidence of the '865 patent in this

Case: 24-2351 Document: 35 Filed: 09/23/2024



analysis.[21] For the reasons set forth above, the Court finds that the intrinsic evidence is clear and uniform that the "VEGF antagonist" and the "buffer" are separate components, and that claims and embodiments would be rendered nonsensical were this Court to adopt a construction wherein the two could be one and the same.

Regeneron argues that Powell v. Home Depot U.S.A., Inc., 663 F.3d 1221 (Fed. Cir. 2011) supports a contrary interpretation. Reply at 11. In Powell, the Federal Circuit held that the recited "cutting box" could also serve as the recited "dust collection structure." 663 F.3d at 1231-32. In Powell, however, the specification provided express written description that "[the] [c]utting box . . . functions to contain the sawdust[.]" Id. at 1231. Powell is thus a case where the intrinsic evidence (i.e., the specification) disclosed that the separately listed elements could overlap in function, which overcame the presumption of separateness. Id. at 1231-32. Likewise, in Retractable Techs.,

[21] During oral argument, Regeneron argued that "in every case where there's evidence that one ingredient can reasonably meet two claim limitations . . . then one ingredient was held to meet two limitations." Hearing Tr. at 27:8-12. However, as discussed herein, the courts in the Sun and Otsuka cases both considered and credited evidence that one excipient could satisfy multiple functions. Sun, 2019 WL 2549267, at *6; Otsuka, 2023 WL 5928313, at *3. Yet, the courts found that the intrinsic record in both cases did not overcome the presumption of separateness. See id.

Inc. v. Becton, Dickinson & Co., the court held that the claimed "needle holder" and the claimed "retainer member" were not necessarily separate and distinct components of the invention because the claim language specified that the "needle holder" "further comprises" a "retainer member." 653 F.3d 1296, 1303-04 (Fed. Cir. 2011). The patent specification in Retractable also repeatedly explained how the two components could be "welded together" into a single structure. Id. at 1303, 1306. Likewise, in Bot M8 LLC, the court found the presumption of separateness was overcome by disclosures in the specification that did not teach "that each limitation must be contained in a distinct program." 2023 WL 5606978, at *4 (also rejecting patentee's reliance on the prosecution history to show separateness). Here, neither the claims nor the specification of the '865 patent explain or suggest that the VEGF antagonist can serve as the buffer, or vice versa, or that these components can overlap in function. Rather, the claims and the specification further support and confirm that they cannot be one and the same. Powell, Retractable, and Bot M8 are distinguishable on that basis.

Accordingly, the Court finds nothing in the intrinsic evidence to overcome the presumption of separateness, and the intrinsic evidence clearly supports a construction requiring

separateness. Regeneron has not overcome the presumption of separateness arising from the claim language. Becton, 616 F.3d at 1254-55.

Finally, the parties dispute the relevance of certain evidence, namely, the testimony given during a deposition by Amgen's expert, Dr. Chamow. Reply at 10; Surreply at 1-6. Regeneron cites the deposition testimony of Dr. Chamow to argue that the components can overlap in terms of their function. Reply at 1, 10. Amgen responds that Dr. Chamow's deposition testimony was not discussing the claims of the '865 patent, but rather extrinsic evidence.[22] Surreply at 4-5 (citing Chamow Tr. 240:9-248:17 (discussing Gokarn); id. 316:10-12 (Amgen's formulation); id. 145:4-146:14 (scientific article); id. 138:19-139:18 (DHHS publication); id. 142:11-144:8 (scientific article); id. 99:22-100:5 (Gokarn); id. 132:11-135:13, 137:13-22 (scientific article)). While the parties dispute the context and relevance of this testimony, even considering the deposition testimony of Dr. Chamow as Regeneron presents it, the Court still finds insufficient

[22] The parties dispute whether Dr. Chamow's deposition testimony is extrinsic evidence (as Amgen argues) or expert opinion regarding what a POSA would have understood about the intrinsic evidence (as Regeneron argues). As discussed in the next section, Dr. Chamow's deposition testimony is extrinsic evidence. However, ultimately the Court finds the cited testimony not sufficiently focused on the '865 patent to weigh significantly in the Court's analysis.

support in the intrinsic evidence to adopt Regeneron's interpretation of the claims. The Court finds that such evidence, as explained in Sun and Otsuka, does not override the clear intrinsic evidence supporting separateness. Even accepting that components other than those two claim elements may, in some instances, have overlapping functionality, this would also be insufficient to alter the assessment as it relates to the dispute concerning separateness between the "VEGF antagonist" and the "buffer."

**c. The extrinsic evidence does not overcome the presumption of separateness and does not show that the "VEGF antagonist" and the "buffer" should be construed as overlapping elements.**

As discussed above, there is no dispute as to what the '865 patent says and does not say. Regeneron does not contend that the '865 patent discloses, including in any examples or embodiments, that the VEGF antagonist can be the "buffer" in this patent. Rather, Regeneron has embraced the lack of disclosure, arguing instead that "[a] patent need not teach, and preferably omits, what is well known in the art." Reply at 10. Regeneron argues that using aflibercept as a buffer was so "well known in the art" such that no description in the specification was necessary for a POSA to understand that the claimed VEGF antagonist can serve as the separately claimed "buffer." Id. For this proposition,

Regeneron directs the Court to references and expert testimony (id.), which is extrinsic evidence. Phillips, 415 F.3d at 1317. For its part, Amgen disagrees and presents contrary evidence that it was not well known in the art that aflibercept could serve as a buffer in a pharmaceutical formulation.

Extrinsic evidence “‘consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises.’” Phillips, 415 F.3d at 1317 (quoting Markman v. Westview Instruments, Inc., 52 F.3d 967, 980 (Fed. Cir. 1995), aff’d, 517 U.S. 370 (1996)). “[E]xtrinsic evidence in the form of expert testimony can be useful to . . . provide background on the technology at issue, to explain how an invention works, to ensure that the court’s understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field.” Id. at 1318. The Federal Circuit has cautioned that “while extrinsic evidence can shed useful light on the relevant art,” it is “less significant than the intrinsic record in determining the legally operative meaning of claim language.” Id. at 1317 (quotations omitted).

"[E]xtrinsic evidence in general [i]s less reliable than the patent and its prosecution history in determining how to read claim terms, for several reasons." Id. at 1318. "[E]xtrinsic evidence by definition is not part of the patent and does not have the specification's virtue of being created at the time of patent prosecution for the purpose of explaining the patent's scope and meaning." Id. "[W]hile claims are construed as they would be understood by a hypothetical person of skill in the art, extrinsic publications may not be written by or for skilled artisans and therefore may not reflect the understanding of a skilled artisan in the field of the patent." Id. "[U]ndue reliance on extrinsic evidence poses the risk that it will be used to change the meaning of claims in derogation of the 'indisputable public records consisting of the claims, the specification and the prosecution history,' thereby undermining the public notice function of patents." Id. at 1319 (internal citation omitted). Further, "extrinsic evidence consisting of expert reports and testimony is generated at the time of and for the purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence." Id. at 1318. "[T]here is a virtually unbounded universe of potential extrinsic evidence of some marginal relevance that could be brought to bear on any claim construction

question." Id. "In the course of litigation, each party will naturally choose the pieces of extrinsic evidence most favorable to its cause, leaving the court with the considerable task of filtering the useful extrinsic evidence from the fluff." Id. (citing Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 595 (1993)). "In sum, extrinsic evidence may be useful to the court, but it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." Id. at 1319. The Court considers these principles in evaluating the extrinsic evidence.

Regeneron argues it is appropriate to consider extrinsic evidence to determine whether the presumption of separateness is overcome. Hearing Tr. at 27:8-12. Regeneron relies on Powell and Merck v. Mylan to argue the court can consider extrinsic evidence to overcome the presumption of separateness. Id. The Court notes, however, that the expert testimony cited in those cases was considered in the context of the infringement analysis in both cases, not claim construction. Powell v. Home Depot U.S.A., Inc., 663 F.3d at 1231-32 ("Turning back to the true infringement issue . . . [t]he experts agreed. . ."); Merck v. Mylan, 2022 U.S. Dist. LEXIS 195204, at *60 (discussing the testimony of Dr. Little under the heading of "Mylan's Janumet® ANDA Product literally

Case: 24-2351 Document: 35 Filed: 09/17/2024


Infringes Limitation (f)"). Additionally, as noted above, the case law as a whole makes clear that the intrinsic (not extrinsic) record must be consulted and should be given primacy in determining whether the presumption of separateness is overcome. See, e.g., Becton, 616 F.3d at 1254-55; Kyocera, 22 F.4th at 1382; Google, 92 F.4th at 1058.

Regeneron has proffered evidence in the form of reference documents and expert testimony that is "external to the patent and prosecution history." Phillips, 415 F.3d at 1317. The Court initially notes that it need not consider this extrinsic evidence for claim construction where, as here, the intrinsic evidence is clear and unambiguous. Seabed, 8 F.4th at 1287 ("If the meaning of a claim term is clear from the intrinsic evidence, there is no reason to resort to extrinsic evidence."); see also Profectus Tech. LLC v. Huawei Techs. Co., 823 F.3d 1375, 1380 (Fed. Cir. 2016) ("Extrinsic evidence may not be used 'to contradict claim meaning that is unambiguous in light of the intrinsic evidence.'" (quoting Phillips, 415 F.3d at 1324)); Helmsderfer v. Bobrick Washroom Equip., Inc., 527 F.3d 1379, 1382 (Fed. Cir. 2008) (holding extrinsic evidence cannot "contradict the meaning otherwise apparent from the intrinsic record").

** [redacted] **

**ORDER DENYING REGENERON'S MOTION FOR PRELIMINARY INJUCTION**

For the reasons above, the claims and specification are clear and uniform in supporting that the Asserted Claims require separate components such that the buffer must be separate and distinct from the VEGF antagonist. Becton emphasizes the importance of intrinsic evidence in this analysis: "A long line of cases indicates that evidence intrinsic to the patent — particularly the patent's specification, including the inventors' statutorily-required written description of the invention — is the primary source for determining claim meaning." Id. at 1255 (quoting AstraZeneca AB v. Mut. Pharm. Co., 384 F.3d 1333, 1336 (Fed. Cir. 2004)). Cases cited by both parties that have applied Becton to resolve similar types of issues have followed this rubric and reached a claim construction based on intrinsic evidence. Opp. at 6, 10; Reply at 10-11 (citing Becton, Kyocera, Google, Powell, Sun, Otsuka v. Mylan, and Merck v. Mylan).

But, for completeness, the Court has considered the extrinsic evidence that Regeneron cites and finds that the evidence supports the construction that the claims require the VEGF antagonist and buffer to be separate and distinct components. Having considered the extrinsic evidence Regeneron cites in support of its position that the VEGF antagonist can also be the claimed buffer, the Court concludes that none of the extrinsic evidence discloses that

aflibercept can function as a buffer in a pharmaceutical formulation, let alone in a manner that indicates this was so well known such that disclosure in the patent was not needed, as Regeneron argues. Phillips, 415 F.3d at 1317; Profectus, 823 F.3d at 1380; Helmsderfer, 527 F.3d at 1382.

Regeneron and Dr. Trout cite to certain references, which are extrinsic evidence, including: Christensen-1966 (ECF No. 180-15, Trout Ex. 123), Abe-2000 (ECF No. 180-15, Trout Ex. 121), Wyman-1939 (ECF No. 180-16, Trout Ex. 138), Nozaki-1967 (ECF No. 180-15, Trout Ex. 124), and WO 2006/138181 ("Gokarn") (ECF No. 180-15, Trout Ex. 125). Motion at 10; Reply at 3-4; Trout Decl. ¶¶ 76-78. Regeneron points to this evidence as support for the proposition that proteins have been known for decades to be buffers or have buffering capacity. Reply at 3-4.

Amgen disputes the contention that the extrinsic evidence cited by Regeneron supports the proposition that aflibercept was "well known" by the POSA to be capable of serving as a buffer in a stable ophthalmic formulation suitable for intravitreal injection during the relevant timeframe. Opp. at 4, 19. Amgen responds that none of these references show that aflibercept was understood to be capable of serving as a buffer in a pharmaceutical composition, especially when considered as of the effective filing

date of the '865 patent (June 16, 2006). <u>See</u> Chamow Tr. 297:21-298:2 (ECF No. 224-1, Argall Ex. 14) ("What was not known was: How do you actually do that? What are the conditions that are necessary to actually reduce that to practice?"). Further, Amgen argued that only one of these references (Gokarn) relates to pharmaceutical compositions. Chamow Decl. ¶ 199; <u>see also</u> Christensen-1966 at 38, 40 (Trout Ex. 123) (discussing "hemoglobin" and "serum albumin"); Abe-2000 at Title (Trout Ex. 121) (discussing "vertebrate muscles"); Wyman-1939 at Title (Trout Ex. 138) (discussing "horse oxyhemoglobin"); Nozaki-1967 at 715 (Trout Ex. 124) (discussing "enzymes"). Amgen observes that aflibercept was not discovered until after many of the cited references, and none of the references relates to aflibercept, including Gokarn. Opp. at 19 (citing Chamow Decl. ¶¶ 198-200).

The parties dispute the relevance of Gokarn, which is an Amgen patent publication filed on June 8, 2006, eight days before the priority date of the '865 patent — June 16, 2006. Amgen notes Gokarn provides no example of a buffer-free aflibercept formulation, no data for a buffer-free aflibercept formulation, no data on the buffering capacity of aflibercept, no pH range within which aflibercept could provide buffering capacity, and no teaching about how to formulate aflibercept in a stable ophthalmic

formulation suitable for intravitreal injection without a separate buffer. Opp. at 19-20. Amgen argues this was discovered, years later, by Amgen scientists, as reflected in Amgen's later patent filings. Opp. at 4, 19; Chamow Decl. ¶¶ 110-111 (citing Amgen 2020-Publication (ECF No. 206-10, Chamow Ex. C-39) and WO ' 476 Publication (ECF No. 206-6, Chamow Ex. C-10)).

Amgen's position is supported by Coherus Bioscis., Inc. v. AbbVie Biotech. Ltd., No. IPR2017-00822, 2017 WL 3974063, at *10 (P.T.A.B. Sept. 7, 2017), where the Patent Trial and Appeal Board ("PTAB") addressed the novelty and nonobviousness of buffer-free protein formulations. See also Opp. at 19. As noted by the PTAB, "[e]ven as late as 2015, all commercially available aqueous monoclonal antibody formulations were provided with a buffering system." Coherus Bioscis., Inc., 2017 WL 3974063, at *10 (emphasis in original); Chamow Decl. ¶ 219. There appears to be no factual dispute that, as of June 2006, there were no formulations of any fusion protein (or aflibercept specifically) or any intravitreal protein formulation that lacked a separate buffer. Chamow Decl. ¶¶ 91-93, 126, 238. This extrinsic evidence supports Amgen's contention that the POSA at the relevant time (i.e., June 2006) would not consider a therapeutic fusion protein like aflibercept to be a "buffer" in the context of the '865 patent. Amgen notes,

and Regeneron does not dispute that, if approved, ABP 938 will be the first FDA-approved buffer-free fusion protein formulation. Opp. at 1, 19-20; Chamow Decl. ¶¶ 91-93, 126, 238.

Accordingly, even considering this extrinsic evidence, the Court finds that the evidence does not show that aflibercept was known as (or understood to be) a buffer in a pharmaceutical composition during the relevant timeframe. This combined with the clarity of the intrinsic record counsels that the claimed "VEGF antagonist" and claimed "buffer" must be separate components.

Moreover, the Court finds that the Gokarn application is not available, as a matter of law, as extrinsic evidence of how a POSA would have interpreted the '865 patent at the time the '865 patent was filed.

When interpreting the claims of a patent, material that became available to the POSA only after the "effective filing date" of the patent generally cannot be relied upon to show how a claim term would have been understood by a POSA "at the time of the invention." Phillips, 415 F.3d at 1313 ("[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application.") (citations omitted) (emphasis added);

Kopykake Enters., Inc. v. Lucks Co., 264 F.3d 1377, 1383 (Fed. Cir. 2001) ("[W]hen a claim term understood to have a narrow meaning when the application is filed later acquires a broader definition, the literal scope of the term is limited to what it was understood to mean at the time of filing.") (emphasis added); Schering Corp. v. Amgen Inc., 222 F.3d 1347, 1353-54 (Fed. Cir. 2000) (holding claims must be construed "at the time of filing" based on what is "supported" by the specification and one cannot "enlarge the scope of the patent to embrace technology arising after"); PC Connector Sols. LLC v. SmartDisk Corp., 406 F.3d 1359, 1363 (Fed. Cir. 2005) ("A claim cannot have different meanings at different times; its meaning must be interpreted as of its effective filing date.") (emphasis added).

Gokarn is a patent publication filed on June 8, 2006, and first published on December 28, 2006. Motion at 8, 10, 13; Reply at 4, 6-7. Therefore, it was not publicly available on June 16, 2006, when Regeneron filed the application for the '865 patent. Accordingly, as of the filing date of the application for the '865 patent, Gokarn "does not show what [was] known generally to 'any person skilled in the art,' to quote from § 112." In re Glass, 492 F.2d 1228, 1232 (C.C.P.A. 1974); Eli Lilly & Co. v. Sicor Pharms., Inc., 705 F. Supp. 2d 971, 996 n.30 (S.D. Ind. 2010)

(explaining that while secret prior art under pre-AIA 35 U.S.C. § 102(e) "is available for assessing obviousness under 35 U.S.C. § 103 . . . [,] it is not evidence of what was generally known in the art"), aff'd, 426 F. App'x 892 (Fed. Cir. 2011). As explained in In re Glass, "as a matter of common sense, it is clear that the contents of a patent application which may be available as 'prior art' under § 102(e) to show that another was the first inventor may not have been known to anyone other than the inventor, his attorney, and the Patent Office examiner, and perhaps the assignee." 492 F.2d at 1231-32.[23]

As noted above, the Court concludes that Gokarn, regardless of its content and availability, is insufficient to rebut the presumption of separateness based on the intrinsic record. On the legal question of whether Gokarn is available, while the Court observes the footnote cited by Regeneron, the Court defers to the Federal Circuit's more recent en banc decision in Phillips, that

[23] Regeneron contends that under footnote 6 of In re Glass, prior art under § 102(e) can be relied on for claim construction. That footnote, however, does not specifically address secret prior art but rather discusses indefiniteness (35 U.S.C. § 112, second paragraph), which is not at issue here. Cases decided after In re Glass makes clear that references available to the POSA only after the date of invention (or effective filing date) should not be relied upon for establishing what was generally known to a POSA. Phillips, 415 F.3d at 1313 (noting claims are to be construed based on the understanding of a person of ordinary skill in the art "at the time of the invention").

** [redacted] **

**ORDER DENYING REGENERON'S MOTION FOR PRELIMINARY INJUCTION**

claim construction must be based on what was generally known by the POSA "at the time of the invention." Phillips, 415 F.3d at 1313. The Court does not read In re Glass as dictating the opposite, particularly given the footnote's reference to a different legal inquiry (indefiniteness under 35 U.S.C. § 112, second paragraph) and the holding in In re Glass that secret prior art cannot show what was generally known. In re Glass, 492 F.2d at 1231-32 (holding that secret prior art cannot show "what is known generally to any person skilled in the art," because that art, while technically prior art, was not "known to anyone other than the inventor, his attorney, and the Patent Office examiner[.]"). The Court therefore finds that Gokarn cannot be used as Regeneron suggests, that is, as evidence of the POSA's understanding of what was generally known in the art as of the filing date of the '865 patent.

Regardless, Gokarn supports Amgen's contention that at the time of the '865 patent, "the utility of proteins, particularly biopharmaceutical proteins, to be formulated in self-buffering compositions, particularly pharmaceutically acceptable compositions, has not been recognized" by those skilled in the art. Gokarn at 27:10-13 (Trout Ex. 125). In other words, Gokarn

is evidence that buffer-free formulations of protein therapeutics were not "well known" as of the '865 patent filing date.

Regeneron also cites U.S. Patent 11,607,451 ("the '451 patent"), which is related to Gokarn, as extrinsic evidence in support of its construction. Reply at 6. The '451 patent post-dates the '865 patent. ECF No. 224-1, Argall Ex. 17. Regardless of whether the '451 patent properly informs this claim construction analysis, Regeneron does not contend that the '451 patent teaches or suggests that aflibercept can serve as a buffer, or that it relates to aflibercept. Consequently, the '451 patent does not inform whether aflibercept can serve as a buffer in a context akin to the '865 patent and it carries little if any weight in this analysis. To the extent the '451 patent was unavailable to a POSA as of June 16, 2006, it is not probative of what the POSA would have understood as of that date. Phillips, 415 F.3d at 1313; Kopykake, 264 F.3d at 1383; Schering, 222 F.3d at 1353-54; PC Connector Sols, 406 F.3d at 1363.

Regeneron also points to the deposition testimony of Amgen's expert, Dr. Chamow. Reply at 1-3, 5-12. The expert testimony is extrinsic evidence. Phillips, 415 F.3d at 1317. Amgen disputes Regeneron's characterization of Dr. Chamow's deposition testimony. Dr. Chamow testified that the Asserted Claims require four separate

components. See Chamow Tr. 26:13-27:4 ("A POSA would understand, in reading this claim, that . . . by listing the four components separately, the interpretation is that these are separate and distinct categories of components and, in fact, that these represent separate and distinct structures."); id. 46:7-47:15 ("[A]s I read what was done and what was written up in '865, there's no evidence to me that these inventors were thinking that these — that anything less than these four categories would work for them."); id. 149:9-14 ("It is an ophthalmic formulation that comprises ingredient one, a vascular endothelial growth factor antagonist, ingredient two, an organic co-solvent, ingredient three, a buffer, ingredient four, a stabilizing agent. That's four ingredients."); id. 151:16-152:1 ("Q: The '865 patent does not expressly state that the formulation ingredients cannot serve multiple roles; right? A: Yeah, Counsel, there's nothing in this patent that tells me that these categories are interchangeable."); id. 167:16-22 ("So the VEGF antagonist is a listed component of Claim 1. It is separate and distinct from the other listed components, one of them being a buffer. There is no indication from Claim 1 or any other part of this patent that the VEGF antagonist would or could serve in that capacity."). Viewed in

Case: 24-2351 Document: 35 Filed: 09/23/2024


context, this testimony does not undermine the ultimate conclusion that the Asserted Claims require four separate components.

**d. Dr. Chamow's deposition testimony does not undermine but rather confirms construing the claims as requiring the "VEGF antagonist" and the "buffer" to be separate components.**

In its Reply brief, Regeneron argues that Dr. Chamow's deposition testimony compels a finding that Amgen infringes the asserted claims of the '865 patent. Reply at 1-2, 12. After reviewing Dr. Chamow's testimony in context and in light of the legal principles discussed above, the Court concludes that Dr. Chamow's testimony does not compel such a conclusion. The Court rather views Dr. Chamow's testimony as confirming that the claims must be construed to require that the "VEGF antagonist" and the "buffer" are separate and distinct components of the claimed formulation.

First, Regeneron points to Dr. Chamow's testimony that "at 40 mgs per ml," "aflibercept does serve as a buffer in Amgen's formulation." Chamow Tr. 316:10-12. Regeneron points to this testimony as an admission that Amgen's formulation has a buffer, and as an admission that aflibercept can be both the VEGF antagonist and the buffer in Amgen's formulation. The Court finds that Dr. Chamow's testimony does not support Regeneron's arguments. Dr. Chamow's testimony that "aflibercept does <u>serve as</u>

a buffer in Amgen's formulation," Chamow Tr. 316:10-12, is consistent with what appears in Amgen's BLA. See Chamow Decl. ¶¶ 125, 226; Trout Ex. A-4 at AMG-AFL-US_00000641. This testimony is not an admission that Amgen infringes the asserted claims because it does not contemplate the correct construction of the asserted claims, based on the '865 patent. When asked about whether the claims require separate components, Dr. Chamow testified: "That says to me there are four separate components here. There is nothing in this claim and there's nothing, in fact, anywhere in this patent that suggests that these are not separate and distinct components." Chamow Tr. 27:8-28:3. This testimony is consistent with the claim construction issue presented, which concerns whether the claims of the '865 patent (as distinct from Amgen's formulation for ABP 938) require separate and distinct components in order to satisfy the "VEGF antagonist" and "buffer" claim limitations.

Dr. Chamow further testified: "And in the time frame of 2006, which is the relevant time frame here, there was—the plain and ordinary meaning of a 'buffer' was clearly an excipient (i.e., an inactive ingredient). There was no evidence or any information that a POSA might have used to consider that a buffer should be anything else." Chamow Tr. 193:8-14. This testimony confirms the

'865 patent does not provide support for aflibercept serving as a buffer in a pharmaceutical formulation. For the reasons explained above, it is not proper to rely on testimony about a recently developed product, in this case Amgen's, to demonstrate the understanding of a POSA as of June 16, 2006. The cited testimony is about Amgen's development of a formulation for ABP 938, not about what the inventors of the '865 patent invented, disclosed, or claimed in the '865 patent.

Finally, to the extent that Regeneron cites additional passages from Dr. Chamow's testimony, the Court finds that none of that testimony compels a finding in support of Regeneron.

**e. Regeneron's claim construction arguments conflict with the trial record developed during the Mylan case and this Court's rulings in the Mylan case that credited Regeneron's expert Dr. Trout.**

The Court's construction here is consistent with the record and its findings in the Mylan case. In the Mylan case, Mylan challenged the claims of the '865 patent as invalid under 35 U.S.C. § 112 for lack of written description and lack of enablement. In responding to Mylan's invalidity challenges, Regeneron advanced testimony, given at trial by Dr. Trout, that the claims were limited to a "'very specific' VEGF antagonist and the categories of organic co-solvent, buffer, and stabilizing agent." Mylan, 2024 WL 382495, at *64. Dr. Trout testified that the claims of

the '865 patent were "'narrow' rather than broad, because they claim 'one specific biologic molecule . . . with a specific sequence ID' at just one concentration (40 mg/m[l]), in a vial for intravitreal administration, and **further claim** specific structural components, including a buffer, stabilizing agent, and the organic co-solvent of polysorbate 20 within a 'narrow range.'" Id. at *66 (emphasis added). The Court credited Dr. Trout's trial testimony and found that the claims required "a specific protein molecule at a specific concentration **along with other** known structures (a buffer, stabilizing agent, and polysorbate 20)." Id. at *65 (emphasis added); see also id. at *60 ("The claimed composition – 40 mg/ml of aflibercept, with polysorbate 20, a buffer, and a stabilizing agent. . .") (emphasis added); see also id. at *70 ("the claimed structure (40 mg/ml of glycosylated aflibercept and polysorbate 20 within the specified concentration range, **plus a buffer** and a stabilizing agent") (emphasis added). Regeneron argues that its arguments in Mylan were not inconsistent based on a passage in Dr. Trout's expert report. Reply at 6-7. The statement in Dr. Trout's expert report upon which Regeneron relies states "Dr. MacMichael cites to Gokarn, but the cited disclosure only teaches that proteins themselves have some buffering capacity." Mylan Trout Responsive Report at ¶ 381 (ECF

No. 206-7, Chamow Ex. C-22). That sentence from Dr. Trout's expert report does not explain Dr. Trout's testimony at trial that the claims require a buffer in addition to the required aflibercept.

During the Mylan trial Regeneron and its expert referred to the "buffer" of the '865 patent claims as an "excipient," which also supports that it is a separate and distinct component from the claimed "VEGF antagonist" active ingredient. Regeneron's Proposed Findings of Fact and Conclusions of Law at ¶ 452 (ECF No. 206-5, Chamow Ex. C-2 Part 2) ("The **excipients** recited in the claims are also structures: categories for the buffer and stabilizing agent . . . .") (emphasis added); id. at ¶ 80 (ECF No. 206-4, Chamow Ex. C-2 Part 1) ("[T]he Product Patent—which lists examples and amounts of stabilizing agent and **buffer excipients** for use in the claimed formulations—is also present in the Furfine Provisional.") (emphasis added); id. at ¶ 147 ("[T]he prior art taught 'how to substitute one **excipient** in a category, such as a stabilizing agent or **buffer**, for another' . . .") (emphasis added). Dr. Trout repeatedly used the term "excipient" to refer to the "buffer" recited in the claims of the '865 patent. Mylan Trial Tr. at 2125:21-25 (ECF No. 206-6, Chamow Ex. C-6) ("Q: Buffers were known **excipients** and have been used for decades to stabilize the pH of solutions, including in formulations, correct? A: Yes.

With other molecules, yes.") (emphasis added); id. at 2106:2-6 ("Q: [D]id the prior art teach how to substitute one **excipient** in a category, such as a stabilizing agent or **buffer**, for another? A: Yes.") (emphasis added); Mylan Trout Responsive Report ¶ 364 (ECF No. 206-7, Chamow Ex. C-22) ("Buffers were known **excipients** and have been used for decades to stabilize the pH of solutions, including in formulations.") (emphasis added); id. ¶ 369 ("The '865 Claims set forth a specific agent that inhibits VEGF . . . along with several recited **excipients** (an organic co-solvent, a buffer, and a stabilizing agent) . . . .") (emphasis added). The VEGF antagonist was never referred to as an "excipient" during the Mylan trial, consistent with it being referred to as the active ingredient in the formulation. See, e.g., Mylan, 2024 WL 382495, at *62, *67, *68.

Consistent with the testimony credited in the Court's decision, the Court upheld the validity of the claims in Mylan, finding: "The **excipients** recited in the claims are also structures: categories for the **buffer** and stabilizing agent . . . ." Id. at *70 (emphasis added). Viewed in this context, Regeneron's statements and positions taken by Regeneron in the Mylan case, which the Court credited, undermine Regeneron's arguments that the VEGF antagonist and buffer can be one and the same.

f. **Having determined that the asserted claims require a "buffer" that is separate from the "VEGF antagonist," the Court need not address the proper construction of the term "buffer" and declines to do so.**

In its Motion, Regeneron proposed that the term "a buffer" be construed to mean "a **substance** that resists changes to pH upon addition of an acid or base within an optimal pH range through a proton donating component and/or a proton-accepting component," and in its Reply added "**and thereby includes phosphate, histidine, and proteins like aflibercept.**" Motion at 7; Reply at 3 (emphases added). Amgen disputed Regeneron's proposed construction, arguing that the term should be construed to mean "an **excipient** that resists changes to pH upon addition of an acid or base within an optimal pH range through a proton-donating component and a proton-accepting component." Opp. at 12 (emphasis added). The dispute between the parties thus centers on whether the "buffer" must be an "excipient" (meaning separate from the aflibercept), as Amgen proposes, or whether it can be any "substance," including the active ingredient (aflibercept) as Regeneron proposes.

Having determined that the claims require a "buffer" that is separate from the "VEGF antagonist," which is sufficient to raise a substantial question of noninfringement as discussed below, the Court need not address the proposed constructions of the term "buffer." <u>O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.,</u>

Ltd., 521 F.3d 1351, 1362 (Fed. Cir. 2008) ("We, however, recognize that district courts are not (and should not be) required to construe every limitation present in a patent's asserted claims."); U.S. Surgical Corp. v. Ethicon, Inc., 103 F.3d 1554, 1568 (Fed. Cir. 1997) (holding that claim construction "is not an obligatory exercise in redundancy."). Accordingly, the Court declines to construe the term "buffer" at this stage.

**g. Regeneron has not demonstrated a likelihood that Amgen infringes.**

Under the Court's construction that the claims require four separate components, there is at least a substantial question concerning infringement. Genentech, 108 F.3d at 1364 (holding that if an alleged infringer "raises a substantial question concerning validity, enforceability, or infringement (i.e., asserts a defense that [the patentee] cannot show lacks substantial merit) the preliminary injunction should not issue") (cleaned up). There is no dispute about what components are present in the formulation for ABP 938. Trout Decl. ¶ 232; Chamow Decl. ¶ 125. Likewise, there is no dispute that ABP 938 does not contain a separate buffer.

On this record, the Court finds that Regeneron has not established a likelihood of success on the merits of its infringement allegations. The Court here addresses the parties'

arguments with respect to literal infringement and infringement based on the doctrine of equivalents ("DOE").

1. **Regeneron has not demonstrated a likelihood that Amgen literally infringes the Asserted Claims.**

"To establish literal infringement, every limitation set forth in a claim must be found in an accused product, exactly." Duncan Parking Techs., Inc. v. IPS Grp., Inc., 914 F.3d 1347, 1360 (Fed. Cir. 2019) (quoting Southwall Techs., Inc. v. Cardinal IG Co., 54 F.3d 1570, 1575 (Fed. Cir. 1995)); see also Forest Lab'ys, Inc. v. Abbott Lab'ys, 239 F.3d 1305, 1310 (Fed. Cir. 2001) ("A patentee claiming infringement must present proof that the accused product meets each and every claim limitation.") (citing J.T. Eaton & Co. v. Atlantic Paste & Glue Co., 106 F.3d 1563, 1570-71 (Fed. Cir. 1997)). Dependent claims are construed to encompass all the limitations of the claims from which they depend. 35 U.S.C. § 112(d). Accordingly, "[o]ne who does not infringe an independent claim cannot infringe a claim dependent on (and thus containing all the limitations of) that [independent] claim." Monsanto Co. v. Syngenta Seeds, Inc., 503 F.3d 1352, 1359 (Fed. Cir. 2007) (citing Wahpeton Canvas Co. v. Frontier, Inc., 870 F.2d 1546, 1552 (Fed. Cir. 1989)).

Under the claim construction adopted above, Amgen has raised a substantial question of infringement with respect to the Asserted

Case: 24-2351 Document: 35 Filed: 09/17/2024


Claims. There is no dispute that ABP 938 does not contain "a buffer" that is separate from the other components listed in the claims, namely, the VEGF antagonist. See generally, Motion; see generally Reply. Under the Court's construction, the aflibercept in the formulation for ABP 938 cannot satisfy both the "[VEGF] antagonist" and "buffer" limitations of the Asserted Claims, rendering the "buffer" a missing element for purposes of literal infringement. This missing element raises a substantial question of noninfringement, and the Court finds that Regeneron has not established a likelihood of success on the merits with respect to literal infringement on this motion. The Court accords significant weight to this determination in the analysis, in part, due to the undisputed nature of the facts concerning infringement based on Amgen's formulation.

**2. Regeneron has not demonstrated a likelihood that Amgen infringes the Asserted Claims under the Doctrine of Equivalents.**

Preliminary injunctions based on infringement under the DOE are rare. Aurobindo, 857 F.3d at 866 ("This appeal is unusual . . . in that it arises from the grant of a preliminary injunction based on [DOE]. There are few such reported decisions . . . ."); see also Ranbaxy Pharms. Inc. v. Apotex, Inc., 350 F.3d 1235, 1241 (Fed. Cir. 2003) (affirming denial of

Case: 24-2351 Document: 35 Filed: 09/17/2024



preliminary injunction where the patentee failed to demonstrate a likelihood of success in proving infringement under the DOE). Infringement based on the DOE is regarded as a "highly factual inquiry [that] rarely comes clear on a premature record." Jeneric/Pentron, Inc. v. Dillon Co., 205 F.3d 1377, 1384 (Fed. Cir. 2000). On the posture of resolving a preliminary injunction motion, it is not ideal for the Court to engage with highly factual inquiries, such as DOE. Regeneron does not address its arguments related to DOE in its Reply, making Amgen's arguments in opposition substantively unrebutted on this record. Compare Opp. at 16-18, with Reply at 12 (responding only that: "In view of this record, there is no need for the Court to address the doctrine of equivalents.").

"Each element contained in a patent claim is deemed material to defining the scope of the patented invention, and thus the doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole." Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17, 29 (1997). "[T]he application of [DOE], even as to an individual element, is not allowed such broad play as to effectively eliminate [an] element in its entirety." Id. This principle is known as vitiation, which

counsels against applying the DOE in a manner that reads out entire limitations.

The Supreme Court has set forth two frameworks for evaluating DOE: (1) the "function-way-result test" and (2) the "insubstantial differences" test. See Aurobindo, 857 F.3d at 866 (citing Graver Tank & Mfg. Co. v. Linde Air Prod. Co., 339 U.S. 605, 608-609 (1950)). The first test asks whether the accused product performs "substantially the same function in substantially the same way to obtain the same result." Id. The second test asks "whether the accused product or process is substantially different from what is patented." Id. The Federal Circuit has explained that "non-mechanical cases may not be well-suited to consideration under the [function-way-result] test." Id. at 867. This is "particularly true in the chemical arts," where the insubstantial differences test is regarded as "more suitable . . . for determining equivalence" because chemicals having significantly different structures may seem equivalent, even when they are not. Id. at 867-69.

Regeneron argues that "even were the Court to construe 'buffer' not to include proteins like aflibercept, ABP 938 would still infringe under the DOE," citing the function-way-result test. Motion at 13-14. Regeneron argues that the 40 mg/mL of

aflibercept in ABP 938: performs the same function as the claimed "buffer" (in terms of maintaining the pH); does so in substantially the same way ("the 28 histidine residues in each aflibercept dimer absorb and release protons, just like free histidine in solution"); and achieves substantially the same result as the "buffer" (a stabilized pH during storage). Id. at 14. Regeneron does not argue infringement under the DOE based on the insubstantial differences test. For its part, Amgen disputes (i) Regeneron's reliance on DOE to eliminate the "buffer" limitation altogether, (ii) Regeneron's use of the function-way-result test for DOE (rather than the insubstantial differences test), and (iii) Regeneron's application of the function-way-result test. Opp. at 16-17. As noted, Regeneron offered no reply arguments in response to Amgen's opposition. The issue of DOE was not raised by either party at the hearing. Consequently, Amgen's disputes regarding this highly factual inquiry go substantively unrebutted.

The Court is mindful that DOE is a highly factual inquiry that rarely becomes clear without a full record. See Jeneric, 205 F.3d at 1384. That is true here, and Regeneron's arguments and Amgen's responses illustrate why, regardless of whether Regeneron or Amgen is correct, Regeneron's arguments based on the DOE do not favor granting a preliminary injunction, even accepting all of

Regeneron's assertions. For completeness, however, the Court concludes that Regeneron has not demonstrated a likelihood of success on the merits of its DOE claim, at least because its DOE theory vitiates the term "buffer" by eliminating it entirely, which is prohibited. Warner-Jenkinson, 520 U.S. at 29 ("[T]he application of [DOE], even as to an individual element, is not allowed such broad play as to effectively eliminate [an] element in its entirety."). Because its Reply is silent on this topic, Regeneron has not attempted to rebut Amgen's arguments regarding claim vitiation. See Opp. at 17. The Court finds vitiation to foreclose Regeneron's DOE theory.

* * *

While unnecessary for the Court to address Amgen's additional arguments regarding why there is no infringement under DOE, the Court agrees with Amgen's unrebutted argument that in a chemical case like this one, it is more appropriate to consider DOE by applying the insubstantial differences test. Aurobindo, 857 F.3d at 867-69. Regeneron does not address the insubstantial differences test and not doing so weighs against finding that there is likelihood of success on the merits of infringement under DOE. With respect to that test, Amgen notes that there are significant differences between the claimed "VEGF antagonist" (aflibercept)

** [redacted] **

ORDER DENYING REGENERON'S MOTION FOR PRELIMINARY INJUCTION

and the "buffer" in terms of structure, formulation approach, functionality, and operation. Opp. at 17; Chamow Decl. ¶¶ 235-247. It is undisputed that the aflibercept in ABP 938 is a large complex macromolecule, orders of magnitude bigger than the small-molecule phosphate buffer exemplified throughout the '865 patent. Chamow Decl. ¶ 229 (Figure 13). Amgen argues that a formulation lacking a buffer offers advantages over a formulation that has a buffer, in terms of using fewer ingredients, which reduces the complexity of the formulation as well as the risk of introducing impurities. Id. ¶ 241. While advantageous, a buffer-free formulation is not straight-forward or easy to develop. Id. ¶¶ 93, 100-101, 104-107, 136. Amgen notes that, if approved, ABP 938 would be the first buffer-free fusion protein formulation approved by FDA. Id. ¶ 238. These arguments and Amgen's expert testimony in support thereof were unrebutted, and for this additional reason, the Court agrees with Amgen that there are substantial differences between the aflibercept in ABP 938 and the claimed buffer.

Even applying the function-way-result test, the Court does not find a likelihood of success on the merits of proving infringement under the DOE. With respect to "function," the '865 patent describes that the function of the buffer is to establish a desired pH. '865 patent at 6:56-58, 3:44-47; Mylan, 2024 WL

382495, at *67 ("Dr. Trout highlighted the patent's disclosure of 'known structures' as the claimed components, including . . . a buffer such as phosphate and other known buffers that would achieve the disclosed pH range . . . ."). [redacted] Dr. Trout did not address or rebut Amgen's argument and expert testimony that a buffer is an inactive ingredient, while the function of aflibercept is to create a therapeutic effect. Thus, the POSA would have understood that the claimed buffer is a non-therapeutic agent and serves a different function than aflibercept as the active ingredient. Id.

With respect to "way," the aflibercept in ABP 938 incidentally protects itself against pH-induced degradation. Id. ¶ 261. By contrast, a "buffer" predictably establishes a pH based on being free in solution and available to contribute buffering capacity depending on its concentration, and thus, appropriate amounts of a buffer can be added to achieve a desired pH in a formulation. Id. ¶¶ 228-232, 261. Amgen explains that this is not the case with ABP 938. [redacted]

Amgen explains that Dr. Trout testified in his declaration that aflibercept acts the same as a buffer simply because "histidine residues in a protein structure can absorb and release protons as a consequence of the structure of histidine's imidazole ring," which is the "same mechanism or way by which sodium phosphate . . . resists changes to pH." Trout Decl. ¶ 293. This testimony, even if assumed to be true, does not address the several differences discussed above in the "way" aflibercept achieves its function compared to the claimed buffer, which presently stands unrebutted. Thus, the Court credits Amgen's arguments that the buffer of the '865 patent achieves its function in a substantially different way than how aflibercept achieves its function in ABP 938.

With respect to "result," Regeneron argues that both a conventional buffer and aflibercept achieve "a stabilized pH" during storage. Motion at 14; Trout Decl. ¶ 294. Amgen responds that ABP 938 offers more and different results, namely: one fewer excipient; lower ionic strength; and improved long-term stability relative to the buffered formulations shown in the '865 patent. Opp. at 17; Chamow Decl. ¶¶ 275-281. Regeneron and its expert did not attempt to rebut any of these differences. Accordingly, the Court credits the differences presented by Amgen and its expert.

Ultimately, in view of the highly factual disputes between the parties, the Court cannot find a likelihood of success on Regeneron's DOE theory, which is deficient on the basis that it vitiates the "buffer" limitation, fails to apply the insubstantial differences test, and does not contest many differences alleged by Amgen to exist with respect to each factor in the function-way-result test.

## VII. CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Preliminary Injunction is **DENIED.**

Defendant Amgen's Motion for Leave to File Surreply [ECF No. 299] is **DENIED AS MOOT.**

The Court is filing this Order under seal, as the Court understands that there is information herein that the parties have designated Confidential or Outside Counsel Eyes Only under the Protective Order. The Court expects the parties to confer on preparing and submitting a public version containing appropriate redactions to protect each party's confidential information. The parties shall meet and confer to discuss which portions of this Order can be unsealed. **They shall submit a joint proposed redacted version for the Court's review within seven (7) days of the entry of this Order.**

** [redacted] **

**ORDER DENYING REGENERON'S MOTION FOR PRELIMINARY INJUCTION**

The Clerk is **DIRECTED** to transmit copies of this Order **only** to counsel for Regeneron and Amgen in case 1:24-CV-39.

DATED: September 23, 2024

THOMAS S. KLEEH, CHIEF JUDGE
NORTHERN DISTRICT OF WEST VIRGINIA

8273378

# THE UNITED STATES OF AMERICA

TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

July 22, 2022

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF:

PATENT NUMBER: *11,084,865*
ISSUE DATE: *August 10, 2021*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

Rodney Glover
Certifying Officer

US011084865B2

(12) **United States Patent**
**Furfine et al.**

(10) **Patent No.: US 11,084,865 B2**
(45) **Date of Patent: *Aug. 10, 2021**

(54) **VEGF ANTAGONIST FORMULATIONS SUITABLE FOR INTRAVITREAL ADMINISTRATION**

(71) Applicant: **REGENERON PHARMACEUTICALS, INC.**, Tarrytown, NY (US)

(72) Inventors: **Eric Furfine**, Concord, MA (US); **Daniel Dix**, LaGrangeville, NY (US); **Kenneth Graham**, Pleasant Valley, NY (US); **Kelly Frye**, Mendham, NJ (US)

(73) Assignee: **REGENERON PHARMACEUTICALS, INC.**, Tarrytown, NY (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/739,559**

(22) Filed: **Jan. 10, 2020**

(65) **Prior Publication Data**

US 2020/0131246 A1 Apr. 30, 2020

**Related U.S. Application Data**

(60) Continuation of application No. 16/582,486, filed on Sep. 25, 2019, which is a continuation of application No. 16/159,269, filed on Oct. 12, 2018, now Pat. No. 10,464,992, which is a continuation of application No. 15/879,294, filed on Jan. 24, 2018, now Pat. No. 10,400,025, which is a continuation of application No. 15/095,606, filed on Apr. 11, 2016, now Pat. No. 9,914,763, which is a continuation of application No. 14/330,096, filed on Jul. 14, 2014, now Pat. No. 9,340,594, which is a continuation of application No. 13/914,996, filed on Jun. 11, 2013, now Pat. No. 8,802,107, which is a continuation of application No. 13/329,770, filed on Dec. 19, 2011, now Pat. No. 8,481,046, which is a continuation of application No. 12/833,417, filed on Jul. 9, 2010, now Pat. No. 8,092,803, which is a continuation of application No. 12/560,885, filed on Sep. 16, 2009, now Pat. No. 7,807,164, which is a division of application No. 11/818,463, filed on Jun. 14, 2007, now Pat. No. 7,608,261.

(60) Provisional application No. 60/814,484, filed on Jun. 16, 2006.

(51) **Int. Cl.**

| | |
|---|---|
| ***A61K 38/17*** | (2006.01) |
| ***A61K 38/18*** | (2006.01) |
| ***C07K 19/00*** | (2006.01) |
| ***C07K 14/71*** | (2006.01) |
| ***A61K 9/00*** | (2006.01) |
| ***A61K 9/19*** | (2006.01) |
| ***C07K 14/47*** | (2006.01) |
| ***A61M 5/178*** | (2006.01) |
| ***A61K 47/26*** | (2006.01) |
| ***A61K 47/02*** | (2006.01) |
| ***A61K 47/10*** | (2017.01) |

(52) **U.S. Cl.**

CPC ............ ***C07K 14/71*** (2013.01); ***A61K 9/0019*** (2013.01); ***A61K 9/0048*** (2013.01); ***A61K 9/19*** (2013.01); ***A61K 38/179*** (2013.01); ***A61K 38/1793*** (2013.01); ***A61K 47/02*** (2013.01); ***A61K 47/10*** (2013.01); ***A61K 47/26*** (2013.01); ***A61M 5/178*** (2013.01); ***C07K 14/47*** (2013.01); ***C07K 14/4705*** (2013.01); *C07K 2319/00* (2013.01); *C07K 2319/30* (2013.01)

(58) **Field of Classification Search**

None

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,100,071 | A | 8/2000 | Davis-Smyth et al. |
| 6,171,586 | B1 | 1/2001 | Lam |
| 6,897,294 | B2 | 5/2005 | Davis-Smyth et al. |
| 7,052,691 | B2 | 5/2006 | Sleeman et al. |
| 7,608,261 | B2 † | 10/2009 | Furfine |
| 8,110,546 | B2 | 2/2012 | Dix et al. |
| 9,340,594 | B2 † | 5/2016 | Furfine |
| 9,580,489 | B2 † | 2/2017 | Furfine |
| 10,464,992 | B2 | 11/2019 | Furfine et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| JP | 10273450 | 10/1998 |
| JP | H11510170 | 9/1999 |

(Continued)

OTHER PUBLICATIONS

Petition for Inter Partes Review of U.S. Pat. No. 10,464,992, as submitted to the USPTO on Jan. 7, 2021, in Inter Partes Review No. IPR2021-00402, 59 pgs.

File History of U.S. Pat. No. 10,464,992, as submitted to the USPTO on Jan. 7, 2021, in Inter Partes Review No. IPR2021-00402, 124 pgs.

Declaration of Dr. Reiner Gentz, as submitted to the USPTO on Jan. 7, 2021, in Inter Partes Review No. IPR2021-00402, 76 pgs.

(Continued)

*Primary Examiner* — Christine J Saoud
*Assistant Examiner* — Jon M Lockard
(74) *Attorney, Agent, or Firm* — Karl Bozicevic; Bozicevic Field & Francis LLP

(57) **ABSTRACT**

Ophthalmic formulations of a vascular endothelial growth factor (VEGF)-specific fusion protein antagonist are provided suitable for intravitreal administration to the eye. The ophthalmic formulations include a stable liquid formulation and a lyophilizable formulation. Preferably, the protein antagonist has an amino acid sequence of SEQ ID NO:4.

**64 Claims, No Drawings**

**Specification includes a Sequence Listing.**

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2003/0113316 | A1 | 6/2003 | Kaisheva et al. |
| 2003/0138417 | A1 | 7/2003 | Kaisheva et al. |
| 2004/0197324 | A1 | 10/2004 | Liu et al. |
| 2005/0281831 | A1 | 12/2005 | Davis-Smyth et al. |
| 2006/0217311 | A1 | 9/2006 | Dix et al. |
| 2008/0085276 | A1 | 4/2008 | Wiegand et al. |
| 2014/0012227 | A1 | 1/2014 | Sigg et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| JP | 2002516871 | 6/2002 |
| WO | WO 97/04801 | 2/1997 |
| WO | WO1998045331 | † 10/1998 |
| WO | WO 99/62536 | 12/1999 |
| WO | WO2000075319 | † 12/2000 |
| WO | WO 2004/091658 | 10/2004 |
| WO | WO 2005/000895 | 1/2005 |
| WO | WO 2005011734 | 2/2005 |
| WO | WO 2005/020972 | 3/2005 |
| WO | WO 2006/047325 | 5/2006 |
| WO | WO 2006/088650 | 8/2006 |
| WO | WO 2006/104852 | 10/2006 |

OTHER PUBLICATIONS

Fraser et al., "Single Injections of Vascular Endothelial Growth Factor Trap Block Ovulation in the Macaque and Produce a Prolonged, Dose-Related Suppression of Ovarian Function," *J. Clin. Endocrinol. & Metab*., 90(2):1114-1122 (2004).

Wulff et al., "Prevention of Thecal Angiogenesis, Antral Follicular Growth, and Ovulation in the Primate by Treatment with Vascular Endothelial Growth Factor Trap R1R2," *Endocrinology*, 143(7):2797-2807 (2002).

Certificate of Correction dated Mar. 3, 2020, in U.S. Pat. No. 10,464,992, 1 pg.

Holash et al., "VEGF-Trap: A VEGF blacker with potent antitumor effects," *PNAS*, 99(17):11393-11398 (2002).

Response to Office Action in U.S. Appl. No. 12/835,065, filed Nov. 22, 2011, as submitted to the USPTO on Jan. 7, 2021, in Inter Partes Review No. IPR2021-00402, 4 pgs.

Declaration Pursuant to 37 C.F.R. § 1.131 of Daniel B. Dix, Kelly Frye, and Susan Kautz in Support of Response to Office Action in U.S. Appl. No. 12/835,065, filed Nov. 22, 2011, as submitted to the USPTO on Jan. 7, 2021, in Inter Partes Review No. IPR2021-00402, 11 pgs.

Resume of Reiner Gentz, Ph.D., as submitted to the USPTO on Jan. 7, 2021, in Inter Partes Review No. IPR2021-00402, 3 pgs.

Rudge et al., "VEGF Trap as a Novel Antiangiogenic Treatment Currently in Clinical Trials for Cancer and Eye Diseases, and VelociGene®-based Discovery of the Next Generation of Angiogenesis Targets," *Cold Spring Harbor Symposia on Quantitative Biology*, 70:411-418 (2004).

Chi et al., "Physical Stability of Proteins in Aqueous Solution: Mechanism and Driving Forces in Nonnative Protein Aggregation," *Pharmaceutical Research*, 20(9):1325-1336 (2003).

Bontempo, "Preformulation Development of Parenteral Biopharmaceuticals," *Drugs and the Pharmaceutical Sciences*, 85:91-108 (1997).

"Guidance for Industry Q1A(R2) Stability Testing of New Drug Substances and Products," U.S. Department of Health and Human Services, Food and Drug Administration, Rockville, MD, as submitted to the USPTO on Jan. 7, 2021, in Inter Partes Review No. IPR2021-00402, 25 pgs.

Parkins et al., "The formulation of biopharmaceutical products," *Pharmaceutical Science & Technology Today*, 3(4):129-137 (2000).

Randolph et al., "Surfactant-Protein Interactions," *Rational Design of Stable Protein Formulations*, pp. 159-175, Springer, Boston, MA (2002).

"Phosphate buffer," Cold Spring Harbor Protocols, 2006:pdb.rec8543, as submitted to the USPTO on Jan. 7, 2021, in Inter Partes Review No. IPR2021-00402, 1 pg.

Lucentis® label, as submitted to the USPTO on Jan. 7, 2021, in Inter Partes Review No. IPR2021-00402, 14 pgs.

Avastin® label, as submitted to the USPTO on Jan. 7, 2021, in Inter Partes Review No. IPR2021-00402, 37 pgs.

Remicade® label, as submitted to the USPTO on Jan. 7, 2021, in Inter Partes Review No. IPR2021-00402, 58 pgs.

Xolair® label, as submitted to the USPTO on Jan. 7, 2021, in Inter Partes Review No. IPR2021-00402, 17 pgs.

Raptiva® label, as submitted to the USPTO on Jan. 7, 2021, in Inter Partes Review No. IPR2021-00402, 36 pgs.

Simulect® label, as submitted to the USPTO on Jan. 7, 2021, in Inter Partes Review No. IPR2021-00402, 7 pgs.

Herceptin® label, as submitted to the USPTO on Jan. 7, 2021, in Inter Partes Review No. IPR2021-00402, 2 pgs.

Andersen et al., "Recombinant protein expression for therapeutic applications," *Current Opinion in Biotechnology*, 13:117-123 (2002).

Janeway et al., "The structure of a typical antibody molecule," Immunobiology: The Immune System in Health and Disease, 5th edition, New York: Garland Science, 6 pgs. (2001).

Drug Vehicle (Code C927), National Cancer Institute (NCI), retrieved Jan. 6, 2021, from <https://ncithesaurus.nci.nih.gov/ncitbrowser/ConceptReport jsp?dictionary=NCI_Thesaurus&ns=ncit&code=C927 >, as submitted to the USPTO on Jan. 7, 2021, in Inter Partes Review No. IPR2021-00402, 2 pgs.

Controls in SCI experiments, RegenBase, retrieved Jan. 6, 2021, from <http://regenbase.org/control-groups.html>, as submitted to the USPTO on Jan. 7, 2021, in Inter Partes Review No. IPR2021-00402, 2 pgs.

Fraser, Hamis M., et al., "Single Injections of Vascular Endothelial Growth Factor Trap Block Ovulation in the Macaque and Produced Prolonged, Dose-Related Suppression of Ovarian Function," (2004) J. Clin. Endocrin. & Metabol. 90(2):1114-1122.

Anonymous: "Lucentis in the treatment of neovascular (wet) age-related macular degeneration (AMD)", Jan. 1, 2007, pp. 1-54.

Ex Parte Request for Reexamination of U.S. Pat. No. 10,464,992, pp. 1-70, published Feb. 11, 2020.†

USPTO Communication on Ex Parte Reexamination of U.S. Pat. No. 10,464,992, pp. 1-12, published Apr. 1, 2020.†

† cited by third party

# VEGF ANTAGONIST FORMULATIONS SUITABLE FOR INTRAVITREAL ADMINISTRATION

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation application of U.S. patent application Ser. No. 16/582,486, filed on Sep. 25, 2019, which is a continuation application of U.S. patent application Ser. No. 16/159,269, filed on Oct. 12, 2018, which issued as U.S. Pat. No. 10,464,992 on Nov. 5, 2019, which is a continuation application of U.S. patent application Ser. No. 15/879,294, which issued as U.S. Pat. No. 10,400,025 on Sep. 2, 2013, filed on Jan. 24, 2018, which is a continuation application of U.S. patent application Ser. No. 15/095,606, filed on Apr. 11, 2016, which issued as U.S. Pat. No. 9,914,763 on Mar. 13, 2018, which is a continuation application of U.S. patent application Ser. No. 14/330,096, filed Jul. 14, 2014, which issued as U.S. Pat. No. 9,340,594 on May 17, 2016, which is a continuation of U.S. patent application Ser. No. 13/914,996, filed Jun. 11, 2013, which issued as U.S. Pat. No. 8,802,107 on Aug. 12, 2014, which is a continuation application of U.S. patent application Ser. No. 13/329,770, filed Dec. 19, 2011, which issued as U.S. Pat. No. 8,481,046 on Jul. 9, 2013, which is a continuation application of U.S. patent application Ser. No. 12/833,417, filed Jul. 9, 2010, which issued as U.S. Pat. No. 8,092,803 on Jan. 10, 2012, which is a continuation application of U.S. patent application Ser. No. 12/560,885, filed Sep. 16, 2009, which issued as U.S. Pat. No. 7,807,164 on Oct. 5, 2010, which is a divisional application of U.S. patent application Ser. No. 11/818,463, filed Jun. 14, 2007, which issued as U.S. Pat. No. 7,608,261 on Oct. 27, 2009, which claims the benefit under 35 U.S.C. .§ 119(e) of U.S. Provisional Application No. 60/814,484, filed Jun. 16, 2006, which applications are each hereby incorporated by reference.

## BACKGROUND OF INVENTION

### Field of the Invention

The present invention is directed to pharmaceutical formulations suitable for intravitreal administration comprising agents capable of inhibiting vascular endothelial growth factor (VEGF), and to methods for making and using such formulations. The invention includes liquid pharmaceutical formulations having increased stability, as well as formulations that may be lyophilize and reconstituted for intravitreal administration.

### Statement of Related Art

Vascular endothelial growth factor (VEGF) expression is nearly ubiquitous in human cancer, consistent with its role as a key mediator of tumor neoangiogenesis. Blockade of VEGF function, by binding to the molecule or its VEGFR-2 receptor, inhibits growth of implanted tumor cells in multiple different xenograft models (see, for example, Gerber et al. (2000) Cancer Res. 60:6253-6258). A soluble VEGF-specific fusion protein antagonist, termed a "VEGF trap" has been described (Kim et al. (2002) Proc. Natl. Acad. Sci. USA 99:11399-404; Holash et al. (2002) Proc. Natl. Acad. Sci. USA 99:11393-8), which applications are specifically incorporated by reference in their entirety.



Ophthalmic formulations are known, see for example, U.S. Pat. Nos. 7,033,604 and 6,777,429. An ophthalmic formulation of a VEGF antibody is described in U.S. Pat. No. 6,676,941.

Lyophilization (freeze drying under controlled conditions) is commonly used for long-term storage of proteins. The lyophilized protein is substantially resistant to degradation, aggregation, oxidation, and other degenerative processes while in the freeze-dried state (see, for example, U.S. Pat. No. 6,436,897).

## BRIEF SUMMARY OF THE INVENTION

Stable formulations of a VEGF-specific fusion protein antagonist are provided. Pharmaceutically acceptable formulations are provided that comprise a VEGF "trap" antagonist with a pharmaceutically acceptable carrier. In specific embodiments, liquid and lyophilized formulations are provided.

In a first aspect, a stable liquid ophthalmic formulation of a VEGF-specific fusion protein antagonist is provided, comprising a fusion protein that comprises a receptor component consisting essentially of an immunoglobulin-like (Ig) domain 2 of a first VEGF receptor and Ig domain 3 of a second VEGF receptor, and a multimerizing component (also termed a "VEGF trap"). In a specific embodiment of the VEGF-specific fusion protein antagonist, the first VEGF receptor is Flt1 and the second VEGF receptor is Flk1 or Flt4. In a more specific embodiment the fusion protein has the amino acid sequence of SEQ ID NO:2 or SEQ ID NO:4. Preferably, the VEGF antagonist is a dimer comprising two fusion proteins of SEQ ID NO:4.

In one aspect, a stable liquid ophthalmic formulation is provided that comprises 1-100 mg/ml VEGF-specific fusion protein antagonist, 0.01-5% of one or more organic co-solvent(s), 30-150 mM of one or more tonicity agent(s), 5-40 mM of a buffering agent, and optionally, 1.0-7.5% of a stabilizing agent, pH between about 5.8-7.0.

In one or more specific embodiments, the organic co-solvent may be polysorbate, for example, polysorbate 20 or polysorbate 80, polyethylene glycol (PEG), for example, PEG 3350, or propylene glycol, or a combination thereof; the tonicity agent may be, for example, sodium chloride or potassium chloride; the stabilizing agent may be sucrose, sorbitol, glycerol, trehalose, or mannitol; and the buffering agent may be, for example, phosphate buffer. In a specific embodiment, the phosphate buffer is a sodium phosphate buffer.

In various embodiments, the organic co-solvent is polysorbate and/or PEG, the stabilizing agent is sucrose, the buffering agent is phosphate buffer, and the tonicity agent is sodium chloride.

More specifically, the stable liquid ophthalmic formulation comprises about 40-50 mg/ml of the VEGF antagonist (SEQ ID NO:4), about 10 mM phosphate buffer, 0.01-3% polysorbate and/or PEG, 40-135 mM sodium chloride, and optionally 5.0% sucrose, pH about 6.2-6.3.

In a specific preferred embodiment, the stable liquid ophthalmic formulation comprises about 50 mg/ml of the VEGF antagonist (SEQ ID NO:4), 10 mM sodium phosphate buffer, 50 mM sodium chloride, 0.1% polysorbate, and 5% sucrose, pH about 6.2-6.3.

In a specific preferred embodiment, the stable liquid ophthalmic formulation comprises about 50 mg/ml of the VEGF antagonist (SEQ ID NO:4), 10 mM sodium phosphate buffer, 50 mM sodium chloride, 3% PEG, and 5% sucrose, pH about 6.2-6.3.

In a specific preferred embodiment, the stable liquid ophthalmic formulation comprises about 40 mg/ml of the VEGF antagonist (SEQ ID NO:4), 10 mM sodium phosphate buffer, 40 mM sodium chloride, 0.03% polysorbate, and 5% sucrose, pH about 6.2-6.3.

In a specific preferred embodiment, the stable liquid ophthalmic formulation comprises about 40 mg/ml of the VEGF antagonist (SEQ ID NO:4), 10 mM sodium phosphate buffer, 135 mM sodium chloride, and 0.03% polysorbate, pH about 6.2-6.3.

In another aspect, a stable liquid ophthalmic formulation is provided that comprises 1-100 mg/ml VEGF-specific fusion protein antagonist; 0.01-5% of one or more organic co-solvent(s); 5-40 mM of a buffering agent; and optionally 30-150 mM of one or more tonicity agent(s) and/or 1.0-7.5% of a stabilizing agent; having a pH between about 5.8-7.0.

In various embodiments, the VEGF antagonist (SEQ ID NO:4) is present at a concentration of about 10 to about 80 mg/ml. In various embodiments, the VEGF antagonist (SEQ ID NO:4) is present at a concentration of about 10, about 20, about 30, about 40, about 50, about 60, about 70, or about 80 mg/ml. In a preferred embodiment, the VEGF antagonist (SEQ ID NO:4) is present at a concentration of about 40 mg/ml.

In another embodiment, the stabilizing agent is selected from one or more of sucrose, sorbitol, glycerol, trehalose, and mannitol.

In another embodiment, the organic co-solvent is selected from one or more of polysorbate, for example, polysorbate 20 or polysorbate 80, polyethylene glycol (PEG), for example, PEG 3350, and propylene glycol.

In another embodiment, the buffer is a phosphate buffer, for example, sodium phosphate.

In another embodiment, the tonicity agent is a salt, for example, sodium chloride.

In one embodiment, the stable liquid ophthalmic formulation comprises 10 mM sodium phosphate buffer, about 0.03 to about 0.1% polysorbate and/or about 3% PEG or propylene glycol, about 40 mM sodium chloride, and about 5% sucrose. In a specific embodiment, the stable liquid ophthalmic formulation comprises 10 mM sodium phosphate buffer, about 0.03% polysorbate, about 40 mM sodium chloride, and about 5% sucrose. In another specific embodiment, the pH of the formulation is about 6.2 to about 6.3. In another specific embodiment, the pH is achieved by mixing mono- and dibasic sodium phosphate to the desired pH without acid/base titration.

In a specific embodiment, the stable liquid ophthalmic formulation consists essentially of a VEGF antagonist (SEQ ID NO:4) at 40 mg/ml, 10 mM sodium phosphate buffer, polysorbate at 0.03%, sodium chloride at 40 mM, and sucrose at 5%, pH 6.2-6.3.

In another aspect, a stable liquid ophthalmic formulation is provided that comprises about 10 to about 80 mg/ml VEGF antagonist, about 10 mM sodium phosphate buffer, about 0.03% polysorbate, and about 135 mM sodium chloride, pH 6.2 to 6.3.

In various embodiments, the VEGF antagonist (SEQ ID NO:4) is present at a concentration of about 10 to about 80 mg/ml. In various embodiments, the VEGF antagonist (SEQ ID NO:4) is present at a concentration of about 10, about 20, about 30, about 40, about 50, about 60, about 70, or about 80 mg/ml. In a specific embodiment, the VEGF antagonist (SEQ ID NO:4) is present at a concentration of about 40 mg/ml.

In one embodiment, the stable liquid ophthalmic formulation comprises 40 mg/ml of VEGF antagonist (SEQ ID NO:4), 10 mM sodium phosphate buffer, 0.03% polysorbate, and 135 mM sodium chloride at pH 6.2-6.3. In a specific embodiment, the stable liquid ophthalmic formulation consists essentially of 40 mg/ml of VEGF antagonist (SEQ ID NO:4), 10 mM sodium phosphate buffer, 0.03% polysorbate, and 135 mM sodium chloride at pH 6.2-6.3.

In another aspect, a lyophilizable formulation of a VEGF antagonist is provided, wherein upon lyophilization followed by reconstitution, a stable liquid ophthalmic formulation as described herein is obtained.

In another aspect, a lyophilizable formulation of a vascular endothelial growth factor (VEGF)-specific fusion protein antagonist is provided, comprising 5-50 mg/ml of the VEGF antagonist, 5-25 mM buffer, such as phosphate buffer, 0.01 to 0.15% of one or more of an organic co-solvent, such as polysorbate, propylene glycol and/or PEG, and optionally 1-10% of a stabilizing agent such as sucrose, sorbitol, trehalose, glycerol, or mannitol, pH about 5.8-7.0. In various embodiments, the VEGF antagonist (SEQ ID NO:4) is present at about 5, about 10, about 20, about 30, or about 40 mg/ml. In a specific embodiment, the lyophilizable ophthalmic formulation of the invention comprises 20 mg/ml of the VEGF antagonist, 10 mM sodium phosphate buffer, 0.03% polysorbate, 0.1% PEG, and 2.5% sucrose, pH about 6.2-6.3. In further embodiments, the lyophilizable formulation further comprises sodium chloride. In a specific embodiment, the sodium chloride is present at a concentration of about 20 mM. In another specific embodiment, the sodium chloride is present at a concentration of about 67.5 mM.

In another specific embodiment, the lyophilizable ophthalmic formulation of the invention comprises 20 mg/ml of the VEGF antagonist, 5 mM sodium phosphate buffer, 0.015% polysorbate, 20 mM sodium chloride, and 2.5% sucrose, pH about 6.2-6.3.

In another embodiment, the lyophilizable ophthalmic formulation comprises 5 mg/ml, 10 mg/ml, or 40 mg/ml VEGF antagonist, 5 mM sodium phosphate buffer, 0.015% polysorbate, 20 mM sodium chloride, and 2.5% sucrose, at pH 6.2-6.3. In a specific embodiment, the lyophilizable ophthalmic formulation consists essentially of 5 mg/ml, 10 mg/ml, or 40 mg/ml VEGF antagonist (SEQ ID NO:4), 5 mM sodium phosphate buffer, 0.015% polysorbate, 20 mM sodium chloride, and 2.5% sucrose, at pH 6.2-6.3.

In another specific embodiment, the lyophilizable ophthalmic formulation comprises 20 mg/ml of the VEGF antagonist, 5 mM sodium phosphate buffer, 0.015% polysorbate, and 67.5 mM sodium chloride, pH about 6.2-6.3. In a more specific embodiment, the lyophilizable ophthalmic formulation consists essentially of 20 mg/ml of the VEGF antagonist (SEQ ID NO:4), 5 mM sodium phosphate buffer, 0.015% polysorbate, and 67.5 mM sodium chloride, pH 6.2-6.3.

In another specific embodiment, the lyophilizable ophthalmic formulation comprises 5 mg/ml, 10 mg/ml, or 40 mg/ml VEGF antagonist, 5 mM sodium phosphate buffer, 0.015% polysorbate, and 67.5 mM sodium chloride, pH about 6.2-6.3. In a more specific embodiment, the lyophilizable ophthalmic formulation consists essentially of 5 mg/ml, 10 mg/ml, or 40 mg/ml VEGF antagonist (SEQ ID NO:4), 5 mM sodium phosphate buffer, 0.015% polysorbate, and 67.5 mM sodium chloride, pH about 6.2-6.3.

Generally, the reconstituted formulation is about 2 times the concentration of the pre-lyophilized formulation, e.g., a 20 mg fusion protein/ml pre-lyophilized formulation is reconstituted to a final formulation of 40 mg fusion protein/ml.

Generally, the lyophilized formulation is reconstituted with sterile water suitable for injection. In one embodiment, the reconstitution liquid is bacteriostatic water.

In another aspect, the invention features a method of producing a lyophilized formulation of a VEGF-specific fusion protein antagonist, comprising subjecting the lyophilizable formulation of the invention to lyophilization to generate a lyophilized formulation. The lyophilized formulation may be lyophilized by any method known in the art for lyophilizing a liquid.

In another related aspect, the invention features a method of producing a reconstituted lyophilized formulation of a VEGF antagonist, comprising reconstituting the lyophilized formulation of the invention to a reconstituted formulation. In one embodiment, the reconstituted formulation is twice the concentration of the pre-lyophilized formulation, e.g., the method of the invention comprises: (a) producing a pre-lyophilized formulation of a VEGF-specific fusion protein antagonist, (b) subjecting the pre-lyophilized formulation of step (a) to lyophilization; and (c) reconstituting the lyophilized formulation of step (b).

The invention further features ophthalmic formulations provided in a pre-filled syringe or vial, particularly suitable for intravitreal administration.

Other objects and advantages will become apparent from a review of the ensuing detailed description.

## DETAILED DESCRIPTION OF THE INVENTION

The present invention is not limited to particular methods, and experimental conditions described, as such methods and conditions may vary. It is also to be understood that the terminology used herein is for the purpose of describing particular embodiments only, and is not intended to be limiting unless indicated, since the scope of the present invention will be limited only by the appended claims.

Unless stated otherwise, all technical and scientific terms and phrases used herein have the same meaning as commonly understood by one of ordinary skill in the art to which the invention belongs. Although any methods and materials similar or equivalent to those described herein can be used in the practice or testing of the present invention, the preferred methods and materials are now described. All publications mentioned herein are incorporated herein by reference.

### General Description

Safe handling and administration of formulations comprising proteins represent significant challenges to pharmaceutical formulators. Proteins possess unique chemical and physical properties that present stability problems: a variety of degradation pathways exist for proteins, implicating both chemical and physical instability. Chemical instability includes deamination, aggregation, clipping of the peptide backbone, and oxidation of methionine residues. Physical instability encompasses many phenomena, including, for example, aggregation and/or precipitation.

Chemical and physical stability can be promoted by removing water from the protein. Lyophilization (freeze-drying under controlled conditions) is commonly used for long-term storage of proteins. The lyophilized protein is substantially resistant to degradation, aggregation, oxidation, and other degenerative processes while in the freeze-dried state. The lyophilized protein may be reconstituted with water optionally containing a bacteriostatic preservative (e.g., benzyl alcohol) prior to administration.

### Definitions

The term "carrier" includes a diluent, adjuvant, excipient, or vehicle with which a composition is administered. Carriers can include sterile liquids, such as, for example, water and oils, including oils of petroleum, animal, vegetable or synthetic origin, such as, for example, peanut oil, soybean oil, mineral oil, sesame oil and the like.

The term "excipient" includes a non-therapeutic agent added to a pharmaceutical composition to provide a desired consistency or stabilizing effect. Suitable pharmaceutical excipients include, for example, starch, glucose, lactose, sucrose, gelatin, malt, rice, flour, chalk, silica gel, sodium stearate, glycerol monostearate, talc, sodium chloride, dried skim milk, glycerol, propylene, glycol, water, ethanol and the like.

The term "lyophilized" or "freeze-dried" includes a state of a substance that has been subjected to a drying procedure such as lyophilization, where at least 90% of moisture has been removed.

### VEGF Antagonists

A VEGF antagonist is a compound capable of blocking or inhibiting the biological action of vascular endothelial growth factor (VEGF), and includes fusion proteins capable of trapping VEGF. In a preferred embodiment, the VEGF antagonist is the fusion protein of SEQ ID NO:2 or 4; more preferably, SEQ ID NO:4. In specific embodiments, the VEGF antagonist is expressed in a mammalian cell line such as a CHO cell and may be modified post-translationally. In a specific embodiment, the fusion protein comprises amino acids 27-457 of SEQ ID NO:4 and is glycosylated at Asn residues 62, 94, 149, 222 and 308. Preferably, the VEGF antagonist is a dimer composed of two fusion proteins of SEQ ID NO:4.

The VEGF antagonist of the methods and formulations of the invention can be prepared by any suitable method known in the art, or that comes to be known. The VEGF antagonist is preferably substantially free of protein contaminants at the time it is used to prepare the pharmaceutically acceptable formulation. By "substantially free of protein contaminants" is meant, preferably, that at least 90% of the weight of protein of the VEGF-specific fusion protein antagonist preparation used for making a formulation is VEGF fusion protein antagonist protein, more preferably at least 95%, most preferably at least 99%. The fusion protein is preferably substantially free of aggregates. "Substantially free of aggregates" means that at least 90% of the weight of fusion protein is not present in an aggregate at the time the fusion protein is used to prepare the pharmaceutically effective formulation. Unless stated otherwise, the phosphates employed are sodium phosphates and a desired buffering pH is achieved by mixing appropriate amounts of mono- and dibasic sodium phosphate.

### Stable Liquid Ophthalmic Formulations

In one aspect, the invention provides a stable pharmaceutically acceptable formulation comprising a VEGF antagonist, wherein the formulation is a liquid formulation suitable for ophthalmic use. Preferably, the liquid formulation comprises a pharmaceutically effective amount of the VEGF antagonist. The formulation can also comprise one or more

pharmaceutically acceptable carriers, buffers, tonicity agents, stabilizers, and/or excipients. An example of a pharmaceutically acceptable liquid formulation comprises a VEGF antagonist in a pharmaceutically effective amount, a buffer, an organic co-solvent such as polysorbate, a tonicity agent such as NaCl, and optionally, a stabilizer such as sucrose or trehalose.

Stability is determined in a number of ways at specified time points, including determination of pH, visual inspection of color and appearance, determination of total protein content by methods known in the art, e.g., UV spectroscopy, and purity is determined by, for example, SDS-PAGE, size-exclusion HPLC, bioassay determination of activity, isoelectric focusing, and isoaspartate quantification. In one example of a bioassay useful for determining VEGF antagonist activity, a BAF/3 VEGFR1/EPOR cell line is used to determine VEGF165 binding by the VEGF antagonist of the invention.

Liquid formulations can be stored in an oxygen-deprived environment. Oxygen-deprived environments can be generated by storing the formulations under an inert gas such as, for example, nitrogen or argon. Liquid formulations are preferably stored at about 5° C.

## Ophthalmic Lyophilized Formulations

In one aspect of the invention, an ophthalmically acceptable formulation comprising a VEGF antagonist is provided, wherein the formulation is a lyophilizable formulation. Lyophilizable formulations can be reconstituted into solutions, suspensions, emulsions, or any other suitable form for administration or use. Lyophilizable formulations are typically first prepared as liquids, then frozen and lyophilized. The total liquid volume before lyophilization can be less, equal to, or more than, the final reconstituted volume of the lyophilized formulation. The lyophilization process is well known to those of ordinary skill in the art, and typically includes sublimation of water from a frozen formulation under controlled conditions.

Lyophilized formulations can be stored at a wide range of temperatures. Lyophilized formulations may be stored below 25° C., for example, refrigerated at 2-8° C., or at room temperature (e.g., approximately 25° C.). Preferably, lyophilized formulations are stored below about 25° C., more preferably, at about 4-20° C.; below about 4° C.; below about −20° C.; about −40° C.; about −70° C., or about −80° C. Stability of the lyophilized formulation may be determined in a number of ways known to the art, for example, by visual appearance of the cake and/or by moisture content.

Lyophilized formulations are typically reconstituted for use by addition of an aqueous solution to dissolve the lyophilized formulation. A wide variety of aqueous solutions can be used to reconstitute a lyophilized formulation. Preferably, lyophilized formulations are reconstituted using water. Lyophilized formulations are preferably reconstituted with a solution consisting essentially of water (e.g., USP WFI, or water for injection) or bacteriostatic water (e.g., USP WFI with 0.9% benzyl alcohol). However, solutions comprising buffers and/or excipients and/or one or more pharmaceutically acceptable carries can also be used.

Freeze-dried or lyophilized formulations are typically prepared from liquids, that is, from solutions, suspensions, emulsions, and the like. Thus, the liquid that is to undergo freeze-drying or lyophilization preferably comprises all components desired in a final reconstituted liquid formulation. As a result, when reconstituted, the freeze-dried or lyophilized formulation will render a desired liquid formulation upon reconstitution.

## EXAMPLES

Before the present methods are described, it is to be understood that this invention is not limited to particular methods, and experimental conditions described, as such methods and conditions may vary. It is also to be understood that the terminology used herein is for the purpose of describing particular embodiments only, and is not intended to be limiting, since the scope of the present invention will be limited only to the appended claims.

As used in this specification and the appended claims, the singular forms "a", "an", and "the" include plural references unless the context clearly dictates otherwise. Thus for example, a reference to "a method" includes one or more methods, and/or steps of the type described herein and/or which will become apparent to those persons skilled in the art upon reading this disclosure and so forth.

Unless defined otherwise, all technical and scientific terms used herein have the same meaning as commonly understood by one of ordinary skill in the art to which this invention belongs. Although any methods and materials similar or equivalent to those described herein can be used in the practice or testing of the present invention, the preferred methods and materials are now described. All publications mentioned herein are incorporated herein by reference in their entirety.

### Example 1. Stability of 50 mg/ml VEGF Trap Liquid Formulation Stored at 5° C. in 3 ml Glass Vials

An ophthalmic liquid formulation containing 50 mg/ml VEGF Trap (SEQ ID NO:4), 10 mM phosphate, 50 mM NaCl, 0.1% polysorbate 20, 5% sucrose, and pH 6.25, was stored at 5° C. in 3 ml glass vials and samples tested at 3, 6, 9, 12, 18 and 24 months. Stability was determined by SE-HPLC The results are shown in Table 1. Turbidity was measured at $OD_{405}$ nm; and percent recovered protein and purity by size exclusion HPLC.

TABLE 1

Stability of 50 mg/ml VEGF Trap Protein (VGFT-SS065)

| Months | Visual Appearance | Turbidity ($OD_{405}$ nm) | pH | % VEGF Trap Recovered | % VEGF Trap Native Configuration |
|---|---|---|---|---|---|
| 0 | Pass | 0.00 | 6.2 | 100 | 98.8 |
| 3 | Pass | 0.00 | 6.2 | 101 | 98.7 |
| 6 | Pass | 0.01 | 6.3 | 100 | 98.3 |
| 9 | Pass | 0.01 | 6.3 | 101 | 98.3 |
| 12 | Pass | 0.01 | 6.3 | 104 | 98.4 |
| 18 | Pass | 0.01 | 6.3 | 96 | 98.1 |
| 24 | Pass | 0.01 | 6.3 | 105 | 98.1 |

### Example 2. Stability of 50 mg/ml VEGF Trap Liquid Formulation Stored at 5° C. in 3 ml Glass Vials

A liquid formulation containing 50 mg/ml VEGF Trap (SEQ ID NO:4), 10 mM phosphate, 50 mM NaC1, 3% polyethylene glycol 3350, 5% sucrose, and pH 6.25, was stored at 5° C. in 3 nil glass vials and samples tested at 3, 6,

9, 12, 18 and 24 months. Stability results are shown in Table 2. Turbidity, percent recovered protein and purity was determined as described above.

TABLE 2

Stability of 50 mg/ml VEGF Trap Protein (VGFT-SS065)

| Months | Visual Appearance | Turbidity | pH | % VEGF Trap Recovered | % VEGF Trap Native Configuration |
|---|---|---|---|---|---|
| 0 | Pass | 0.00 | 6.2 | 100 | 98.9 |
| 3 | Pass | 0.00 | 6.1 | 104 | 98.5 |
| 6 | Pass | 0.01 | 6.3 | 99 | 98.3 |
| 9 | Pass | 0.00 | 6.3 | 102 | 97.6 |
| 12 | Pass | 0.01 | 6.3 | 103 | 98.0 |
| 18 | Pass | 0.00 | 6.3 | 113 | 97.7 |
| 24 | Pass | 0.00 | 6.2 | 106 | 97.6 |

Example 3. Stability of 40 mg/ml VEGF Trap Liquid Formulation Stored at 5° C. in 3 ml Glass Vials

A liquid formulation containing 40 mg/ml VEGF Trap (SEQ ID NO:4), 10 mM phosphate, 40 mM NaCl, 0.03% polysorbate 20, 5% sucrose, and pH 6.3, was stored at 5° C. in 3 ml glass vials and samples tested at 0.5, 1, 2, 3, and 4 months. Stability results are shown in Table 3. Turbidity, percent recovered protein and purity was determined as described above.

TABLE 3

Stability of 40 mg/ml VEGF Trap Protein (VGFT-SS207)

| Months | Visual Appearance | Turbidity | pH | % VEGF Trap Recovered | % VEGF Trap Native Configuration |
|---|---|---|---|---|---|
| 0 | Pass | 0.00 | 6.3 | 100 | 99.5 |
| 0.5 | Pass | 0.00 | 6.3 | 99 | 99.4 |
| 1 | Pass | 0.00 | 6.2 | 98 | 99.5 |
| 2 | Pass | 0.00 | 6.2 | 95 | 99.2 |
| 3 | Pass | 0.01 | 6.4 | | |
| 4 | Pass | 0.01 | 6.3 | | |

Example 4. Stability of 40 mg/ml VEGF Trap Liquid Formulation Stored at 5° C. in Pre-Filled Glass Syringe

A liquid formulation containing 40 mg/ml VEGF trap (SEQ ID NO:4), 10 mM phosphate, 40 mM NaCl, 0.03% polysorbate 20, 5% sucrose, and pH 6.3, was stored at 5° C. in 1 ml prefilled luer glass syringe with 4023/50 FluroTec coated plunger and samples tested at 0.5, 1, 2, 3, and 4 months. Stability results are shown in Table 4. Turbidity, percent recovered protein and purity was determined as described above.

TABLE 4

Stability of 40 mg/ml VEGF Trap Protein (VGFT-SS207)

| Months | Visual Appearance | Turbidity | pH | % VEGF Trap Recovered | % VEGF Trap Native Configuration |
|---|---|---|---|---|---|
| 0 | Pass | 0.00 | 6.3 | 100 | 99.4 |
| 0.5 | Pass | 0.00 | 6.3 | 100 | 99.3 |

TABLE 4-continued

Stability of 40 mg/ml VEGF Trap Protein (VGFT-SS207)

| Months | Visual Appearance | Turbidity | pH | % VEGF Trap Recovered | % VEGF Trap Native Configuration |
|---|---|---|---|---|---|
| 1 | Pass | 0.00 | 6.3 | 100 | 99.4 |
| 2 | Pass | 0.00 | 6.3 | 97 | 99.1 |
| 3 | Pass | 0.01 | 6.4 | | |
| 4 | Pass | 0.01 | 6.3 | | |

Example 5. Stability of 40 mg/ml VEGF Trap Liquid Formulation Stored at 5° C. in 3 ml Glass Vials

A liquid formulation containing 40 mg/ml VEGF trap (SEQ ID NO:4), 10 mM phosphate, 135 mM NaCl, 0.03% polysorbate 20, and pH 6.3, was stored at 5° C. in 3 ml glass vials and samples tested at 0.5, 1, 2, 3, and 4 months. Stability results are shown in Table 5. Turbidity, percent recovered protein and purity was determined as described above.

TABLE 5

Stability of 40 mg/ml VEGF Trap Protein (VGFT-SS203)

| Months | Visual Appearance | Turbidity | pH | % VEGF Trap Recovered | % VEGF Trap Native Configuration |
|---|---|---|---|---|---|
| 0 | Pass | 0.00 | 6.3 | 100 | 99.3 |
| 0.5 | Pass | 0.00 | 6.2 | 87 | 99.2 |
| 1 | Pass | 0.00 | 6.2 | 88 | 99.1 |
| 2 | Pass | 0.00 | 6.3 | 103 | 99.2 |
| 3 | Pass | 0.00 | 6.3 | 88 | 99.0 |
| 4 | Pass | 0.00 | 6.2 | 85 | 98.9 |
| 5 | Pass | 0.00 | 6.3 | 84 | 99.0 |

Example 6. Stability of 40 mg/ml VEGF Trap Liquid Formulation Stored at 5° C. in 1 ml Pre-Filled Glass Syringe

A liquid formulation containing 40 mg/ml VEGF trap (SEQ ID NO:4), 10 mM phosphate, 135 mM NaCl, 0.03% polysorbate 20, and pH 6.3, was stored at 5° C. in 1 ml prefilled glass luer syringe with 4023/50 FluroTec coated plunger and samples tested at 0.5, 1, 2, 3, 4, and 5 months. Stability results are shown in Table 6. Turbidity, percent recovered protein and purity was determined as described above.

TABLE 6

Stability of 40 mg/ml VEGF Trap Protein (VGFT-SS203)

| Months | Visual Appearance | Turbidity | pH | % VEGF Trap Recovered | % VEGF Trap Native Configuration |
|---|---|---|---|---|---|
| 0 | Pass | 0.00 | 6.3 | 100 | 99.2 |
| 0.5 | Pass | 0.01 | 6.3 | 101 | 99.2 |
| 1 | Pass | 0.00 | 6.3 | 101 | 99.2 |
| 2 | Pass | 0.00 | 6.3 | — | — |
| 3 | Pass | 0.01 | 6.3 | 102 | 99.1 |
| 4 | Pass | 0.01 | 6.3 | 103 | 98.8 |
| 5 | Pass | 0.00 | 6.3 | 99 | 98.9 |

### Example 7. Stability of Lyophilized 20 mg/ml VEGF Trap Formulation Stored at 5° C. in 3 ml Glass Vials and Reconstituted to 40 mg/ml

0.8 ml of a liquid formulation containing 20 mg/ml VEGF trap (SEQ ID NO:4), 5 mM phosphate, 20 mM NaCl, 0.015% polysorbate 20, 2.5% sucrose, and pH 6.3, were lyophilized in 3 ml glass vials. Samples were stored at 5° C. and tested at 1, and 2 months. VEGF trap was reconstituted to a final concentration of 40 mg/ml VEGF Trap (final volume of 0.4 ml). Stability results are shown in Table 7 (t=time in months; *=visual appearance; **=reconstitution time). Turbidity, percent recovered protein and purity was determined as described above.

TABLE 7

Stability of Lyophilized 20 mg/ml VEGF Trap Protein (VGFT-SS216)

| t | Vis. App.* | Recon. Time** (min) | Vis. App.* Reconst'd Liquid | Turbidity | pH | % VEGF Trap Recovered | % VEGF Trap Native Config. |
|---|---|---|---|---|---|---|---|
| 0 | Pass | 0.6 | Pass | 0.00 | 6.3 | 100 | 99.5 |
| 1 | Pass | 0.6 | Pass | 0.01 | 6.3 | 106 | 99.4 |
| 2 | Pass | 0.4 | Pass | 0.01 | 6.2 | 103 | 99.3 |

### Example 8. Stability of Lyophilized 20 mg/ml VEGF Trap Formulation Stored at 5° C. in 3 ml Glass Vials

0.8 ml of a liquid formulation containing 20 mg/ml VEGF trap (SEQ ID NO:4), 5 mM phosphate, 67.5 mM NaCl, 0.015% polysorbate 20, and pH 6.3, were lyophilized in 3 ml glass vials. Samples were stored at 5° C. and tested at 1, 2, and 3 months. VEGF trap was reconstituted to a final concentration of 40 mg/ml VEGF trap (final volume of 0.4 ml). Stability results are shown in Table 8 (t=time in months; *=visual appearance; **=reconstitution time).

TABLE 8

Stability of Lyophilized 20 mg/ml VEGF Trap Protein (VGFT-SS216)

| t | Vis. App.* | Recon. Time** (min) | Vis. App. Reconst'd Liquid | Turbidity | pH | % VEGF Trap Recovered | % VEGF Trap Native Config. |
|---|---|---|---|---|---|---|---|
| 0 | Pass | 0.7 | Pass | 0.00 | 6.3 | 100 | 99.0 |
| 1 | Pass | 0.7 | Pass | 0.01 | 6.2 | 105 | 98.9 |
| 2 | Pass | 0.4 | Pass | 0.01 | 6.2 | 103 | 98.9 |

SEQUENCE LISTING

```
<160> NUMBER OF SEQ ID NOS: 4

<210> SEQ ID NO 1
<211> LENGTH: 1453
<212> TYPE: DNA
<213> ORGANISM: Artificial sequence
<220> FEATURE:
<223> OTHER INFORMATION: Synthetic

<400> SEQUENCE: 1

aagcttgggc tgcaggtcga tcgactctag aggatcgatc cccgggcgag ctcgaattcg     60

caaccaccat ggtcagctac tgggacaccg gggtcctgct gtgcgcgctg ctcagctgtc    120

tgcttctcac aggatctagt tccggaggta gacctttcgt agagatgtac agtgaaatcc    180

ccgaaattat acacatgact gaaggaaggg agctcgtcat tccctgccgg gttacgtcac    240

ctaacatcac tgttacttta aaaaagtttc cacttgacac tttgatccct gatggaaaac    300

gcataatctg ggacagtaga aagggcttca tcatatcaaa tgcaacgtac aaagaaatag    360

ggcttctgac ctgtgaagca acagtcaatg ggcatttgta taagacaaac tatctcacac    420

atcgacaaac caatacaatc atagatgtgg ttctgagtcc gtctcatgga attgaactat    480

ctgttggaga aaagcttgtc ttaaattgta cagcaagaac tgaactaaat gtggggattg    540

acttcaactg ggaataccct tcttcgaagc atcagcataa gaaacttgta aaccgagacc    600

taaaaaccca gtctgggagt gagatgaaga aatttttgag caccttaact atagatggtg    660

taacccggag tgaccaagga ttgtacacct gtgcagcatc cagtgggctg atgaccaaga    720

agaacagcac atttgtcagg gtccatgaaa agggcccggg cgacaaaact cacacatgcc    780

caccgtgccc agcacctgaa ctcctggggg gaccgtcagt cttcctcttc cccccaaaac    840

ccaaggacac cctcatgatc tcccggaccc ctgaggtcac atgcgtggtg gtggacgtga    900

gccacgaaga ccctgaggtc aagttcaact ggtacgtgga cggcgtggag gtgcataatg    960

ccaagacaaa gccgcgggag gagcagtaca acagcacgta ccgtgtggtc agcgtcctca   1020
```

```
ccgtcctgca ccaggactgg ctgaatggca aggagtacaa gtgcaaggtc tccaacaaag   1080

ccctcccagc ccccatcgag aaaaccatct ccaaagccaa agggcagccc cgagaaccac   1140

aggtgtacac cctgccccca tcccgggatg agctgaccaa gaaccaggtc agcctgacct   1200

gcctggtcaa aggcttctat cccagcgaca tcgccgtgga gtgggagagc aatgggcagc   1260

cggagaacaa ctacaagacc acgcctcccg tgctggactc cgacggctcc ttcttcctct   1320

atagcaagct caccgtggac aagagcaggt ggcagcaggg gaacgtcttc tcatgctccg   1380

tgatgcatga ggctctgcac aaccactaca cgcagaagag cctctccctg tctccgggta   1440

aatgagcggc cgc                                                      1453


<210> SEQ ID NO 2
<211> LENGTH: 458
<212> TYPE: PRT
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Synthetic

<400> SEQUENCE: 2

Met Val Ser Tyr Trp Asp Thr Gly Val Leu Leu Cys Ala Leu Leu Ser
1               5                   10                  15

Cys Leu Leu Leu Thr Gly Ser Ser Ser Gly Gly Arg Pro Phe Val Glu
            20                  25                  30

Met Tyr Ser Glu Ile Pro Glu Ile Ile His Met Thr Glu Gly Arg Glu
        35                  40                  45

Leu Val Ile Pro Cys Arg Val Thr Ser Pro Asn Ile Thr Val Thr Leu
    50                  55                  60

Lys Lys Phe Pro Leu Asp Thr Leu Ile Pro Asp Gly Lys Arg Ile Ile
65                  70                  75                  80

Trp Asp Ser Arg Lys Gly Phe Ile Ile Ser Asn Ala Thr Tyr Lys Glu
                85                  90                  95

Ile Gly Leu Leu Thr Cys Glu Ala Thr Val Asn Gly His Leu Tyr Lys
            100                 105                 110

Thr Asn Tyr Leu Thr His Arg Gln Thr Asn Thr Ile Ile Asp Val Val
        115                 120                 125

Leu Ser Pro Ser His Gly Ile Glu Leu Ser Val Gly Glu Lys Leu Val
    130                 135                 140

Leu Asn Cys Thr Ala Arg Thr Glu Leu Asn Val Gly Ile Asp Phe Asn
145                 150                 155                 160

Trp Glu Tyr Pro Ser Ser Lys His Gln His Lys Lys Leu Val Asn Arg
                165                 170                 175

Asp Leu Lys Thr Gln Ser Gly Ser Glu Met Lys Lys Phe Leu Ser Thr
            180                 185                 190

Leu Thr Ile Asp Gly Val Thr Arg Ser Asp Gln Gly Leu Tyr Thr Cys
        195                 200                 205

Ala Ala Ser Ser Gly Leu Met Thr Lys Lys Asn Ser Thr Phe Val Arg
    210                 215                 220

Val His Glu Lys Gly Pro Gly Asp Lys Thr His Thr Cys Pro Pro Cys
225                 230                 235                 240

Pro Ala Pro Glu Leu Leu Gly Gly Pro Ser Val Phe Leu Phe Pro Pro
                245                 250                 255

Lys Pro Lys Asp Thr Leu Met Ile Ser Arg Thr Pro Glu Val Thr Cys
            260                 265                 270

Val Val Val Asp Val Ser His Glu Asp Pro Glu Val Lys Phe Asn Trp
        275                 280                 285
```

```
Tyr Val Asp Gly Val Glu Val His Asn Ala Lys Thr Lys Pro Arg Glu
    290                 295                 300

Glu Gln Tyr Asn Ser Thr Tyr Arg Val Val Ser Val Leu Thr Val Leu
305                 310                 315                 320

His Gln Asp Trp Leu Asn Gly Lys Glu Tyr Lys Cys Lys Val Ser Asn
                325                 330                 335

Lys Ala Leu Pro Ala Pro Ile Glu Lys Thr Ile Ser Lys Ala Lys Gly
            340                 345                 350

Gln Pro Arg Glu Pro Gln Val Tyr Thr Leu Pro Pro Ser Arg Asp Glu
        355                 360                 365

Leu Thr Lys Asn Gln Val Ser Leu Thr Cys Leu Val Lys Gly Phe Tyr
    370                 375                 380

Pro Ser Asp Ile Ala Val Glu Trp Glu Ser Asn Gly Gln Pro Glu Asn
385                 390                 395                 400

Asn Tyr Lys Thr Thr Pro Pro Val Leu Asp Ser Asp Gly Ser Phe Phe
                405                 410                 415

Leu Tyr Ser Lys Leu Thr Val Asp Lys Ser Arg Trp Gln Gln Gly Asn
            420                 425                 430

Val Phe Ser Cys Ser Val Met His Glu Ala Leu His Asn His Tyr Thr
        435                 440                 445

Gln Lys Ser Leu Ser Leu Ser Pro Gly Lys
    450                 455


<210> SEQ ID NO 3
<211> LENGTH: 1377
<212> TYPE: DNA
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Synthetic

<400> SEQUENCE: 3

atggtcagct actgggacac cggggtcctg ctgtgcgcgc tgctcagctg tctgcttctc     60

acaggatcta gttccggaag tgataccggt agacctttcg tagagatgta cagtgaaatc    120

cccgaaatta tacacatgac tgaaggaagg gagctcgtca ttccctgccg ggttacgtca    180

cctaacatca ctgttacttt aaaaaagttt ccacttgaca ctttgatccc tgatggaaaa    240

cgcataatct gggacagtag aaagggcttc atcatatcaa atgcaacgta caaagaaata    300

gggcttctga cctgtgaagc aacagtcaat gggcatttgt ataagacaaa ctatctcaca    360

catcgacaaa ccaatacaat catagatgtg gttctgagtc cgtctcatgg aattgaacta    420

tctgttggag aaaagcttgt cttaaattgt acagcaagaa ctgaactaaa tgtggggatt    480

gacttcaact gggaataccc ttcttcgaag catcagcata agaaacttgt aaaccgagac    540

ctaaaaaccc agtctgggag tgagatgaag aaatttttga gcaccttaac tatagatggt    600

gtaacccgga gtgaccaagg attgtacacc tgtgcagcat ccagtgggct gatgaccaag    660

aagaacagca catttgtcag ggtccatgaa aaggacaaaa ctcacacatg cccaccgtgc    720

ccagcacctg aactcctggg gggaccgtca gtcttcctct tccccccaaa acccaaggac    780

accctcatga tctcccggac ccctgaggtc acatgcgtgg tggtggacgt gagccacgaa    840

gaccctgagg tcaagttcaa ctggtacgtg gacggcgtgg aggtgcataa tgccaagaca    900

aagccgcggg aggagcagta caacagcacg taccgtgtgg tcagcgtcct caccgtcctg    960

caccaggact ggctgaatgg caaggagtac aagtgcaagg tctccaacaa agccctccca   1020

gcccccatcg agaaaaccat ctccaaagcc aaagggcagc cccgagaacc acaggtgtac   1080
```

-continued

accctgcccc catcccggga tgagctgacc aagaaccagg tcagcctgac ctgcctggtc 1140

aaaggcttct atcccagcga catcgccgtg gagtgggaga gcaatgggca gccggagaac 1200

aactacaaga ccacgcctcc cgtgctggac tccgacggct ccttcttcct ctacagcaag 1260

ctcaccgtgg acaagagcag gtggcagcag gggaacgtct tctcatgctc cgtgatgcat 1320

gaggctctgc acaaccacta cacgcagaag agcctctccc tgtctccggg taaatga 1377

<210> SEQ ID NO 4
<211> LENGTH: 458
<212> TYPE: PRT
<213> ORGANISM: Artificial Sequence
<220> FEATURE:
<223> OTHER INFORMATION: Synthetic

<400> SEQUENCE: 4

Met Val Ser Tyr Trp Asp Thr Gly Val Leu Leu Cys Ala Leu Leu Ser
1 5 10 15

Cys Leu Leu Leu Thr Gly Ser Ser Ser Gly Ser Asp Thr Gly Arg Pro
20 25 30

Phe Val Glu Met Tyr Ser Glu Ile Pro Glu Ile Ile His Met Thr Glu
35 40 45

Gly Arg Glu Leu Val Ile Pro Cys Arg Val Thr Ser Pro Asn Ile Thr
50 55 60

Val Thr Leu Lys Lys Phe Pro Leu Asp Thr Leu Ile Pro Asp Gly Lys
65 70 75 80

Arg Ile Ile Trp Asp Ser Arg Lys Gly Phe Ile Ile Ser Asn Ala Thr
85 90 95

Tyr Lys Glu Ile Gly Leu Leu Thr Cys Glu Ala Thr Val Asn Gly His
100 105 110

Leu Tyr Lys Thr Asn Tyr Leu Thr His Arg Gln Thr Asn Thr Ile Ile
115 120 125

Asp Val Val Leu Ser Pro Ser His Gly Ile Glu Leu Ser Val Gly Glu
130 135 140

Lys Leu Val Leu Asn Cys Thr Ala Arg Thr Glu Leu Asn Val Gly Ile
145 150 155 160

Asp Phe Asn Trp Glu Tyr Pro Ser Ser Lys His Gln His Lys Lys Leu
165 170 175

Val Asn Arg Asp Leu Lys Thr Gln Ser Gly Ser Glu Met Lys Lys Phe
180 185 190

Leu Ser Thr Leu Thr Ile Asp Gly Val Thr Arg Ser Asp Gln Gly Leu
195 200 205

Tyr Thr Cys Ala Ala Ser Ser Gly Leu Met Thr Lys Lys Asn Ser Thr
210 215 220

Phe Val Arg Val His Glu Lys Asp Lys Thr His Thr Cys Pro Pro Cys
225 230 235 240

Pro Ala Pro Glu Leu Leu Gly Gly Pro Ser Val Phe Leu Phe Pro Pro
245 250 255

Lys Pro Lys Asp Thr Leu Met Ile Ser Arg Thr Pro Glu Val Thr Cys
260 265 270

Val Val Val Asp Val Ser His Glu Asp Pro Glu Val Lys Phe Asn Trp
275 280 285

Tyr Val Asp Gly Val Glu Val His Asn Ala Lys Thr Lys Pro Arg Glu
290 295 300

Glu Gln Tyr Asn Ser Thr Tyr Arg Val Val Ser Val Leu Thr Val Leu

-continued

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 305 | | | | | 310 | | | | | 315 | | | | | 320 |
| His | Gln | Asp | Trp | Leu | Asn | Gly | Lys | Glu | Tyr | Lys | Cys | Lys | Val | Ser | Asn |
| | | | | 325 | | | | | 330 | | | | | 335 | |
| Lys | Ala | Leu | Pro | Ala | Pro | Ile | Glu | Lys | Thr | Ile | Ser | Lys | Ala | Lys | Gly |
| | | | 340 | | | | | 345 | | | | | 350 | | |
| Gln | Pro | Arg | Glu | Pro | Gln | Val | Tyr | Thr | Leu | Pro | Pro | Ser | Arg | Asp | Glu |
| | | 355 | | | | | 360 | | | | | 365 | | | |
| Leu | Thr | Lys | Asn | Gln | Val | Ser | Leu | Thr | Cys | Leu | Val | Lys | Gly | Phe | Tyr |
| | 370 | | | | | 375 | | | | | 380 | | | | |
| Pro | Ser | Asp | Ile | Ala | Val | Glu | Trp | Glu | Ser | Asn | Gly | Gln | Pro | Glu | Asn |
| 385 | | | | | 390 | | | | | 395 | | | | | 400 |
| Asn | Tyr | Lys | Thr | Thr | Pro | Pro | Val | Leu | Asp | Ser | Asp | Gly | Ser | Phe | Phe |
| | | | | 405 | | | | | 410 | | | | | 415 | |
| Leu | Tyr | Ser | Lys | Leu | Thr | Val | Asp | Lys | Ser | Arg | Trp | Gln | Gln | Gly | Asn |
| | | | 420 | | | | | 425 | | | | | 430 | | |
| Val | Phe | Ser | Cys | Ser | Val | Met | His | Glu | Ala | Leu | His | Asn | His | Tyr | Thr |
| | | 435 | | | | | 440 | | | | | 445 | | | |
| Gln | Lys | Ser | Leu | Ser | Leu | Ser | Pro | Gly | Lys | | | | | | |
| | 450 | | | | | 455 | | | | | | | | | |

We claim:

**1**. A vial comprising an ophthalmic formulation suitable for intravitreal administration that comprises:

a vascular endothelial growth factor (VEGF) antagonist an organic co-solvent,

a buffer, and

a stabilizing agent,

wherein said VEGF antagonist fusion protein is glycosylated and comprises amino acids 27-457 of SEQ ID NO:4; and

wherein at least 98% of the VEGF antagonist is present in native conformation following storage at 5° C. for two months as measured by size exclusion chromatography.

**2**. The vial of claim **1**, wherein the concentration of said VEGF antagonist fusion protein is 40 mg/ml, and wherein said organic co-solvent comprises polysorbate.

**3**. The vial of claim **2**, wherein said organic co-solvent comprises 0.01% to 3% polysorbate.

**4**. The vial of claim **2**, wherein said organic co-solvent comprises about 0.03% to about 0.1% polysorbate 20.

**5**. The vial of claim **2**, wherein said organic co-solvent comprises 0.01% to 3% polysorbate 20.

**6**. The vial of claim **5**, wherein said buffer comprises a phosphate buffer.

**7**. The vial of claim **5**, wherein said buffer comprises 5-25 mM buffer.

**8**. The vial of claim **5**, wherein said buffer comprises a pH between about 5.8-7.0.

**9**. The vial of claim **5**, wherein said buffer comprises a pH about 6.2-6.3.

**10**. The vial of claim **5**, wherein said stabilizing agent comprises a sugar.

**11**. The vial of claim **10**, wherein said sugar is selected from the group consisting of sucrose, sorbitol, glycerol, trehalose, and mannitol.

**12**. The vial of claim **5**, wherein said stabilizing agent comprises 1.0-7.5% of sucrose.

**13**. The vial of claim **5**, wherein said formulation further comprises a tonicity agent.

**14**. The vial of claim **5**, wherein said VEGF antagonist fusion protein is glycosylated at asparagine residues corresponding to asparagine residues 62, 94, 149, 222 and 308 of SEQ ID NO: 4.

**15**. The vial of claim **5**, wherein said formulation is capable of providing a turbidity of 0.01 or lower at $OD_{405}$ after 2 month storage at 5° C.

**16**. The vial of claim **5**, wherein at least 99% of said VEGF antagonist fusion protein is present in native conformation after 2 month storage at 5° C. as measured by size exclusion chromatography.

**17**. The vial of claim **5**, wherein at least 98% of said VEGF antagonist fusion protein is present in native conformation following storage at 5° C. for 24 months as measured by size exclusion chromatography.

**18**. The vial of claim **5**, wherein said formulation does not contain phosphate.

**19**. The vial of claim **5**, wherein said formulation does not contain trehalose.

**20**. The vial of claim **5**, wherein said stabilizing agent comprises 1.0-10% of sucrose.

**21**. The vial of claim **20**, wherein said formulation further comprises a tonicity agent.

**22**. The vial of claim **20**, wherein said VEGF antagonist fusion protein is glycosylated at asparagine residues corresponding to asparagine residues 62, 94, 149, 222 and 308 of SEQ ID NO: 4.

**23**. The vial of claim **20**, wherein said formulation is capable of providing a turbidity of 0.01 or lower at $OD_{405}$ after 2 month storage at 5° C.

**24**. The vial of claim **20**, wherein at least 99% of said VEGF antagonist fusion protein is present in native conformation after 2 month storage at 5° C. as measured by size exclusion chromatography.

**25**. The vial of claim **20**, wherein at least 98% of said VEGF antagonist fusion protein is present in native conformation following storage at 5° C. for 24 months as measured by size exclusion chromatography.

**26**. A pre-filled syringe comprising an ophthalmic formulation suitable for intravitreal administration comprising:

a vascular endothelial growth factor (VEGF) antagonist fusion protein,

an organic co-solvent,

a buffer, and

a stabilizing agent;

wherein said VEGF antagonist fusion protein is glycosylated and comprises amino acids 27-457 of SEQ ID NO:4; and

wherein at least 98% of said VEGF antagonist fusion protein is present in native conformation following storage at 5° C. for two months as measured by size exclusion chromatography.

**27**. The pre-filled syringe of claim **26**, wherein the concentration of said VEGF antagonist fusion protein is 40 mg/ml, and wherein said organic co-solvent comprises polysorbate.

**28**. The pre-filled syringe of claim **27**, wherein said organic co-solvent comprises 0.01% to 3% polysorbate.

**29**. The pre-filled syringe of claim **27**, wherein said organic co-solvent comprises about 0.03% to about 0.1% polysorbate 20.

**30**. The pre-filled syringe of claim **27**, wherein said organic co-solvent comprises 0.01% to 3% polysorbate 20.

**31**. The pre-filled syringe of claim **30**, wherein said buffer comprises a phosphate buffer.

**32**. The pre-filled syringe of claim **30**, wherein said buffer comprises 5-25 mM buffer.

**33**. The pre-filled syringe of claim **30**, wherein said buffer comprises a pH between about 5.8-7.0.

**34**. The pre-filled syringe of claim **30**, wherein said buffer comprises a pH about 6.2-6.3.

**35**. The pre-filled syringe of claim **30**, wherein said stabilizing agent comprises a sugar.

**36**. The pre-filled syringe of claim **35**, wherein said sugar is selected from the group consisting of sucrose, sorbitol, glycerol, trehalose, and mannitol.

**37**. The pre-filled syringe of claim **30**, wherein said stabilizing agent comprises 1.0-7.5% of sucrose.

**38**. The pre-filled syringe of claim **30**, wherein said formulation further comprises a tonicity agent.

**39**. The pre-filled syringe of claim **30**, wherein said VEGF antagonist fusion protein is glycosylated at asparagine residues corresponding to asparagine residues 62, 94, 149, 222 and 308 of SEQ ID NO: 4.

**40**. The pre-filled syringe of claim **30**, wherein said formulation is capable of providing a turbidity of 0.01 or lower at $OD_{405}$ after 2 month storage at 5° C.

**41**. The pre-filled syringe of claim **30**, wherein at least 99% of said VEGF antagonist fusion protein is present in native conformation after 2 month storage at 5° C. as measured by size exclusion chromatography.

**42**. The pre-filled syringe of claim **30**, wherein at least 98% of said VEGF antagonist fusion protein is present in native conformation following storage at 5° C. for 24 months as measured by size exclusion chromatography.

**43**. The pre-filled syringe of claim **30**, wherein said formulation does not contain phosphate.

**44**. The pre-filled syringe of claim **30**, wherein said formulation does not contain trehalose.

**45**. The pre-filled syringe of claim **30**, wherein said stabilizing agent comprises 1.0-10% of sucrose.

**46**. The pre-filled syringe of claim **45**, wherein said formulation further comprises a tonicity agent.

**47**. The pre-filled syringe of claim **45**, wherein said VEGF antagonist fusion protein is glycosylated at asparagine residues corresponding to asparagine residues 62, 94, 149, 222 and 308 of SEQ ID NO: 4.

**48**. The pre-filled syringe of claim **45**, wherein said formulation is capable of providing a turbidity of 0.01 or lower at $OD_{405}$ after 2 month storage at 5° C.

**49**. The pre-filled syringe of claim **45**, wherein at least 99% of said VEGF antagonist fusion protein is present in native conformation after 2 month storage at 5° C. as measured by size exclusion chromatography.

**50**. The pre-filled syringe of claim **45**, wherein at least 98% of said VEGF antagonist fusion protein is present in native conformation following storage at 5° C. for 24 months as measured by size exclusion chromatography.

**51**. An ophthalmic formulation comprising:

(a) 40 mg/ml of a glycosylated VEGF antagonist fusion protein comprising amino acids 27-457 of SEQ ID NO:4;

(b) 0.03% to 0.1% polysorbate;

(c) 5-40 mM of sodium phosphate buffer, pH between 5.8-7.0; and

(d) sucrose;

wherein the ophthalmic formulation is suitable for intravitreal administration; and

wherein at least 98% of the VEGF antagonist is present in native conformation following storage at 5° C. for 2 months as measured by size exclusion chromatography.

**52**. The formulation of claim **51**, wherein said formulation comprises at least 5% sucrose.

**53**. The formulation of claim **51**, wherein said formulation comprises 1-10% sucrose.

**54**. A pre-filled syringe suitable for intravitreal administration comprising the formulation of claim **51**.

**55**. A vial suitable for intravitreal administration comprising the formulation of claim **51**.

**56**. The formulation of claim **51**, wherein said formulation comprises 10 mM sodium phosphate buffer, 0.03% polysorbate, 5% sucrose, and a pH between 6.2-6.3.

**57**. A pre-filled syringe suitable for intravitreal administration comprising the formulation of claim **56**.

**58**. A vial suitable for intravitreal administration comprising the formulation of claim **56**.

**59**. The formulation of claim **56**, wherein said formulation further comprises 40 mM NaCl.

**60**. A pre-filled syringe suitable for intravitreal administration comprising the formulation of claim **59**.

**61**. A vial suitable for intravitreal administration comprising the formulation of claim **59**.

**62**. The formulation of claim **59**, wherein said VEGF antagonist fusion protein is glycosylated at asparagine residues corresponding to asparagine residues 62, 94, 149, 222 and 308 of SEQ ID NO: 4.

**63**. A pre-filled syringe suitable for intravitreal administration comprising the formulation of claim **62**.

**64**. A vial suitable for intravitreal administration comprising the formulation of claim **62**.

* * * * *

## CERTIFICATE OF SERVICE

I certify that today, October 17, 2024, I electronically filed the foregoing Brief for Plaintiff-Appellant with the Clerk of the Court for the U.S. Court of Appeals for the Federal Circuit using the appellate CM/ECF system. Counsel of record for all parties will be served by the appellate CM/ECF system.

OCTOBER 17, 2024

/s/ David I. Berl
DAVID I. BERL

*Attorney for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE WITH TYPEFACE LIMITATION AND WORD-COUNT

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Federal Circuit Rule 32(b). This brief contains 13,938 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). This brief has been prepared in a proportionally-spaced typeface using Microsoft Word in fourteen-point CenturyExpd BT style.

/s/ David I. Berl

OCTOBER 17, 2024 DAVID I. BERL

*Attorney for Plaintiff-Appellant*

## CERTIFICATE OF CONFIDENTIAL MATERIAL

The foregoing document contains 2 unique words (including numbers) marked confidential for the first time in this filing. This number does not exceed the maximum of 15 words permitted by Fed. Cir. R. 25.1(d)(1)(A).

/s/ David I. Berl

OCTOBER 17, 2024 DAVID I. BERL

*Attorney for Plaintiff-Appellant*